Rodney G. Hoffman                                    02/14/2005

51

1        Q.   Okay.  So that was about six months earlier

2    or so?

3        A.   October of '96, effective October of '96.

4        Q.   Okay.  I've already requested copies of his

5    options.  So Mr. James's we know was different in

6    some respect.

7        A.   Yes.

8        Q.   Anyone else that was different?  So we've

9    got Mr. House's was different, and Mr. James's was

10   different in some respect, but you don't recall.

11   Anyone else?

12       A.   Not that I remember.

13       Q.   Okay.  So Nos.  2 and 3, as I look at Nos. 1

14   through 6, refer to the vesting schedule, correct?

15       A.   Yes.

16       Q.   And No. 4 then says, "If an employee resigns

17   or is terminated, unvested options terminate."

18       A.   That's what it says.

19       Q.   Which means -- and you understood that

20   vested options remained with the employee, correct?

21   If they were vested, they weren't impacted by

22   resignation or termination, correct?

23                  MR. DeMOURA:  Objection.

24       A.   That's what's written, but it's incorrect.

Rodney G. Hoffman                                    02/14/2005

52

1       Q.   That's what's written, but it's incorrect?

2       A.   Yes.

3       Q.   How is it incorrect?

4       A.   Because it implies -- it does not go on to

5    state the three-month.

6       Q.   No, it certainly does not.

7       A.   It does not.

8       Q.   That was just an error when you put that in?

9       A.   Yes.

10       Q.   When you made your presentation, did you say

11    to the assembled multitude, "Hey, gang, I didn't

12    write it down here, I forgot, but if you resign, you

13    have three months to exercise"?

14            I'm sure I don't have to do this, Mr.

15    Hoffman, but do you understand you're under oath?

16       A.   Yes, I understand.  Please -- just --

17    please.

18       Q.   That's for the record, Mr. Hoffman.  So you

19    can tell me if you remember whether or not you

20    indicated in the meeting that you had omitted that

21    piece?

22       A.   I don't remember.

23       Q.   Okay.  And in fact, No. 6 says the options

24    must be exercised within 10 years of the date of

Rodney G. Hoffman                                          02/14/2005

53

1    grant.  Do you see that?

2        A.  Yes.

3        Q.  That refers to vested options, correct?

4        A.  Yes.

5        Q.  Or that portion of options that are vested?

6        A.  That restates another requirement of Section

7    422.

8        Q.  Okay.  But it doesn't say "must be exercised

9    within ten years of the date of grant unless in the

10   event of termination you have three months"?

11       A.  It does not say that.

12       Q.  That was just an omission from this --

13       A.  Yes, it was a mistake.

14       Q.  It was a mistake.  Did you point out that

15   mistake?

16       A.  I don't believe I got into that level of

17   detail when I went through the presentation.

18       Q.  Okay.  Did anyone ask any questions, so far

19   as you can recall, at the meeting that reflected on

20   the three-month exercise period?  Do you remember

21   that coming up at the meeting?

22       A.  I don't.

23       Q.  Was Mr. House at the meeting?

24       A.  My recollection is that everybody from both

Rodney G. Hoffman                                                02/14/2005

62

1    for purposes of a presentation to a group of

2    employees?

3        A.   I don't believe so.

4        Q.   Now, I know you've said that it was a

5    mistake not to -- you've testified it was a mistake

6    not to reference the three-month period, Mr.

7    Hoffman.

8        A.   Yes.

9        Q.   Other than it being a mistake, was there

10   some reason why you omitted that from the

11   memorandum, or was it simply a mistake?

12       A.   It was a mistake.

13       Q.   Prior to today, have you ever pointed out

14   that mistake to anyone?

15             MR. DeMOURA:   Objection.   Instruct the

16   witness not to answer the question if it relates to

17   attorney-client communications.

18             MR. WANG:   Well, I don't know what

19   advice is being requested.

20       Q.   When did it -- better question.

21             When did it first occur to you that you

22   had made a mistake by not including that provision

23   in the memorandum?

24       A.   I don't know.   I just can't remember.

Rodney G. Hoffman                                      02/14/2005

63

1        Q.   Well, was it within the last couple of

2    weeks?

