UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE FIRST MARBLEHEAD
CORPORATION
    Plaintiff

v

GREGORY J. HOUSE
    Defendant

CIVIL ACTION NO. 04-11263PBS

## PLAINTIFF'S APPENDIX IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In further support of its motion for summary judgment, the plaintiff, The First

Marblehead Corporation, submits the attached documents:

| Tab | Description |
|-----|-------------|
| A | Deposition Transcript of Gregory House (entire transcript) |
| B | Plaintiff's Responses to Defendant's First Set of Interrogatories |
| C | Deposition Transcript of Steven Anbinder (pages 30, 38) |
| D | Anbinder Deposition Exhibit 1-The First Marblehead Corporation 1996 Stock Option Plan |
| E | Deposition Transcript of Rodney Hoffman (pages 43-45; 48-49; and 76-77) |
| F | Hoffman Deposition Exhibit 1-Consent of Stockholders in Lieu of Meeting dated March 4, 1997 |
| G | Deposition Transcript of Ralph James (pages 44-45; 55; 59-60; and 63–67) |
| H | James Deposition Exhibit 4- Compensation Review for Gregory House (June 1997) |
| I | James Deposition Exhibit 2-Memorandum from Ralph James to FMC Staff dated July 7, 1997. |

J      James Deposition Exhibit 3- July 7, 1997 Memorandum from Rodney G. Hoffman to All Employees

Respectfully submitted,

THE FIRST MARBLEHEAD CORPORATION
By its attorneys

/s/ Kenneth J. DeMoura
Kenneth J. DeMoura (BBO#548910)
ADLER POLLOCK & SHEEHAN, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 482-0600

Dated: July 1, 2005

**TAB A**

1

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF MASSACHUSETTS

4  Civil Action No. 04-11263PBS

5  -------------------------------------x

6  FIRST MARBLEHEAD CORP.,

7                          Plaintiff,

8         - against -

9  GREGORY HOUSE,

10                         Defendant.

11 -------------------------------------x

12                         March 2, 2005

                           10:00 a.m.

13

14         DEPOSITION of GREGORY HOUSE,

15 taken by the Plaintiff, pursuant to

16 Notice, held at the offices of Foley &

17 Lardner, 90 Park Avenue, New York, New

18 York, before Debbie Zaromatidis, a

19 Shorthand Reporter and Notary Public of

20 the State of New York.

21

22

23

24

25

**2**

```
 1
 2   A P P E A R A N C E S :
 3
 4   ADLER POLLOCK & SHEEHAN, P.C.
 5   Attorneys for Plaintiff
 6       175 Federal Street
 7       Boston, Massachusetts 02110
 8   BY:  KENNETH J. DEMOURA, ESQ.
 9
10
11   FOLEY & LARDNER, LLP
12   Attorneys for Defendant
13       90 Park Avenue
14       New York, New York 10016-1314
15   BY:  PETER WANG, ESQ.
16       YONATON ARONOFF, ESQ.
17
18   ALSO PRESENT:
19       DONALD R. PECK, First Marblehead Corp.
20
21
22
23
24
25
```

**3**

```
 1                    HOUSE
 2   G R E G O R Y   H O U S E,
 3   having first been duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY MR. DEMOURA:
 7       Q.   Good morning, Mr. House. My
 8   name is Kenneth Demoura, and I represent
 9   First Marblehead Corporation in this case.
10       Have you ever been deposed
11   before?
12       A.   No.
13       Q.   During the course of today's
14   deposition, the court reporter is going to
15   take down anything that is said in the
16   room by anybody, so just a few quick
17   ground rules first.
18       Let's try to make sure that I
19   wait until you finish speaking and you
20   wait until I finish speaking because the
21   court reporter has a hard time putting us
22   both down together. Okay.
23       A.   Agreed.
24       Q.   Second is that all of your
25   answers need to be verbal as opposed to a
```

**4**

```
 1                    HOUSE
 2   nod of the head because those are also
 3   difficult for the court reporter to
 4   interpret, and sometime later if we have
 5   to use the transcript we won't know what
 6   your answer was. Okay?
 7       A.   Fair enough.
 8       Q.   Mr. House, what is your current
 9   residential address?
10       A.   1 River Court, Apartment
11   911 -- 1911, Jersey City, New Jersey.
12       Q.   And how long have you lived
13   there?
14       A.   Since June of last year.
15       Q.   Do you own or rent?
16       A.   I rent.
17       Q.   Are you married, sir?
18       A.   No.
19       Q.   Do you live with anybody other
20   than yourself?
21       A.   No.
22       MR. WANG:  You don't have to
23   answer that, but he already did.
24       Q.   And who is your current
25   employer?
```

**5**

```
 1                    HOUSE
 2       A.   Angelo Gordon & Company.
 3       Q.   What is Angelo Gordon & Company?
 4       A.   It is commonly called a hedge
 5   fund.
 6       Q.   Where are they located?
 7       A.   245 Park Avenue in New York.
 8       Q.   How long have you been employed
 9   at Angelo Gordon?
10       A.   Since August 4, 2003.
11       Q.   What is your position at Angelo
12   Gordon?
13       A.   Angelo Gordon doesn't really
14   have titles as strange as that may sound.
15       Q.   You said that there are no
16   titles at Angelo Gordon.
17       What are your job
18   responsibilities?
19       A.   I am in risk management. We are
20   a hedge fund with a variety of financial
21   activities. Let me correct this. I think
22   that Mr. Angelo would have a problem with
23   me describing our firm as a hedge fund. I
24   think he describes it as an alternative
25   investment company.
```

6

HOUSE

1
2    So my expertise is in pricing
3    securities, and that is pretty much what I
4    do. I figure out where our risk lies, how
5    much we can make, how much we can lose and
6    so forth.
7        Q.    And when you say your expertise
8    is in pricing securities, can you tell me
9    what type of securities you price for
10   Angelo Gordon?
11       A.    All types but I would say
12   where -- where I differentiate myself is
13   in the area of fixed income securities and
14   derivatives.
15       Q.    And would the securities pricing
16   work that you do for Angelo Gordon include
17   pricing of any stock options?
18       A.    Yes.
19       Q.    What types of stock options
20   would that include?
21       A.    Well, we have a variety. I am
22   not sure what your level of understanding
23   is of -- about the subject, but options
24   can be listed. They can be essentially
25   warrants. They can be relatively

7

HOUSE

1
2    long-term options that are differentiated
3    from listed options only in that they are
4    not listed. They can be short-term
5    options. They can be any -- any number of
6    things. Typically what I do is -- in that
7    realm is our activities have declined in
8    that area recently for other reasons, but
9    we use a variety of option modeling
10   techniques, and that is what I do is write
11   computer code to do that essentially.
12       Q.    All right.
13            Would the options that you
14   currently work on pricing for Angelo
15   Gordon include options known as incentive
16   stock options?
17       A.    No.
18       Q.    Do you know what incentive stock
19   options are?
20       A.    Yes, I have a vague idea. I
21   mean that to me is a legal term, and that
22   is not my area of expertise in what I do.
23       Q.    Okay.
24       A.    Options to me are -- have
25   characteristics that can be mathematically

8

HOUSE

1
2    modeled. Legal characteristics cannot be
3    mathematically modeled.
4        Q.    Since August of 2003 when you
5    joined Angelo Gordon, have any of your
6    responsibilities changed?
7        A.    Broadly, no.
8        Q.    How about specifically?
9        A.    Of course. I am -- I have been
10   there for a year and a half. I think I do
11   different things from day to day. Can you
12   be more specific? I am kind --
13       Q.    Well, you essentially said, as I
14   understand it, your primary job
15   responsibility there is to provide
16   expertise to Angelo Gordon in the area of
17   pricing various securities, correct?
18       A.    Um hum.
19       Q.    You have to answer yes or no. I
20   am sorry.
21       A.    Yes. I am sorry.
22       Q.    And I wanted to know other than
23   pricing securities is there any other job
24   responsibility that you have at Angelo
25   Gordon?

9

HOUSE

1
2        A.    When you say job responsibility,
3    is there anything that I -- that I have
4    done differently from day one. Sure. Is
5    it a job responsibility? I am not sure I
6    would describe it as that.
7        Q.    Okay.
8        A.    It is --
9        Q.    Other than pricing securities,
10   what else do you do for Angelo Gordon?
11       A.    Talk to people. It is an
12   investment firm, and I have a number of
13   skills that maybe are valuable to other
14   people, but it is not -- I wouldn't call
15   it a job responsibility to talk to people
16   and advise them how to do certain things
17   and that sort of -- it is just other
18   things that I do. It is not a job
19   responsibility. I mean --
20       Q.    And those are jobs -- the people
21   you talk to, are they internal employees
22   of Angelo Gordon?
23       A.    Yes.
24       Q.    As opposed to the investors who
25   might be --



10

HOUSE

1
2    A.    I can't recall ever talking to
3  an investor at Angelo Gordon.
4    Q.    Okay.
5         Prior to working at Angelo
6  Gordon, where were you employed?
7    A.    I was self-employed in Denver,
8  Colorado. I was renovating a home into
9  a -- it was actually a -- an investment
10  property. It was a commercial structure,
11  and it was a Victorian home that had long
12  since been converted into a rental
13  structure, and I was doing that for a
14  living.
15    Q.    Okay.
16         And how -- when did you start
17  doing that?
18    A.    April 27, 2000 I believe was the
19  closing date.
20    Q.    So you bought a victorian home
21  in April of 2000 in Denver, Colorado for
22  the purposes of doing renovation work
23  and --
24    A.    Um hum.
25    Q.    -- and using it for investment?

11

HOUSE

1
2    A.    Converting it into a condominium
3  structure and selling it. I still own it.
4    Q.    Did you do that?
5    A.    I am sorry?
6    Q.    Did you do that?
7    A.    I still own it.
8    Q.    And so you did that for -- for
9  almost three years, correct? Over three
10  years?
11    A.    Um hum. Yes.
12    Q.    And prior to that, what did you
13  do?
14    A.    I was employed at ABN Amro Bank
15  in Chicago.
16    Q.    What did you do there?
17    A.    Similar tasks to what I am doing
18  now actually. I wouldn't describe it as
19  being all that different.
20    Q.    You provided ABN Amro with
21  expertise in the pricing of securities?
22    A.    Um hum. They were a bank --
23    Q.    You have to say yes or no.
24  Sorry.
25    A.    Yes, they were a bank

12

HOUSE

1
2  substantially involved in substantial ways
3  similar to a hedge fund. I mean it is --
4    Q.    Alternative investments?
5    A.    They would characterize it
6  differently, but the investment world is a
7  pretty fungible place. There are
8  -- different kinds of firms do similar
9  things. We all invest and all spend money
10  on securities, and we want to know what
11  they are worth, and so my activities were
12  substantially the same -- from my
13  standpoint they were substantially the
14  same as they are now at Angelo Gordon.
15    Q.    Now, I know from your reviewing
16  your interrogatory responses that you
17  worked at Amro, ABN Amro from March of
18  1998 to September of 1999.
19         Did you do anything between
20  September of 1999 and April of 2000 when
21  you bought the --
22    A.    Yes, I shopped for that
23  victorian home. It was a fairly arduous
24  task.
25    Q.    When you were at ABN Amro from

13

HOUSE

1
2  March '98 to September '99, where were
3  you -- where were your offices?
4         MR. WANG:  He said Chicago.
5         MR. DEMOURA:  He did. I am
6  sorry. I didn't hear him.
7    A.    Yes, 181 West Madison I believe
8  from memory.
9    Q.    Why did you leave Amro?
10    A.    I was fired.
11    Q.    And why were you fired?
12    A.    I had a difference with a guy
13  who has since been fired from the same
14  activities I believe.
15    Q.    Difference with a guy?
16    A.    Um hum.
17    Q.    Who was the guy?
18    A.    Ron Davidson.
19    Q.    Was that your superior?
20    A.    Yes.
21    Q.    And what was the difference?
22    A.    He used some profanity in my
23  presence and directed at me, and I went to
24  the human resources department at the bank
25  and conveyed to them that this wasn't the

14

```
1              HOUSE
2   first time, and he had an ally that was
3   his boss, and his boss decided to fire me.
4       Q.    And that was in September 1999?
5       A.    Yes.
6       Q.    Did you take any legal action as
7   a result of the termination?
8       A.    No.
9       Q.    You started at Amro according to
10  your answers to interrogatories in March
11  of 1998.
12            Can you tell me how long prior
13  to the date you were hired in March of
14  1988 had you been in discussions with ABN
15  Amro about going to work for them?
16      A.    I would say two weeks. My
17  memory is not perfect, but it wasn't a lot
18  more than that.
19      Q.    Did any -- according to your
20  interrogatory responses your last date of
21  employment at First Marblehead Corporation
22  was in March of 1998, and your first day
23  of employment at ABN Amro was in March of
24  1998.
25            Were any of the discussions that
```

15

```
1              HOUSE
2   you had with ABN Amro in March of 1998 at
3   the same time you were still employed with
4   First Marblehead?
5       A.    Of course. I believe that -- my
6   memory is not perfect, but I believe that
7   my last day at First Marblehead was a
8   Friday, and my first day at ABN Amro was
9   the following Monday.
10      Q.    While you were at ABN Amro, did
11  any of your job responsibilities -- did
12  you do anything other than provide
13  expertise in pricing securities?
14      A.    Sure. I would answer that the
15  same way I answered the question about
16  Angelo Gordon. I am a reasonably capable
17  guy, and I get sought after by other
18  people to do other things, and of course I
19  talk to them and advise them and so forth.
20  But would I call them job
21  responsibilities? Probably not.
22      Q.    But you were available to others
23  internally to discuss various issues that
24  would come up that might be within your
25  area of expertise?
```

16

```
1              HOUSE
2       A.    Sure.
3       Q.    Okay.
4             Who hired you at ABN Amro?
5       A.    A guy named David Reiner. I
6   believe that is R-E-I-N-E-R. It might be
7   reversed.
8       Q.    Okay.
9             Let's talk a little bit about
10  the circumstances surrounding your leaving
11  of First Marblehead Corporation, since
12  that is the next company that you list on
13  your interrogatories as having worked for.
14      A.    Okay.
15      Q.    Do you remember the date that
16  you -- that you left First Marblehead?
17      A.    The exact date, no.
18      Q.    Do you recall the -- anything
19  about the day that you left First
20  Marblehead, being out of the company?
21      MR. WANG:   What day of the
22  week?
23      MR. DEMOURA:   No, I mean that
24  particular day. I don't care what day of
25  the week it was.
```

17

```
1              HOUSE
2       A.    Well, my leaving First
3   Marblehead was a period of time. I
4   announced I was leaving, and there -- I
5   was there for two weeks following that. I
6   gave two weeks notice. They accepted
7   that.
8       Q.    You gave two weeks notice?
9       A.    Yes.
10      Q.    Who did you give two weeks
11  notice to?
12      A.    I believe it would be Dan and
13  Ralph in the same conversation. I
14  remember some of that, and I don't
15  remember the exact date, but Dan and Ralph
16  were both there. Dan Meyers and Ralph
17  James. Sorry.
18      Q.    Did you do that in writing or
19  verbally?
20      A.    Verbally. I believe that I sent
21  a letter also, but I don't think it was at
22  that time. It might have been much later.
23  Almost certainly it was much later,
24  several days later, but the conversation
25  where I announced I was leaving was a
```

18

HOUSE

1
2 conversation, not a letter.
3    Q.   Do you remember where that
4 conversation took place?
5    A.   Dan's office at Little Harbor.
6 I don't remember that address. At Little
7 Harbor.
8    Q.   In Marblehead?
9    A.   Yes.
10    Q.   As best as you can recall, can
11 you tell me the substance of the
12 conversation that you had with Dan Meyers
13 and Ralph James --
14    A.   Yes.
15    Q.   -- when you announced that you
16 were leaving the company?
17    A.   Yes, it was relatively
18 congenial. I said I have received an
19 offer to go back to the bank I worked at
20 before I came here. I think I will leave.
21 Ralph's reply -- I don't remember anything
22 about Dan's reply. Ralph's reply was is
23 there anything we can do to keep you, and
24 I replied to that I don't think you are
25 going to pay me a quarter of a million

19

HOUSE

1
2 dollars Ralph. So, no, but it was -- it
3 was not a contentious conversation. It
4 was friendly. More than friendly, it
5 was -- they were -- they seemed to be
6 wishing me well.
7    Q.   Did you leave First Marblehead
8 because the offer that you got from your
9 prior employment ABN Amro was better
10 financially for you?
11    A.   Yes, I believed it was.
12    Q.   To the tune of a quarter million
13 dollars?
14    A.   It --
15       MR. WANG:   Don't answer what
16 the specifics were. That is not your
17 business, Mr. Demoura. Don't answer his
18 question. When I say don't answer, don't
19 answer. Ask your next question.
20    Q.   Okay.
21       You said a few seconds ago that
22 one of the things Mr. James said was is
23 there anything we can do to keep you,
24 correct?
25    A.   Yes.

20

HOUSE

1
2    Q.   And your response to him was not
3 unless you can offer me a quarter of a
4 million dollars, correct?
5       MR. WANG:   Actually, you did
6 not accurately summarize what he said.
7       MR. DEMOURA:   Let him tell me
8 that.
9       MR. WANG:   Don't put words in
10 his mouth.
11       MR. DEMOURA:   All you are
12 supposed to do is say objection. He can
13 answer the question.
14       MR. WANG:   I think I am obliged
15 to also point out when you fairly badly
16 misconstrue something he said not more
17 than three minutes ago.
18    Q.   Why don't you tell me what it
19 was that you said in response to Mr. James
20 when he said is there anything we can do
21 to keep you?
22    A.   I said I don't think so, Ralph,
23 because I don't think you are going to pay
24 me a quarter of a million dollars. I
25 don't know if the words were exactly that,

21

HOUSE

1
2 but the number was that, and the substance
3 was that.
4    Q.   Okay.
5       Do you recall anything else
6 about the conversation that you had --
7    A.   No.
8    Q.   -- where you announced you were
9 leaving?
10    A.   No. I remember the tone of the
11 conversation. I don't remember the words
12 or the -- any more of the substance than
13 that.
14    Q.   And your testimony is that as
15 far as you were concerned the tone was
16 cordial?
17    A.   Absolutely.
18    Q.   And at that time, did you also
19 tell them what date you expected would be
20 your last date at First Marblehead?
21    A.   I don't think I probably phrased
22 it as you said. I said I will give you
23 two weeks notice, and they accepted it.
24    Q.   In other words, that day they
25 accepted the two week's notice?

22

HOUSE

1
2    A.    Right.
3    Q.    And did -- I am sorry.
4    A.    You asked me a question a while
5    ago about how long it was between the time
6    I went to ABN Amro and the time I left
7    First Marblehead, and I said that my
8    negotiation period with ABN Amro was a
9    two-week period or not much more than
10   that.
11   Q.    Right.
12   A.    I think that that was
13   probably -- I probably answered it -- the
14   way you understood the answer was that it
15   was prior to the date that I left.  I
16   meant it was two weeks prior to the date
17   that I announced it.
18   Q.    No, I took it to mean that
19   before you decided to leave First
20   Marblehead you had had discussions with
21   ABN Amro.
22   A.    Right.
23   Q.    For about two weeks before that,
24   correct?
25   A.    It was a short period of time.

23

HOUSE

1
2    Q.    Okay.
3    A.    And I announced I was leaving,
4    and then two weeks later I left.
5    Q.    So you did continue to work at
6    First Marblehead for the next two weeks?
7    A.    Yes, I continued to instruct
8    people on what I was -- what they had to
9    do that I had been doing and so forth.
10   Q.    And do you recall the last day
11   you were at First Marblehead?
12   A.    Um hum.  I don't recall what day
13   it was or what day of the week it was or
14   what date it was, but I recall some things
15   about it.
16   Q.    Okay.
17         What do you recall about it?
18   A.    I recall being angry and leaving
19   in anger.
20   Q.    Do you remember -- did you have
21   any discussions with anybody?
22   A.    Probably but I don't remember
23   any -- any of the substance.  I just
24   remember the anger.
25   Q.    Why were you angry?

24

HOUSE

1
2    A.    There was an issue over the firm
3    owing me money that had been stewing for
4    several weeks as a matter of fact, and I
5    became exasperated with what I would
6    characterize as the folliness about it,
7    and I got angry and probably had some
8    angry words and left.
9    Q.    Who did you get angry at?
10   A.    I believe it was Dan.
11   Q.    Dan Meyers?
12   A.    Yes.
13   Q.    Did you have a discussion with
14   Mr. Meyers that day?
15   A.    Undoubtedly but I can't remember
16   the -- what it was about.  I can remember
17   what it was about, but I can't remember
18   the conversation itself.  I remember I was
19   mad, and he was mad.  If I could tell you
20   more I would, but I can't.  I can't
21   remember --
22   Q.    Did you storm out of the offices
23   that day?
24   A.    It is fair to characterize it as
25   that, yes.

25

HOUSE

1
2    Q.    And was that the last day you
3    were ever at First Marblehead's offices?
4    A.    I believe that day was a Friday,
5    and that was the last day I was there.
6    Q.    Had you already cleaned out your
7    desk and taken all your personal
8    belongings home?
9    A.    I don't recall but probably,
10   yes.
11   Q.    Do you recall anything else
12   about that day?
13   A.    No.
14   Q.    I may have asked you this
15   already.
16         Can you recall anything about
17   the conversation that you had with Mr.
18   Meyers and Mr. James on the date that you
19   told them that you were giving your two
20   weeks notice?
21   A.    No.
22   Q.    During the period of time
23   between the day you gave your notice and
24   the time you actually left, were there
25   any -- did you have any discussions with

26

1          HOUSE
2  anybody from the human resources office
3  about your benefits or COBRA or any of
4  those sorts of issues?
5      A.    I don't know that First
6  Marblehead had a human resources office.
7  I wouldn't know who that would have been.
8      Q.    Okay.
9          Fair to say at the time it was a
10 fairly small company?
11     A.    Um hum.
12     Q.    You have to say yes or no.
13 Sorry.
14     A.    Yes.  Yes.  I am sorry.
15     Q.    Well, then the same question
16 except take out the part about human
17 resources.
18         Did you have any discussions
19 with anybody at First Marblehead from the
20 day you gave your notice until the day you
21 left about your benefits and whether those
22 would continue for a period of time or any
23 of those discussions?
24     A.    No.
25     Q.    You've left other positions

27

1          HOUSE
2  before, correct?
3      A.    Yes.
4      Q.    And you are familiar with what
5  is known as an exit interview?
6      A.    I know what -- I know the
7  phrase.
8      Q.    Okay.
9      A.    I can't remember ever having
10 one.
11     Q.    Okay.
12         So have you ever when you have
13 left a position had anybody sit down and
14 talk to you about COBRA, for example, you
15 know, the continuation of your health
16 insurance benefits?
17     A.    No, I have not had that
18 discussion.  I think I remember when I
19 left ABN Amro the second time I think I
20 remember getting a letter about that and
21 nothing else about it, and certainly it
22 was not discussed with me.
23     Q.    How about issues relating to any
24 401 K plans or other benefits that you had
25 at any employer?

