UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE FIRST MARBLEHEAD
CORPORATION
    Plaintiff

v

GREGORY J. HOUSE
    Defendant

CIVIL ACTION NO. 04-11263PBS

## PLAINTIFF'S APPENDIX IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In further support of its motion for summary judgment, the plaintiff, The First

Marblehead Corporation, submits the attached documents:

| Tab | Description |
|-----|-------------|
| A | Deposition Transcript of Gregory House (entire transcript) |
| B | Plaintiff's Responses to Defendant's First Set of Interrogatories |
| C | Deposition Transcript of Steven Anbinder (pages 30, 38) |
| D | Anbinder Deposition Exhibit 1-The First Marblehead Corporation 1996 Stock Option Plan |
| E | Deposition Transcript of Rodney Hoffman (pages 43-45; 48-49; and 76-77) |
| F | Hoffman Deposition Exhibit 1-Consent of Stockholders in Lieu of Meeting dated March 4, 1997 |
| G | Deposition Transcript of Ralph James (pages 44-45; 55; 59-60; and 63–67) |
| H | James Deposition Exhibit 4- Compensation Review for Gregory House (June 1997) |
| I | James Deposition Exhibit 2-Memorandum from Ralph James to FMC Staff dated July 7, 1997. |

**TAB B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE FIRST MARBLEHEAD
CORPORATION
    Plaintiff

v

GREGORY J. HOUSE
    Defendant

CIVIL ACTION NO. 04-11263PBS

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 26 and Rule 33 of the Federal Rules of Civil Procedure, plaintiff The First Marblehead Corporation ("First Marblehead"), responds to the First Set of Interrogatories of Defendant (the "Interrogatories" ) as follows:

### GENERAL OBJECTIONS

1.    First Marblehead objects to the Interrogatories, and the definitions and instructions contained therein, to the extent that they purport to expand upon First Marblehead's obligations under the Federal Rules of Civil Procedure.

2.    First Marblehead objects to the Interrogatories, and the definitions and instructions contained therein, to the extent they seek the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine and any other applicable privilege or immunity.

2/14/05
James
Exhibit No. 5
LISA A. MOREIRA

3.     First Marblehead objects to the Interrogatories, and the definitions and instructions contained therein, to the extent that they are overly broad, unduly burdensome, and/or seek information not relevant to the claim or defense of any party to this action.

4.     First Marblehead objects to the Interrogatories, and the definitions and instructions contained therein, to the extent that they request information that is as readily accessible to the Defendants as it is to First Marblehead. First Marblehead has no obligation to undertake any investigation for the Defendants.

5.     Discovery in this case is ongoing. First Marblehead reserves the right to supplement its responses and objections should additional information become available. These general objections are incorporated into each of the specific answers to the Interrogatories.

### INDIVIDUAL OBJECTIONS AND RESPONSES

1. Please identify all Experts. As to each, please describe such Expert's qualifications, the matters on which the Expert is expected to opine and/or testify, and state whether you or your attorneys will call the Expert to testify in this case.

OBJECTION AND RESPONSE: In addition to the general objections set forth above, First Marblehead objects to providing any information concerning experts except as required by Fed. R. Civ. P. 26 and specifically objects to providing information protected by Fed. R. Civ. P. 26(b)(4). Without waiving these objections, First Marblehead has not determined who it will call as an expert witness at trial.

2. Please identify each person (other than your attorneys in this case) who participated in or assisted with preparing responses to any of these interrogatories, or who provided information

to your attorneys for the purpose of responding to any of these interrogatories. As to each person Identified, please describe the information provided.

OBJECTION AND RESPONSE:    First Marblehead objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or information constituting attorney work-product.

3. Please identify all persons who you know or your attorneys know or believe to have knowledge or information relevant to any of the claims or defenses asserted in this lawsuit. As to each person Identified, please describe the knowledge or information you or your attorneys know or believe the person to have.

OBJECTION AND RESPONSE:  Subject to the foregoing general objections, First Marblehead believes that the following individuals may have information relevant to the claims and defenses asserted in this litigation:

*Daniel Maxwell Meyers, Chief Executive Officer and Chairman of the Board of Directors*
c/o The First Marblehead Corporation
Prudential Tower, 34th Floor
800 Boylston Street
Boston, MA  02119-8157
(617) 638-2000

Mr.  Meyers has served as First Marblehead's Chief Executive Officer and Chairman of the board of directors since its incorporation in 1994. Mr. Meyers has knowledge concerning Mr. House's employment with First Marblehead, the adoption of The First Marblehead 1996 Stock Option and the grant of options to the defendant Gregory House.

_Rodney G. Hoffman, Esq._
Deutsch Williams Brooks DeRensis & Holland P.C.
99 Summer Street
Boston, MA 02110
(617) 951-2300

Mr. Hoffman served as attorney for First Marblehead Corporation and has knowledge concerning

the adoption of The First Marblehead 1996 Stock Option Plan and the grant of options to the

defendant Gregory House.

_Jennifer House_
(address currently unknown)

Mrs. House was married to Gregory House while he was employed at First Marblehead. It is

believed that she may have knowledge relevant to the claims and defenses asserted in this

litigation.

4. Please identify all persons who you or your attorneys intend to call as a witness in this

lawsuit. As to each person Identified, please describe the subject matter on which each is expected

to testify and any and all documents upon which each is expected to rely.

OBJECTION AND RESPONSE:    First Marblehead objects to this interrogatory to the extent it

seeks information protected by the attorney-client privilege or information constituting attorney

work-product. Subject to and without waiver of the foregoing general and specific objections, First

Marblehead states that it has not determined who will be called to testify as a witness in this

lawsuit.

5. Please describe in detail the process(es) you followed in drafting any and all employee

stock option plans. Your response should include, without limitation, the Identification of all

persons and committees that participated in that process, a detailed description of all internal

standards, procedures and policies that you applied in drafting such plans, and any and all documents that support your answer.

OBJECTION AND RESPONSE:    First Marblehead objects to providing any information concerning any stock option plans which were approved and implemented after the termination of Gregory House's employment as such information is irrelevant and not likely to lead to the discovery of admissible evidence.  Subject to and without waiver of the foregoing general and specific objections, First Marblehead states that the 1996 Stock Option Plan was approved by the Corporation's Board of Directors as of October 15, 1996 and further approved by the Consent of Stockholders on or about March 4, 1997.  The plan was designed to comport with the relevant tax code provisions to qualify the plan and options granted under it as qualified incentive stock options.  The plan and specific option agreements were prepared by and with the advice of counsel to First Marblehead, Rodney G. Hoffman.

6. Please describe in detail the process(es) you followed in announcing, describing, and circulating stock options and stock option plans to First Marblehead employees.  Your response should include, without limitation, the Identification of all persons and committees that participated in that process, a detailed description of all internal standards, procedures and policies that you applied in this process, and any and all documents that support your answer.

