UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

FIRST MARBLEHEAD CORP.,    )
                           )
       Plaintiff,           )
                           )
vs.                        )  Civil Action No. 04-11263PBS
                           )
GREGORY HOUSE,             )
                           )
       Defendant.           )

---

**DEFENDANT GREGORY HOUSE'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendant Gregory House ("House") submits this memorandum of law in opposition to the motion for summary judgment (the "Motion")[1] of plaintiff First Marblehead Corporation ("First Marblehead" or the "Company"). For all of the reasons set forth below, there remain numerous genuine issues of material fact, First Marblehead certainly is not entitled to judgment as a matter of law, and the Motion should be denied.

**FACTS**

This action concerns First Marblehead's refusal to honor stock options (the "Options") it issued to House while he was employed by the Company. First Marblehead commenced this action seeking a declaratory judgment that House's Options expired pursuant to the terms of a written Stock Option Agreement (the "Agreement").[2] House, in turn, has asserted counterclaims

---

[1] In support of its Motion First Marblehead submitted a Memorandum of Law, herein referred to as "Plaintiff's Brief."

[2] In May 2004, after House had reached out to First Marblehead to discuss a settlement to avoid litigation (which House had told First Marblehead would be commenced in New York), and in the midst of discussions between counsel, First Marblehead commenced its own action in Massachusetts State Court seeking a declaratory judgment that House's Options had expired. House subsequently removed the case to Federal Court.

for breach of contract and promissory estoppel.[3] Although its Motion misstates and overlooks numerous important facts, First Marblehead does not seriously dispute that House never signed any such Agreement. What is disputed is (i) whether, as House insists (and all of the proof appears to confirm), he never was provided with a copy of the Agreement (and whether, as a result, he never was informed of the purported early exercise requirement at issue) during his tenure with the Company, and (ii) the terms of the Options as communicated to House.

The background facts are relatively straightforward. House began working at First Marblehead in April 1996, soon becoming President of First Marblehead Data Services, an affiliate of First Marblehead. House was hired by Dan Meyers, First Marblehead's CEO, to assist with (in Meyers' words) "financial modeling and technical issues."[4] House had become friends with Meyers while the two of them worked together at Prudential Bache Securities, and sometime in early 1996 Meyers contacted House and asked him if he would be interested in joining First Marblehead.[5] Although Meyers had all but guaranteed House that the position would be his if he so desired, in or around March of 1996 House agreed as a formality to attend an "interview" with Meyers and Stephen Anbinder at Anbinder's office in New York City.[6]

During this "interview" an offer of employment was formally extended to House; House and Meyers then took a walk together and further discussed the position. Meyers was aware that, in leaving his job at ABN AMRO to join First Marblehead, House's salary would be reduced significantly.[7] Meyers promised House that the difference would be more than made up in the

---

[3] Defendant's Answer and Counterclaims, Appendix Tab N.

[4] Meyers Dep., p. 24: Appendix Tab A.

[5] House Dep., p. 57: Appendix Tab B.

[6] House Aff. at ¶ 5.

[7] House Aff. at ¶ 5.

form of First Marblehead stock options that, he promised, the Company would grant to House.[8] Meyers assured House that these Options would constitute "a significant portion" of his compensation, and that House eventually would "make a lot of money" as a result of his First Marblehead Options.[9]

During his first year of employment at First Marblehead, House was told that the Company would soon be granting Options to certain employees, including House.[10]  At some point in the spring of 1997, Meyers asked House to help value the Options.[11]  Meyers told House that the Options would be included in certain employees' compensation, and that the Company would reveal to these employees the number of Options they would be receiving during their upcoming, annual performance/compensation reviews.  House agreed to assist Meyers with that valuation process, and shortly thereafter he met with Meyers and Anbinder to help value the Options.[12]

During this meeting with Meyers and Anbinder, Meyers informed House that the Options First Marblehead would be granting (to House, among others) would have the following features: (i) the Options were to have a ten-year duration; (ii) a $32 "strike price"; (iii) a $32 "underlying price"; (iv) a volatility, which Meyers asked House to determine; and (v) an interest rate.  Based upon these parameters, House calculated a value for the Options.[13]  House was <u>never</u> told during this meeting (or at any other time) that the Options had to be exercised within three months of his

---

[8]   Meyers Dep., pp. 24-28, 45-47:  Appendix Tab A.

[9]   House Aff. at ¶ 5.

[10]  House Aff. at ¶¶ 6-7.

[11]  House Aff. at ¶ 7; House Dep., pp. 128-29:  Appendix Tab B; Meyers Dep., pp. 43, 75-76:  Appendix Tab A.

[12]  House Aff. at ¶ 7.

[13]  House Aff. at ¶ 8.

