## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------
FIRST MARBLEHEAD CORP.,            )
                                   )
      Plaintiff,                    )
                                   )
vs.                                )   Civil Action No. 04-11263PBS
                                   )
GREGORY HOUSE,                     )
                                   )
      Defendant.                    )
---------------------------------------------------------

### DEFENDANT GREGORY HOUSE'S
### STATEMENT OF FACTS IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.  House began working at First Marblehead in April 1996, soon becoming President of First Marblehead Data Services, an affiliate of First Marblehead. House was hired by Dan Meyers, First Marblehead's CEO, to assist with (in Meyers' words) "financial modeling and technical issues." (Meyers Dep., p. 24: Appendix Tab A)

2.  In early 1996 Meyers contacted House and asked him if he would be interested in joining First Marblehead. (House Dep., p. 57: Appendix Tab B) Although Meyers had all but guaranteed House that the position would be his if he so desired, in or around March of 1996 House agreed as a formality to attend an "interview" with Meyers and Stephen Anbinder at Anbinder's office in New York City. (House Aff. at ¶ 5)

3.  During this "interview" an offer of employment was formally extended to House; House and Meyers then took a walk together and further discussed the position. Meyers was aware that, in leaving his job at ABN AMRO to join First Marblehead, House's salary would be reduced significantly. (House Aff. at ¶ 5) Meyers promised House that the difference would be more than made up in the form of First Marblehead stock options that, he promised, the Company would grant to House. (Meyers Dep., pp. 24-28, 45-47: Appendix Tab A) Meyers

assured House that these Options would constitute "a significant portion" of his compensation, and that House eventually would "make a lot of money" as a result of his First Marblehead Options. (House Aff. at ¶ 5)

4. During his first year of employment at First Marblehead, House was told that the Company would soon be granting Options to certain employees, including House. (House Aff. at ¶¶ 6-7)

5. At some point in the spring of 1997, Meyers asked House to help value the Options. (House Aff. at ¶ 7; House Dep., pp. 128-29: Appendix Tab B; Meyers Dep., pp. 43, 75-76: Appendix Tab A) Meyers told House that the Options would be included in certain employees' compensation, and that the Company would reveal to these employees the number of Options they would be receiving during their upcoming, annual performance/compensation reviews. House agreed to assist Meyers with that valuation process, and shortly thereafter he met with Meyers and Anbinder to help value the Options. (House Aff. at ¶ 7)

6. During this meeting with Meyers and Anbinder, Meyers informed House that the Options First Marblehead would be granting (to House, among others) would have the following features: (i) the Options were to have a ten-year duration; (ii) a $32 "strike price"; (iii) a $32 "underlying price"; (iv) a volatility, which Meyers asked House to determine; and (v) an interest rate. Based upon these parameters, House calculated a value for the Options. (House Aff. at ¶ 8)

7. House was <u>never</u> told – during this meeting or otherwise – that the Options had to be exercised within three months of his departure from First Marblehead. (House Aff. at ¶ 9)

8. At some point during this meeting House was given a handwritten notation displaying an alternative calculation. (Appendix Tab C)

9. Soon thereafter, House met with Meyers and Ralph James (then First Marblehead's Executive Vice President) for his annual performance/compensation review, during which House was given a worksheet (the "Worksheet", Appendix Tab D) indicating that he was to be granted 2,500 Options. (House Aff. at ¶ 10)

10. Some weeks after House received the Worksheet, he received another document – a memorandum (the "Memo," Appendix Tab E) addressed to "First Marblehead Employees," purported to have been authored by Rodney Hoffman, First Marblehead's outside general counsel. The Memo was accompanied by an announcement that Hoffman would be giving a presentation relating to the stock options. (House Aff. at ¶ 11)

11. The Memo confirmed that the Options were to have a ten-year duration and a price of $32. The Memo also set forth a vesting schedule whereby only 20% of House's Options were to vest immediately, with the remainder of his Options to vest 20% each year for the following four years. The Memo further indicated that the Company could defer the vesting of up to 10% of House's Options each year, based on his performance, and that if House resigned or was terminated "for cause" all of his unvested Options would terminate immediately.

12. House was upset by the vesting schedule because he had taken a pay cut to join First Marblehead based in large part on Meyers' assurances that House's reduced salary would be made up for by Options that would constitute a "significant portion" of House's compensation and that would make House "a lot of money". (House Aff. at ¶¶ 11-12)

13. Upon reading the Memo, House went directly to Meyers' office and insisted that he be given immediate, unconditional ownership of all of his Options. Meyers agreed, and in House's presence Meyers telephoned Rodney Hoffman and directed Hoffman to assure that all

3

of House's Options vested immediately. (House Aff. at ¶ 13; House Dep., pp. 147-48: Appendix Tab B)

14.  The Memo contained no purported requirement that House exercise his Options within three months of departing First Marblehead, and Hoffman had not mentioned any such requirement during his presentation about the Options. (House Aff. at ¶¶ 14-15; Hoffman Dep., pp. 52-53: Appendix Tab G)

15.  In or around February of 1998 House resigned his position with First Marblehead, giving two weeks notice to Meyers and James. (House Aff. at ¶ 17; House Dep., pp. 16-17: Appendix Tab B) House informed Meyers and James that he planned to work for ABN-AMRO in Chicago, and he spent part of his final two weeks helping to train Bruce Lefenfeld. (House Aff. at ¶ 17)

16.  When he left First Marblehead, House understood that he had 2,500 fully-vested Options (because he had been told, and had received documentation confirming, that he in fact owned them), having a 10-year duration and a $32 "strike price."

17.  At no time during his employment was House given or shown a copy of the 1996 Stock Option Plan (the "Plan", Appendix Tab F), nor was he ever given the purported Agreement. (House Aff. at ¶ 16; House Dep., pp. 115, 210-211: Appendix Tab B) In fact, the first time the Company gave House a copy of the Plan was in March 2004, when it forwarded House a copy of the Plan in response to House's attempt to exercise his Options (First Marblehead also forwarded House an unsigned copy of the Agreement).

        Respectfully submitted,
        Gregory House,
        By his attorneys,

        //S//  William T. Hogan III_____
        William T. Hogan, III BBO # 237710
        Elizabeth D. Killeen BBO # 645178
        **Hogan, Roache & Malone**
        66 Long Wharf
        Boston, MA  02110
        (617) 367-0330

        Peter N. Wang (admitted *pro hac*)
        Yonaton Aronoff (admitted *pro hac*)
        **Foley & Lardner LLP**
        90 Park Avenue
        New York, NY 10016
        Attorneys for Defendant Gregory House

Dated:  July 15, 2005

### CERTIFICATE OF RULE 7.1 CONFERENCE AND OF SERVICE

I, William T. Hogan III, hereby certify that, prior to filing the above document, counsel conferred concerning this motion and attempted in good faith to resolve or narrow the issues.  I further certify that on this 15th day of July 2005, I filed a copy of said motion electrically.  Notice of this filing will be sent to all parties via the United States District Court electronic filing system.  Parties may access this filing through the Court's system.

        /s/William T. Hogan III_____
        William T. Hogan III