UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

FIRST MARBLEHEAD CORP.,           )
                                  )
      Plaintiff,                  )
                                  )
vs.                               )   Civil Action No. 04-11263PBS
                                  )
GREGORY HOUSE,                    )
                                  )
      Defendant.                  )

---

### AFFIDAVIT OF GREGORY HOUSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

STATE OF NEW YORK     )
                      )
COUNTY OF NEW YORK    )

Gregory House, being duly sworn, states as follows:

1. I am the defendant in the above-captioned action. I respectfully submit this Affidavit in opposition to plaintiff First Marblehead Corporation's ("First Marblehead" or the "Company") Motion for Summary Judgment (the "Motion"), in order to address certain mischaracterizations and outright inaccuracies contained in the Motion.

2. I understand that First Marblehead asserts in its Motion that I consider myself to be an "expert in stock options" and further suggests that, based upon my experience in the securities industry, I was familiar with the legal and tax consequences of qualified Incentive Stock Options at the time First Marblehead granted me the stock options at issue in this case. The first of these assertions is misleading, and the second is patently false.

3. Prior to joining First Marblehead in April 1996, my previous employment consisted mainly of pricing derivatives for retail sellers. In connection with this I became familiar with basic methods of valuing options (including stock options). In order to price stock

options, I had to familiarize myself with some of their basic financial and mathematical characteristics.

    4.  Although by the time I began working at First Marblehead I had acquired a general understanding of how to *price* stock options, I knew virtually nothing about the legal and tax-related characteristics of stock options given to employees by their employers. Indeed, prior to joining First Marblehead, I never before had received stock options from an employer as part of my compensation, nor had I ever attempted to price such options. Although I understood that the acronym "ISO" stood for "incentive stock options", I merely understood this to refer to stock options given to employees as incentives, as the term itself implies.

    5.  I began working at First Marblehead in April of 1996, eventually occupying the position of President of First Marblehead Data Services, an affiliate of First Marblehead. I was hired in or around March of 1996, after an interview with the CEO of First Marblehead, Dan Meyers, and Stephen E. Anbinder, at Anbinder's office in New York City. The interview was very informal, mainly because Meyers already had become a friend of mine after we had worked together at Prudential Bache. Meyers already had intimated to me prior to the interview that I would be hired, and in fact an offer was extended to me on the spot. Afterwards, Meyers and I took a walk together and further discussed the position. Meyers was aware that, in leaving my job at ABN AMRO to come to First Marblehead, my salary would be reduced significantly. He promised me that I would be given First Marblehead stock options, and that such options would constitute "a significant portion" of my compensation. He further assured me that, although I was giving up a higher salary, I eventually would "make a lot of money" while at the Company. As a result, I decided to accept the job.

6.  Over the course of my first year at First Marblehead, I remember generally that stock options were discussed amongst First Marblehead employees, and that I was again told at some point in the winter or spring of 1997 that I was to be given First Marblehead stock options.

7.  Also in the spring of 1997, Meyers asked me to help value the options that were going to be granted to me and certain other First Marblehead employees. Meyers explained to me that options were going to be discussed with employees during our upcoming, annual performance/compensation reviews, and that the Company needed help establishing a value for the options in order to explain to individual employees how many stock options they would be receiving. I agreed to assist Meyers with this, and shortly thereafter I met with Meyers and Anbinder to help value the options.

8.  During this meeting with Meyers and Anbinder, Meyers told me to calculate a value for options having the following features (which he said would be the features of the options we'd be receiving): (i) the options were to have a ten-year duration; (ii) a $32 "strike price"; (iii) a $32 "underlying price"; (iv) a volatility, which Meyers asked me to determine (I believe the number I chose was 40% or 50%); and (v) an interest rate. Based upon these parameters, I calculated a value for the options.

9.  I was not told during this meeting (or any other time) of any requirement that my options be exercised within three months of an employee's departure from First Marblehead. Again, the only terms I was told of were those I listed above, and I was told that these were to be the terms of the options we were going to be given. Indeed, the presence of such a term would have stood out to me, because the introduction of such a feature would have (i) made the calculation of an option value much more difficult to accomplish, as I would have

needed to plug numbers into not one, but *hundreds* of equations (depending on how many possible exercise dates I used within a ten-year span), and (ii) made the number I came up with nearly impossible to interpret, because each equation would require its own subjective input.

