# House Appendix Exhibit A

```
                                                                    1

 1                                    Volume:    I

 2       CERTIFIED ORIGINAL            Pages:     1 to 174
         LEGALINK BOSTON
 3                                    Exhibits:  None

 4

 5              UNITED STATES DISTRICT COURT

 6               DISTRICT OF MASSACHUSETTS

 7    Civil Action No. 04-11263PBS

 8    - - - - - - - - - - - - - - - - - - x

 9    THE FIRST MARBLEHEAD CORPORATION,

10              Plaintiff,

11      v.

12    GREGORY J. HOUSE,

13              Defendant.

14    - - - - - - - - - - - - - - - - - - x

15

16           DEPOSITION OF DANIEL M. MEYERS

17              Tuesday, February 15, 2005

18                    10:15 a.m.

19                 Foley & Lardner LLP

20                111 Huntington Avenue

21                 Boston, Massachusetts

22

23         Reporter:  Lisa A. Moreira, RMR/CRR

24
```

24

1  the idea of hiring Mr. House?
2     A.  Yes.
3     Q.  And Mr. Anbinder agreed?
4     A.  Yes.
5     Q.  And was there a particular position you had
6  in mind for Mr. House?
7     A.  Yes.
8     Q.  What was that?
9     A.  To work with Mr. Anbinder.
10    Q.  Doing what?
11    A.  On financial modeling and technical issues.
12    Q.  Okay.  And so somebody, either you or Mr.
13 Anbinder, reached out to Mr. House to see if he was
14 interested?
15    A.  I don't recall who made the offer.
16    Q.  All right.  And do you remember discussing
17 with Mr. House the offer?
18    A.  Somewhat.
19    Q.  Tell me what you remember.
20    A.  I remember discussions with Mr. House
21 ranging from relocation to cash compensation to work
22 responsibilities, and maybe other things.
23    Q.  What did you discuss with him about cash
24 compensation?

25

1    A.   I have some recollection that Mr. House said
2  that our cash offer to him was below what he was
3  making at his current employer.
4    Q.   And did you and he talk about what possible
5  incentives that you might be able to offer him to
6  improve that compensation?
7    A.   Yes.
8    Q.   And what were the nature of those
9  incentives?
10   A.   I can't fully recall the conversation, but I
11 know options were discussed.
12   Q.   Okay.  Between you and Mr. House?
13   A.   Yes.
14   Q.   So you don't remember the particulars of the
15 conversation, but you know that you discussed
16 options with him?
17   A.   Yes.
18   Q.   The idea that he would be granted options?
19   A.   Yes.
20   Q.   And did you discuss with him the number of
21 options?  This is before he's hired.  I want to
22 make -- let's stay with that.
23   A.   I believe so.
24   Q.   What did you tell him in terms of the number

26

1  of options?
2      A.  I cannot recall.
3      Q.  Okay.  But you think you talked about the
4  number of options?
5      A.  I believe so.
6      Q.  And did you talk to him about the --
7  withdrawn.
8          At the time that you were having this
9  discussion with Mr. House, was the option plan
10 already in place?
11     A.  I do not recall.
12     Q.  You have a -- I take it that the company had
13 a personnel file for Mr. House?
14     A.  I do not recall.
15         MR. WANG:  All right.  I'm going to
16 request that -- I think actually, you've indicated,
17 Mr. DeMoura, that there's a personnel file for Mr.
18 House.
19         MR. DeMOURA:  I've produced it already.
20         MR. WANG:  The entirety of the personnel
21 file?
22         MR. DeMOURA:  Yes, I did.
23         MR. WANG:  All right.  Then, we have it.
24     Q.  Did you discuss with him -- again, this is

