# House Appendix
# Exhibit B

1

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF MASSACHUSETTS

4  Civil Action No. 04-11263PBS

5  -------------------------------------------x

6  FIRST MARBLEHEAD CORP.,

7                              Plaintiff,

8         - against -

9  GREGORY HOUSE,

10                             Defendant.

11 -------------------------------------------x

12                       March 2, 2005

                         10:00 a.m.

13

14         DEPOSITION of GREGORY HOUSE,

15 taken by the Plaintiff, pursuant to

16 Notice, held at the offices of Foley &

17 Lardner, 90 Park Avenue, New York, New

18 York, before Debbie Zaromatidis, a

19 Shorthand Reporter and Notary Public of

20 the State of New York.

21

22

23

24

25

2

```
 1

 2    A P P E A R A N C E S :

 3

 4       ADLER POLLOCK & SHEEHAN, P.C.

 5       Attorneys for Plaintiff

 6            175 Federal Street

 7            Boston, Massachusetts 02110

 8       BY:   KENNETH J. DEMOURA, ESQ.

 9

10

11       FOLEY & LARDNER, LLP

12        Attorneys for Defendant

13            90 Park Avenue

14            New York, New York 10016-1314

15       BY:   PETER WANG, ESQ.

16            YONATON ARONOFF, ESQ.

17

18    ALSO PRESENT:

19       DONALD R. PECK, First Marblehead Corp.

20

21

22

23

24

25
```

3

```
 1                    HOUSE
 2   G R E G O R Y    H O U S E,
 3   having first been duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY MR. DEMOURA:
 7        Q.    Good morning, Mr. House.  My
 8   name is Kenneth Demoura, and I represent
 9   First Marblehead Corporation in this case.
10            Have you ever been deposed
11   before?
12        A.    No.
13        Q.    During the course of today's
14   deposition, the court reporter is going to
15   take down anything that is said in the
16   room by anybody, so just a few quick
17   ground rules first.
18            Let's try to make sure that I
19   wait until you finish speaking and you
20   wait until I finish speaking because the
21   court reporter has a hard time putting us
22   both down together.  Okay.
23        A.    Agreed.
24        Q.    Second is that all of your
25   answers need to be verbal as opposed to a
```

4

1                          HOUSE

2    nod of the head because those are also

3    difficult for the court reporter to

4    interpret, and sometime later if we have

5    to use the transcript we won't know what

6    your answer was.  Okay?

7         A.     Fair enough.

8         Q.     Mr. House, what is your current

9    residential address?

10         A.     1 River Court, Apartment

11    911 -- 1911, Jersey City, New Jersey.

12         Q.     And how long have you lived

13    there?

14         A.     Since June of last year.

15         Q.     Do you own or rent?

16         A.     I rent.

17         Q.     Are you married, sir?

18         A.     No.

19         Q.     Do you live with anybody other

20    than yourself?

21         A.     No.

22              MR. WANG:   You don't have to

23    answer that, but he already did.

24         Q.     And who is your current

25    employer?

5

1                      HOUSE

2     A.        Angelo Gordon & Company.

3     Q.        What is Angelo Gordon & Company?

4     A.        It is commonly called a hedge

5  fund.

6     Q.        Where are they located?

7     A.        245 Park Avenue in New York.

8     Q.        How long have you been employed

9  at Angelo Gordon?

10    A.        Since August 4, 2003.

11    Q.        What is your position at Angelo

12 Gordon?

13    A.        Angelo Gordon doesn't really

14 have titles as strange as that may sound.

15    Q.        You said that there are no

16 titles at Angelo Gordon.

17             What are your job

18 responsibilities?

19    A.        I am in risk management.  We are

20 a hedge fund with a variety of financial

21 activities.  Let me correct this.  I think

22 that Mr. Angelo would have a problem with

23 me describing our firm as a hedge fund.  I

24 think he describes it as an alternative

25 investment company.

6

1                            HOUSE
2            So my expertise is in pricing
3   securities, and that is pretty much what I
4   do.  I figure out where our risk lies, how
5   much we can make, how much we can lose and
6   so forth.
7       Q.    And when you say your expertise
8   is in pricing securities, can you tell me
9   what type of securities you price for
10  Angelo Gordon?
11      A.    All types but I would say
12  where -- where I differentiate myself is
13  in the area of fixed income securities and
14  derivatives.
15      Q.    And would the securities pricing
16  work that you do for Angelo Gordon include
17  pricing of any stock options?
18      A.    Yes.
19      Q.    What types of stock options
20  would that include?
21      A.    Well, we have a variety.  I am
22  not sure what your level of understanding
23  is of -- about the subject, but options
24  can be listed.  They can be essentially
25  warrants.  They can be relatively

7

1                            HOUSE

2    long-term options that are differentiated

3    from listed options only in that they are

4    not listed.   They can be short-term

5    options.   They can be any -- any number of

6    things.   Typically what I do is -- in that

7    realm is our activities have declined in

8    that area recently for other reasons, but

9    we use a variety of option modeling

10   techniques, and that is what I do is write

11   computer code to do that essentially.

12        Q.     All right.

13               Would the options that you

14   currently work on pricing for Angelo

15   Gordon include options known as incentive

16   stock options?

17        A.     No.

18        Q.     Do you know what incentive stock

19   options are?

20        A.     Yes, I have a vague idea.   I

21   mean that to me is a legal term, and that

22   is not my area of expertise in what I do.

23        Q.     Okay.

24        A.     Options to me are -- have

25   characteristics that can be mathematically

8

1              HOUSE

2  modeled.  Legal characteristics cannot be

3  mathematically modeled.

4       Q.    Since August of 2003 when you

5  joined Angelo Gordon, have any of your

6  responsibilities changed?

7       A.    Broadly, no.

8       Q.    How about specifically?

9       A.    Of course.  I am -- I have been

10  there for a year and a half.  I think I do

11  different things from day to day.  Can you

12  be more specific?  I am kind --

13       Q.    Well, you essentially said, as I

14  understand it, your primary job

15  responsibility there is to provide

16  expertise to Angelo Gordon in the area of

17  pricing various securities, correct?

18       A.    Um hum.

19       Q.    You have to answer yes or no.  I

20  am sorry.

21       A.    Yes.  I am sorry.

22       Q.    And I wanted to know other than

23  pricing securities is there any other job

24  responsibility that you have at Angelo

25  Gordon?

9

HOUSE

1

2    A.    When you say job responsibility,

3  is there anything that I -- that I have

4  done differently from day one.  Sure.  Is

5  it a job responsibility?  I am not sure I

6  would describe it as that.

7    Q.    Okay.

8    A.    It is --

9    Q.    Other than pricing securities,

10  what else do you do for Angelo Gordon?

11    A.    Talk to people.  It is an

12  investment firm, and I have a number of

13  skills that maybe are valuable to other

14  people, but it is not -- I wouldn't call

15  it a job responsibility to talk to people

16  and advise them how to do certain things

17  and that sort of -- it is just other

18  things that I do.  It is not a job

19  responsibility.  I mean --

20    Q.    And those are jobs -- the people

21  you talk to, are they internal employees

22  of Angelo Gordon?

23    A.    Yes.

24    Q.    As opposed to the investors who

25  might be --

10

1                    HOUSE

2      A.    I can't recall ever talking to

3   an investor at Angelo Gordon.

4      Q.    Okay.

5            Prior to working at Angelo

6   Gordon, where were you employed?

7      A.    I was self-employed in Denver,

8   Colorado.  I was renovating a home into

9   a -- it was actually a -- an investment

10  property.  It was a commercial structure,

11  and it was a Victorian home that had long

12  since been converted into a rental

13  structure, and I was doing that for a

14  living.

15     Q.    Okay.

16           And how -- when did you start

17  doing that?

18     A.    April 27, 2000 I believe was the

19  closing date.

20     Q.    So you bought a victorian home

21  in April of 2000 in Denver, Colorado for

22  the purposes of doing renovation work

23  and --

24     A.    Um hum.

25     Q.    -- and using it for investment?

11

1                         HOUSE
2        A.      Converting it into a condominium
3    structure and selling it.  I still own it.
4        Q.      Did you do that?
5        A.      I am sorry?
6        Q.      Did you do that?
7        A.      I still own it.
8        Q.      And so you did that for -- for
9    almost three years, correct?  Over three
10   years?
11       A.      Um hum.  Yes.
12       Q.      And prior to that, what did you
13   do?
14       A.      I was employed at ABN Amro Bank
15   in Chicago.
16       Q.      What did you do there?
17       A.      Similar tasks to what I am doing
18   now actually. I wouldn't describe it as
19   being all that different.
20       Q.      You provided ABN Amro with
21   expertise in the pricing of securities?
22       A.      Um hum.  They were a bank --
23       Q.      You have to say yes or no.
24   Sorry.
25       A.      Yes, they were a bank

12

1                    HOUSE

2    substantially involved in substantial ways

3    similar to a hedge fund.  I mean it is --

4         Q.     Alternative investments?

5         A.     They would characterize it

6    differently, but the investment world is a

7    pretty fungible place.  There are

8    -- different kinds of firms do similar

9    things.  We all invest and all spend money

10   on securities, and we want to know what

11   they are worth, and so my activities were

12   substantially the same -- from my

13   standpoint they were substantially the

14   same as they are now at Angelo Gordon.

