91

**HOUSE**

1

2          MR. WANG:    I think he testified

3  about that.

4      Q.    After you told him about the IPO

5  and you requested a meeting you discussed

6  with him at that meeting, the subsequent

7  meeting, the fact that you thought that

8  you had options in First Marblehead,

9  correct?

10     A.    No, I am pretty sure I

11  characterized it as I know I have options

12  at First Marblehead.

13     Q.    What else can you recall about

14  the substance of that meeting?

15     A.    It was very short.  The reason I

16  asked for it later is because it didn't

17  occur in the kitchen.  I didn't want to

18  talk about it in the kitchen.

19     Q.    Completely understandable.

20     A.    So it was very short, and I

21  don't recall anything else about it other

22  than to just say that.

23     Q.    Michael I just want to let you

24  know I couldn't talk to you in the kitchen

25  about this, but I want to let you know I

92

1                          HOUSE

2   have options in First Marblehead.

3   Basically that was the substances of the

4   conversation?

5              MR. WANG:    Objection to the

6   form of the question, the

7   characterization.  The question the way he

8   just phrased it, can you answer it.

9      Q.    Is that the substance of the

10  conversation?

11     A.    Not quite.

12     Q.    Okay.

13     A.    The substance of the

14  conversation is something like that

15  Michael I believe I have a problem here,

16  and I want to tell you about it, and I

17  told him about it, and he said -- I don't

18  recall his response, but it was something

19  along the lines of okay.  I understand or

20  that is fine.

21     Q.    What was the problem?

22     A.    The problem is that four months

23  had passed and that it was clear to me

24  that I was being deprived of my options,

25  and so I had to do something, and I was

93

1                          HOUSE

2    telling Michael that I was going to do

3    something.  I didn't tell him what it was

4    because I didn't know what it was.  I mean

5    this was minutes after our discussion, but

6    I said I have a problem.

7        Q.      Okay.

8                Now, so let me ask you a

9    question about the day you found

10   out -- when did you find out that First

11   Marblehead had gone public?

12       A.      I don't recall the precise date.

13       Q.      But was it at or around the time

14   it went public?

15       A.      No.

16       Q.      It was not.  How long after?

17       A.      What I just said a few minutes

18   ago.  It was significantly after.  I

19   believe the IPO was in late October, and

20   this was in the middle of February.

21       Q.      That was when you found out that

22   First Marblehead was now a public company?

23       A.      Yes.

24       Q.      Fred Berger, do you remember the

25   discussions you had with Mr. Berger about

94

HOUSE

First Marblehead?

     A.     They were prompted by a memo.

     Q.     The memo dealt with this
particular issue?

     A.     No.

     Q.     It was a general memo to all?

     A.     I believe it was a general memo
to all, and I can't recall it either, but
it was a memo addressing the issue of
legal actions.  It said something like
have you ever been involved in a legal
action, et cetera, et cetera, and I went
to Fred and discussed that I am in a legal
action and told him why, and the
conversation was short.

     Q.     What do you recall telling him?

     A.     The same thing I would call --
tell anybody if I was going to discuss
this case.  I am involved in a lawsuit
with First Marblehead involving a dispute
over options, and he understood that, and
I think his instructions were to answer no
to the question on the memo, and I can't
recall the question on the memo.  So I

95

1                      HOUSE

2    can't recall that, but that was it.  The

3    conversation was that short.

4        Q.    Who is -- what is Mr. Berger's

5    position at Angelo Gordon?

6        A.    Well, again Angelo Gordon

7    doesn't have titles as far as I know

8    except CEO.  I think Michael has a title

9    also, but I can't recall what it is,

10   maybe --

11       Q.    So what were his

12   responsibilities?

13       A.    Fred has been with Michael and

14   John forever and does a variety of things.

15   He is clearly an administrative person

16   with a great deal of authority.

17       Q.    Okay.

18       A.    And he seems to do a

19   variety -- head a variety of groups in

20   some way.  As I said, it is relatively

21   informal, and I couldn't tell you

22   precisely how he would describe his job

23   position.

24       Q.    Donna Howe, do you recall having

25   discussions with Donna Howe about the

96

1                HOUSE

2    litigation?

3        A.    Yes.

4        Q.    What -- how many conversations

5    did you have with her about the case?

6        A.    She is my boss, so lots.  She

7    asks the question how is the suit going

8    every once in a while, and I say fine.

9    She knows -- she knows the substance of

10   it.

11       Q.    Meaning the same thing you've

12   told other people that you are in the

13   middle of a dispute with First Marblehead

14   over stock options?

15       A.    Yes.

16       Q.    Anything else, anything more?

17   Have you provided more information to her

18   than you provided to other people?

19       A.    Since we talk frequently,

20   probably.  We talk every day.  We sit

21   eighteen feet apart. She probably knows a

22   lot, but do we -- do you mean have I

23   provided her information other than just

24   conversation, no.  She is just there.

25       Q.    Other than the individuals you

97

HOUSE

1
2    have talked to me about today, Ava Blum,
3    your brother Lawrence, Kara Byun, Josh
4    Brain, John Angelo, Michael Gordon, Fred
5    Berger and Donna Howe, have you had any
6    discussions or correspondence with anybody
7    else about the litigation other than your
8    attorneys that you can remember?
9        A.    My sister Colleen.
10       Q.    Have you E mailed her about the
11   case?
12       A.    No, we have talked on the
13   telephone.
14       Q.    What have you told her?
15       A.    I think -- actually I talked to
16   her probably pretty early and probably not
17   since then about it, and she knows the
18   case, and I think, you know, I talked to
19   her for -- reasonably frequently, and she
20   probably asks about it, but -- people ask
21   about it.  Kara asks about it.  Donna asks
22   about it, and I answer fine.
23       Q.    Anybody else?
24       A.    Drew Bashpipe.  He sits next to
25   me.

98

HOUSE

1    Q.    I am sorry.

2    A.    Drew Bashpipe, he sits next to

3    me, and he probably hears the conversation

4    with Donna.  So he probably hears --

5    Q.    I am not asking you to tell me

6    about what he probably hears.  I am asking

7    you to tell me about whether or not there

8    were any conversations with him.

9    A.    He asks me about it too.  I

10   think he said something to me this

11   morning, you know, wished me well.

12   Q.    So everybody -- he knew you were

13   coming here for a deposition today?

14   A.    Yes.

15   Q.    So everybody -- do all these

16   folks know you are here for a deposition

17   today?

18   A.    No, probably not.  Donna did.

19   Michael didn't.  John didn't.  Fred didn't

20   Q.    Other than talking about the

21   case in generalities with these folks

22   telling them I am involved in a case

23   involving stock options, have you had any

24   other discussions, broader discussions?

99

HOUSE

1

2      A.      I think the only person in this

3  whole basket of folks who has talked in

4  any detail about the case is Ava Blum, and

5  it is because she is a paralegal.  So yes,

6  that is -- that is probably it.

7      Q.      Okay.

8              Do you currently have any -- are

9  you currently -- do you currently have any

10  grants of stock options from anybody other

11  than your contention that you have one

12  with First Marblehead?

13      A.      No.

14      Q.      Have you with any of your other

15  employers been granted stock options

16  before?

17      A.      Did you ask if any of my

18  employers have granted me stock options or

19  have granted stock options period?

20      Q.      No, I meant have they granted

21  you stock options during the time that you

22  were employed with any of these other

23  employers that we talked about today?

24      A.      No.

25      Q.      Have you received any stock

100

HOUSE

1
2  options in any form from anybody other
3  than First Marblehead --
4      A.    No.
5      Q.    -- that you allege in this case?
6      A.    No.  I think I have traded stock
7  options but not received them.
8      Q.    Meaning you've bought and sold
9  stock options as a commodity, correct?
10     A.    Yes, as a financial instrument
11 but not in the sense that we are talking
12 about.
13     Q.    Okay.
14         Have you had any discussions
15 with a gentleman named Vick Samra about
16 this case?
17     A.    No.
18     Q.    Have you had any discussions
19 with Mr. Samra about whether or not you
20 had any stock options at First Marblehead?
21     A.    No.
22     Q.    When was the last time you spoke
23 with Mr. Samra?
24     A.    Probably around the time he
25 left, which to the best of my

101

1                            HOUSE

2    recollection, and it is not perfect, is

3    1996.

