173

**HOUSE**

1

2       MR. WANG:    We will take all

3  your requests under advisement.  You will

4  confirm them in a letter as we did with

5  you, and we will respond to them.

6       Q.    By the way, Mr. House, you did

7  divorce Jennifer House, correct?

8       A.    Yes.

9       Q.    When was the last time you spoke

10  with Jennifer House?

11       A.    I am having trouble with the

12  precise date, but I think I know it, and I

13  believe it is April 7, 1998.

14       Q.    April 7, 1998?

15       A.    I am sorry.  April 7, 1999 was

16  the date of our divorce.

17       Q.    That is the day you were in

18  court getting your divorce, correct?

19       A.    Yes.

20       Q.    And the day you submitted your

21  personal financial statement and

22  separation -- settlement agreement with

23  the court, correct?

24       A.    I don't recall submitting any

25  personal financial statement in that

174

HOUSE

context at all.

    Q.    When did you last live with Jennifer House?

    A.    Around the time that I was leaving First Marblehead we planned to move to Chicago, and we wound up divorcing.

    Q.    Well, you left First Marblehead February 28, 1998, correct?

    A.    Um hum.

    Q.    You have to say yes or no. Sorry.

    A.    Yes.

    Q.    And the divorce papers you filed indicate that the last day you lived together was March 1, the next day, of 1998.

    Does that refresh your memory as to how long it was after you left? Is that consistent with your memory that you basically left the company and left your wife at the same time?

    A.    No.  It is absolutely false.

    Q.    It is absolutely false.

175

**HOUSE**

1

2        MR. DEMOURA:   Mark this as the

3  next exhibit.

4        (House Exhibit 2 marked for

5  identification.)

6    Q.   Showing you a document that has

7  been marked as Exhibit 2, Mr. House, I

8  represent to you that I obtained that

9  document from the Essex County Superior

10  Court in Massachusetts.

11        Is that your signature on that

12  document?

13    A.   Yes.

14    Q.   Is that your affidavit?

15    A.   Yes.

16    Q.   Does it say the last time you

17  lived together with Jennifer House was

18  March of 1998?

19    A.   Yes.

20    Q.   Was it true when you signed it?

21    A.   It is true.  It does not

22  describe what you described.

23    Q.   I didn't ask you anything.

24    A.   You said if I --

25    Q.   That was two questions ago.  The

176

1          HOUSE

2    question I just asked was was that true?

3        A.    Yes.

4        Q.    The last day you lived with her

5    was March 1, 1998?

6        A.    Yes.

7        Q.    Did she know you were moving out

8    to Chicago?

9        A.    Yes.

10       Q.    How long prior to March 1998 did

11   she know?

12            MR. WANG:    What is the

13   relevance of this?

14            MR. DEMOURA:    It could

15   reasonably lead to admissible evidence.

16            MR. WANG:    Just give me a

17   glimmer.  I can direct him not to answer.

18            MR. DEMOURA:    You can object.

19            MR. WANG:    I can direct him not

20   to answer.  I can call a halt to the

21   deposition and seek a ruling with respect

22   to that.  Do you want to do that? I can do

23   that.

24            MR. DEMOURA:    Do you want to do

25   that?

177

```
 1                    H O U S E
 2         MR. WANG:   What I would prefer
 3   to do is because I think it is a more
 4   mature way to proceed is I want you to
 5   give me a glimmer of what you think this
 6   could lead to, just the subject matter of
 7   what it could lead to.  Not the subject
 8   matter,  the --
 9         MR. DEMOURA:   I think it goes
10   to the credibility of the witness of how
11   much notice he gave anybody about leaving
12   to go to Chicago.
13         MR. WANG:   That has to do with
14   what?
15         MR. DEMOURA:   He testified he
16   was leaving the company by a certain date.
17         MR. WANG:   What is the
18   relevance to any issue in this case?
19         MR. DEMOURA:   I don't have to
20   tell you that.
21         MR. WANG:   I think you do
22   because you are dealing with
23   somebody's --
24         MR. DEMOURA:   Are you going to
25   direct him not to answer?
```

178

HOUSE

1

2      MR. WANG:  You are dealing with

3  somebody's personal affairs of that

4  nature, and I think you are being

5  gratuitously evasive.

6      MR. DEMOURA:   It is a public

7  document that I obtained from the court.

8      MR. DEMOURA:   Are you going to

9  direct him not to answer the question?

10      MR. WANG:   Yes.

11      MR. DEMOURA:   So that we can

12  proceed.  Just say you are going to direct

13  him not to answer, so we can proceed.

14      MR. WANG:   I direct him not to

15  answer the question.   That is fair.

16      Q.    In your interrogatories, you

17  identified a gentleman named Kevin Walker

18  as someone who might have information or

19  possess information relative to this

20  action.

21      Do you know who Kevin Walker is?

22      A.    Yes.

23      Q.    Who is he?

24      A.    He was a First Marblehead

25  salesman.

179

HOUSE

1

2      Q.      And what information do you

3   believe he has that is relevant to this

4   case?

5      A.      He was one of the people who was

6   I believe granted options.

7      Q.      Have you had any discussions

8   with him about stock options?

9      A.      No.

10      Q.      I am sorry?

11      A.      No.

12      Q.      Have you had any discussions

13   with him since requesting -- requesting

14   the right to exercise your options in this

15   case?

16      A.      No.

17      Q.      When was the last time you

18   talked to Kevin?

19      A.      Probably the date I left or

20   thereabouts.  No, I am sorry.  I believe

21   he may have -- Kevin Walker left the

22   company at some point.  I don't remember

23   when, but he went to business school, so

24   he may not have been there on the day I

25   left.  It was either when I went to

180

HOUSE

1
2  business school or when I left the
3  company.
4      Q.    Thatcher Fields is another
5  individual whom you identified as someone
6  who would possess information or might
7  possess information relative to this
8  action in responses to our
9  interrogatories.
10          Who is Thatcher Fields?
11     A.    Salesman slash do everything guy
12  at First Marblehead.
13     Q.    When was the last time you had
14  any discussions with Mr. Fields?
15     A.    Probably the last day I left
16  also.
17     Q.    And what information do you
18  believe he has that is relevant to this
19  case?
20     A.    He was another recipient of
21  options I believe.
22     Q.    Do you believe he has any other
23  information?
24     A.    No.
25     Q.    Have you had any discussions

181

HOUSE

1
2  with him about stock options at First
3  Marblehead?
4      A.     No.
5      Q.     Steve Anbinder, we discussed him
6  a little bit today with respect to some
7  discussions you had about the valuing of
8  stock options.
9          Is Steve Anbinder -- is this the
10  same Steve Anbinder that you identified in
11  your --
12      A.     Yes, there is only one.
13      Q.     And what information do you
14  believe he has that is relevant to this
15  case other than what you have already
16  testified to?
17      A.     He was my immediate superior.
18  He would have information about my
19  employment, information about my
20  employment that has come up in this case.
21      Q.     So other than the information
22  that you've already told me about earlier
23  today plus information he might have about
24  your employment, any other information?
25      A.     Not that I could think of, no.