3        A.   No.  It was before.

4        Q.   Was it before Mr. House had made his claim?

5        A.   Yes.

6        Q.   So sometime before -- I'm sorry?

7        A.   Yes.

8        Q.   Your best recollection is it was sometime --

9        A.   It would be before, yes.

10       Q.   Was it at or about 1997?

11       A.   There's a distinction I draw between when I

12   knew it was incorrect and -- when I knew what the

13   law was and when I looked at the memo to

14   determine -- and determined that the memo misstated

15   it.  I knew the law before.

16       Q.   Because it's in the plan.

17       A.   Right.

18       Q.   And it's in the grant.

19       A.   Yes.

20       Q.   It's referenced in the grant.  So presumably

21   you were aware of the law?

22       A.   Yes.

23       Q.   But the memo doesn't include it?

24       A.   That's correct.

Rodney G. Hoffman                                           02/14/2005

64

1      Q.  So my question really is when you realized

2   that the memo was in error.  When did that first

3   come to your attention?

4      A.  I don't know.

5      Q.  Well, when you say -- was it at or about the

6   time that the memo was distributed?  I don't want

7   you to guess, Mr. Hoffman.

8      A.  I'm just trying to come up with a hook.

9      Q.  Let me offer a hook for you, and see if it

10  helps you.  Was there any occasion for you after

11  July 7th to look at the memorandum, other than in

12  connection with your deposition today?

13     A.  This memo came up when Mr. House --

14     Q.  Right.

15     A.  -- raised his claim.

16     Q.  I understand that.

17           Mr. Hoffman, let's try to see if we can

18  track this.  I thought you had testified earlier

19  that the fact that it was a mistake came to your

20  attention before Mr. House raised his claim.  If I'm

21  mistaken, tell me I'm mistaken.

22     A.  Yes.

23     Q.  I see.  So it was after Mr. House made his

24  claim that it occurred to you that it was a mistake?

Rodney G. Hoffman                                    02/14/2005

65

1          A.   Again, I'm drawing a distinction between

2     when I knew that the law was the law and when I knew

3     that the words in the memo were -- the statement in

4     the memo was not complete.   It may well have been at

5     the time.

6          Q.   What time?

7          A.   At about the time.

8          Q.   That Mr. House made his claim?

9          A.   No, at about the time of the meeting, at the

10    time of the memo.

11         Q.   I think we're getting lost, and I want to

12    make sure that we have a clear record.   You always

13    understood what the law was.

14         A.   Yes.

15         Q.   When I say "always," when you did this work.

16    We've got that pretty established.

17         A.   Yes.

18         Q.   You wrote the memo that has, as you

19    testified today, a mistake or an error in it.

20         A.   Yes.

21         Q.   I've asked you when you realized the memo

22    had the mistake; not with reference to when you

23    understood the law, when it first came to your

24    attention that the memo had the mistake.   And I

Rodney G. Hoffman                                    02/14/2005

66

1    simply want to know whether or not that came to your

2    attention for the first time at or about the time

3    that you understood Mr. House was making a claim or

4    some other time?

5              MR. DeMOURA:  Objection.

6       Q.  Okay.  You may answer.  That's not a

7    direction not to answer.

8              MR. DeMOURA:  I'll tell you when you

9    should not answer the question.

10      A.  I'm sorry.

11      Q.  Sure.  I'll do it again.  I'll do it again.

12             I'm interested in finding out when you

13   first realized that the memo had the mistake.

14             MR. DeMOURA:  Objection.

15      A.  It was before -- withdrawn.

16             I think it was shortly after the

17   meeting.

18      Q.  Okay.  Now, what occurred shortly after the

19   meeting to cause you to realize that you had made a

20   mistake?

21             MR. DeMOURA:  Objection.

22      A.  I think I reread the memo.

23      Q.  For a particular purpose?

24      A.  I like to reread my writing.

Rodney G. Hoffman                                    02/14/2005

67

1        Q.   Good for you.  And so your best recollection

2    is for some reason you were looking back over the

3    memo, and you said to yourself, "I left something

4    out.  I made a mistake"?  Is that your best

5    recollection?

6        A.   That's my best recollection.

7        Q.   Did you tell anyone that you had made a

8    mistake?

9             MR. DeMOURA:  Again, caution the witness

10   not to answer the question if it involves

11   attorney-client communications.

12            MR. WANG:  It's not for giving advice.

13       Q.   Did you alert anybody to the mistake?

14            MR. DeMOURA:  I disagree with you.

15       Q.   Just yes or no, did you alert anyone to the

16   mistake?