28

1          HOUSE
2      A.    I have 401 K plans from several
3  employers, but again --
4          MR. WANG:   The question was
5  simply have you ever had any discussions
6  about that in connection with leaving.
7  That is the question.
8      A.    I don't recall any kind of
9  discussion about continuation of plans.
10 The letter from ABN Amro sounds like what
11 you are talking about.
12         MR. WANG:   No.  Don't read into
13 his mind.  He is asking did you ever have
14 any discussions about 401 K plans.  That
15 is the question.
16     A.    I can't remember having any
17 kinds of discussions about those things
18 with anybody at any firm.
19     Q.    Okay.
20         Well, we have moved backwards
21 for a little while.  I am going to move
22 forward now.
23     A.    Okay.
24     Q.    Starting with your graduation
25 from college, which I believe your answers

29

1          HOUSE
2  to interrogatories indicate that you
3  graduated in 1978 from the University of
4  Florida in Gainesville.  You started
5  working shortly thereafter at a
6  company called Paine Webber Jackson &
7  Curtis, correct?
8      A.    Yes.
9      Q.    What did you do there?
10     A.    I was 20 years old, so I did
11 other things other than being a
12 stockbroker.  You are not allowed to do
13 that, so that is what I did until I was
14 able to get registered as a stockbroker.
15 That is what I became at that point.  When
16 I reached my birthday, which was 21, I
17 went to class, et cetera.  So I was a
18 stockbroker but not for a little while
19 after that until I was allowed to do that.
20     Q.    So it is fair to say for the
21 first period of time you were there you
22 were acting as an apprentice or doing odd
23 things until you could take the courses
24 necessary and take the exams necessary to
25 become a stockbroker?

30

HOUSE
1
2    A.    Right.
3    Q.    And then ultimately you did
4    that, correct?
5    A.    Yes.
6    Q.    Do you have any current SEC
7    licenses?
8    A.    Truthfully I don't know if
9    they -- how long they last, if they
10    expired at some point. So I was a
11    registered series 7 and series 3 I believe
12    it is at that time, but I don't know if
13    they expired. If they do, I don't. If
14    they don't, I do.
15    Q.    Okay.
16        Well, have you had any ongoing
17    communications with the SEC or renewals
18    that you had to file with the SEC that you
19    are aware of?
20    A.    I suspect that they are expired,
21    but I don't -- I don't know how that
22    works. I haven't had any need to find
23    out, so I suspect that I am no longer
24    registered.
25    Q.    So when is the last time in your

31

HOUSE
1
2    recollection that you would have been
3    acting as a series 7 or series 3
4    registered broker in your employment
5    history?
6    A.    Probably 1982 when I moved to
7    New York.
8    Q.    When you started with Paine
9    Webber, were you in their New York office
10    or --
11    A.    No, it was in Naples, Florida.
12    Q.    You put Paine Webber Jackson &
13    Curtis and Heritage Investment Securities.
14        Are they the same entity?
15    A.    No.
16    Q.    So from '78 to September of '83
17    you had actually two employers?
18    A.    Yes.
19    Q.    What did you do at Heritage
20    Investment Securities?
21    A.    The same.
22    Q.    Stockbroker?
23    A.    Yes.
24    Q.    How long were you there?
25    A.    Until I moved to New York which

32

HOUSE
1
2    I believe was March of -- you have my
3    resume in front of you. I put some
4    thought into it. The dates are sometimes
5    difficult to remember. I believe the date
6    was March of '82.
7    Q.    When you came to New York, where
8    did you work?
9    A.    At Prudential Bache Securities.
10    Q.    What did you do there?
11    A.    It was a -- the entity was the
12    commodity options division, and so I
13    worked within that, but my role was to
14    focus on the financial markets, which I
15    have focused most of my career on. For
16    example, commodities options would be
17    Swiggings & Core. I don't know about
18    Swiggings & Core. I know about financial
19    options, and that is what I focused on.
20    Q.    And what did you do other than
21    focusing on that?
22    A.    I -- it was an institutional
23    desk. Activities which were directed at
24    generating -- it is a brokerage firm.
25    They want to generate a commission. The

33

HOUSE
1
2    way it works in a brokerage firm at that
3    time anyways is that they have a retail
4    sales force and an institutional sales
5    force. They tend to be a little -- they
6    tend to be differently focused. I would
7    talk to both of them, but for the most
8    part my activities were to talk to
9    institutional brokers about financial
10    options and ways to generate commissions
11    with them.
12    Q.    By purchasing options?
13    A.    And -- not necessarily but using
14    options in a variety of ways.
15    Q.    Okay.
16        And how long did you work there?
17    It is not a memory contest by the way.
18    A.    Yes, I believe until 1987.
19    Q.    And did your -- what you were
20    doing there change at all from the time
21    you started until the time you left?
22    A.    Not substantially, no.
23    Q.    You worked in the institutional
24    fixed income group; is that right?
25    A.    No, it was the commodities

34

HOUSE
1
2   options division.
3     Q.   Okay.
4     A.   The institutional fixed income
5   group was separate. They were who -- the
6   people I talked to.
7     Q.   Okay.
8          Then maybe you can tell me why
9   in your answers to interrogatories you
10  said that your position was institutional
11  fixed income group assistant vice
12  president?
13    A.   I don't think the institutional
14  fixed income group actually existed as a
15  defined entity. They were the people I
16  dealt with, but they were not people who
17  technically employed me.
18    Q.   Okay.
19         The people who employed you were
20  the commodities options division?
21    A.   Yes.
22    Q.   Is there a reason why you didn't
23  put that in your answers to
24  interrogatories?
25    A.   I think I took that resume, the

35

HOUSE
1
2   resume information that I gave you, from
3   the resume information that I would give
4   an employer, and an employer wouldn't
5   necessarily be interested in dissecting
6   the manner in which you are dissecting my
7   resume. They would be interested in what
8   I did, and so if you say you worked with
9   institutional brokers, it is what you did.
10  It is what I did.
11    Q.   An employer would want you to
12  tell them -- give them an accurate
13  description of the divisions you worked
14  for, correct?
15    A.   Yes, but that is an accurate
16  description of what I did at the firm. It
17  is maybe not an accurate description of
18  who employed -- who signed my check, but
19  who signed my check is not what
20  necessarily what anybody cares about.
21    Q.   Okay.
22    A.   When they are looking to find
23  out if you know what you are doing or not.
24    Q.   The next position that you list
25  in your -- in the answers to

36

HOUSE
1
2   interrogatories is a position in the
3   options trading division of Societe
4   Generale in Chicago from December of 1990
5   to May of 1993; is that right?
6     A.   Um hum.
7     Q.   You have to say yes or no.
8   Sorry.
9     A.   Yes. I am sorry. Yes. I am
10  relying on you to read those dates
11  correctly. If I have to think about them
12  again, I am going to have to think hard.
13    Q.   I will just show you your
14  answers to interrogatories.
15    A.   If that is what I already gave
16  you, that is what I already thought hard
17  about.
18    Q.   Is that your signature on the
19  last page?
20    A.   Yes.
21    Q.   Okay.
22         You started there in December of
23  190?
24    A.   Yes.
25    Q.   You left Pru Bache in January of

37

HOUSE
1
2   1987?
3     A.   Um hum.
4          MR. WANG:   You have to answer
5   yes or no.
6     A.   I am sorry. Yes.
7     Q.   What did you do for four years
8   before you started working at Societe
9   Generale?
10    A.   I wrote a fixed income options
11  pricing model and did the work
12  necessary -- I did work essentially to get
13  myself another job, which was to write a
14  fixed income options pricing model that I
15  believed was useful for accomplishing that
16  task.
17    Q.   Self-employed?
18    A.   Yes. It was also a time in
19  which I learned another skill.
20    Q.   What skill was that?
21    A.   Computer programming. I learned
22  the skill of -- the skill, required skill
23  of writing in the C language which I still
24  do.
25    Q.   Were you making any money during

38

HOUSE

1
2 this period of time from December -- from
3 January '87 to December of 1990 doing
4 either computer programming or writing
5 your fixed income pricing model?
6     A.    No.
7     Q.    What were the circumstances
8 surrounding your leaving Pru Bache
9 securities in January 1987?
10    A.    It was fairly negative.  There
11 was a guy there who -- whose name I can't
12 remember.  He was a fairly difficult human
13 being to work with, and I had difficulty
14 with him, and it was very similar in some
15 ways to my leaving ABN Amro.
16    Q.    The second time?
17    A.    Um hum.
18    Q.    You have to say yes or no.
19 Sorry.
20    A.    Yes, the second time where I had
21 difficulty with working with the guy and
22 left.
23    Q.    Were you fired?
24    A.    Yes.
25    Q.    And was the person who you had

39

HOUSE

1
2 difficulty working with your superior?
3     A.    No.
4     Q.    Just a fellow employee,
5 co-employee?
6     A.    I am not sure that he was an
7 employee at all.  He may have been.  I
8 can't -- I can't recall frankly the time.
9 He was a programmer.
10    Q.    So it may have been a contractor
11 that Pru Bache was using, a programmer?
12    A.    Yes, I don't know for sure.
13    Q.    By the way, what were the
14 circumstances surrounding your leaving
15 Paine Webber?
16    A.    I went to Heritage because a guy
17 who worked at Paine Webber liked me and he
18 went there and asked me to come with him
19 essentially, so I did.
20    Q.    So you weren't terminated from
21 Paine Webber?
22    A.    No.
23    Q.    What about the circumstances
24 surrounding your leaving of Heritage?
25    A.    I moved to New York.  I decided

40

HOUSE

1
2 being a retail broker was not what I
3 wanted to do in life.
4     Q.    And you were in Naples, Florida
5 at the time?
6     A.    Yes.
7     Q.    What did you do at Societe
8 Generale from December 1990 to May of
9 1993?
10    A.    They were an options trading
11 firm or an options trading division of a
12 french bank.  They were structured as a
13 separate firm actually, but they traded
14 options.  They traded mainly foreign
15 exchange options, and I priced
16 them -- managed -- risk managed them, did
17 a variety of things in that regard.
18    Q.    Similar to the stuff you are
19 doing now in terms of providing expertise
20 and pricing of securities in the options
21 area?
22    A.    Yes.
23    Q.    And what did you have -- did
24 your position there change at all in the
25 the three years you were there?

41

HOUSE

1
2     A.    Not substantially, no.  It -- I
3 moved from the New York office to the
4 Chicago office, but that was mainly as
5 part of the work I was already doing.  I
6 was hired in the New York office.
7     Q.    Um hum.
8     A.    I moved to the Chicago office
9 for convenience.
10    Q.    And you left in May of 1993; is
11 that right?
12    A.    Yes.
13    Q.    Were you fired or did you leave
14 on your own?
15    A.    I was fired.
16    Q.    And what were the circumstances
17 surrounding that termination?
18    A.    They had lost a hundred million
19 dollars I believe, and the guy who fired
20 me was about to be fired himself, and I
21 think my suspicion is that he was trying
22 to save his job by saving money.  So I
23 imagine he fired me for that reason.  I
24 think that --
25    Q.    I guess I wouldn't want you to

42

HOUSE

1    speculate what he was thinking when he
2    fired you.
3        What were you told about why you
4    were being fired?
5    A.    It was a fairly congenial
6    interview actually.  There was a guy there
7    whose role was kind of a human resources
8    kind of rule, and he just said you are
9    being fired and so forth and et cetera, et
10   cetera.  I believe that the guy
11   that -- the guy who ran the place who was
12   the head -- head trader on the
13   desk -- this was a fairly small
14   firm -- was in the office, but I don't
15   recall.  I just recall -- I believe his
16   name was Dan.  I can't remember if that is
17   from putting two things together here.  He
18   just said you are being fired.  It was --
19   Q.    He didn't tell you why?
20   A.    -- kind of friendly.
21   Q.    He didn't tell you?
22   A.    I am sure he did.  He didn't say
23   get out of here, but I don't recall there
24   being a long list of reasons, you know.
25

43

HOUSE

1    It was just you are being fired.
2    Q.    Okay.
3        And after leaving Societe
4    Generale in May of '93, what did you do
5    next?
6    A.    I am reading my resume up side
7    down.
8    Q.    I appreciate your candor, Mr.
9    House.  According to your resume you
10   started at ABN Amro in November of 1993.
11   A.    Okay.
12   Q.    Which would mean it is
13   approximately a six-month period of time
14   between the time you left Societe Generale
15   and the time you started at ABN Amro, and
16   I am trying to find out what you did
17   during that six months.
18   A.    I can't remember.
19   Q.    Okay.
20   A.    I am sorry, but I --
21   Q.    That is fine.
22   A.    I think I lived in New York.
23   You know, I just can't remember.  It is
24   not clear to me.
25

44

HOUSE

1    Q.    I presume some of that period of
2    time you spent looking for a job?
3    A.    Yes.
4    Q.    Okay.
5    A.    I don't think I held other
6    employment if that is your question.  I am
7    pretty sure of that.
8    Q.    Right.  Okay.
9        By the way, up until this point,
10   up until the time you leave Societe
11   Generale, did you take any other
12   postgraduate courses --
13   A.    No.
14   Q.    -- on finance?
15   A.    No.
16   Q.    On stock options?
17   A.    No.
18   Q.    Commodities trading?
19   A.    No, my -- no.
20   Q.    Did you take any professional
21   courses offered by the companies you
22   worked with or associations in order to
23   pass any sort of licensing requirements to
24   do what you were doing?
25

45

HOUSE

1    A.    No.  Are you talking about at
2    that point or early in my career?
3    Q.    At any time between the time you
4    started at Paine Webber and the time you
5    left Societe Generale?
6    A.    Yes, there was a course
7    associated with becoming registered at
8    Paine Webber.  I believe it was held in
9    Norwalk, Connecticut.
10       MR. WANG:    He just asked you
11   you whether or not you took a course.  He
12   didn't ask where it was.  Just listen to
13   the question okay.
14   A.    Yes.
15   Q.    Where was it?
16   A.    Norwalk, Connecticut.
17   Q.    Okay.
18       And do you recall, as you sit
19   here today, and I know it was over 20
20   years ago, what topics were discussed
21   during that -- or what topics were covered
22   in that course?
23   A.    Very vaguely, but the course
24   was -- the purpose of the course was --
25

46

1        HOUSE
2        MR. WANG:  He asked you what
3   topics were discussed during the course.
4   That was the question.
5        MR. DEMOURA:  Mr. Wang --
6        MR. WANG:  He is not --
7        MR. DEMOURA:  With all due
8   respect, I allowed my witness to answer
9   your questions and say what they were
10  saying without stopping them in the middle
11  of an answer and telling them to stop
12  answering the question.  I wish you would
13  do the same.
14       MR. WANG:  I am simply
15  instructing the witness --
16       MR. DEMOURA:  You are
17  instructing the witness, which you have no
18  right to do during the question.
19       MR. WANG:  Yes, I do.
20       MR. DEMOURA:  No, you don't.
21       MR. WANG:  Yes, I do.  I am
22  sure you want the witness to be responsive
23  to your question.
24       MR. DEMOURA:  If he is not
25  responsive, I will ask him again or I will

47

1        HOUSE
2   strike the answer.
3        MR. WANG:  It is my
4   responsibility to --
5        MR. DEMOURA:  Your
6   responsibility is to object.
7        MR. WANG:  No, I don't agree
8   with that.  Why don't we move forward
9   rather than spend a lot of time talking
10  about our respective roles.
11       MR. DEMOURA:  I will.
12       MR. WANG:  Let's just go on and
13  listen to the witness and not you and not
14  me.
15       MR. DEMOURA:  I will, but I
16  don't want you to interrupt the witness.
17  Q.    Did you take any courses with
18  Paine Webber relating to stock options?
19  A.    I don't believe so.
20  Q.    Did you take any courses
21  anywhere else relating to stock options?
22  A.    No, I don't believe so.
23  Q.    How did you learn what you know
24  in order to do your job relating to stock
25  options?

48

1        HOUSE
2   A.    I read books.
3   Q.    That is it.
4        Are you a member of any
5   professional societies or organizations
6   that publish, you know, periodicals that
7   discuss stock options?
8   A.    No.
9   Q.    So do you subscribe to any
10  services that include written materials on
11  that?
12  A.    No.
13  Q.    What books have you read on
14  stock options?
15  A.    They are uncountable.
16  I -- many, many and --
17  Q.    Are there any that you would
18  consider to be the authoritative books on
19  stock options?
20  A.    No, but there are -- there are
21  authoritative books on stock options
22  certainly.
23  Q.    Have you read them?
24  A.    Certainly.
25  Q.    What are they?

49

1        HOUSE
2   A.    Paul Wilmont wrote a book called
3   Option Pricing I believe.
4   Q.    Any others that come to mind?
5   A.    Many, many years ago there was a
6   book that was written by a guy I believe
7   named Lawrence McMillan that provided the
8   rudimentary details.  I am sure that was
9   the first book I read, but I wouldn't call
10  it an authoritative tome.
11  Q.    More like Options for dummies
12  kind of thing?
13  A.    No, it was more like options for
14  financial professionals, but it is
15  rudimentary.  By the standards of that
16  time, it was fairly advanced, but by
17  today's standards it was fairly
18  rudimentary.  There are a lot of books.
19  Q.    You started at ABN Amro for the
20  first time in November of 1993.  Where did
21  you work for them initially?
22  A.    At ABN Amro in what year?
23  Q.    November '93 is what you said in
24  your answers.
25  A.    In November '93 I was at 181

50

1          HOUSE
2    West Madison.
3      Q.    In New York?
4      A.    No, 181 West Madison in Chicago.
5      Q.    I am sorry.  Yes.
6          And what did you do when you
7    started there?
8      A.    I was in essentially a group
9    that was developing software, and that
10   group had a lot of programmers.  I wasn't
11   one of them strangely enough.  I was
12   instructed -- I was devoted to the task of
13   talking with the programmers to try to
14   convey financial information to them.
15   They were people who would be typically C
16   programmers or C plus plus programmers,
17   the languages, and since I had some
18   knowledge of the language and a lot of
19   financial knowledge I could tell them what
20   to do because they would typically not
21   know anything.  I can't think of a case of
22   anyone who did, so my job was -- was to
23   convey financial information to them, so
24   that they could do their jobs.
25          Sometimes I would do -- I would

51

1          HOUSE
2    actually write code, but that was
3    relatively rare.
4      Q.    And how long did you do that,
5    provide assistance to software
6    programmers?
7      A.    As long as I was there.
8      Q.    So the first time that you were
9    employed there from November '93 to March
10   '96 you worked in the software development
11   group?
12     A.    Yes.
13     Q.    And your role in that software
14   development group was not to provide the
15   technical programming expertise but rather
16   the financial information that would be
17   used by the programmers to develop the
18   software, correct?
19     A.    Yes.
20     Q.    And in March of 1996 you left
21   ABN Amro, correct?
22     A.    Yes.
23     Q.    What were the circumstances
24   surrounding your leaving them?
25     A.    I left to go to First

52

1          HOUSE
2    Marblehead.
3      Q.    Were you fired?
4      A.    No.
5      Q.    Let's talk about the
6    hiring -- your hiring at First Marblehead,
7    but before we do that how did you find out
8    that there was a company called First
9    Marblehead?
10     A.    I knew Dan Meyers.
11     Q.    How did you know Dan Meyers?
12     A.    From our being employed at the
13   same time by Prudential Bache Securities.
14     Q.    Did you first meet Dan Meyers
15   when you were employed at Prudential Bache
16   between May of '83 and January of '87?
17     A.    Yes.
18     Q.    And what was Mr. Meyers doing at
19   that time?
20          MR. WANG:  Between '83 and '87?
21          MR. DEMOURA:  Yes, while he was
22   at Pru Bache.
23     A.    You want the blunt answer?
24          MR. WANG:  No, he wants the
25   truthful answer.

53

1          HOUSE
2      Q.    I want a truthful answer.
3      A.    Nothing.  And that is not a wise
4    answer, Mr. Demoura.  That is a true one.
5      Q.    What was -- did he have a title?
6      A.    Probably.
7      Q.    Do you remember what it was?
8      A.    No.
9      Q.    Did you work for him?
10     A.    No.
11     Q.    Did he work for you?
12     A.    No.
13     Q.    Were you in the same department?
14     A.    Broadly, yes.  He was also
15   employed by the commodity division of
16   which the commodity options division that
17   I was employed by was a part.
18     Q.    Okay.
19     A.    I believe his -- his direct
20   superior would have been Fred Hawk.
21     Q.    When you say he did nothing,
22   what do you mean by that?
23     A.    Dan was hired to -- with a
24   systems program I believe that had been
25   written by someone else at his

54

HOUSE

1
2    instruction, and Dan sat in his office
3    running that program for two years I
4    believe. That is it. That to me
5    constitutes nothing.
6        Q.    Okay.
7        A.    Because the program wasn't used
8    for anything.
9        Q.    To your knowledge?
10       A.    No, that is from Dan. That
11   comes from Dan not -- not my opinion.
12       Q.    Did you become a friend or a
13   social acquaintance of Dan's during that
14   period of time?
15       A.    Absolutely.
16       Q.    At that time -- I am sorry.
17   This was in New York, correct?
18       A.    Yes.
19       Q.    Did you continue to maintain an
20   acquaintance or a social friendship with
21   Mr. Meyers from the time you met him until
22   the time were you hired at First
23   Marblehead?
24       A.    Yes.
25       Q.    And how frequently would you be

55

HOUSE

1
2    in touch with him during that period of
3    time?
4        A.    Frequently. Dan would call me
5    from his car.
6        Q.    Okay. How often, daily?
7        A.    No, but I couldn't put a
8    finger -- my finger on a precise
9    frequency. It is just frequently. We
10   were friends.
11       Q.    Okay.
12       A.    I mean I -- I wouldn't -- I am
13   trying to be as forthcoming as I can, Mr.
14   Demoura.
15       Q.    I understand.
16       A.    I am trying to give you answers
17   that you can -- I am not trying to be
18   oblique here.
19       Q.    All I can ask for is your
20   memory. Did you go on trips together?
21       A.    Yes.
22       Q.    Did you invite him to your home?
23       A.    Sure.
24       Q.    Did he invite you to his home?
25       A.    Sure.

56

HOUSE

1
2        Q.    And did you invite him to your
3    wedding?
4        A.    Yes.
5        Q.    Did you ask him to be in the
6    wedding?
7        A.    No.
8        Q.    Was he a member of the wedding
9    party? I don't mean did you ask -- did you
10   ask him to be a member of your wedding
11   party?
12       A.    No.
13       Q.    When you -- how was the
14   discussion -- before joining First
15   Marblehead I assume you had some
16   discussions with Mr. Meyers about the
17   prospect of coming to work for First
18   Marblehead, correct?
19       A.    Yes.
20       Q.    Can you tell me as best you can
21   recall how long prior to the time you
22   joined First Marblehead those discussions
23   started?
24       A.    I can't put a precise number on
25   that one either.