OBJECTION AND RESPONSE:    First Marblehead objects to providing any information concerning any stock option plans which were approved and implemented after the termination of Gregory House's employment as such information is irrelevant and not likely to lead to the discovery of admissible evidence.  Subject to and without waiver of the foregoing general and specific objections, First Marblehead states that the 1996 Stock Option Plan was approved by the

Corporation's Board of Directors as of October 15, 1996 and further approved by the Consent of Stockholders on or about March 4, 1997. The plan and specific option agreements were prepared by and with the advice of counsel to First Marblehead, Rodney G. Hoffman. Employees who were granted options pursuant to the 1996 Stock Option Plan were advised of the grants individually. In July 1997 a meeting was held with employees to discuss and provide general information about the option plan. The option agreements were circulated to employees sometime after the July 1997 meeting. The Plan was also made available on an ongoing basis to employees qualified to receive options who requested it.

7. Please describe in detail any and all correspondence and communications between you and House regarding any employee stock option plans, and please identify any and all documents that support your answer.

OBJECTION AND RESPONSE: When Gregory House was hired by First Marblehead there were discussions concerning a grant of stock options including the amount of stock and the vesting schedule. It was agreed, at the time of his hire, that House would be given incentive stock options pursuant to the terms of First Marblehead's 1996 Stock Option Plan, that the grant would be for 2500 shares of stock and that the entire option would vest immediately. Later discussions with House concerned the pricing of options under the Plan and a general discussion of the plan and options at an employee meeting with First Marblehead's attorney.

8. If you contend that any documents relating to employee stock option plans were distributed to House during or after his employment at First Marblehead, please so state, including in your answer the date it was distributed, and please identify any and all documents that support your contention.

OBJECTION AND RESPONSE: It is believed that Gregory House received copies of the 1996 Stock Option Plan and the Grant of Incentive Stock Option. Presently, First Marblehead does not know when he would have received these documents however a copy of the Grant is part of his personnel file. House also received a memorandum prepared by First Marblehead's attorney, Rod Hoffman, providing a general description of the 1996 Stock Option Plan. The memorandum is dated July 7, 1997 and it is believed that House received the memorandum on or about July 7, 1997. While he was employed with First Marblehead, House also received a document describing his compensation and confirming that he had received 2500 Incentive Stock Options.

9. Please Identify any and all current or former First Marblehead employees who have exercised First Marblehead employee stock options, and please identify any and all documents that support your contention.

OBJECTION AND RESPONSE: In addition to the foregoing general objections, First Marblehead objects to providing any information concerning other employees on the grounds that such information is confidential and private information.

10. If you believe you have lost or destroyed any documents responsive to House's First Request for the Production of Documents, please describe the circumstances under which they were destroyed or lost.

OBJECTION AND RESPONSE: First Marblehead is unaware of any documents that have been lost or destroyed.

11. If you denied any of House's requests for admission to you, please state in detail the basis for each denial. Your response should include, without limitation, a description of all facts and circumstances that support each denial.

OBJECTION AND RESPONSE: First Marblehead denied Requests 2 and 3 because it is presently unknown whether House knew or was advised, orally or in writing, that he was required to exercise his stock options within 90 days of his termination of employment with First Marblehead and discovery has not yet been completed.

      12. Identify by caption and status (i.e. pending or resolved) any and all federal and/or state lawsuits, and charges or claim or claims made with any administrative agency, in which you are or were a party.

OBJECTION AND RESPONSE: In addition to the foregoing general objections, First Marblehead objects to providing any information concerning any federal or state lawsuits or charges or claims with any administrative agency which do not relate to the 1996 Stock Option Plan as such information is irrelevant and not likely to lead to the discovery of admissible evidence. Without waiving any objections, First Marblehead states that it has not been a party to any federal or state lawsuits or charges or claims with any administrative agency that relate to the 1996 Stock Option Plan.

<u>Verification</u>

The undersigned, being duly sworn, deposes and says: 1) she is the Senior Vice President of Human Resources of the plaintiff, The First Marblehead Corporation ("First Marblehead"); 2) she has read the foregoing responses to the Defendant's First Set of Interrogatories, knows the contents hereof, and states that the same are true and accurate to the best of her knowledge and belief; 3) this verification is made by her as an authorized representative of First Marblehead; and, 4) the grounds for her belief as to all matters herein are her personal knowledge, the contents of the First Marblehead's files and business records, and the knowledge of other employees and agents of First Marblehead.

Signed under the pains and penalties of perjury.

Robin Camara, Senior Vice President
The First Marblehead Corporation


AS TO OBJECTIONS:


/s/ Kenneth J. DeMoura
Kenneth J. DeMoura (BBO#548910)
ADLER POLLOCK & SHEEHAN, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 482-0600

Dated: December 17, 2004

**TAB C**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

FIRST MARBLEHEAD CORP.,

                              Civil

               Plaintiff,      Action

                              No.

          -against-        04-11263PBS

GREGORY HOUSE,

               Defendant.

- - - - - - - - - - - - - - - - - x


               April 20, 2005

               12:57 p.m.




Deposition of STEPHEN E. ANBINDER, taken by

Defendant, pursuant to Notice, held at the offices

of Foley & Lardner LLP, 90 Park Avenue, New York,

New York, before Robert E. Levy, a Certified

Shorthand Reporter and Notary Public within and for

the State of New York.

30

Anbinder

1    after this presentation in terms of --

2    withdrawn.  After this presentation was made,

3    did the board ultimately decide to implement a

4    stock option plan?

5              A.    Yes.

6         Q.    How was that decision made?

7         A.    By a vote of the board.

8         Q.    Were there any other

9    presentations before that vote on the subject?

10             A.    I don't remember.

11        Q.    Did you participate in that

12   voting?

13             A.    Yes.

14        Q.    Getting back to the stock option

15   subcommittee which you testified was composed

16   of Mr. Meyers, Mr. Berkley, do you remember

17   when that committee was formed?

18             A.    I don't.

19        Q.    What was it charged with?

20        A.    I don't know precisely.  I would

21   suspect it was charged with coming up with a

22   recommendation for the board.

23        Q.    So the board asked that this

24   committee be formed?