026.15286.1

departure from First Marblehead – had he been told of such a requirement, his calculation would have been substantially different.[14] Also, at some point during this meeting House was given a handwritten notation displaying an alternative calculation. (Appendix Tab C)

Soon thereafter, House met with Meyers and Ralph James (then First Marblehead's Executive Vice President) for his annual performance/compensation review, during which House was given a worksheet (the "Worksheet", Appendix Tab D) indicating that he was to be granted 2,500 Options.[15]

Some weeks after House received the Worksheet, he received another document – a memorandum (the "Memo," Appendix Tab E) addressed to "First Marblehead Employees," purported to have been authored by Rodney Hoffman, First Marblehead's outside general counsel. The Memo was accompanied by an announcement that Hoffman would be giving a presentation relating to the stock options.[16]

The Memo confirmed that the Options were to have a ten-year duration and a price of $32 (which was consistent with the documents and assurances House had received previously). However, to House's surprise the Memo also included certain additional terms that were completely at odds with what he had been promised. For example, the Memo set forth a vesting schedule whereby only 20% of House's Options were to vest immediately, with the remainder of his Options to vest 20% each year for the following four years. The Memo further indicated that the Company could defer the vesting of up to 10% of House's Options each year, based on his

---

[14] House Aff. at ¶ 9. See also Lewis v. Vogelstein, 699 A.2d 327, 331 n.8 (Del. Ch. 1997) ("Such a[n early exercise provision] would also make calculation of a present value of the option grant difficult since the probability of a directors' termination at any (or every) point during the ten year term is impossible to know and very hard to responsibly estimate").

[15] House Aff. at ¶ 10.

[16] House Aff. at ¶ 11.

026.15286.1

performance, and that if House resigned or was terminated "for cause" all of his unvested Options would terminate immediately.

House found the vesting schedule especially offensive because, as described earlier, he had taken a pay cut to join First Marblehead based in large part on Meyers' assurances that House's reduced salary would be made up for by Options that would constitute a "significant portion" of House's compensation and that would make House "a lot of money".[17]  As a result, upon reading the Memo, House went directly to Meyers' office and insisted that he be given immediate, unconditional ownership of all of his Options, as he had been promised.  Meyers agreed, and in House's presence Meyers telephoned Rodney Hoffman and directed Hoffman to assure that all of House's Options vested immediately.[18]  Significantly, the Memo contained <u>no</u> purported requirement that House exercise his Options within three months of departing First Marblehead,[19] and Hoffman had not mentioned any such requirement during his presentation about the Options.[20]

In or around February of 1998 House resigned his position with First Marblehead, giving two weeks notice to Meyers and James.[21]  House informed Meyers and James that he planned to work for ABN-AMRO in Chicago, and he spent part of his final two weeks helping to train

---

[17]  House Aff. at ¶¶ 11-12.

[18]  House Aff. at ¶ 13; House Dep., pp. 147-48:  Appendix Tab B.  First Marblehead concedes that House's Options were fully vested upon issuance.

[19]  Hoffman revealed in his deposition that he deemed this omission from the Memo "a mistake", and that he drafted a supplement to the Memo (the "Supplemental Memo") intending to correct this mistake, which he gave to the Company to distribute to the Option grantees. (Hoffman Dep., 51-53, 62-71: Appendix Tab G)  However, for reasons unknown, First Marblehead did not distribute that supplemental memo to its employees, and the Company obstinately has refused to produce it.  The withholding of that document (as well as numerous other discovery failures by First Marblehead and its counsel) is the subject of House's Motion to Compel, filed on June 28, 2005.

[20]  House Aff. at ¶¶ 14-15; Hoffman Dep., pp. 52-53: Appendix Tab G.

[21]  House Aff. at ¶ 17; House Dep., pp. 16-17:  Appendix Tab B.

026.15286.1

Bruce Lefenfeld.[22]  When he left First Marblehead, House understood that he had 2,500 fully-vested Options (because he had been told, and had received documentation confirming, that he in fact owned them), having a 10-year duration and a $32 "strike price."

Crucially, at no time during his employment was House given or shown a copy of the 1996 Stock Option Plan (the "Plan", Appendix Tab F), nor was he ever given (much less asked to sign) the purported Agreement.[23]  In fact, the first time the Company gave House a copy of the Plan was in March 2004, when it forwarded House a copy of the Plan in response to House's attempt to exercise his Options (First Marblehead also forwarded House an unsigned copy of the Agreement).

## ARGUMENT

**I. First Marblehead Has Failed to Satisfy the Summary Judgment Standard**

First Marblehead only is entitled to summary judgment if it can show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986), Lipsett v. Univ.

---

[22]  House Aff. at ¶ 17.