10. At some point thereafter, I met with Meyers and (I think) Ralph James (then First Marblehead's Executive Vice President), for my annual performance/compensation review, during which I was given a worksheet [Appendix Tab D] indicating that I was to be granted 2,500 stock options.

11. My pleasure was short-lived, however, because I soon thereafter received another document – a memorandum [the "Memo," Appendix Tab E] purported to have been authored by Rodney Hoffman, a lawyer for First Marblehead – that described the terms of the stock options we were going to receive. The Memo was given to me in advance of a firm-wide meeting at which Hoffman was going to discuss our stock options. Although the Memo explained that the options were to have a ten-year duration and a price of $32 (terms consistent with the documents and assurances I had received previously), to my surprise the Memo also set forth a vesting schedule whereby only 20% of my options were to vest immediately, with the remainder of my options to vest 20% each year for the following four years. The Memo further indicated that the Company could defer the vesting of up to 10% of my options each year, based on my performance, and that if I resigned or was terminated "for cause" all of my unvested options would terminate immediately.

12. I was extremely upset by the vesting provisions set forth in the Memo, as this was entirely inconsistent with the options that previously had been promised to me. Whereas I had initially been promised during my performance/compensation review that I was to be given 2,500 options, I now was being informed that I was only being given 500 options, and

that the remainder of my options might not ever come into my possession if the Company became dissatisfied with my performance or if I left First Marblehead within the next four years. I was especially incensed because, as I had expressed to Meyers upon my hiring, I had taken a sizeable pay cut to work at First Marblehead, based in large part on Meyers' assurances that I would receive stock options that would constitute a "significant portion" of my compensation and that would make me "a lot of money."

13. Immediately after receiving the Memo, I went directly to Meyers' office to express my surprise and anger. I explained to Meyers that I did not think it was fair that my options were subject to these conditions, and that these were not the options that had previously been promised to me. I demanded that I receive immediate, unconditional ownership of my options, as I had been promised. Meyers agreed, and in my presence he telephoned Rodney Hoffman and directed Hoffman to remove the vesting schedule from my options.

14. The Memo did not mention any purported requirement that I exercise my options within three months of departing First Marblehead. Had the Memo contained such a provision, I would have found it similarly objectionable, as that also would have been different from what had previously been promised to me – namely, that I would be receiving 2,500 options having a $32 "strike price" and a ten-year duration. Had the Memo contained such a term, I have no doubt whatsoever that I would have complained to Meyers about it, as I had done with respect to the vesting schedule.

15. Moreover, although I remember very little of the firm-wide meeting with Rodney Hoffman in July of 1997 (which the Memo was distributed in advance of), I am quite certain that Hoffman did not mention any purported requirement that we exercise our stock

options within three months of our departure from the Company. In fact, I was never informed of any such requirement until I attempted to exercise my stock options in 2004.

16. The documents I have described above are the <u>only</u> documents First Marblehead ever gave to me relating to my stock options. I was <u>never</u> given nor shown a copy of the 1996 Stock Option Plan, nor was I given or asked to sign a "Stock Option Agreement."

17. In or around February of 1998, upon receiving an employment offer from ABN-AMRO, I voluntarily resigned from First Marblehead. Two weeks before my departure date I notified Meyers and James that I would be leaving, and in fact I worked throughout those two weeks, spending part of that time training Bruce Lefenfeld how to file SEC paperwork related to the National Collegiate Trust. During those two weeks, I never was given an "exit interview" of any kind. Additionally, I specifically informed Meyers and James that I was leaving First Marblehead to work at ABN AMRO in Chicago.

18. Even though I moved to Chicago shortly after leaving First Marblehead, I maintained my residence in Marblehead for some time. Also, I am fairly certain I completed an "Emergency Contact" form shortly after my hiring. Moreover, because we at one time had been close friends, Meyers was friendly with my wife Jennifer (who, after our divorce in April 1999, continued to live a few blocks away from First Marblehead's offices). First Marblehead never contacted me or any of my friends or relatives to inform me that my options were going to expire.

Dated: July 15, 2005

_____
Gregory House

Sworn to before me this
15 day of July, 2005

_____
ROBERT A. SCHER
Notary Public, State of New York
No. 02SC6064112
Qualified in Westchester County
Commission Expires September 17, 20 05

026.15275.1