1  in the prospect of his hiring. Did you discuss with
2  him the term of the options? By that, I mean, how
3  long they would last for? When they would be
4  exercisable?
5      A.  I remember having a vesting discussion with
6  him.
7      Q.  Before he was hired?
8      A.  I can't say so specifically.
9      Q.  Okay. We're going to come to the vesting
10 discussion in a bit, because there's already been
11 testimony about that, but let's see if you can focus
12 now on the discussions you had with him to get him
13 to come to First Marblehead, all right?
14     A.  Sure.
15     Q.  So we're together on that. So in the
16 discussions to get him to come to First Marblehead
17 you recall there was some discussion about options?
18     A.  Yes.
19     Q.  And there was some discussion about the
20 number of options, even if you don't remember the
21 particulars of it?
22     A.  I do not recall.
23     Q.  Well, you remember that Mr. House was
24 concerned that the cash portion of the offer to him,

28

1  he expressed some concern that that was less than he
2  was making at his current job?
3      A.  Yes.
4      Q.  So you were trying to show him that there
5  would be other noncash incentives that you would be
6  able to offer him, correct?
7      A.  Yes.
8      Q.  And stock options was one of them, correct?
9      A.  I don't remember if there was anything
10 other -- discussed other than stock options.
11     Q.  Then stock options was the noncash
12 incentive?
13     A.  Again, I do not recall.
14     Q.  No, no, you remember that you talked about
15 stock options.
16     A.  I remember talking about stock options, but
17 you said in your question, "was the."  I don't
18 remember if there were others at all.
19     Q.  Certainly stock options was one, if not the
20 only, noncash piece of incentive compensation that
21 you were offering to him, correct?
22     A.  I believe that's correct.
23     Q.  And you're not certain whether or not you
24 talked to him prior to hiring about the number of

1   Q. Did they make any claim to -- was any money
2   paid to them?
3   A. Yes.
4   Q. On what account?
5   A. I believe against a claim that did not
6   involve a court, to my recollection, as to their
7   expenses.
8   Q. Expenses in trying to raise money?
9   A. Yes.
10  Q. Okay. Do you remember asking Mr. House to
11  price the options?
12  A. I remember Mr. House having input. Whether
13  it was requested by me or anybody else at the firm,
14  I do not recall. Mr. House had spent -- when I met
15  Mr. House at Prudential Bache, he worked in the
16  options department of the futures division.
17  Subsequent to that, he spent, I believe, several
18  years trying to write an options model
19  independently, and then it's my understanding that
20  his subsequent jobs prior to coming to First
21  Marblehead involved options. Whether or not we
22  asked him to try and price the options or not, I
23  don't recall.
24  Q. Okay. So you think he had something to do

Daniel M. Meyers                                          02/15/2005

45

1    Q. You don't recall anyone?
2    A. I don't recall the methodology by which they
3 were -- options were priced or any of those
4 specifics were reached.
5    Q. Okay. I'm going to show you -- I think I'm
6 going to show you. Yes, James Exhibit 5 is a copy
7 of responses to certain interrogatories or questions
8 that Mr. House -- that we on behalf of Mr. House
9 asked First Marblehead. I'm going to show you
10 Interrogatory 7 or the response to Interrogatory 7.
11        The question in the interrogatory says,
12 "Please describe in detail any and all
13 correspondence and communications between you and
14 House regarding any employee stock option plans."
15 Do you see that?
16   A. Yes, I see that part of the sentence.
17   Q. Okay. And part of the answer is as follows:
18 "When Gregory House was hired by First Marblehead,
19 there were discussions concerning a grant of stock
20 options including the amount of stock and the
21 vesting schedule." Do you see that, sir?
22   A. I see that sentence.
23   Q. What information, if any, do you have to
24 support that statement?

Daniel M. Meyers                                            02/15/2005

46

1   A.   I agree with that statement.
2   Q.   Okay. So far as you know, that's a true
3   statement?
4   A.   To the best of my recollection.
5   Q.   And was anyone other than yourself involved
6   with the hiring of Mr. House?
7   A.   Mr. Anbinder was.
8   Q.   And did Mr. Anbinder -- did you and Mr.
9   Anbinder meet together when you spoke to Mr. House?
10  A.   I do not recall.
11  Q.   Did you speak to Mr. House in person, on the
12  telephone, or both in connection with the hiring?
13  A.   I don't recall.
14  Q.   And do you know whether or not Mr. Anbinder
15  had any discussions with Mr. House regarding
16  options?
17  A.   I do not recall.
18  Q.   Okay. In any event, to your best
19  recollection, that first sentence is true; that is,
20  that when Mr. House was hired, there were
21  discussions concerning a grant of stock options,
22  including the amount of stock and the vesting
23  schedule?
24  A.   I believe that to be the case.