15        Q.     Now, I know from your reviewing

16   your interrogatory responses that you

17   worked at Amro, ABN Amro from March of

18   1998 to September of 1999.

19             Did you do anything between

20   September of 1999 and April of 2000 when

21   you bought the --

22        A.     Yes, I shopped for that

23   victorian home.  It was a fairly arduous

24   task.

25        Q.     When you were at ABN Amro from

13

1                       H O U S E

2    March '98 to September '99, where were

3    you -- where were your offices?

4            MR. WANG:    He said Chicago.

5            MR. DEMOURA:    He did.   I am

6    sorry.   I didn't hear him.

7        A.    Yes, 181 West Madison I believe

8    from memory.

9        Q.    Why did you leave Amro?

10       A.    I was fired.

11       Q.    And why were you fired?

12       A.    I had a difference with a guy

13   who has since been fired from the same

14   activities I believe.

15       Q.    Difference with a guy?

16       A.    Um hum.

17       Q.    Who was the guy?

18       A.    Ron Davidson.

19       Q.    Was that your superior?

20       A.    Yes.

21       Q.    And what was the difference?

22       A.    He used some profanity in my

23   presence and directed at me, and I went to

24   the human resources department at the bank

25   and conveyed to them that this wasn't the

14

                    H O U S E

1

2  first time, and he had an ally that was

3  his boss, and his boss decided to fire me.

4      Q.    And that was in September 1999?

5      A.    Yes.

6      Q.    Did you take any legal action as

7  a result of the termination?

8      A.    No.

9      Q.    You started at Amro according to

10 your answers to interrogatories in March

11 of 1998.

12          Can you tell me how long prior

13 to the date you were hired in March of

14 1988 had you been in discussions with ABN

15 Amro about going to work for them?

16     A.    I would say two weeks.  My

17 memory is not perfect, but it wasn't a lot

18 more than that.

19     Q.    Did any -- according to your

20 interrogatory responses your last date of

21 employment at First Marblehead Corporation

22 was in March of 1998, and your first day

23 of employment at ABN Amro was in March of

24 1998.

25          Were any of the discussions that

15

HOUSE

1                             HOUSE

2   you had with ABN Amro in March of 1998 at

3   the same time you were still employed with

4   First Marblehead?

5      A.     Of course.  I believe that -- my

6   memory is not perfect, but I believe that

7   my last day at First Marblehead was a

8   Friday, and my first day at ABN Amro was

9   the following Monday.

10      Q.     While you were at ABN Amro, did

11   any of your job responsibilities -- did

12   you do anything other than provide

13   expertise in pricing securities?

14      A.     Sure.  I would answer that the

15   same way I answered the question about

16   Angelo Gordon.  I am a reasonably capable

17   guy, and I get sought after by other

18   people to do other things, and of course I

19   talk to them and advise them and so forth.

20   But would I call them job

21   responsibilities?  Probably not.

22      Q.     But you were available to others

23   internally to discuss various issues that

24   would come up that might be within your

25   area of expertise?

16

HOUSE

1

2    A.    Sure.

3    Q.    Okay.

4          Who hired you at ABN Amro?

5    A.    A guy named David Reiner.  I

6    believe that is R-E-I-N-E-R.  It might be

7    reversed.

8    Q.    Okay.

9          Let's talk a little bit about

10   the circumstances surrounding your leaving

11   of First Marblehead Corporation, since

12   that is the next company that you list on

13   your interrogatories as having worked for.

14   A.    Okay.

15   Q.    Do you remember the date that

16   you -- that you left First Marblehead?

17   A.    The exact date, no.

18   Q.    Do you recall the -- anything

19   about the day that you left First

20   Marblehead, being out of the company?

21         MR. WANG:    What day of the

22   week?

23         MR. DEMOURA:   No, I mean that

24   particular day.  I don't care what day of

25   the week it was.

17

HOUSE

A.      Well, my leaving First
Marblehead was a period of time.  I
announced I was leaving, and there -- I
was there for two weeks following that.  I
gave two weeks notice.  They accepted
that.

Q.      You gave two weeks notice?

A.      Yes.

Q.      Who did you give two weeks
notice to?

A.      I believe it would be Dan and
Ralph in the same conversation.  I
remember some of that, and I don't
remember the exact date, but Dan and Ralph
were both there.  Dan Meyers and Ralph
James.  Sorry.

Q.      Did you do that in writing or
verbally?

A.      Verbally.  I believe that I sent
a letter also, but I don't think it was at
that time.  It might have been much later.
Almost certainly it was much later,
several days later, but the conversation
where I announced I was leaving was a

18

                              H O U S E

1

2    conversation, not a letter.

3        Q.    Do you remember where that

4    conversation took place?

5        A.    Dan's office at Little Harbor.

6    I don't remember that address.  At Little

7    Harbor.

8        Q.    In Marblehead?

9        A.    Yes.

10       Q.    As best as you can recall, can

11   you tell me the substance of the

12   conversation that you had with Dan Meyers

13   and Ralph James --

14       A.    Yes.

15       Q.    -- when you announced that you

16   were leaving the company?

17       A.    Yes, it was relatively

18   congenial.  I said I have received an

19   offer to go back to the bank I worked at

20   before I came here.  I think I will leave.

21   Ralph's reply -- I don't remember anything

22   about Dan's reply.  Ralph's reply was is

23   there anything we can do to keep you, and

24   I replied to that I don't think you are

25   going to pay me a quarter of a million

19

1          HOUSE

2    dollars Ralph.  So, no, but it was -- it

3    was not a contentious conversation.  It

4    was friendly.  More than friendly, it

5    was -- they were -- they seemed to be

6    wishing me well.

7         Q.    Did you leave First Marblehead

8    because the offer that you got from your

9    prior employment ABN Amro was better

10   financially for you?

11        A.    Yes, I believed it was.

12        Q.    To the tune of a quarter million

13   dollars?

14        A.    It --

15              MR. WANG:  Don't answer what

16   the specifics were.  That is not your

17   business, Mr. Demoura.  Don't answer his

18   question.  When I say don't answer, don't

19   answer. Ask your next question.

20        Q.    Okay.

21              You said a few seconds ago that

22   one of the things Mr. James said was is

23   there anything we can do to keep you,

24   correct?

25        A.    Yes.

20

1                          HOUSE

2        Q.      And your response to him was not

3    unless you can offer me a quarter of a

4    million dollars, correct?

5                MR. WANG:   Actually, you did

6    not accurately summarize what he said.

7                MR. DEMOURA:   Let him tell me

8    that.

9                MR. WANG:   Don't put words in

10   his mouth.

11               MR. DEMOURA:   All you are

12   supposed to do is say objection.  He can

13   answer the question.

14               MR. WANG:   I think I am obliged

15   to also point out when you fairly badly

16   misconstrue something he said not more

17   than three minutes ago.

18       Q.      Why don't you tell me what it

19   was that you said in response to Mr. James

20   when he said is there anything we can do

21   to keep you?

22       A.      I said I don't think so, Ralph,

23   because I don't think you are going to pay

24   me a quarter of a million dollars.  I

25   don't know if the words were exactly that,

21

```
 1                    H O U S E

 2   but the number was that, and the substance

 3   was that.

 4        Q.    Okay.

 5              Do you recall anything else

 6   about the conversation that you had --

 7        A.    No.

 8        Q.    -- where you announced you were

 9   leaving?

10        A.    No.  I remember the tone of the

11   conversation.  I don't remember the words

12   or the -- any more of the substance than

13   that.

14        Q.    And your testimony is that as

15   far as you were concerned the tone was

16   cordial?

17        A.    Absolutely.

18        Q.    And at that time, did you also

19   tell them what date you expected would be

20   your last date at First Marblehead?

21        A.    I don't think I probably phrased

22   it as you said.  I said I will give you

23   two weeks notice, and they accepted it.

24        Q.    In other words, that day they

25   accepted the two week's notice?
```

22

1                          HOUSE

2      A.      Right.

3      Q.      And did -- I am sorry.

4      A.      You asked me a question a while

5  ago about how long it was between the time

6  I went to ABN Amro and the time I left

7  First Marblehead, and I said that my

8  negotiation period with ABN Amro was a

9  two-week period or not much more than

10  that.

11      Q.      Right.

12      A.      I think that that was

13  probably -- I probably answered it -- the

14  way you understood the answer was that it

15  was prior to the date that I left.  I

16  meant it was two weeks prior to the date

17  that I announced it.

18      Q.      No, I took it to mean that

19  before you decided to leave First

20  Marblehead you had had discussions with

21  ABN Amro.

22      A.      Right.

23      Q.      For about two weeks before that,

24  correct?

25      A.      It was a short period of time.

23

1                          H O U S E

2          Q.      Okay.

3          A.      And I announced I was leaving,

4    and then two weeks later I left.

5          Q.      So you did continue to work at

6    First Marblehead for the next two weeks?

7          A.      Yes, I continued to instruct

8    people on what I was -- what they had to

9    do that I had been doing and so forth.