4        Q.    When --

5        A.    Which was prior to the options

6    being granted, so I am --

7        Q.    When you told Mr. -- I am going

8    back to the discussion that you had with

9    Mr. James and Mr. Meyers giving your two

10   weeks notice.

11            When you told them that you were

12   leaving First Marblehead, did you tell

13   them where you were going?

14       A.    Yes.

15       Q.    And did you tell them that you

16   were going to relocate back to Chicago to

17   do that?

18       A.    Yes.

19       Q.    In your answers to

20   interrogatories -- in your automatic

21   disclosure in this case when you --

22       A.    I don't know that term.

23       Q.    One of the documents that was

24   filed in this case is a document that

25   lists -- it is in your answers to

102

HOUSE

1 interrogatories.  I am sorry.  I am sorry.

2 interrogatories.  I am sorry.  I am sorry.

3 I was looking for a list, and it is not

4 included in the list.

5          Showing you your answers to

6 interrogatories in the case and

7 specifically I would ask you to look at

8 answer -- interrogatory number 2 in the

9 response you gave.

10     A.     Okay.

11          (Document handed to witness.)

12          (Pause.)

13     A.     Okay.

14     Q.     Now, I am going to go through

15 the list of individuals that you have

16 identified in that interrogatory response.

17 The question asks for you to provide

18 information or identify people who you

19 believe possess information relative to

20 the action, correct?

21     A.     Yes.

22     Q.     And I am going to go down that

23 list with you now to find out what you

24 believe is the relevant information these

25 individuals have and why you put them down

103

HOUSE

1

2  in that answer.

3       Dan Meyers.  Who is Dan Meyers?

4  A.    The CEO of First Marblehead.

5  Q.    And what information do you

6  believe he has that is relevant to this

7  case?

8  A.    As far as I knew at the time he

9  was the only person who knew that my

10  options had been restructured

11  beyond -- besides Ron Hoffman.

12  Q.    And can you tell me have you had

13  any discussions at any time with Dan

14  Meyers about stock options at First

15  Marblehead?

16  A.    Yes.

17  Q.    Can you tell -- can you tell me

18  when those conversations occurred?

19  A.    I can't precisely nail down the

20  times, the dates.

21  Q.    Generally, and I can break it up

22  for you if it is easier, did you have any

23  discussions with Mr. Meyers regarding

24  stock options at First Marblehead prior to

25  the time you were hired at First

104

HOUSE

2  Marblehead?

3      A.      No, I don't think so.

4      Q.      Did you have discussions with

5  Mr. Meyers about stock options during the

6  time you were employed at First

7  Marblehead?

8      A.      Certainly, yes.

9      Q.      Can you tell me as best as you

10  can recall the substance of the

11  discussions you had with Mr. Meyers about

12  stock options at First Marblehead while

13  you were employed there?

14      A.      Okay.  Prior to being -- or

15  to -- at around the time I was hired in

16  what you would characterize as

17  negotiations but --

18      Q.      Please don't try to characterize

19  what I am -- I am just asking you a

20  question.

21      A.      I am not saying you, Mr.

22  Demoura.

23      Q.      Okay.

24      A.      I am saying what most people

25  would characterize as negotiations but

105

1                              HOUSE
2    what I would characterize as just
3    conversations.
4         Q.      Okay.
5         A.      The subject came up in a very
6    general way, and I can't recall.
7         Q.      This was prior to your hiring?
8         A.      No, this was in the time
9    where -- where -- there was a time I
10   was --
11              MR. WANG:      Was it prior to your
12   hiring?
13        A.      Immediately prior.
14        Q.      Okay.
15        A.      Yes.
16        Q.      Tell me the substance of the
17   conversation as best you can recall.  You
18   told me it was a very general discussion.
19        A.      Yes.
20        Q.      Tell me what you recall.
21        A.      I recall a very general
22   discussion about we are going to issue
23   options at this company because if you
24   want to sum it up in the real substance of
25   it is because we don't -- we can't afford

106

HOUSE

1

2 to pay big salaries.  I am sure it wasn't

3 put that way.

4     Q.    Okay.

5     A.    So yes.  I was going to get

6 options if I came to this company.

7 Now --

8     Q.    Again, this is prior to the time

9 you actually joined the company?

10     A.    Technically, yes.

11     Q.    Other than that one general

12 discussion you are going to get options,

13 any other discussions you can recall prior

14 to the time you actually were hired with

15 Mr. Meyers?

16     A.    No, that is it.

17     Q.    Okay.

18           How about with anybody else at

19 First Marblehead prior to the time you

20 were hired?

21     A.    No.

22     Q.    Now, can you tell me as best as

23 you can recall, any discussions you had

24 with Mr. Meyers about stock options for

25 First Marblehead while you were actually

107

```
 1                    H O U S E
 2   employed at First Marblehead?
 3       A.     Yes.
 4       Q.     Okay.  Tell me.
 5       A.     Between the time of what we are
 6   characterizing as the negotiation period
 7   days prior to being an employee at First
 8   Marblehead and the time of the granting of
 9   the options I would say that there were
10   none.
11       Q.     There were none?
12       A.     That I can recall.
13       Q.     Okay.
14       A.     And --
15       Q.     How about from the date of the
16   grant until the time you left First
17   Marblehead?
18       A.     I cannot pin down the times that
19   we are associating with the grant.
20       Q.     Well, you just -- the reason I
21   am using that benchmark is because that
22   was the benchmark you just used in your
23   answer which was that you couldn't recall
24   any conversations from the time you joined
25   the company until the time the options
```

108

HOUSE

1

2 were granted with Mr. Meyers about stock

3 options; is that correct?

4     A.    Yes, but I just said that I

5 can't recall the date of the grant.

6     Q.    Okay.

7     A.    I said between time A and time B

8 nothing happened that I can recall.

9     Q.    Right.

10     A.    But time B I can't recall the

11 date.

12     Q.    But other than recalling the

13 date, do you recall having discussions?

14     A.    Yes.

15     Q.    What can you tell me about the

16 discussions with Mr. Meyers?

17     A.    Again, the date of the grant

18 escapes me, but -- and it was not a

19 particular date.

20     Q.    Right.

21     A.    There were a series of events.

22     Q.    All right.

23         Tell me what were the events

24 that you use as your benchmark here if not

25 dates.

109

HOUSE

1

2      A.      The main one and one that I

3  believe occurred first was some sort of

4  talk about we are going to issue

5  options -- options and maybe even that we

6  already have options issued, and we are

7  just going to reveal it pretty soon.  That

8  is the substantive discussion about

9  options.

10      Q.      And who did you have that

11  discussion with?

12      A.      I think that was a fairly firm

13  wide discussion.  Everybody knew this.

14      Q.      Yes.

15      A.      We have got options.  We have

16  talked about this before.  They are going

17  to be issued at some point, and it is

18  going to be soon.  Then we received -- I

19  believe -- I am certain that we received,

20  and I am not sure when we received it, a

21  piece of paper detailing what we owned and

22  the number of options that we owned and so

23  forth.

24      Q.      Okay.

25      A.      I believe that proceeded a third

110

1                          HOUSE

2    event.

3        Q.     What was that event?

4        A.     The announcement of a meeting to

5    discuss the options with Mr. Hoffman.  All

6    of these things I am sort of glomming

7    together into a grant, the period of the

8    grant.  Presumably options are a formal

9    agreement between an organization and the

10   individual, and they have a date and so

11   forth, but I am calling it the period of

12   the grant because I can't recall the dates

13   and -- and these events just happened in a

14   series.

15       Q.     And so far those events are sort

16   of general discussions around the office

17   that the options -- we are going to grant

18   options, and we are going to be granting

19   them soon and then a specific paper that

20   was given to you that told you how much

21   options you had?

22       A.     Yes.

23       Q.     And then an announcement that

24   there would be a meeting with Mr. Hoffman

25   to discuss options, correct?

111

1                    HOUSE

2     A.     Yes.

3     Q.     Any other events that you are

4  glomming, as you say, glomming together?

5     A.     Well, you asked me before what

6  discussions I had.

7     Q.     Right.

8     A.     That is my answer, that those

9  are -- this constitutes a discussion of

10  sorts.

11     Q.     Okay.

12            And these discussions were with

13  Dan Meyers?

14     A.     No, not necessarily, but --

15     Q.     They were with other people as

16  well at First Marblehead, correct?