182

                    **HOUSE**

1

2    Q.    Have you had any discussions

3   with Mr. Anbinder regarding your stock

4   options?

5    A.    No.

6    Q.    Ralph James, who is Ralph James?

7    A.    Ralph James was the president of

8   First Marblehead.  I think he holds some

9   other title now.

10    Q.    And what information do you

11   believe Ralph James has that might be

12   relevant -- that is relevant or might be

13   relevant to this case?

14    A.    Well, he is on documents that I

15   submitted, and he was the president of the

16   firm and so forth, and one would expect

17   that he might know something about my

18   employment so also.

19    Q.    So other than what we have

20   discussed already today regarding any

21   discussions you had with Ralph James, and

22   I think one of the things we have

23   discussed was Exhibit 4, the compensation

24   review and what you have just told me, is

25   there any other information that he might

183

HOUSE

1

2  have that would be relevant to the case

3  that you believe he has?

4      A.    Not that I could think of, no.

5      Q.    Have you had any discussions

6  with Ralph James about your stock options

7  other than in connection with the -- your

8  compensation review?

9      A.    No.

10     Q.    Jay Niles, who is Jay Niles?

11     A.    Jay Niles is another recipient

12 of options at First Marblehead and still

13 is employed by the firm also.

14     Q.    And what information do you

15 believe he has that is relevant to this

16 case?

17     A.    Again, he was a recipient of

18 options I believe of -- of a type that was

19 issued at the same time as mine with

20 Thatcher and so forth, and he was an

21 employee of the firm and is still an

22 employee of the firm.

23     Q.    And I have others on the list

24 but stopping there for a minute, of the

25 ones we have already discussed Mr. Meyers,

184

```
 1              HOUSE
 2   Mr. Walker, Mr. Fields, Mr. Anbinder, Mr.
 3   James and Mr. Niles, of those which one of
 4   those individuals do you believe got the
 5   same ISOs that you got?
 6        A.    No one.
 7        Q.    Nobody?
 8        A.    That I know of.  Maybe
 9   everybody.  I don't know.
10        Q.    Which of them got ISOs at the
11   same time you got ISOs? Did Dan Meyers?
12        A.    If -- I don't know.
13        Q.    Did Kevin Walker?
14        A.    I believe so.
15        Q.    Did Thatcher Fields?
16        A.    I believe so.
17        Q.    Did Steve Anbinder?
18        A.    Yes.
19        Q.    Did Ralph James?
20        A.    I believe so.
21        Q.    Did Rod Hoffman?
22        A.    I don't believe so.
23        Q.    Why wouldn't he get them?
24        A.    He wasn't an employee of the
25   firm.
```

185

HOUSE

1

2      Q.      Did Troy Boone get them, get

3  ISOs at the same time you did?

4      A.      My memory is not terrific.  I

5  don't even know if he was at the firm at

6  the time because he came later, but if he

7  was he probably would have been in the

8  same category as Thatcher and --

9      Q.      And Noreen Sloan was she an

10  employee of First Marblehead?

11      A.      Yes, and I have no idea if she

12  received options.

13      Q.      How about Gary Santo, did he

14  receive ISOs?

15      A.      I don't know.

16      Q.      Bruce Lefenfelder, did he get

17  ISOs?

18      A.      I would imagine he did.

19      Q.      At the same time you did?

20      A.      I believe so.

21      Q.      Tom Anderson, did he receive

22  ISOs?

23      A.      He is in the same category.  I

24  don't know.

25      Q.      Back to the list, Rod Hoffman

186

HOUSE

1

2    you have listed as somebody who has

3    information that is or may be relevant to

4    this action, and other than what you have

5    already testified to today about Mr.

6    Hoffman what other information do you

7    believe that he has that is relevant to

8    this case?

9        A.    I have testified to it.

10       Q.    Other than what -- so if

11   you -- there is nothing else other than

12   what you have testified to?

13       A.    Right.

14       Q.    Troy Boone, who is he?

15       A.    A salesman.  A number of those

16   people were -- played a similar role at

17   First Marblehead.

18       Q.    So he was an employee at First

19   Marblehead?

20       A.    Yes.

21       Q.    And what information do you

22   believe that he has relevant to the case?

23       A.    If he was there, he probably

24   received options also.

25       Q.    Other than that, any other

187

1                           HOUSE

2  information?

3      A.     No.

4      Q.     Have you ever discussed your

5  ISOs with him?

6      A.     No.

7      Q.     With Troy Boone?

8      A.     No.

9      Q.     When was the last time you spoke

10  with Troy Boone?

11      A.     Again, I am not sure if he was

12  there on my last day.  If he was, I

13  probably had a conversation with him.  If

14  he wasn't, it was sometime when he left.

15  He left the firm also, but I am not sure

16  if -- I am fairly sure that he left after

17  I was gone.

18      Q.     Okay.

19             Have you had any discussions

20  with him since you left?

21      A.     No.

22      Q.     By the way, on Jay Niles let me

23  move back to that for a minute, did you

24  ever have any discussions with Jay Niles

25  about your ISOs?

188

HOUSE

1

2      A.      I don't believe so.

3      Q.      When was the last time you

4  talked to Jay Niles?

5      A.      Probably the last day I was

6  there probably.

7      Q.      Noreen Sloan, she is an

8  employee -- she was an employee of First

9  Marblehead, correct?

10      A.      Was or is.  I am not sure.  Was

11  definitely.

12      Q.      Was when you were there?

13      A.      Maybe is.  I don't know.

14      Q.      When is the last time you spoke

15  to with Noreen Sloan?