17            MR. DeMOURA:  I'm going to instruct him

18   not to answer.  That would be revealing whether

19   there was an attorney-client communication.

20            MR. WANG:  Mr. DeMoura, direct as you

21   want to direct.  Again, I've pointed out that --

22            MR. DeMOURA:  I know.  We disagree.

23            MR. WANG:  -- I'm sure that that option

24   is not well taken, but I don't have the wherewithal

Rodney G. Hoffman                                                02/14/2005

68

1    to force you to reconsider it.

2        A.  I won't answer the question.

3        Q.  Did you write any supplement to the memo?

4        A.  Yes.

5        Q.  And to whom did you distribute the

6    supplement?

7        A.  It would have gone to the company.

8        Q.  And did it correct the mistake?

9        A.  Yes.

10       Q.  The answer's yes?

11       A.  Yes.

12       Q.  Approximately how long after the original

13   memo, July 7, 1997, did this supplement come out?

14   Approximately.  Months?  Weeks?  Years?

15       A.  Not years.

16       Q.  So months, months or weeks?

17       A.  Months or weeks.

18              MR. WANG:  Mr. DeMoura, I am certain

19   that hasn't been produced, any supplement.

20              MR. DeMOURA:  You're right.  I have not

21   produced it.

22              MR. WANG:  Is that for some reason?

23              MR. DeMOURA:  Because it's an

24   attorney-client communication.

Rodney G. Hoffman                                    02/14/2005

69

1              MR. WANG:  He said that he --

2              MR. DeMOURA:  He did not distribute it

3    to the employees.

4              MR. WANG:  He said it was submitted to

5    the company for purposes of distribution.

6              MR. DeMOURA:  That's not what he said at

7    all.

8              MR. WANG:  Okay.

9              MR. DeMOURA:  He said he delivered it to

10   the company.

11             MR. WANG:  Okay.

12      Q.  Did you have any discussion with anyone at

13   the company about the fact that you had made that

14   mistake in the memorandum?

15             MR. DeMOURA:  Again, I would instruct

16   the witness not to --

17             MR. WANG:  I'm just asking for the

18   person he had a discussion with, not for any advice.

19             MR. DeMOURA:  You're asking about the

20   subject.

21             MR. WANG:  It's the general subject

22   matter.  He's already testified that he sent a

23   memorandum to the company pointing out the mistake,

24   so I want to know if he had a discussion.

Rodney G. Hoffman                                    02/14/2005

70

1          MR. DeMOURA:  I disagree that that's the

2    testimony he gave, but I'll let him answer this

3    question.  Did you have any discussions with

4    anybody, is that what the question was?

5          MR. WANG:  Yes.

6       Q.  On that general subject.

7       A.  I'm certain I would have, but I don't

8    remember specifically.

9       Q.  Or with whom?

10      A.  I don't remember.

11      Q.  Was there some individual with whom you

12   discussed matters involving the stock options?

13      A.  It would most likely be Mr. James.

14      Q.  Mr. James?

15      A.  I believe that's correct.  Let me just say,

16   later on I always discussed these matters with Mr.

17   James.  I don't have a specific recollection --

18      Q.  I see, at that time.

19      A.  -- this time because he was relatively new

20   at the company.

21      Q.  Did you conclude not to distribute the

22   supplement that you referred to to employees who had

23   received the earlier memorandum?

24      A.  I did not.

Rodney G. Hoffman                                           02/14/2005

71

1        Q.  Did you understand that the supplement was

2   going to be distributed?

3                MR. DeMOURA:  Objection.  Instruct the

4   witness not to answer.

5        Q.  Did you intend that that supplement --

6   withdrawn.

7                Exhibit 3 that we're looking at was

8   intended for distribution to employees of First

9   Marblehead, right?

10       A.  Yes.

11       Q.  In fact, it's addressed that way.

12       A.  Yes.

13       Q.  Did you intend for the supplement to be

14   similarly distributed?

15       A.  Yes.

16               MR. WANG:  Okay.  Mr. DeMoura, I'm

17  telling you I think this is a dangerous invocation

18  of privilege on your part.  I would really urge you

19  to reconsider it in light of the testimony.

20               Let's just take a couple-of-minutes

21  break.

22               (Recess taken)

23     BY MR. WANG:

24       Q.  Mr. Hoffman, have you ever appeared -- made