57

HOUSE

1
2        Q.    Ballpark.
3        A.    It could probably be a couple of
4    months, but it wouldn't shock me if it was
5    a few weeks.
6        Q.    Okay.
7        A.    Something like that. I don't
8    remember. I remember coming to New York,
9    but I don't remember a lot of the specific
10   dates.
11       Q.    Okay.
12            Do you remember -- do you recall
13   or did you contact him or did he contact
14   you?
15       A.    He contacted me.
16       Q.    And prior to the time that he
17   contacted you, how long had it been since
18   you talked to him?
19       A.    I can't remember.
20       Q.    Had it been years?
21       A.    No.
22       Q.    Was it sort of a call out of the
23   blue?
24       A.    No.
25       Q.    And at that time, you were

58

HOUSE

1
2    working in Chicago, correct?
3        A.    Yes.
4        Q.    Do you remember the conversation
5    that you had with Dan in terms of the
6    substance of the conversation when you
7    first started discussing the prospect of
8    joining First Marblehead?
9        A.    No. I don't remember the
10    substance. Those details just escape me.
11        Q.    Do you remember what position he
12    was interested in having you come and
13    fill?
14        A.    Broadly, yes.
15        Q.    What was that?
16        A.    I knew why he would be
17    interested in talking to me. They are a
18    financial firm. They didn't have a lot of
19    financial expertise. Why wouldn't he want
20    to hire me? I had financial expertise that
21    could be useful to a financial firm. I
22    mean I am not trying to be, you know -- it
23    doesn't go much beyond that.
24            First Marblehead to the best of
25    my knowledge didn't have any titles beyond

59

HOUSE

1
2    CEO either. It is like Angelo Gordon in
3    that respect. I don't think he said you
4    are going to be the first vice president
5    of financial modeling. They didn't have a
6    title like that. They didn't do that sort
7    of thing. He just said something along
8    the lines of we are a financial firm. We
9    can use you. I would have understood that
10    clearly.
11        Q.    Did you ask him what could you
12    use me to do or --
13        A.    I think it would be implicit in
14    the conversation. I don't think we would
15    have to have that conversation.
16        Q.    Okay. So your answer is no?
17        A.    It is a financial firm.
18    What -- what are you going to do here
19    Gregory? Well, he wouldn't have to say
20    that. Well, it would be just sort of
21    understood.
22        Q.    Let me ask you a different
23    question.
24            During the entire time between
25    the time you first had that discussion and

60

HOUSE

1
2    the time you started, did you ever have a
3    discussion where Mr. Meyers or anybody
4    from First Marblehead laid out to you what
5    it was expected you were going to do for
6    them?
7        A.    Yes.
8        Q.    What was that?
9        A.    Well, some of the -- some little
10    details are coming back to me. I remember
11    talking to Steve Anbinder long before I
12    was ever employed at First Marblehead
13    about what he was doing. I even met the
14    consultant he had hired. So I knew what
15    kind of modeling he did. He did it on
16    Lotus spreadsheets. He hired a consultant
17    to help him with that. Steve has
18    financial expertise but not technical
19    expertise I would say. He hired a
20    consultant to do that. I met the
21    consultant. I can't remember who he was.
22    He told me what he was doing. I was going
23    to do something similar as Steve was doing
24    except take it to a technical level beyond
25    what he was able to do. That is accurate.

61

HOUSE

1
2        Q.    Did all those discussions occur
3    after Mr. Meyers reached out to you about
4    the prospect of coming or before?
5        A.    No. The discussion where I met
6    the consultant?
7        Q.    Yes.
8        A.    That was long before. I
9    mean --
10        Q.    So was that --
11        A.    I can't remember the year, but
12    it was long before.
13        Q.    Was that more in the nature of
14    gee, Greg, we are trying to do something
15    with our company. We know you have some
16    expertise, so can you talk to our
17    consultant?
18        A.    No.
19            MR. WANG:    Objection to the
20    form of the question.
21        Q.    Okay.
22            Well, tell me what you recall of
23    your discussions with Steve Anbinder prior
24    to your discussions with Mr. Meyers about
25    joining Marblehead?

62

HOUSE

1
2      MR. WANG:   Other than what he
3  has already testified?
4      A.   Can you --
5      Q.   You said you had some
6  discussions with Steve Anbinder that now
7  as you were sitting here talking about
8  discussions with Dan Meyers about joining
9  Marblehead that you remembered, that long
10  before that you had some discussions with
11  Steve Anbinder?
12      A.   I think you are trying to make
13  those discussions out to be job
14  discussions, and they were not.
15      Q.   No, I am not. I am simply
16  trying to find out what was discussed.
17      A.   His model.
18      Q.   His financial model?
19      A.   Yes, he described it to me in a
20  general way. I sort of understood it in a
21  general way. He talked about objectives,
22  et cetera. They were not conversations
23  about -- we want to hire you to do this.
24  This was just conversation because I knew
25  Dan.

63

HOUSE

1
2      Q.   I understand. I understand it
3  was not for the purposes of hiring you or
4  for you looking for a job there.
5      A.   Um hum.
6      Q.   How did that conversation
7  happen? Did you ever talk to Mr. Anbinder
8  before?
9      A.   I can't remember when I met
10  Steve. I am sorry. I can't. Upon
11  reflection, I remember the day I met
12  Steve. I am sorry I can. I remember it
13  was in his office. So, yes. I knew
14  Steve. I knew Dan. I knee what they were
15  doing. They described it to me. We had
16  conversations.
17      Q.   All completely unrelated to the
18  issue of whether you would ever come to
19  work for them?
20      A.   Exactly.
21      Q.   And at or around that time did
22  Steve also ask you to talk to the
23  consultant that they had hired?
24      A.   No, I think he happened to be
25  there.

64

HOUSE

1
2      Q.   So there was a one-day thing.
3  It happened to be on one occasion when you
4  visited First Marblehead's offices or
5  visited -- went to see Dan?
6      A.   No. I can't remember why
7  I -- if I -- if it was specifically to go
8  see Steve. If it was just to talk to Dan
9  and I happened to be with him when he was
10  going to Steve's office. I have no idea.
11      Q.   Okay.
12      A.   I just remember that -- that
13  Steve was there, and a consultant happened
14  to be there. I don't think there was
15  a -- I don't think I served any necessary
16  purpose.
17      MR. WANG:   When you think it is
18  a good time for a break, we have been
19  going for an hour.
20      MR. DEMOURA:   We can do that
21  now.
22      MR. WANG:   Fine.
23      (Recess taken.)
24  BY MR. DEMOURA:
25      Q.   Mr. House, did you review any

65

HOUSE

1
2  documents in preparation for your
3  deposition today?
4      A.   Sure.
5      Q.   What did you review?
6      A.   I read all the pleadings. I
7  think there were three documents. One of
8  them -- I am sorry. My legal technical
9  knowledge is weak. I don't know what the
10  documents are called. I may be calling
11  them the wrong with.
12      Q.   Okay.
13      A.   One of them was a document
14  listing -- one of the three was a document
15  listing all of the witnesses that might be
16  called, Mitchell Fields, Kevin Walker, et
17  cetera. That is not a pleading I guess.
18      Q.   Okay.
19      A.   One was the actual plaintiff's
20  case, plaintiff's position and defendant's
21  position. It was a pretty short one, and
22  the third one was I guess some sort
23  of -- probably was a pleading and laid out
24  the case for the district court or
25  whatever. Those three documents are what



66

1          HOUSE
2   I read.
3      Q.   Anything else that you can
4   recall?
5      A.   No, that was pretty much it.
6      Q.   When did you review those?
7      A.   Actually last night and this
8   morning.
9      Q.   Did you speak with anybody other
10  than your attorneys about coming here for
11  your deposition today?
12     A.   Sure.
13     Q.   Who?
14     A.   How recently do you mean?
15     Q.   Ever.
16     A.   Sure.
17     Q.   Who?
18     A.   I have a friend who is a next
19  door neighbor of mine in Denver.  She does
20  -- she doesn't any longer live there.  She
21  was a paralegal, and since she was a
22  friend of mine she knew about the case,
23  and anybody who knows me is likely to know
24  something about this.  So she asked me
25  about it, and I discussed it with her over

67

1          HOUSE
2   time, and she spoke to me last about it a
3   few days ago.
4      Q.   What is her name?
5      A.   Ava Blum.
6      Q.   B-L-U-M?
7      A.   Yes.
8      Q.   Do you have her address?
9      A.   Not with me.
10     Q.   What city does she live in?
11     A.   Seattle.
12     Q.   You say she was a paralegal or
13  is she -- is she a paralegal now?
14     A.   She is a landscape designer.
15     Q.   She is a landscape designer?
16     A.   Landscape architect, sorry.
17  Fully degreed.
18     Q.   What can you tell me about your
19  conversations with Ava Blum; what did you
20  tell her about the case?
21     A.   I -- specifically, I am involved
22  in a lawsuit.  She knows about my being
23  employed at First Marblehead.  She knows
24  why I am suing them or why you are suing
25  me actually.  She said that a deposition

68

1          HOUSE
2   is a relatively straightforward process.
3   She actually told me a story about one
4   that she attended where no lawyer showed
5   up.  That was pretty much it.  She knows
6   the broad details of the lawsuit.  I don't
7   know that she knows any particular
8   details, and so she probably didn't even
9   talk a lot about them.
10     Q.   And the way she would have known
11  anything about the broad details of the
12  lawsuit was as a result of talking to you,
13  correct?
14     A.   Um hum.
15     Q.   You have to say yes or no.  I am
16  sorry.
17     A.   Yes, I am sorry.
18     Q.   And can you tell me what you
19  would have told her about the broad
20  details of the case?
21     A.   For example, I am trying to -- I
22  don't know what you are -- you are asking
23  for a conversation that --
24     Q.   I am asking you to recall your
25  conversations with Ava Blum about the

69

1          HOUSE
2   case.
3      A.   I believe I have told her that
4   you all are suing me for a bizarre reason.
5   I should have been suing you, but -- and
6   she understood that.  She understood what
7   a declaratory judgment was and sort of
8   explained it to me because I
9   didn't -- that part of the case baffled me
10  from the beginning.  She is a paralegal,
11  so she -- she explained some of these
12  details to me in a way that is just
13  reasonably clear and that I can
14  understand.  I am not trying to
15  mischaracterize what she said to me or
16  anything, but it is just not very
17  detailed.
18     Q.   Is it fair to say that most of
19  your discussions with Ava Blum about the
20  case had to do with questions about the
21  procedural maneuvers that were going on in
22  the case?
23     A.   Yes.
24     Q.   Were there any discussions about
25  the substance of the claims that are being

70

HOUSE

1
2  made by either First Marblehead or
3  yourself in the case?
4      A.   Well, probably.  I don't know
5  that I can recall them because they are
6  not terrifically important to her.
7      Q.   Okay.
8      A.   Lots of things baffle me, so I
9  get -- I talk to her because she is easy.
10  She is a phone call away.
11      MR. WANG:  Mr. House, are you
12  finished with your answer?
13      THE WITNESS:  Yes.
14      MR. WANG:  I am not
15  interrupting his answer.
16      Just listen to the question and
17  answer the question.  Don't give the
18  details and the why of the conversation.
19  Just answer the question.  All right, sir?
20      THE WITNESS:  Sure.
21      Q.   Other than Ava Blum, you
22  mentioned several friends that if they
23  know you they know something about the
24  litigation.
25      Can you tell me what they have

71

HOUSE

1
2  talked to you about this case?
3      A.   I don't think I said friends.  I
4  said people who know me probably know
5  something about this case.
6      Q.   Okay.
7      Let's talk about people who know
8  you that may know something about this
9  case.  Who else would know something about
10  the case?
11      A.   My brother.  I didn't talk to
12  him, but I E mailed him once.
13      Q.   Do you have a copy of that E
14  mail?
15      A.   No, because it --
16      Q.   Was it more than one E mail?
17      A.   No, because --
18      MR. WANG:  I am going to get
19  him to answer the questions before we
20  finish today or die trying I am afraid.
21      Q.   Do you remember when you sent
22  that E mail?
23      A.   It was not long ago because
24  it -- it -- I don't remember exactly, but
25  it wasn't long ago, and the reason I

72

HOUSE

1
2  remember it wasn't long ago is because I
3  didn't tell him about it for a long -- I
4  didn't talk about it for a long time.
5      MR. WANG:  I am sorry.  I just
6  have to have a short conversation with
7  him.  Let's take a short break.
8      Let the record reflect that the
9  witness and Mr. Wang have left the room.
10      (Discussion held off the
11  record.)
12      MR. WANG:  Back on the record.
13      Q.   Mr. House, the last topic we
14  were discussing is an E mail that you had
15  sent to your brother.
16      What is your brother's name?
17      A.   Lawrence.
18      Q.   Lawrence House?
19      A.   Yes.
20      Q.   Other than the one E mail that
21  you sent to your brother, did you send any
22  E mails to anybody else discussing the
23  litigation other than your attorneys?
24      A.   I don't believe so.
25      Q.   By the way, do you recall being

73

HOUSE

1
2  asked to produce various documents in this
3  case?
4      A.   Yes.
5      Q.   And during that search, did you
6  search for documents to produce in
7  response to my request?
8      A.   Yes.
9      Q.   During that search, did you
10  use -- did you go on your computer to see
11  if there were any documents in the files
12  in your computer that would be responsive
13  to the request?
14      A.   Yes.
15      Q.   And did you provide any
16  documents that were in the computer?
17      A.   Yes.
18      Q.   Other than the E mail to your
19  brother and the discussions that you have
20  had with Ava Blum, can you tell me have
21  you had any discussions with anybody other
22  than your attorneys about the litigation?
23      MR. WANG:  I object to the form
24  of the question.  You may answer.
25      A.   Yes.

VERITEXT/NEW YORK REPORTING COMPANY, LLC

212-267-6868                                    516-608-2400

**74**

```
                    HOUSE
 1
 2   Q.   Who?
 3   A.   Kara Byun.
 4   Q.   How do you spell that?
 5   A.   B-Y-U-N.
 6   Q.   First name?
 7   A.   Kara with a K.
 8   Q.   I am sorry.  Okay.  And who is
 9   Kara Byun?
10   A.   I work with her.  She is a
11   trader.
12   Q.   Can you tell me the substance of
13   the discussions you have had -- first of
14   all, tell me how many discussions you have
15   had with Kara about the litigation?
16   A.   Several.  What kind of
17   substance?
18   Q.   Anything, whatever you said to
19   her and whatever she said to you.  I don't
20   mean a script.  You don't need to say I
21   said this.  She said that.
22   A.   I couldn't recall it even if you
23   were asking that, but I think she knows I
24   am involved in a lawsuit.  Mr. Demoura,
25   there aren't many facts in this lawsuit,
```

**75**

```
                    HOUSE
 1
 2   and so I think that you or I could
 3   represent them to anybody in 60 seconds,
 4   and I think there is -- that is probably
 5   Kara's position.  I probably represented
 6   my position to her in 60 seconds, and she
 7   probably could regurgitate it.
 8   Q.   So what you are telling me is
 9   that the discussions you had with Kara
10   Byun took about 60 seconds, and it was
11   a -- it was you telling her about your
12   position in the litigation?
13   A.   You asked me --
14        MR. WANG:  Objection to the
15   form of that question.  You may answer.
16   A.   You asked me the substance of
17   what I said, and that was the substance of
18   what I said.  Over time I imagine Kara is
19   probably going to say how is your suit
20   going like normal people would say.  I
21   would say fine.  It would be like that.
22   Q.   As best as you can recall, what
23   would you have told her as this sort of 60
24   second commercial about your case?
25   A.   The same thing --
```

**76**

```
                    HOUSE
 1
 2        MR. WANG:  Objection to the
 3   form of the question.
 4   Q.   I am sorry?
 5   A.   Essentially the same thing I
 6   would tell you.
 7   Q.   I want you to tell me sitting
 8   here today what you would have said?
 9        MR. WANG:  What he would have
10   said or what he said?
11   Q.   What you said.
12   A.   I can't recall the conversation
13   exactly.
14   Q.   Okay.  How about generally.
15   A.   I am only saying at some point
16   Kara and I had a conversation that
17   represented my position in the case and
18   frankly probably your position in the
19   case.  That is that.  You know, it is very
20   simple.
21   Q.   Generally what would your
22   position in the case be that you relayed
23   to her?
24   A.   My position in the case would be
25   in our pleading, and it would be that I am
```

**77**

```
                    HOUSE
 1
 2   entitled to options on First Marblehead
 3   stock that I exercised last February.
 4   Q.   And what would -- did you tell
 5   her what First Marblehead's position was,
 6   if you can recall?
 7   A.   I am sure I did.
 8   Q.   What did you tell her?
 9   A.   I told her that First Marblehead
10   told me that I didn't have any options.
11   Q.   Other than Kara, your brother
12   and Ava, anybody else you had discussions
13   with about the litigation?
14        MR. WANG:  Not including
15   counsel of course?
16        MR. DEMOURA:  Of course.
17   Q.   Unless of course you were having
18   conversations with other people while your
19   counsel was in the room.
20   A.   I need to ask my attorney a
21   question if --
22        MR. WANG:  You can ask me.
23   Q.   Yes.
24        (Witness confers with counsel.)
25   A.   Okay.  I have discussed the case
```

78

```
1                HOUSE
2    with a couple of people at Angelo Gordon.
3        Q.   Okay.
4        A.   One of whom is Josh Brain.
5    Another -- I am sorry.
6        Q.   How do you spell Brain?
7        A.   Like brain.
8        Q.   Okay.
9        A.   Another is John Angelo and
10   Michael Gordon as a matter of fact.
11       Q.   John Angelo?
12       A.   Angelo, the Angelo of Angelo
13   Gordon, and Michael Gordon who is the
14   Gordon of Angelo Gordon.
15       Q.   Okay.
16       A.   I spoke to John because at a
17   very early stage -- at a very early stage
18   because I wanted him to know what I was
19   going to be involved in probably. I spoke
20   to Michael because Michael told me about
21   your IPO. That is the way I found out
22   about it.
23       Q.   My -- I am sorry.
24       A.   I am sorry. Your client's IPO.
25       Q.   First Marblehead's IPO?
```

79

```
1                HOUSE
2        A.   Yes, Michael told me about First
3    Marblehead's IPO. Fred Berger because a
4    question came up and I talked to Fred.
5    Donna Howe. I believe that is it.
6        Q.   That is it from people at Angelo
7    Gordon?
8        A.   I believe that is it from people
9    period.
10       Q.   Okay.
11            Josh Brain, what did you talk to
12   him about?
13       A.   Josh Brain directed me to Mr.
14   Wang.
15       Q.   Josh Brain, what is his position
16   at Angelo Gordon?
17       A.   He is in the private equity
18   group. He is also an attorney, but he is
19   in the private equity group.
20       Q.   And what did you tell Josh?
21       A.   I discussed the case with him in
22   the same way that I probably discussed
23   it -- I would discuss it with you, and he
24   sent me to people.
25            MR. WANG: Probably not with
```

80

```
1                HOUSE
2    Mr. Demoura, but we will leave him out of
3    it.
4        Q.   Did you -- at the time there was
5    no case I assume because the first time
6    that we got --
7        A.   You are using a technical term I
8    guess the case, but as far as I was
9    concerned I had a case as soon as I got a
10   letter from First Marblehead telling me to
11   jump off a cliff.
12       Q.   And after you got that letter,
13   that was when you talked to Josh Brain?
14       A.   Well, actually probably days
15   after that.
16       Q.   And the substance of the
17   conversation was to describe the nature of
18   the dispute and see if he knew somebody as
19   an attorney who could help you with it?
20       A.   Yes.
21       Q.   And he referred to you Mr. Wang?
22       A.   Yes.
23       Q.   How about John Angelo, how
24   many -- by the way before we do that, have
25   you had any further discussions with Josh
```

81

```
1                HOUSE
2    Brain about the litigation?
3        A.   I believe I ran into him at the
4    elevator one time, and I can't recall
5    discussing any particular part of the
6    case, but I -- I think he probably said
7    the same thing that I was describing Kara
8    as saying. How is it going. I said fine.
9        Q.   How about John Angelo?
10       A.   No further discussions with
11   John.
12       Q.   The reason you discussed it with
13   him was? I am sorry if you --
14       A.   His name is on the door.
15       Q.   Just to let him know that you
16   were going to probably end up in
17   litigation involving stock options,
18   correct?
19       A.   No, I didn't -- I don't think I
20   mentioned any particulars of the case. I
21   just said I am going to be more than
22   likely involved in litigation with Dan
23   Meyers.
24       Q.   Does he know Dan Meyers?
25       A.   Yes.
```



82

HOUSE

2   Q.   Other than that, any other
3   discussions with John Angelo about the
4   litigation?
5   A.   No.
6   Q.   How about Michael Gordon, you
7   mentioned that Mr. Gordon --
8   A.   I am sorry. I am sorry. There
9   was a conversation with John.
10  Q.   Okay.
11  A.   Not long ago he asked me where
12  the stock was, and I told him. I can't
13  remember where it was at the time, but I
14  told him, and that was pretty much it. It
15  was in the kitchen --
16  Q.   I am sorry?
17  A.   It was in the kitchen at Angelo
18  Gordon, so there were two conversations
19  with John. I just remember the latter
20  one.
21  Q.   The latter conversation is where
22  is the stock, what is it trading at right
23  now?
24  A.   Yes. He asked me where the
25  stock was.

83

HOUSE

2   Q.   That was the entire
3   conversation?
4   A.   I answered him. I don't recall
5   anything else about it.
6   Q.   Okay.
7       Now, Mr. Gordon you mentioned
8   was the one who told you that First
9   Marblehead had gone public, correct?
10  A.   Yes.
11  Q.   Or had had an IPO?
12  A.   Yes.
13  Q.   Prior to that, you didn't know
14  that First Marblehead had been planning to
15  go public?
16  A.   No.
17  Q.   And do you recall the
18  conversation you had with Mr. Gordon at
19  that time?
20  A.   Not in any detail, but I
21  remember the substance of it.
22  Q.   What was it?
23  A.   He said First Marblehead has
24  issued their IPO and that Dan Meyers was
25  worth 300 million dollars, and that is

84

HOUSE

2   pretty much it.
3   Q.   What did you say to him?
4   A.   I actually asked for a
5   conversation with him and which he
6   granted. I didn't -- we didn't discuss it
7   at that time, but we discussed it later.
8   Q.   Tell me about that conversation
9   of that meeting.
10  A.   I described to him my position
11  on the options, that I had owned options
12  that I would like to exercise, and since I
13  believe I said something along the lines
14  since four months have passed since the
15  IPO I anticipate that it will be a
16  problem, and he understood that.
17  Q.   Why did you tell him that you
18  anticipated that it would be a problem?
19  A.   Because if it wasn't going to be
20  a problem I would have had a hundred
21  thousand shares in First Marblehead stock
22  in that moment, and I wouldn't have ever
23  had the first conversation with Michael.
24  I would have been talking to him.
25  Q.   Talking with him?

85

HOUSE

2   A.   To Michael. I would have said
3   Michael First Marblehead has had an
4   IPO -- because I have to tell -- I
5   understand my obligation to Angelo Gordon
6   is to tell them things like that. I
7   believe that I may be wrong about this,
8   but I believe I have to tell them when I
9   own a hundred thousand shares of
10  somebody's stock.
11  Q.   Do you have to tell them when
12  you own the right or option to a hundred
13  thousand shares in someone's stock?
14  A.   I don't have to. I don't
15  believe so, no.
16  Q.   So it is only when you actually
17  own them?
18  A.   No, I believe that -- that my
19  understanding of this is that I have been
20  asked repeated -- repeatedly here, several
21  times at Angelo Gordon in the form of
22  memos and so forth questions about other
23  accounts. I think that there was
24  something like what when I first came to
25  work there. They probably have regulatory

86

HOUSE

1  issues as a hedge fund, you know.
2  Employees --
3      Q.   That you have to report whatever
4  holding you have to --
5      A.   Yes, you have to report holdings
6  and probably trading activities, so it
7  would be something that as a matter of
8  course I would have to talk to Michael or
9  John about or Fred, and that was the
10  reason I talked to all three of those
11  guys.
12      Q.   This memo, was it -- is it in
13  the form --
14      A.   What memo?
15      Q.   You said you would get memos
16  from Angelo Gordon --
17      A.   About --
18      Q.   -- that said you had to disclose
19  various things?
20      A.   No, I would get memos addressing
21  the issues of other accounts, addressing
22  the issues of holdings, addressing the
23  issues of stuff, order types having to do
24  with this, so it would be just normal for

---

87

HOUSE

1  me to say if I had known something I would
2  have to tell John or Michael or Fred or
3  some managerial person at Angelo Gordon
4  about it. So as a result I had a
5  conversation with Michael about that.
6      Q.   And you believe that you had to
7  do that as a result of some sort of
8  regulatory requirements, correct?
9      A.   Yes.
10      Q.   Okay.
11      A.   In part, yes.
12      Q.   Did the memos that were sent to
13  you reminding -- maybe they are not
14  reminder --
15      A.   I think you are
16  mischaracterizing them.
17      Q.   I don't want to do that. You
18  said they were memos that discussed or
19  asked you about holdings; is that right?
20      A.   I don't recall a memo asking me
21  about holdings. I recall a memo
22  addressing the subject of holdings --
23      Q.   And did that --
24      A.   -- in things -- in outside

---

88

HOUSE

1  accounts, et cetera.
2      Q.   And did that memo direct you to
3  discuss those issues with the people you
4  discussed them with or fill out a form
5  or --
6      A.   No. No, they didn't.
7      Q.   Did you ever have to fill out
8  any forms with any of your employers after
9  you left First Marblehead discussing or
10  disclosing your holdings in various
11  companies?
12      A.   I can't recall any. It may have
13  happened, but I don't recall any until
14  Angelo Gordon.
15      Q.   Okay.
16      And then when you joined Angelo
17  Gordon, did you have to actually provide
18  them with information about any holdings
19  you had, any assets you had?
20      A.   Not precisely, no.
21      Q.   Okay.
22      Was there a form that you had to
23  fill out?
24      A.   I don't think so.