25

1                        Anbinder
2            Q.    I'm going to show you what we
3    have just marked as Anbinder Exhibit 1.
4            A.    Uh-huh.
5            Q.    Which is the First Marblehead
6    Corporation 1996 stock option plan.
7            A.    Right.
8            Q.    Have you seen this before, sir?
9            A.    I'm sure I must have.
10           Q.    Would you like to take a minute
11   just to look it over?
12           A.    Yes.
13           Q.    You don't have to read it in
14   depth.
15                 (Pause)
16           A.    Uh-huh.
17           Q.    Okay.  Do you see on the first
18   page, sir, it says "Section 2.02 authority"?
19           A.    Uh-huh.
20           Q.    Do you see where it says, "Within
21   the limits of the plan the committee shall
22   determine...the type of option and number of
23   shares to be granted"?
24           A.    Right.
25           Q.    "The duration of each option, the

**TAB D**

THE FIRST MARBLEHEAD CORPORATION

1996 STOCK OPTION PLAN

<Page>

THE FIRST MARBLEHEAD CORPORATION

1996 STOCK OPTION PLAN

1.    PURPOSES

The purposes of this 1996 Stock Option Plan (the "Plan") are to: (i) closely associate the interests of the officers, other employees and consultants of The First Marblehead Corporation and its subsidiaries and affiliates (collectively referred to as the "Company") with the stockholders by reinforcing the relationship between participants' rewards and stockholder gains; (ii) provide participants with an equity ownership in the Company commensurate with Company performance; (iii) maintain competitive compensation levels; and (iv) provide an incentive to officers and employees for continuous employment with the Company. The Plan accomplishes these purposes by providing for the grant of Incentive Stock Options and Nonstatutory Stock Options (collectively, as defined below, "Options") to the Company's officers, employees and consultants.

2.    ADMINISTRATION OF THE PLAN

2.01    ADMINISTRATION BY COMMITTEE. The Plan shall be administered by the Stock Option Committee (the "Committee") appointed by the Board of Directors of the Company from time to time. Whenever options are granted to any person subject to Section 16 of the Securities Exchange Act of 1934 (the "Exchange Act"), each member of the Committee shall be a "disinterested person" within the meaning of Rule 16b-3 under the Exchange Act.

2.02    AUTHORITY. Within the limits of the Plan, the Committee shall determine: the individuals to whom, and the times at which, Options shall be granted; the type of Option and number of shares to be granted; the duration of each Option; the price and method of payment for each Option; and the time or times within which (during its term) all or portions of each Option may be exercised.

2.03    ADOPTION OF RULES; INTERPRETATION OF PLAN. The Committee may: (i) establish such rules as it deems necessary for the proper administration of the Plan; (ii) make such determinations and interpretations with respect to the Plan and Options granted under it as may be necessary or desirable; and (iii) supply

any omission, reconcile any inconsistency and include such further provisions or
conditions in the Plan or any Option as it deems advisable. Decisions rendered
by the Committee shall be made in its sole discretion and shall be conclusive.
No member of the Committee shall be liable for any decision rendered in good
faith relating to the Plan or any award thereunder.

    3.     SHARES SUBJECT TO THE PLAN

    3.01  NUMBER AND TYPE OF SHARES. The aggregate number of shares of stock
of
the Company which may be optioned under the Plan is One Hundred Thousand
(100,000) shares of the Company's Common Stock, $.10 par value, (the "Stock").

<Page>

    3.02  RESTORATION OF SHARES. If any option expires, is terminated
unexercised or is forfeited for any reason, the shares subject to such Option,
to the extent of such expiration, termination or forfeiture, shall again be
available for granting Options under the Plan, subject, however, in the case
of
Incentive Stock Options, to any requirements under the Internal Revenue Code
of
1986, as amended (the "Code").

    3.03  RESERVATION OF SHARES. The Company shall, at all times while the
Plan
is in force, reserve such number of shares of Stock as will be sufficient to
satisfy the requirements of the Plan. Shares issued under the Plan may
consist,
in whole or in part, of authorized but unissued shares or treasury shares.

    4.     GRANT OF OPTIONS; ELIGIBLE PERSONS

    4.01  TYPES OF OPTIONS. Options shall be granted under the Plan either as
incentive stock options ("Incentive Stock Options"), as defined in Section 422
of the Code, or as options which do not meet the requirements of Section 422
("Nonstatutory Stock Options"). Options may be granted from time to time by
the
Committee, within the limits set forth in the Plan, to all employees of the
Company or of any parent corporation or subsidiary corporation of the Company
(as defined in Sections 424(e) and (f), respectively, of the Code) and, in the
case of Nonstatutory Stock Options, to consultants.

    4.02  DATE OF GRANT. The date of grant for each Option shall be the date
on
which it is approved by the Committee, or such later date as the Committee may
specify. No Incentive Stock Options shall be granted hereunder after ten years
from the date on which the Plan was adopted by the Board or approved by the
stockholders, whichever is earlier.

    5.     FORMS OF OPTIONS

    Options granted hereunder shall be evidenced by a writing delivered to
the
grantee specifying the terms and conditions thereof and containing such other
terms and conditions not inconsistent with the provisions of the Plan as the

Committee considers necessary or advisable to achieve the purposes of the Plan or to comply with applicable tax and regulatory laws and accounting principles.
The form of such Options may vary among grantees.

6.   OPTION PRICE

6.01   INCENTIVE STOCK OPTIONS. In the case of Incentive Stock Options, the
price at which shares may from time to time be optioned shall be determined by the Committee, provided that such price shall not be less than the fair market value of the Stock on the date of granting as determined in good faith by the Committee; and provided further that no Incentive Stock Option shall be granted
to any individual who owns stock of the Company or its parent or subsidiary corporations in excess of the limitations set forth in Section 422(b)(6) of the
Code unless such option price is at least 110% of the fair market value of the Stock on the date of the grant.

6.02   NONSTATUTORY STOCK OPTIONS.  In the case of Nonstatutory Stock Options, the price at which shares may from time to time be optioned shall be determined by the Committee.

<Page>                                        2

6.03   MANNER OF PAYMENT. To the extent permitted by law, the Committee, may
in its discretion, permit the option price to be paid in whole or in part by a note or in installments or with shares of stock of the Company or such other lawful consideration as the Committee may determine.

7.   TERM OF OPTION AND DATES OF EXERCISE

7.01   EXERCISABILITY. The Committee shall determine the term of all Options, the time or times that Options may be exercised and whether they may be
exercised in installments; provided, however, that: (i) the term of each Incentive Stock Option granted under the Plan shall not exceed a period of ten years from the date of its grant; and (ii) no Incentive Stock Option shall be granted to any individual who owns stock of the Company or its parent or subsidiary corporations exceeds the limitations set forth in Section 422(b)(6) of the Code unless the term of the Option does not exceed a period of five years
from the date of its grant.

7.02   EFFECT OF TERMINATION OF EMPLOYMENT. Except to the extent otherwise determined by the Committee in writing, the effect on an Option of the termination of employment of a grantee and the extent to which the grantee or his or her estate, legal representative, guardian, or beneficiary may exercise rights thereunder, shall be as set forth below:

(a) DEATH OF GRANTEE. Upon the death of the grantee, all rights, including those not yet vested on the date of death, shall immediately be vested and may be exercised by the grantee's estate or by a person who acquires the right to exercise such Option by bequest or inheritance or

otherwise by reason of the death of the grantee; provided, however, that such exercise must occur within both the remaining effective term of the Option and within one year after the grantee's death.