[23]  House Aff. at ¶ 16; House Dep., pp. 115, 210-211:  Appendix Tab B.  Although First Marblehead admits in its Motion that House never *signed* the Agreement (Pl. Brief p. 6), the Company asserts equivocally that, "House testified that he did not see a copy of the Plan or the specific grant prepared for his signature".  However, it is clear that despite First Marblehead's evasive dodging and ducking of this issue, it does not – and could not – dispute the fact that House never *received* the Agreement (or Plan), and never was told of any purported requirement that he exercise his Options within three months of his departure from the Company.  The Company's back-and-forth on this issue is disturbing:  First Marblehead alleged initially in its Complaint (Appendix Tab H) that, "Upon information and belief, sometime after the option grant was made to House, First Marblehead provided House with a Stock Option Agreement which further set forth the terms of the grant".  (Complaint, ¶ 10)  First Marblehead later reversed course, and admitted (in its Responses to Defendant's First Set of Interrogatories, Appendix Tab I) that "it is presently unknown whether House knew or was advised, orally or in writing, that he was required to exercise his stock options within 90 days of his termination of employment with First Marblehead" (Response no. 11).  In its Motion, First Marblehead again relies on the alleged distribution of the Agreement to House (and other employees) (Pl. Brief, p. 6) – despite the fact that there is not a stitch of evidence supporting that contention.

of Puerto Rico, 864 F.2d 881, 894 (1st Cir. 1988).  In determining whether summary judgment is appropriate, all reasonable inferences are to be drawn and all ambiguities resolved in favor of the nonmoving party.  Lipsett, 864 F.2d at 895.  In ruling on the motion, the Court may not assess weight or credibility of the evidence.  Id.  "If, after this canvassing of the material presented, the district court finds that *some* genuine factual issue remains in the case, whose resolution one way or another *could* affect its outcome, the court must deny the motion."  Id. (emphasis in original).  For the reasons set forth below, First Marblehead has failed to meet its burden, and summary judgment should not be granted.

## II. House's Options are Permitted by the Internal Revenue Code and Consistent with the Express Terms of the Plan

### A. House Was Granted Non-Qualified Stock Options Under the Internal Revenue Code

House's Options – having a ten-year duration, a $32 "strike price", and certain restrictions on transferability as set forth in the Memo – are consistent with the definition of "incentive stock options" under Section 422 of the Internal Revenue Code.[24]  One of the key cornerstones of First Marblehead's Motion is its argument that "the Code provides for expiration of incentive stock options if not exercised within three months of the holder's termination of employment."  (Pl. Brief, p.8)  In fact, Section 422 contains no such requirement.  Rather, Section 422(b) sets forth six criteria for "incentive stock options" – all of which are consistent with the terms of House's Options, and none of which contain any requirement that an employee exercise his stock within three months of his termination.[25]  As a result, the fact that the

---

[24] 26 U.S.C. §422.

[25] Section 422(b) requires that an "incentive stock option" meet the following six criteria:

Company may have referred to the Options as "ISOs" does not change (or add to) the terms of House's Options.

The provision First Marblehead purports to rely on in arguing that House's Options have "expired … as a matter of law" pursuant to the Code appears to be Section 422(a)(2).[26] However that section provides only that, in order to qualify for the special tax treatment conferred by Section 421(a),[27] an employee must exercise his incentive stock option within three months of

---

(1) the option is granted pursuant to a plan which includes the aggregate number of shares which may be issued under options and the employees (or class of employees) eligible to receive options, and which is approved by the stockholders of the granting corporation within 12 months before or after the date such plan is adopted;
(2) such option is granted within 10 years from the date such plan is adopted, or the date such plan is approved by the stockholders, whichever is earlier;
(3) such option by its terms is not exercisable after the expiration of 10 years from the date such option is granted;
(4) the option price is not less than the fair market value of the stock at the time such option is granted;
(5) such option by its terms is not transferable by such individual otherwise than by will or the laws of descent and distribution, and is exercisable, during his lifetime, only by him; and
(6) such individual, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation.

Section 422(c)(4), entitled "Permissible provisions", further provides in relevant part that "An option which meets the requirements of subsection (b) shall be treated as an incentive stock option even if –
…
(C) the option is subject to any condition not inconsistent with the provisions of subsection (b).

[26]   Section 422(a) provides, in relevant part:
(a) In general. Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock option if –
…
(2) at all times during the period beginning on the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of … the corporation granting such option [or a subsidiary thereof].

[27]   Section 421(a) provides as follows:
(a) Effect of qualifying transfer. If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a) or 423(a) are met –
(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;
(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation, or a corporation issuing or assuming a stock option in a transaction to which section 424(a) applies, with respect to the share so transferred; and
(3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

8

his termination.  *The Code says nothing about incentive stock options expiring due to an employee's failure to exercise them within that time period.*  Options not meeting this requirement simply are considered "non-statutory" or "non-qualified" options for tax purposes.  See, e.g., McDonald v. Comm'r of Internal Revenue, 764 F.2d 322, 327 (5th Cir. 1985) ("if the conditions of sections 421 and 422 are not met, then the employee exercising the unqualified option normally recognizes ordinary compensation income").[28]  House has never argued that his options were "qualified," nor that he may take advantage of the special tax treatment afforded by Section 421.