1   Q. And the discussions were perhaps among
2   others with you; is that right?
3   A. To the best of my recollection.
4   Q. Have you exhausted your recollection in
5   telling me about what you recall about those
6   discussions?
7   A. I believe so.
8   Q. Now, it then continues, "It was agreed at
9   the time of his hire that House would be given
10  incentive stock options pursuant to the terms of
11  First Marblehead's 1996 stock option plan." I'll
12  stop right there.
13  A. Yes.
14  Q. Do you remember telling him that; that is,
15  that he was going to be given incentive stock
16  options pursuant to the terms of the plan?
17  A. I remember there was a discussion that he
18  would be granted ISOs.
19  Q. Right.
20  A. As to the timing and the dating of the plan,
21  I don't have any specific recollection.
22  Q. Well, was he given a copy of the plan?
23  A. I do not recall.
24  Q. So you don't remember giving him a copy of

50

1   A.   Yes, I see that sentence.

2   Q.   Does that ring a bell with you?

3   A.   Yes.

4   Q.   So you believe at the time of his hire the discussion was that the options would vest immediately?

7   A.   Well, I can't make a specific recollection as to the first part of your question, and let me --

9   Q.   I'm just reading what --

10  A.   Let me clarify, because I want to be very clear here.

12  Q.   Good.

13  A.   I can't remember -- I do not remember whether or not the options were granted to Mr. House before or after he joined the company. I do remember that the one thing Greg House asked us for in regard to his ISOs were -- it's my best recollection that he told us that he was making more cash compensation at his existing job, and I believe he said that he had options at his existing job that he was giving up. And then I remember some discussion of some number of options, and he came back and said, "I want my ISOs" -- "given what I'm giving up to come to First Marblehead," or "what I

51

1   gave up to come to First Marblehead," and I don't
2   remember whether it was before or after, I remember
3   specifically him asking us to make a change for him
4   where his options would vest immediately, and that
5   there was a discussion of that, and that we agreed
6   to that.
7        Q.  And when you say "we agreed to that," that's
8   First Marblehead agreed to it?
9        A.  First Marblehead agreed to that.
10       Q.  And did you have to talk about that with Mr.
11  Anbinder?
12       A.  Yes.
13       Q.  Did you have to talk about that with the
14  board?
15       A.  I'm sure I did.
16       Q.  And who did you talk about it with?
17       A.  I don't recall.
18       Q.  You wanted to make sure that you could do
19  that; that is, to change the vesting schedule for
20  him?
21       A.  Yes.
22       Q.  Did you seek advice with respect to that?
23       A.  I do not recall.
24       Q.  Did you -- well, did you speak to Mr.

Daniel M. Meyers                                                02/15/2005

75

1   that you talked to him about the ten-year term?
2       A.   I recall talking to him about some of the
3   specifics of the plan as I knew it, and -- but do I
4   specifically recall talking about the ten-year term?
5   I may or I may not.
6       Q.   Okay. But you did know that they were --
7   there was a ten-year term, correct?
8       A.   That they were ten-year ISOs, yes.
9       Q.   There would be no reason not to tell him
10  that, would there?
11      A.   No, not to my knowledge.
12      Q.   To the contrary. You regarded that the
13  ten-year term would be very attractive to him,
14  didn't you?
15              MR. DeMOURA:  Objection.
16      A.   It seemed like a long time.
17      Q.   Long being good, the longer the better?
18      A.   From the employee's perspective, certainly.
19      Q.   Okay. So although you don't specifically
20  recall telling him about the ten years, it would
21  stand to reason that you told him that, wouldn't it?
22              MR. DeMOURA:  Objection.
23      A.   I wouldn't want to make that assumption, but
24  we discussed enough of the -- he had a number of