10         Q.      And do you recall the last day

11   you were at First Marblehead?

12         A.      Um hum.  I don't recall what day

13   it was or what day of the week it was or

14   what date it was, but I recall some things

15   about it.

16         Q.      Okay.

17                 What do you recall about it?

18         A.      I recall being angry and leaving

19   in anger.

20         Q.      Do you remember -- did you have

21   any discussions with anybody?

22         A.      Probably but I don't remember

23   any -- any of the substance.  I just

24   remember the anger.

25         Q.      Why were you angry?

24

HOUSE

1

2    A.    There was an issue over the firm

3  owing me money that had been stewing for

4  several weeks as a matter of fact, and I

5  became exasperated with what I would

6  characterize as the folliness about it,

7  and I got angry and probably had some

8  angry words and left.

9    Q.    Who did you get angry at?

10    A.    I believe it was Dan.

11    Q.    Dan Meyers?

12    A.    Yes.

13    Q.    Did you have a discussion with

14  Mr. Meyers that day?

15    A.    Undoubtedly but I can't remember

16  the -- what it was about.  I can remember

17  what it was about, but I can't remember

18  the conversation itself.  I remember I was

19  mad, and he was mad.  If I could tell you

20  more I would, but I can't.  I can't

21  remember --

22    Q.    Did you storm out of the offices

23  that day?

24    A.    It is fair to characterize it as

25  that, yes.

25

HOUSE

1

2     Q.    And was that the last day you
3  were ever at First Marblehead's offices?
4     A.    I believe that day was a Friday,
5  and that was the last day I was there.
6     Q.    Had you already cleaned out your
7  desk and taken all your personal
8  belongings home?
9     A.    I don't recall but probably,
10  yes.
11     Q.    Do you recall anything else
12  about that day?
13     A.    No.
14     Q.    I may have asked you this
15  already.
16          Can you recall anything about
17  the conversation that you had with Mr.
18  Meyers and Mr. James on the date that you
19  told them that you were giving your two
20  weeks notice?
21     A.    No.
22     Q.    During the period of time
23  between the day you gave your notice and
24  the time you actually left, were there
25  any -- did you have any discussions with

26

HOUSE

1
2  anybody from the human resources office
3  about your benefits or COBRA or any of
4  those sorts of issues?
5      A.    I don't know that First
6  Marblehead had a human resources office.
7  I wouldn't know who that would have been.
8      Q.    Okay.
9            Fair to say at the time it was a
10 fairly small company?
11     A.    Um hum.
12     Q.    You have to say yes or no.
13 Sorry.
14     A.    Yes.  Yes.  I am sorry.
15     Q.    Well, then the same question
16 except take out the part about human
17 resources.
18           Did you have any discussions
19 with anybody at First Marblehead from the
20 day you gave your notice until the day you
21 left about your benefits and whether those
22 would continue for a period of time or any
23 of those discussions?
24     A.    No.
25     Q.    You've left other positions

27

HOUSE

1
2    before, correct?

3    A.    Yes.

4    Q.    And you are familiar with what

5    is known as an exit interview?

6    A.    I know what -- I know the

7    phrase.

8    Q.    Okay.

9    A.    I can't remember ever having

10   one.

11   Q.    Okay.

12        So have you ever when you have

13   left a position had anybody sit down and

14   talk to you about COBRA, for example, you

15   know, the continuation of your health

16   insurance benefits?

17   A.    No, I have not had that

18   discussion.  I think I remember when I

19   left ABN Amro the second time I think I

20   remember getting a letter about that and

21   nothing else about it, and certainly it

22   was not discussed with me.

23   Q.    How about issues relating to any

24   401 K plans or other benefits that you had

25   at any employer?

28

                    H O U S E

1

2     A.     I have 401 K plans from several

3  employers, but again --

4            MR. WANG:   The question was

5  simply have you ever had any discussions

6  about that in connection with leaving.

7  That is the question.

8     A.     I don't recall any kind of

9  discussion about continuation of plans.

10  The letter from ABN Amro sounds like what

11  you are talking about.

12            MR. WANG:   No.  Don't read into

13  his mind.  He is asking did you ever have

14  any discussions about 401 K plans.  That

15  is the question.

16     A.     I can't remember having any

17  kinds of discussions about those things

18  with anybody at any firm.

19     Q.     Okay.

20            Well, we have moved backwards

21  for a little while.  I am going to move

22  forward now.

23     A.     Okay.

24     Q.     Starting with your graduation

25  from college, which I believe your answers

29

1                           H O U S E

2    to interrogatories indicate that you

3    graduated in 1978 from the University of

4    Florida in Gainesville.  You started

5    working I believe shortly thereafter at a

6    company called Paine Webber Jackson &

7    Curtis, correct?

8         A.    Yes.

9         Q.    What did you do there?

10        A.    I was 20 years old, so I did

11   other things other than being a

12   stockbroker.  You are not allowed to do

13   that, so that is what I did until I was

14   able to get registered as a stockbroker.

15   That is what I became at that point.  When

16   I reached my birthday, which was 21, I

17   went to class, et cetera.  So I was a

18   stockbroker but not for a little while

19   after that until I was allowed to do that.

20        Q.    So it is fair to say for the

21   first period of time you were there you

22   were acting as an apprentice or doing odd

23   things until you could take the courses

24   necessary and take the exams necessary to

25   become a stockbroker?

30

HOUSE

1

2     A.     Right.

3     Q.     And then ultimately you did

4 that, correct?

5     A.     Yes.

6     Q.     Do you have any current SEC

7 licenses?

8     A.     Truthfully I don't know if

9 they -- how long they last, if they

10 expired at some point.  So I was a

11 registered series 7 and series 3 I believe

12 it is at that time, but I don't know if

13 they expired.  If they do, I don't.  If

14 they don't, I do.

15     Q.     Okay.

16           Well, have you had any ongoing

17 communications with the SEC or renewals

18 that you had to file with the SEC that you

19 are aware of?

20     A.     I suspect that they are expired,

21 but I don't -- I don't know how that

22 works.  I haven't had any need to find

23 out, so I suspect that I am no longer

24 registered.

25     Q.     So when is the last time in your

31

HOUSE

1    recollection that you would have been
2    acting as a series 7 or series 3
3    registered broker in your employment
4    history?
5        A.    Probably 1982 when I moved to
6    New York.
7        Q.    When you started with Paine
8    Webber, were you in their New York office
9    or --
10        A.    No, it was in Naples, Florida.
11        Q.    You put Paine Webber Jackson &
12    Curtis and Heritage Investment Securities.
13            Are they the same entity?
14        A.    No.
15        Q.    So from '78 to September of '83
16    you had actually two employers?
17        A.    Yes.
18        Q.    What did you do at Heritage
19    Investment Securities?
20        A.    The same.
21        Q.    Stockbroker?
22        A.    Yes.
23        Q.    How long were you there?
24        A.    Until I moved to New York which
25

32

HOUSE

1

2    I believe was March of -- you have my

3    resume in front of you.  I put some

4    thought into it.  The dates are sometimes

5    difficult to remember.  I believe the date

6    was March of '82.

7         Q.    When you came to New York, where

8    did you work?

9         A.    At Prudential Bache Securities.

10        Q.    What did you do there?

11        A.    It was a -- the entity was the

12   commodity options division, and so I

13   worked within that, but my role was to

14   focus on the financial markets, which I

15   have focused most of my career on.  For

16   example, commodities options would be

17   Swiggings & Core.  I don't know about

18   Swiggings & Core.  I know about financial

19   options, and that is what I focused on.

20        Q.    And what did you do other than

21   focusing on that?

22        A.    I -- it was an institutional

23   desk.  Activities which were directed at

24   generating -- it is a brokerage firm.

25   They want to generate a commission.  The

33

HOUSE

1
2    way it works in a brokerage firm at that
3    time anyways is that they have a retail
4    sales force and an institutional sales
5    force.  They tend to be a little -- they
6    tend to be differently focused.  I would
7    talk to both of them, but for the most
8    part my activities were to talk to
9    institutional brokers about financial
10   options and ways to generate commissions
11   with them.
12       Q.    By purchasing options?
13       A.    And -- not necessarily but using
14   options in a variety of ways.
15       Q.    Okay.
16             And how long did you work there?
17   It is not a memory contest by the way.
18       A.    Yes, I believe until 1987.
19       Q.    And did your -- what you were
20   doing there change at all from the time
21   you started until the time you left?
22       A.    Not substantially, no.
23       Q.    You worked in the institutional
24   fixed income group; is that right?
25       A.    No, it was the commodities

34

1                        HOUSE

2     options division.

3          Q.      Okay.

4          A.      The institutional fixed income

5     group was separate.   They were who -- the

6     people I talked to.

7          Q.      Okay.

8                  Then maybe you can tell me why

9     in your answers to interrogatories you

10    said that your position was institutional

11    fixed income group assistant vice

12    president?

13         A.      I don't think the institutional

14    fixed income group actually existed as a

15    defined entity.   They were the people I

16    dealt with, but they were not people who

17    technically employed me.

18         Q.      Okay.

19                 The people who employed you were

20    the commodities options division?

21         A.      Yes.

22         Q.      Is there a reason why you didn't

23    put that in your answers to

24    interrogatories?