17     A.     Yes.  As I say I think the firm

18  knew that we had options, that we were

19  going to get options.  This was an --

20     Q.     The firm, who is the firm?

21     A.     This was a small firm Mr.

22  Demoura.  It was 12 people or 14 people or

23  something like that, so it was an office

24  where people knew what was going on in

25  general.

112

HOUSE

1    

2    Q.    Um hum.

3    A.    If there would be an event like

4    this, people would just know it.

5    Q.    Okay.

6    A.    So I am sure it was discussed.

7    MR. WANG:  When you have a good

8    time for a short break, I need to make a

9    short phone call.

10    MR. DEMOURA:  Do you have a

11    time you have to make the call?

12    MR. WANG:  It was supposed to

13    be around noon time.  I don't want to

14    interrupt you if you are in the middle of

15    a question.

16    MR. DEMOURA:  Let me finish

17    this period.

18    Q.    So other than -- by the way, how

19    soon before the announcement of the

20    meeting with Mr. Hoffman did the actual

21    meeting take place, do you remember, with

22    Mr. Hoffman?

23    A.    How soon between --

24    Q.    Between the time there was an

25    announcement we are going to and the

113

                    HOUSE

1    meeting with Mr. Hoffman where we are

2    going to talk about options and the time

3    the meeting took place?

4        A.    I don't recall.

5        Q.    Was there a written memo sent

6    out announcing that we are going to have a

7    meeting with Rod Hoffman?

8        A.    Yes.

9        Q.    Do you recall about how long

10   between the time the first -- you know,

11   where people started talking about we are

12   going -- these options are coming and the

13   time of the Hoffman meeting, what period

14   of time are we talking about, months,

15   weeks, days in between the first and last

16   events?

17       A.    I can't put a precise time frame

18   on it.

19       Q.    How about an imprecise time

20   frame?

21       A.    It was seven years ago.

22       Q.    I understand that.

23       A.    I don't know.

24       Q.    Okay.

114

```
 1                    HOUSE
 2          The paper that you got that
 3   talked about your specific ISOs,
 4   what -- who gave you that piece of paper,
 5   do you remember?
 6          MR. WANG:   The question is who
 7   gave you the piece of paper.
 8      A.    I have a very vague memory that
 9   it was in a meeting with Ralph and Dan
10   together, but it is very vague.
11          MR. WANG:   Is now a good time?
12          MR. DEMOURA:   I just want to
13   show him one document.
14          MR. WANG:    That is fine.
15      Q.    I am showing you a document that
16   was marked at Ralph James' deposition as
17   Exhibit 4, and I am going to ask you, Mr.
18   House, is that the document that you are
19   referring to as a -- the specific paper
20   that told you how many options you had,
21   how many ISOs you had?
22      A.    Yes.
23      Q.    And that is the document that
24   you stated you believe you received --
25   vaguely recall receiving in a meeting with
```

115

1                           H O U S E

2      Mr. James and Mr. Meyers present, correct?

3           A.      That is correct.

4           Q.      And this the document that says

5      you have a grant of ISO shares, correct?

6           A.      Yes.

7           Q.      And ISOs are what?

8           A.      Incentive stock options I

9      believe that acronym is.

10               MR. DEMOURA:    Okay.  We will

11     take a break now.

12               (Recess taken.)

13     BY MR. DEMOURA:

14          Q.      Mr. House, I was showing you

15     Exhibit 4 to the James deposition.

16          A.      Right.

17          Q.      Now, as you sit here looking at

18     this document, do you recall where you

19     were when you received it?

20          A.      I have a vague memory that it

21     was in a meeting with Dan and Ralph, but I

22     am not certain about that.  I don't

23     remember where I was or where they were.

24          Q.      But it was an in person meeting,

25     correct?

116

HOUSE

1

2     A.     Yes, and it followed -- this
3     meeting in which I was given this
4     followed -- this was in this time frame of
5     the options grant that I talk of as a
6     period because I don't have a precise
7     memory.  There was no time where somebody
8     said this is what you got.  This was a
9     period of time in which facts were
10    revealed to us, and our agreement was
11    revealed to us.  This was one of those
12    events.  This proceeded I believe, but it
13    may have followed, I am pretty sure it
14    proceeded another event that I mentioned
15    that was the memorandum that we received
16    where it -- where it announced that a
17    meeting where the options would be
18    discussed.
19    Q.     The memorandum announcing that
20    Mr. Hoffman would be coming to discuss
21    that?
22    A.     Yes.  The memorandum I believe
23    contains other terms.  This does not
24    describe options precisely.  It only
25    describes the number of them, so we had

117

HOUSE

1
this discussion --

2
Q.    Let's stop here.  Let's go to

3
the next question.  The top of the

4
document says it is compensation review,

5
correct?

6

7
A.    Yes.

8
Q.    Do you recall that the purpose

9
of meeting with you and giving this

10
document was to discuss with you your

11
compensation review for the next year that

12
you were going to be employed there?

13
A.    No.

14
Q.    Did the company have customarily

15
an annual compensation review with its

16
employees to your recollection?

17
A.    Maybe.  I didn't.

18
Q.    Okay.

19
Well, you only worked -- you had

20
only worked there in June of '97.  You had

21
only been there about a year, correct?

22
A.    A little longer.

23
Q.    And do you recall whether or not

24
this was filled out while you were there

25
discussing your compensation with Mr.

118

                          H O U S E

James or Mr. Meyers or did they already

have it done and handed it to you?

     A.    I don't recall it either way,

but I think it probably was filled out.

     Q.    Okay.

           Now, when you saw it and you saw

that your salary was 70,000 and that there

would be some -- I will ask you this:

What did you think this was about?  What

did you -- why did you think this was

being given to you?

           MR. WANG:   I object to the form

of the question.  You may answer.  The

question is why did you think this was

being given to you.

     A.    I think that the main purpose

was to show that number.

     Q.    You pointed to a number --

     A.    The 2500 ISO shares granted.

     Q.    Okay.

     A.    I think the other stuff was a

little bit of a surprise.  I didn't know

it would be there.  I was --

     Q.    The numbers that you are focused

119

1                          H O U S E

2    on were the numbers that appear under the

3    subheading stock options, correct?

4         A.     Yes.

5         Q.     And they are ISO shares granted,

6    2500, correct?

7         A.     Yes.

8         Q.     Value of ISO shares of 31 per

9    share value $78,125, correct?

10        A.     Correct.

11        Q.     Now, do you know -- did you have

12   any discussions during the meeting when

13   you got this piece of paper about the

14   stock options and the grant?

15        A.     I don't recall the discussions

16   occurring at that time.  The discussions

17   definitely occurred, and they addressed

18   other substantive issues about the

19   options.

20        Q.     Okay.

21        A.     And I --

22        Q.     When do you recall those

23   conversations happening, before or after

24   you got the paper.

25        A.     After I got the paper, and the

120

                              HOUSE

1    main one was after I got the memo.  I

2    believe the memo served as the impetus for

3    the conversation.

4        Q.      Okay.  Let's not go there yet.

5        A.      Okay.

6        Q.      Let's focus our attention on the

7    meeting you had when you got this piece of

8    paper.

9            Other than getting this piece of

10   paper, do you recall any discussions

11   relating to the stock options?

12       A.      Sure.  Specifically, no.

13       Q.      Generally?

14       A.      Yes.

15       Q.      What?

16       A.      We were going to get stock

17   options.  I believe that I knew -- I don't

18   know that anyone else in the firm knew,

19   but I knew that the options would carry

20   the characteristics that they eventually

21   were found to carry; namely a 32 dollar

22   stock price and a ten-year term at that

23   point.  I could be wrong about this

24   because I wasn't always perfectly

121

HOUSE

1
2  knowledgeable about what other people were
3  being told.  You know, it was a small
4  office, but I don't necessarily pay
5  attention to what everybody else is
6  talking about.  I don't know that anybody
7  else knew that.  I knew it because in this
8  period of time in which the options were
9  being granted and this period when
10 discussions were being held I was the only
11 guy in the firm that knew anything about
12 pricing options for the most part.  Maybe
13 Steve knew some, but if he did, he wasn't
14 owning up to it.  He wanted me to price
15 the options, and he wanted me to address
16 the value in a general way.  And so Steve
17 is knowledgeable --
18     Q.    Steve Anbinder we are talking
19 about, correct?
20     A.    Yes, Steve is knowledgeable
21 about that in a general way.  Dan is
22 somewhat knowledgeable about it, but I
23 actually knew the math, so we talked about
24 that.  These options were going to have a
25 ten-year term.  They are going to have a

122

HOUSE

2    32 dollar stock price. What do you think

3    we can make them worth, and I am not

4    saying that in a nasty way. I am just

5    saying that was the discussion. That

6    number there, that 78,125 dollar number --

7        Q.    Yes.

8        A.    -- I don't believe that is

9    my -- the number that I assigned in those

10   discussions, and it is not because I

11   recall the number specifically, but

12   because I have -- I have priced options

13   with the same parameters since I found

14   this, and they don't fit, and I remember

15   the discussions being with assigning a 40

16   or 50 volatility, which is in financial

17   terms a parameter to an option pricing

18   model.