16      A.      Same story.  The last day I was

17  there.

18      Q.      And have you ever had any

19  discussions with Noreen Sloan about your

20  ISOs?

21      A.      No.

22      Q.      Gary Santo, is he an employee of

23  First Marblehead?

24      A.      I don't know.

25      Q.      Was he?

189

HOUSE

1

2      A.      Yes.

3      Q.      What information would he have

4   that would be relevant to this litigation?

5      A.      Again, he is in an uncertain

6   category.  The -- there are people I can

7   be pretty sure about who received options,

8   and there are people I am less sure about.

9   Gary Santo is one of the ones I am not

10   sure about.

11      Q.      He might have received ISOs?

12      A.      Right.

13      Q.      Now, have had any discussions

14   with Gary Santo about your options?

15      A.      No.

16      Q.      And when was the last time you

17   spoke with him?

18      A.      The same day.

19      Q.      Bruce Lefenfelder, who is he?

20      A.      He was a slightly different

21   role.  He was an accountant.  He was the

22   firm's accountant as a -- what you call it

23   -- a contractor.  He was self-employed I

24   believe, and he served as the firm's

25   accountant for I believe years, and at

190

HOUSE

1

2     some point he became an employee. I don't

3     remember when, but he became an employee.

4     He had an office in the firm at Little

5     Harbor, so he was sort of an internal

6     accountant. He was also a guy -- so he

7     was slightly different from most of the

8     people you've just mentioned. Most of

9     those people were salesman.

10          Q.     And Mr. Lefenfelder is somebody

11    you listed as someone who might have

12    information relative to this action. What

13    information do you believe that he has

14    that is relevant to the case?

15          A.     He received options also.

16          Q.     Other than that, any other

17    information that he would have?

18          A.     No.

19          Q.     Have you had any discussions

20    with Mr. Lefenfelder since you left First

21    Marblehead?

22          A.     No.

23          Q.     Did you ever discuss your ISOs

24    with Mr. Lefenfelder while you were

25    there?

191

                    HOUSE

1

2      A.      No.

3      Q.      Tom Anderson, who is he?

4      A.      He was Dan's man Friday I would

5   say.

6      Q.      Was he an employee of First

7   Marblehead?

8      A.      Yes.

9      Q.      And what information do you

10  believe he has that is relevant to this

11  case?

12     A.      I don't know if he received

13  options at all, but if he did I would want

14  to know about it.

15     Q.      Okay.

16             So that would be the information

17  that he might have received options,

18  correct?

19     A.      Correct.

20     Q.      And that is why you listed him?

21     A.      Right.

22     Q.      Have you had any discussions

23  with Tom Anderson about your ISOs?

24     A.      No.

25     Q.      And have you had any discussions

                        HOUSE

1

2   with Tom Anderson since you left First

3   Marblehead?

4       A.     No.  I -- I have to amend this a

5   little bit.

6       Q.     Okay.

7       A.     I believe Jay Niles called me at

8   some point to say hello and --

9       Q.     Do you recall how long ago that

10  was?

11      A.     It was probably a couple of

12  weeks after I left.

13      Q.     Okay.

14      A.     And I believe he called me

15  and -- in my office in Chicago, but I

16  can't recall that precisely either.  It

17  was to say hello, and, you know, he knew

18  the circumstances under which I had left

19  were not terrific, and he just wanted to

20  say hello.  We were -- I would say we were

21  pals.

22      Q.     While you were both at First

23  Marblehead?

24      A.     Yes, and he called to say hello,

25  and it completely slipped my min until

193

1                          HOUSE

2      just a second ago.

3          Q.      During that time was there any

4      discussion about the ISOs?

5          A.      No.

6          Q.      What documents do you say or do

7      you believe there were any documents that

8      support your contention that whatever ISOs

9      you were granted by First Marblehead are

10     still valid and exercisable?

11             MR. WANG:    I object to the form

12     of the question.    I also object to the

13     extent it calls for a legal conclusion.

14     Subject to those objections, you can

15     answer.    That is really nothing that is

16     for a fact witness, but you may answer.

17         A.      Okay.  Do I understand the

18     question correctly you are asking for

19     documentation of what I -- what I am

20     claiming?

21         Q.      No, I am saying can you point to

22     any documents that you say support your

23     contention, and it is your contention, not

24     his, and it is not mine, your contention

25     that the options that you got from First

194

```
1              HOUSE
2   Marblehead are still valid and
3   exercisable?  Can you point to any
4   document that says that?
5        A.    Yes.
6              MR. WANG:   Objection.  My
7   objection is noted.  You may answer.
8        Q.    Yes?
9        A.    Yes.
10       Q.    What documents do you have?
11       A.    It is not a document.  It is a
12   series of documents.
13       Q.    What are they?
14       A.    The memorandum that I submitted
15   here.
16       Q.    You submitted?
17       A.    And which I believe you --
18       Q.    Have we talked --
19       A.    -- you do not dispute.
20       Q.    Have we talked about it today?
21       A.    Yes.
22       Q.    Is it James Exhibit Number 3?
23       A.    Yes.
24       Q.    Any other documents?
25       A.    Exhibit 4 I believe.
```

195

HOUSE

1

2    Q.    James Exhibit Number 4?

3    A.    If you put this together with

4    this --

5    Q.    Any other documents? Hold on.

6    Don't put anything together yet.  Are

7    there any other documents that you --

8    A.    There is a document that I

9    haven't seen here, and I don't know if it

10   is in here, but I believe it was

11   submitted.

12   Q.    What is it?

13   A.    And it was surrounding the issue

14   of pricing the options.  I can't recall

15   what it looks like.  I think it was on a

16   yellow pad, but I am not sure, and it

17   contained I believe -- my memory is that

18   it contained some terms relevant to

19   pricing the options that went -- that are

20   consistent with these documents and which

21   helped to flesh out story that I

22   am -- that I am representing as -- as my

23   agreement.

24   Q.    So it is a piece of yellow legal

25   pad?

196

                    HOUSE

1

2       A.      Right.  I am not really sure.

3               MR. WANG:   It was produced.

4               MR. DEMOURA:   I didn't -- so it

5   is white because it is a copy.

6               MR. WANG:   It was white.  It

7   was produced to you.  That is true.

8       Q.      So it is a piece of paper that

9   has typewritten information on it.