---

89

HOUSE

1      Q.   Do you ever recall having in
2  writing to provide a list of whatever
3  assets you had in the form of stock or
4  stock options or anything like that?
5      A.   Could you ask --
6      Q.   Sure.
7      Do you recall when you were
8  hired at Angelo Gordon ever being asked to
9  fill out any forms or any documents,
10  whether it is a form or just a regular
11  piece of paper, submit a piece of paper
12  that listed your holdings --
13      A.   I don't recall receiving a piece
14  of paper.
15      MR. WANG:   Let him finish his
16  question.
17      Q.   -- that requested that you
18  provide information to the company about
19  what you owned?
20      A.   I don't recall it that way.
21      Q.   Okay.
22      How do you recall it?
23      A.   I recall, and I can't recall
24  the -- any memoranda specifically, but I

90

HOUSE

1
2  recall receiving a piece of paper that
3  alerted me to -- I have never worked for a
4  hedge fund before.
5      Q.    Yes.
6      A.    And I received something when I
7  first got to the firm that seemed to
8  indicate to me that this world was a
9  little different in a minor respect in
10  that if I traded somewhere else, for
11  example, the firm would have to know about
12  it, and it made perfect sense to me.  I
13  don't recall how that was phrased to me.
14  At what -- I am pretty sure it was not
15  phrased to me in a way as what you are
16  describing which is tell us what you own.
17  That didn't happen.  They may be able to
18  do that.  Maybe they didn't.  They did not
19  ~do that as far as I know.  So that is my
20  answer.
21      Q.    All right.
22      I am sorry.  We sidetracked a
23  little bit there.  I wanted to find out
24  about the discussion and meeting you had
25  with Michael Gordon.

91

HOUSE

1
2      MR. WANG:  I think he testified
3  about that.
4      Q.    After you told him about the IPO
5  and you requested a meeting you discussed
6  with him at that meeting, the subsequent
7  meeting, the fact that you thought that
8  you had options in First Marblehead,
9  correct?
10      A.    No, I am pretty sure I
11  characterized it as I know I have options
12  at First Marblehead.
13      Q.    What else can you recall about
14  the substance of that meeting?
15      A.    It was very short.  The reason I
16  asked for it later is because it didn't
17  occur in the kitchen.  I didn't want to
18  talk about it in the kitchen.
19      Q.    Completely understandable.
20      A.    So it was very short, and I
21  don't recall anything else about it other
22  than to just say that.
23      Q.    Michael I just want to let you
24  know I couldn't talk to you in the kitchen
25  about this, but I want to let you know I

92

HOUSE

1
2  have options in First Marblehead.
3  Basically that was the substances of the
4  conversation?
5      MR. WANG:  Objection to the
6  form of the question, the
7  characterization.  The question the way he
8  just phrased it, can you answer it.
9      Q.    Is that the substance of the
10  conversation?
11      A.    Not quite.
12      Q.    Okay.
13      A.    The substance of the
14  conversation is something like that
15  Michael I believe I have a problem here,
16  and I want to tell you about it, and I
17  told him about it, and he said -- I don't
18  recall his response, but it was something
19  along the lines of okay.  I understand or
20  that is fine.
21      Q.    What was the problem?
22      A.    The problem is that four months
23  had passed and that it was clear to me
24  that I was being deprived of my options,
25  and so I had to do something, and I was

93

HOUSE

1
2  telling Michael that I was going to do
3  something.  I didn't tell him what it was
4  because I didn't know what it was.  I mean
5  this was minutes after our discussion, but
6  I said I have a problem.
7      Q.    Okay.
8      Now, so let me ask you a
9  question about the day you found
10  out -- when did you find out that First
11  Marblehead had gone public?
12      A.    I don't recall the precise date.
13      Q.    But was it at or around the time
14  it went public?
15      A.    No.
16      Q.    It was not.  How long after?
17      A.    What I just said a few minutes
18  ago.  It was significantly after.  I
19  believe the IPO was in late October, and
20  this was in the middle of February.
21      Q.    That was when you found out that
22  First Marblehead was now a public company?
23      A.    Yes.
24      Q.    Fred Berger, do you remember the
25  discussions you had with Mr. Berger about

94

HOUSE
1    HOUSE
2  First Marblehead?
3      A.    They were prompted by a memo.
4      Q.    The memo dealt with this
5  particular issue?
6      A.    No.
7      Q.    It was a general memo to all?
8      A.    I believe it was a general memo
9  to all, and I can't recall it either, but
10  it was a memo addressing the issue of
11  legal actions. It said something like
12  have you ever been involved in a legal
13  action, et cetera, et cetera, and I went
14  to Fred and discussed that I am in a legal
15  action and told him why, and the
16  conversation was short.
17      Q.    What do you recall telling him?
18      A.    The same thing I would call --
19  tell anybody if I was going to discuss
20  this case. I am involved in a lawsuit
21  with First Marblehead involving a dispute
22  over options, and he understood that, and
23  I think his instructions were to answer no
24  to the question on the memo, and I can't
25  recall the question on the memo. So I

95

1    HOUSE
2  can't recall that, but that was it. The
3  conversation was that short.
4      Q.    Who is -- what is Mr. Berger's
5  position at Angelo Gordon?
6      A.    Well, again Angelo Gordon
7  doesn't have titles as far as I know
8  except CEO. I think Michael has a title
9  also, but I can't recall what it is,
10  maybe --
11      Q.    So what were his
12  responsibilities?
13      A.    Fred has been with Michael and
14  John forever and does a variety of things.
15  He is clearly an administrative person
16  with a great deal of authority.
17      Q.    Okay.
18      A.    And he seems to do a
19  variety -- head a variety of groups in
20  some way. As I said, it is relatively
21  informal, and I couldn't tell you
22  precisely how he would describe his job
23  position.
24      Q.    Donna Howe, do you recall having
25  discussions with Donna Howe about the

96

1    HOUSE
2  litigation?
3      A.    Yes.
4      Q.    What -- how many conversations
5  did you have with her about the case?
6      A.    She is my boss, so lots. She
7  asks the question how is the suit going
8  every once in a while, and I say fine.
9  She knows -- she knows the substance of
10  it.
11      Q.    Meaning the same thing you've
12  told other people that you are in the
13  middle of a dispute with First Marblehead
14  over stock options?
15      A.    Yes.
16      Q.    Anything else, anything more?
17  Have you provided more information to her
18  than you provided to other people?
19      A.    Since we talk frequently,
20  probably. We talk every day. We sit
21  eighteen feet apart. She probably knows a
22  lot, but do we -- do you mean have I
23  provided her information other than just
24  conversation, no. She is just there.
25      Q.    Other than the individuals you

97

1    HOUSE
2  have talked to me about today, Ava Blum,
3  your brother Lawrence, Kara Byun, Josh
4  Brain, John Angelo, Michael Gordon, Fred
5  Berger and Donna Howe, have you had any
6  discussions or correspondence with anybody
7  else about the litigation other than your
8  attorneys that you can remember?
9      A.    My sister Colleen.
10      Q.    Have you E mailed her about the
11  case?
12      A.    No, we have talked on the
13  telephone.
14      Q.    What have you told her?
15      A.    I think -- actually I talked to
16  her pretty early and probably not
17  since then about it, and she knows the
18  case, and I think, you know, I talked to
19  her for -- reasonably frequently, and she
20  probably asks about it, but -- people ask
21  about it. Kara asks about it. Donna asks
22  about it, and I answer fine.
23      Q.    Anybody else?
24      A.    Drew Bashpipe. He sits next to
25  me.

98

HOUSE
1
2    Q.    I am sorry.
3    A.    Drew Bashpipe, he sits next to
4    me, and he probably hears the conversation
5    with Donna. So he probably hears --
6    Q.    I am not asking you to tell me
7    about what he probably hears. I am asking
8    you to tell me about whether or not there
9    were any conversations with him.
10    A.    He asks me about it too. I
11    think he said something to me this
12    morning, you know, wished me well.
13    Q.    So everybody -- he knew you were
14    coming here for a deposition today?
15    A.    Yes.
16    Q.    So everybody -- do all these
17    folks know you are here for a deposition
18    today?
19    A.    No, probably not. Donna did.
20    Michael didn't. John didn't. Fred didn't.
21    Q.    Other than talking about the
22    case in generalities with these folks
23    telling them I am involved in a case
24    involving stock options, have you had any
25    other discussions, broader discussions?

99

HOUSE
1
2    A.    I think the only person in this
3    whole basket of folks who has talked in
4    any detail about the case is Ava Blum, and
5    it is because she is a paralegal. So yes,
6    that is -- that is probably it.
7    Q.    Okay.
8        Do you currently have any -- are
9    you currently -- do you currently have any
10    grants of stock options from anybody other
11    than your contention that you have one
12    with First Marblehead?
13    A.    No.
14    Q.    Have you with any of your other
15    employers been granted stock options
16    before?
17    A.    Did you ask if any of my
18    employers have granted me stock options or
19    have granted stock options period?
20    Q.    No, I meant have they granted
21    you stock options during the time that you
22    were employed with any of these other
23    employers that we talked about today?
24    A.    No.
25    Q.    Have you received any stock

100

HOUSE
1
2    options in any form from anybody other
3    than First Marblehead --
4    A.    No.
5    Q.    -- that you allege in this case?
6    A.    No. I think I have traded stock
7    options but not received them.
8    Q.    Meaning you've bought and sold
9    stock options as a commodity, correct?
10    A.    Yes, as a financial instrument
11    but not in the sense that we are talking
12    about.
13    Q.    Okay.
14        Have you had any discussions
15    with a gentleman named Vick Samra about
16    this case?
17    A.    No.
18    Q.    Have you had any discussions
19    with Mr. Samra about whether or not you
20    had any stock options at First Marblehead?
21    A.    No.
22    Q.    When was the last time you spoke
23    with Mr. Samra?
24    A.    Probably around the time he
25    left, which to the best of my

101

HOUSE
1
2    recollection, and it is not perfect, is
3    1996.
4    Q.    When --
5    A.    Which was prior to the options
6    being granted, so I am --
7    Q.    When you told Mr. -- I am going
8    back to the discussion that you had with
9    Mr. James and Mr. Meyers giving your two
10    weeks notice.
11        When you told them that you were
12    leaving First Marblehead, did you tell
13    them where you were going?
14    A.    Yes.
15    Q.    And did you tell them that you
16    were going to relocate back to Chicago to
17    do that?
18    A.    Yes.
19    Q.    In your answers to
20    interrogatories -- in your automatic
21    disclosure in this case when you --
22    A.    I don't know that term.
23    Q.    One of the documents that was
24    filed in this case is a document that
25    lists -- it is in your answers to

102

HOUSE

1
2  interrogatories. I am sorry. I am sorry.
3  I was looking for a list, and it is not
4  included in the list.
5       Showing you your answers to
6  interrogatories in the case and
7  specifically I would ask you to look at
8  answer -- interrogatory number 2 in the
9  response you gave.
10     A.   Okay.
11          (Document handed to witness.)
12          (Pause.)
13     A.   Okay.
14     Q.   Now, I am going to go through
15  the list of individuals that you have
16  identified in that interrogatory response.
17  The question asks for you to provide
18  information or identify people who you
19  believe possess information relative to
20  the action, correct?
21     A.   Yes.
22     Q.   And I am going to go down that
23  list with you now to find out what you
24  believe is the relevant information these
25  individuals have and why you put them down

103

HOUSE

1
2  in that answer.
3       Dan Meyers. Who is Dan Meyers?
4     A.   The CEO of First Marblehead.
5     Q.   And what information do you
6  believe he has that is relevant to this
7  case?
8     A.   As far as I knew at the time he
9  was the only person who knew that my
10  options had been restructured
11  beyond -- besides Ron Hoffman.
12     Q.   And can you tell me have you had
13  any discussions at any time with Dan
14  Meyers about stock options at First
15  Marblehead?
16     A.   Yes.
17     Q.   Can you tell -- can you tell me
18  when those conversations occurred?
19     A.   I can't precisely nail down the
20  times, the dates.
21     Q.   Generally, and I can break it up
22  for you if it is easier, did you have any
23  discussions with Mr. Meyers regarding
24  stock options at First Marblehead prior to
25  the time you were hired at First

104

HOUSE

1
2  Marblehead?
3     A.   No, I don't think so.
4     Q.   Did you have discussions with
5  Mr. Meyers about stock options during the
6  time you were employed at First
7  Marblehead?
8     A.   Certainly, yes.
9     Q.   Can you tell me as best as you
10  can recall the substance of the
11  discussions you had with Mr. Meyers about
12  stock options at First Marblehead while
13  you were employed there?
14     A.   Okay. Prior to being -- or
15  to -- at around the time I was hired in
16  what you would characterize as
17  negotiations but --
18     Q.   Please don't try to characterize
19  what I am -- I am just asking you a
20  question.
21     A.   I am not saying you, Mr.
22  Demoura.
23     Q.   Okay.
24     A.   I am saying what most people
25  would characterize as negotiations but

105

HOUSE

1
2  what I would characterize as just
3  conversations.
4     Q.   Okay.
5     A.   The subject came up in a very
6  general way, and I can't recall.
7     Q.   This was prior to your hiring?
8     A.   No, this was in the time
9  where -- where -- there was a time I
10  was --
11          MR. WANG:  Was it prior to your
12  hiring?
13     A.   Immediately prior.
14     Q.   Okay.
15     A.   Yes.
16     Q.   Tell me the substance of the
17  conversation as best you can recall. You
18  told me it was a very general discussion.
19     A.   Yes.
20     Q.   Tell me what you recall.
21     A.   I recall a very general
22  discussion about we are going to issue
23  options at this company because if you
24  want to sum it up in the real substance of
25  it is because we don't -- we can't afford



106

HOUSE

1  to pay big salaries.  I am sure it wasn't
2  put that way.
3      Q.   Okay.
4      A.   So yes.  I was going to get
5  options if I came to this company.
6  Now --
7      Q.   Again, this is prior to the time
8  you actually joined the company?
9      A.   Technically, yes.
10     Q.   Other than that one general
11 discussion you are going to get options,
12 any other discussions you can recall prior
13 to the time you actually were hired with
14 Mr. Meyers?
15     A.   No, that is it.
16     Q.   Okay.
17         How about with anybody else at
18 First Marblehead prior to the time you
19 were hired?
20     A.   No.
21     Q.   Now, can you tell me as best as
22 you can recall, any discussions you had
23 with Mr. Meyers about stock options for
24 First Marblehead while you were actually

107

HOUSE

1  employed at First Marblehead?
2      A.   Yes.
3      Q.   Okay.  Tell me.
4      A.   Between the time of what we are
5  characterizing as the negotiation period
6  days prior to being an employee at First
7  Marblehead and the time of the granting of
8  the options I would say that there were
9  none.
10     Q.   There were none?
11     A.   That I can recall.
12     Q.   Okay.
13     A.   And --
14     Q.   How about from the date of the
15 grant until the time you left First
16 Marblehead?
17     A.   I cannot pin down the times that
18 we are associating with the grant.
19     Q.   Well, you just -- the reason I
20 am using that benchmark is because that
21 was the benchmark you just used in your
22 answer which was that you couldn't recall
23 any conversations from the time you joined
24 the company until the time the options

108

HOUSE

1  were granted with Mr. Meyers about stock
2  options; is that correct?
3      A.   Yes, but I just said that I
4  can't recall the date of the grant.
5      Q.   Okay.
6      A.   I said between time A and time B
7  nothing happened that I can recall.
8      Q.   Right.
9      A.   But time B I can't recall the
10 date.
11     Q.   But other than recalling the
12 date, do you recall having discussions?
13     A.   Yes.
14     Q.   What can you tell me about the
15 discussions with Mr. Meyers?
16     A.   Again, the date of the grant
17 escapes me, but -- and it was not a
18 particular date.
19     Q.   Right.
20     A.   There were a series of events.
21     Q.   All right.
22         Tell me what were the events
23 that you use as your benchmark here if not
24 dates.

109

HOUSE

1      A.   The main one and one that I
2  believe occurred first was some sort of
3  talk about we are going to issue
4  options -- options and maybe even that we
5  already have options issued, and we are
6  just going to reveal it pretty soon.  That
7  is the substantive discussion about
8  options.
9      Q.   And who did you have that
10 discussion with?
11     A.   I think that was a fairly firm
12 wide discussion.  Everybody knew this.
13     Q.   Yes.
14     A.   We have got options.  We have
15 talked about this before.  They are going
16 to be issued at some point, and it is
17 going to be soon.  Then we received -- I
18 believe -- I am certain that we received,
19 and I am not sure when we received it, a
20 piece of paper detailing what we owned and
21 the number of options that we owned and so
22 forth.
23     Q.   Okay.
24     A.   I believe that proceeded a third

110

```
1              HOUSE
2  event.
3     Q.    What was that event?
4     A.    The announcement of a meeting to
5  discuss the options with Mr. Hoffman.  All
6  of these things I am sort of glomming
7  together into a grant, the period of the
8  grant.  Presumably options are a formal
9  agreement between an organization and the
10  individual, and they have a date and so
11  forth, but I am calling it the period of
12  the grant because I can't recall the dates
13  and -- and these events just happened in a
14  series.
15     Q.    And so far those events are sort
16  of general discussions around the office
17  that the options -- we are going to grant
18  options, and we are going to be granting
19  them soon and then a specific paper that
20  was given to you that told you how much
21  options you had?
22     A.    Yes.
23     Q.    And then an announcement that
24  there would be a meeting with Mr. Hoffman
25  to discuss options, correct?
```

111

```
1              HOUSE
2     A.    Yes.
3     Q.    Any other events that you are
4  glomming, as you say, glomming together?
5     A.    Well, you asked me before what
6  discussions I had.
7     Q.    Right.
8     A.    That is my answer, that those
9  are -- this constitutes a discussion of
10  sorts.
11     Q.    Okay.
12        And these discussions were with
13  Dan Meyers?
14     A.    No, not necessarily, but --
15     Q.    They were with other people as
16  well at First Marblehead, correct?
17     A.    Yes.  As I say I think the firm
18  knew that we had options.  This was an --
19  going to get options.  This was an --
20     Q.    The firm, who is the firm?
21     A.    This was a small firm Mr.
22  Demoura.  It was 12 people or 14 people or
23  something like that, so it was an office
24  where people knew what was going on in
25  general.
```

112

```
1              HOUSE
2     Q.    Um hum.
3     A.    If there would be an event like
4  this, people would just know it.
5     Q.    Okay.
6     A.    So I am sure it was discussed.
7        MR. WANG:  When you have a good
8  time for a short break, I need to make a
9  short phone call.
10        MR. DEMOURA:  Do you have a
11  time you have to make the call?
12        MR. WANG:  It was supposed to
13  be around noon time.  I don't want to
14  interrupt you if you are in the middle of
15  a question.
16        MR. DEMOURA:  Let me finish
17  this period.
18     Q.    So other than -- by the way, how
19  soon before the announcement of the
20  meeting with Mr. Hoffman did the actual
21  meeting take place, do you remember, with
22  Mr. Hoffman?
23     A.    How soon between --
24     Q.    Between the time there was an
25  announcement we are going to and the
```

113

```
1              HOUSE
2  meeting with Mr. Hoffman where we are
3  going to talk about options and the time
4  the meeting took place?
5     A.    I don't recall.
6     Q.    Was there a written memo sent
7  out announcing that we are going to have a
8  meeting with Rod Hoffman?
9     A.    Yes.
10     Q.    Do you recall about how long
11  between the time the first -- you know,
12  where people started talking about we are
13  going -- these options are coming and the
14  time of the Hoffman meeting, what period
15  of time are we talking about, months,
16  weeks, days in between the first and last
17  events?
18     A.    I can't put a precise time frame
19  on it.
20     Q.    How about an imprecise time
21  frame?
22     A.    It was seven years ago.
23     Q.    I understand that.
24     A.    I don't know.
25     Q.    Okay.
```

114

HOUSE

1
2       The paper that you got that
3   talked about your specific ISOs,
4   what -- who gave you that piece of paper,
5   do you remember?
6       MR. WANG:  The question is who
7   gave you the piece of paper.
8       A.   I have a very vague memory that
9   it was in a meeting with Ralph and Dan
10  together, but it is very vague.
11      MR. WANG:  Is now a good time?
12      MR. DEMOURA:  I just want to
13  show him one document.
14      MR. WANG:  That is fine.
15      Q.   I am showing you a document that
16  was marked at Ralph James' deposition as
17  Exhibit 4, and I am going to ask you, Mr.
18  House, is that the document that you are
19  referring to as a -- the specific paper
20  that told you how many options you had,
21  how many ISOs you had?
22      A.   Yes.
23      Q.   And that is the document that
24  you stated you believe you received --
25  vaguely recall receiving in a meeting with

115

HOUSE

1
2   Mr. James and Mr. Meyers present, correct?
3       A.   That is correct.
4       Q.   And this document that says
5   you have a grant of ISO shares, correct?
6       A.   Yes.
7       Q.   And ISOs are what?
8       A.   Incentive stock options I
9   believe that acronym is.
10      MR. DEMOURA:  Okay.  We will
11  take a break now.
12      (Recess taken.)
13  BY MR. DEMOURA:
14      Q.   Mr. House, I was showing you
15  Exhibit 4 to the James deposition.
16      A.   Right.
17      Q.   Now, as you sit here looking at
18  this document, do you recall where you
19  were when you received it?
20      A.   I have a vague memory that it
21  was in a meeting with Dan and Ralph, but I
22  am not certain about that.  I don't
23  remember where I was or where they were.
24      Q.   But it was an in person meeting,
25  correct?

116

HOUSE

1
2       A.   Yes, and it followed -- this
3   meeting in which I was given this
4   followed -- this was in this time frame of
5   the options grant that I talk of as a
6   period because I don't have a precise
7   memory.  There was no time where somebody
8   said this is what you got.  This was a
9   period of time in which facts were
10  revealed to us, and our agreement was
11  revealed to us.  This was one of those
12  events.  This proceeded I believe, but it
13  may have followed, I am pretty sure it
14  proceeded another event that I mentioned
15  that was the memorandum that we received
16  where it -- where it announced that a
17  meeting where the options would be
18  discussed.
19      Q.   The memorandum announcing that
20  Mr. Hoffman would be coming to discuss
21  that?
22      A.   Yes.  The memorandum I believe
23  contains other terms.  This does not
24  describe options precisely.  It only
25  describes the number of them, so we had

117

HOUSE

1
2   this discussion --
3       Q.   Let's stop here.  Let's go to
4   the next question.  The top of the
5   document says it is compensation review,
6   correct?
7       A.   Yes.
8       Q.   Do you recall that the purpose
9   of meeting with you and giving this
10  document was to discuss with you your
11  compensation review for the next year that
12  you were going to be employed there?
13      A.   No.
14      Q.   Did the company have customarily
15  an annual compensation review with its
16  employees to your recollection?
17      A.   Maybe.  I didn't.
18      Q.   Okay.
19      Well, you only worked -- you had
20  only worked there in June of '97.  You had
21  only been there about a year, correct?
22      A.   A little longer.
23      Q.   And do you recall whether or not
24  this was filled out while you were there
25  discussing your compensation with Mr.