The provisions of this subsection (a) shall apply even if the grantee's employment may have terminated prior to death, but only to the extent such rights were otherwise exercisable pursuant to this Section

7.02

at the date of death.

(b) RETIREMENT OR DISABILITY. Upon termination of the grantee's employment by reason of retirement or permanent disability (as each is determined by the Committee), the grantee (or his or her guardian) may, within 36 months from the date of termination, exercise any Options to

the

extent such options are or become exercisable during such 36 month period.

Notwithstanding the foregoing, the tax treatment available pursuant to Section 422 of the Code upon the exercise of an Incentive Stock Option

will

not be available to a grantee who exercises any Incentive Stock Options more than (i) 12 months after the date of termination due to permanent disability or (ii) three months after the date of termination due to retirement.

(c) TERMINATION FOR CAUSE.  Upon termination of the grantee's employment for "cause" (as determined by the Committee), all Options not yet exercised by the grantee shall terminate immediately.

(d) TERMINATION FOR OTHER REASONS. Upon the termination of the grantee's employment for reasons other than those set forth in subsections

7.02(a), (b) and (c), the

3

<Page>

Options will remain exercisable by the grantee for a period not extending beyond three months after the date of the termination of employment, but only to the extent of Options which are exercisable as of the date of

such

termination of employment.

7.03  OTHER CONDITIONS. The Committee may impose such conditions with respect to the exercise of options, including conditions relating to

applicable

federal or state securities laws or requiring the holder to enter into a Stock Restriction Agreement, Non-Competition Agreement or other agreement as it considers necessary or advisable.

7.04  AMENDMENT OF OPTIONS. The Committee may amend, modify or terminate any outstanding Option, including substituting therefor another Option of the same or different type, changing the date of exercise or realization and converting an Incentive Stock Option to a Nonstatutory Stock Option, provided that the grantee's consent to such action shall be required unless the Committee

reasonably determines that the action, taking into account any related action,

would not materially and adversely affect the grantee.

    8.    MISCELLANEOUS

    8.01  GENERAL RESTRICTIONS. Each award under the Plan shall be subject to
the requirement that, if at any time the Committee shall determine that the
accomplishment of any of the following prerequisites is necessary or desirable
as a condition of, or in connection with, the granting of such award or the
issuance or purchase of Stock thereunder, then the prerequisite shall be
accomplished to the satisfaction of the Committee prior to the consummation of
such grant, issuance or sale. The prerequisite events, as may be determined by
the Committee, are: (i) the listing, registration or qualification of shares
of
Stock on a securities exchange or under any state or federal law; (ii) the
consent or approval of any government regulatory body; or (iii) an agreement
by
the grantee with respect to the disposition of shares of Stock.

    8.02  NON-TRANSFERABILITY. Options granted under the Plan shall not be
transferable by the grantee, except by will or the laws of descent and
distribution. Moreover, no option granted under the plan may be transferred
pursuant to a domestic relations order. Options shall be exercisable, during
the
grantee's lifetime, only by the grantee or such permitted transferee.

    8.03  WITHHOLDING. The grantee shall pay to the Company, or make
provision
satisfactory to the Committee for payment of, any taxes required by law to be
withheld in respect of any Options under the Plan no later than the date of
the
event creating the tax liability. In the Committee's discretion, such tax
obligations may be paid in whole or in part in shares of Stock, including
shares
retained from the exercise of the Option creating the tax obligation, valued
at
the fair market value of the Stock on the date of delivery to the Company as
determined in good faith by the Committee. The Company and any parent
corporation or subsidiary corporation of the Company (as defined in Sections
424(e) and (f), respectively, of the Code) may, to the extent permitted by
law,
deduct any such tax obligations from any payment of any kind otherwise due to
the grantee.

    8.04  NO RIGHT TO EMPLOYMENT. The grant of an Option shall not be
construed
as giving a grantee the right to continued employment. Except as may otherwise
be limited by a written agreement between the Company and the grantee, the
right
of the Company to terminate, at will,

                                        4

<Page>

the grantee's employment with it at any time, free from any liability or claim
under the Plan, is specifically reserved by the Company and acknowledged by
the
grantee.

8.05   NON-UNIFORM DETERMINATIONS. The Committee's determinations under the
Plan (including, without limitation, determinations of the persons to be granted
awards, the form, amount and timing of such awards, the terms and provisions of
such awards and the agreements evidencing the same) need not be uniform and may
be made by it selectively among persons who receive, or are eligible to receive,
awards under the Plan, whether or not such persons are similarly situated.

8.06   NO RIGHTS AS A STOCKHOLDER. Subject to the provisions of the
applicable Option, no grantee or any person claiming through a grantee shall
have any rights as a stockholder with respect to any shares of Stock to be
distributed under the Plan until the share certificates are duly issued by the
Company.

8.07   ADJUSTMENTS. In the event of any change in the outstanding Stock by
reason of a stock dividend, split-up, combination or reclassification of shares,
recapitalization or other similar capital change, the Committee may
appropriately adjust: (i) the number of share of Stock which may be issued under
the Plan; (ii) the number of shares of Stock subject to Options theretofore
granted under the Plan; (iii) the option price of Options theretofore granted
under the Plan; or (iv) any and all other matters as may be deemed appropriate
by the Committee, the determination of which on such matters shall be
conclusive.

8.08   EFFECT OF REORGANIZATION TRANSACTIONS. In the event of a
consolidation or merger of the Company with another corporation, or the sale or
exchange of all or substantially all of the assets of the Company, or a
reorganization or liquidation of the Company, each holder of an outstanding
Option shall be entitled to receive, upon exercise and payment in accordance
with the terms of the Option, the same shares, securities or property as he or
she would have been entitled to receive upon the occurrence of such event if he
or she had been, immediately prior to such event, the holder of the number of
shares of Stock purchasable under his or her Option; provided, however, that in
lieu of the foregoing the Company may, upon written notice to each holder of an
outstanding Option, provide that such Option shall terminate within a specified
number of days after the date of such notice unless theretofore exercised. In
connection with such notice, the Company may, in its discretion, accelerate or
waive any deferred exercise period. Options granted under this Plan may contain
such provisions as the Committee shall approve permitting part of all of such
Options to become exercisable without regard to any deferred exercise period in
the event of a change of control of the Company, as defined by the Committee.

8.09   AMENDMENT OF PLAN.   The Committee may amend the Plan in the following situations:

(a)  CHANGE IN LAW.  The Committee may, without further action by the stockholders and without receiving further consideration from the participants, amend this Plan or condition or modify awards under this Plan, in response to changes in securities, tax or other laws or rules, regulations or regulatory interpretations thereof applicable to this Plan or to comply with stock exchange rules or requirements.