     Even if, *arguendo*, House's Options – which contain no requirement that they be exercised within three months of his departure –fail to qualify formally as "incentive stock options" under the Internal Revenue Code, that would not affect their *validity*.  That the Company may have labeled House's Options "ISOs" in the Memo and the Worksheet is of no consequence.  In Hubbard v. United States, 359 F. Supp. 2d 1123 (W.D. Wash. 2005), a case cited by First Marblehead (Pl. Brief, p. 8), the Court rejected the Government's contention that the option at issue was an incentive stock option as defined in Section 422 of the Internal Revenue Code – despite the fact that the stock option agreement expressly had "labeled the option an 'Incentive Stock Option' and explained that it was 'intended to qualify as an Incentive Stock Option under Section 422 of the Internal Revenue Code ….'"  Hubbard, 359 F. Supp. 2d at 1125-26.  Instead, because the option failed to comply with Sections 422(b)(1)-(2), the Court elected to treat the option as non-statutory for tax purposes.  Id.  For similar reasons, even if the

---

[28]  See also Gordon v. Comm'r of Internal Revenue, 1987 WL 40396, *1-2 (U.S. Tax Ct. 1987), aff'd, 136 F.3d 1330 (11th Cir. 1998) ("Once any stock option granted an employee is stripped of its preferential treatment, the employee is left with compensation, pure and simple, which in the vast majority of cases is taxed as ordinary income upon receipt").

9

Court were to find that House's Options are not "incentive stock options," House's Options merely lose the favorable tax treatment conferred by Section 421(a) but otherwise remain exercisable.[29]

### B. The Express Terms of the Plan Give the Company the Authority to Issue both Qualified and Non-Qualified Stock Options

As an initial matter, whether or not the 1996 First Marblehead Stock Option Plan (Appendix Tab F) was properly approved by the First Marblehead Board of Directors and Shareholders, as required by Delaware law, is not at issue in this litigation, and why First Marblehead felt the need to devote three pages to that issue in its Motion is a mystery. Discovery in this case has established that the Plan was approved by the Board of Directors and Shareholders – a Plan which, by its terms, *expressly* permits the Options granted to House. Although First Marblehead cherry-picks from the Plan in its Motion, selectively (and self-servingly) mentioning only the provisions relating to the Company's authority to grant incentive stock options that qualify for special tax treatment under Section 422 of the Internal Revenue Code, the Plan in fact provides for broad flexibility with respect to the types of Options that may be granted – and further provides expressly that non-qualified Options may be granted, among other things:

- Section 2.02 of the Plan, entitled, "Authority," states that, "Within the limits of the Plan, the Committee shall determine: the individuals to whom, and the times at

---

[29] First Marblehead also appears to argue that, because one of the purposes of issuing "incentive stock options" is to retain employees, the Options First Marblehead granted to House were not "incentive stock options" if they were not required to be exercised within three months of his departure because they would have been stripped of their "incentive" function. However, this argument is belied by the fact that, as First Marblehead admits, House's Options were unique from other employees in that they were altered so as to be *fully vested*. (James Dep., pp. 46-49, 53-54: Appendix Tab J; Meyers Dep., p. 83: Appendix Tab A; Hoffman Dep., pp. 33-34: Appendix Tab G) As Meyers testified in his deposition, House's Options were given this unique feature because House had taken a pay cut in order to join First Marblehead. (Meyers Dep., pp. 50-51: Appendix Tab A) In other words, unlike the Options that may have been granted to other employees, House's Options were designed, in part, to reward him for his past performance and sacrifice, rather than simply to provide House with an incentive to remain with the Company.

10

which, Options shall be granted; the type of Option and number of shares to be granted; the duration of each Option; the price and method of payment for each Option; *and the time or times within which (during its term) all or portions of each Option may be exercised*" (emphasis added);

- Section 4.01 of the Plan, entitled, "Types of Options," states expressly that Options may be granted either as "incentive stock options" as defined in Section 422 of the Internal Revenue Code, "or as options which do not meet the requirements of Section 422 ('Nonstatutory Stock Options')", and further provides that the Committee has the authority to grant both types of Options;

- Section 5 of the Plan, entitled, "Forms of Options," states unequivocally that "The form of such Options may vary among grantees";

- Section 6 of the Plan, entitled "Nonstatutory Stock Options," states that, "In the case of Nonstatutory Stock Options, the price at which shares may from time to time be optioned shall be determined by the Committee";

- Section 7.04, entitled "Amendment of Options," states that "The Committee may amend, modify or terminate any outstanding Option, including substituting therefore another Option of the same or different type, changing the date of exercise or realization and converting an Incentive Stock Option to a Nonstatutory Stock Option";

- Deposition testimony of relevant First Marblehead officers affirmed that the Plan in fact provides the Company with the flexibility to vary the terms of Options among grantees, including the ability to grant both statutory and non-statutory Options. (Anbinder Dep., pp. 38-42: Appendix Tab K; Meyers Dep., pp. 87-88: Appendix Tab A).