76

1  questions, and based on the little things that I
2  know -- and it is little -- on valuing options, it
3  would be hard for someone to make an independent
4  calculation of an option without knowing the term of
5  the option.
6      Q.  Do you remember whether or not he asked you
7  whether or not he would have to exercise the option
8  in a shorter period of time in the event he resigned
9  from the company?
10     A.  I do not recall having that conversation.
11     Q.  And you certainly don't remember having --
12  offering that information to him, do you?
13     A.  I do not recall.
14     Q.  In fact, at the time were you even aware of
15  that provision in the plan; that is, that in the
16  event of resignation, there would be a shorter time
17  period in which the options had to be exercised?
18     A.  I remember the board having a discussion in
19  that regard, yes.
20     Q.  You remember the board having that
21  discussion?
22     A.  Yes, the type of option.
23     Q.  No, no, do you remember the board having a
24  discussion about the shortening of the period of

Daniel M. Meyers                                           02/15/2005

83

1  schedule, and then you spoke to others about that,
2  the board, counsel, Mr. Anbinder, and then came back
3  to Mr. House and he agreed to it. And I take it
4  then when Mr. House said that was agreeable, did you
5  then do something to put in place the grant of the
6  options to get that done?
7       A.  I don't recall, but Mr. -- specifically, but
8  Mr. Hoffman was involved in the discussion.
9       Q.  Okay. Well, the good news is we took his
10 deposition yesterday, too, and Mr. Hoffman said he
11 didn't have any discussion with Mr. House about
12 this, so...
13      A.  I didn't say he did.
14      Q.  Let me ask the question, perhaps, in a long
15 way, but maybe it will be helpful to you. You've
16 testified in substance, Mr. Meyers, that you had a
17 discussion with Mr. House in which you were talking
18 to him about the options you were proposing. Mr.
19 House at a point in time objected to the vesting
20 schedule. You then, after consultation with others,
21 came back to him and acceded to his request, but
22 then I take it the options had to be granted,
23 correct?
24      A.  Yes, I believe so.

1   Q.  When you use the term "ISOs," is that meant
2   to encompass a certain kind of stock option?
3   A.  That's my understanding.
4   Q.  And what is your understanding of what an
5   ISO is?  I mean, we know it stands for incentive
6   stock option, but as you use the term, what does
7   that mean?
8   A.  I would not consider myself an expert in
9   stock options.
10  Q.  I understand, right.
11  A.  But it's my understanding that it's an
12  option that does not require the grantee to pay
13  tax --
14  Q.  I see.
15  A.  -- when they receive it, but there are some
16  specific limitations on the ISO plan itself as to
17  what everyone's -- the grantor and the grantee's
18  rights and responsibilities are under the plan.
19  Q.  Did you also understand that the plan as
20  written gave the company the ability to issue tax-
21  qualified stock options or ISOs, as you've referred
22  to it, as well as nonqualified stock options, ones
23  that did not qualify for that favorable tax
24  treatment?

88

1    A.  I have some recollection of that in regard
2  to Mr. James's -- I am not certain, but I have some
3  recollection that some of Mr. James's options might
4  not have been ISOs, but I --
5    Q.  And were those options that Mr. James was
6  given in connection with his hiring?
7    A.  I believe Mr. James has had three different
8  grants, but I'm not -- I don't have a specific
9  recollection as to when one was to another.
10   Q.  It's your best recollection, then, that some
11 of Mr. James's options are nonqualified or
12 nonstatutory?
13           MR. DeMOURA:  Objection.
14   Q.  You may answer.
15   A.  It is my recollection that it's possible
16 that -- I may have a recollection that Mr. James may
17 have had an option other than what I consider to be
18 the standard ISOs issued by the fund.
19   Q.  And when you say you may have a recollection
20 that he may have gotten it, is that your way of
21 saying that you have a vague recollection?
22   A.  I think it's a little less certain than I
23 have a vague recollection.
24   Q.  Even less than a vague recollection?