25         A.      I think I took that resume, the

35

**HOUSE**

1
2  resume information that I gave you, from

3  the resume information that I would give

4  an employer, and an employer wouldn't

5  necessarily be interested in dissecting

6  the manner in which you are dissecting my

7  resume.  They would be interested in what

8  I did, and so if you say you worked with

9  institutional brokers, it is what you did.

10 It is what I did.

11     Q.    An employer would want you to

12 tell them -- give them an accurate

13 description of the divisions you worked

14 for, correct?

15     A.    Yes, but that is an accurate

16 description of what I did at the firm.  It

17 is maybe not an accurate description of

18 who employed -- who signed my check, but

19 who signed my check is not what

20 necessarily what anybody cares about.

21     Q.    Okay.

22     A.    When they are looking to find

23 out if you know what you are doing or not.

24     Q.    The next position that you list

25 in your -- in the answers to

36

```
1              H O U S E
2  interrogatories is a position in the
3  options trading division of Societe
4  Generale in Chicago from December of 1990
5  to May of 1993; is that right?
6      A.    Um hum.
7      Q.    You have to say yes or no.
8  Sorry.
9      A.    Yes.  I am sorry.  Yes.  I am
10 relying on you to read those dates
11 correctly.  If I have to think about them
12 again, I am going to have to think hard.
13     Q.    I will just show you your
14 answers to interrogatories.
15     A.    If that is what I already gave
16 you, that is what I already thought hard
17 about.
18     Q.    Is that your signature on the
19 last page?
20     A.    Yes.
21     Q.    Okay.
22           You started there in December of
23 190?
24     A.    Yes.
25     Q.    You left Pru Bache in January of
```

37

1      HOUSE

2   1987?

3      A.    Um hum.

4            MR. WANG:    You have to answer

5   yes or no.

6      A.    I am sorry.  Yes.

7      Q.    What did you do for four years

8   before you started working at Societe

9   Generale?

10     A.    I wrote a fixed income options

11  pricing model and did the work

12  necessary -- I did work essentially to get

13  myself another job, which was to write a

14  fixed income options pricing model that I

15  believed was useful for accomplishing that

16  task.

17     Q.    Self-employed?

18     A.    Yes.  It was also a time in

19  which I learned another skill.

20     Q.    What skill was that?

21     A.    Computer programming.  I learned

22  the skill of -- the skill, required skill

23  of writing in the C language which I still

24  do.

25     Q.    Were you making any money during

38

```
 1                    H O U S E
 2   this period of time from December -- from
 3   January '87 to December of 1990 doing
 4   either computer programming or writing
 5   your fixed income options pricing model?
 6        A.    No.
 7        Q.    What were the circumstances
 8   surrounding your leaving Pru Bache
 9   securities in January 1987?
10        A.    It was fairly negative.  There
11   was a guy there who -- whose name I can't
12   remember.  He was a fairly difficult human
13   being to work with, and I had difficulty
14   with him, and it was very similar in some
15   ways to my leaving ABN Amro.
16        Q.    The second time?
17        A.    Um hum.
18        Q.    You have to say yes or no.
19   Sorry.
20        A.    Yes, the second time where I had
21   difficulty with working with the guy and
22   left.
23        Q.    Were you fired?
24        A.    Yes.
25        Q.    And was the person who you had
```

39

1                      HOUSE

2    difficulty working with your superior?

3        A.    No.

4        Q.    Just a fellow employee,

5    co-employee?

6        A.    I am not sure that he was an

7    employee at all.  He may have been.  I

8    can't -- I can't recall frankly the time.

9    He was a programmer.

10       Q.    So it may have been a contractor

11   that Pru Bache was using, a programmer?

12       A.    Yes, I don't know for sure.

13       Q.    By the way, what were the

14   circumstances surrounding your leaving

15   Paine Webber?

16       A.    I went to Heritage because a guy

17   who worked at Paine Webber liked me and he

18   went there and asked me to come with him

19   essentially, so I did.

20       Q.    So you weren't terminated from

21   Paine Webber?

22       A.    No.

23       Q.    What about the circumstances

24   surrounding your leaving of Heritage?

25       A.    I moved to New York.  I decided

40

HOUSE

1
2  being a retail broker was not what I
3  wanted to do in life.
4      Q.      And you were in Naples, Florida
5  at the time?
6      A.      Yes.
7      Q.      What did you do at Societe
8  Generale from December 1990 to May of
9  1993?
10      A.      They were an options trading
11  firm or an options trading division of a
12  french bank.  They were structured as a
13  separate firm actually, but they traded
14  options.  They traded mainly foreign
15  exchange options, and I priced
16  them -- managed -- risk managed them, did
17  a variety of things in that regard.
18      Q.      Similar to the stuff you are
19  doing now in terms of providing expertise
20  and pricing of securities in the options
21  area?
22      A.      Yes.
23      Q.      And what did you have -- did
24  your position there change at all in the
25  the three years you were there?

41

HOUSE

    A.    Not substantially, no.  It -- I moved from the New York office to the Chicago office, but that was mainly as part of the work I was already doing.  I was hired in the New York office.

    Q.    Um hum.

    A.    I moved to the Chicago office for convenience.

    Q.    And you left in May of 1993; is that right?

    A.    Yes.

    Q.    Were you fired or did you leave on your own?

    A.    I was fired.

    Q.    And what were the circumstances surrounding that termination?

    A.    They had lost a hundred million dollars I believe, and the guy who fired me was about to be fired himself, and I think my suspicion is that he was trying to save his job by saving money.  So I imagine he fired me for that reason.  I think that --

    Q.    I guess I wouldn't want you to

42

**H O U S E**

2    speculate what he was thinking when he

3    fired you.

4           What were you told about why you

5    were being fired?

6       A.    It was a fairly congenial

7    interview actually.  There was a guy there

8    whose role was kind of a human resources

9    kind of rule, and he just said you are

10   being fired and so forth and et cetera, et

11   cetera.  I believe that the guy

12   that -- the guy who ran the place who was

13   the head -- head trader on the

14   desk -- this was a fairly small

15   firm -- was in the office, but I don't

16   recall.  I just recall -- I believe his

17   name was Dan.  I can't remember if that is

18   from putting two things together here.  He

19   just said you are being fired.  It was --

20      Q.    He didn't tell you why?

21      A.    -- kind of friendly.

22      Q.    He didn't tell you?

23      A.    I am sure he did.  He didn't say

24   get out of here, but I don't recall there

25   being a long list of reasons, you know.

43

                              H O U S E

1
2    It was just you are being fired.
3         Q.      Okay.
4              And after leaving Societe
5    Generale in May of '93, what did you do
6    next?
7         A.      I am reading my resume up side
8    down.
9         Q.      I appreciate your candor, Mr.
10   House.  According to your resume you
11   started at ABN Amro in November of 1993.
12        A.      Okay.
13        Q.      Which would mean it is
14   approximately a six-month period of time
15   between the time you left Societe Generale
16   and the time you started at ABN Amro, and
17   I am trying to find out what you did
18   during that six months.
19        A.      I can't remember.
20        Q.      Okay.
21        A.      I am sorry, but I --
22        Q.      That is fine.
23        A.      I think I lived in New York.
24   You know, I just can't remember.  It is
25   not clear to me.

44

1              HOUSE

2    Q.    I presume some of that period of

3 time you spent looking for a job?

4    A.    Yes.

5    Q.    Okay.

6    A.    I don't think I held other

7 employment if that is your question.  I am

8 pretty sure of that.

9    Q.    Right.  Okay.

10         By the way, up until this point,

11 up until the time you leave Societe

12 Generale, did you take any other

13 postgraduate courses --

14    A.    No.

15    Q.    -- on finance?

16    A.    No.

17    Q.    On stock options?

18    A.    No.

19    Q.    Commodities trading?

20    A.    No, my -- no.

21    Q.    Did you take any professional

22 courses offered by the companies you

23 worked with or associations in order to

24 pass any sort of licensing requirements to

25 do what you were doing?

45

                    HOUSE
1
2       A.    No.  Are you talking about at
3   that point or early in my career?
4       Q.    At any time between the time you
5   started at Paine Webber and the time you
6   left Societe Generale?
7       A.    Yes, there was a course
8   associated with becoming registered at
9   Paine Webber.  I believe it was held in
10  Norwalk, Connecticut.
11          MR. WANG:   He just asked you
12  you whether or not you took a course.  He
13  didn't ask where it was.  Just listen to
14  the question okay.
15      A.    Yes.
16      Q.    Where was it?
17      A.    Norwalk, Connecticut.
18      Q.    Okay.
19          And do you recall, as you sit
20  here today, and I know it was over 20
21  years ago, what topics were discussed
22  during that -- or what topics were covered
23  in that course?
24      A.    Very vaguely, but the course
25  was -- the purpose of the course was --

46

1                     **H O U S E**

2              MR. WANG:   He asked you what

3    topics were discussed during the course.

4    That was the question.

5              MR. DEMOURA:   Mr. Wang --

6              MR. WANG:  He is not --

7              MR. DEMOURA:   With all due

8    respect, I allowed my witness to answer

9    your questions and say what they were

10   saying without stopping them in the middle

11   of an answer and telling them to stop

12   answering the question.  I wish you would

13   do the same.