19       Q.    Okay.

20           Now, let me ask you a question.

21   Is there a difference between pricing puts

22   and calls options in the commodities

23   industry and incentive stock options?

24       A.    There can be.

25       Q.    The incentive stock options are

123

HOUSE

1

2  priced at the fair market value of the

3  company's stock, correct?

4      A.    No, that is what they appear to

5  have done, something like that here, and

6  that is just incorrect.  That 31 dollars

7  and 25 cents per share for an option,

8  well, a shade -- it is worth only a shade

9  less than the stock itself.  How does that

10  make any sense? Or a shade less

11  during -- worth only a shade less than

12  what they were claiming the stock was

13  worth.  Bear in mind that there was no

14  real reasonable certainty that anybody

15  could have -- that that the stock was

16  worth any number versus any other number.

17  From our standpoint, our company was a

18  black box with financial stuff underneath

19  it.  I was only asked to price the options

20  with parametric information I was given.

21      Q.    And what was parametric

22  information you were given?

23      A.    32 dollar strike price, a

24  ten-year term, and I believe my memory of

25  this is not perfect, but I believe it was

124

                    HOUSE

1  with a 40 volume.

2      Q.    So you were given all of this

3  information, these parameters?

4      A.    I wasn't given it.  I think I

5  probably came up with the volatility

6  number, but that is a -- I was given the

7  numbers that were applicable to this -- to

8  the options themselves that would be

9  presumably indisputable, 40 or 50

10 volatility.  That is certainly a

11 disputable number.  You can assign 20

12 volatility, 30 volatility, and it has a

13 big impact, but the parametric information

14 we are talking about was very specific, 32

15 dollar strike price, ten-year term.

16     Q.    Why would they need -- why would

17 you need to come up with a price if they

18 were giving you a price? They were giving

19 you a price at 32 dollars.  What was the

20 pricing information they were giving you?

21     A.    That is not an option price.

22 That is a stock price.  If I say to you,

23 Mr. Demoura, I am going to give you an

24 option to buy this building and you are

125

1                    H O U S E

2    going to pay a million dollars for it,

3    clearly the building is worth more than a

4    million dollars.

5        Q.     But I am buying an option,

6    right?

7        A.     You are buying an option.

8        Q.     Right?

9        A.     If I say the option is being

10   priced at a million dollars but you have

11   an option to buy the building at a hundred

12   billion dollars, you would say no, I am

13   not going to pay a million dollars for

14   that.

15       Q.     Let me ask you a question.  Were

16   you under the impression that you were

17   going to have to buy these options?

18       A.     No.

19       Q.     You were going to get the

20   options, correct?

21       A.     Right.

22       Q.     You were going to have to buy

23   shares, correct?

24       A.     No.

25       Q.     If you wanted to exercise your

126

HOUSE

1

2  options you would have to buy the shares,

3  correct?

4      A.    Evenutally but not then.

5      Q.    And the price would be the

6  strike price, correct?

7      A.    Yes.  That's correct.

8      Q.    And they gave that to you.  They

9  told you it was 32 dollars?

10      A.    Correct.  Now, you can do that.

11      Q.    So I guess what I am trying to

12  get at or trying to find out is why were

13  they asking you to price something if they

14  already had a price?

15      A.    Because they wanted to -- my

16  thought at the time that we were having

17  pricing discussions was that we would have

18  put a realistic number there.

19      Q.    There meaning on this sheet

20  where the value of ISO shares is listed as

21  125,000.

22      A.    My thought is they wanted --

23  they were telling employees we want to

24  give you something of value, and the value

25  is this number.  They didn't eventually do

127

1                    HOUSE

2    that I don't believe, and I don't know

3    why, but that was what the discussions

4    were centered around I thought.

5        Q.    Now, these discussions that were

6    occurring around pricing, do you know for

7    a fact that they were pricing discussions

8    relating to the ISO stock options for the

9    First Marblehead stock option plan?

10            MR. WANG:    Object to the form

11   of the question.  What do you mean know

12   for a fact?  Is that what he recalls?

13            MR. DEMOURA:    I will withdraw

14   the question.

15            MR. WANG:    I don't understand

16   the question.

17       Q.    You had some discussions with

18   Mr. Anbinder about pricing options,

19   correct?

20       A.    I think when Steve was missing

21   from Marblehead, I think discussions were

22   mainly with Mr. Meyers.

23       Q.    You had discussions with Meyers

24   and Mr. Anbinder?

25       A.    Yes.

128

1                        HOUSE

2        Q.      And those discussions occurred

3   at or around the time that we are talking

4   about here, the general firm-wide

5   discussions we are getting stock options

6   and then a specific meeting where you got

7   Exhibit 4 and then the announcement, to

8   Mr. Hoffman, these discussions occurred

9   all around that time?

10       A.      Yes, around that same time

11  frame.

12       Q.      During those discussions, was it

13  specifically related to you that the

14  reason -- what we want you to price are

15  the options that we are giving out as ISO

16  options in our '96 ISO plan?

17       A.      I don't think it was phrased

18  that way, but --

19       Q.      Was there an assumption --

20          MR. WANG:    He was in the middle

21  of an answer.

22       A.      I don't think it was phrased

23  that way.  I don't think they said this is

24  -- are going to be options according to a

25  special -- specifically delineated plan,

129

HOUSE

1
2       et cetera, et cetera.  They just said
3       these are going to our stock options that
4       we are going to issue to employees.  There
5       were no specifics --
6            Q.     So the pricing --
7                   MR. WANG:   Let him finish,
8       please.
9            A.     There was no specific -- as far
10      as I was concerned, these options were
11      that -- options that from a mathematical
12      standpoint could have been on the Chicago
13      board of trade, and we priced them that
14      way, and there was a standard variety
15      mathematical model for doing that.
16      Embedded in that model though is a set of
17      assumptions.
18           Q.     These parametric --
19           A.     These input parameters --
20           Q.     Parameters, right?
21           A.     -- have to be assumed or known.
22      Some are known, like 32 dollar strike
23      price and ten-year term, and some were
24      assumed.  One main one was assumed.
25           Q.     Which was?

130

HOUSE

1

2      A.      Volatility.  It is a standard

3  deviation number.

4      Q.      Okay.

5      A.      It says to the person pricing

6  the option that in ten years this stock

7  price can be in a certain range.  It is a

8  standard deviation number of returns.

9      Q.      Okay.

10     A.      And underneath that it says that

11  the stock can be in a certain range.  If

12  it is in a certain range below the stock

13  price, the options are worthless.  If it

14  is in a certain range above the stock

15  price, the options are worth whatever that

16  particular number minus the strike price,

17  so the process of pricing options is this,

18  is that mathematical integration of that

19  set of assumptions.

20     Q.      Have you ever priced options for

21  an incentive stock option plan before?

22     A.      Yes, when I was at First

23  Marblehead.  I didn't know it at the time.

24  I didn't put it that way.

25          MR. WANG:   No, Greg.  Slow

131

1                    HOUSE

2    down.  Other than what you --

3             MR. DEMOURA:   I don't want to

4    you phrase the question.  I will ask it

5    this way.

6       Q.    At the time you were pricing

7    options ever, did you know you were

8    pricing them for an incentive stock option

9    plan?

10      A.    Yes.

11      Q.    And when was that?

12      A.    At First Marblehead.

13      Q.    Other than that, any other

14   occasion?

15      A.    I have priced options many

16   times.

17      Q.    I am not asking you about other

18   options.  I am asking you about incentive

19   stock options.

20      A.    No.

21      Q.    Okay.

22      A.    I think that is fair.

23      Q.    Okay.

24            So the next event that occurs

25   after your meeting -- by the way, have you

HOUSE

1

2  now told me everything that you can recall

3  about the discussions that you had?