10      A.      No, it is handwritten, and it is

11  not my handwriting.

12      Q.      Whose handwriting is it?

13      A.      I don't know.  I suspect it is

14  Steve or maybe Dan's.

15      Q.      I don't want you to make any

16  suspicions.

17      A.      I have no idea.  I do have an

18  idea, but --

19      Q.      And does it have any names on

20  it?

21      A.      No, it has numbers on it.

22      Q.      And those numbers say what?

23      A.      They are parametric information

24  that we talked about earlier.

25      Q.      Information that we talked about

197

**HOUSE**

1
2    about giving you the value of the options,
3    correct?
4        A.    Yes, that -- I haven't seen it
5    in a while, so I can't describe it
6    perfectly accurately.  You asked me for
7    things that put together this -- this
8    case.
9        Q.    That is precisely what I am
10   asking you, and you understand it
11   perfectly.
12              So other than the James Exhibit
13   3, the James Exhibit 4, and the -- by the
14   way, the other document that has that
15   handwriting on it, how many pages is it?
16       A.    One.
17       Q.    Okay.
18              So other than Exhibit 3 from the
19   James deposition, Exhibit 4 from the James
20   deposition and a one-page piece of paper
21   with some numbers on it that were the
22   numbers used for you to -- I keep
23   forgetting the word -- parametrics,
24   parameters?
25       A.    Parameters.

198

HOUSE

1

2    Q.    -- parameters, handwritten

3    numbers that were the parameters given for

4    you to value the options, other than those

5    three documents are there any other

6    documents that you say support your

7    contention that the options you were

8    granted by First Marblehead are still

9    valid and exercise?

10        MR. WANG:    I object to the form

11   of the question for reasons previously

12   stated.  You may answer.

13   A.    I believe there has

14   been -- there is also a document that we

15   requested in these proceedings that would

16   evidence the telephone call between Dan

17   and Ralph -- and Rod Hoffman.

18   Q.    You are saying that there is a

19   document out there --

20   A.    I don't know that there is or

21   not.  I know that we requested it.

22   Q.    So you don't know if there is

23   another document -- if there is a document

24   that memorializes the telephone call

25   between Mr. Meyers and Mr. Hoffman that

199

HOUSE

2  you say took place in your presence?

3      A.    Yes.

4      Q.    But if there was such a

5  document, that would also be a document

6  you would say would support your position

7  that all the options that you were granted

8  by First Marblehead are still valid and

9  exercisable?

10      A.    Let me put this way.  If -- if

11  Rod Hoffman keeps records, that record

12  will turn up I promise.

13      Q.    That is not my question, Mr.

14  House.  My question is is that -- if there

15  is such a document, that is a document you

16  are claiming also supports your position

17  that --

18      A.    Yes.

19      Q.    -- that the First Marblehead

20  options, ISOs are still valid and

21  exercisable?

22      A.    Correct.

23      Q.    Other than those four documents,

24  are there any other documents?

25          MR. WANG:   Same objection.  You

200

```
                        HOUSE
 1
 2   may answer.
 3        A.    I believe that is it.
 4              MR. WANG:   Off the record.
 5              (Discussion held off the
 6   record.)
 7              MR. DEMOURA:   Back on the
 8   record.
 9              (House Exhibit 3 marked for
10   identification.)
11              (Document handed to witness.)
12        Q.    Mr. House, I am showing you a
13   document that has been marked as Exhibit
14   3.  The copy that I have is white.  I
15   don't know what the original color of it
16   is, but is that the handwritten
17   note -- first of all, it was produced by
18   you, G. House?
19        A.    I think I can clarify this.
20              MR. WANG:   It is not --
21        Q.    The coloration is irrelevant.
22   Yes, that is irrelevant.
23              MR. WANG:   It is irrelevant.
24        Q.    I don't want you to say that
25   this is not the right color.
```

201

**HOUSE**

1

2          MR. WANG:    Is this the document

3     you had in mind?

4          THE WITNESS:  Yes.

5          MR. DEMOURA:    Thank you.

6     Q.    So this document is the document

7     you are referring to that is another one

8     that supports your contention that the

9     option is still -- the ISO is still

10    exercisable, correct?

11    A.    Yes.  Absolutely.

12    Q.    And that is the one with the

13    handwriting on it that had the parameters

14    on it that you were discussing earlier,

15    correct?

16    A.    Yes.

17    Q.    Okay.

18          Back to this issue about whether

19    or not you have filed any personal

20    financial information in applying for

21    loans or otherwise, as you sit here today

22    can you recall any other occasion other

23    than applying for your mortgage, and I

24    believe even though you don't recall you

25    did file something in connection with your

202

HOUSE

2  divorce proceedings, where you had an

3  occasion to list your liabilities -- your

4  assets and liabilities?

5      A.    No, there was no other occasion.

6      Q.    Okay.

7          When you applied for a position

8  with Angelo Gordon, did you have to submit

9  any such documentation about your assets

10 and liabilities?

11     A.    No.

12         MR. WANG:    I think you asked

13 him that.

14     Q.    Did you answer it?

15         MR. WANG:    He answered it no

16 then, and he answered it no now.

17         MR. DEMOURA:    I didn't hear him

18 answer it no now.

19     Q.    Do you ever monitor -- have you

20 ever gone to an Yahoo finance message

21 board on First Marblehead?

22     A.    I don't know.  I don't think so,

23 but I don't know.

24     Q.    Do you --

25     A.    I am an avid web surfer.  I

203

HOUSE

1

2  don't know.

3      Q.    That wasn't my question, but

4  okay.

5          You are familiar with the fact

6  that Yahoo has -- in the finance section

7  of Yahoo there is a section where people

8  can talk about various stocks and

9  corporations and message boards, correct?

10     A.    Yes.

11     Q.    Have you gone to that site

12  before?

13     A.    Now, that you have phrased it

14  more clearly, I can answer it more

15  clearly.

16     Q.    Okay.

17     A.    Absolutely not.  I would not

18  participate in those kind of discussions

19  just as a matter of course.

20     Q.    Do you know anybody who uses a

21  user name "Longer Term"?