118

HOUSE

1
2  James or Mr. Meyers or did they already
3  have it done and handed it to you?
4      A.   I don't recall it either way,
5  but I think it probably was filled out.
6      Q.   Okay.
7           Now, when you saw it and you saw
8  that your salary was 70,000 and that there
9  would be some -- I will ask you this:
10  What did you think this was about?  What
11  did you -- why did you think this was
12  being given to you?
13          MR. WANG:   I object to the form
14  of the question.  You may answer.  The
15  question is why did you think this was
16  being given to you.
17     A.   I think that the main purpose
18  was to show that number.
19     Q.   You pointed to a number --
20     A.   The 2500 ISO shares granted.
21     Q.   Okay.
22     A.   I think the other stuff was a
23  little bit of a surprise.  I didn't know
24  it would be there.  I was --
25     Q.   The numbers that you are focused

119

HOUSE

1
2  on were the numbers that appear under the
3  subheading stock options, correct?
4      A.   Yes.
5      Q.   And they are ISO shares granted,
6  2500, correct?
7      A.   Yes.
8      Q.   Value of ISO shares of 31 per
9  share value $78,125, correct?
10     A.   Correct.
11     Q.   Now, do you know -- did you have
12  any discussions during the meeting when
13  you got this piece of paper about the
14  stock options and the grant?
15     A.   I don't recall the discussions
16  occurring at that time.  The discussions
17  definitely occurred, and they addressed
18  other substantive issues about the
19  options.
20     Q.   Okay.
21     A.   And I --
22     Q.   When do you recall those
23  conversations happening, before or after
24  you got the paper.
25     A.   After I got the paper, and the

120

HOUSE

1
2  main one was after I got the memo.  I
3  believe the memo served as the impetus for
4  the conversation.
5      Q.   Okay.  Let's not go there yet.
6      A.   Okay.
7      Q.   Let's focus our attention on the
8  meeting you had when you got this piece of
9  paper.
10          Other than getting this piece of
11  paper, do you recall any discussions
12  relating to the stock options?
13     A.   Sure.  Specifically, no.
14     Q.   Generally?
15     A.   Yes.
16     Q.   What?
17     A.   We were going to get stock
18  options.  I believe that I knew -- I don't
19  know that anyone else in the firm knew,
20  but I knew that the options would carry
21  the characteristics that they eventually
22  were found to carry; namely a 32 dollar
23  stock price and a ten-year term at that
24  point.  I could be wrong about this
25  because I wasn't always perfectly

121

HOUSE

1
2  knowledgeable about what other people were
3  being told.  You know, it was a small
4  office, but I don't necessarily pay
5  attention to what everybody else is
6  talking about.  I don't know that anybody
7  else knew that.  I knew it because in this
8  period of time in which the options were
9  being granted and this period when
10  discussions were being held I was the only
11  guy in the firm that knew anything about
12  pricing options for the most part.  Maybe
13  Steve knew some, but if he did, he wasn't
14  owning up to it.  He wanted me to price
15  the options, and he wanted me to address
16  the value in a general way.  And so Steve
17  is knowledgeable --
18     Q.   Steve Anbinder we are talking
19  about, correct?
20     A.   Yes, Steve is knowledgeable
21  about that in a general way.  Dan is
22  somewhat knowledgeable about it, but I
23  actually knew the math, so we talked about
24  that.  These options were going to have a
25  ten-year term.  They are going to have a

122

HOUSE

1   HOUSE
2   32 dollar stock price. What do you think
3   we can make them worth, and I am not
4   saying that in a nasty way. I am just
5   saying that was the discussion. That
6   number there, that 78,125 dollar number --
7      Q.   Yes.
8      A.   -- I don't believe that is
9   my -- the number that I assigned in those
10  discussions, and it is not because I
11  recall the number specifically, but
12  because I have -- I have priced options
13  with the same parameters since I found
14  this, and they don't fit, and I remember
15  the discussions being with assigning a 40
16  or 50 volatility, which is in financial
17  terms a parameter to an option pricing
18  model.
19     Q.   Okay.
20          Now, let me ask you a question.
21  Is there a difference between pricing puts
22  and calls options in the commodities
23  industry and incentive stock options?
24     A.   There can be.
25     Q.   The incentive stock options are

123

1   HOUSE
2   priced at the fair market value of the
3   company's stock, correct?
4      A.   No, that is what they appear to
5   have done, something like that here, and
6   that is just incorrect. That 31 dollars
7   and 25 cents per share for an option,
8   well, a shade -- it is worth only a shade
9   less than the stock itself. How does that
10  make any sense? Or a shade less
11  during -- worth only a shade less than
12  what they were claiming the stock was
13  worth. Bear in mind that there was no
14  real reasonable certainty that anybody
15  could have -- that that the stock was
16  worth any number versus any other number.
17  From our standpoint, our company was a
18  black box with financial stuff underneath
19  it. I was only asked to price the options
20  with parametric information I was given.
21     Q.   And what was parametric
22  information you were given?
23     A.   32 dollar strike price, a
24  ten-year term, and I believe my memory of
25  this is not perfect, but I believe it was

124

HOUSE

1   with a 40 volume.
2      Q.   So you were given all of this
3   information, these parameters?
4      A.   I wasn't given it. I think I
5   probably came up with the volatility
6   number, but that is a -- I was given the
7   numbers that were applicable to this -- to
8   the options themselves that would be
9   presumably indisputable, 40 or 50
10  volatility. That is certainly a
11  disputable number. You can assign 20
12  volatility, 30 volatility, and it has a
13  big impact, but the parametric information
14  we are talking about was very specific, 32
15  dollar strike price, ten-year term.
16     Q.   Why would they need -- why would
17  you need to come up with a price if they
18  were giving you a price? They were giving
19  you a price at 32 dollars. What was the
20  pricing information they were giving you?
21     A.   That is not an option price.
22  That is a stock price. If I say to you,
23  Mr. Demoura, I am going to give you an
24  option to buy this building and you are

125

1   HOUSE
2   going to pay a million dollars for it,
3   clearly the building is worth more than a
4   million dollars.
5      Q.   But I am buying an option,
6   right?
7      A.   You are buying an option.
8      Q.   Right?
9      A.   If I say the option is being
10  priced at a million dollars but you have
11  an option to buy the building at a hundred
12  billion dollars, you would say no, I am
13  not going to pay a million dollars for
14  that.
15     Q.   Let me ask you a question. Were
16  you under the impression that you were
17  going to have to buy these options?
18     A.   No.
19     Q.   You were going to get the
20  options, correct?
21     A.   Right.
22     Q.   You were going to have to buy
23  shares, correct?
24     A.   No.
25     Q.   If you wanted to exercise your

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                                      516-608-2400

126

HOUSE

1
2  options you would have to buy the shares,
3  correct?
4      A.    Evenually but not then.
5      Q.    And the price would be the
6  strike price, correct?
7      A.    Yes. That's correct.
8      Q.    And they gave that to you. They
9  told you it was 32 dollars?
10     A.    Correct. Now, you can do that.
11     Q.    So I guess what I am trying to
12  get at or trying to find out is why were
13  they asking you to price something if you
14  already had a price?
15     A.    Because they wanted to -- my
16  thought at the time that we were having
17  pricing discussions was that we would have
18  put a realistic number there.
19     Q.    There meaning on this sheet
20  where the value of ISO shares is listed as
21  125,000.
22     A.    My thought is they wanted --
23  they were telling employees we want to
24  give you something of value, and the value
25  is this number. They didn't eventually do

127

HOUSE

1
2  that I don't believe, and I don't know
3  why, but that was what the discussions
4  were centered around I thought.
5      Q.    Now, these discussions that were
6  occurring around pricing, do you know for
7  a fact that they were pricing discussions
8  relating to the ISO stock options for the
9  First Marblehead stock option plan?
10     MR. WANG:   Object to the form
11  of the question. What do you mean know
12  for a fact? Is that what he recalls?
13     MR. DEMOURA:   I will withdraw
14  the question.
15     MR. WANG:   I don't understand
16  the question.
17     Q.    You had some discussions with
18  Mr. Anbinder about pricing options,
19  correct?
20     A.    I think when Steve was missing
21  from Marblehead, I think discussions were
22  mainly with Mr. Meyers.
23     Q.    You had discussions with Meyers
24  and Mr. Anbinder?
25     A.    Yes.

128

HOUSE

1
2      Q.    And those discussions occurred
3  at or around the time that we are talking
4  about here, the general firm-wide
5  discussions we are getting stock options
6  and then a specific meeting where you got
7  Exhibit 4 and then the announcement, to
8  Mr. Hoffman, these discussions occurred
9  all around that time?
10     A.    Yes, around that same time
11  frame.
12     Q.    During those discussions, was it
13  specifically related to you that the
14  reason -- what we want you to price are
15  the options that we are giving out as ISO
16  options in our '96 ISO plan?
17     A.    I don't think it was phrased
18  that way, but --
19     Q.    Was there an assumption --
20     MR. WANG:   He was in the middle
21  of an answer.
22     A.    I don't think it was phrased
23  that way. I don't think they said this is
24  -- are going to be options according to a
25  special -- specifically delineated plan,

129

HOUSE

1
2  et cetera, et cetera. They just said
3  these are going to our stock options that
4  we are going to issue to employees. There
5  were no specifics --
6      Q.    So the pricing --
7      MR. WANG:   Let him finish,
8  please.
9      A.    There was no specific -- as far
10  as I was concerned, these options were
11  that -- options that from a mathematical
12  standpoint could have been on the Chicago
13  board of trade, and we priced them that
14  way, and there was a standard variety
15  mathematical model for doing that.
16  Embedded in that model though is a set of
17  assumptions.
18     Q.    These parametric --
19     A.    These input parameters --
20     Q.    Parameters, right?
21     A.    -- have to be assumed or known.
22  Some are known, like 32 dollar strike
23  price and ten-year term, and some were
24  assumed. One main one was assumed.
25     Q.    Which was?

130

HOUSE

1
2     A.    Volatility.  It is a standard
3  deviation number.
4     Q.    Okay.
5     A.    It says to the person pricing
6  the option that in ten years this stock
7  price can be in a certain range.  It is a
8  standard deviation number of returns.
9     Q.    Okay.
10    A.    And underneath that it says that
11  the stock can be in a certain range.  If
12  it is in a certain range below the stock
13  price, the options are worthless.  If it
14  is in a certain range above the stock
15  price, the options are worth whatever that
16  particular number minus the strike price,
17  so the process of pricing options is this,
18  is that mathematical integration of that
19  set of assumptions.
20    Q.    Have you ever priced options for
21  an incentive stock option plan before?
22    A.    Yes, when I was at First
23  Marblehead.  I didn't know it at the time.
24  I didn't put it that way.
25        MR. WANG:  No, Greg.  Slow

131

HOUSE

1
2  down.  Other than what you --
3        MR. DEMOURA:  I don't want to
4  you phrase the question.  I will ask it
5  this way.
6     Q.    At the time you were pricing
7  options ever, did you know you were
8  pricing them for an incentive stock option
9  plan?
10    A.    Yes.
11    Q.    And when was that?
12    A.    At First Marblehead.
13    Q.    Other than that, any other
14  occasion?
15    A.    I have priced options many
16  times.
17    Q.    I am not asking you about other
18  options.  I am asking you about incentive
19  stock options.
20    A.    No.
21    Q.    Okay.
22    A.    I think that is fair.
23    Q.    Okay.
24        So the next event that occurs
25  after your meeting -- by the way, have you

132

HOUSE

1
2  now told me everything that you can recall
3  about the discussions that you had?
4     A.    No.
5     Q.    What else do you recall about
6  the discussions you had when you got
7  Exhibit 4?
8     A.    You are asking that narrowly and
9  saying when I received Exhibit 4.
10    Q.    That is exactly right.
11    A.    I don't recall the sequence of
12  events perfectly.
13    Q.    Okay.
14    A.    I recall receiving Exhibit 4.  I
15  recall receiving the memo announcement.  I
16  recall these discussions.
17    Q.    Okay.
18    A.    I can't put a precise date on
19  all those things.
20    Q.    I am not asking for a date.  I
21  don't know when this meeting occurred when
22  you got Exhibit 4.
23    A.    Now, when the memo -- when I
24  received the memo.
25    Q.    We will get to that in a minute.

133

HOUSE

1
2  I want to exhaust your memory.
3     A.    Yes, but --
4        MR. WANG:  You keep
5  interrupting him which is not fair.
6  Believe me I am not queuing the witness.
7  He is trying to tell you he does remember
8  certain conversations, but he doesn't
9  remember when he had them.  Either you
10  want to know about the conversations or
11  you don't.
12        MR. DEMOURA:  I do want to know
13  about the conversations.  I want to know
14  if he has any specific recollection --
15        MR. WANG:  Even the sequence of
16  conversations.  He has told you the
17  sequence of the conversations.
18    A.    When you say at this point, I
19  don't know if it happened at this point or
20  a little while following that.
21    Q.    Okay.
22    A.    So embedded in your question is
23  the assumption that I have already said
24  something that I said I don't know.
25    Q.    Okay.  Fair enough.



134

HOUSE

1    HOUSE
2        I am showing you a document that
3    was marked at Ralph James' deposition as
4    Exhibit 2. I ask you if you recognize
5    that document.
6        (Document handed to witness.)
7    A.    Yes.
8    Q.    What is it?
9    A.    It is sort of a description of
10   how a day -- a day of meetings is going to
11   go I suppose.
12   Q.    Do you remember getting that?
13   A.    Well, Mr. Demoura, this comes
14   from me.
15       MR. WANG:   The question is do
16   you remember getting it?
17   Q.    Do you remember getting it?
18   A.    The specific moment when I
19   received it, reading it?
20   Q.    Right.
21   A.    Not anything particular about
22   it, no.
23   Q.    Is that the announcement you
24   were talking about when you said there is
25   a series of events. You don't remember

135

1    HOUSE
2    dates, but you remember a series of events
3    where stock option issues were discussed
4    and the last of those events you mentioned
5    was an announcement that there would be a
6    meeting with Mr. Hoffman?
7    A.    Yes.
8    Q.    Is that the memo you are talking
9    about?
10   A.    It is not the memo I am talking
11   about.
12   Q.    It is not. So there was yet
13   another --
14   A.    This announced the meeting, and
15   in that sense it is an announcement of the
16   meeting, but the memo I am talking about
17   it contains in it fairly descriptive
18   information about the options themselves.
19   Q.    So that wasn't a memo announcing
20   the fact that there would be a memo. That
21   was a memo that was given out at the
22   meeting; is that right?
23   A.    I think it was given before the
24   meeting, but maybe it was at the meeting,
25   I don't recall. I have already told you

136

1    HOUSE
2    that I -- that I have had a conversation
3    as a result of the memo that I am
4    remembering.
5    Q.    We will get to that.
6    A.    You keep saying we will get to
7    that but --
8    Q.    And we will, and I am trying to
9    help your attorney here keep you focused
10   on the questions I am asking.
11   A.    Okay.
12   Q.    Exhibit number 3 from the Ralph
13   James deposition, do you recognize that?
14   A.    Bingo. Yes.
15   Q.    I told you we would get to it.
16   A.    Okay. We are here.
17   Q.    Is this the memo you were saying
18   was the last of these series of events
19   that occurred surrounding the discussions
20   about the options?
21   A.    No. It wasn't the last of the
22   series of events.
23   Q.    Okay.
24       It was the third event because
25   we have first general discussion --

137

1    HOUSE
2    A.    Again, don't put -- you are
3    putting a -- a series of sequence numbers
4    here, and I am not able to do that
5    accurately.
6    Q.    We will let the earlier answers
7    speak for themselves about how you put
8    things, but, as I recall, there were
9    general firm-wide discussions about
10   getting options and getting them soon, and
11   then there was a specific meeting with
12   either Mr. Meyers or Mr. James or both of
13   them where you were given Exhibit number 4
14   to the James deposition.
15   A.    Yes.
16   Q.    And then there was the
17   announcement and meeting with Mr. Hoffman?
18   A.    Okay. I think that is -- that
19   accurately describes my memory.
20   Q.    All right.
21       So now what I want you to do is
22   tell me as best as you can recall exhibit
23   number -- I am sorry -- exhibit number 3,
24   do you recognize that?
25   A.    Yes.

VERITEXT/NEW YORK REPORTING COMPANY, LLC

212-267-6868                                        516-608-2400

138

1         HOUSE
2    Q.   What is it?
3    A.   It is a memorandum from Ron
4  Hoffman that details the most complete
5  description of the -- of the options
6  that -- that we received at that time I
7  believe. Everything else was
8  conversational.
9    Q.   Everything else except Exhibit
10  number 4 of the Ralph James deposition,
11  correct?
12    A.   Yes, the 2500 was in some sort
13  of thing you are calling the compensation
14  review.
15    Q.   And everything else except
16  Exhibit 2, correct?
17         MR. WANG:  Exhibit 2 is hardly
18  substantive.
19         MR. DEMOURA:  I don't want you
20  to characterize what it is or isn't.
21    A.   Mr. Demoura, I characterize this
22  as the announcement of the meeting.
23    Q.   And then Exhibit number 3 is the
24  actual memo that you are saying sets forth
25  some of the terms that -- to the ISO,

139

1         HOUSE
2  correct?
3    A.   Some more of the terms of the
4  option plan, yes.
5    Q.   Okay.
6         Does the memo encompass all of
7  the terms of the option plan?
8         MR. WANG:  I object to the form
9  of the question.
10    A.   No.
11    Q.   Can you recall as you sit here
12  today the actual meeting that you had with
13  Mr. Hoffman?
14    A.   No, I can't.
15    Q.   Okay.
16         Do you recall was it a
17  one-on-one meeting with you and Mr.
18  Hoffman or was it a meeting with
19  the -- with several of the employees?
20    A.   I don't recall. I just said I
21  don't recall anything about the meeting
22  itself.
23    Q.   You don't recall anything about
24  it?
25    A.   It is very vague, very vague.

140

1         HOUSE
2  It would have been a meeting though since
3  it -- this memo presumably went to -- this
4  memo went to everybody. It would have
5  been a meeting with not just me. It was
6  not a meeting for me, and I can't recall
7  anything about it. It was clearly not for
8  me though. This was to describe the
9  option plan to the employees.
10    Q.   And you were one of the
11  employees who was --
12    A.   Yes.
13    Q.   -- who the option plan was being
14  described to, correct?
15    A.   Yes.
16    Q.   Do you recall any of the other
17  employees who were at the meeting?
18    A.   No, I can't recall anything
19  about the meeting substantively, no.
20    Q.   And you can't recall who was
21  there or who wasn't there, correct?
22    A.   No.
23    Q.   Other than the fact that Mr.
24  Hoffman was there, correct?
25    A.   Mr. Hoffman was presumably

141

1         HOUSE
2  there, but I don't have -- you are asking
3  me for a picture in my mind of this, and I
4  don't have it.
5    Q.   Okay. If you don't have one,
6  just say you don't recall.
7    A.   Okay.
8    Q.   Now, you mentioned that after
9  you got what has been marked as Exhibit 3
10  of the James deposition that there
11  were -- you had some discussions, correct?
12    A.   Yes.
13    Q.   As best as you can recall, who
14  did you have discussions with after you
15  received Exhibit 3?
16    A.   Dan Meyers.
17    Q.   Was anybody else present?
18    A.   No.
19    Q.   And do you recall --
20    A.   Not in person.
21    Q.   Do you recall how soon after the
22  meeting with Mr. Hoffman you had that
23  meeting with Mr. Meyers?
24    A.   I think it may have been before
25  the meeting with Mr. Hoffman that I had



142

HOUSE

1
2 the meeting with Mr. Meyers because I
3 believe that was the impetus for it.
4    Q.    That -- you are pointing at
5 Exhibit 3?
6    A.    Yes.
7    Q.    So you believe that the
8 memorandum, Exhibit 3, was actually given
9 to you prior to the meeting with Mr.
10 Hoffman?
11    A.    I believe so.
12    Q.    Do you know whether it was
13 distributed firm-wide prior to the meeting
14 with Mr. Hoffman?
15    A.    I don't know that. I assume it
16 was since it was sort of -- I think it is
17 sort of addressed that way to the
18 employees of First Marblehead, but I
19 couldn't tell you if anybody received it.
20    Q.    So you don't know whether or not
21 you went to speak to Mr. Meyers after or
22 before the meeting with Mr. Hoffman, but
23 you do know for sure that your meeting
24 with Mr. Meyers occurred after you got
25 Exhibit 3, correct?

143

HOUSE

1
2    A.    Yes. It was -- yes, it is the
3 impetus for it.
4    Q.    That was the reason you went to
5 talk to Mr. Meyers, correct? You have to
6 answer yes or no.
7    A.    Yes.
8    Q.    Okay.
9    A.    Since I don't recall the time
10 sequence of these things all that well, if
11 we received this at the meeting I went to
12 to talk to Dan about it. If we received
13 it before the meeting, I went to talk to
14 Dan about it. If we received it after the
15 meeting, I went to talk to Dan about it,
16 but that was why I went to talk to Dan.
17    Q.    Tell me as best you can recall
18 your conversation with Mr. Meyers after
19 you got Exhibit 3 to the James deposition?
20    A.    I was -- I was volcanic, and
21 I -- it turned out the result of the
22 conversation is that I was embarrassed
23 about it.
24    Q.    Okay.
25        Why were you volcanic?

144

HOUSE

1
2    A.    Because the memorandum announced
3 a feature of the options that I found
4 offensive in that I -- I don't recall the
5 vesting schedule exactly, but the options
6 were not mine immediately, and that upset
7 me.
8    Q.    It upset you that the option
9 plan that Mr. Hoffman had described in the
10 memorandum Exhibit 3 had a vesting
11 schedule, correct?
12    A.    Yes, and that was not what I had
13 been led to believe.
14    Q.    Who led you to believe
15 otherwise?
16    A.    Dan.
17    Q.    How?
18    A.    When these general discussions
19 were being had about options, there was
20 never any mention of a vesting schedule.
21 That would certainly change the pricing of
22 the options. It would change the basic
23 characteristics of the options in a
24 fundamental way, and in order to price
25 them properly one would have to take

145

HOUSE

1
2 those -- that into account. I think that
3 Dan and Steve are sufficiently
4 sophisticated financially that if these
5 characteristics had in fact applied they
6 would have said so. They would have
7 intuitively known.
8    Q.    This is an assumption you are
9 making now. I don't want you to assume
10 anything. I want you to tell me what was
11 said.
12    A.    What was said. The stock
13 options have a 32 dollar strike price and
14 a ten-year term, and we are going to price
15 them with after discussion of 40
16 volatility and whatever rate assumption we
17 can make. There were no extra terms
18 involved at all in the pricing
19 discussions. If there should have been,
20 there would have been I believe.
21    Q.    Stop there.
22    A.    That was the basis for my
23 assumption.
24    Q.    Okay.
25        What was said other than what

146

HOUSE

1    HOUSE
2    you just said, not assumptions about what
3    should have been said or maybe they were
4    thinking?  What was said other than that,
5    anything in terms of the parameters of how
6    you were going to price the stock?
7        A.    Well, there were -- the
8    parameter discussion probably lasted a
9    while.
10       Q.    Okay.
11       A.    Because it had to make
12   assumptions.
13       Q.    Okay.
14             We are going to take a
15   two-second break, and we should break for
16   lunch by 1.
17             MR. PECK:  This will take one
18   second.
19             (Recess taken.)
20   BY MR. DEMOURA:
21       Q.    I want to go back to the meeting
22   that you had with Mr. Meyers after you got
23   Exhibit 3 to the James deposition where
24   you described yourself as being volcanic.
25       A.    Yes.