5

<Page>

(b)  OTHER AMENDMENTS. The Committee may at any time and from time to

time terminate or modify or amend the Plan in any respect, except that, without stockholder approval, the Committee may not: (i) increase the maximum number of shares of Stock which may be issued under the Plan (other

than increases pursuant to Section 8.07); (ii) extend the period during which any award may be granted or exercised; or (iii) extend the term of the Plan. The termination, modification or amendment of the Plan, except as

provided in Section 8.09(a), shall not, without the consent of the grantee,

materially and adversely affect the grantee's rights under an award previously granted.

8.10   STOCKHOLDER APPROVAL. The Plan is subject to approval by the stockholders of the Company by the affirmative vote of the holders of a majority

of the shares of capital stock of the Company entitled to vote thereon and present or represented at a meeting duly held in accordance with the laws of the

State of Delaware or by any other action that would be given the same effect under the laws of such jurisdiction. Such action shall be taken within twelve (12) months from the date the Plan was adopted by the Board. In the event such stockholder approval is not obtained, all Options granted under the Plan shall be void and without effect.

8.11   GOVERNING LAW.  The provisions of the Plan shall be governed by and interpreted in accordance with the laws of the State of Delaware, except to the

extent preempted by federal law which, to that extent, shall govern.

ADOPTED by the Board of Directors effective as of October 15, 1996.

Attest:                                              /s/ Rodney G. Hoffman, Ass't Secretary
         --                 -------------------------------------------------

6

**TAB E**

Rodney G. Hoffman                                        02/14/2005

```
                                                                    1
 1                              Volume:    I

 2                              Pages:     1 to 84

 3                              Exhibits:  1

 4

 5            UNITED STATES DISTRICT COURT

 6               DISTRICT OF MASSACHUSETTS

 7     Civil Action No. 04-11263PBS

 8     - - - - - - - - - - - - - - - - - x

 9     THE FIRST MARBLEHEAD CORPORATION,

10                  Plaintiff,

11       v.

12     GREGORY J. HOUSE,

13                  Defendant.

14     - - - - - - - - - - - - - - - - - x

15

16            DEPOSITION OF RODNEY G. HOFFMAN

17              Monday, February 14, 2005

18                    1:10 p.m.

19               Foley & Lardner LLP

20              111 Huntington Avenue

21              Boston, Massachusetts

22

23         Reporter:   Lisa A. Moreira, RMR/CRR

24
```

Rodney G. Hoffman                                                  02/14/2005

43

1      Q.   -- whose job it was to get the signatures

2   and maintain them, correct?

3      A.   Yes.

4      Q.   And that was important, wasn't it?  Wasn't

5   it important that the option agreement be given to

6   the grantee?

7               MR. DeMOURA:  Objection.

8      Q.   You may answer.

9      A.   Yes.

10     Q.   Now, at some point you also had a meeting,

11   did you not, with employees?

12     A.   Yes.

13     Q.   To talk about the options?

14     A.   Yes.

15     Q.   I'm going to show you a copy of a memorandum

16   that appears to come from you to the employees of

17   First Marblehead.  Do you recognize that document?

18     A.   Yes.

19     Q.   And you drafted it, did you not?

20     A.   I did.

21     Q.   Did you have any help in drafting it?

22     A.   No.

23     Q.   And what was the purpose of the memorandum?

24     A.   It was to be a handout at the meeting that I

Word Index

1    held with the employees.

2        Q.  And how was that meeting arranged?  Whose

3    idea was it to have the meeting?

4        A.  Someone from First Marblehead.  I don't

5    remember who.

6        Q.  So someone at First Marblehead contacted you

7    and said, "You know, we should have a meeting to

8    talk about these options"?

9        A.  Yes.

10       Q.  Is that the way it happened?

11       A.  Yes.

12       Q.  You see the date of the meeting was July

13   7th?

14       A.  Yes.

15       Q.  And the date of the option grant to Mr.

16   House happened to be June 15th of the same year.

17       A.  Yes.

18       Q.  Do you recall that as of the time that you

19   had the meeting Mr. House had already gotten his

20   options?

21       A.  I don't remember.

22       Q.  Do you recall whether or not at the time of

23   the meeting the employees who were getting options

24   had already -- already were supposed to have

Word Index

Rodney G. Hoffman
02/14/2005

45

1    received their stock option agreements?

2        A.   I don't remember the chronology.

3        Q.   Okay.  Would there be some way for you to

4    refresh your memory or to check to see what the

5    chronology was?

6        A.   I don't think so.

7        Q.   Okay.  In any event, you drafted this, and

8    it was meant to be an overview of how the stock

9    options worked?

10       A.   Yes.

11       Q.   And that was supposed to be handed to

12   employees, correct?

13       A.   Yes.

14       Q.   So that the employees could understand what

15   their rights were under the agreement and under the

16   plan?

17              MR. DeMOURA:   Objection.

18       A.   It was to be handed out at the meeting that

19   I conducted.

20       Q.   And did you have any notes for yourself to

21   guide you through that meeting?

22       A.   I don't remember.

23       Q.   Did you make -- you did make a presentation,

24   correct?

Word Index

Rodney G. Hoffman

48

1    your files, either in your computer files or your

2    hard copy files?

3        A.   I don't know.

4        Q.   Although I think it would be encompassed in

5    the earlier request that I made, I specifically want

6    any drafts of this document be produced, okay?

7                Now, look at the bottom of the first

8    page of the document.  It says, "The following are

9    the principal terms of the options which have been

10   proposed by the stock option subcommittee of the

11   board of directors."  Do you see that?

12       A.   Yes.

13       Q.   Couple of things.  First of all, it says,

14   "which have been proposed by."  That suggests that

15   some of the options had not yet been granted.  Am I

16   reading that correctly?

17       A.   That suggests that.

18       Q.   It's -- there's a future tense in there?

19       A.   Yes.

20       Q.   But is it possible that there were some

21   people who were getting it after July 7th and some,

22   like Mr. House, who had gotten it before July 7th?

23       A.   I don't believe so.

24       Q.   So you think everybody was getting it at one

Rodney G. Hoffman

1    time, at least in the mid-1997 time period?

2        A.  Yes.

3        Q.  And you're just not sure if it was before or

4    after July 7th?

5        A.  That's correct.

6        Q.  Okay.  I mean, this might have just been an

7    error?  Where you say, "which have been proposed

8    by," you may have drafted this earlier and by the

9    time you got around to distributing it --

10       A.  That could be, yes.  I'm not sure.

11       Q.  You don't know the timing?

12       A.  I'm just not clear on the chronology.

13       Q.  There is a reference to stock option

14   subcommittee.  Is the stock option subcommittee the

15   same as the stock option committee that we saw

16   referenced in the plan itself?