In fact, Hoffman – the drafter of the Plan – testified that "the plan allows for both qualified and nonqualified [Options]. It gives the company flexibility … [F]lexibility was built in." (Hoffman Dep., pp. 28-31, 34-36: Appendix Tab G) Hoffman further testified that he specifically designed the Plan so as to allow the Company to issue Options meeting the requirements of Section 422 and Options that do not. Id. at 34.[30] As a result, House's Options –

---

[30] Hoffman also testified that the provisions of Paragraph 7 of the Plan relating to termination and early exercise, which First Marblehead contends render House's Options expired (Pl. Mem. p. 2), were intended only to apply to the *qualified* Options issued pursuant to the Plan, and were not intended to apply to the non-qualified Options. (Hoffman Dep., pp. 31-32: Appendix Tab G)

026.15286.1

containing no requirement that they be exercised within three months of his departure from First Marblehead –expressly are provided for in the Plan, and First Marblehead's assertion that "the Plan requires that options be exercised within three months of termination of employment" (Pl. Brief, p. 11) is just plain wrong. [31]

At the very least, there exist genuine issues of material fact relating to, among other things, whether (as First Marblehead contends) the Company in fact "prepared and distributed specific incentive stock option grants to employees" (Pl. Brief, p. 6, Pl. Statement of Undisputed Facts No. 29). House strongly disputes whether he – or, for that matter, other employees[32] – received any purported Agreement, and for that reason alone First Marblehead's Motion should be denied.

---

[31] Moreover, because House's Options were granted pursuant to an approved, written Plan, the cases First Marblehead relies on are inapposite. In Grimes v. Alteon, Inc., 804 A.2d 256 (Del. 2002) (Pl. Brief, pp. 9-10), the Court refused to enforce an oral promise by a corporation's CEO (without Board approval) that the company would issue to the plaintiff 10% of the corporation's future offerings. The Court held that to force the company to issue, prospectively, 10% of its outstanding stock to plaintiff would "significantly encumber[ ] the board's business judgment." Id. at 262. The Court further noted that were it to enforce the alleged promise, the Court would effectively be forcing the company to give plaintiff "considerable leverage … over the future direction of the corporation" due to the size of the stake involved. Id. Neither concern is present in this case – here, there exists a written Plan, approved by the Board, that explicitly confers the authority to issue the kind of Options granted to House. House's Options, if exercised, would not result in his obtaining a material stake in the Company. Similarly, in STAAR Surgical Co. v. Waggoner, 588 A.2d 1130 (Del. 1991) (Pl. Brief, p. 9), the Court held preferred stock invalid where the corporation never formally had adopted the resolution that would have provided for its issuance. In Michelson v. Duncan, 386 A.2d 1144, 1152 (Del. Ch. 1978) (Pl. Brief, p. 9), rev'd in part, 407 A.2d 211 (Del. 1979), although a stock option plan existed, the Court held that the actions taken by the Board of Directors violated the clear terms of that plan. Likewise, in both Lieberman v. Frangiosa, 844 A.2d 992 (Del. Ch. 2002) and Field v. Carlisle Corp., 68 A.2d 817 (Del. Ch. 1949) (both found at Pl. Brief, p. 10), the Boards' actions were prohibited by the companies' Certificates of Incorporation (in Lieberman, the Board had attempted to issue 4.5 million more shares than had been provided for in the Certificate of Incorporation).

[32] First Marblehead has refused to produce documents relating to the stock option grants issued to employees other than House, as more fully set forth in House's Motion to Compel, along with the Fed. R. Civ. P. 56(f) Affidavit submitted herewith. These documents unquestionably are relevant and material, as they should demonstrate whether other employees signed (and therefore received) their formal grants – either making House's situation unique, or confirming that other employees similarly did not receive written Agreements. These documents also may demonstrate, among other things, that contrary to First Marblehead's contention in its Motion that "writings or oral representations of officers or others" cannot vary the terms of House's Options (Pl. Brief, p. 9), First Marblehead altered the terms of grantees' Options, and subsequently honored those terms. Indeed, Meyers testified that he believed Ralph James may have been granted non-qualified Options (Meyers Dep., pp. 87-88: Appendix Tab A), something House has not been able to verify due to First Marblehead's discovery failures.