14             MR. WANG:   I am simply

15   instructing the witness --

16             MR. DEMOURA:   You are

17   instructing the witness, which you have no

18   right to do during the question.

19             MR. WANG:   Yes, I do.

20             MR. DEMOURA:   No, you don't.

21             MR. WANG:   Yes, I do.  I am

22   sure you want the witness to be responsive

23   to your question.

24             MR. DEMOURA:   If he is not

25   responsive, I will ask him again or I will

47

```
  1              HOUSE
  2   strike the answer.
  3           MR. WANG:   It is my
  4   responsibility to --
  5           MR. DEMOURA:   Your
  6   responsibility is to object.
  7           MR. WANG:   No, I don't agree
  8   with that.  Why don't we move forward
  9   rather than spend a lot of time talking
 10   about our respective roles.
 11           MR. DEMOURA:   I will.
 12           MR. WANG:   Let's just go on and
 13   listen to the witness and not you and not
 14   me.
 15           MR. DEMOURA:   I will, but I
 16   don't want you to interrupt the witness.
 17       Q.    Did you take any courses with
 18   Paine Webber relating to stock options?
 19       A.    I don't believe so.
 20       Q.    Did you take any courses
 21   anywhere else relating to stock options?
 22       A.    No, I don't believe so.
 23       Q.    How did you learn what you know
 24   in order to do your job relating to stock
 25   options?
```

48

1                         HOUSE

2       A.      I read books.

3       Q.      That is it.

4               Are you a member of any

5  professional societies or organizations

6  that publish, you know, periodicals that

7  discuss stock options?

8       A.      No.

9       Q.      So do you subscribe to any

10 services that include written materials on

11 that?

12      A.      No.

13      Q.      What books have you read on

14 stock options?

15      A.      They are uncountable.

16 I -- many, many and --

17      Q.      Are there any that you would

18 consider to be the authoritative books on

19 stock options?

20      A.       No, but there are -- there are

21 authoritative books on stock options

22 certainly.

23      Q.      Have you read them?

24      A.      Certainly.

25      Q.      What are they?

49

HOUSE

1

2       A.       Paul Wilmont wrote a book called

3    Option Pricing I believe.

4       Q.       Any others that come to mind?

5       A.       Many, many years ago there was a

6    book that was written by a guy I believe

7    named Lawrence McMillan that provided the

8    rudimentary details.    I am sure that was

9    the first book I read, but I wouldn't call

10   it an authoritative tome.

11      Q.       More like Options for dummies

12   kind of thing?

13      A.       No, it was more like options for

14   financial professionals, but it is

15   rudimentary.    By the standards of that

16   time, it was fairly advanced, but by

17   today's standards it was fairly

18   rudimentary.    There are a lot of books.

19      Q.       You started at ABN Amro for the

20   first time in November of 1993.    Where did

21   you work for them initially?

22      A.       At ABN Amro in what year?

23      Q.       November '93 is what you said in

24   your answers.

25      A.       In November '93 I was at 181

50

1                    H O U S E

2    West Madison.

3         Q.      In New York?

4         A.      No, 181 West Madison in Chicago.

5         Q.      I am sorry.  Yes.

6                And what did you do when you

7    started there?

8         A.      I was in essentially a group

9    that was developing software, and that

10   group had a lot of programmers.  I wasn't

11   one of them strangely enough.  I was

12   instructed -- I was devoted to the task of

13   talking with the programmers to try to

14   convey financial information to them.

15   They were people who would be typically C

16   programmers or C plus plus programmers,

17   the languages, and since I had some

18   knowledge of the language and a lot of

19   financial knowledge I could tell them what

20   to do because they would typically not

21   know anything.  I can't think of a case of

22   anyone who did, so my job was -- was to

23   convey financial information to them, so

24   that they could do their jobs.

25                Sometimes I would do -- I would

51

                    HOUSE

1
2   actually write code, but that was

3   relatively rare.

4       Q.     And how long did you do that,

5   provide assistance to software

6   programmers?

7       A.     As long as I was there.

8       Q.     So the first time that you were

9   employed there from November '93 to March

10  '96 you worked in the software development

11  group?

12      A.     Yes.

13      Q.     And your role in that software

14  development group was not to provide the

15  technical programming expertise but rather

16  the financial information that would be

17  used by the programmers to develop the

18  software, correct?

19      A.     Yes.

20      Q.     And in March of 1996 you left

21  ABN Amro, correct?

22      A.     Yes.

23      Q.     What were the circumstances

24  surrounding your leaving them?

25      A.     I left to go to First

52

1                    H O U S E

2    Marblehead.

3         Q.    Were you fired?

4         A.    No.

5         Q.    Let's talk about the

6    hiring -- your hiring at First Marblehead,

7    but before we do that how did you find out

8    that there was a company called First

9    Marblehead?

10        A.    I knew Dan Meyers.

11        Q.    How did you know Dan Meyers?

12        A.    From our being employed at the

13   same time by Prudential Bache Securities.

14        Q.    Did you first meet Dan Meyers

15   when you were employed at Prudential Bache

16   between May of '83 and January of '87?

17        A.    Yes.

18        Q.    And what was Mr. Meyers doing at

19   that time?

20             MR. WANG:    Between '83 and '87?

21             MR. DEMOURA:    Yes, while he was

22   at Pru Bache.

23        A.    You want the blunt answer?

24             MR. WANG:    No, he wants the

25   truthful answer.

53

1                        H O U S E

2       Q.      I want a truthful answer.

3       A.      Nothing.  And that is not a wise

4   answer, Mr. Demoura.  That is a true one.

5       Q.      What was -- did he have a title?

6       A.      Probably.

7       Q.      Do you remember what it was?

8       A.      No.

9       Q.      Did you work for him?

10      A.      No.

11      Q.      Did he work for you?

12      A.      No.

13      Q.      Were you in the same department?

14      A.      Broadly, yes.  He was also

15   employed by the commodity division of

16   which the commodity options division that

17   I was employed by was a part.

18      Q.      Okay.

19      A.      I believe his -- his direct

20   superior would have been Fred Hawk.

21      Q.      When you say he did nothing,

22   what do you mean by that?

23      A.      Dan was hired to -- with a

24   systems program I believe that had been

25   written by someone else at his

54

                              HOUSE

1

2    instruction, and Dan sat in his office

3    running that program for two years I

4    believe.   That is it.   That to me

5    constitutes nothing.

6         Q.     Okay.

7         A.     Because the program wasn't used

8    for anything.

9         Q.     To your knowledge?

10        A.     No, that is from Dan.   That

11   comes from Dan not -- not my opinion.

12        Q.     Did you become a friend or a

13   social acquaintance of Dan's during that

14   period of time?

15        A.     Absolutely.

16        Q.     At that time -- I am sorry.

17   This was in New York, correct?

18        A.     Yes.

19        Q.     Did you continue to maintain an

20   acquaintance or a social friendship with

21   Mr. Meyers from the time you met him until

22   the time were you hired at First

23   Marblehead?

24        A.     Yes.

25        Q.     And how frequently would you be

55

HOUSE

in touch with him during that period of
time?

    A.    Frequently.  Dan would call me
from his car.

    Q.    Okay.  How often, daily?

    A.    No, but I couldn't put a
finger -- my finger on a precise
frequency.  It is just frequently.  We
were friends.

    Q.    Okay.

    A.    I mean I -- I wouldn't -- I am
trying to be as forthcoming as I can, Mr.
Demoura.

    Q.    I understand.

    A.    I am trying to give you answers
that you can -- I am not trying to be
oblique here.

    Q.    All I can ask for is your
memory.  Did you go on trips together?

    A.    Yes.

    Q.    Did you invite him to your home?

    A.    Sure.

    Q.    Did he invite you to his home?

    A.    Sure.

56

HOUSE

1

2     Q.      And did you invite him to your

3  wedding?

4     A.      Yes.

5     Q.      Did you ask him to be in the

6  wedding?

7     A.      No.

8     Q.      Was he a member of the wedding

9  party? I don't mean did you ask -- did you

10  ask him to be a member of your wedding

11  party?

12     A.      No.

13     Q.      When you -- how was the

14  discussion -- before joining First

15  Marblehead I assume you had some

16  discussions with Mr. Meyers about the

17  prospect of coming to work for First

18  Marblehead, correct?

19     A.      Yes.

20     Q.      Can you tell me as best you can

21  recall how long prior to the time you

22  joined First Marblehead those discussions

23  started?

24     A.      I can't put a precise number on

25  that one either.

57

HOUSE

1

2    Q.    Ballpark.

3    A.    It could probably be a couple of

4    months, but it wouldn't shock me if it was

5    a few weeks.

6    Q.    Okay.

7    A.    Something like that.  I don't

8    remember.  I remember coming to New York,

9    but I don't remember a lot of the specific

10   dates.

11   Q.    Okay.

12         Do you remember -- do you recall

13   or did you contact him or did he contact

14   you?

15   A.    He contacted me.

16   Q.    And prior to the time that he

17   contacted you, how long had it been since

18   you talked to him?