4      A.    No.

5      Q.    What else do you recall about

6  the discussions you had when you got

7  Exhibit 4?

8      A.    You are asking that narrowly and

9  saying when I received Exhibit 4.

10      Q.    That is exactly right.

11      A.    I don't recall the sequence of

12  events perfectly.

13      Q.    Okay.

14      A.    I recall receiving Exhibit 4.    I

15  recall receiving the memo announcement.    I

16  recall these discussions.

17      Q.    Okay.

18      A.    I can't put a precise date on

19  all those things.

20      Q.    I am not asking for a date.    I

21  don't know when this meeting occurred when

22  you got Exhibit 4.

23      A.    Now, when the memo -- when I

24  received the memo.

25      Q.    We will get to that in a minute.

133

HOUSE

2  I want to exhaust your memory.

3      A.      Yes, but --

4          MR. WANG:   You keep

5  interrupting him which is not fair.

6  Believe me I am not queuing the witness.

7  He is trying to tell you he does remember

8  certain conversations, but he doesn't

9  remember when he had them.  Either you

10  want to know about the conversations or

11  you don't.

12          MR. DEMOURA:   I do want to know

13  about the conversations.  I want to know

14  if he has any specific recollection --

15          MR. WANG:   Even the sequence of

16  conversations.  He has told you the

17  sequence of the conversations.

18      A.      When you say at this point, I

19  don't know if it happened at this point or

20  a little while following that.

21      Q.      Okay.

22      A.      So embedded in your question is

23  the assumption that I have already said

24  something that I said I don't know.

25      Q.      Okay.  Fair enough.

134

1              HOUSE

2          I am showing you a document that

3    was marked at Ralph James' deposition as

4    Exhibit 2.  I ask you if you recognize

5    that document.

6          (Document handed to witness.)

7    A.     Yes.

8    Q.     What is it?

9    A.     It is sort of a description of

10   how a day -- a day of meetings is going to

11   go I suppose.

12   Q.     Do you remember getting that?

13   A.     Well, Mr. Demoura, this comes

14   from me.

15         MR. WANG:   The question is do

16   you remember getting it?

17   Q.     Do you remember getting it?

18   A.     The specific moment when I

19   received it, reading it?

20   Q.     Right.

21   A.     Not anything particular about

22   it, no.

23   Q.     Is that the announcement you

24   were talking about when you said there is

25   a series of events.  You don't remember

135

HOUSE

1

2  dates, but you remember a series of events

3  where stock option issues were discussed

4  and the last of those events you mentioned

5  was an announcement that there would be a

6  meeting with Mr. Hoffman?

7      A.    Yes.

8      Q.    Is that the memo you are talking

9  about?

10     A.    It is not the memo I am talking

11 about.

12     Q.    It is not.  So there was yet

13 another --

14     A.    This announced the meeting, and

15 in that sense it is an announcement of the

16 meeting, but the memo I am talking about

17 it contains in it fairly descriptive

18 information about the options themselves.

19     Q.    So that wasn't a memo announcing

20 the fact that there would be a memo.  That

21 was a memo that was given out at the

22 meeting; is that right?

23     A.    I think it was given before the

24 meeting, but maybe it was at the meeting,

25 I don't recall.  I have already told you

136

HOUSE

1  that I -- that I have had a conversation

2  as a result of the memo that I am

3  remembering.

4      Q.      We will get to that.

5      A.      You keep saying we will get to

6  that but --

7      Q.      And we will, and I am trying to

8  help your attorney here keep you focused

9  on the questions I am asking.

10     A.      Okay.

11     Q.      Exhibit number 3 from the Ralph

12  James deposition, do you recognize that?

13     A.      Bingo.  Yes.

14     Q.      I told you we would get to it.

15     A.      Okay.  We are here.

16     Q.      Is this the memo you were saying

17  was the last of these series of events

18  that occurred surrounding the discussions

19  about the options?

20     A.      No.  It wasn't the last of the

21  series of events.

22     Q.      Okay.

23          It was the third event because

24  we have first general discussion --

137

1                             HOUSE

2       A.      Again, don't put -- you are

3    putting a -- a series of sequence numbers

4    here, and I am not able to do that

5    accurately.

6       Q.      We will let the earlier answers

7    speak for themselves about how you put

8    things, but, as I recall, there were

9    general firm-wide discussions about

10   getting options and getting them soon, and

11   then there was a specific meeting with

12   either Mr. Meyers or Mr. James or both of

13   them where you were given Exhibit number 4

14   to the James deposition.

15      A.      Yes.

16      Q.      And then there was the

17   announcement and meeting with Mr. Hoffman?

18      A.      Okay.  I think that is -- that

19   accurately describes my memory.

20      Q.      All right.

21             So now what I want you to do is

22   tell me as best as you can recall exhibit

23   number -- I am sorry -- exhibit number 3,

24   do you recognize that?

25      A.      Yes.

138

HOUSE

1

2       Q.      What is it?

3       A.      It is a memorandum from Ron

4   Hoffman that details the most complete

5   description of the -- of the options

6   that -- that we received at that time I

7   believe.  Everything else was

8   conversational.

9       Q.      Everything else except Exhibit

10  number 4 of the Ralph James deposition,

11  correct?

12      A.      Yes, the 2500 was in some sort

13  of thing you are calling the compensation

14  review.

15      Q.      And everything else except

16  Exhibit 2, correct?

17          MR. WANG:    Exhibit 2 is hardly

18  substantive.

19          MR. DEMOURA:    I don't want you

20  to characterize what it is or isn't.

21      A.      Mr. Demoura, I characterize this

22  as the announcement of the meeting.

23      Q.      And then Exhibit number 3 is the

24  actual memo that you are saying sets forth

25  some of the terms that -- to the ISO,

139

HOUSE

2    correct?

3        A.    Some more of the terms of the

4    option plan, yes.

5        Q.    Okay.

6            Does the memo encompass all of

7    the terms of the option plan?

8            MR. WANG:    I object to the form

9    of the question.

10       A.    No.

11       Q.    Can you recall as you sit here

12   today the actual meeting that you had with

13   Mr. Hoffman?

14       A.    No, I can't.

15       Q.    Okay.

16           Do you recall was it a

17   one-on-one meeting with you and Mr.

18   Hoffman or was it a meeting with

19   the -- with several of the employees?

20       A.    I don't recall.  I just said I

21   don't recall anything about the meeting

22   itself.

23       Q.    You don't recall anything about

24   it?

25       A.    It is very vague, very vague.

140

1                           H O U S E

2    It would have been a meeting though since

3    it -- this memo presumably went to -- this

4    memo went to everybody.  It would have

5    been a meeting with not just me.  It was

6    not a meeting for me, and I can't recall

7    anything about it.  It was clearly not for

8    me though.  This was to describe the

9    option plan to the employees.

10        Q.    And you were one of the

11   employees who was --

12        A.    Yes.

13        Q.    -- who the option plan was being

14   described to, correct?

15        A.    Yes.

16        Q.    Do you recall any of the other

17   employees who were at the meeting?

18        A.    No, I can't recall anything

19   about the meeting substantively, no.

20        Q.    And you can't recall who was

21   there or who wasn't there, correct?

22        A.    No.

23        Q.    Other than the fact that Mr.

24   Hoffman was there, correct?

25        A.    Mr. Hoffman was presumably

141

                    HOUSE

1

2    there, but I don't have -- you are asking

3    me for a picture in my mind of this, and I

4    don't have it.

5        Q.    Okay.  If you don't have one,

6    just say you don't recall.

7        A.    Okay.

8        Q.    Now, you mentioned that after

9    you got what has been marked as Exhibit 3

10   of the James deposition that there

11   were -- you had some discussions, correct?

12       A.    Yes.

13       Q.    As best as you can recall, who

14   did you have discussions with after you

15   received Exhibit 3?

16       A.    Dan Meyers.

17       Q.    Was anybody else present?

18       A.    No.

19       Q.    And do you recall --

20       A.    Not in person.

21       Q.    Do you recall how soon after the

22   meeting with Mr. Hoffman you had that

23   meeting with Mr. Meyers?

24       A.    I think it may have been before

25   the meeting with Mr. Hoffman that I had

142

1                         H O U S E

2    the meeting with Mr. Meyers because I

3    believe that was the impetus for it.