22     A.    No idea.

23         MR. WANG:   Now I am intrigued.

24     Q.    Have you ever reviewed any SEC

25  filings involving First Marblehead

204

1          **HOUSE**

2  **Corporation?**

3      **A.     Yes.**

4          MR. WANG:   I am going to object

5  to the extent that some of that may be

6  covered by work product privilege, so to

7  the extent that some of that may have been

8  in connection with --

9          MR. DEMOURA:   Requests made by

10  your attorney?

11          MR. WANG:   Or because work not

12  done by an attorney could still be work

13  product as you know.  I didn't stop him

14  from answering.

15          MR. DEMOURA:   I know.  You are

16  trying to flag the issue, so we don't have

17  any waiver.

18          MR. WANG:    That's correct.

19      **Q.     I am sorry.**

20          **Have you reviewed any SEC**

21  **filings involving First Marblehead?**

22      **A.     I answered yes before, and I am**

23  **answering yes again.**

24      **Q.     When was the first time you did**

25  **that?**

205

```
                        HOUSE
 1
 2      A.      Following the category of
 3   assigned work, it is part of what I did.
 4      Q.      Assigned work at --
 5      A.      I didn't review them.  I made
 6   them.
 7              MR. WANG:    He --
 8      Q.      I am talking about --
 9              MR. WANG:    He is thinking about
10   what he did in 1998.
11      Q.      I am talking about SEC filings
12   made by First Marblehead in connection
13   with its own stock offerings.
14      A.      No.   No.   No.   The ones I was
15   talking about were different.
16      Q.      Why don't I just take a break
17   for a minute.   Go ahead and make a call.
18   This is a good time for me to take a
19   break.
20              (Recess taken.)
21   BY MR. DEMOURA:
22      Q.      Mr. House, earlier we discussed
23   Exhibit 1, which deals with your expense
24   reporting or the issue about expense
25   reporting and reimbursements towards the
```

206

```
                        HOUSE
 1
 2    end of your employment with First
 3    Marblehead, correct?
 4         A.    Yes.
 5         Q.    Had you had similar issues at
 6    other employers -- with other employment
 7    prior to First Marblehead at other
 8    companies?
 9              MR. ARONOFF:   I object to the
10    form.  You can answer.
11         A.    What do you mean similar issues?
12         Q.    At your other employers prior to
13    working at First Marblehead, had there
14    ever been an issue or -- about your
15    failure to report and submit expense
16    forms, expense vouchers?
17              MR. ARONOFF:   I object to the
18    form.
19         A.    I can't recall now.
20         Q.    Okay.
21              Do you recall ever telling Mr.
22    James or Mr. Meyers that in your prior
23    employment you had had other problems with
24    submitting --
25         A.    I can't recall either.
```

                            HOUSE

1

2       Q.      Have you ever had any

3  conversations about your stock options

4  with Jennifer House?

5       A.      Yes.

6       Q.      When do you recall doing that?

7       A.      Prior to leaving Marblehead, but

8  when I have no idea.  I can't recall that

9  at all.  I know that she knew I had them.

10      Q.      It would have been while you

11 were still married?

12      A.      Yes.

13      Q.      And what do you recall telling

14 her?

15      A.      I would not characterize

16 Jennifer as financially sophisticated, so

17 we would not have gone into the details of

18 the options or their characteristics or

19 their valuation or anything like that.

20 What we would have discussed is that I

21 received them as part of my compensation,

22 and I recall her being upset about them

23 not being enough.  That is -- that would

24 have been it.

25      Q.      Okay.

208

1          HOUSE

2          Would that conversation have

3 occurred at or around the time that you

4 learned how many options you had received

5 in June of 1997?

6     A.     No, I think probably it happened

7 later.

8     Q.     Later.

9          MR. ARONOFF:    For the record,

10 Mr. Demoura, we are not waiving any

11 possible marital privilege that might

12 apply.

13          MR. DEMOURA:    I understand.

14     Q.     Other than that one conversation

15 that you had, do you recall any other

16 conversations --

17     A.     I didn't say it was one

18 conversation.  I said that we discussed

19 the issue.  I can't recall if it was in

20 one conversation or 30 conversations.  I

21 think that it was a subject for

22 discussion.

23     Q.     Now, earlier you testified

24 that -- I believe you testified earlier

25 that at some point the options were going

209

HOUSE

1

2    to be reduced to some sort of a writing or

3    the terms were going to be presented in

4    some sort of document, correct, the ISOs?

5        A.    I don't think that ever

6    got -- that was ever said to me.  I

7    assumed that it would be done, but I

8    didn't -- I don't think it was ever

9    represented to me that way at all.

10       Q.    And that is because of your

11   experience and understanding about the

12   stock options and your financial

13   expertise, correct?

14            MR. ARONOFF:   I object as to

15   form.

16       A.    I --

17            MR. ARONOFF:   You can answer if

18   you can.

19       A.    I wouldn't think that they would

20   do a major thing like that without

21   documenting it, and when they didn't

22   document it for me --

23       Q.    I think you answered the

24   question.

25            I am going to show you Exhibit V

210

1          HOUSE

2    to the complaint, which was marked as an

3    exhibit, as Exhibit 1 to the Ralph James

4    deposition.  This is all together, but it

5    is not stapled together.  You can take my

6    word for it, and I ask you if you

7    recognize that.

8              (Document handed to witness.)

9        A.    Yes.

10       Q.    What is it?

11       A.    I received it from Peter Tarr I

12   believe.

13       Q.    And the first time you saw that

14   was when?

15       A.    Early March 2004.

16       Q.    And also attached to the

17   complaint as Exhibit A is a document that

18   I will ask if you have ever seen before?

19       A.    No.  I don't -- I have never

20   seen this -- I don't believe I have ever

21   seen that.  It looks like very similar to

22   that, but it looks -- maybe it is just the

23   typeface.  I will read this in detail, but

24   I don't -- hold on.

25       Q.    Do you remember ever receiving a

211

HOUSE

1
2  document entitled "The First Marblehead
3  1996 Stock Option Plan"?
4      A.      That is why I say I am thinking
5  that it is like this.
6      Q.      Exhibit B is the specific grant.
7      A.      I am sorry.  I am thinking that
8  it looks like the stock option plan that
9  Peter Tarr sent me.
10      Q.      Okay.
11      A.      But it doesn't look precisely
12  the same.  If I review them in tandem,
13  maybe it will be clear, but no, I did not
14  receive this document in 1996 or any time
15  while I was employed, any time
16  significantly after I was employed.
17      Q.      Okay.
18      A.      It may have been the thing that
19  Peter -- maybe I am making them the same
20  thing that Peter Tarr sent me this.  Peter
21  Tarr sent me a document.
22          MR. ARONOFF:   Is there a
23  pending question?
24          MR. DEMOURA:   There was, and I
25  think he has answered it.