147

HOUSE

1    HOUSE
2        Q.    Can you tell me as best as you
3    can recall the substance of the
4    conversation you had with Mr. Meyers at
5    that meeting?
6        A.    It was very short, and that is
7    why I was embarrassed.  I walked in, and I
8    believe I said something along the lines
9    of what the hell are these -- is this
10   vesting, Dan.  That was the substance of
11   my concern.  Why should my options be
12   vested.  You know, I then -- how I put
13   it -- I was angry, and I said something
14   along that line and conveyed to him that
15   why are you doing this to me, you know.
16   That is -- that is why I was mad.
17       Q.    Okay.
18       A.    The reason I was not -- I became
19   sort of embarrassed is because Dan
20   capitulated on that in a heartbeat.  He
21   said you are right, Gregory.  Let's call
22   Rod Hoffman, and he called -- he conversed
23   with him, and I don't know how that
24   worked, and he told Rod to alter the
25   vesting characteristics of my options, and

148

HOUSE

1    HOUSE
2    I was embarrassed, so I made a fool of
3    myself.
4        Q.    So that all happened in one
5    meeting?
6        A.    Yes.
7        Q.    You walked in angry about the
8    fact that the -- the fact that you were
9    going to get -- were going to include a
10   vesting schedule, and Mr. Meyers said you
11   are right.  They shouldn't include a
12   vesting schedule, and we will take care of
13   that, correct?
14       A.    And he did so at that moment
15   while I was in the room.
16       Q.    Okay.  By the way, we have been
17   talking a little bit about pricing and,
18   you know, whatever Mr. Meyers or Mr.
19   Anbinder requested that you do in
20   connection with that?
21             The fact is that there is a
22   difference between -- the pricing was
23   already decided.  The strike price was
24   decided of 32 dollars, correct?
25       A.    That is not a price.  That is

149

HOUSE

1    HOUSE
2    just a parameter of an option.
3        Q.    That is the price of the shares,
4    correct?
5        A.    Yes.
6        Q.    What you were being asked to do
7    was try to find out the value of the
8    option, correct?
9        A.    Yes.
10       Q.    And that is so that -- so that
11   is different than -- you weren't being
12   asked to price the shares.  You were asked
13   to price the options or value the options?
14       A.    Exactly and --
15       Q.    Okay.
16       A.    Precisely right.
17       Q.    Okay.
18             Anything else you can recall
19   about your meeting with Mr. Meyers
20   at -- where you talked about the vesting
21   issue?  We will call it the volcanic
22   meeting.  I like that term.
23             MR. WANG:  I knew you would.
24       A.    I am trying to recall anything
25   else that I can tell you, and I can't.

150

HOUSE

1
2    Q.    You recall that during that
3    meeting Mr. Meyers picked up the phone and
4    called Rod Hoffman?
5    A.    Yes, correct.
6    Q.    And were you there when you
7    spoke to Mr. Hoffman?
8    A.    Yes, I couldn't hear Rod speak,
9    but I was there.
10    Q.    What do you recall Mr. Meyers
11    saying?
12    A.    I can't recall the specific
13    words.  I just know that it dealt with the
14    issue that we had just addressed.
15    Q.    In other words, instructing Mr.
16    Hoffman that to the extent there is a
17    vesting schedule it doesn't apply to Mr.
18    House, correct?
19    A.    I think he -- he probably put
20    vest Greg's options immediately.
21    Q.    Okay.
22    A.    And probably in terms that
23    simple.
24    Q.    Other than changing the vesting
25    during that meeting with Mr. Meyers, was

151

HOUSE

1
2    there a discussion about making any other
3    alterations to the ISOs that you were
4    getting from First Marblehead?
5    A.    No.
6    Q.    And other than that other than
7    instructing Mr. Hoffman to have your
8    shares vest immediately, did he give Mr.
9    Hoffman any other instructions while you
10    were listening about making any other
11    changes to the ISO that you were granted?
12    A.    Not that I can recall, no.
13    MR. DEMOURA:    Let's break for
14    lunch.
15    (Luncheon recess: 12:55 p.m.)
16
17
18
19
20
21
22
23
24
25

152

HOUSE

1
2    A F T E R N O O N   S E S S I O N.
3    1:40 p.m.
4    G R E G O R Y   J A M E S   H O U S E,
5    resumed.
6    CONTINUED EXAMINATION
7    BY MR. DEMOURA:
8    Q.    I want to go back to your
9    resignation from First Marblehead for a
10    minute, Mr. House.
11    I believe this morning when you
12    testified you said that at the -- on the
13    last day you were there you recall that
14    you left in anger; is that right?
15    A.    Yes.
16    Q.    Do you remember why you were
17    angry?
18    A.    Yes.
19    Q.    Why?
20    A.    We addressed this a little bit
21    too, but there was a dispute -- not really
22    a dispute.  A matter relating to an
23    expense report that I had not filed.  My
24    memory is that it was for $12,000, roughly
25    in that neighborhood.  Dan was

153

HOUSE

1
2    volcanic --
3    MR. WANG:    The word of the day.
4    A.    -- over the accounting details
5    relating to that filing.  He was not
6    volcanic.  He was apoplectic, and I didn't
7    really understand why.  I thought yes, I
8    had made a little bit of a mistake here in
9    letting this go for a while, but First
10    Marblehead and Dan himself did not dispute
11    anything about the expense report.  They
12    knew that the computers that I had bought
13    were on people's desks.  They knew that I
14    had paid for them for a good reason with
15    my own credit card because it was double
16    the warrantee.  There was no disagreement
17    about any of that stuff.  It was about
18    whether or not that filing should have
19    been made earlier, which I didn't dispute
20    that it should have been, but it wasn't,
21    and he was angry that it had to be -- that
22    the firm had to jump through some hoops in
23    some way that I didn't understand then or
24    now regarding the movement of the -- or
25    the placement of the accounting details in

154

HOUSE

1  some period or some other period.  He was
2  angry about that.  I became frustrated
3  with that, and I believe I made a -- an
4  intemperant remark to Dan about it, and
5  that is what set me off, and I think that
6  is what set him off to the stratosphere,
7  but that is what sent me out of the
8  office, his getting angry about this
9  trivia was what sent me out of the office,
10  and I left in anger, and I believe that
11  was the last day I was there.
12      Q.   Do you recall writing any
13  memoranda or other document to Dan or the
14  company regarding that after the fact,
15  after you left?
16      A.   Yes, I do recall writing it.  I
17  am -- what I am not sure about is whether
18  or not I actually would -- whether or not
19  the version that I had that I submitted
20  for -- you asked me earlier if I looked
21  for things on my computer and I found
22  that.  It was a memorandum or it was a
23  really kind of a just a letter trying to
24  be conciliatory about it, and I think that

155

HOUSE

1  probably if I said that it had to have
2  been before that last day because I don't
3  think I would have sent it after that, but
4  it was a nice letter I thought and
5  essentially apologizing for not filing the
6  expense report and what have you.
7      Q.   Okay.
8          So that memo was -- your
9  recollection is that memo was prepared
10  prior to you -- to the date you left in
11  anger?
12      A.   Yes.
13      Q.   Okay.
14          But you don't know whether or
15  not you sent it?
16      A.   I think I did, but I am not
17  sure.
18      Q.   Do you recall having any
19  discussions with anyone at First
20  Marblehead about that memo?
21      A.   Which memo?
22      Q.   The one you just described as
23  having sent.
24          MR. DEMOURA:  Why don't we just

156

HOUSE

1  mark it as an exhibit.
2          (House Exhibit 1 marked for
3  identification.)
4      Q.   I am showing you, Mr. House, a
5  document that has been marked Exhibit 1
6  for your deposition, and also for the
7  record it was produced with Bates stamp
8  number GH 00342.
9          Do you recognize that?
10      A.   Yes.
11      Q.   Is that the memo you were just
12  talking about that you sent or that you
13  found on your computer and produced?
14      A.   Yes, I think so.
15      Q.   Does looking at that refresh
16  your memory about whether or not you
17  actually sent it to anyone at First
18  Marblehead?
19      A.   It refreshes my memory as to why
20  I have an unclear memory.  It is unsigned,
21  and that is why I don't know if I sent it
22  or not.
23      Q.   Okay.
24          So you don't know whether or not

157

HOUSE

1  you sent it?
2      A.   I don't know.
3      Q.   And you don't recall, as you sit
4  here today, having any conversations with
5  anybody at First Marblehead about that
6  memo, correct?
7      A.   Yes, I don't recall any
8  conversations about the memo.
9      Q.   It is dated February 26, 1998.
10  I believe the documentation that has been
11  produced in the case indicates that your
12  last date at First Marblehead was February
13  28, 1998.
14          Do you recall that -- whether or
15  not at any time between the day you gave
16  your notice, which you testified was two
17  weeks before your last day there, and the
18  last day that there were any
19  discussions -- other than the last day
20  when you went out in anger about your
21  expense reports?
22      A.   Yes, there were.
23      Q.   Okay.
24          Can you tell me about those?

158

HOUSE

1    A.    I can't tell you the details of
2    the discussions. I know that they took
3    place because there wasn't any dispute
4    about the money, and I got paid.
5        Q.    When did you get paid, while you
6    were still employed there?
7        A.    I am pretty sure. Yes.
8        Q.    Okay.
9        A.    I don't recall exactly, but I am
10   pretty sure.
11       Q.    Okay.
12       Earlier in the day you mentioned
13   that you had not received any stock
14   options from any other employer other than
15   First Marblehead, correct?
16       A.    Correct.
17       Q.    Do you know whether or not any
18   of those employers that you have listed on
19   your answers to interrogatories offer
20   stock options to employees?
21       A.    I don't know.
22       Q.    At the time you were employed
23   with any of those employers, were you ever
24   advised that we have a stock option plan,

159

HOUSE

1    and you may be eligible for stock options?
2        A.    No. I -- I take that back. I
3    believe ABN Amro may have had a stock
4    option plan.
5        Q.    Did you ever see it?
6        A.    No.
7        Q.    Did you ever tell Mr. Meyers
8    that you had options that you were leaving
9    at ABN Amro when you were going to accept
10   the position at First Marblehead?
11       A.    Okay. I think I understand your
12   question, but you can phrase it more
13   precisely.
14       Q.    I am sorry. It is a bad
15   question. I will take it out and shoot
16   it.
17       Do you recall ever at any time
18   having a discussion with Dan Meyers in
19   which you told him when I left my prior
20   employer to come here and join First
21   Marblehead I had to give up stock options
22   at that company?
23       A.    No, I don't recall saying that.
24       Q.    Or in sum or substance saying

160

HOUSE

1    that?
2        A.    No.
3        Q.    The day that you had a
4    discussion with Mr. Meyers again going
5    back to the volcanic meeting when you
6    found out that there was a vesting
7    schedule, and you went in and talked to
8    him about it.
9        Was there any discussion about
10   why he had or why the company had given
11   you a vesting schedule?
12       A.    Okay. I am going to ask you to
13   phrase that more precisely again.
14       Q.    Okay. Earlier today we talked
15   about a meeting you had with Mr. Meyers.
16   It is the same meeting or during the
17   meeting he called Rod Hoffman and said
18   have Mr. House's stock vest immediately.
19   So we are at that meeting now. Okay.
20       A.    Yes.
21       Q.    Was there any discussion after
22   you came in the room and said I don't
23   want -- I don't agree with having a
24   vesting schedule, was there any discussion

161

HOUSE

1    between you and Mr. Meyers about why they
2    had initially put a vesting schedule in
3    there?
4        A.    No.
5        MR. WANG:    I object to the form
6    of the question.
7        Q.    Do you recall any other -- do
8    you recall why Mr. Meyers -- did
9    Mr. Meyers tell you why he agreed to let
10   you allow your stock to vest immediately?
11       MR. WANG:    I am sorry. Did you
12   tell Mr. House why he agreed to it? Is
13   that the question?
14       MR. DEMOURA:    Yes.
15       A.    Let me rephrase it in the way
16   that I understand it.
17       Q.    Yes.
18       A.    I go into to Dan and I tell him
19   I don't want my options vested. He says
20   okay. You are asking if he explained why
21   he said okay?
22       Q.    Exactly.
23       A.    He didn't.
24       Q.    Was there a give and take; was

162

HOUSE

1    there an argument about it?
2        A.    When I said earlier that I was
3    embarrassed at being angry, the reason I
4    was embarrassed was because he said okay
5    so readily, and I thought I -- I should
6    have come in in a more conciliatory
7    manner.
8        Q.    So there was no discussion or
9    debate about it?
10       A.    None. It happened in a
11   heartbeat.
12       Q.    Had there been prior discussions
13   about the fact that your options should
14   vest immediately with Mr. Meyers before
15   that day?
16       A.    No, and if there had been, I
17   probably wouldn't have been so angry about
18   it.
19       Q.    Okay.
20       A.    That is why I was angry because
21   it came as such a surprise.
22       Q.    Okay.
23            What were the tasks that you
24   were assigned to do when you joined First

163

HOUSE

1    Marblehead?
2        A.    The way you are asking the
3    question suggests that the process was
4    much more formal than it was. I would
5    characterize it as I was hired to do smart
6    things.
7        Q.    Okay. What --
8        A.    I was a smart guy. They were
9    hiring a smart guy to do smart things.
10       Q.    What smart things were they
11   hiring you to do?
12       A.    A wide variety of things. Can
13   you be more specific?
14       Q.    I really can't. I wasn't there.
15   Sorry.
16       A.    Okay. I can layout examples.
17       Q.    Okay.
18       A.    Earlier we talked about Steve's
19   activities with the consultant, et cetera,
20   et cetera.
21            MR. WANG:  Greg, just answer
22   what tasks you were given to do. It is as
23   simple as that.
24       A.    Okay. Tasks previously

164

HOUSE

1    performed by Steve Anbinder and were
2    fairly explicitly assigned to me and
3    assigned to me in a way to have me make
4    them more robust and make them work if the
5    firm God for bid ever succeeded.
6            For example, he wrote
7    spreadsheets to do things. Spreadsheets
8    are not a reasonable way for a large
9    financial firm to operate in most
10   respects. He wrote a spreadsheet to
11   value -- to present information on a
12   student's loan to the student. That was
13   kind of a big one. He -- I designed and
14   constructed and maintained a database of
15   student loan information. I reported
16   information to the Securities And Exchange
17   Commission regarding the trusts, the
18   behavior of the loans owned by the
19   National Collegiate Trust. All of this in
20   a general way in the arena of, you know,
21   applying technology to financial problems.
22   That is what I was assigned to do, and
23   that is what I did.
24       Q.    Were there specific projects

165

HOUSE

1    that you were given?
2        A.    Yes.
3        Q.    One that comes to mind is a GATE
4    project or --
5        A.    Well, that is like saying the
6    First Marblehead project. I mean GATE is
7    an acronym for Guaranteed Access to
8    Education. That described their -- I
9    think that to this day as far as I know
10   describes -- is the acronym they applied
11   to their loan program. It is the whole
12   thing.
13       Q.    Okay.
14            You certainly weren't charged
15   with the whole loan program. I understand
16   that, but were you charged with developing
17   more sophisticated computer programs that
18   would help First Marblehead provide the
19   services it was providing to its
20   customers?
21       A.    Yes.
22       Q.    Did you do that?
23       A.    Yes.
24       Q.    Did the projects that you were

166

HOUSE

1
2  assigned to do that ever get done?
3      A.   Absolutely.
4      Q.   Were there any assignments that
5  you were given that didn't get done?
6      A.   Nothing major, no, and so -- no.
7  I think that I accomplished what I went
8  there to do and would have worked in a
9  continuing way on the same kinds of
10  things, but there certainly was not any
11  kind of big pending thing that didn't get
12  done.
13      Q.   Okay.
14          Have you filed any personal
15  financial statements in the last -- have
16  you filed any personal financial
17  statements since you were granted the
18  options sometime in June, July of '97
19  period?
20      A.   What do you mean filed personal
21  financial statements?
22      Q.   Have you prepared any personal
23  financial statements listing your assets
24  and liabilities?
25          You know what a personal

167

HOUSE

1
2  financial statements is, don't you?
3      A.   I am not sure I know what you
4  mean in your context.
5      Q.   I mean a statement that
6  indicates your personal financial
7  condition, namely your assets and your
8  liabilities.
9      A.   I don't think so. I mean why
10  would I do that?
11          MR. WANG:   Gregory --
12      Q.   You might do it because you are
13  applying for a loan.
14          MR. WANG:   Mr. Demoura, he
15  asked you a question. You shouldn't be
16  answering his questions. I was going to
17  say don't ask questions. You are going to
18  answer questions, and you, Mr. Demoura,
19  you ask questions.
20      Q.   Did you file any type of
21  document like that -- have you applied for
22  any loans, for example, since you received
23  the grant of options?
24      A.   Yes.
25      Q.   Can you tell me what loans you

168

HOUSE

1
2  have applied for?
3      A.   I got a mortgage on my house.
4      Q.   The house in Colorado?
5      A.   Yes.
6      Q.   Is it the same mortgage you
7  currently have?
8      A.   Yes.
9      Q.   Do you have the documents that
10  you submitted to the bank in order to get
11  the mortgage still?
12      A.   Yes, but you are --
13      Q.   Don't yes but. Do you have the
14  documents or not?
15      A.   In New York, no. They are in
16  Colorado.
17      Q.   Okay.
18          Are they --
19      A.   They weren't financial
20  statements that you are describing.
21      Q.   I am not asking you about
22  financial statements. I am asking you
23  whether or not you applied for any loans.
24      A.   Yes.
25      Q.   And one loan you applied for was

169

HOUSE

1
2  the mortgage you have on the house in
3  Colorado, correct?
4      A.   Yes.
5      Q.   Who is that with?
6      A.   The loan is -- the mortgage is
7  held or serviced by National City Mortgage
8  of Dayton, Ohio I believe.
9      Q.   And is that the company that you
10  actually got the mortgage with originally?
11      A.   No, I actually handled all the
12  administrative details with a mortgage
13  broker.
14      Q.   Where?
15      A.   In -- I am having trouble with
16  the address because I am not sure if it is
17  in Denver or in Englewood.
18      Q.   In any event, it is in Colorado?
19      A.   Yes.
20      Q.   And you said you still have
21  copies of that documentation except not in
22  your personal possession right now,
23  correct?
24      A.   Yes, correct.
25      Q.   So you have a storage facility

170

HOUSE

1
2    in --
3      A.   My house.
4      Q.   You have a house in Colorado?
5      A.   Yes.
6      Q.   And there are personal papers of
7    yours at your home?
8      A.   There is practically everything
9    I own there.
10     Q.   Did you conduct a search of your
11   home in Colorado before you produced the
12   documents that we requested in this case?
13     A.   No, I wasn't there.
14     Q.   Does anybody else have access to
15   that -- to that home in terms of a key to
16   get in or --
17     A.   I am not sure. I don't think
18   so.
19     Q.   Is anybody taking care of the
20   property for you?
21     A.   The reason why I am not sure is
22   because Ava Blum was my next door
23   neighbor, and she had a key. She moved
24   away, so --
25     Q.   In any event, you have personal

171

HOUSE

1
2    papers, and you have testified that
3    virtually everything you own is located in
4    that house, correct?
5      A.   Yes.
6      Q.   I would ask for purposes of this
7    case that you do a search of the
8    property -- of your personal papers at
9    that home to see if there are any
10   documents responsive to the request I made
11   in the case.
12     A.   Could I speak to my attorney for
13   a second?
14          MR. WANG:  You don't have to
15   respond. He is a making a request. We
16   will respond. He will confirm the request
17   in a letter, and then we will respond.
18   That wasn't a question to you.
19     Q.   But you believe that within the
20   papers you have in Colorado would be the
21   paperwork that was submitted by you in
22   connection with applying for a mortgage,
23   correct?
24     A.   Yes.
25     Q.   Any other loans you have applied

172

HOUSE

1
2    for since --
3      A.   No.
4      Q.   -- 1997?
5      A.   No.
6      Q.   Have you had to file any
7    personal financial information in
8    connection with obtaining any professional
9    licenses since 1997?
10     A.   No.
11     Q.   Did you have to file a personal
12   financial statement in connection with
13   your divorce proceedings involving
14   Jennifer House in Essex Superior Court in
15   Massachusetts?
16     A.   I don't recall, and I don't
17   think so.
18     Q.   I will tell you that you did,
19   and I will also tell you that the court
20   will not let me obtain a copy of it
21   because they impound personal financial
22   statements, but I will request that that
23   personal financial statement be produced
24   or that I be given permission to receive
25   it by Mr. House.

173

HOUSE

1
2          MR. WANG:  We will take all
3    your requests under advisement. You will
4    confirm them in a letter as we did with
5    you, and we will respond to them.
6      Q.   By the way, Mr. House, you did
7    divorce Jennifer House, correct?
8      A.   Yes.
9      Q.   When was the last time you spoke
10   with Jennifer House?
11     A.   I am having trouble with the
12   precise date, but I think I know it, and I
13   believe it is April 7, 1998.
14     Q.   April 7, 1998?
15     A.   I am sorry. April 7, 1999 was
16   the date of our divorce.
17     Q.   That is the day you were in
18   court getting your divorce, correct?
19     A.   Yes.
20     Q.   And the day you submitted your
21   personal financial statement and
22   separation -- settlement agreement with
23   the court, correct?
24     A.   I don't recall submitting any
25   personal financial statement in that

174

HOUSE

1
2  context at all.
3      Q.    When did you last live with
4  Jennifer House?
5      A.    Around the time that I was
6  leaving First Marblehead we planned to
7  move to Chicago, and we wound up
8  divorcing.
9      Q.    Well, you left First Marblehead
10  February 28, 1998, correct?
11      A.    Um hum.
12      Q.    You have to say yes or no.
13  Sorry.
14      A.    Yes.
15      Q.    And the divorce papers you filed
16  indicate that the last day you lived
17  together was March 1, the next day, of
18  1998.
19          Does that refresh your memory as
20  to how long it was after you left? Is that
21  consistent with your memory that you
22  basically left the company and left your
23  wife at the same time?
24      A.    No. It is absolutely false.
25      Q.    It is absolutely false.