17       A.  Yes.

18       Q.  And that was at this time Mr. Berkley and

19   Mr. Meyers?

20       A.  Yes.

21       Q.  And you see that there are then six items

22   that are the quote-unquote principal terms of the

23   options.  Do you see that?

24       A.  Yes.

1  3?

2      A.   It was much more detailed.

3      Q.   Much more detailed; is that right?

4      A.   Yes.

5           MR. WANG:  I assume that's going to be

6  on your privilege log, Mr. DeMoura.

7           MR. DeMOURA:  I need to prepare the

8  privilege log.

9           MR. WANG:  Well, let me request a copy

10  of the document, but I'm assuming from its

11  description that's something that, Mr. DeMoura, you

12  withheld?

13          MR. DeMOURA:  It is.

14     Q.   And who were you distributing it to, that

15  memorandum?

16     A.   Members of the board.

17     Q.   And the stockholders, or just members of the

18  board?

19     A.   I think just members of the board.

20     Q.   The board had to first approve -- the board

21  first approved the plan, correct?

22     A.   Yes.

23     Q.   And then there was a consent of

24  stockholders, correct?

Rodney G. Hoffman

1       A.   Yes.

2       Q.   So the memorandum you believe was

3   prepared --

4       A.   I guess I'm not sure there was consent of

5   stockholders.   I'm conflating directors and

6   stockholders.

7              MR. WANG:   Let me show you what we'll

8   have marked as Hoffman Exhibit 1 for identification.

9              (Exhibit No. 1, Consent of Stockholders

10              in Lieu of a Meeting, marked for

11              identification)

12      Q.   I've showed you a document that's entitled

13   "Consent of Stockholders in Lieu of a Meeting."

14   Does that refresh your recollection?

15      A.   Yes, it does.

16      Q.   And there also was a board approval of the

17   plan, was there not?

18      A.   I believe so.

19              MR. DeMOURA:   Can I just take one

20   second?

21              MR. WANG:   Sure.

22              (Pause)

23              MR. WANG:   Mr. DeMoura, in the answers

24   to interrogatories there's a reference made to

Word Index

**TAB F**

stock option plan

## THE FIRST MARBLEHEAD CORPORATION

### Consent of Stockholders in Lieu of a Meeting

March 4, 1997

The undersigned stockholders of THE FIRST MARBLEHEAD CORPORATION (the "Corporation"), pursuant to the Section 228 of Delaware Corporation Law, hereby consent to the following action taken without a meeting of the Stockholders.

VOTED:      That The First Marblehead Corporation 1996 Stock Option Plan (the "Plan") in the form approved by the Corporation's Board of Directors as of October 15, 1996 be, and is hereby, approved and adopted.

VOTED:      That, in order to permit the implementation of the Plan, the Corporation's Certificate of Incorporation be amended to increase the number of authorized shares of the common stock of the Corporation, $.10 par value, by an additional 100,000 shares;

VOTED:      That the proper officers of the Corporation be, and are hereby, authorized and directed, on behalf of the Corporation, to prepare, execute and deliver for filing with the Delaware Secretary of State (along with the appropriate filing fee) an appropriate Amended and Restated Certificate of Incorporation reflecting the increase in authorized capital stock of the Corporation;

VOTED:      That the officers of the Corporation are, and each of them is, hereby authorized, on behalf of the Corporation, to do any and all such further acts and things and to execute and deliver any and all such further acts and things and to execute and deliver any and all such documents, instruments and certificates as may, in the opinion of such officers, or any of them, be necessary, convenient or appropriate to effectuate the purposes, and carry out the actions, set forth herein;

VOTED:      That this written consent of the stockholders shall be filed with the records of the Corporation and any action set forth herein shall be treated for all purposes as an action duly taken at a meeting on the effective date set forth above.

\*                    \*                    \*



Hoffman    2/14/05

Exhibit No.    1

LISA A. MOREIRA

IN WITNESS WHEREOF, the undersigned have signed the within instrument as of the day and year first written above.

_____          _____
Leslie Alexander                    Daniel M. Meyers

Interlaken Investment
  Partners

By: _____          _____
      William R. Berkley             Stephen Anbinder

_____          _____
Joseph Fraites                      Victor M. Samra, Jr.

_____          _____
Dort A. Cameron, III                James W. Walker, II

_____          _____
Lucielle R. Molloy                  William R. Berkley, Jr.

_____          _____
Catherine B. James                  Joshua A. Polan

Doopy L.P.

By: _____          _____
                                     William L. Mahone

_____          _____
Martin B. O'Connell                 Charles J. Martin

2

51

**TAB G**

Ralph M. James

02/14/2005

```
 1                                Volume:    I            1

 2                                Pages:     1 to 93

 3                                Exhibits:  1 to 5

 4

 5              UNITED STATES DISTRICT COURT

 6                DISTRICT OF MASSACHUSETTS

 7     Civil Action No. 04-11263PBS

 8     - - - - - - - - - - - - - - - - - x

 9     THE FIRST MARBLEHEAD CORPORATION,

10                    Plaintiff,

11       v.

12     GREGORY J. HOUSE,

13                    Defendant.

14     - - - - - - - - - - - - - - - - - x

15

16             DEPOSITION OF RALPH M. JAMES

17            Monday, February 14, 2005

18                    9:20 a.m.

19               Foley & Lardner LLP

20               111 Huntington Avenue

21               Boston, Massachusetts

22

23         Reporter:  Lisa A. Moreira, RMR/CRR

24
```

Ralph M. James

02/14/2005

44

1    option grant?

2        A.   Not that I'm aware of.

3        Q.   Was it in connection with the IPO, for

4    example?

5        A.   I don't remember.

6        Q.   Now, focusing on the period of time around

7    1997, sir, at the time that Mr. House, according to

8    the complaint, was granted his stock options, about

9    how many employees did First Marblehead have?

10   Approximately.

11       A.   A dozen, maybe.

12       Q.   And of that dozen -- and you're including

13   yourself?

14       A.   Yes.

15       Q.   Okay.  And of that dozen employees, how many

16   of the dozen were granted stock options?

17       A.   I don't remember exactly.

18       Q.   Was it more than half of the employees?

19       A.   Probably, yes.

20       Q.   Well, you got some in 1996, correct?

21       A.   Yes.

22       Q.   Did you get additional ones in 1997 at or

23   about the time that Mr. House got his?

24       A.   I got additional ones.  I don't remember

Ralph M. James

1   when.

2       Q.   Okay.   And Mr. Meyers certainly had --

3       A.   No.

4       Q.   Mr. Meyers did not?

5       A.   No.

6       Q.   Mr. Anbinder?

7       A.   No.

8       Q.   Mr. Hoffman?

9       A.   No.

10      Q.   Who else got stock options that you can

11  recall -- let's do it that way -- in 1997?