12
026.15286.1

### III. House's Options by their Terms Remain Valid and Exercisable

House's Options, granted consistent with and pursuant to the Plan, confer a binding contractual obligation upon First Marblehead. See, e.g., In re Allen, 226 B.R. 857, 862 (Bankr. N.D. Ill. 1998) ("Issuance of a stock option contract imposes a binding obligation on the corporation to deliver the shares upon exercise by the optionee"). There is no question that House's grant (which, as described above, consisted of the Plan and a series of discussions and documents, including the Worksheet and the Memo), is a valid, enforceable contract, which House performed (by exercising within ten years) and First Marblehead breached (by refusing to honor House's exercise). See, e.g., Smith v. Horsehead Indus., Inc., 1995 WL 406024, *5-6 (S.D.N.Y. 1995) (assuming Board had approved stock option plan, letter setting forth terms of employment, stock incentive plan outlines, and conversations between plaintiff and corporate officers formed enforceable stock option contract).[33]

Clearly, the Memo, which *was* provided to House, and which sets forth the most complete rendition of the terms of House's Options (with the exception of its vesting schedule, which First Marblehead concedes was altered), contains <u>no</u> requirement that House exercise his Options within three months of his departure from the Company. (Pl. Brief, pp. 5-6, Pl. Statement of Undisputed Facts No. 26) First Marblehead admits only that House never *signed* the Agreement (Pl. Brief p. 6) purporting to contain such a requirement, implying that it was distributed to him and he simply failed (or refused) to sign it. But the record leads to the contrary conclusion: House insists that he never was given a copy of the Agreement, in sharp contrast to First Marblehead's assertion that it "prepared and distributed specific incentive stock

---

[33] See also Cattin v. Gen. Motors Corp., 955 F.2d 416, 430-31 (6th Cir. 1992) (letters setting forth basic parameters of stock purchase agreement constituted enforceable contract).

13

option grants to employees". (Pl. Brief, p. 6, Pl. Statement of Undisputed Facts No. 29)[34] *Again, this represents a key, disputed factual issue.* [35]

Here, a parallel can be drawn to the ERISA context, where courts hold uniformly that where an employer distributes to its employees a summary description of their ERISA benefits that conflicts with the express terms of the ERISA plan, the terms in the summary description control. This even is the case where the summary description contains a disclaimer stating that employees should refer to the plan itself and that the plan will govern any inconsistencies – especially where, as here, the plan itself never was distributed. As stated by the Court in Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 31 F. Supp. 2d 168, 174 (D. Mass. 1998), aff'd on other grounds, 239 F.3d 51 (1st Cir. 2001), "It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee."[36] For similar reasons, the terms set forth in the Memo (which do not include a purported three-month post-departure exercise provision) apply to House's Options.[37]

---

[34] First Marblehead also asserted in its Responses to House's First Set of Interrogatories (Appendix Tab I), Response no. 6, that. "Employees who were granted options … were advised of their grants individually … The option agreements were circulated to employees sometime after the July 1997 meeting." By refusing to produce copies of those Agreements, First Marblehead has made it impossible to verify this important fact.

[35] House Aff. at ¶ 16; House Dep., pp. 115, 210-211: Appendix Tab B.

[36] Mauser held that an omission from the summary plan description governed the terms of plaintiff's benefits. See also Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990) (upholding District Court's holding that terms of ERISA plan summary booklet governed employee's benefits, where only booklet, not plan, distributed to employees); Clark v. Bank of New York, 801 F. Supp. 1182, 1190 (S.D.N.Y. 1992) ("[ERISA] plan summary governs … where only the plan summary was distributed to employees"); Santiago Rolon v. Chase Manhattan Bank, 912 F. Supp. 19, 21-23 (D.P.R. 1996) (fact issues remained regarding whether employee was ever informed of disqualification provisions contained in ERISA plan but omitted from plan summary, precluding summary judgment); Springs Valley Bank & Trust Co. v. Carpenter, 885 F. Supp. 1131, 1142 (S.D. Ind. 1993) (summary description of ERISA plan held to govern benefits where inconsistent with terms of plan, despite disclaimers contained in summary).

[37] Additionally, to the extent House's Options contained any such exercise requirement, the Court should find that it was waived by House. Hoffman testified in his deposition that the three-month post-departure exercise period was included in the Plan in order for the qualified Options issued thereunder to comply with IRS regulations,

14

At the very least, as is apparent from the Motion, genuine issues of material fact exist with respect to the precise terms of House's grant. First Marblehead insists that House's Options contained a term that required House to exercise them within three months of his departure from the Company. (Pl. Brief, pp. 1, 2, 6, 8, 9, 11) In fact, House's Options contained <u>no</u> such term. It is difficult to conceive of a more obvious example of a genuine, disputed issue of material fact that precludes summary judgment. <u>See</u>, e.g., <u>McGurn v. Bell Microproducts, Inc.</u>, 284 F.3d 86, 91 (1st Cir. (Mass.) 2002) (disputes over whether a contract has been formed and terms thereof should be resolved by fact finder; motion for summary judgment denied).