19   A.    I can't remember.

20   Q.    Had it been years?

21   A.    No.

22   Q.    Was it sort of a call out of the

23   blue?

24   A.    No.

25   Q.    And at that time, you were

58

HOUSE

1
2    working in Chicago, correct?

3        A.    Yes.

4        Q.    Do you remember the conversation

5    that you had with Dan in terms of the

6    substance of the conversation when you

7    first started discussing the prospect of

8    joining First Marblehead?

9        A.    No.  I don't remember the

10    substance.  Those details just escape me.

11        Q.    Do you remember what position he

12    was interested in having you come and

13    fill?

14        A.    Broadly, yes.

15        Q.    What was that?

16        A.    I knew why he would be

17    interested in talking to me.  They are a

18    financial firm.  They didn't have a lot of

19    financial expertise.  Why wouldn't he want

20    to hire me? I had financial expertise that

21    could be useful to a financial firm.  I

22    mean I am not trying to be, you know -- it

23    doesn't go much beyond that.

24            First Marblehead to the best of

25    my knowledge didn't have any titles beyond

59

HOUSE

1

2 CEO either.  It is like Angelo Gordon in

3 that respect.  I don't think he said you

4 are going to be the first vice president

5 of financial modeling.  They didn't have a

6 title like that.  They didn't do that sort

7 of thing.  He just said something along

8 the lines of we are a financial firm.  We

9 can use you.  I would have understood that

10 clearly.

11      Q.    Did you ask him what could you

12 use me to do or --

13      A.    I think it would be implicit in

14 the conversation.  I don't think we would

15 have to have that conversation.

16      Q.    Okay.  So your answer is no?

17      A.    It is a financial firm.

18 What -- what are you going to do here

19 Gregory?  Well, he wouldn't have to say

20 that.  Well, it would be just sort of

21 understood.

22      Q.    Let me ask you a different

23 question.

24            During the entire time between

25 the time you first had that discussion and

60

1                    HOUSE
2    the time you started, did you ever have a
3    discussion where Mr. Meyers or anybody
4    from First Marblehead laid out to you what
5    it was expected you were going to do for
6    them?
7         A.     Yes.
8         Q.     What was that?
9         A.     Well, some of the -- some little
10   details are coming back to me.  I remember
11   talking to Steve Anbinder long before I
12   was ever employed at First Marblehead
13   about what he was doing.  I even met the
14   consultant he had hired.  So I knew what
15   kind of modeling he did.  He did it on
16   Lotus spreadsheets.  He hired a consultant
17   to help him with that.  Steve has
18   financial expertise but not technical
19   expertise I would say.  He hired a
20   consultant to do that.  I met the
21   consultant.  I can't remember who he was.
22   He told me what he was doing.  I was going
23   to do something similar as Steve was doing
24   except take it to a technical level beyond
25   what he was able to do.  That is accurate.

61

HOUSE

1

2       Q.     Did all those discussions occur

3   after Mr. Meyers reached out to you about

4   the prospect of coming or before?

5       A.     No.   The discussion where I met

6   the consultant?

7       Q.     Yes.

8       A.     That was long before.   I

9   mean --

10      Q.     So was that --

11      A.     I can't remember the year, but

12  it was long before.

13      Q.     Was that more in the nature of

14  gee, Greg, we are trying to do something

15  with our company.   We know you have some

16  expertise, so can you talk to our

17  consultant?

18      A.     No.

19             MR. WANG:     Objection to the

20  form of the question.

21      Q.     Okay.

22             Well, tell me what you recall of

23  your discussions with Steve Anbinder prior

24  to your discussions with Mr. Meyers about

25  joining Marblehead?

62

**HOUSE**

1
2          MR. WANG:    Other than what he
3    has already testified?
4        A.    Can you --
5        Q.    You said you had some
6    discussions with Steve Anbinder that now
7    as you were sitting here talking about
8    discussions with Dan Meyers about joining
9    Marblehead that you remembered, that long
10   before that you had some discussions with
11   Steve Anbinder?
12       A.    I think you are trying to make
13   those discussions out to be job
14   discussions, and they were not.
15       Q.    No, I am not.  I am simply
16   trying to find out what was discussed.
17       A.    His model.
18       Q.    His financial model?
19       A.    Yes, he described it to me in a
20   general way. I sort of understood it in a
21   general way.  He talked about objectives,
22   et cetera.  They were not conversations
23   about -- we want to hire you to do this.
24   This was just conversation because I knew
25   Dan.

63

HOUSE

1

2     Q.     I understand.  I understand it

3  was not for the purposes of hiring you or

4  for you looking for a job there.

5     A.     Um hum.

6     Q.     How did that conversation

7  happen? Did you ever talk to Mr. Anbinder

8  before?

9     A.     I can't remember when I met

10  Steve.  I am sorry.  I can't.  Upon

11  reflection, I remember the day I met

12  Steve.  I am sorry I can.  I remember it

13  was in his office.  So, yes.  I knew

14  Steve.  I knew Dan.  I knee what they were

15  doing.  They described it to me.  We had

16  conversations.

17     Q.     All completely unrelated to the

18  issue of whether you would ever come to

19  work for them?

20     A.     Exactly.

21     Q.     And at or around that time did

22  Steve also ask you to talk to the

23  consultant that they had hired?

24     A.     No, I think he happened to be

25  there.

64

HOUSE

1

2     Q.     So there was a one-day thing.

3     It happened to be on one occasion when you

4     visited First Marblehead's offices or

5     visited -- went to see Dan?

6     A.     No.  I can't remember why

7     I -- if I -- if it was specifically to go

8     see Steve.  If it was just to talk to Dan

9     and I happened to be with him when he was

10    going to Steve's office.  I have no idea.

11    Q.     Okay.

12    A.     I just remember that -- that

13    Steve was there, and a consultant happened

14    to be there.  I don't think there was

15    a -- I don't think I served any necessary

16    purpose.

17           MR. WANG:   When you think it is

18    a good time for a break, we have been

19    going for an hour.

20           MR. DEMOURA:   We can do that

21    now.

22           MR. WANG:   Fine.

23           (Recess taken.)

24    BY MR. DEMOURA:

25    Q.     Mr. House, did you review any

65

                              HOUSE

1

2    documents in preparation for your

3    deposition today?

4        A.      Sure.

5        Q.      What did you review?

6        A.      I read all the pleadings.  I

7    think there were three documents.  One of

8    them -- I am sorry.  My legal technical

9    knowledge is weak.  I don't know what the

10   documents are called.  I may be calling

11   them the wrong with.

12       Q.      Okay.

13       A.      One of them was a document

14   listing -- one of the three was a document

15   listing all of the witnesses that might be

16   called, Mitchell Fields, Kevin Walker, et

17   cetera.  That is not a pleading I guess.

18       Q.      Okay.

19       A.      One was the actual plaintiff's

20   case, plaintiff's position and defendant's

21   position.  It was a pretty short one, and

22   the third one was I guess some sort

23   of -- probably was a pleading and laid out

24   the case for the district court or

25   whatever.  Those three documents are what

66

                          H O U S E

1    I read.

2        Q.    Anything else that you can

3    recall?

4        A.    No, that was pretty much it.

5        Q.    When did you review those?

6        A.    Actually last night and this

7    morning.

8        Q.    Did you speak with anybody other

9    than your attorneys about coming here for

10   your deposition today?

11       A.    Sure.

12       Q.    Who?

13       A.    How recently do you mean?

14       Q.    Ever.

15       A.    Sure.

16       Q.    Who?

17       A.    I have a friend who is a next

18   door neighbor of mine in Denver.  She does

19   -- she doesn't any longer live there.  She

20   was a paralegal, and since she was a

21   friend of mine she knew about the case,

22   and anybody who knows me is likely to know

23   something about this.  So she asked me

24   about it, and I discussed it with her over

67

                        HOUSE

1
2   time, and she spoke to me last about it a
3   few days ago.
4        Q.     What is her name?
5        A.     Ava Blum.
6        Q.     B-L-U-M?
7        A.     Yes.
8        Q.     Do you have her address?
9        A.     Not with me.
10       Q.     What city does she live in?
11       A.     Seattle.
12       Q.     You say she was a paralegal or
13  is she -- is she a paralegal now?
14       A.     She is a landscape designer.
15       Q.     She is a landscape designer?
16       A.     Landscape architect, sorry.
17  Fully degreed.
18       Q.     What can you tell me about your
19  conversations with Ava Blum; what did you
20  tell her about the case?
21       A.     I -- specifically, I am involved
22  in a lawsuit.  She knows about my being
23  employed at First Marblehead.  She knows
24  why I am suing them or why you are suing
25  me actually.  She said that a deposition

68

HOUSE

1
2  is a relatively straightforward process.
3  She actually told me a story about one
4  that she attended where no lawyer showed
5  up.  That was pretty much it.  She knows
6  the broad details of the lawsuit.  I don't
7  know that she knows any particular
8  details, and so she probably didn't even
9  talk a lot about them.
10       Q.    And the way she would have known
11  anything about the broad details of the
12  lawsuit was as a result of talking to you,
13  correct?
14       A.    Um hum.
15       Q.    You have to say yes or no.  I am
16  sorry.
17       A.    Yes, I am sorry.
18       Q.    And can you tell me what you
19  would have told her about the broad
20  details of the case?
21       A.    For example, I am trying to -- I
22  don't know what you are -- you are asking
23  for a conversation that --
24       Q.    I am asking you to recall your
25  conversations with Ava Blum about the

69

HOUSE

case.