4         Q.    That -- you are pointing at

5    Exhibit 3?

6         A.    Yes.

7         Q.    So you believe that the

8    memorandum, Exhibit 3, was actually given

9    to you prior to the meeting with Mr.

10   Hoffman?

11        A.    I believe so.

12        Q.    Do you know whether it was

13   distributed firm-wide prior to the meeting

14   with Mr. Hoffman?

15        A.    I don't know that.  I assume it

16   was since it was sort of -- I think it is

17   sort of addressed that way to the

18   employees of First Marblehead, but I

19   couldn't tell you if anybody received it.

20        Q.    So you don't know whether or not

21   you went to speak to Mr. Meyers after or

22   before the meeting with Mr. Hoffman, but

23   you do know for sure that your meeting

24   with Mr. Meyers occurred after you got

25   Exhibit 3, correct?

143

1          HOUSE

2     A.     Yes.   It was -- yes, it is the

3 impetus for it.

4     Q.     That was the reason you went to

5 talk to Mr. Meyers, correct? You have to

6 answer yes or no.

7     A.     Yes.

8     Q.     Okay.

9     A.     Since I don't recall the time

10 sequence of these things all that well, if

11 we received this at the meeting I went to

12 to talk to Dan about it.  If we received

13 it before the meeting, I went to talk to

14 Dan about it.  If we received it after the

15 meeting, I went to talk to Dan about it,

16 but that was why I went to talk to Dan.

17     Q.     Tell me as best you can recall

18 your conversation with Mr. Meyers after

19 you got Exhibit 3 to the James deposition?

20     A.     I was -- I was volcanic, and

21 I -- it turned out the result of the

22 conversation is that I was embarrassed

23 about it.

24     Q.     Okay.

25          Why were you volcanic?

144

1                    H O U S E

2      A.      Because the memorandum announced

3   a feature of the options that I found

4   offensive in that I -- I don't recall the

5   vesting schedule exactly, but the options

6   were not mine immediately, and that upset

7   me.

8      Q.      It upset you that the option

9   plan that Mr. Hoffman had described in the

10  memorandum Exhibit 3 had a vesting

11  schedule, correct?

12     A.      Yes, and that was not what I had

13  been led to believe.

14     Q.      Who led you to believe

15  otherwise?

16     A.      Dan.

17     Q.      How?

18     A.      When these general discussions

19  were being had about options, there was

20  never any mention of a vesting schedule.

21  That would certainly change the pricing of

22  the options.  It would change the basic

23  characteristics of the options in a

24  fundamental way, and in order to price

25  them properly one would have to take

145

HOUSE

1

2  those -- that into account.  I think that

3  Dan and Steve are sufficiently

4  sophisticated financially that if these

5  characteristics had in fact applied they

6  would have said so.  They would have

7  intuitively known.

8      Q.    This is an assumption you are

9  making now.  I don't want you to assume

10  anything.  I want you to tell me what was

11  said.

12      A.    What was said.  The stock

13  options have a 32 dollar strike price and

14  a ten-year term, and we are going to price

15  them with after discussion of 40

16  volatility and whatever rate assumption we

17  can make.  There were no extra terms

18  involved at all in the pricing

19  discussions.  If there should have been,

20  there would have been I believe.

21      Q.    Stop there.

22      A.    That was the basis for my

23  assumption.

24      Q.    Okay.

25          What was said other than what

146

1                              HOUSE

2     you just said, not assumptions about what

3     should have been said or maybe they were

4     thinking?  What was said other than that,

5     anything in terms of the parameters of how

6     you were going to price the stock?

7         A.      Well, there were -- the

8     parameter discussion probably lasted a

9     while.

10        Q.      Okay.

11        A.      Because it had to make

12    assumptions.

13        Q.      Okay.

14                We are going to take a

15    two-second break, and we should break for

16    lunch by 1.

17                MR. PECK:   This will take one

18    second.

19                (Recess taken.)

20    BY MR. DEMOURA:

21        Q.      I want to go back to the meeting

22    that you had with Mr. Meyers after you got

23    Exhibit 3 to the James deposition where

24    you described yourself as being volcanic.

25        A.      Yes.

147

**HOUSE**

1

2      Q.     Can you tell me as best as you

3   can recall the substance of the

4   conversation you had with Mr. Meyers at

5   that meeting?

6      A.     It was very short, and that is

7   why I was embarrassed.  I walked in, and I

8   believe I said something along the lines

9   of what the hell are these -- is this

10   vesting, Dan.  That was the substance of

11   my concern.  Why should my options be

12   vested.  You know, I then -- how I put

13   it -- I was angry, and I said something

14   along that line and conveyed to him that

15   why are you doing this to me, you know.

16   That is -- that is why I was mad.

17      Q.     Okay.

18      A.     The reason I was not -- I became

19   sort of embarrassed is because Dan

20   capitulated on that in a heartbeat.  He

21   said you are right, Gregory.  Let's call

22   Rod Hoffman, and he called -- he conversed

23   with him, and I don't know how that

24   worked, and he told Rod to alter the

25   vesting characteristics of my options, and

148

HOUSE

1

2  I was embarrassed, so I made a fool of

3  myself.

4      Q.    So that all happened in one

5  meeting?

6      A.    Yes.

7      Q.    You walked in angry about the

8  fact that the -- the fact that you were

9  going to get -- were going to include a

10  vesting schedule, and Mr. Meyers said you

11  are right.  They shouldn't include a

12  vesting schedule, and we will take care of

13  that, correct?

14      A.    And he did so at that moment

15  while I was in the room.

16      Q.    Okay.  By the way, we have been

17  talking a little bit about pricing and,

18  you know, whatever Mr. Meyers or Mr.

19  Anbinder requested that you do in

20  connection with that?

21          The fact is that there is a

22  difference between -- the pricing was

23  already decided.  The strike price was

24  decided of 32 dollars, correct?

25      A.    That is not a price.  That is

149

HOUSE

2  just a parameter of an option.

3      Q.     That is the price of the shares,

4  correct?

5      A.     Yes.

6      Q.     What you were being asked to do

7  was try to find out the value of the

8  option, correct?

9      A.     Yes.

10      Q.     And that is so that -- so that

11  is different than -- you weren't being

12  asked to price the shares.  You were asked

13  to price the options or value the options?

14      A.     Exactly and --

15      Q.     Okay.

16      A.     Precisely right.

17      Q.     Okay.

18          Anything else you can recall

19  about your meeting with Mr. Meyers

20  at -- where you talked about the vesting

21  issue? We will call it the volcanic

22  meeting.  I like that term.

23          MR. WANG:   I knew you would.

24      A.     I am trying to recall anything

25  else that I can tell you, and I can't.

150

HOUSE

1

2      Q.     You recall that during that

3  meeting Mr. Meyers picked up the phone and

4  called Rod Hoffman?

5      A.     Yes, correct.

6      Q.     And were you there when you

7  spoke to Mr. Hoffman?

8      A.     Yes, I couldn't hear Rod speak,

9  but I was there.

10     Q.     What do you recall Mr. Meyers

11  saying?

12     A.     I can't recall the specific

13  words.  I just know that it dealt with the

14  issue that we had just addressed.

15     Q.     In other words, instructing Mr.

16  Hoffman that to the extent there is a

17  vesting schedule it doesn't apply to Mr.

18  House, correct?

19     A.     I think he -- he probably put

20  vest Greg's options immediately.

21     Q.     Okay.

22     A.     And probably in terms that

23  simple.

24     Q.     Other than changing the vesting

25  during that meeting with Mr. Meyers, was

151

HOUSE

1
2      there a discussion about making any other
3      alterations to the ISOs that you were
4      getting from First Marblehead?
5          A.    No.
6          Q.    And other than that other than
7      instructing Mr. Hoffman to have your
8      shares vest immediately, did he give Mr.
9      Hoffman any other instructions while you
10     were listening about making any other
11     changes to the ISO that you were granted?
12         A.    Not that I can recall, no.
13             MR. DEMOURA:    Let's break for
14     lunch.
15             (Luncheon recess: 12:55 p.m.)
16
17
18
19
20
21
22
23
24
25

152

HOUSE

A F T E R N O O N    S E S S I O N.

1:40 p.m.

G R E G O R Y    J A M E S    H O U S E,

resumed.