1                        H O U S E

2       Q.     In February of 2004 you state in

3  your answers to interrogatories that you

4  attempted to exercise the stock option at

5  the -- the First Marblehead stock options,

6  correct?

7       A.     No, I attempted to exercise my

8  options.  I didn't know what context they

9  were in at all.  They were just my options

10 that I had received.

11      Q.     The ISOs you received from First

12 Marblehead, correct?

13      A.     I didn't call them ISOs.  I just

14 called them my options.

15      Q.     You called them your options.

16 The documents that you say support your

17 contention that you -- that you still have

18 them called them ISOs, correct? Isn't that

19 what it is called on the document Exhibit

20 Number 4, ISO?

21      A.     Okay.  Yes.

22      Q.     Is that correct?

23      A.     Yes.  I am not having a

24 semantical argument here.

25      Q.     Does the document James Exhibit

213

HOUSE

2      3 talk about ISOs?

3           MR. ARONOFF:    The documents say

4      what they say.  You don't have to ask him

5      to testify what they say.

6           MR. DEMOURA:    Is that an

7      objection?

8           MR. ARONOFF:    Just move on.

9      You want him to read the document.  Ask

10     him to read the document.

11          MR. DEMOURA:    I want him to

12     answer my question.

13          Are you objecting?

14          MR. ARONOFF:    Yes, I am

15     objecting.

16          MR. DEMOURA:    Thank you.

17     Q.    Doesn't the document that you

18     have testified to today support your

19     position that your ISOs are still valid

20     and exercisable refer to them as ISOs or

21     incentive stock options?

22     A.    Okay.  Fine.  I don't think I

23     called them that in the conversation.

24     Q.    Okay.  I guess where we are

25     going with this is I want to find out, A,

214

1                          HOUSE

2     when did that conversation take place?

3     Did it take place in February 2004?

4          A.    Yes.

5          Q.    What was said during that

6     conversation?

7          A.    I called Dan.

8          Q.    Okay.

9                Where were you when you called

10    him?

11         A.    At my -- in my office at Angelo

12    Gordon.

13         Q.    Was anybody else present with

14    you?

15         A.    No.  I called him, and the

16    conversation was -- was initially about

17    congratulations.  I believe it moved from

18    that, and that was brief.

19         Q.    By the way, was that the reason

20    you were calling, to congradulate him?

21         A.    Certainly not.

22         Q.    But you exchanged pleasantries

23    at the beginning of the conversation.  You

24    congratulated him?

25         A.    Yes.

215

                         HOUSE

1

2      Q.      And then what?

3      A.      I said I believe I said almost

4   verbatim, Dan, I am a little disappointed

5   that I didn't hear from you.

6      Q.      And what did he say?

7      A.      And he responded pretty much

8   verbatim we couldn't find you.  The

9   precision of my memory fails me here, and

10  I can't recall how I introduced the

11  subject of exercising my options, but I

12  said Dan I have options on First

13  Marblehead stock.  I would like to

14  exercise them, and he said, Gregory, we

15  have a vesting issue.  I remember that

16  pretty much verbatim, and I said pretty

17  much, you know, less -- my memory maybe

18  not verbatim, but I said, Dan, we don't

19  have a vesting issue.  I own my options.

20  I believe, but I can't recall exactly that

21  I said something along the lines that the

22  reason I own my options is because of a

23  conversation that you have to recall that

24  you may be forgetting between you and Rod

25  Hoffman.

216

1          HOUSE

2          Dan replied we have a guy who

3    administrates our plan.  His name is Peter

4    Tarr.  You have to call him Gregory, and I

5    replied, this is another verbatim memory,

6    Dan, you call him, Peter Tarr.  I am not

7    calling him.  I know what I have.  That

8    was the substance of the conversation.

9          Q.     Okay.

10         Going back to the beginning of

11   the conversation when you said you were

12   disappointed that he hadn't -- that the

13   company hadn't contacted you and he said

14   we didn't know where you were --

15         A.     Um hum.

16         Q.     -- or we couldn't locate you,

17   had you at that point brought up the

18   whole -- any issue about stock options?

19         A.     I believe no.  At that point,

20   no.

21         Q.     In fact, do you know that after

22   you left abruptly on February 28, 1988

23   that the company had been looking for you

24   from that point?

25         A.     I don't know that, and I

HOUSE

1

2    don't -- I don't know that.

3         Q.    The conversation then moved on

4    to the options, and you said you were -- I

5    am not trying to put words in your mouth

6    but paraphrasing -- you tried to remind

7    him about the conversation he had with Rod

8    Hoffman, correct?

9         A.    I believe so, but I am -- my

10   memory isn't perfect on that.

11        Q.    And what do you recall him

12   saying in connection with that?

13        A.    I recall something -- him saying

14   something in connection with that I would

15   probably recall the rest of it better.

16        Q.    Okay.

17        A.    But I don't recall any response.

18        Q.    And the only thing that happened

19   during the conversation with Rod Hoffman

20   that you would have been reminding him

21   about was Dan Meyers telling Rod Hoffman

22   please make sure that Gregory House's

23   stock options vest immediately, correct?

24             MR. ARONOFF:    I object as to

25   form.

218

HOUSE

1

2       A.     Say that again.

3              MR. DEMOURA:  Can you just wait

4   until I am done with my question because I

5   think that is what is confusing him here.

6       Q.     The only conversation that you

7   were reminding Dan about was the

8   conversation that Dan had with Rod Hoffman

9   where Dan told Rod make sure that Greg

10  House's stock options vest immediately,

11  correct?

12      A.     Yes, that is correct.

13      Q.     That was the conversation you

14  were trying to remind him about, the one

15  you've testified to already here, correct?

16      A.     Yes.

17      Q.     I am trying to get if that is

18  true because I want to know if there was

19  another conversation that I don't know

20  about?

21      A.     No, the only question is:  Was

22  the language precisely that.  Did I remind

23  him of Rod Hoffman's conversation with him

24  or was I just saying something that didn't

25  mention Rod's name that asserted the same

219

HOUSE

1
2  facts.  I can't remember that precisely.