175

HOUSE

1
2          MR. DEMOURA:   Mark this as the
3  next exhibit.
4          (House Exhibit 2 marked for
5  identification.)
6      Q.    Showing you a document that has
7  been marked as Exhibit 2, Mr. House, I
8  represent to you that I obtained that
9  document from the Essex County Superior
10  Court in Massachusetts.
11          Is that your signature on that
12  document?
13      A.    Yes.
14      Q.    Is that your affidavit?
15      A.    Yes.
16      Q.    Does it say the last time you
17  lived together with Jennifer House was
18  March of 1998?
19      A.    Yes.
20      Q.    Was it true when you signed it?
21      A.    It is true. It does not
22  describe what you described.
23      Q.    I didn't ask you anything.
24      A.    You said if I --
25      Q.    That was two questions ago. The

176

HOUSE

1
2  question I just asked was was that true?
3      A.    Yes.
4      Q.    The last day you lived with her
5  was March 1, 1998?
6      A.    Yes.
7      Q.    Did she know you were moving out
8  to Chicago?
9      A.    Yes.
10      Q.    How long prior to March 1998 did
11  she know?
12          MR. WANG:   What is the
13  relevance of this?
14          MR. DEMOURA:   It could
15  reasonably lead to admissible evidence.
16          MR. WANG:   Just give me a
17  glimmer. I can direct him not to answer.
18          MR. DEMOURA:   You can object.
19          MR. WANG:   I can direct him not
20  to answer. I can call a halt to the
21  deposition and seek a ruling with respect
22  to that. Do you want to do that? I can do
23  that.
24          MR. DEMOURA:   Do you want to do
25  that?

177

HOUSE

1
2          MR. WANG:   What I would prefer
3  to do is because I think it is a more
4  mature way to proceed is I want you to
5  give me a glimmer of what you think this
6  could lead to, just the subject matter of
7  what it could lead to. Not the subject
8  matter, the --
9          MR. DEMOURA:   I think it goes
10  to the credibility of the witness of how
11  much notice he gave anybody about leaving
12  to go to Chicago.
13          MR. WANG:   That has to do with
14  what?
15          MR. DEMOURA:   He testified he
16  was leaving the company by a certain date.
17          MR. WANG:   What is the
18  relevance to any issue in this case?
19          MR. DEMOURA:   I don't have to
20  tell you that.
21          MR. WANG:   I think you do
22  because you are dealing with
23  somebody's --
24          MR. DEMOURA:   Are you going to
25  direct him not to answer?

178

1          HOUSE
2          MR. WANG: You are dealing with
3   somebody's personal affairs of that
4   nature, and I think you are being
5   gratuitously evasive.
6          MR. DEMOURA: It is a public
7   document that I obtained from the court.
8          MR. DEMOURA: Are you going to
9   direct him not to answer the question?
10         MR. WANG: Yes.
11         MR. DEMOURA: So that we can
12  proceed. Just say you are going to direct
13  him not to answer, so we can proceed.
14         MR. WANG: I direct him not to
15  answer the question. That is fair.
16     Q.   In your interrogatories, you
17  identified a gentleman named Kevin Walker
18  as someone who might have information or
19  possess information relative to this
20  action.
21         Do you know who Kevin Walker is?
22     A.   Yes.
23     Q.   Who is he?
24     A.   He was a First Marblehead
25  salesman.

179

1          HOUSE
2      Q.   And what information do you
3   believe he has that is relevant to this
4   case?
5      A.   He was one of the people who was
6   I believe granted options.
7      Q.   Have you had any discussions
8   with him about stock options?
9      A.   No.
10     Q.   I am sorry?
11     A.   No.
12     Q.   Have you had any discussions
13  with him since requesting -- requesting
14  the right to exercise your options in this
15  case?
16     A.   No.
17     Q.   When was the last time you
18  talked to Kevin?
19     A.   Probably the date I left or
20  thereabouts. No, I am sorry. I believe
21  he may have -- Kevin Walker left the
22  company at some point. I don't remember
23  when, but he went to business school, so
24  he may not have been there on the day I
25  left. It was either when I went to

180

1          HOUSE
2   business school or when I left the
3   company.
4      Q.   Thatcher Fields is another
5   individual whom you identified as someone
6   who would possess information or might
7   possess information relative to this
8   action in responses to our
9   interrogatories.
10         Who is Thatcher Fields?
11     A.   Salesman slash do everything guy
12  at First Marblehead.
13     Q.   When was the last time you had
14  any discussions with Mr. Fields?
15     A.   Probably the last day I left
16  also.
17     Q.   And what information do you
18  believe he has that is relevant to this
19  case?
20     A.   He was another recipient of
21  options I believe.
22     Q.   Do you believe he has any other
23  information?
24     A.   No.
25     Q.   Have you had any discussions

181

1          HOUSE
2   with him about stock options at First
3   Marblehead?
4      A.   No.
5      Q.   Steve Anbinder, we discussed him
6   a little bit today with respect to some
7   discussions you had about the valuing of
8   stock options.
9          Is Steve Anbinder -- is this the
10  same Steve Anbinder that you identified in
11  your --
12     A.   Yes, there is only one.
13     Q.   And what information do you
14  believe he has that is relevant to this
15  case other than what you have already
16  testified to?
17     A.   He was my immediate superior.
18  He would have information about my
19  employment, information about my
20  employment that has come up in this case.
21     Q.   So other than the information
22  that you've already told me about earlier
23  today plus information he might have about
24  your employment, any other information?
25     A.   Not that I could think of, no.

182

```
1            HOUSE
2     Q.   Have you had any discussions
3  with Mr. Anbinder regarding your stock
4  options?
5     A.   No.
6     Q.   Ralph James, who is Ralph James?
7     A.   Ralph James was the president of
8  First Marblehead.  I think he holds some
9  other title now.
10    Q.   And what information do you
11 believe Ralph James has that might be
12 relevant -- that is relevant or might be
13 relevant to this case?
14    A.   Well, he is on documents that I
15 submitted, and he was the president of the
16 firm and so forth, and one would expect
17 that he might know something about my
18 employment so also.
19    Q.   So other than what we have
20 discussed already today regarding any
21 discussions you had with Ralph James, and
22 I think one of the things we have
23 discussed was Exhibit 4, the compensation
24 review and what you have just told me, is
25 there any other information that he might
```

183

```
1            HOUSE
2  have that would be relevant to the case
3  that you believe he has?
4     A.   Not that I could think of, no.
5     Q.   Have you had any discussions
6  with Ralph James about your stock options
7  other than in connection with the -- your
8  compensation review?
9     A.   No.
10    Q.   Jay Niles, who is Jay Niles?
11    A.   Jay Niles is another recipient
12 of options at First Marblehead and still
13 is employed by the firm also.
14    Q.   And what information do you
15 believe he has that is relevant to this
16 case?
17    A.   Again, he was a recipient of
18 options I believe of -- of a type that was
19 issued at the same time as mine with
20 Thatcher and so forth, and he was an
21 employee of the firm and is still an
22 employee of the firm.
23    Q.   And I have others on the list
24 but stopping there for a minute, of the
25 ones we have already discussed Mr. Meyers,
```

184

```
1            HOUSE
2  Mr. Walker, Mr. Fields, Mr. Anbinder, Mr.
3  James and Mr. Niles, of those which one of
4  those individuals do you believe got the
5  same ISOs that you got?
6     A.   No one.
7     Q.   Nobody?
8     A.   That I know of.  Maybe
9  everybody.  I don't know.
10    Q.   Which of them got ISOs at the
11 same time you got ISOs?  Did Dan Meyers?
12    A.   If -- I don't know.
13    Q.   Did Kevin Walker?
14    A.   I believe so.
15    Q.   Did Thatcher Fields?
16    A.   I believe so.
17    Q.   Did Steve Anbinder?
18    A.   Yes.
19    Q.   Did Ralph James?
20    A.   I believe so.
21    Q.   Did Rod Hoffman?
22    A.   I don't believe so.
23    Q.   Why wouldn't he get them?
24    A.   He wasn't an employee of the
25 firm.
```

185

```
1            HOUSE
2     Q.   Did Troy Boone get them, get
3  ISOs at the same time you did?
4     A.   My memory is not terrific.  I
5  don't even know if he was at the firm at
6  the time because he came later, but if he
7  was he probably would have been in the
8  same category as Thatcher and --
9     Q.   And Noreen Sloan was she an
10 employee of First Marblehead?
11    A.   Yes, and I have no idea if she
12 received options.
13    Q.   How about Gary Santo, did he
14 receive ISOs?
15    A.   I don't know.
16    Q.   Bruce Lefenfelder, did he get
17 ISOs?
18    A.   I would imagine he did.
19    Q.   At the same time you did?
20    A.   I believe so.
21    Q.   Tom Anderson, did he receive
22 ISOs?
23    A.   He is in the same category.  I
24 don't know.
25    Q.   Back to the list, Rod Hoffman
```

186

HOUSE

1
2    you have listed as somebody who has
3    information that is or may be relevant to
4    this action, and other than what you have
5    already testified to today about Mr.
6    Hoffman what other information do you
7    believe that he has that is relevant to
8    this case?
9        A.   I have testified to it.
10       Q.   Other than what -- so if
11   you -- there is nothing else other than
12   what you have testified to?
13       A.   Right.
14       Q.   Troy Boone, who is he?
15       A.   A salesman. A number of those
16   people were -- played a similar role at
17   First Marblehead.
18       Q.   So he was an employee at First
19   Marblehead?
20       A.   Yes.
21       Q.   And what information do you
22   believe that he has relevant to the case?
23       A.   If he was there, he probably
24   received options also.
25       Q.   Other than that, any other

187

HOUSE

1
2    information?
3        A.   No.
4        Q.   Have you ever discussed your
5    ISOs with him?
6        A.   No.
7        Q.   With Troy Boone?
8        A.   No.
9        Q.   When was the last time you spoke
10   with Troy Boone?
11       A.   Again, I am not sure if he was
12   there on my last day. If he was, I
13   probably had a conversation with him. If
14   he wasn't, it was sometime when he left.
15   He left the firm also, but I am not sure
16   if -- I am fairly sure that he left after
17   I was gone.
18       Q.   Okay.
19            Have you had any discussions
20   with him since you left?
21       A.   No.
22       Q.   By the way, on Jay Niles let me
23   move back to that for a minute, did you
24   ever have any discussions with Jay Niles
25   about your ISOs?

188

HOUSE

1
2        A.   I don't believe so.
3        Q.   When was the last time you
4    talked to Jay Niles?
5        A.   Probably the last day I was
6    there probably.
7        Q.   Noreen Sloan, she is an
8    employee -- she was an employee of First
9    Marblehead, correct?
10       A.   Was or is. I am not sure. Was
11   definitely.
12       Q.   Was when you were there?
13       A.   Maybe is. I don't know.
14       Q.   When is the last time you spoke
15   to with Noreen Sloan?
16       A.   Same story. The last day I was
17   there.
18       Q.   And have you ever had any
19   discussions with Noreen Sloan about your
20   ISOs?
21       A.   No.
22       Q.   Gary Santo, is he an employee of
23   First Marblehead?
24       A.   I don't know.
25       Q.   Was he?

189

HOUSE

1
2        A.   Yes.
3        Q.   What information would he have
4    that would be relevant to this litigation?
5        A.   Again, he is in an uncertain
6    category. The -- there are people I can
7    be pretty sure about who received options,
8    and there are people I am less sure about.
9    Gary Santo is one of the ones I am not
10   sure about.
11       Q.   He might have received ISOs?
12       A.   Right.
13       Q.   Now, have had any discussions
14   with Gary Santo about your options?
15       A.   No.
16       Q.   And when was the last time you
17   spoke with him?
18       A.   The same day.
19       Q.   Bruce Lefenfelder, who is he?
20       A.   He was a slightly different
21   role. He was an accountant. He was the
22   firm's accountant as a -- what you call it
23   -- a contractor. He was self-employed I
24   believe, and he served as the firm's
25   accountant for I believe years, and at



190

HOUSE

2 some point he became an employee. I don't
3 remember when, but he became an employee.
4 He had an office in the firm at Little
5 Harbor, so he was sort of an internal
6 accountant. He was also a guy -- so he
7 was slightly different from most of the
8 people you've just mentioned. Most of
9 those people were salesman.
10    Q.   And Mr. Lefenfelder is somebody
11 you listed as someone who might have
12 information relative to this action. What
13 information do you believe that he has
14 that is relevant to the case?
15    A.   He received options also.
16    Q.   Other than that, any other
17 information that he would have?
18    A.   No.
19    Q.   Have you had any discussions
20 with Mr. Lefenfelder since you left First
21 Marblehead?
22    A.   No.
23    Q.   Did you ever discuss your ISOs
24 with Mr. Lefenfelder while you were
25 there?

191

HOUSE

2    A.   No.
3    Q.   Tom Anderson, who is he?
4    A.   He was Dan's man Friday I would
5 say.
6    Q.   Was he an employee of First
7 Marblehead?
8    A.   Yes.
9    Q.   And what information do you
10 believe he has that is relevant to this
11 case?
12    A.   I don't know if he received
13 options at all, but if he did I would want
14 to know about it.
15    Q.   Okay.
16       So that would be the information
17 that he might have received options,
18 correct?
19    A.   Correct.
20    Q.   And that is why you listed him?
21    A.   Right.
22    Q.   Have you had any discussions
23 with Tom Anderson about your ISOs?
24    A.   No.
25    Q.   And have you had any discussions

192

HOUSE

2 with Tom Anderson since you left First
3 Marblehead?
4    A.   No.  I -- I have to amend this a
5 little bit.
6    Q.   Okay.
7    A.   I believe Jay Niles called me at
8 some point to say hello and --
9    Q.   Do you recall how long ago that
10 was?
11    A.   It was probably a couple of
12 weeks after I left.
13    Q.   Okay.
14    A.   And I believe he called me
15 and -- in my office in Chicago, but I
16 can't recall that precisely either. It
17 was to say hello, and, you know, he knew
18 the circumstances under which I had left
19 were not terrific, and he just wanted to
20 say hello. We were -- I would say we were
21 pals.
22    Q.   While you were both at First
23 Marblehead?
24    A.   Yes, and he called to say hello,
25 and it completely slipped my min until

193

HOUSE

2 just a second ago.
3    Q.   During that time was there any
4 discussion about the ISOs?
5    A.   No.
6    Q.   What documents do you say or do
7 you believe there were any documents that
8 support your contention that whatever ISOs
9 you were granted by First Marblehead are
10 still valid and exercisable?
11       MR. WANG:  I object to the form
12 of the question. I also object to the
13 extent it calls for a legal conclusion.
14 Subject to those objections, you can
15 answer. That is really nothing that is
16 for a fact witness, but you may answer.
17    A.   Okay. Do I understand the
18 question correctly you are asking for
19 documentation of what I -- what I am
20 claiming?
21    Q.   No, I am saying can you point to
22 any documents that you say support your
23 contention, and it is your contention, not
24 his, and it is not mine, your contention
25 that the options that you got from First

194

HOUSE

1      HOUSE
2    Marblehead are still valid and
3    exercisable?  Can you point to any
4    document that says that?
5        A.    Yes.
6            MR. WANG:   Objection.  My
7    objection is noted.  You may answer.
8        Q.    Yes?
9        A.    Yes.
10       Q.    What documents do you have?
11       A.    It is not a document.  It is a
12   series of documents.
13       Q.    What are they?
14       A.    The memorandum that I submitted
15   here.
16       Q.    You submitted?
17       A.    And which I believe you --
18       Q.    Have we talked --
19       A.    -- you do not dispute.
20       Q.    Have we talked about it today?
21       A.    Yes.
22       Q.    Is it James Exhibit Number 3?
23       A.    Yes.
24       Q.    Any other documents?
25       A.    Exhibit 4 I believe.

195

HOUSE

1      HOUSE
2        Q.    James Exhibit Number 4?
3        A.    If you put this together with
4    this --
5        Q.    Any other documents? Hold on.
6    Don't put anything together yet.  Are
7    there any other documents that you --
8        A.    There is a document that I
9    haven't seen here, and I don't know if it
10   is in here, but I believe it was
11   submitted.
12       Q.    What is it?
13       A.    And it was surrounding the issue
14   of pricing the options.  I can't recall
15   what it looks like.  I think it was on a
16   yellow pad, but I am not sure, and it
17   contained I believe -- my memory is that
18   it contained some terms relevant to
19   pricing the options that went -- that are
20   consistent with these documents and which
21   helped to flesh out story that I
22   am -- that I am representing as -- as my
23   agreement.
24       Q.    So it is a piece of yellow legal
25   pad?

196

HOUSE

1      HOUSE
2        A.    Right.  I am not really sure.
3            MR. WANG:   It was produced.
4            MR. DEMOURA:   I didn't -- so it
5    is white because it is a copy.
6            MR. WANG:   It was white.  It
7    was produced to you.  That is true.
8        Q.    So it is a piece of paper that
9    has typewritten information on it.
10       A.    No, it is handwritten, and it is
11   not my handwriting.
12       Q.    Whose handwriting is it?
13       A.    I don't know.  I suspect it is
14   Steve or maybe Dan's.
15       Q.    I don't want you to make any
16   suspicions.
17       A.    I have no idea.  I do have an
18   idea, but --
19       Q.    And does it have any names on
20   it?
21       A.    No, it has numbers on it.
22       Q.    And those numbers say what?
23       A.    They are parametric information
24   that we talked about earlier.
25       Q.    Information that we talked about

197

HOUSE

1      HOUSE
2    about giving you the value of the options,
3    correct?
4        A.    Yes, that -- I haven't seen it
5    in a while, so I can't describe it
6    perfectly accurately.  You asked me for
7    things that put together this -- this
8    case.
9        Q.    That is precisely what I am
10   asking you, and you understand it
11   perfectly.
12           So other than the James Exhibit
13   3, the James Exhibit 4, and the -- by the
14   way, the other document that has that
15   handwriting on it, how many pages is it?
16       A.    One.
17       Q.    Okay.
18           So other than Exhibit 3 from the
19   James deposition, Exhibit 4 from the James
20   deposition and a one-page piece of paper
21   with some numbers on it that were the
22   numbers used for you to -- I keep
23   forgetting the word -- parametrics,
24   parameters?
25       A.    Parameters.

198

1      HOUSE
2      Q.  -- parameters, handwritten
3  numbers that were the parameters given for
4  you to value the options, other than those
5  three documents are there any other
6  documents that you say support your
7  contention that the options you were
8  granted by First Marblehead are still
9  valid and exercise?
10         MR. WANG:  I object to the form
11 of the question for reasons previously
12 stated.  You may answer.
13     A.   I believe there has
14 been -- there is also a document that we
15 requested in these proceedings that would
16 evidence the telephone call between Dan
17 and Ralph -- and Rod Hoffman.
18     Q.   You are saying that there is a
19 document out there --
20     A.   I don't know that there is or
21 not.  I know that we requested it.
22     Q.   So you don't know if there is
23 another document -- if there is a document
24 that memorializes the telephone call
25 between Mr. Meyers and Mr. Hoffman that

199

1      HOUSE
2  you say took place in your presence?
3      A.   Yes.
4      Q.   But if there was such a
5  document, that would also be a document
6  you would say would support your position
7  that all the options that you were granted
8  by First Marblehead are still valid and
9  exercisable?
10     A.   Let me put this way.  If -- if
11 Rod Hoffman keeps records, that record
12 will turn up I promise.
13     Q.   That is not my question, Mr.
14 House.  My question is is that -- if there
15 is such a document, that is a document you
16 are claiming also supports your position
17 that --
18     A.   Yes.
19     Q.   -- that the First Marblehead
20 options, ISOs are still valid and
21 exercisable?
22     A.   Correct.
23     Q.   Other than those four documents,
24 are there any other documents?
25         MR. WANG:  Same objection.  You

200

1      HOUSE
2  may answer.
3      A.   I believe that is it.
4          MR. WANG:  Off the record.
5          (Discussion held off the
6  record.)
7          MR. DEMOURA:  Back on the
8  record.
9          (House Exhibit 3 marked for
10 identification.)
11         (Document handed to witness.)
12     Q.   Mr. House, I am showing you a
13 document that has been marked as Exhibit
14 3.  The copy that I have is white.  I
15 don't know what the original color of it
16 is, but is that the handwritten
17 note -- first of all, it was produced by
18 you, G. House?
19     A.   I think I can clarify this.
20         MR. WANG:  It is not --
21     Q.   The coloration is irrelevant.
22 Yes, that is irrelevant.
23         MR. WANG:  It is irrelevant.
24     Q.   I don't want you to say that
25 this is not the right color.

201

1      HOUSE
2          MR. WANG:  Is this the document
3  you had in mind?
4          THE WITNESS:  Yes.
5          MR. DEMOURA:  Thank you.
6      Q.   So this document is the document
7  you are referring to that is another one
8  that supports your contention that the
9  option is still -- the ISO is still
10 exercisable, correct?
11     A.   Yes.  Absolutely.
12     Q.   And that is the one with the
13 handwriting on it that had the parameters
14 on it that you were discussing earlier,
15 correct?
16     A.   Yes.
17     Q.   Okay.
18         Back to this issue about whether
19 or not you have filed any personal
20 financial information in applying for
21 loans or otherwise, as you sit here today
22 can you recall any other occasion other
23 than applying for your mortgage, and I
24 believe even though you don't recall you
25 did file something in connection with your



202

1          HOUSE
2    divorce proceedings, where you had an
3    occasion to list your liabilities -- your
4    assets and liabilities?
5        A.    No, there was no other occasion.
6        Q.    Okay.
7              When you applied for a position
8    with Angelo Gordon, did you have to submit
9    any such documentation about your assets
10   and liabilities?
11       A.    No.
12             MR. WANG:  I think you asked
13   him that.
14       Q.    Did you answer it?
15             MR. WANG:  He answered it no
16   then, and he answered it no now.
17             MR. DEMOURA:  I didn't hear him
18   answer it no now.
19       Q.    Do you ever monitor -- have you
20   ever gone to an Yahoo finance message
21   board on First Marblehead?
22       A.    I don't know.  I don't think so,
23   but I don't know.
24       Q.    Do you --
25       A.    I am an avid web surfer.  I

203

1          HOUSE
2    don't know.
3        Q.    That wasn't my question, but
4    okay.
5              You are familiar with the fact
6    that Yahoo has -- in the finance section
7    of Yahoo there is a section where people
8    can talk about various stocks and
9    corporations and message boards, correct?
10       A.    Yes.
11       Q.    Have you gone to that site
12   before?
13       A.    Now, that you have phrased it
14   more clearly, I can answer it more
15   clearly.
16       Q.    Okay.
17       A.    Absolutely not.  I would not
18   participate in those kind of discussions
19   just as a matter of course.
20       Q.    Do you know anybody who uses a
21   user name "Longer Term"?
22       A.    No idea.
23             MR. WANG:  Now I am intrigued.
24       Q.    Have you ever reviewed any SEC
25   filings involving First Marblehead

204

1          HOUSE
2    Corporation?
3        A.    Yes.
4              MR. WANG:  I am going to object
5    to the extent that some of that may be
6    covered by work product privilege, so to
7    the extent that some of that may have been
8    in connection with --
9              MR. DEMOURA:  Requests made by
10   your attorney?
11             MR. WANG:  Or because work not
12   done by an attorney could still be work
13   product as you know.  I didn't stop him
14   from answering.
15             MR. DEMOURA:  I know.  You are
16   trying to flag the issue, so we don't have
17   any waiver.
18             MR. WANG:  That's correct.
19       Q.    I am sorry.
20             Have you reviewed any SEC
21   filings involving First Marblehead?
22       A.    I answered yes before, and I am
23   answering yes again.
24       Q.    When was the first time you did
25   that?