12      A.   There were salespeople.

13      Q.   Can you name them?

14      A.   Well, let's see, Kevin Walker, Thatcher

15  Fields.  I'm trying to remember who else was

16  employed then.  I'd have to look at a list.

17      Q.   All right.  And do you recall that in your

18  options, sir, there was a vesting schedule for the

19  stock options?

20      A.   Yes.

21      Q.   And they vested over time on a rolling

22  basis, correct, sir?

23      A.   Yes, uh-huh.

24      Q.   Did you ever hear that Mr. House's options

Word Index

Ralph M. James                                              02/14/2005

55

1    discuss that with anyone?

2        A.   He didn't report to me.

3        Q.   That's not what I asked you.  Did you

4    discuss it with anyone?

5        A.   Not that I recall.

6        Q.   Now, let me show you what I'm going to have

7    marked as James Exhibit 2 for identification.  It's

8    a memorandum to the FMC staff from you, Mr. James,

9    and it's dated July 7, 1997?

10                  (Exhibit No. 2, Memo from Mr. James dated

11                  7/7/97, marked for identification)

12        Q.   Have you ever seen that document before,

13   sir?

14        A.   Yes.

15        Q.   Have you seen it in preparation for your

16   deposition?

17        A.   I can't remember.

18        Q.   Just put the document aside for a second.

19   I'm going to ask you a different question, Mr.

20   James.

21                  Other than your lawyer -- that is, Mr.

22   DeMoura -- have you spoken with anybody regarding

23   this litigation ever?

24        A.   Yes.

Case 1:04-cv-11263-PBS    Document 27    Filed 07/01/2005    Page 41 of 54

1    includes the quote, "Discussion of the Incentive

2    Stock Option program," do you see that, sir?

3        A.   Yes.

4        Q.   And you indicated that Mr. Hoffman was going

5    to join the meeting, do you see that?

6        A.   Yes.

7        Q.   And that, quote, he -- referring to Mr.

8    Hoffman -- knows this stuff inside and out.  Do you

9    see that, sir?

10       A.   Yes.

11       Q.   Now, who was invited?  When it says FMC

12   staff, who was invited to this meeting?  Is that

13   just the sales staff?

14       A.   No, that would be all FMC staff.

15       Q.   Now, not all FMC staff were going to be

16   getting stock options, correct, or is that

17   incorrect?

18       A.   Anybody who worked for the firm was eligible

19   to receive incentive stock options based on their

20   performance.

21       Q.   I see.

22       A.   So everybody at the firm should understand

23   what is in the program.

24       Q.   And by this time Mr. House already had

**Word Index**

Ralph M. James                                              02/14/2005

60

1    gotten his options, correct?  You can take a look at

2    the Exhibit B.  I think it says June 15, 1997.

3        A.   So I guess that would be true.

4        Q.   So he already had his from earlier in June.

5    Do you recall that there were other people who were

6    not going to get theirs until sometime after July?

7        A.   No, the practice was to give options once a

8    year, so everybody who had them had them.

9        Q.   Once a year?

10       A.   Around this time.

11       Q.   "This time" meaning July 7th?

12       A.   Around whatever, June.

13       Q.   Well, do you recall whether or not Mr. House

14   was in a different position in terms of when he

15   got -- it appears, according to the document, that

16   he had already gotten the grant on June 15th.  Do

17   you recall whether or not there were other people

18   who had not yet gotten but it was going to be --

19       A.   I don't recall.

20       Q.   Okay.  Well, let me show you what I'm going

21   to have marked -- withdrawn.

22            Were you present at the staff meeting?

23       A.   I don't remember.

24       Q.   Do you recall whether or not Mr. Hoffman

63

1          MR. DeMOURA:  Objection.  I instruct the

2    witness not to answer questions regarding what you

3    discussed with Mr. Hoffman.

4          MR. WANG:  Okay.

5      Q.  Mr. Hoffman, you understood, acted as

6    counsel to the company?

7      A.  Yes.

8      Q.  All right.  I'm going to show you a

9    memorandum, and we're going to have it marked as

10   James Exhibit 3 for identification.  It's addressed

11   to the employees of First Marblehead from Rodney

12   Hoffman, and it's dated July 7, 1997.

13          (Exhibit No. 3, Memo from Mr. Hoffman

14           dated 7/7/97, marked for identification)

15     Q.  Do you recall ever seeing that before, sir?

16     A.  Vaguely.

17     Q.  When you say "vaguely," what do you mean,

18   sir?

19     A.  I have some vague recollection of seeing it.

20   I can't tell you when.

21     Q.  Do you have a vague -- a recollection, vague

22   or otherwise, that this was distributed to the

23   employees of First Marblehead at the July 7th staff

24   meeting to which your memorandum, James Exhibit 2,

64

1    makes reference?

2        A.   I don't remember whether it was or not.

3        Q.   Okay.  The dates are the same.  You see

4    that?

5        A.   The dates are the same.

6        Q.   Now, at the bottom of the first page of

7    James Exhibit 3, the memorandum, it makes reference

8    to a, quote, stock option subcommittee of the board

9    of directors.  First page, sir, stock option

10   subcommittee of the board of directors.  Do you see

11   that?

12       A.   Yes.

13       Q.   Do you know who was on the stock option

14   subcommittee?

15       A.   No, I don't.

16       Q.   Is it your understanding that that stock

17   option subcommittee is the same as the stock option

18   committee that's referred to in the earlier document

19   we looked at; that is, the plan itself?

20       A.   I don't know.

21       Q.   Mr. Hoffman would know the answer to that,

22   you think, as the architect of the plan?

23       A.   "Architect" is my word.

24       Q.   Yes.  You understood he was the architect of

Word Index

Ralph M. James

65

1    the plan?

2            MR. DeMOURA:   Objection.

3        A.   Yes.

4        Q.   All right.   He's the expert, so far as you

5    know, isn't he?

6        A.   Yes.

7        Q.   Was there anyone else within the company who

8    you understood was responsible for the plan or

9    knowing what the details of the plan were, or was

10   that something that was Mr. Hoffman's bailiwick?

11       A.   That was Rod's.

12       Q.   Now, you see, if you look at Page 2 of the

13   memorandum, Mr. Hoffman's memorandum, Nos. 2 and 3

14   talk about the vesting schedule.   Do you see that?

15       A.   Yes.

16       Q.   And that did not apply to Mr. House,

17   correct?

18       A.   That is correct.

19       Q.   And No. 4, it says "If the employee resigns

20   or is terminated for cause, the unvested options

21   terminate."   Do you see that, sir?

22       A.   Yes.

23       Q.   But vested options would remain, correct?

24   The employee would still have his vested options.

Ralph M. James

66

1   That's what you understood, correct, on resignation

2   or termination, do you see that?