## IV. House Has a Viable Claim for Promissory Estoppel

House has demonstrated all of the elements required for promissory estoppel. <u>See</u>, e.g., <u>Collins v. Am. Int'l Group, Inc.</u>, 1998 WL 227889, *5-6 (Del. Ch. 1998) (unpublished),[38] aff'd, 719 A.2d 947 (Del. 1998) (promissory estoppel requires (i) a promise; (ii) the promisor expected the promisee to rely on the promise; (iii) reasonable reliance by the promise; and (iv) injustice would result if the promise were not enforced). As set forth above, it is undisputed that House was promised that stock options would be granted to him as a condition of his acceptance of employment. First Marblehead further concedes that, as described to House in various

---

and that the special tax treatment afforded to qualified options was for the benefit of the Company's employees. (Hoffman Dep., pp. 27, 35-36: Appendix Tab G) It is well-settled that a party to a contract may waive a condition precedent that exists solely for his benefit. For example, in <u>Schwieger v. Iowa Beef Processors, Inc.</u>, 802 F.2d 1032, 1035-37 (8th Cir. 1986), the Court held that employees were entitled to waive a "sequence of exercise" provision in their option agreements that was included in order to obtain the special tax treatment for qualified options under the Internal Revenue Code, and that would have, in conjunction with a similar three-month, post-departure exercise provision, rendered their later-granted, more lucrative options expired. The Court stated, unequivocally, "We have difficulty accepting the argument that the parties mutually intended that the optionees could give full consideration under the option agreement and then be deprived of their right to exercise the options because of a provision included in the agreement solely to increase the value of the options *to the optionees*." <u>Id.</u> (emphasis in original); <u>see</u> also <u>Snyder v. Time Warner, Inc.</u>, 179 F. Supp. 2d 1374, 1382-83 (N.D. Ga. 2001) (denying summary judgment where fact issue existed as to whether employer waived post-departure 90-day exercise provision in stock options).

[38] Because <u>Collins</u> is an unpublished decision, for the Court's convenience a copy is included herewith as Appendix Tab L.

026.15286.1

statements and documents, his Options contained no requirement that he exercise them within three months of his departure. It is clear that House relied on these promises to his detriment, by (i) accepting employment at First Marblehead (and, later, by remaining in its employ), and (ii) waiting to exercise his Options until 2004.

First Marblehead argues that any reliance by House on these statements and documents is unreasonable, given the reference in the Memo to "incentive stock options" and House's purported expectation that a formal, written grant would be distributed to him at a later date. (Pl. Brief, p. 12 n.4) This argument is unavailing. As set forth above, courts routinely ignore disclaimer language in plan summary descriptions, and the fact that the Company referred to House's Options as "ISOs" has no bearing on their validity.[39] In any event, the reasonability of House's reliance is precisely the sort of issue that must be determined by a trier of fact, inappropriate for resolution by summary judgment. See, e.g., Fini v. Remington Arms Co., Inc., 1998 WL 299358, *10 (D. Del. 1998) (reasonable reliance is a factual question for jury to resolve); Wilmington Trust Co. v. Aetna Cas. & Sur. Co., 690 A.2d 914, 916-17 (Del. 1996) (same).[40]

As discussed earlier, House does not dispute that his Options were granted pursuant to a written Plan, approved by the First Marblehead Board of Directors and shareholders. As a result, despite First Marblehead's assertions to the contrary, House does not seek to invoke estoppel

---

[39] Moreover, as First Marblehead failed to inform House of the purported exercise requirement at issue, it would be highly inequitable to preclude him from relying on that omission. See, e.g., Haft v. Dart Group Corp., 877 F. Supp. 896, 903-04 (D. Del. 1995) ("Because defendants are the cause for plaintiff's failure to exercise these options, defendants cannot benefit from their wrongdoings"; Court would extend exercise date of stock options).

[40] Similarly, in asserting that House was an "expert in stock options" (Pl. Brief, p. 3) and that he was "a sophisticated financial person who has worked most of his life in the options industry" (Pl. Brief, p. 9 n.2), First Marblehead appears to be attacking the reasonableness of House's reliance on its assurances. House disputes that he knew anything about the legal and tax-related qualities of "incentive stock options" (House Aff. at ¶¶ 2, 4), and this issue is inappropriate for resolution by summary judgment.

principles to rescue an otherwise invalid grant (Pl. Brief, p. 13), but rather, seeks only to enforce the promise made to him by the Company under its own Plan, where the Company now disputes the terms of its promise. As a result, House's promissory estoppel claim does not in any way conflict with the requirements of 8 Del. C. § 157.

Moreover, even were the Court to find that House's Options failed to comply with § 157, House's promissory estoppel claim still would be viable under Delaware law. In Collins (Appendix, Tab L), a former employee asserted a claim for promissory estoppel, alleging that he was promised by an agent of his former employer that he could exercise his stock options more than three months after his departure, in contravention of the express terms of his options.[41] In ruling for plaintiff, the Court rejected the company's argument that plaintiff's promissory estoppel claim was barred for lack of shareholder approval. Collins, 1998 WL 227889 at *1, 3.