    A.    I believe I have told her that you all are suing me for a bizarre reason. I should have been suing you, but -- and she understood that. She understood what a declaratory judgment was and sort of explained it to me because I didn't -- that part of the case baffled me from the beginning. She is a paralegal, so she -- she explained some of these details to me in a way that is just reasonably clear and that I can understand. I am not trying to mischaracterize what she said to me or anything, but it is just not very detailed.

    Q.    Is it fair to say that most of your discussions with Ava Blum about the case had to do with questions about the procedural maneuvers that were going on in the case?

    A.    Yes.

    Q.    Were there any discussions about the substance of the claims that are being

70

HOUSE

1

2 made by either First Marblehead or

3 yourself in the case?

4     A.    Well, probably.  I don't know

5 that I can recall them because they are

6 not terrifically important to her.

7     Q.    Okay.

8     A.    Lots of things baffle me, so I

9 get -- I talk to her because she is easy.

10 She is a phone call away.

11        MR. WANG:   Mr. House, are you

12 finished with your answer?

13        THE WITNESS:  Yes.

14        MR. WANG:   I am not

15 interrupting his answer.

16        Just listen to the question and

17 answer the question.  Don't give the

18 details and the why of the conversation.

19 Just answer the question.  All right, sir?

20        THE WITNESS:  Sure.

21     Q.    Other than Ava Blum, you

22 mentioned several friends that if they

23 know you they know something about the

24 litigation.

25        Can you tell me what they have

71

HOUSE

1

2 talked to you about this case?

3    A.    I don't think I said friends.  I

4 said people who know me probably know

5 something about this case.

6    Q.    Okay.

7         Let's talk about people who know

8 you that may know something about this

9 case.  Who else would know something about

10 the case?

11    A.    My brother.  I didn't talk to

12 him, but I E mailed him once.

13    Q.    Do you have a copy of that E

14 mail?

15    A.    No, because it --

16    Q.    Was it more than one E mail?

17    A.    No, because --

18         MR. WANG:   I am going to get

19 him to answer the questions before we

20 finish today or die trying I am afraid.

21    Q.    Do you remember when you sent

22 that E mail?

23    A.    It was not long ago because

24 it -- it -- I don't remember exactly, but

25 it wasn't long ago, and the reason I

72

HOUSE

1
2  remember it wasn't long ago is because I

3  didn't tell him about it for a long -- I

4  didn't talk about it for a long time.

5          MR. WANG:   I am sorry.  I just

6  have to have a short conversation with

7  him.  Let's take a short break.

8          Let the record reflect that the

9  witness and Mr. Wang have left the room.

10          (Discussion held off the

11  record.)

12          MR. WANG:    Back on the record.

13      Q.    Mr. House, the last topic we

14  were discussing is an E mail that you had

15  sent to your brother.

16          What is your brother's name?

17      A.    Lawrence.

18      Q.    Lawrence House?

19      A.    Yes.

20      Q.    Other than the one E mail that

21  you sent to your brother, did you send any

22  E mails to anybody else discussing the

23  litigation other than your attorneys?

24      A.    I don't believe so.

25      Q.    By the way, do you recall being

73

HOUSE

1

2  asked to produce various documents in this

3  case?

4       A.    Yes.

5       Q.    And during that search, did you

6  search for documents to produce in

7  response to my request?

8       A.    Yes.

9       Q.    During that search, did you

10  use -- did you go on your computer to see

11  if there were any documents in the files

12  in your computer that would be responsive

13  to the request?

14       A.    Yes.

15       Q.    And did you provide any

16  documents that were in the computer?

17       A.    Yes.

18       Q.    Other than the E mail to your

19  brother and the discussions that you have

20  had with Ava Blum, can you tell me have

21  you had any discussions with anybody other

22  than your attorneys about the litigation?

23            MR. WANG:    I object to the form

24  of the question.  You may answer.

25       A.    Yes.

74

HOUSE

1

2      Q.     Who?

3      A.     Kara Byun.

4      Q.     How do you spell that?

5      A.     B-Y-U-N.

6      Q.     First name?

7      A.     Kara with a K.

8      Q.     I am sorry.  Okay.  And who is

9   Kara Byun?

10     A.     I work with her.  She is a

11   trader.

12     Q.     Can you tell me the substance of

13   the discussions you have had -- first of

14   all, tell me how many discussions you have

15   had with Kara about the litigation?

16     A.     Several.  What kind of

17   substance?

18     Q.     Anything, whatever you said to

19   her and whatever she said to you.  I don't

20   mean a script.  You don't need to say I

21   said this.  She said that.

22     A.     I couldn't recall it even if you

23   were asking that, but I think she knows I

24   am involved in a lawsuit.  Mr. Demoura,

25   there aren't many facts in this lawsuit,

75

HOUSE

1    and so I think that you or I could

2    represent them to anybody in 60 seconds,

3    and I think there is -- that is probably

4    Kara's position.  I probably represented

5    my position to her in 60 seconds, and she

6    probably could regurgitate it.

7         Q.    So what you are telling me is

8    that the discussions you had with Kara

9    Byun took about 60 seconds, and it was

10   a -- it was you telling her about your

11   position in the litigation?

12        A.    You asked me --

13             MR. WANG:   Objection to the

14   form of that question.  You may answer.

15        A.    You asked me the substance of

16   what I said, and that was the substance of

17   what I said.  Over time I imagine Kara is

18   probably going to say how is your suit

19   going like normal people would say.  I

20   would say fine.  It would be like that.

21        Q.    As best as you can recall, what

22   would you have told her as this sort of 60

23   second commercial about your case?

24        A.    The same thing --

76

1          **HOUSE**

2          MR. WANG:    Objection to the

3   form of the question.

4      Q.    I am sorry?

5      A.    Essentially the same thing I

6   would tell you.

7      Q.    I want you to tell me sitting

8   here today what you would have said?

9          MR. WANG:    What he would have

10  said or what he said?

11     Q.    What you said.

12     A.    I can't recall the conversation

13  exactly.

14     Q.    Okay.  How about generally.

15     A.    I am only saying at some point

16  Kara and I had a conversation that

17  represented my position in the case and

18  frankly probably your position in the

19  case.  That is that.  You know, it is very

20  simple.

21     Q.    Generally what would your

22  position in the case be that you relayed

23  to her?

24     A.    My position in the case would be

25  in our pleading, and it would be that I am

77

HOUSE

1

2    entitled to options on First Marblehead

3    stock that I exercised last February.

4        Q.    And what would -- did you tell

5    her what First Marblehead's position was,

6    if you can recall?

7        A.    I am sure I did.

8        Q.    What did you tell her?

9        A.    I told her that First Marblehead

10    told me that I didn't have any options.

11        Q.    Other than Kara, your brother

12    and Ava, anybody else you had discussions

13    with about the litigation?

14            MR. WANG:    Not including

15    counsel of course?

16            MR. DEMOURA:    Of course.

17        Q.    Unless of course you were having

18    conversations with other people while your

19    counsel was in the room.

20        A.    I need to ask my attorney a

21    question if --

22            MR. WANG:    You can ask me.

23        Q.    Yes.

24            (Witness confers with counsel.)

25        A.    Okay.   I have discussed the case

78

HOUSE

1

2    with a couple of people at Angelo Gordon.

3        Q.      Okay.

4        A.      One of whom is Josh Brain.

5    Another -- I am sorry.

6        Q.      How do you spell Brain?

7        A.      Like brain.

8        Q.      Okay.

9        A.      Another is John Angelo and

10   Michael Gordon as a matter of fact.

11       Q.      John Angelo?

12       A.      Angelo, the Angelo of Angelo

13   Gordon, and Michael Gordon who is the

14   Gordon of Angelo Gordon.

15       Q.      Okay.

16       A.      I spoke to John because at a

17   very early stage -- at a very early stage

18   because I wanted him to know what I was

19   going to be involved in probably.  I spoke

20   to Michael because Michael told me about

21   your IPO.  That is the way I found out

22   about it.

23       Q.      My -- I am sorry.

24       A.      I am sorry.  Your client's IPO.

25       Q.      First Marblehead's IPO?

79

1                      H O U S E

2      A.    Yes, Michael told me about First

3  Marblehead's IPO.  Fred Berger because a

4  question came up and I talked to Fred.

5  Donna Howe.  I believe that is it.

6      Q.    That is it from people at Angelo

7  Gordon?

8      A.    I believe that is it from people

9  period.

10      Q.    Okay.

11            Josh Brain, what did you talk to

12  him about?

13      A.    Josh Brain directed me to Mr.

14  Wang.

15      Q.    Josh Brain, what is his position

16  at Angelo Gordon?

17      A.    He is in the private equity

18  group.  He is also an attorney, but he is

19  in the private equity group.