CONTINUED EXAMINATION

BY MR. DEMOURA:

    Q.    I want to go back to your resignation from First Marblehead for a minute, Mr. House.

    I believe this morning when you testified you said that at the -- on the last day you were there you recall that you left in anger; is that right?

    A.    Yes.

    Q.    Do you remember why you were angry?

    A.    Yes.

    Q.    Why?

    A.    We addressed this a little bit too, but there was a dispute -- not really a dispute.  A matter relating to an expense report that I had not filed.  My memory is that it was for $12,000, roughly in that neighborhood.  Dan was

153

**HOUSE**

1

2  volcanic --

3           MR. WANG:    The word of the day.

4     A.    -- over the accounting details

5  relating to that filing.  He was not

6  volcanic.  He was apoplectic, and I didn't

7  really understand why.  I thought yes, I

8  had made a little bit of a mistake here in

9  letting this go for a while, but First

10  Marblehead and Dan himself did not dispute

11  anything about the expense report.  They

12  knew that the computers that I had bought

13  were on people's desks.  They knew that I

14  had paid for them for a good reason with

15  my own credit card because it was double

16  the warrantee.  There was no disagreement

17  about any of that stuff.  It was about

18  whether or not that filing should have

19  been made earlier, which I didn't dispute

20  that it should have been, but it wasn't,

21  and he was angry that it had to be -- that

22  the firm had to jump through some hoops in

23  some way that I didn't understand then or

24  now regarding the movement of the -- or

25  the placement of the accounting details in

154

HOUSE

1
2    some period or some other period.  He was
3    angry about that.  I became frustrated
4    with that, and I believe I made a -- an
5    intemperant remark to Dan about it, and
6    that is what set me off, and I think that
7    is what set him off to the stratosphere,
8    but that is what sent me out of the
9    office, his getting angry about this
10   trivia was what sent me out of the office,
11   and I left in anger, and I believe that
12   was the last day I was there.
13       Q.    Do you recall writing any
14   memoranda or other document to Dan or the
15   company regarding that after the fact,
16   after you left?
17       A.    Yes, I do recall writing it. I
18   am -- what I am not sure about is whether
19   or not I actually would -- whether or not
20   the version that I had that I submitted
21   for -- you asked me earlier if I looked
22   for things on my computer and I found
23   that.  It was a memorandum or it was a
24   really kind of a just a letter trying to
25   be conciliatory about it, and I think that

155

                              HOUSE

1

2    probably if I said that it had to have

3    been before that last day because I don't

4    think I would have sent it after that, but

5    it was a nice letter I thought and

6    essentially apologizing for not filing the

7    expense report and what have you.

8        Q.    Okay.

9              So that memo was -- your

10   recollection is that memo was prepared

11   prior to you -- to the date you left in

12   anger?

13       A.    Yes.

14       Q.    Okay.

15             But you don't know whether or

16   not you sent it?

17       A.    I think I did, but I am not

18   sure.

19       Q.    Do you recall having any

20   discussions with anyone at First

21   Marblehead about that memo?

22       A.    Which memo?

23       Q.    The one you just described as

24   having sent.

25             MR. DEMOURA:  Why don't we just

156

1                          HOUSE

2    mark it as an exhibit.

3              (House Exhibit 1 marked for

4    identification.)

5         Q.    I am showing you, Mr. House, a

6    document that has been marked Exhibit 1

7    for your deposition, and also for the

8    record it was produced with Bates stamp

9    number GH 00342.

10             Do you recognize that?

11        A.    Yes.

12        Q.    Is that the memo you were just

13   talking about that you sent or that you

14   found on your computer and produced?

15        A.    Yes, I think so.

16        Q.    Does looking at that refresh

17   your memory about whether or not you

18   actually sent it to anyone at First

19   Marblehead?

20        A.    It refreshes my memory as to why

21   I have an unclear memory.  It is unsigned,

22   and that is why I don't know if I sent it

23   or not.

24        Q.    Okay.

25             So you don't know whether or not

157

HOUSE

1                     HOUSE

2   you sent it?

3      A.    I don't know.

4      Q.    And you don't recall, as you sit

5   here today, having any conversations with

6   anybody at First Marblehead about that

7   memo, correct?

8      A.    Yes, I don't recall any

9   conversations about the memo.

10      Q.    It is dated February 26, 1998.

11   I believe the documentation that has been

12   produced in the case indicates that your

13   last date at First Marblehead was February

14   28, 1998.

15      Do you recall that -- whether or

16   not at any time between the day you gave

17   your notice, which you testified was two

18   weeks before your last day there, and the

19   last day that there were any

20   discussions -- other than the last day

21   when you went out in anger about your

22   expense reports?

23      A.    Yes, there were.

24      Q.    Okay.

25      Can you tell me about those?

158

HOUSE

1

2    A.    I can't tell you the details of

3    the discussions.  I know that they took

4    place because there wasn't any dispute

5    about the money, and I got paid.

6    Q.    When did you get paid, while you

7    were still employed there?

8    A.    I am pretty sure.  Yes.

9    Q.    Okay.

10    A.    I don't recall exactly, but I am

11    pretty sure.

12    Q.    Okay.

13    Earlier in the day you mentioned

14    that you had not received any stock

15    options from any other employer other than

16    First Marblehead, correct?

17    A.    Correct.

18    Q.    Do you know whether or not any

19    of those employers that you have listed on

20    your answers to interrogatories offer

21    stock options to employees?

22    A.    I don't know.

23    Q.    At the time you were employed

24    with any of those employers, were you ever

25    advised that we have a stock option plan,

159

HOUSE

1
2  and you may be eligible for stock options?

3      A.    No.   I -- I take that back.   I

4  believe ABN Amro may have had a stock

5  option plan.

6      Q.    Did you ever see it?

7      A.    No.

8      Q.    Did you ever tell Mr. Meyers

9  that you had options that you were leaving

10  at ABN Amro when you were going to accept

11  the position at First Marblehead?

12      A.    Okay.   I think I understand your

13  question, but you can phrase it more

14  precisely.

15      Q.    I am sorry.   It is a bad

16  question.   I will take it out and shoot

17  it.

18          Do you recall ever at any time

19  having a discussion with Dan Meyers in

20  which you told him when I left my prior

21  employer to come here and join First

22  Marblehead I had to give up stock options

23  at that company?

24      A.    No, I don't recall saying that.

25      Q.    Or in sum or substance saying

HOUSE

1

2    that?

3    A.    No.

4    Q.    The day that you had a

5    discussion with Mr. Meyers again going

6    back to the volcanic meeting when you

7    found out that there was a vesting

8    schedule, and you went in and talked to

9    him about it.

10    Was there any discussion about

11    why he had or why the company had given

12    you a vesting schedule?

13    A.    Okay.  I am going to ask you to

14    phrase that more precisely again.

15    Q.    Okay.  Earlier today we talked

16    about a meeting you had with Mr. Meyers.

17    It is the same meeting or during the

18    meeting he called Rod Hoffman and said

19    have Mr. House's stock vest immediately.

20    So we are at that meeting now.  Okay.

21    A.    Yes.

22    Q.    Was there any discussion after

23    you came in the room and said I don't

24    want -- I don't agree with having a

25    vesting schedule, was there any discussion

161

                              HOUSE

1  between you and Mr. Meyers about why they

2  had initially put a vesting schedule in

3  there?

4      A.    No.

5          MR. WANG:    I object to the form

6  of the question.  Sorry.

7      Q.    Do you recall any other -- do

8  you recall why Mr. Meyers -- did

9  Mr. Meyers tell you why he agreed to let

10 you allow your stock to vest immediately?

11         MR. WANG:    I am sorry.  Did you

12 tell Mr. House why he agreed to it?  Is

13 that the question?

14         MR. DEMOURA:    Yes.

15     A.    Let me rephrase it in the way

16 that I understand it.

17     Q.    Yes.

18     A.    I go into to Dan and I tell him

19 I don't want my options vested.  He says

20 okay.  You are asking if he explained why

21 he said okay?

22     Q.    Exactly.

23     A.    He didn't.

24     Q.    Was there a give and take; was

162

HOUSE

1  there an argument about it?

3      A.      When I said earlier that I was

4  embarrassed at being angry, the reason I

5  was embarrassed was because he said okay

6  so readily, and I thought I -- I should

7  have come in in a more conciliatory

8  manner.

9      Q.      So there was no discussion or

10  debate about it?