3      Q.     But it only related to the issue

4  about whether your stock was going to

5  invest immediately, your stock options,

6  your ISOs were going to vest immediately

7  rather than the vesting schedule that you

8  had been given, the Hoffman memo, correct?

9      A.     Correct.

10         MR. ARONOFF:    Objection.

11      Q.     Anything else you can recall

12  about the conversation with Dan Meyers?

13      A.     I believe -- I think even though

14  I claimed I would not call Peter Tarr, I

15  think he gave me the phone number anyway,

16  but I am not sure about that, and clearly

17  in my mind I was awaiting a response.  So

18  there must have been something at the end

19  of the conversation that would indicate

20  that Dan was going to do what I asked and

21  call Peter Tarr because as far as I was

22  concerned they could come back and say,

23  yes, your claim is exactly right.  I don't

24  know what he was going to do.

25         MR. ARONOFF:    Greg, you are not

220

HOUSE

1
2    supposed to be speculating.  You realize
3    that.
4      A.    I am just saying at the end of
5    the conversation something must have
6    happened.  We didn't hang up.  It wasn't
7    abrupt.
8            MR. ARONOFF:   Again, he doesn't
9    want you to guess.
10           THE WITNESS:   Okay.
11     Q.    Prior to that conversation with
12   Dan Meyers -- by the way, how soon after
13   you had talked -- how soon after you had
14   learned that First Marblehead had gone
15   public did you have that conversation with
16   Dan Meyers, within hours, days, weeks,
17   months?
18     A.    I think it was probably a couple
19   of weeks.  Maybe a week.
20     A.    I don't know.
21     Q.    In the time between the time you
22   found out that First Marblehead had become
23   a public company and time you made that
24   phone call to Dan Meyers, did you -- what
25   did you do to -- did you try to gather as

221

HOUSE

2 much information from your personal

3 belongings as you could about your stock

4 options?

5      A.      Not really.

6      Q.      What did you do before

7 you -- did you do anything before you

8 called Dan to talk to him about the

9 options relating to your stock options?

10      A.      Yes.

11      Q.      What?

12      A.      I tried to figure out what they

13 were, how many I had.  That was the big

14 thing.

15      Q.      How did you do it?

16      A.      Because I didn't know.  I mean

17 what I had in 1996 I had -- in fact there

18 is another item that I did forget to

19 mention in my -- in my conversation with

20 Dan I made an error on the number.

21      Q.      You made -- which conversation

22 with Dan are we talking about now?

23      A.      The phone conversation where I

24 tried to exercise my options.  I didn't

25 have these pieces of paper in my

222

HOUSE

1

2    possession, and I thought they were still

3    in Denver.  They were not.  I had brought

4    my whole First Marblehead file here.

5        Q.    Okay.

6        A.    They turned up, and I later

7    found out what I had, but when I had the

8    conversation with Dan, I was remembering

9    that I had 4,000 options because it was

10   just a handwritten piece of paper, and I

11   knew it had no -- no meaning in

12   today's -- in terms of today's outstanding

13   stock because I knew that -- that the firm

14   was now roughly a 2 billion company, and

15   then it wasn't.  It was far less.  So I

16   knew it would have been a bigger number,

17   and it would have split and so forth, and

18   it was in fact bigger than what I thought

19   I had, you know, at first, what I actually

20   had.

21       Q.    So how did you go about trying

22   to find --

23       A.    And I made an error.

24       Q.    -- what you had?

25       A.    I searched the web.  I looked

223

HOUSE

1

2    for information about stock splits, et

3    cetera, and I eventually got a copy of the

4    prospectus, the IPO.  It was beried in

5    that.

6        Q.    What was beried in that?

7        A.    The information about the stock

8    split.  There was a four for one, and then

9    there was a ten four one.

10        Q.    So there wasn't any information

11    that that public information or prospectus

12    that was related to you, your ISO grant

13    specifically, was there?

14        A.    No.

15        Q.    And you were using your -- the

16    number 4,000 in your head as a -- as then

17    the way to calculate splits and how that

18    was going to affect your grant of ISOs,

19    correct?

20        A.    Yes.

21        Q.    So other than trying to find out

22    how many options you had by going on the

23    web and looking at whether there had been

24    splits and so forth, did you do anything

25    else before the conversation you had with

224

1                          HOUSE

2    Dan Meyers about trying to look into or

3    researching your stock, your ISO grant?

4         A.    No.  I didn't feel there was a

5    need to.

6         Q.    After that conversation

7    with -- did you do anything to figure out

8    what you needed to do in order to exercise

9    what you believed was a valid and

10   exercisable --

11        A.    Why would I do that?  It was

12   just a simple matter of making a phone

13   call and saying I am going to exercise my

14   option.  I did that.

15        Q.    I didn't ask you why.  I am

16   asking you if you did.

17        A.    Okay.  Maybe I didn't understand

18   the question.

19        Q.    Did you do anything to determine

20   how you should go about exercising the

21   ISOs that you believed were still valid

22   and exercisable?

23        A.    Okay.  Mr. Demoura, no, but I

24   also didn't do anything to figure out how

25   to walk out of this building.

225

HOUSE

2    Q.    Then your answer is no then.

3  Right.    That is your answer.

4            MR. ARONOFF:    Just answer his

5  question.

6    Q.    Do you know whether there is a

7  procedure in effect with respect to how

8  you go about exercising ISOs?

9    A.    If there is a procedure, I don't

10  know about it.

11    Q.    Do you believe that in order to

12  exercise the ISOs that you believe are

13  still valid you would have to come up with

14  any money to exercise them?

15            MR. ARONOFF:    Objection as to

16  form.

17    A.    Say again.

18    Q.    Sure.

19        Do you believe that in order to

20  exercise the options you believe are still

21  valid that you would have to come up with

22  any money?

23    A.    I certainly expected to come up

24  -- to do exactly that.

25    Q.    And how much money do you

226

HOUSE

1
2  believe you needed to come up with?

3      A.    When I made the error on the

4  number of shares that I had, it was 4,000.

5  Now, it is 160,000 shares.

6      Q.    Right.

7      A.    At 80 cents a share, so what is

8  that, $144,000 or something like that.