205

1          HOUSE
2        A.    Following the category of
3    assigned work, it is part of what I did.
4        Q.    Assigned work at --
5        A.    I didn't review them.  I made
6    them.
7              MR. WANG:  He --
8        Q.    I am talking about --
9              MR. WANG:  He is thinking about
10   what he did in 1998.
11       Q.    I am talking about SEC filings
12   made by First Marblehead in connection
13   with its own stock offerings.
14       A.    No.  No.  No.  The ones I was
15   talking about were different.
16       Q.    Why don't I just take a break
17   for a minute.  Go ahead and make a call.
18   This is a good time for me to take a
19   break.
20             (Recess taken.)
21   BY MR. DEMOURA:
22       Q.    Mr. House, earlier we discussed
23   Exhibit 1, which deals with your expense
24   reporting or the issue about expense
25   reporting and reimbursements towards the

206

1      HOUSE
2 end of your employment with First
3 Marblehead, correct?
4      A.   Yes.
5      Q.   Had you had similar issues at
6 other employers -- with other employment
7 prior to First Marblehead at other
8 companies?
9          MR. ARONOFF:  I object to the
10 form.  You can answer.
11     A.   What do you mean similar issues?
12     Q.   At your other employers prior to
13 working at First Marblehead, had there
14 ever been an issue or -- about your
15 failure to report and submit expense
16 forms, expense vouchers?
17         MR. ARONOFF:  I object to the
18 form.
19     A.   I can't recall now.
20     Q.   Okay.
21         Do you recall ever telling Mr.
22 James or Mr. Meyers that in your prior
23 employment you had had other problems with
24 submitting --
25     A.   I can't recall either.

207

1      HOUSE
2      Q.   Have you ever had any
3 conversations about your stock options
4 with Jennifer House?
5      A.   Yes.
6      Q.   When do you recall doing that?
7      A.   Prior to leaving Marblehead, but
8 when I have no idea.  I can't recall that
9 at all.  I know that she knew I had them.
10     Q.   It would have been while you
11 were still married?
12     A.   Yes.
13     Q.   And what do you recall telling
14 her?
15     A.   I would not characterize
16 Jennifer as financially sophisticated, so
17 we would not have gone into the details of
18 the options or their characteristics or
19 their valuation or anything like that.
20 What we would have discussed is that I
21 received them as part of my compensation,
22 and I recall her being upset about them
23 not being enough.  That is -- that would
24 have been it.
25     Q.   Okay.

208

1      HOUSE
2          Would that conversation have
3 occurred at or around the time that you
4 learned how many options you had received
5 in June of 1997?
6      A.   No, I think probably it happened
7 later.
8      Q.   Later.
9          MR. ARONOFF:  For the record,
10 Mr. Demoura, we are not waiving any
11 possible marital privilege that might
12 apply.
13         MR. DEMOURA:  I understand.
14     Q.   Other than that one conversation
15 that you had, do you recall any other
16 conversations --
17     A.   I didn't say it was one
18 conversation.  I said that we discussed
19 the issue.  I can't recall if it was in
20 one conversation or 30 conversations.  I
21 think that it was a subject for
22 discussion.
23     Q.   Now, earlier you testified
24 that -- I believe you testified earlier
25 that at some point the options were going

209

1      HOUSE
2 to be reduced to some sort of a writing or
3 the terms were going to be presented in
4 some sort of document, correct, the ISOs?
5      A.   I don't think that ever
6 got -- that was ever said to me.  I
7 assumed that it would be done, but I
8 didn't -- I don't think it was ever
9 represented to me that way at all.
10     Q.   And that is because of your
11 experience and understanding about the
12 stock options and your financial
13 expertise, correct?
14         MR. ARONOFF:  I object as to
15 form.
16     A.   I --
17         MR. ARONOFF:  You can answer if
18 you can.
19     A.   I wouldn't think that they would
20 do a major thing like that without
21 documenting it, and when they didn't
22 document it for me --
23     Q.   I think you answered the
24 question.
25         I am going to show you Exhibit V



210

HOUSE

1
2  to the complaint, which was marked as an
3  exhibit, as Exhibit 1 to the Ralph James
4  deposition. This is all together, but it
5  is not stapled together. You can take my
6  word for it, and I ask you if you
7  recognize that.
8      (Document handed to witness.)
9   A.   Yes.
10  Q.   What is it?
11  A.   I received it from Peter Tarr I
12 believe.
13  Q.   And the first time you saw that
14 was when?
15  A.   Early March 2004.
16  Q.   And also attached to the
17 complaint as Exhibit A is a document that
18 I will ask if you have ever seen before?
19  A.   No. I don't -- I have never
20 seen this -- I don't believe I have ever
21 seen that. It looks like very similar to
22 that, but it looks -- maybe it is just the
23 typeface. I will read this in detail, but
24 I don't -- hold on.
25  Q.   Do you remember ever receiving a

211

HOUSE

1
2  document entitled "The First Marblehead
3  1996 Stock Option Plan"?
4   A.   That is why I say I am thinking
5  that it is like this.
6   Q.   Exhibit B is the specific grant.
7   A.   I am sorry. I am thinking that
8  it looks like the stock option plan that
9  Peter Tarr sent me.
10  Q.   Okay.
11  A.   But it doesn't look precisely
12 the same. If I review them in tandem,
13 maybe it will be clear, but no, I did not
14 receive this document in 1996 or any time
15 while I was employed, any time
16 significantly after I was employed.
17  Q.   Okay.
18  A.   It may have been the thing that
19 Peter -- maybe I am making them the same
20 thing that Peter Tarr sent me this. Peter
21 Tarr sent me a document.
22      MR. ARONOFF:   Is there a
23 pending question?
24      MR. DEMOURA:   There was, and I
25 think he has answered it.

212

HOUSE

1
2   Q.   In February of 2004 you state in
3  your answers to interrogatories that you
4  attempted to exercise the stock option at
5  the -- the First Marblehead stock options,
6  correct?
7   A.   No, I attempted to exercise my
8  options. I didn't know what context they
9  were in at all. They were just my options
10 that I had received.
11  Q.   The ISOs you received from First
12 Marblehead, correct?
13  A.   I didn't call them ISOs. I just
14 called them my options.
15  Q.   You called them your options.
16 The documents that you say support your
17 contention that you -- that you still have
18 them called them ISOs, correct? Isn't that
19 what it is called on the document Exhibit
20 Number 4, ISO?
21  A.   Okay. Yes.
22  Q.   Is that correct?
23  A.   Yes. I am not having a
24 semantical argument here.
25  Q.   Does the document James Exhibit

213

HOUSE

1
2  3 talk about ISOs?
3      MR. ARONOFF:   The documents say
4  what they say. You don't have to ask him
5  to testify what they say.
6      MR. DEMOURA:   Is that an
7  objection?
8      MR. ARONOFF:   Just move on.
9  You want him to read the document. Ask
10 him to read the document.
11      MR. DEMOURA:   I want him to
12 answer my question.
13      Are you objecting?
14      MR. ARONOFF:   Yes, I am
15 objecting.
16      MR. DEMOURA:   Thank you.
17  Q.   Doesn't the document that you
18 have testified to today support your
19 position that your ISOs are still valid
20 and exercisable refer to them as ISOs or
21 incentive stock options?
22  A.   Okay. Fine. I don't think I
23 called them that in the conversation.
24  Q.   Okay. I guess where we are
25 going with this is I want to find out, A,

214

HOUSE

1
2  when did that conversation take place?
3  Did it take place in February 2004?
4      A.   Yes.
5      Q.   What was said during that
6  conversation?
7      A.   I called Dan.
8      Q.   Okay.
9           Where were you when you called
10 him?
11     A.   At my -- in my office at Angelo
12 Gordon.
13     Q.   Was anybody else present with
14 you?
15     A.   No.  I called him, and the
16 conversation was -- was initially about
17 congratulations.  I believe it moved from
18 that, and that was brief.
19     Q.   By the way, was that the reason
20 you were calling, to congratulate him?
21     A.   Certainly not.
22     Q.   But you exchanged pleasantries
23 at the beginning of the conversation.  You
24 congratulated him?
25     A.   Yes.

215

HOUSE

1
2      Q.   And then what?
3      A.   I said I believe I said almost
4  verbatim, Dan, I am a little disappointed
5  that I didn't hear from you.
6      Q.   And what did he say?
7      A.   And he responded pretty much
8  verbatim we couldn't find you.  The
9  precision of my memory fails me here, and
10 I can't recall how I introduced the
11 subject of exercising my options, but I
12 said Dan I have options on First
13 Marblehead stock.  I would like to
14 exercise them, and he said, Gregory, we
15 have a vesting issue.  I remember that
16 pretty much verbatim, and I said pretty
17 much, you know, less -- my memory maybe
18 not verbatim, but I said, Dan, we don't
19 have a vesting issue.  I own my options.
20 I believe, but I can't recall exactly that
21 I said something along the lines that the
22 reason I own my options is because of a
23 conversation that you have to recall that
24 you may be forgetting between you and Rod
25 Hoffman.

216

HOUSE

1
2      Dan replied we have a guy who
3  administrates our plan.  His name is Peter
4  Tarr.  You have to call him Gregory, and I
5  replied, this is another verbatim memory,
6  Dan, you call him, Peter Tarr.  I am not
7  calling him.  I know what I have.  That
8  was the substance of the conversation.
9      Q.   Okay.
10          Going back to the beginning of
11 the conversation when you said you were
12 disappointed that he hadn't -- that the
13 company hadn't contacted you and he said
14 we didn't know where you were --
15     A.   Um hum.
16     Q.   -- or we couldn't locate you,
17 had you at that point brought up the
18 whole -- any issue about stock options?
19     A.   I believe no.  At that point,
20 no.
21     Q.   In fact, do you know that after
22 you left abruptly on February 28, 1988
23 that the company had been looking for you
24 from that point?
25     A.   I don't know that, and I

217

HOUSE

1
2  don't -- I don't know that.
3      Q.   The conversation then moved on
4  to the options, and you said you were -- I
5  am not trying to put words in your mouth
6  but paraphrasing -- you tried to remind
7  him about the conversation he had with Rod
8  Hoffman, correct?
9      A.   I believe so, but I am -- my
10 memory isn't perfect on that.
11     Q.   And what do you recall him
12 saying in connection with that?
13     A.   I recall something -- him saying
14 something in connection with that I would
15 probably recall the rest of it better.
16     Q.   Okay.
17     A.   But I don't recall any response.
18     Q.   And the only thing that happened
19 during the conversation with Rod Hoffman
20 that you would have been reminding him
21 about was Dan Meyers telling Rod Hoffman
22 please make sure that Gregory House's
23 stock options vest immediately, correct?
24     MR. ARONOFF:  I object as to
25 form.

218

1      HOUSE
2    A.   Say that again.
3         MR. DEMOURA:   Can you just wait
4    until I am done with my question because I
5    think that is what is confusing him here.
6    Q.   The only conversation that you
7    were reminding Dan about was the
8    conversation that you had with Rod Hoffman
9    where Dan told Rod make sure that Greg
10   House's stock options vest immediately,
11   correct?
12   A.   Yes, that is correct.
13   Q.   That was the conversation you
14   were trying to remind him about, the one
15   you've testified to already here, correct?
16   A.   Yes.
17   Q.   I am trying to get if that is
18   true because I want to know if there was
19   another conversation that I don't know
20   about?
21   A.   No, the only question is:  Was
22   the language precisely that.  Did I remind
23   him of Rod Hoffman's conversation with him
24   or was I just saying something that didn't
25   mention Rod's name that asserted the same

219

1    HOUSE
2    facts.  I can't remember that precisely.
3    Q.   But it only related to the issue
4    about whether your stock was going to
5    invest immediately, your stock options,
6    your ISOs were going to vest immediately
7    rather than the vesting schedule that you
8    had been given, the Hoffman memo, correct?
9    A.   Correct.
10        MR. ARONOFF:   Objection.
11   Q.   Anything else you can recall
12   about the conversation with Dan Meyers?
13   A.   I believe -- I think even though
14   I claimed I would not call Peter Tarr, I
15   think he gave me the phone number anyway,
16   but I am not sure about that, and clearly
17   in my mind I was awaiting a response.  So
18   there must have been something at the end
19   of the conversation that would indicate
20   that Dan was going to do what I asked and
21   call Peter Tarr because as far as I was
22   concerned they could come back and say,
23   yes, your claim is exactly right.  I don't
24   know what he was going to do.
25        MR. ARONOFF:   Greg, you are not

220

1      HOUSE
2    supposed to be speculating.  You realize
3    that.
4    A.   I am just saying at the end of
5    the conversation something must have
6    happened.  We didn't hang up.  It wasn't
7    abrupt.
8         MR. ARONOFF:   Again, he doesn't
9    want you to guess.
10        THE WITNESS:   Okay.
11   Q.   Prior to that conversation with
12   Dan Meyers -- by the way, how soon after
13   you had talked -- how soon after you had
14   learned that First Marblehead had gone
15   public did you have that conversation with
16   Dan Meyers, within hours, days, weeks,
17   months?
18   A.   I think it was probably a couple
19   of weeks.  Maybe a week.
20   A.   I don't know.
21   Q.   In the time between the time you
22   found out that First Marblehead had become
23   a public company and time you made that
24   phone call to Dan Meyers, did you -- what
25   did you do to -- did you try to gather as

221

1      HOUSE
2    much information from your personal
3    belongings as you could about your stock
4    options?
5    A.   Not really.
6    Q.   What did you do before
7    you -- did you do anything before you
8    called Dan to talk to him about the
9    options relating to your stock options?
10   A.   Yes.
11   Q.   What?
12   A.   I tried to figure out what they
13   were, how many I had.  That was the big
14   thing.
15   Q.   How did you do it?
16   A.   Because I didn't know.  I mean
17   what I had in 1996 I had -- in fact there
18   is another item that I did forget to
19   mention in my -- in my conversation with
20   Dan I made an error on the number.
21   Q.   You made -- which conversation
22   with Dan are we talking about now?
23   A.   The phone conversation where I
24   tried to exercise my options.  I didn't
25   have these pieces of paper in my



**222**

1    HOUSE
2    possession, and I thought they were still
3    in Denver. They were not. I had brought
4    my whole First Marblehead file here.
5    Q.    Okay.
6    A.    They turned up, and I later
7    found out what I had, but when I had the
8    conversation with Dan, I was remembering
9    that I had 4,000 options because it was
10   just a handwritten piece of paper, and I
11   knew it had no -- no meaning in
12   today's -- in terms of today's outstanding
13   stock because I knew that -- that the firm
14   was now roughly a 2 billion company, and
15   then it wasn't. It was far less. So I
16   knew it would have been a bigger number,
17   and it would have split and so forth, and
18   it was in fact bigger than what I thought
19   I had, you know, at first, what I actually
20   had.
21   Q.    So how did you go about trying
22   to find --
23   A.    And I made an error.
24   Q.    -- what you had?
25   A.    I searched the web. I looked

**223**

1    HOUSE
2    for information about stock splits, et
3    cetera, and I eventually got a copy of the
4    prospectus, the IPO. It was beried in
5    that.
6    Q.    What was beried in that?
7    A.    The information about the stock
8    split. There was a four for one, and then
9    there was a ten four one.
10   Q.    So there wasn't any information
11   that that public information or prospectus
12   that was related to you, your ISO grant
13   specifically, was there?
14   A.    No.
15   Q.    And you were using your -- the
16   number 4,000 in your head as a -- as then
17   the way to calculate splits and how that
18   was going to affect your grant of ISOs,
19   correct?
20   A.    Yes.
21   Q.    So other than trying to find out
22   how many options you had by going on the
23   web and looking at whether there had been
24   splits and so forth, did you do anything
25   else before the conversation you had with

**224**

1    HOUSE
2    Dan Meyers about trying to look into or
3    researching your stock, your ISO grant?
4    A.    No. I didn't feel there was a
5    need to.
6    Q.    After that conversation
7    with -- did you do anything to figure out
8    what you needed to do in order to exercise
9    what you believed was a valid and
10   exercisable --
11   A.    Why would I do that? It was
12   just a simple matter of making a phone
13   call and saying I am going to exercise my
14   option. I did that.
15   Q.    I didn't ask you why. I am
16   asking you if you did.
17   A.    Okay. Maybe I didn't understand
18   the question.
19   Q.    Did you do anything to determine
20   how you should go about exercising the
21   ISOs that you believed were still valid
22   and exercisable?
23   A.    Okay. Mr. Demoura, no, but I
24   also didn't do anything to figure out how
25   to walk out of this building.

**225**

1    HOUSE
2    Q.    Then your answer is no then.
3    Right. That is your answer.
4    MR. ARONOFF:    Just answer his
5    question.
6    Q.    Do you know whether there is a
7    procedure in effect with respect to how
8    you go about exercising ISOs?
9    A.    If there is a procedure, I don't
10   know about it.
11   Q.    Do you believe that in order to
12   exercise the ISOs that you believe are
13   still valid you would have to come up with
14   any money to exercise them?
15   MR. ARONOFF:    Objection as to
16   form.
17   A.    Say again.
18   Q.    Sure.
19   Do you believe that in order to
20   exercise the options you believe are still
21   valid that you would have to come up with
22   any money?
23   A.    I certainly expected to come up
24   -- to do exactly that.
25   Q.    And how much money do you

226

1           HOUSE
2   believe you needed to come up with?
3       A.   When I made the error on the
4   number of shares that I had, it was 4,000.
5   Now, it is 160,000 shares.
6       Q.   Right.
7       A.   At 80 cents a share, so what is
8   that, $144,000 or something like that.
9       Q.   And at the time that you called
10  to exercise your options, did you have
11  $144,000 that you could have sent to First
12  Marblehead to exercise your shares?
13      A.   Yes, in my checking account.
14      Q.   And were you prepared to do
15  that?
16      A.   Absolutely.
17      Q.   After your discussion with Mr.
18  Meyers on -- sometime in February of 2004
19  that we have been talking about here, what
20  was the next thing you did, if anything,
21  in order to exercise your options, the
22  ISOs?
23      A.   After my conversation with him
24  in February?
25      Q.   Yes.

227

1           HOUSE
2       A.   When I tried to exercise my
3   options, what did I do to try to exercise
4   my options is your question?
5       Q.   Yes.
6       A.   Nothing.
7       Q.   What did you do --
8       A.   That is the step I would follow.
9       Q.   Did you have any discussions
10  with anybody else after that discussion
11  with Mr. Meyers about your options -- the
12  ISOs?
13      MR. ARONOFF:   Other than with,
14  counsel?
15      Q.   Other than with your attorneys.
16      A.   Did I have a conversations with
17  respect how to exercise -- no, there was
18  no --
19      Q.   No. My question
20  didn't -- wasn't limited to exercising the
21  ISOs. My question is after your
22  discussion with the phone conversation you
23  had with Mr. Meyers, were you
24  told -- where you told him you were
25  disappointed that no one had contacted you

228

1           HOUSE
2   in February 2004, did you have any
3   discussions with anybody else about the
4   ISOs, the First Marblehead ISOs other than
5   your attorneys?
6       A.   No.
7       MR. ARONOFF:   Other than what
8   he has testified to already?
9       MR. DEMOURA:   Yes.
10      A.   No, I -- I think that --
11      Q.   You mentioned a gentleman named
12  Peter Tarr. Did you have any
13  conversations with Peter Tarr?
14      A.   I have never spoken a word to
15  Peter Tarr, and I wouldn't know him if he
16  were standing here.
17      Q.   Did you receive anything in the
18  mail from Mr. Tarr?
19      A.   Yes.
20      Q.   How soon after your discussion
21  with Mr. Meyers if you can recall?
22      A.   Ten days or so.
23      Q.   And what did you get?
24      A.   I got a document saying
25  that -- the stock option plan that is all

229

1           HOUSE
2   over your documentation here, and I
3   believe a letter saying something along
4   the lines here that you were granted these
5   options. They are now null and void.
6   That letter said -- I am sure it is
7   available here, but that letter
8   essentially told me to go jump off a cliff
9   in so many words.
10      Q.   It didn't use those words, did
11  it?
12      A.   No, I am just paraphrasing. It
13  also didn't contain information about any
14  kind of -- I don't think it said
15  anything --
16      Q.   I don't want to know what it
17  didn't contain. I only asked you what it
18  did contain.
19      A.   Okay.
20      Q.   Did it -- after you got that
21  letter and the plan that was enclosed with
22  it, what did you do next regarding your
23  ISOs?
24      MR. ARONOFF:   He has
25  already -- that is asked and answered.

230

HOUSE
1    HOUSE
2    MR. DEMOURA:  No, it isn't.
3    A.    I can't remember the time frame,
4    but it was sometime after that that I
5    spoke to Josh Brain and came to Peter
6    Wang.
7    Q.    So you decided you needed to get
8    an attorney, correct?
9    A.    Yes.
10    Q.    Other than seeking an attorney,
11    did you do anything else?
12    A.    No.
13    Q.    By the way, the E mail that you
14    sent to your brother, do you remember what
15    you said in it?
16    A.    Yes.
17    Q.    What?
18    A.    I essentially described my case.
19    I mean I am involved in a lawsuit against
20    my former employer.  I was surprised that
21    he didn't know anything about it because I
22    had said something in a -- just a one
23    sentence thing about how I had to go off
24    and do something with my lawsuit or
25    my -- I think I said my suit.  We

231

HOUSE
1    HOUSE
2    can -- we correspond frequently, sometimes
3    more than once per day, and I had said
4    something like that, and this was recent,
5    and he responded with something about what
6    I was talking about that had nothing to do
7    with this, and at the end of his response
8    he said what suit, and it looked to me
9    that it made no sense to me.
10    Q.    That you hadn't told him about
11    it?
12    A.    It made no sense to me that the
13    remark was there because I thought
14    it -- you know, how you are using a
15    computer it, and you could just
16    inadvertently paste things into other
17    documents, and you read them later and
18    what happened here, and it was just pasted
19    inadvertently from some other documents.
20    So I ignored it and wrote a response that
21    probably had something to do with
22    applications or something.  I don't know,
23    something, and he responded to that with
24    another -- another E mail saying -- with
25    capital letters saying what suit?

232

HOUSE
1    HOUSE
2    Paraphrasing that, what suit idiot, and I
3    realized that he didn't know anything
4    about it, and this was weeks ago, and I
5    responded to him I am surprised that you
6    don't know anything about this, but I am
7    involved in a lawsuit and ..., et cetera,
8    et cetera, and I described the suit for
9    him, and that was that, and he responded
10    in some way with that -- that probably had
11    nothing to do with the suit also.  We
12    write frequently.
13    Q.    Okay.
14    If you just give me three
15    minutes, we might be wrapped up here.
16    (Recess taken.)
17    (Continued on next page.)
18
19
20
21
22
23
24
25

233

HOUSE
1    HOUSE
2
3    MR. DEMOURA:    Subject to our
4    document issues, we are suspending.
5    MR. WANG:    Thank you.
6    MR. DEMOURA:    Thank you.
7    (Time noted:  3:00 p.m.)
8
9
10
11
12
13
14    GREGORY HOUSE
15
16    Subscribed and sworn to before me
17    this    day of    , 2005
18
19                    .
20
21
22
23
24
25

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                                    516-608-2400

234

```
1              HOUSE
2         C E R T I F I C A T I O N
3
4
5
6     I, DEBBIE ZAROMATIDIS, a Shorthand
7   Reporter and a Notary Public, do hereby
8   certify that the foregoing witness,
9   GREGORY HOUSE, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13    I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23         DEBBIE ZAROMATIDIS
24
25
```

236

```
1              HOUSE
2       LITIGATION SUPPORT INDEX
3
4
5    DIRECTION TO WITNESS NOT TO ANSWER
6   Page    Line      Page    Line
7
8          (None)
9
10   REQUEST FOR PRODUCTION OF DOCUMENTS
11  Page    Line      Page    Line
12
13         (None)
14
15      INFORMATION TO BE FURNISHED
16  Page    Line      Page    Line
17
18         (None)
19
20    QUESTIONS MARKED FOR A RULING
21  Page    Line      Page    Line
22
23         (None)
24
25
```

235

```
1              HOUSE
2         E X H I B I T S
3
4   HOUSE
5   EXHIBIT    DESCRIPTION          PAGE
6   1      GH 00342, letter      156
7   2      Affidavit          175
8   3      Handwritten note      200
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```