3       A.   Subject to the terms of the incentive stock

4   option agreement.

5       Q.   I see.  Well, under No. 6 it says, "The

6   options must be exercised within ten years of the

7   date of grant," do you see that, sir?

8       A.   Yes.

9       Q.   And did you understand that that was a term,

10  as well?

11      A.   Excuse me?

12      Q.   You understood that that was a term of the

13  options, as well?

14      A.   The terms of the options as long as you were

15  employed, yes.

16      Q.   That doesn't say it in this memorandum.

17  Take my word for it.  That's not in this memorandum.

18      A.   I'll take your word for it.

19      Q.   Okay.  Well, you can take your time and look

20  at it, but I think Mr. DeMoura and I would probably

21  stipulate that it's not in this memorandum.

22           Did you ever say to Mr. Hoffman, "Gee,

23  you seem to have forgotten a fairly important part

24  of the plan here"?

67

1        A.   I don't recall saying that, no.

2        Q.   Now, take a look at the bottom of Page 1,

3   again, on James Exhibit 3.  It says, "The following

4   are the principal terms of the options which have

5   been proposed by the Stock Options Subcommittee of

6   the Board of Directors," do you see that, sir?

7        A.   Yes.

8        Q.   It seems to be talking in future, something

9   that has been proposed but not yet acted on,

10  correct, sir?

11       A.   Okay.

12       Q.   But you'd agree with me that, as to Mr.

13  House, since we see his grant was June 15th, it

14  wasn't something that was forward-looking.  Mr.

15  House already had his options, correct?

16       A.   He already had his options, yes.

17       Q.   How many options do you still have?  I think

18  you said you think you've exercised around 200,000.

19  How many do you still have?

20       A.   I honestly don't know.

21       Q.   Hundreds of thousands?

22       A.   Yes.

23       Q.   Do you know what the average price is for

24  those options?

**TAB H**

2/14/05
James
Exhibit No. 4
LISA A. MOREIRA

COMPENSATION REVIEW          JUNE 1997

NAME: _GREGORY  HOUSE_____

## SALARY

Current Salary ($):          $ 70,000

5% COLA ($):                 3,500

New Salary (as of 7/1/97):   $ 73,500

## BENEFITS

Life Insurance Benefits ($):     590

Medical Benefits ($):            5400

Total Benefits Provided          $ 5990
by FMC ($):

## STOCK OPTIONS

ISO Shares Granted:              2500

Value of ISO Shares             $ 78125
(at $31.25 per share):

## TOTAL COMPENSATION
Package of salary + benefits + ISO:  $ 157615
                                     ===========

GH0341

**TAB I**

# Memorandum



**To:**    FMC Staff

**From:**  Ralph James

**Date:**  07/07/97

**Re:**    Agenda for July 7 Staff Meeting

---

9:30 – 10:30    Discussion of the Incentive Stock Option program

Rod Hoffman, FMC general counsel and architect of the ISO will join us. He knows this stuff inside and out, and will be prepared to answer any and all questions

10:30 – 12:30   Staff Meeting

            1.   Product Update            10 minutes
- Gate Family
- Gate Student
- PrepGATE
- PATH

            2.   Operations Update        20 minutes

            3.   Field Update            45 minutes
- Outstanding RFP's
- Customer Feedback
- NASFAA and NACUBO conferences

            4.   Issues and Opportunities     45 minutes

1:00 – 3:00    Management Committee

3:00 – 5:00    Sales Team Meeting

CONFIDENTIAL

1

GH0020

**TAB J**

**DEUTSCH WILLIAMS BROOKS DeRENSIS HOLLAND & DRACHMAN, P.C.**
99 Summer Street, Boston, MA 02110-1235   (617) 951-2300

TO: Employees of First Marblehead
FROM: Rodney G. Hoffman
DATE: July 7, 1997
SUBJECT: Employee Stock Option Plan



## I.    OVERVIEW

The Board of Directors of First Marblehead has established an employee stock option plan (the "Plan").  The Plan provides an alternative method of compensating employees.  Under the Plan, the company has the ability to grant to an employee an option to purchase First Marblehead stock in the future at the current fair value of the stock.

The benefit of a stock option grant to the employee is that it gives him the opportunity to participate in any increase in the value of the company without actually risking an investment; if the value of the company declines over time, the employee simply would not exercise his option and would not suffer any out-of-pocket loss.  As a practical matter, stock options are not often exercised until just before the employee intends to sell the stock (unless the option is about to expire).  The options here will be "Incentive Stock Options" or "ISOs" under the Internal Revenue Code.  There is no income tax effect to the employee when an ISO is granted; it is not considered "compensation" which must be included in an employee's income for tax purposes.  Taxes must be paid when the stock is sold.

The benefit of the stock option grant to the company is that, without having to pay out additional cash, the company is able to give its employees an additional incentive to work to increase the value of the company.  One way of looking at the Plan is that, by establishing it, the stockholders are agreeing to have their ownership interests diluted in order to save the company's cash.

In addition, stock options can also be viewed as "golden handcuffs" which bind the employee to the company.  Because a stock option typically "vests" over time, an employee risks losing all or part of the value of his option if he resigns or is terminated before his option is fully vested.

## II.    PRINCIPAL TERMS OF FIRST MARBLEHEAD STOCK OPTION

The following are the principal terms of the options which have been proposed by the Stock Option Subcommittee of the Board of Directors.  These terms may be changed before the options are issued.

GH0021

1.  The employee will be granted an option to purchase a certain number of shares at the current fair market value of the stock - approximately $32.00 per share.

2.  The employee cannot exercise the option until the options "vest". The terms of the vesting are that 20% of the total grant vests immediately and an additional 20% of the total vests on each of the first four anniversaries of the date of the grant.

3.  In any year, the company will have the right to defer the vesting of 1/2 of the options which were to vest in that year (i.e., 10% of the total). By this, the Company may indicate that the employee's performance during the year was not up to the expected standard.

4.  If the employee resigns or is terminated for "cause", the unvested options terminate.

5.  If the company is sold, all unvested options will vest immediately.

6.  The options must be exercised within ten years of the date of grant.

### III.  LIMITATIONS ON TRANSFER

There are significant limitations on the transferability of the options and the stock purchased upon the exercise of an option.

1.  By its terms, an option may not be transferred by the employee to any other person except in limited cases such as the death of the employee.

2.  A condition of the exercise of the option is that the employee enter into the same Shareholders Agreement which all the current shareholders have signed. Among other things, the Shareholders Agreement gives the company and the other stockholders the first right to purchase stock before it can be sold to third parties.

3.  The company's stock is not now registered under the federal securities laws. Accordingly, it cannot be sold to third parties unless either it is registered with the federal Securities and Exchange Commission or it fits within one of the exemptions under federal law.

2

GH0022