Other courts have since cited Collins for the proposition that promissory estoppel claims are not inconsistent with § 157. In Ostler v. Codman Research Group, Inc., 241 F.3d 91 (1st Cir. 2001), an employee argued that extensions to his options' exercise deadline given to him by management were invalid under § 157 for lack of Board approval. The Court disagreed, citing Collins in holding that management's failure to comply with the requirements of § 157 in extending the exercise dates of plaintiff's options did not render such extensions invalid. Id. at 94-95. The Court noted that "courts have commonly used apparent authority and estoppel doctrine to protect those who have relied on corporate officials later found to have lacked actual authority." Id. Similarly, in Wert v. Clear Channel Communications, Inc., 345 F. Supp. 2d 909 (N.D. Ill. 2004), in holding that plaintiff stated a claim for promissory estoppel, the Court

---

[41] In Collins, unlike the present case, the three-month post-departure exercise provision was a term of plaintiff's options, of which plaintiff had been informed.

026.15286.1

rejected defendant company's argument that management's waiver of the post-departure three-month exercise requirement was ineffective for failure to comply with § 157.  The Court held specifically that "[defendant's] argument that Section 157 renders a waiver of the 90-day requirement of the type involved here *ultra vires* and void as a matter of law, does not at all represent a required reading of the statute.  If that had been the case, Collins could not have reached the result that it did."  Id. at 911 n.3.

In this case, equity clearly mandates the enforcement of First Marblehead's promise to House, even if such promise failed to comport with § 157.  House was misled by First Marblehead, in that he never was informed of a purported three-month post-departure exercise requirement.  To make matters worse, First Marblehead *knew* that House had been misled – surely tipping the equities in House's favor.[42]

### V.     First Marblehead's Discovery Failures Warrant a Denial of its Motion

As more fully set forth in the accompanying Fed. R. Civ. P. 56(f) Affidavit and House's Motion to Compel filed on June 28, 2005, First Marblehead has concealed and withheld from House information and documents House requires for his claims and defenses.  As a result of First Marblehead's gamesmanship, several material factual issues remain unresolved, warranting a denial of the Motion pursuant to Fed. R. Civ. P. 56(f), and House should, at a minimum, be given the opportunity to obtain and review the information and documents he seeks.  See generally, Resolution Trust Corp. v. North Bridge Assocs., Inc., 22 F.3d 1198 (1st Cir. (Mass.)

---

[42] Indeed, based on the discovery that has been obtained and Hoffman's admission that he drafted the Supplemental Memo (Hoffman Dep., pp. 51-53, 62-71: Appendix Tab G), it is clear that First Marblehead knew of the purported three-month exercise deadline but did not inform House of it – thus, even if the Court were to conclude that the Options actually were limited by the three-month exercise condition, House should be deemed to have stated a claim for negligent misrepresentation (or, at the very least, the Company's improper withholding of the Supplemental Memo wrongfully has prevented House from stating such a claim).  See, e.g., Trytko v. Hubbell, Inc., 28 F.3d 715, 718-21 (7th Cir. 1994) (upholding judgment for plaintiff on negligent

026.15286.1

1994) (vacating award of summary judgment and remanding for further discovery, where facts needed to oppose summary judgment were in exclusive control of movant, and incompleteness of discovery was fault of movant).[43]

## CONCLUSION

For all of the foregoing reasons, First Marblehead's Motion for Summary Judgment should be denied.

                    Respectfully submitted,
                    Gregory House,
                    By his attorneys,

                    //S//  William T. Hogan III_____
                    William T. Hogan, III BBO # 237710
                    Elizabeth D. Killeen BBO # 645178
                    **Hogan, Roache & Malone**
                    66 Long Wharf
                    Boston, MA  02110
                    (617) 367-0330

                    Peter N. Wang (admitted *pro hac*)
                    Yonaton Aronoff (admitted *pro hac*)
                    **Foley & Lardner LLP**
                    90 Park Avenue
                    New York, NY 10016
                    Attorneys for Defendant Gregory House

Dated:  July 15, 2005

### CERTIFICATE OF RULE 7.1 CONFERENCE AND OF SERVICE

I, William T. Hogan III, hereby certify that, prior to filing the above opposition, counsel conferred concerning this motion and attempted in good faith to resolve or narrow the issues.  I further certify that on this 15th day of July 2005, I filed a copy of said motion electrically.  Notice of this filing will be sent to all parties via the United States District Court electronic filing system.  Parties may access this filing through the Court's system.

                /s/William T. Hogan III_____
                William T. Hogan III

---

    misrepresentation claim related to company's failure to inform him of the true exercise date of his stock options).

[43] See also Commonwealth Aluminum Corp. v. Markowitz, 164 F.R.D. 117, 119-20 (D. Mass. 1995) ("[Rule 56(f)] prevents a party from being railroaded by premature motion for summary judgment") (internal quotation marks omitted).