20      Q.    And what did you tell Josh?

21      A.    I discussed the case with him in

22  the same way that I probably discussed

23  it -- I would discuss it with you, and he

24  sent me to people.

25            MR. WANG:    Probably not with

80

HOUSE

1
2  Mr. Demoura, but we will leave him out of
3  it.
4      Q.    Did you -- at the time there was
5  no case I assume because the first time
6  that we got --
7      A.    You are using a technical term I
8  guess the case, but as far as I was
9  concerned I had a case as soon as I got a
10 letter from First Marblehead telling me to
11 jump off a cliff.
12     Q.    And after you got that letter,
13 that was when you talked to Josh Brain?
14     A.    Well, actually probably days
15 after that.
16     Q.    And the substance of the
17 conversation was to describe the nature of
18 the dispute and see if he knew somebody as
19 an attorney who could help you with it?
20     A.    Yes.
21     Q.    And he referred to you Mr. Wang?
22     A.    Yes.
23     Q.    How about John Angelo, how
24 many -- by the way before we do that, have
25 you had any further discussions with Josh

81

1                       HOUSE

2   Brain about the litigation?

3        A.     I believe I ran into him at the

4   elevator one time, and I can't recall

5   discussing any particular part of the

6   case, but I -- I think he probably said

7   the same thing that I was describing Kara

8   as saying.  How is it going.  I said fine.

9        Q.     How about John Angelo?

10       A.     No further discussions with

11   John.

12       Q.     The reason you discussed it with

13   him was? I am sorry if you --

14       A.     His name is on the door.

15       Q.     Just to let him know that you

16   were going to probably end up in

17   litigation involving stock options,

18   correct?

19       A.     No, I didn't -- I don't think I

20   mentioned any particulars of the case.  I

21   just said I am going to be more than

22   likely involved in litigation with Dan

23   Meyers.

24       Q.     Does he know Dan Meyers?

25       A.     Yes.

82

HOUSE

1

2     Q.    Other than that, any other

3  discussions with John Angelo about the

4  litigation?

5     A.    No.

6     Q.    How about Michael Gordon, you

7  mentioned that Mr. Gordon --

8     A.    I am sorry.  I am sorry.  There

9  was a conversation with John.

10     Q.    Okay.

11     A.    Not long ago he asked me where

12  the stock was, and I told him.  I can't

13  remember where it was at the time, but I

14  told him, and that was pretty much it.  It

15  was in the kitchen --

16     Q.    I am sorry?

17     A.    It was in the kitchen at Angelo

18  Gordon, so there were two conversations

19  with John.  I just remember the latter

20  one.

21     Q.    The latter conversation is where

22  is the stock, what is it trading at right

23  now?

24     A.    Yes.  He asked me where the

25  stock was.

83

HOUSE

1

2    Q.    That was the entire

3    conversation?

4    A.    I answered him.  I don't recall

5    anything else about it.

6    Q.    Okay.

7        Now, Mr. Gordon you mentioned

8    was the one who told you that First

9    Marblehead had gone public, correct?

10   A.    Yes.

11   Q.    Or had had an IPO?

12   A.    Yes.

13   Q.    Prior to that, you didn't know

14   that First Marblehead had been planning to

15   go public?

16   A.    No.

17   Q.    And do you recall the

18   conversation you had with Mr. Gordon at

19   that time?

20   A.    Not in any detail, but I

21   remember the substance of it.

22   Q.    What was it?

23   A.    He said First Marblehead has

24   issued their IPO and that Dan Meyers was

25   worth 300 million dollars, and that is

84

HOUSE

1

2    pretty much it.

3        Q.     What did you say to him?

4        A.     I actually asked for a

5    conversation with him and which he

6    granted.   I didn't -- we didn't discuss it

7    at that time, but we discussed it later.

8        Q.     Tell me about that conversation

9    of that meeting.

10       A.     I described to him my position

11   on the options, that I had owned options

12   that I would like to exercise, and since I

13   believe I said something along the lines

14   since four months have passed since the

15   IPO I anticipate that it will be a

16   problem, and he understood that.

17       Q.     Why did you tell him that you

18   anticipated that it would be a problem?

19       A.     Because if it wasn't going to be

20   a problem I would have had a hundred

21   thousand shares in First Marblehead stock

22   in that moment, and I wouldn't have ever

23   had the first conversation with Michael.

24   I would have been talking to him.

25       Q.     Talking with him?

85

HOUSE

1

2      A.      To Michael.  I would have said

3  Michael First Marblehead has had an

4  IPO -- because I have to tell -- I

5  understand my obligation to Angelo Gordon

6  is to tell them things like that.  I

7  believe that I may be wrong about this,

8  but I believe I have to tell them when I

9  own a hundred thousand shares of

10  somebody's stock.

11      Q.      Do you have to tell them when

12  you own the right or option to a hundred

13  thousand shares in someone's stock?

14      A.      I don't have to.  I don't

15  believe so, no.

16      Q.      So it is only when you actually

17  own them?

18      A.      No, I believe that -- that my

19  understanding of this is that I have been

20  asked repeated -- repeatedly here, several

21  times at Angelo Gordon in the form of

22  memos and so forth questions about other

23  accounts.  I think that there was

24  something like what when I first came to

25  work there.  They probably have regulatory

86

1                    HOUSE

2    issues as a hedge fund, you know.

3    Employees --

4        Q.    That you have to report whatever

5    holding you have to --

6        A.    Yes, you have to report holdings

7    and probably trading activities, so it

8    would be something that as a matter of

9    course I would have to talk to Michael or

10   John about or Fred, and that was the

11   reason I talked to all three of those

12   guys.

13       Q.    This memo, was it -- is it in

14   the form --

15       A.    What memo?

16       Q.    You said you would get memos

17   from Angelo Gordon --

18       A.    About --

19       Q.    -- that said you had to disclose

20   various things?

21       A.    No, I would get memos addressing

22   the issues of other accounts, addressing

23   the issues of holdings, addressing the

24   issues of stuff, order types having to do

25   with this, so it would be just normal for

87

HOUSE

1

2    me to say if I had known something I would

3    have to tell John or Michael or Fred or

4    some managerial person at Angelo Gordon

5    about it. So as a result I had a

6    conversation with Michael about that.

7        Q.    And you believe that you had to

8    do that as a result of some sort of

9    regulatory requirements, correct?

10       A.    Yes.

11       Q.    Okay.

12       A.    In part, yes.

13       Q.    Did the memos that were sent to

14   you reminding -- maybe they are not

15   reminder --

16       A.    I think you are

17   mischaracterizing them.

18       Q.    I don't want to do that.  You

19   said they were memos that discussed or

20   asked you about holdings; is that right?

21       A.    I don't recall a memo asking me

22   about holdings.  I recall a memo

23   addressing the subject of holdings --

24       Q.    And did that --

25       A.    -- in things -- in outside

88

HOUSE

2  accounts, et cetera.

3     Q.    And did that memo direct you to
4  discuss those issues with the people you
5  discussed them with or fill out a form
6  or --

7     A.    No.  No, they didn't.

8     Q.    Did you ever have to fill out
9  any forms with any of your employers after
10  you left First Marblehead discussing or
11  disclosing your holdings in various
12  companies?

13     A.    I can't recall any.  It may have
14  happened, but I don't recall any until
15  Angelo Gordon.

16     Q.    Okay.

17        And then when you joined Angelo
18  Gordon, did you have to actually provide
19  them with information about any holdings
20  you had, any assets you had?

21     A.    Not precisely, no.

22     Q.    Okay.

23        Was there a form that you had to
24  fill out?

25     A.    I don't think so.

89

1                    HOUSE

2       Q.      Do you ever recall having in

3   writing to provide a list of whatever

4   assets you had in the form of stock or

5   stock options or anything like that?

6       A.      Could you ask --

7       Q.      Sure.

8               Do you recall when you were

9   hired at Angelo Gordon ever being asked to

10  fill out any forms or any documents,

11  whether it is a form or just a regular

12  piece of paper, submit a piece of paper

13  that listed your holdings --

14      A.      I don't recall receiving a piece

15  of paper.

16              MR. WANG:    Let him finish his

17  question.

18      Q.      -- that requested that you

19  provide information to the company about

20  what you owned?

21      A.      I don't recall it that way.

22      Q.      Okay.

23              How do you recall it?

24      A.      I recall, and I can't recall

25  the -- any memoranda specifically, but I

90

1                      H O U S E

2    recall receiving a piece of paper that

3    alerted me to -- I have never worked for a

4    hedge fund before.

5        Q.    Yes.

6        A.    And I received something when I

7    first got to the firm that seemed to

8    indicate to me that this world was a

9    little different in a minor respect in

10   that if I traded somewhere else, for

11   example, the firm would have to know about

12   it, and it made perfect sense to me.   I

13   don't recall how that was phrased to me.

14   At what -- I am pretty sure it was not

15   phrased to me in a way as what you are

16   describing which is tell us what you own.

17   That didn't happen.  They may be able to

18   do that.  Maybe they didn't.  They did not

19   do that as far as I know.  So that is my

20   answer.

21       Q.    All right.

22             I am sorry.  We sidetracked a

23   little bit there.  I wanted to find out

24   about the discussion and meeting you had

25   with Michael Gordon.