11      A.      None.  It happened in a

12  heartbeat.

13      Q.      Had there been prior discussions

14  about the fact that your options should

15  vest immediately with Mr. Meyers before

16  that day?

17      A.      No, and if there had been, I

18  probably wouldn't have been so angry about

19  it.

20      Q.      Okay.

21      A.      That is why I was angry because

22  it came as such a surprise.

23      Q.      Okay.

24          What were the tasks that you

25  were assigned to do when you joined First

163

1                    H O U S E

2  Marblehead?

3      A.    The way you are asking the

4  question suggests that the process was

5  much more formal than it was.  I would

6  characterize it as I was hired to do smart

7  things.

8      Q.    Okay.  What --

9      A.    I was a smart guy.  They were

10  hiring a smart guy to do smart things.

11      Q.    What smart things were they

12  hiring you to do?

13      A.    A wide variety of things.  Can

14  you be more specific?

15      Q.    I really can't.  I wasn't there.

16  Sorry.

17      A.    Okay.  I can layout examples.

18      Q.    Okay.

19      A.    Earlier we talked about Steve's

20  activities with the consultant, et cetera,

21  et cetera.

22            MR. WANG:   Greg, just answer

23  what tasks you were given to do.  It is as

24  simple as that.

25      A.    Okay.  Tasks previously

164

HOUSE

2  performed by Steve Anbinder and were

3  fairly explicitly assigned to me and

4  assigned to me in a way to have me make

5  them more robust and make them work if the

6  firm God for bid ever succeeded.

7          For example, he wrote

8  spreadsheets to do things.  Spreadsheets

9  are not a reasonable way for a large

10  financial firm to operate in most

11  respects.  He wrote a spreadsheet to

12  value -- to present information on a

13  student's loan to the student.  That was

14  kind of a big one.  He -- I designed and

15  constructed and maintained a database of

16  student loan information.  I reported

17  information to the Securities And Exchange

18  Commission regarding the trusts, the

19  behavior of the loans owned by the

20  National Collegiate Trust.  All of this in

21  a general way in the arena of, you know,

22  applying technology to financial problems.

23  That is what I was assigned to do, and

24  that is what I did.

25      Q.    Were there specific projects

165

1                          HOUSE

2    that you were given?

3         A.     Yes.

4         Q.     One that comes to mind is a GATE

5    project or --

6         A.     Well, that is like saying the

7    First Marblehead project.  I mean GATE is

8    an acronym for Guaranteed Access to

9    Education.  That described their -- I

10   think that to this day as far as I know

11   describes -- is the acronym they applied

12   to their loan program.  It is the whole

13   thing.

14        Q.     Okay.

15               You certainly weren't charged

16   with the whole loan program.  I understand

17   that, but were you charged with developing

18   more sophisticated computer programs that

19   would help First Marblehead provide the

20   services it was providing to its

21   customers?

22        A.     Yes.

23        Q.     Did you do that?

24        A.     Yes.

25        Q.     Did the projects that you were

166

**HOUSE**

1

2    assigned to do that ever get done?

3        A.      Absolutely.

4        Q.      Were there any assignments that

5    you were given that didn't get done?

6        A.      Nothing major, no, and so -- no.

7    I think that I accomplished what I went

8    there to do and would have worked in a

9    continuing way on the same kinds of

10   things, but there certainly was not any

11   kind of big pending thing that didn't get

12   done.

13       Q.      Okay.

14           Have you filed any personal

15   financial statements in the last -- have

16   you filed any personal financial

17   statements since you were granted the

18   options sometime in June, July of '97

19   period?

20       A.      What do you mean filed personal

21   financial statements?

22       Q.      Have you prepared any personal

23   financial statements listing your assets

24   and liabilities?

25           You know what a personal

167

HOUSE

1
2    financial statements is, don't you?
3        A.    I am not sure I know what you
4    mean in your context.
5        Q.    I mean a statement that
6    indicates your personal financial
7    condition, namely your assets and your
8    liabilities.
9        A.    I don't think so.  I mean why
10   would I do that?
11            MR. WANG:    Gregory --
12       Q.    You might do it because you are
13   applying for a loan.
14            MR. WANG:    Mr. Demoura, he
15   asked you a question.  You shouldn't be
16   answering his questions.  I was going to
17   say don't ask questions.  You are going to
18   answer questions, and you, Mr. Demoura,
19   you ask questions.
20       Q.    Did you file any type of
21   document like that -- have you applied for
22   any loans, for example, since you received
23   the grant of options?
24       A.    Yes.
25       Q.    Can you tell me what loans you

168

```
 1                      H O U S E
 2    have applied for?
 3         A.    I got a mortgage on my house.
 4         Q.    The house in Colorado?
 5         A.    Yes.
 6         Q.    Is it the same mortgage you
 7    currently have?
 8         A.    Yes.
 9         Q.    Do you have the documents that
10    you submitted to the bank in order to get
11    the mortgage still?
12         A.    Yes, but you are --
13         Q.    Don't yes but.  Do you have the
14    documents or not?
15         A.    In New York, no.  They are in
16    Colorado.
17         Q.    Okay.
18               Are they --
19         A.    They weren't financial
20    statements that you are describing.
21         Q.    I am not asking you about
22    financial statements.  I am asking you
23    whether or not you applied for any loans.
24         A.    Yes.
25         Q.    And one loan you applied for was
```

169

### HOUSE

1

2  the mortgage you have on the house in

3  Colorado, correct?

4      A.    Yes.

5      Q.    Who is that with?

6      A.    The loan is -- the mortgage is

7  held or serviced by National City Mortgage

8  of Dayton, Ohio I believe.

9      Q.    And is that the company that you

10  actually got the mortgage with originally?

11      A.    No, I actually handled all the

12  administrative details with a mortgage

13  broker.

14      Q.    Where?

15      A.    In -- I am having trouble with

16  the address because I am not sure if it is

17  in Denver or in Englewood.

18      Q.    In any event, it is in Colorado?

19      A.    Yes.

20      Q.    And you said you still have

21  copies of that documentation except not in

22  your personal possession right now,

23  correct?

24      A.    Yes, correct.

25      Q.    So you have a storage facility

170

1              HOUSE

2    in --

3        A.    My house.

4        Q.    You have a house in Colorado?

5        A.    Yes.

6        Q.    And there are personal papers of

7    yours at your home?

8        A.    There is practically everything

9    I own there.

10        Q.    Did you conduct a search of your

11    home in Colorado before you produced the

12    documents that we requested in this case?

13        A.    No, I wasn't there.

14        Q.    Does anybody else have access to

15    that -- to that home in terms of a key to

16    get in or --

17        A.    I am not sure.  I don't think

18    so.

19        Q.    Is anybody taking care of the

20    property for you?

21        A.    The reason why I am not sure is

22    because Ava Blum was my next door

23    neighbor, and she had a key.  She moved

24    away, so --

25        Q.    In any event, you have personal

171

HOUSE

1

2  papers, and you have testified that

3  virtually everything you own is located in

4  that house, correct?

5      A.    Yes.

6      Q.    I would ask for purposes of this

7  case that you do a search of the

8  property -- of your personal papers at

9  that home to see if there are any

10 documents responsive to the request I made

11 in the case.

12     A.    Could I speak to my attorney for

13 a second?

14         MR. WANG:   You don't have to

15 respond.  He is a making a request.  We

16 will respond.  He will confirm the request

17 in a letter, and then we will respond.

18 That wasn't a question to you.

19     Q.    But you believe that within the

20 papers you have in Colorado would be the

21 paperwork that was submitted by you in

22 connection with applying for a mortgage,

23 correct?

24     A.    Yes.

25     Q.    Any other loans you have applied

172

HOUSE

1

2      for since --

3          A.      No.

4          Q.      -- 1997?

5          A.      No.

6          Q.      Have you had to file any

7      personal financial information in

8      connection with obtaining any professional

9      licenses since 1997?

10         A.      No.

11         Q.      Did you have to file a personal

12     financial statement in connection with

13     your divorce proceedings involving

14     Jennifer House in Essex Superior Court in

15     Massachusetts?

16         A.      I don't recall, and I don't

17     think so.

18         Q.      I will tell you that you did,

19     and I will also tell you that the court

20     will not let me obtain a copy of it

21     because they impound personal financial

22     statements, but I will request that that

23     personal financial statement be produced

24     or that I be given permission to receive

25     it by Mr. House.