9      Q.    And at the time that you called

10 to exercise your options, did you have

11 $144,000 that you could have sent to First

12 Marblehead to exercise your shares?

13     A.    Yes, in my checking account.

14     Q.    And were you prepared to do

15 that?

16     A.    Absolutely.

17     Q.    After your discussion with Mr.

18 Meyers on -- sometime in February of 2004

19 that we have been talking about here, what

20 was the next thing you did, if anything,

21 in order to exercise your options, the

22 ISOs?

23     A.    After my conversation with him

24 in February?

25     Q.    Yes.

227

HOUSE

1

2    A.    When I tried to exercise my

3  options, what did I do to try to exercise

4  my options is your question?

5    Q.    Yes.

6    A.    Nothing.

7    Q.    What did you do --

8    A.    That is the step I would follow.

9    Q.    Did you have any discussions

10  with anybody else after that discussion

11  with Mr. Meyers about your options -- the

12  ISOs?

13        MR. ARONOFF:  Other than with,

14  counsel?

15    Q.    Other than with your attorneys.

16    A.    Did I have a conversations with

17  respect how to exercise -- no, there was

18  no --

19    Q.    No.  My question

20  didn't -- wasn't limited to exercising the

21  ISOs.  My question is after your

22  discussion with the phone conversation you

23  had with Mr. Meyers, were you

24  told -- where you told him you were

25  disappointed that no one had contacted you

228

**HOUSE**

1

2    in February 2004, did you have any

3    discussions with anybody else about the

4    ISOs, the First Marblehead ISOs other than

5    your attorneys?

6        A.    No.

7            MR. ARONOFF:    Other than what

8    he has testified to already?

9            MR. DEMOURA:    Yes.

10       A.    No, I -- I think that --

11       Q.    You mentioned a gentleman named

12   Peter Tarr.  Did you have any

13   conversations with Peter Tarr?

14       A.    I have never spoken a word to

15   Peter Tarr, and I wouldn't know him if he

16   were standing here.

17       Q.    Did you receive anything in the

18   mail from Mr. Tarr?

19       A.    Yes.

20       Q.    How soon after your discussion

21   with Mr. Meyers if you can recall?

22       A.    Ten days or so.

23       Q.    And what did you get?

24       A.    I got a document saying

25   that -- the stock option plan that is all

229

HOUSE

1

2   over your documentation here, and I

3   believe a letter saying something along

4   the lines here that you were granted these

5   options.  They are now null and void.

6   That letter said -- I am sure it is

7   available here, but that letter

8   essentially told me to go jump off a cliff

9   in so many words.

10      Q.    It didn't use those words, did

11   it?

12      A.    No, I am just paraphrasing.  It

13   also didn't contain information about any

14   kind of -- I don't think it said

15   anything --

16      Q.    I don't want to know what it

17   didn't contain.  I only asked you what it

18   did contain.

19      A.    Okay.

20      Q.    Did it -- after you got that

21   letter and the plan that was enclosed with

22   it, what did you do next regarding your

23   ISOs?

24          MR. ARONOFF:   He has

25   already -- that is asked and answered.

230

HOUSE

1

2          MR. DEMOURA:    No, it isn't.

3      A.    I can't remember the time frame,

4   but it was sometime after that that I

5   spoke to Josh Brain and came to Peter

6   Wang.

7      Q.    So you decided you needed to get

8   an attorney, correct?

9      A.    Yes.

10     Q.    Other than seeking an attorney,

11  did you do anything else?

12     A.    No.

13     Q.    By the way, the E mail that you

14  sent to your brother, do you remember what

15  you said in it?

16     A.    Yes.

17     Q.    What?

18     A.    I essentially described my case.

19  I mean I am involved in a lawsuit against

20  my former employer.  I was surprised that

21  he didn't know anything about it because I

22  had said something in a -- just a one

23  sentence thing about how I had to go off

24  and do something with my lawsuit or

25  my -- I think I said my suit.  We

231

HOUSE

1

2    can -- we correspond frequently, sometimes

3    more than once per day, and I had said

4    something like that, and this was recent,

5    and he responded with something about what

6    I was talking about that had nothing to do

7    with this, and at the end of his response

8    he said what suit, and it looked to me

9    that it made no sense to me.

10        Q.    That you hadn't told him about

11    it?

12        A.    It made no sense to me that the

13    remark was there because I thought

14    it -- you know, how you are using a

15    computer it, and you could just

16    inadvertently paste things into other

17    documents, and you read them later and

18    what happened here, and it was just pasted

19    inadvertently from some other documents.

20    So I ignored it and wrote a response that

21    probably had something to do with

22    applications or something.  I don't know,

23    something, and he responded to that with

24    another -- another E mail saying -- with

25    capital letters saying what suit?

232

```
 1              HOUSE
 2   Paraphrasing that, what suit idiot, and I
 3   realized that he didn't know anything
 4   about it, and this was weeks ago, and I
 5   responded to him I am surprised that you
 6   don't know anything about this, but I am
 7   involved in a lawsuit and ..., et cetera,
 8   et cetera, and I described the suit for
 9   him, and that was that, and he responded
10   in some way with that -- that probably had
11   nothing to do with the suit also.  We
12   write frequently.
13       Q.    Okay.
14            If you just give me three
15   minutes, we might be wrapped up here.
16            (Recess taken.)
17            (Continued on next page.)
18
19
20
21
22
23
24
25
```

233

1                        H O U S E

2

3          MR. DEMOURA:    Subject to our

4    document issues, we are suspending.

5          MR. WANG:    Thank you.

6          MR. DEMOURA:    Thank you.

7          (Time noted:  3:00 p.m.)

8

9

10

11

12

13

14                    G R E G O R Y   H O U S E

15

16    Subscribed and sworn to before me

17    this     day of              , 2005

18

19                                          .

20

21

22

23

24

25

234

HOUSE

C E R T I F I C A T I O N

1
2
3
4
5
6   I, DEBBIE ZAROMATIDIS, a Shorthand
7   Reporter and a Notary Public, do hereby
8   certify that the foregoing witness,
9   GREGORY HOUSE, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13      I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23  DEBBIE ZAROMATIDIS
24
25

235

1               H O U S E

2             E X H I B I T S

3

4    H O U S E

5    E X H I B I T       D E S C R I P T I O N                    P A G E

6    1                    GH 00342, letter                        156

7    2                    Affidavit                               175

8    3                    Handwritten note                        200

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25