# House Appendix
# Exhibit G

1

1                                        Volume:    I

2          CERTIFIED ORIGINAL            Pages:     1 to 84

3           LEGALINK BOSTON              Exhibits:  1

4

5              UNITED STATES DISTRICT COURT

6                DISTRICT OF MASSACHUSETTS

7     Civil Action No. 04-11263PBS

8     - - - - - - - - - - - - - - - - - - x

9     THE FIRST MARBLEHEAD CORPORATION,

10                    Plaintiff,

11       v.

12    GREGORY J. HOUSE,

13                    Defendant.

14    - - - - - - - - - - - - - - - - - - x

15

16            DEPOSITION OF RODNEY G. HOFFMAN

17              Monday, February 14, 2005

18                    1:10 p.m.

19              Foley & Lardner LLP

20              111 Huntington Avenue

21              Boston, Massachusetts

22

23        Reporter:  Lisa A. Moreira, RMR/CRR

24

2

1    A P P E A R A N C E S

2

3

4        ADLER, POLLOCK & SHEEHAN, P.C.

5        (BY: KENNETH J. DeMOURA, ESQ.)

6        175 Federal Street

7        Boston, Massachusetts 02110

8        (617) 482-0600

9        kdemoura@apslaw.com

10       Counsel for the Plaintiff

11

12

13       FOLEY & LARDNER LLP

14       (BY: PETER N. WANG, ESQ., and

15            YONATON ARONOFF, ESQ.)

16       90 Park Avenue

17       New York, New York 10016-1314

18       (212) 682-7474

19       pwang@foley.com

20       Counsel for the Defendant

21

22

23

24

Rodney G. Hoffman                                02/14/2005

3

1                          I N D E X

2    WITNESS:              DIRECT  CROSS  REDIRECT  RECROSS

3    RODNEY G. HOFFMAN

4    (By Mr. Wang)              4

5

6

7

8                      E X H I B I T S

9    NO.               DESCRIPTION                    PAGE

10    1   Consent of Stockholders in Lieu of a        77
          Meeting

11

12

13

14

15

16

17    *Original exhibits returned to Attorney Wang

18

19

20

21

22

23

24

4

1                    P R O C E E D I N G S

2                    RODNEY G. HOFFMAN,

3    a witness called on behalf of the Defendant, having

4    been satisfactorily identified by the production of

5    his driver's license and duly sworn by the Notary

6    Public, was deposed and testified as follows:

7                    DIRECT EXAMINATION

8      BY MR. WANG:

9        Q.  Mr. Hoffman, state your full name and

10   address for the record, please.

11       A.  Rodney G. Hoffman, 97 Cochrane,

12   C-o-c-h-r-a-n-e, Street, Melrose, Massachusetts.

13       Q.  My name is Peter Wang, and I represent

14   Gregory House in connection with the litigation

15   between First Marblehead Corporation and Gregory

16   House.  I'm going to be asking you some questions.

17   You're a lawyer, so I assume you know how

18   depositions work.  Be sure to keep your voice up and

19   to speak verbally -- that is, in words rather than

20   in nods or shakes of the head -- so that the

21   reporter can take it down.  And if you don't

22   understand any part of my question, just let me

23   know, and I will rephrase, okay?

24       A.  That's fine.

Rodney G. Hoffman                                      02/14/2005

5

1     Q.   Have you ever been deposed before, sir?

2     A.   Once.

3     Q.   Was it a matter involving First Marblehead

4  at all?

5     A.   No.

6     Q.   Okay.  Now, you are -- are you a partner at

7  the firm of Deutsch Williams?

8     A.   Yes, I am.

9     Q.   And do you act -- what is your relationship

10  to First Marblehead Corporation?

11     A.   When First Marblehead was first formed, I

12  represented Dan Meyers and Steve Anbinder, so I

13  organized the predecessor limited partnership and

14  represented the company on general matters up until

15  they went public, the company went public.

16     Q.   And that was in 2003?

17     A.   Yes.

18     Q.   And since 2003 have you had any relationship

19  with the company?

20     A.   Very little.  Not much of an ongoing thing.

21     Q.   Is it fair to say that until 2003 you acted,

22  in a sense, as their general counsel?

23     A.   Yes.

24     Q.   Do they have an in-house general counsel

Rodney G. Hoffman                                      02/14/2005

6

1   now?

2       A.  Yes.

3       Q.  Who is that?

4       A.  Don Peck.

5       Q.  All right.  So Mr. Peck I thought had been

6   identified as the chief financial officer.  Is he

7   also that?

8       A.  He is a lawyer, and my understanding is he

9   is supervising the legal work.

10      Q.  So he's a lawyer, he's supervising legal

11  work and he's acting as chief financial officer?

12      A.  That's my understanding.

13      Q.  But you don't continue to do work for the

14  company, or very minimal?

15      A.  Very minimal.

16      Q.  And prior to 2003, prior to the going public

17  of First Marblehead -- and I'm not interested in the

18  amount, sir -- were you on a retainer basis?

19      A.  No.

20      Q.  Was it an hourly charge?

21      A.  Yes.

22      Q.  And was that always the case?

23      A.  Yes.

24      Q.  Now, when did you get your law degree, sir?

Rodney G. Hoffman                                    02/14/2005

7

1    A.   1978.

2    Q.   From where?

3    A.   Harvard.

4    Q.   And tell me your progression of employment

5    following your graduation from law school.

6    A.   I graduated from Harvard.  I joined a firm

7    in Pittsburgh, what was then Kirkpatrick, Lockhart,

8    Johnson & Hutchinson.  I was there until 1983, I

9    believe it was, and then I became an associate of

10   Hale and Dorr here in Boston.  I moved here to Hale

11   and Dorr until 1986, and have been with Deutsch

12   Williams since then.

13   Q.   Are you a partner with Deutsch Williams?

14   A.   Yes.

15   Q.   Were you a partner at Hale and Dorr?

16   A.   No.

17   Q.   And is your specialty corporate law?

18   A.   Yes.

19   Q.   And in your capacity as a corporate lawyer,

20   you have a number of different clients, I take it?

21   A.   Yes.

22   Q.   And you've been described in at least one

23   document that we have looked at as the quote-unquote

24   architect of the incentive stock option plan for

Rodney G. Hoffman                                                    02/14/2005

8

1    First Marblehead, sir.

2        A.  I think that's fair.

3        Q.  Okay.  You think that's a fair

4    characterization as you created it?

5        A.  Yes.

6        Q.  Have you performed similar work for any

7    other companies; that is, to create incentive stock

8    option plans?

9        A.  Yes.

10       Q.  Before or subsequent to --

11       A.  Subsequent.

12       Q.  So is it fair to say this was the first one

13   that you've done -- that you did?

14       A.  The first one I did from whole cloth.

15       Q.  Yes, that's what I mean.

16       A.  Yes.

17       Q.  So you didn't have a form that you pulled

18   out and said, "Okay, let's use the form from ABC

19   Company, and we'll adopt that"?

20       A.  I used -- I started with the form from my

21   firm, so I had that form.

22       Q.  Yes, but you personally didn't have a form,

23   correct?

24       A.  Correct.

Rodney G. Hoffman

02/14/2005

9

1    Q.   Were there other people at your firm who had

2  done this sort of work?

3    A.   Yes.

4    Q.   Okay.  I'm going to come back to that in

5  some more detail in a bit.

6    A.   Okay.

7    Q.   Let me do this first, sir:  What did you do

8  to prepare for your deposition?

9    A.   I looked at my file.  I spoke to Ken briefly

10  last Friday.  I spoke with another litigator in my

11  office.

12    Q.   In your office?

13    A.   In my office.

14    Q.   And who was that?

15    A.   His name is Robert Hillman.

16    Q.   Hellman?

17    A.   Hillman.

18    Q.   Is Mr. DeMoura acting as your counsel here

19  today?

20    A.   No.

21    Q.   So you're unrepresented?

22    A.   Correct.

23    Q.   Did you have any discussion about whether or

24  not Mr. DeMoura should represent you today?

Rodney G. Hoffman                                    02/14/2005

10

1    A.  No.

2    Q.  Has any claim been made against either you

3    or your firm on account of your preparation of the

4    plan or the matters involving Gregory House?

5    A.  No.

6    Q.  By that, I mean, has there been any claim

7    made that in the event that First Marblehead is

8    found to be liable to Mr. House, that that would be

9    as a result of something you either did or didn't do

10    properly?

11    A.  No.

12    Q.  So you're not aware of any such claim?

13    A.  I'm not aware.

14    Q.  Have you sought indemnification from First

15    Marblehead on account of any allegations or claims

16    against you?

17    A.  I have not.

18    Q.  So far as you're aware, has First Marblehead

19    made an insurance claim on account of Mr. House's

20    claim against them?

21        MR. DeMOURA:  Objection.  Instruct the

22    witness not to answer.

23        MR. WANG:  On what ground?

24        MR. DeMOURA:  If he knows about it, he

Rodney G. Hoffman

1    knows about it because we told him, and it's

2    attorney-client privilege.

3            MR. WANG:  Well, not everything you talk

4    about with a lawyer is privileged.  If you asked his

5    advice, it would be privileged.  I'm not sure a

6    communication out to an insurance company, telling

7    your lawyer about that, would be privileged under

8    any stretch of the imagination.

9            MR. DeMOURA:  Well, we might disagree.

10           MR. WANG:  Apparently we do, but I'm not

11   sure what the basis of the disagreement is, other

12   than stubbornness.

13       Q.  All right, sir.  When did you first hear --

14   when did you first learn that First Marblehead was

15   interested in setting up an incentive stock option

16   plan?

17       A.  In 1995 when --

18           MR. DeMOURA:  Please do not disclose any

19   attorney-client communications.

20       Q.  The answer is 1995?

21       A.  Yes.

22       Q.  And just tell me who it was who communicated

23   with you about the subject of setting up an

24   incentive stock option plan?

Rodney G. Hoffman                                    02/14/2005

                                                              12

1      A.   It would have been Dan Meyers.

2      Q.   And did you then, over a period of time, set

3  up the plan or draft the plan?

4      A.   No.

5      Q.   Did somebody else do that?

6      A.   No.

7      Q.   Okay.  How did the plan come into being?

8      A.   Later on I was asked to draft the plan.

9      Q.   When was that?

10     A.   1996.

11     Q.   Who asked you?

12     A.   Dan, Dan Meyers.

13     Q.   And, again, since this was something that

14  ultimately was reflected in something that was to be

15  communicated out, were you told what the provisions

16  of the plan were to be?

17          MR. DeMOURA:  Instruct the witness not

18  to answer.

19          MR. WANG:  Okay.  I'm just going to tell

20  you that, really, with respect, Ken, I think that

21  when a communication is made with the intent that it

22  be communicated out -- that is, a plan is going to

23  be shared with others -- I don't think that any

24  privilege attaches to that.  But you'll think about

Rodney G. Hoffman

02/14/2005

13

1    that, and maybe you'll change your mind over time.

2        Q.  Do you recall having any discussion with --

3    withdrawn.

4            Did there come a point in time when you

5    learned which employees were going to get options?

6        A.  Yes.

7        Q.  And did you also -- let me show you a copy

8    of the complaint, which is James Exhibit 1, sir.

9    Have you ever seen the complaint before?

10       A.  No.

11       Q.  Do you understand what Mr. House's claim is

12   against First Marblehead?

13       A.  I believe so, yes.

14       Q.  And what do you understand that claim to be?

15           MR. DeMOURA:  Again, only if you've

16   learned it as a result of something other than

17   communications with your client.

18       A.  Then, no.

19           MR. WANG:  Again, I don't agree with the

20   direction, but we'll press forward.

21       Q.  Are you being paid for your time here today?

22       A.  No.

23       Q.  Do you have any understanding about whether

24   or not you're going to be paid for your time?

Rodney G. Hoffman                                            02/14/2005

14

1       A.   No.

2       Q.   And how about whatever discussions led up to

3   this deposition?  That is, you said, for example,

4   you met with Mr. DeMoura, and you had some

5   discussions.  Are you keeping track of the amount of

6   time?

7       A.   I'm keeping track of it.

8       Q.   But no intention to bill for it?

9       A.   No.

10      Q.   Take a look at the exhibits that are

11  attached to the complaint.  One is the 1996 stock

12  option plan, and the other is the grant of incentive

13  stock options to Mr. House.

14           Now, first looking at the plan itself,

15  the 1996 stock option plan, you drafted that, did

16  you not?

17      A.   Yes.

18      Q.   Did you have help doing so?

19      A.   I consulted with another attorney in my

20  office.

21      Q.   Who was that attorney?

22      A.   Burt Williams.

23      Q.   Is that a younger or older attorney?

24      A.   Older attorney.  He has since passed away.

Rodney G. Hoffman                                02/14/2005

15

1    Q.   And was Mr. Williams somebody who so far as

2   you understood had done this sort of work before?

3    A.   Yes.

4    Q.   Because you had not, correct?  You

5   personally.

6    A.   Right.

7    Q.   Correct?

8    A.   Correct.

9    Q.   By the way, have you looked at your files in

10   the office to see if you had any documents regarding

11   this work?  Has anyone asked you to do that?

12    A.   I've looked at my files.

13    Q.   Have you turned your files over to Mr.

14   DeMoura?

15    A.   I have.

16         MR. WANG:  Mr. DeMoura, just so we

17   understand it, have those documents been reviewed

18   and produced to us as required?

19         MR. DeMOURA:  The documents have been

20   reviewed.  They have not been produced because the

21   documents were all privileged.

22         MR. WANG:  That would mean, I assume,

23   that we've got a privilege log some place that

24   you've prepared.

Rodney G. Hoffman                                                02/14/2005

16

1           MR. DeMOURA:  No.

2           MR. WANG:  Are you planning on preparing

3    one?

4           MR. DeMOURA:  I will if you want me to.

5           MR. WANG:  I think that's your

6    requirement under the rule.

7           MR. DeMOURA:  Okay.

8           MR. WANG:  So we'll ask that we get a

9    privilege log.

10          MR. DeMOURA:  Okay.

11          MR. WANG:  And I'll reserve the right --

12   I'll say it now.  I'll reserve the right after we

13   get the privilege log to call Mr. Hoffman back

14   depending on what's on that privilege log, because

15   what you've just said is all of the documents in Mr.

16   Hoffman's file were privileged.

17          MR. DeMOURA:  No, I said all the

18   documents that were given to me.

19          MR. WANG:  Maybe there's a disconnect

20   here.

21      Q.  Mr. Hoffman, have you turned over all your

22   files concerning the stock option plan to Mr.

23   DeMoura?

24      A.  Yes.

Rodney G. Hoffman
02/14/2005

17

1      MR. WANG:  Okay.  So now we have it that

2  your entire file, according to Mr. DeMoura, is

3  privileged.  Do we have that right, Mr. DeMoura?

4      MR. DeMOURA:  Yes.

5      Q.  How big a file --

6      MR. DeMOURA:  Privileged or otherwise

7  objected to in the document responses.  For example,

8  I'll tell you, there are copies of other stock

9  option agreements involving individual employees

10  that you had requested in other requests, and I had

11  objected saying I'm not giving you the documents

12  relating to other employees because I believe those

13  are private with respect to those employees, and

14  that was one of the objections we made.

15      MR. WANG:  Even, for example, if they

16  showed that the other employees had signed copies of

17  the agreements?  You don't think we're entitled to

18  that?

19      MR. DeMOURA:  I don't think so unless

20  the employee agrees to give it up.  I made the

21  objection, and I haven't heard any -- until today

22  that you don't agree with that objection.

23      MR. WANG:  Well, you're hearing it.  I

24  don't think I was obliged to do that, but we can

Rodney G. Hoffman
02/14/2005

19

1    that I updated from time to time.

2        Q.    From time to time.  Did you give a printout

3    of that computer listing to Mr. DeMoura?

4        A.    I did not.

5        Q.    Okay.  I'll ask that that be produced, sir.

6    I take it you still have it.

7        A.    Yes.

8        Q.    I'll ask for a copy of the computer listing,

9    listing from all times from I guess 1996 to date

10    what the options are.  If Mr. DeMoura wants to

11    redact that, he can do what's best advised, but my

12    request is for the entirety of that listing.

13              Do you keep any other documents on your

14    computer relating to the stock option plan?

15        A.    I'm pausing because it was several computer

16    systems ago, and there may be other documents on

17    there.

18        Q.    Okay.

19              MR. WANG:  So there's no

20    misunderstanding about it, Mr. DeMoura, let me ask

21    -- I'll make the request as broad as I can.  I want

22    to make sure that computers have been checked,

23    whether it's for e-mails or for computer data with

24    respect to all of the requests that we made earlier,

Rodney G. Hoffman                                           02/14/2005

20

1   so that would certainly include Mr. Hoffman's

2   computer, but it would be broader than that.  It

3   would include all of the First Marblehead people as

4   well.  All right?

5              MR. DeMOURA:  I understand the request.

6       Q.  Did you take any steps to distribute the

7   1996 stock option plan, which is Exhibit A to the

8   complaint, to employees of First Marblehead?

9       A.  I don't remember.

10      Q.  So you don't have a present recollection of

11  doing so; is that right?

12      A.  That's correct.

13      Q.  Now, take a look, if you will, at this

14  Exhibit B to the complaint, which is the grant of

15  stock options to Mr. House, okay?

16      A.  Okay.

17      Q.  Now, did you prepare the form of grant

18  that's utilized here?

19      A.  Yes.

20      Q.  And did you personally, then, fill out each

21  one individually for the various employees who got

22  options?

23      A.  Either I or someone under my direction.

24      Q.  By that, I mean, it was your office that did

Rodney G. Hoffman
02/14/2005

21

1    it?

2        A.   Yes.

3        Q.   Okay.  So, in other words, it wasn't that

4    you gave a template to First Marblehead and said,

5    "Hear, go fill it out."  You actually -- you at

6    Deutsch Williams filled this out for individual

7    employees; is that right?

8        A.   That's correct.

9        Q.   And you would get information from your

10   client saying, "John Doe is going to get 1,000

11   options.  Send us the grant form"?

12       A.   Yes.

13       Q.   Or grant agreement?

14            MR. DeMOURA:  Objection, to the extent

15   that you're giving information with relation to the

16   client.  I understand it's an example question.  I

17   don't want it to be thought that I'm waiving any

18   attorney-client privilege.

19            MR. WANG:  I will not regard that answer

20   as a waiver of anything.

21            MR. DeMOURA:  Okay.

22       Q.   Did you take any steps -- withdrawn.

23            Once you filled out the grant agreement

24   or the grant form to indicate that a particular

Rodney G. Hoffman                                          02/14/2005

22

1    employee was going to get a grant, did you then send

2    it back to the client?

3        A.  Yes.

4        Q.  And that's Mr. Meyers?

5            Well, let me ask the question a

6    different way.  Did you send it back to Mr. Meyers?

7        A.  I don't think so.

8        Q.  Do you recall who you did send it to?

9        A.  No.  I don't know for sure.

10       Q.  Is there somebody else who you have in mind

11   that you might have sent it to other than Mr.

12   Meyers?

13       A.  It could be Mr. James.

14       Q.  Mr. James, okay.

15           And how about with respect to Mr.

16   House's particular agreement?  Do you remember who

17   you sent that to?

18       A.  There were a number of grants issued at one

19   time, and it would have been in a package and would

20   have gone to --

21       Q.  To either Mr. James or Mr. Meyers?

22       A.  Someone at First Marblehead, yes.

23       Q.  Okay.  Is it your recollection that Mr.

24   House got his grant at the same time as some other

23

1  people got theirs?

2      A.  Yes.

3      Q.  And is there some way for you to check in

4  your files that that's the case; that is, whether or

5  not Mr. House was given his grant at the same time

6  as others?

7      A.  Yes.

8      Q.  How would you do that?

9      A.  The listing we discussed earlier.

10     Q.  That computer listing will tell you who else

11 got it at the same time?

12     A.  Yes.

13     Q.  Now, if you look at Mr. House's grant, it

14 says "Date of Grant, June 15, 1997"?

15     A.  Yes.

16     Q.  That's the date of the grant, correct?

17 That's what it says.

18     A.  Yes.

19     Q.  Now, does that indicate that -- would that

20 tell you that you sent this grant back to the client

21 filled in either on June 15th or sometime before

22 June 15th?

23     A.  No.

24     Q.  It could have been later?

Rodney G. Hoffman                                      02/14/2005

24

1      A.   It could have been later.

2      Q.   And it's just simply dated as an earlier

3   date; is that right?

4      A.   Correct.

5      Q.   Okay.  And would your computer listing be

6   able to establish that and tell us when it was that

7   you actually did transmit the grant back to the

8   client?

9      A.   No.

10      Q.   It will simply indicate June 15th; is that

11   right?

12      A.   Yes.

13      Q.   So there might be a number that were granted

14   as of June 15th, but they might have been submitted

15   to the client at different times.  Is that possible?

16      A.   My recollection is that they all would have

17   been sent in one package.

18      Q.   All right.  Did you take any steps to

19   transmit the grant to the individual grantees?

20      A.   No.

21      Q.   So far as you understand, was the individual

22   grantee supposed to get a copy of the agreement?

23      A.   Yes.

24      Q.   Because they were supposed to sign it,

Rodney G. Hoffman

02/14/2005

25

1    correct?

2        A.   Yes.

3        Q.   And did you keep records of the signed

4    copies?

5        A.   I did not.

6        Q.   Who was to do that?  Did you make

7    arrangements as to how that was to be kept?

8            MR. DeMOURA:  Objection.  Instruct the

9    witness not to answer any questions that constitute

10   attorney-client communications with respect to legal

11   advice.

12           MR. WANG:  Again, I'm not sure this is

13   legal advice.

14       Q.   If you're aware of any steps that were taken

15   to collect signatures and maintain them some place,

16   that's all I want to know.

17           MR. DeMOURA:  That wasn't the question.

18   The question was, did you tell anybody?

19           MR. WANG:  Okay.  So I asked a better

20   question.

21       A.   I don't remember.

22       Q.   You don't remember doing so?

23       A.   I don't remember.

24       Q.   Looking at the grant of incentive stock

Rodney G. Hoffman
02/14/2005

26

1    options, Mr. House, under "Recital" Paragraph 3 it

2    makes reference to a, quote, stock option committee,

3    do you see that?

4        A.   Yes.

5        Q.   Who was on the stock option committee in

6    1997?

7        A.   My recollection is that it would be Mr.

8    Meyers and Mr. Berkley.

9        Q.   Mr. Berkley you think was on that stock

10   option committee?

11       A.   Yes, I believe so.

12       Q.   Okay.  That's Bill Berkley, I believe?

13       A.   Yes.

14       Q.   Did you ever speak to Mr. Berkley about the

15   subject of stock options?

16       A.   No.

17       Q.   And in what form were you told that

18   employees -- particular or specific employees were

19   getting options?  That is, was it in an e-mail?  Was

20   it a letter?  Was it a phone call?  How were you

21   told that certain employees were getting stock

22   options or were to get stock options?

23       A.   Later on it was by e-mail, but I'm not

24   certain that I had e-mail in 1997.

Rodney G. Hoffman

02/14/2005

27

1    Q.   In 1997.  So the answer is you don't know
2  how you heard in 1997?
3    A.   That's correct.
4    Q.   Okay.  Again, I'd ask that within the
5  checking of records that is being done, if there was
6  any communication to you informing you of the
7  various individuals getting stock options, that we
8  get copies of those documents.
9            Since you're the architect of the plan,
10  I need to ask you some questions about how the plan
11  works.  First of all, you understood under the plan
12  that on an employee's resigning, resignation from
13  the company, that they had three months in which to
14  exercise the option; is that right?
15    A.   That is correct.
16    Q.   And you also understood there was a certain
17  vesting schedule?
18    A.   Yes.
19    Q.   Now, that three-month period, that was in
20  order to be qualified under certain IRS rules; is
21  that right?
22    A.   That's correct.
23    Q.   And you're aware, aren't you, that you can
24  have nonqualified options that wouldn't have such

Rodney G. Hoffman                                    02/14/2005

28

1    provisions, correct?

2        A.  That's correct.

3        Q.  I mean, there's nothing so far as you

4    understand, there's nothing unlawful about having

5    options that are exercised long after three months

6    from resignation, correct?

7        A.  That's correct.

8        Q.  That's just not the way the plan you drafted

9    was put into place, correct?

10       A.  My recollection is that the plan allows for

11   both qualified and nonqualified.  It gives the

12   company flexibility.

13       Q.  Tell me again, because now we're looking at

14   Exhibit A, which is the plan.  Just tell me what

15   you're referring to in terms of that.

16       A.  I'm referring to my recollection.

17       Q.  That's fine.  It may be that it's not in the

18   plan itself, so just tell me if there's something

19   particularly in the plan that you're referring to

20   that gives that flexibility.

21       A.  Well, for example, I note that under Section

22   6, "Option Price," 6.01 refers to incentive stock

23   options, and 6.02 refers to nonstatutory stock

24   options.

Rodney G. Hoffman                                    02/14/2005

29

1      Q.  Let me take a look at that, because

2  unfortunately my....

3      A.  That would not be the operative provision,

4  but that indicates that the flexibility was built

5  in.

6      Q.  I see.  So, in other words, nonstatutory

7  stock options, what you're referring to is

8  nonqualified, if you will?

9      A.  Yes.

10      Q.  I see.

11          Was nonstatutory stock options a defined

12  term?  Let's take a look.  Again, this isn't meant

13  to be a trick question.  Is that a defined term?

14  Because it has individual initial caps.

15      A.  I'm looking at the purposes provision,

16  Section 1 of the plan.

17      Q.  It says, "The plan accomplishes these

18  purposes by providing for the grant of incentive

19  stock options and nonstatutory stock options," and

20  that's defined together as stock options?

21      A.  Correct.

22      Q.  So it's not a separately defined term; is

23  that right?  But do I understand you to be saying

24  that nonstatutory stock options would include those

Rodney G. Hoffman                                          02/14/2005

30

1    that would not qualify under the IRS treatment?

2        A.  Correct.

3        Q.  And among other things, that might include

4    being exercisable at a time past three months after

5    resignation?

6        A.  Correct.

7        Q.  And if you look -- I just noticed something.

8    If you look under Section 4.01, I see that actually

9    nonstatutory stock options is defined:  Options that

10   do not meet the requirements of Section 422.

11       A.  I see that, yes.

12       Q.  So you were setting up a plan that gave the

13   company the flexibility to grant options either

14   which met the requirements of the Internal Revenue

15   Code, Section 422, or in particular that did not

16   meet the requirements, correct?

17       A.  Correct.

18       Q.  And it was up to the company as to which

19   ones they would do; is that right?

20       A.  Yes.

21       Q.  That wasn't something that you gave counsel

22   about one way or another; that is, whether or not to

23   a certain employee, to give them qualified or not

24   qualified options?

31

1          MR. DeMOURA:  Again, instruct the

2     witness not to answer the question to the extent

3     it's attorney-client.

4          MR. WANG:  This is the absence of

5     counsel.  I'm asking him that he was not involved in

6     determining whether or not a particular employee got

7     either qualified or not qualified options.

8          A.  I was not involved in making the decision

9     whether an employee got qualified or not qualified

10    options.

11         Q.  The plan that you developed was broad enough

12    to encompass both?

13         A.  'Correct.

14         Q.  Is that right?

15         A.  Yes.

16         Q.  And in Paragraph 7, when you're talking

17    about exercisability, and the effect of termination

18    of employment on exercisability, was that only

19    referring to statutory options?

20         A.  The paragraph refers to incentive stock

21    options, and so it refers to those which are

22    qualified and so limited in accordance with law.

23         Q.  Okay.  So it was not referring to when

24    nonstatutory stock options, as we've -- as you've

Rodney G. Hoffman                                    02/14/2005

32

1    made reference in your plan, when those would be

2    exercisable?

3        A.  Correct.

4        Q.  Okay.  There's also vesting schedules that

5    are included in the plan, correct, about how stock

6    options would vest?

7        A.  Yes.

8        Q.  And did the company -- I'm sorry.

9        A.  Not in the plan.

10       Q.  It's in the individual grants; is that

11   right?

12       A.  In the grants.

13       Q.  In the grants.  And in the case of Mr.

14   House, if you look at Exhibit B to the complaint, it

15   has a vesting schedule, does it not?  Does it?

16       A.  I expect to find one, but I don't see it

17   yet.

18       Q.  Well, take a look under Paragraph 2.01.  Do

19   you see it says, "Subject to further limitations as

20   is provided here, the options shall be exercisable

21   in whole or in part immediately"?

22       A.  Yes, I see that.

23       Q.  Okay.  That means so far as you understood,

24   Mr. House's options were fully vested immediately?

Rodney G. Hoffman                              02/14/2005

33

1        A.  Yes.

2        Q.  And that was different than other people's;

3    is that right?

4        A.  That's correct.

5        Q.  Had you ever, so far as you know, prepared a

6    different grant for Mr. House which had a vesting

7    schedule in it?

8        A.  I may have.

9        Q.  All things are possible.  Tell me why you're

10   saying you may have.  I know you're trying to do

11   this within the bounds of privilege.

12       A.  I don't want Ken to get mad at me.

13       Q.  We wouldn't want that, either.

14            MR. DeMOURA:  Let the record reflect,

15   I'm not getting mad at either of you.  I'm just

16   trying to serve my client's interests.

17       A.  My recollection is that Mr. House's original

18   grant was different from the other employees, and

19   that is reflected in this grant that shows no

20   vesting schedule.  The other employees all had

21   vesting schedules.

22            If Mr. House had a subsequent grant in

23   another year -- and I don't know that he did, but if

24   he did -- it may be that that was subject to a

Rodney G. Hoffman                                    02/14/2005

34

1   vesting schedule.

2       Q.  Actually, I was looking backwards, whether

3   or not there was an earlier draft that had a vesting

4   schedule, and you said, "No, no, these are fully

5   vested.  Prepare one without a vesting schedule."

6   Do you recall that happening?

7       A.  My recollection is that when I was given the

8   original list, it was noted that Mr. House had

9   bargained for immediate vesting, and that that was

10  the exception to the general rule, that the other

11  employees all had vesting schedules.

12      Q.  And did you understand that individual

13  employees could, as you put it, bargain for

14  individual terms?

15              MR. DeMOURA:  Objection.

16      Q.  Well, let me ask the question a different

17  way.  Did you design the plan in a way that

18  individual employees could bargain for individual

19  terms?

20      A.  I designed the plan so that it would be

21  flexible for the company.

22      Q.  Exactly.  So that the company could give a

23  stock option to Employee A for -- that would be

24  vested immediately, and for Employee B, that would

Rodney G. Hoffman                                    02/14/2005

35

1    be vested on a schedule, for example, correct?

2        A.  Correct.

3        Q.  You designed it broadly enough that it could

4    be for Employee A exercisable for ten years and

5    Employee B for five years, correct?

6                MR. DeMOURA:  Objection.

7        A.  Yes.

8        Q.  And part of the reason you're hesitating was

9    because there's a question about whether or not it's

10   qualified or nonstatutory.

11       A.  Exactly, yes.

12       Q.  But the way you designed the plan, it could

13   be either way?

14       A.  Correct.

15       Q.  And your understanding was that the

16   qualification under Section 422 of the Internal

17   Revenue Code is really for the benefit of the

18   employee, to make it more attractive for the

19   employee, tax treatment, correct?

20       A.  Correct.

21       Q.  So it's not for the company's benefit.  It's

22   for the employee's benefit, Section 422?

23       A.  The law is what it is.

24       Q.  But your plan was designed to encompass both

Rodney G. Hoffman                                    02/14/2005

36

1    and to give maximum flexibility?

2        A.  Yes.

3        Q.  By the way, prior to understanding that you

4    were going to have to be deposed here today -- well,

5    let's put it a different way.

6             When did you hear that Mr. House had

7    raised a claim against First Marblehead for -- in

8    connection with the exercise of options?  Just tell

9    me when you heard that.

10       A.  I think shortly after he sent his demand

11   letter to the company.

12       Q.  And was that demand letter forwarded to you?

13       A.  Yes.

14       Q.  Just yes or no.  Did you do any

15   investigation with respect to it?

16       A.  Yes.

17       Q.  Did you render an opinion to the company?

18   Don't tell me what that opinion was.  Did you give

19   advice?

20       A.  No.

21       Q.  You did not give advice; is that right?

22       A.  That's correct.

23       Q.  But you did an investigation?

24       A.  Yes.

Rodney G. Hoffman                                    02/14/2005

37

1       Q.   What did you investigate?

2       A.   I looked at my file.

3       Q.   Okay.  Did you look at your file to see

4    whether or not, for example, you had a signed copy

5    of Mr. House's grant?

6       A.   No.

7       Q.   What were you looking for?

8       A.   I looked at my file.

9       Q.   To see what you had on the subject?

10       A.   To see what I had, yes.

11       Q.   And whatever you had, you turned over to

12    counsel?

13       A.   Yes.

14       Q.   At that time; is that right?

15       A.   Yes.

16       Q.   What counsel was it that you turned it over

17    to at that time?

18       A.   Peter Tarr.

19       Q.   Peter Tarr at Hale and Dorr?

20       A.   Correct.  Wilmer Cutler.

21       Q.   Excuse me.  It's a new world.

22            And did you get those papers back from

23    Mr. Tarr, or do you understand that Mr. Tarr did

24    something with them?

Rodney G. Hoffman                                          02/14/2005

38

1    A.  I did not get them.

2    Q.  So you have not gotten them back?

3    A.  No.

4    Q.  So when you earlier said you had turned them

5    over to counsel, that's because you turned them over

6    to Mr. Tarr, and you assume they made their way over

7    to present counsel; is that right?

8    A.  Yes.

9    Q.  I'm going to try to be very careful with the

10   question so we don't offend Mr. DeMoura, because I

11   don't like to do that.  It's very disturbing to do

12   that.

13            Did anyone from the company ever tell

14   you that they had had a discussion with Mr. House

15   about his options?  In other words, this is their

16   telling you about a conversation with Mr. House, so

17   that, by definition, is not privileged.

18            MR. DeMOURA:  That's not true, and I'm

19   going to instruct him not to answer the question.

20            MR. WANG:  It is true, Mr. DeMoura.  It

21   really is.

22            MR. DeMOURA:  If the client is talking

23   to Mr. Hoffman to seek legal advice, what the client

24   decides to tell Mr. Hoffman and what answers to

Rodney G. Hoffman                                    02/14/2005

39

1    questions Mr. Hoffman is asked are all privileged.

2              MR. WANG:  First of all, I didn't ask

3    him about what questions Mr. Hoffman responded to,

4    so let's take it in pieces.

5              MR. DeMOURA:  I'm instructing him not to

6    answer any of that.

7              MR. WANG:  Just hear me out.  If the

8    client, for example, says, "I just spoke to Mr.

9    House, and Mr. House told me X, Y, Z," that much of

10   the conversation is not privileged under --

11             MR. DeMOURA:  I disagree.  I disagree.

12             MR. WANG:  You're just wrong.  You're

13   wrong, and we're going to ultimately have to take

14   this to the court.  You might want to find out if

15   this is a moot point, but with respect, Mr. DeMoura,

16   you're just wrong.

17             I didn't ask the context.  I didn't ask

18   what question they asked.  But the relaying of a

19   conversation by itself is not privileged, period.

20             MR. DeMOURA:  But isn't that the same

21   thing as trying to get through the back door what

22   you can't get in through the front door?

23             MR. WANG:  No, because I'm not asking

24   what the question was that was attached to that or

1    what the request for advice was that was attached to

2    that, or what Mr. Hoffman then responded with

3    respect to that. I simply want to know, because it

4    is relevant, whether or not anybody from the company

5    told Mr. Hoffman that they had had a conversation

6    with Mr. House on the subject of options. That's

7    all. Because as we know, that's a relevant

8    question, whether or not there was any discussion

9    with Mr. House.

10           MR. DeMOURA: Well, it's clearly a

11   relevant question as to whether or not Mr. House had

12   any discussions with the company.

13           MR. WANG: That's correct.

14           MR. DeMOURA: But it is not relevant

15   whether or not anybody at the company had any

16   discussions with Mr. Hoffman about that and it's

17   privileged.

18           MR. WANG: Relaying the fact of the

19   conversation, that the conversation had occurred,

20   isn't privileged. So, I mean, I can't make you --

21           MR. DeMOURA: Right. We can do this. I

22   can check to see if there's a way to short-circuit

23   it.

24           MR. WANG: Why don't you do that.

Rodney G. Hoffman                                    02/14/2005

41

1              MR. DeMOURA:  And maybe it's a no.

2              MR. WANG:  Then we're having a

3    discussion for nothing, so why don't you talk to Mr.

4    Hoffman.

5      (Mr. DeMoura and the witness leave room to confer)

6              MR. DeMOURA:  Well, it wasn't for naught

7    to have that conversation, but I will say that the

8    information you're going to get is information

9    that's already been disclosed, so I'm not going to

10   instruct the witness not to answer, but I don't want

11   that --

12             MR. WANG:  Not a waiver.

13             MR. DeMOURA:  -- to be a waiver.

14     Q.  Mr. Hoffman, do you have the question in

15   mind?

16     A.  Yes.

17     Q.  Okay.  What's the answer?

18     A.  I was told Mr. House had negotiated, and

19   that his special deal was that his options would

20   vest immediately.

21     Q.  Okay.  Were you told anything else about the

22   conversation with Mr. House?

23     A.  I don't think so.  I don't remember anything

24   else.

42

1    Q.  Okay.  Now, if you look at the last page of

2  the grant of options for Mr. House that's attached

3  to the complaint, you'll see that it's not signed by

4  either Mr. Meyers or Mr. House.  Do you see that?

5    A.  I see that.

6    Q.  And the way you had designed this operation

7  to work, it was supposed to be signed by both,

8  correct?

9    A.  Yes.

10    Q.  Both by Mr. Meyers and by Mr. House?

11    A.  Yes.

12    Q.  And was there someone within the company who

13  was supposed to retain copies of the signed copies?

14    A.  Yes.

15    Q.  Who was that?

16    A.  I don't remember.

17    Q.  Okay.  But it was a person?

18    A.  Yes.

19    Q.  Was it human resources?  Was it Mr. Meyers?

20  Do you recall?  I mean, it was not a big company,

21  that's why I asked.

22    A.  It would not have been Mr. Meyers.

23    Q.  Okay.  So it was somebody else --

24    A.  Somebody else.

Rodney G. Hoffman                                02/14/2005

43

1      Q.  -- whose job it was to get the signatures

2  and maintain them, correct?

3      A.  Yes.

4      Q.  And that was important, wasn't it?  Wasn't

5  it important that the option agreement be given to

6  the grantee?

7              MR. DeMOURA:  Objection.

8      Q.  You may answer.

9      A.  Yes.

10     Q.  Now, at some point you also had a meeting,

11 did you not, with employees?

12     A.  Yes.

13     Q.  To talk about the options?

14     A.  Yes.

15     Q.  I'm going to show you a copy of a memorandum

16 that appears to come from you to the employees of

17 First Marblehead.  Do you recognize that document?

18     A.  Yes.

19     Q.  And you drafted it, did you not?

20     A.  I did.

21     Q.  Did you have any help in drafting it?

22     A.  No.

23     Q.  And what was the purpose of the memorandum?

24     A.  It was to be a handout at the meeting that I

Rodney G. Hoffman                                    02/14/2005

44

1    held with the employees.

2        Q.  And how was that meeting arranged?  Whose

3    idea was it to have the meeting?

4        A.  Someone from First Marblehead.  I don't

5    remember who.

6        Q.  So someone at First Marblehead contacted you

7    and said, "You know, we should have a meeting to

8    talk about these options"?

9        A.  Yes.

10       Q.  Is that the way it happened?

11       A.  Yes.

12       Q.  You see the date of the meeting was July

13   7th?

14       A.  Yes.

15       Q.  And the date of the option grant to Mr.

16   House happened to be June 15th of the same year.

17       A.  Yes.

18       Q.  Do you recall that as of the time that you

19   had the meeting Mr. House had already gotten his

20   options?

21       A.  I don't remember.

22       Q.  Do you recall whether or not at the time of

23   the meeting the employees who were getting options

24   had already -- already were supposed to have

Rodney G. Hoffman                                    02/14/2005

45

1  received their stock option agreements?

2       A.  I don't remember the chronology.

3       Q.  Okay.  Would there be some way for you to

4  refresh your memory or to check to see what the

5  chronology was?

6       A.  I don't think so.

7       Q.  Okay.  In any event, you drafted this, and

8  it was meant to be an overview of how the stock

9  options worked?

10      A.  Yes.

11      Q.  And that was supposed to be handed to

12 employees, correct?

13      A.  Yes.

14      Q.  So that the employees could understand what

15 their rights were under the agreement and under the

16 plan?

17          MR. DeMOURA:  Objection.

18      A.  It was to be handed out at the meeting that

19 I conducted.

20      Q.  And did you have any notes for yourself to

21 guide you through that meeting?

22      A.  I don't remember.

23      Q.  Did you make -- you did make a presentation,

24 correct?

Rodney G. Hoffman                                    02/14/2005

46

1      A.   Yes.

2      Q.   And an earlier document -- and I will show

3   it to you, which is James Exhibit 2 -- indicates

4   that there was roughly an hour that was set aside

5   for the discussion on July 7th, 9:30 to 10:30.

6      A.   That seems right.

7      Q.   Okay.  I was going to ask you, do you recall

8   about how long that portion of the meeting was?

9      A.   I don't.

10     Q.   By the way, did you make any -- had you made

11   any presentations to the board of directors of First

12   Marblehead to explain to them how the options would

13   work?

14     A.   No.

15     Q.   Was this July 7th presentation to employees

16   the only time that you made an oral presentation of

17   how the options were to work?

18     A.   Yes.

19     Q.   And this document -- that is, James Exhibit

20   3 -- was meant to be a summary of the plan, correct?

21          MR. DeMOURA:  Objection.

22     Q.   Is that correct?  As well as a document

23   describing what the plan was designed to do?

24          MR. DeMOURA:  Objection.

Rodney G. Hoffman                                02/14/2005

47

1      A.   It was to be a take-away in conjunction with
2   the meeting that I held.
3      Q.   What did you look at in order to prepare
4   Exhibit 3?
5      A.   I don't remember.
6      Q.   By the time of the July 7th meeting, had
7   copies of the plan been distributed to employees?
8      A.   I don't know.
9      Q.   Were they made available to employees at
10  that meeting?
11     A.   I don't know.
12     Q.   Did anyone ask for a copy of the plan?
13     A.   I don't remember.
14     Q.   Did you tell people that the plan was
15  available for them?
16     A.   I don't remember.
17     Q.   Now, if you look at the bottom of the first
18  page of this memorandum that you prepared, it
19  says -- withdrawn.
20          Was this done at your office?
21     A.   Yes.
22     Q.   Okay.  And, again, I know this is a tough
23  question about something that's from 1997.  Do you
24  know if there are any drafts of this document in

1    your files, either in your computer files or your

2    hard copy files?

3        A.  I don't know.

4        Q.  Although I think it would be encompassed in

5    the earlier request that I made, I specifically want

6    any drafts of this document be produced, okay?

7              Now, look at the bottom of the first

8    page of the document.  It says, "The following are

9    the principal terms of the options which have been

10   proposed by the stock option subcommittee of the

11   board of directors."  Do you see that?

12       A.  Yes.

13       Q.  Couple of things.  First of all, it says,

14   "which have been proposed by."  That suggests that

15   some of the options had not yet been granted.  Am I

16   reading that correctly?

17       A.  That suggests that.

18       Q.  It's -- there's a future tense in there?

19       A.  Yes.

20       Q.  But is it possible that there were some

21   people who were getting it after July 7th and some,

22   like Mr. House, who had gotten it before July 7th?

23       A.  I don't believe so.

24       Q.  So you think everybody was getting it at one

1  time, at least in the mid-1997 time period?

2      A.  Yes.

3      Q.  And you're just not sure if it was before or

4  after July 7th?

5      A.  That's correct.

6      Q.  Okay.  I mean, this might have just been an

7  error?  Where you say, "which have been proposed

8  by," you may have drafted this earlier and by the

9  time you got around to distributing it --

10     A.  That could be, yes.  I'm not sure.

11     Q.  You don't know the timing?

12     A.  I'm just not clear on the chronology.

13     Q.  There is a reference to stock option

14  subcommittee.  Is the stock option subcommittee the

15  same as the stock option committee that we saw

16  referenced in the plan itself?

17     A.  Yes.

18     Q.  And that was at this time Mr. Berkley and

19  Mr. Meyers?

20     A.  Yes.

21     Q.  And you see that there are then six items

22  that are the quote-unquote principal terms of the

23  options.  Do you see that?

24     A.  Yes.

Rodney G. Hoffman                                    02/14/2005

50

1      Q.   And, now, Nos. 2 and 3 talk about vesting

2   schedules.

3      A.   Yes.

4      Q.   And that didn't apply to Mr. House, did it?

5      A.   That's correct.

6      Q.   Now, other than -- so far as you recall, was

7   Mr. House the only person who was favored with an

8   immediately vesting set of stock options?

9      A.   Of the group of employees with whom I met,

10  that's my recollection, that he was the only one.

11     Q.   Was there some differing group, whether

12  they're executives or directors, who got immediately

13  vesting stock options?

14     A.   Yes.

15     Q.   Who got immediately vesting stock options?

16     A.   Mr. James's grant was different.  I don't

17  know that it was immediate vesting.

18     Q.   But it was different in some way?

19     A.   It was different.

20     Q.   Do you recall in what respect it was

21  different?

22     A.   It was done at a different time.

23     Q.   It was done in connection with his hiring?

24     A.   Yes.

Rodney G. Hoffman                                    02/14/2005

51

1      Q.   Okay.  So that was about six months earlier
2   or so?
3      A.   October of '96, effective October of '96.
4      Q.   Okay.  I've already requested copies of his
5   options.  So Mr. James's we know was different in
6   some respect.
7      A.   Yes.
8      Q.   Anyone else that was different?  So we've
9   got Mr. House's was different, and Mr. James's was
10  different in some respect, but you don't recall.
11  Anyone else?
12     A.   Not that I remember.
13     Q.   Okay.  So Nos.  2 and 3, as I look at Nos. 1
14  through 6, refer to the vesting schedule, correct?
15     A.   Yes.
16     Q.   And No. 4 then says, "If an employee resigns
17  or is terminated, unvested options terminate."
18     A.   That's what it says.
19     Q.   Which means -- and you understood that
20  vested options remained with the employee, correct?
21  If they were vested, they weren't impacted by
22  resignation or termination, correct?
23          MR. DeMOURA:  Objection.
24     A.   That's what's written, but it's incorrect.

Rodney G. Hoffman                                    02/14/2005

52

1    Q.  That's what's written, but it's incorrect?

2    A.  Yes.

3    Q.  How is it incorrect?

4    A.  Because it implies -- it does not go on to

5    state the three-month.

6    Q.  No, it certainly does not.

7    A.  It does not.

8    Q.  That was just an error when you put that in?

9    A.  Yes.

10   Q.  When you made your presentation, did you say

11   to the assembled multitude, "Hey, gang, I didn't

12   write it down here, I forgot, but if you resign, you

13   have three months to exercise"?

14            I'm sure I don't have to do this, Mr.

15   Hoffman, but do you understand you're under oath?

16   A.  Yes, I understand.  Please -- just --

17   please.

18   Q.  That's for the record, Mr. Hoffman.  So you

19   can tell me if you remember whether or not you

20   indicated in the meeting that you had omitted that

21   piece?

22   A.  I don't remember.

23   Q.  Okay.  And in fact, No. 6 says the options

24   must be exercised within 10 years of the date of

Rodney G. Hoffman                                    02/14/2005

53

1    grant.  Do you see that?

2        A.  Yes.

3        Q.  That refers to vested options, correct?

4        A.  Yes.

5        Q.  Or that portion of options that are vested?

6        A.  That restates another requirement of Section

7    422.

8        Q.  Okay.  But it doesn't say "must be exercised

9    within ten years of the date of grant unless in the

10   event of termination you have three months"?

11       A.  It does not say that.

12       Q.  That was just an omission from this --

13       A.  Yes, it was a mistake.

14       Q.  It was a mistake.  Did you point out that

15   mistake?

16       A.  I don't believe I got into that level of

17   detail when I went through the presentation.

18       Q.  Okay.  Did anyone ask any questions, so far

19   as you can recall, at the meeting that reflected on

20   the three-month exercise period?  Do you remember

21   that coming up at the meeting?

22       A.  I don't.

23       Q.  Was Mr. House at the meeting?

24       A.  My recollection is that everybody from both

Rodney G. Hoffman                                    02/14/2005

54

1    offices was there, so I assume that Mr. House was,

2    but I don't remember.

3        Q.  Well, I'll tell you, this document, the one

4    you're looking at, you'll see at the bottom

5    right-hand corner has these GH Bates stamp numbers.

6    That reflects it's from House's files.

7             Was this document literally given out at

8    the meeting?

9        A.  Yes.

10       Q.  So that would lead you to believe that he

11   was at the meeting, unless somebody gave it to him

12   afterwards?

13       A.  Correct.

14       Q.  I mean, had you made copies and did you hand

15   them out or was there a stack sitting at a table?

16       A.  There were copies to be handed out.

17       Q.  There were copies to be handed out at that

18   meeting?

19       A.  I probably had them made and brought them

20   with me.

21       Q.  Did any employee subsequent to the meeting

22   raise any questions directly to you -- that is,

23   either call you at your office or send you any

24   notes -- about the options?

Rodney G. Hoffman                                    02/14/2005

1      A.   I don't believe so.

2      Q.   Do you have -- do you personally have any

3   information that would lead you to conclude that Mr.

4   House was given a copy of --

5      A.   The option grant?

6      Q.   -- the option grant?

7      A.   I don't have any independent knowledge.

8      Q.   Do you have any information one way or the

9   other as to whether or not Mr. House was given a

10   copy of the plan?

11      A.   I don't have any information on that.

12      Q.   So far as you know, were any employees given

13   copies of the plan?

14      A.   I don't know.

15      Q.   So far as you know, were any -- have any

16   employees of First Marblehead, other than Mr. House,

17   have any of them attempted to exercise options past

18   the three-month period from their resignation or

19   termination?

20      A.   No, not to my knowledge.

21      Q.   Mr. House is the only one who has so

22   attempted to do that?

23      A.   I don't know what Mr. House has attempted to

24   do.

Rodney G. Hoffman                                    02/14/2005

56

1      Q.  Well, you understand that's one of the

2   issues in this litigation, don't you?

3      A.  Yes.

4      Q.  I mean, you understand that's the issue in

5   the litigation?

6      A.  Yes.

7      Q.  Okay.

8      A.  I don't know that he formally attempted to

9   exercise the options.

10     Q.  I see.  Fair enough.

11          How about Mr. Samra?  Do you know Mr.

12   Samra?  Remember him?

13     A.  I know Mr. Samra.

14     Q.  Do you recall whether or not Mr. Samra

15   exercised options greater than three months after

16   his leaving the company?

17     A.  I don't know that he has options -- he had

18   options.

19     Q.  You don't recall whether or not he had

20   options?

21     A.  He may well not.

22     Q.  I see.  Let me ask you a general question

23   about the pricing of options.

24          By the way, did anyone ever tell you

Rodney G. Hoffman                                    02/14/2005

57

1    that Mr. House was involved in the pricing of the

2    options?

3        A.  No.

4        Q.  Do you know how the price was arrived at or

5    who arrived at the price?

6        A.  It would have been the option subcommittee

7    of the board.

8        Q.  Okay.  And so however they did it, they did

9    it.  They told you it's priced at dollars X, and

10   that's what you took?

11       A.  The requirements of Section 422 are that the

12   option be priced at the then fair market value of

13   the stock.

14       Q.  I see.

15       A.  So they would have been priced accordingly.

16       Q.  Okay.  Now, in this case, Mr. House was

17   given or was granted 2,500 options at $32 a share,

18   all right?

19       A.  Uh-huh, yes.

20       Q.  I want to understand how that works once

21   stock splits.  You understand that there were stock

22   splits over time, correct?

23       A.  Yes.

24       Q.  And as I understand from reading ultimately

Rodney G. Hoffman                                    02/14/2005

58

1    the prospectus, there was a four-for-one split and a

2    ten-for-one split.  Does that sound right to you?

3        A.  Vaguely.  That was when I was not

4    intricately involved.

5        Q.  Let's talk generically, then, rather than

6    talk about the specifics of it.

7            If there was, let's assume

8    hypothetically, a two-for-one split to make it easy.

9    If there was a two-for-one split, Mr. House's 2,500

10   options would become 5,000 options, would they not?

11       A.  Yes.

12       Q.  And his strike price of $32 would become

13   $16, correct?

14       A.  I believe that's correct, yes.

15       Q.  Okay.  And so we can do the math depending

16   on what the number of splits were to alter the price

17   and the number of options accordingly, correct?

18       A.  Yes.

19       Q.  All right.  The reason I ask that is because

20   there is some reference in the plan, I think, to

21   whether or not -- withdrawn.

22            So far as you know, what I just

23   described, that change of the number of options and

24   the change -- the adjustment in the price, that was

1    done for all option holders who got options in the

2    1997 grant, correct?

3        A.    There is a mechanism -- my recollection is

4    there is a mechanism in the plan, and that that

5    mechanism would govern all options granted under the

6    plan.

7        Q.    Okay.  Let's take a quick look at that.

8        A.    But that's my recollection.

9        Q.    Take a look at Paragraph 8.07.

10       A.    Yes, I see it.

11       Q.    Is that the section you're referring to,

12   8.07, "In the event of any change in the outstanding

13   stock by reason of a stock dividend, split-up or

14   reclassification of shares"?

15       A.    Yes.

16       Q.    It says, "The committee may appropriately

17   adjust the number of shares of stock and the option

18   price of options."  Do you see that?

19       A.    Yes.

20       Q.    Okay.  So the use of the word "may" suggests

21   that there's not a mechanism for it automatically

22   happening, that's why I was asking whether or not,

23   so far as you understood, it was formulary; that is,

24   if it was a two-for-one split, twice as many option

Rodney G. Hoffman                                    02/14/2005

60

1    shares, half the price?

2              MR. DeMOURA:  Objection.

3         Q.  Is that the way it works?  Is that the way

4    it worked under this plan?

5              MR. DeMOURA:  Objection.

6         A.  The plan says it may be done this way, and

7    so how it was actually done is a matter of how the

8    board determined.

9         Q.  Did the board determine at the time of

10   splits as to how to treat the outstanding options?

11        A.  The split occurred after Hale and Dorr was

12   taking the lead on this.

13        Q.  I see.  I think there were two splits.

14        A.  I guess that's right.

15        Q.  Did Hale and Dorr have responsibility for

16   both of those splits?

17        A.  No.

18        Q.  You had one?

19        A.  I had one, that's correct.

20        Q.  So in connection with the one that you had

21   responsibility for, is it your recollection that the

22   options were adjusted to take account of the split?

23        A.  Yes.

24        Q.  Okay.

Rodney G. Hoffman                    02/14/2005

61

1              MR. WANG:  Mr. DeMoura, I don't think

2    this is a matter that's in dispute, but I want to --

3    I don't mean to tax the witness's recollection with

4    respect to this.  I'm sure we could probably

5    stipulate about the amounts of the options and the

6    pricing, assuming they were otherwise exercisable.

7    Exercisability I don't think we're going to

8    stipulate to quite yet.

9              MR. DeMOURA:  We're not going to

10   stipulate to that yet.

11             MR. WANG:  But the amounts and the

12   shares I don't think are in dispute.

13      Q.  Now, you say -- have you designed other

14   stock option plans since this one?  I think you said

15   you've done them subsequent.

16      A.  Yes.

17      Q.  Are they also qualified and not qualified,

18   statutory and nonstatutory?

19      A.  They are similarly designed to be flexible,

20   yes.

21      Q.  That's what I mean, flexible.

22             And have you prepared other sorts of

23   documents like Exhibit 3; that is, employee handouts

24   to kind of describe the plan, describe the grants

Rodney G. Hoffman                          02/14/2005

62

1    for purposes of a presentation to a group of

2    employees?

3        A.   I don't believe so.

4        Q.   Now, I know you've said that it was a

5    mistake not to -- you've testified it was a mistake

6    not to reference the three-month period, Mr.

7    Hoffman.

8        A.   Yes.

9        Q.   Other than it being a mistake, was there

10   some reason why you omitted that from the

11   memorandum, or was it simply a mistake?

12       A.   It was a mistake.

13       Q.   Prior to today, have you ever pointed out

14   that mistake to anyone?

15            MR. DeMOURA:  Objection.  Instruct the

16   witness not to answer the question if it relates to

17   attorney-client communications.

18            MR. WANG:  Well, I don't know what

19   advice is being requested.

20       Q.   When did it -- better question.

21            When did it first occur to you that you

22   had made a mistake by not including that provision

23   in the memorandum?

24       A.   I don't know.  I just can't remember.

63

1      Q.   Well, was it within the last couple of

2  weeks?

3      A.   No.  It was before.

4      Q.   Was it before Mr. House had made his claim?

5      A.   Yes.

6      Q.   So sometime before -- I'm sorry?

7      A.   Yes.

8      Q.   Your best recollection is it was sometime --

9      A.   It would be before, yes.

10     Q.   Was it at or about 1997?

11     A.   There's a distinction I draw between when I

12  knew it was incorrect and -- when I knew what the

13  law was and when I looked at the memo to

14  determine -- and determined that the memo misstated

15  it.  I knew the law before.

16     Q.   Because it's in the plan.

17     A.   Right.

18     Q.   And it's in the grant.

19     A.   Yes.

20     Q.   It's referenced in the grant.  So presumably

21  you were aware of the law?

22     A.   Yes.

23     Q.   But the memo doesn't include it?

24     A.   That's correct.

1       Q.  So my question really is when you realized

2   that the memo was in error.  When did that first

3   come to your attention?

4       A.  I don't know.

5       Q.  Well, when you say -- was it at or about the

6   time that the memo was distributed?  I don't want

7   you to guess, Mr. Hoffman.

8       A.  I'm just trying to come up with a hook.

9       Q.  Let me offer a hook for you, and see if it

10  helps you.  Was there any occasion for you after

11  July 7th to look at the memorandum, other than in

12  connection with your deposition today?

13      A.  This memo came up when Mr. House --

14      Q.  Right.

15      A.  -- raised his claim.

16      Q.  I understand that.

17          Mr. Hoffman, let's try to see if we can

18  track this.  I thought you had testified earlier

19  that the fact that it was a mistake came to your

20  attention before Mr. House raised his claim.  If I'm

21  mistaken, tell me I'm mistaken.

22      A.  Yes.

23      Q.  I see.  So it was after Mr. House made his

24  claim that it occurred to you that it was a mistake?

1      A.  Again, I'm drawing a distinction between

2  when I knew that the law was the law and when I knew

3  that the words in the memo were -- the statement in

4  the memo was not complete.  It may well have been at

5  the time.

6      Q.  What time?

7      A.  At about the time.

8      Q.  That Mr. House made his claim?

9      A.  No, at about the time of the meeting, at the

10  time of the memo.

11      Q.  I think we're getting lost, and I want to

12  make sure that we have a clear record.  You always

13  understood what the law was.

14      A.  Yes.

15      Q.  When I say "always," when you did this work.

16  We've got that pretty established.

17      A.  Yes.

18      Q.  You wrote the memo that has, as you

19  testified today, a mistake or an error in it.

20      A.  Yes.

21      Q.  I've asked you when you realized the memo

22  had the mistake; not with reference to when you

23  understood the law, when it first came to your

24  attention that the memo had the mistake.  And I

Rodney G. Hoffman                                    02/14/2005

66

1   simply want to know whether or not that came to your

2   attention for the first time at or about the time

3   that you understood Mr. House was making a claim or

4   some other time?

5            MR. DeMOURA:  Objection.

6       Q.  Okay.  You may answer.  That's not a

7   direction not to answer.

8            MR. DeMOURA:  I'll tell you when you

9   should not answer the question.

10      A.  I'm sorry.

11      Q.  Sure.  I'll do it again.  I'll do it again.

12           I'm interested in finding out when you

13  first realized that the memo had the mistake.

14           MR. DeMOURA:  Objection.

15      A.  It was before -- withdrawn.

16           I think it was shortly after the

17  meeting.

18      Q.  Okay.  Now, what occurred shortly after the

19  meeting to cause you to realize that you had made a

20  mistake?

21           MR. DeMOURA:  Objection.

22      A.  I think I reread the memo.

23      Q.  For a particular purpose?

24      A.  I like to reread my writing.

Rodney G. Hoffman                                    02/14/2005

67

1       Q.  Good for you.  And so your best recollection

2  is for some reason you were looking back over the

3  memo, and you said to yourself, "I left something

4  out.  I made a mistake"?  Is that your best

5  recollection?

6       A.  That's my best recollection.

7       Q.  Did you tell anyone that you had made a

8  mistake?

9            MR. DeMOURA:  Again, caution the witness

10  not to answer the question if it involves

11  attorney-client communications.

12            MR. WANG:  It's not for giving advice.

13       Q.  Did you alert anybody to the mistake?

14            MR. DeMOURA:  I disagree with you.

15       Q.  Just yes or no, did you alert anyone to the

16  mistake?

17            MR. DeMOURA:  I'm going to instruct him

18  not to answer.  That would be revealing whether

19  there was an attorney-client communication.

20            MR. WANG:  Mr. DeMoura, direct as you

21  want to direct.  Again, I've pointed out that --

22            MR. DeMOURA:  I know.  We disagree.

23            MR. WANG:  -- I'm sure that that option

24  is not well taken, but I don't have the wherewithal

Rodney G. Hoffman                                    02/14/2005

68

1   to force you to reconsider it.

2       A.  I won't answer the question.

3       Q.  Did you write any supplement to the memo?

4       A.  Yes.

5       Q.  And to whom did you distribute the

6   supplement?

7       A.  It would have gone to the company.

8       Q.  And did it correct the mistake?

9       A.  Yes.

10      Q.  The answer's yes?

11      A.  Yes.

12      Q.  Approximately how long after the original

13  memo, July 7, 1997, did this supplement come out?

14  Approximately.  Months?  Weeks?  Years?

15      A.  Not years.

16      Q.  So months, months or weeks?

17      A.  Months or weeks.

18          MR. WANG:  Mr. DeMoura, I am certain

19  that hasn't been produced, any supplement.

20          MR. DeMOURA:  You're right.  I have not

21  produced it.

22          MR. WANG:  Is that for some reason?

23          MR. DeMOURA:  Because it's an

24  attorney-client communication.

Rodney G. Hoffman                          02/14/2005

69

1          MR. WANG:  He said that he --

2          MR. DeMOURA:  He did not distribute it

3    to the employees.

4          MR. WANG:  He said it was submitted to

5    the company for purposes of distribution.

6          MR. DeMOURA:  That's not what he said at

7    all.

8          MR. WANG:  Okay.

9          MR. DeMOURA:  He said he delivered it to

10   the company.

11         MR. WANG:  Okay.

12    Q.  Did you have any discussion with anyone at

13   the company about the fact that you had made that

14   mistake in the memorandum?

15         MR. DeMOURA:  Again, I would instruct

16   the witness not to --

17         MR. WANG:  I'm just asking for the

18   person he had a discussion with, not for any advice.

19         MR. DeMOURA:  You're asking about the

20   subject.

21         MR. WANG:  It's the general subject

22   matter.  He's already testified that he sent a

23   memorandum to the company pointing out the mistake,

24   so I want to know if he had a discussion.

Rodney G. Hoffman                          02/14/2005

70

1          MR. DeMOURA:  I disagree that that's the

2    testimony he gave, but I'll let him answer this

3    question.  Did you have any discussions with

4    anybody, is that what the question was?

5          MR. WANG:  Yes.

6      Q.  On that general subject.

7      A.  I'm certain I would have, but I don't

8    remember specifically.

9      Q.  Or with whom?

10     A.  I don't remember.

11     Q.  Was there some individual with whom you

12   discussed matters involving the stock options?

13     A.  It would most likely be Mr. James.

14     Q.  Mr. James?

15     A.  I believe that's correct.  Let me just say,

16   later on I always discussed these matters with Mr.

17   James.  I don't have a specific recollection --

18     Q.  I see, at that time.

19     A.  -- this time because he was relatively new

20   at the company.

21     Q.  Did you conclude not to distribute the

22   supplement that you referred to to employees who had

23   received the earlier memorandum?

24     A.  I did not.

Rodney G. Hoffman                                02/14/2005

71

1       Q.  Did you understand that the supplement was

2   going to be distributed?

3              MR. DeMOURA:  Objection.  Instruct the

4   witness not to answer.

5       Q.  Did you intend that that supplement --

6   withdrawn.

7              Exhibit 3 that we're looking at was

8   intended for distribution to employees of First

9   Marblehead, right?

10      A.  Yes.

11      Q.  In fact, it's addressed that way.

12      A.  Yes.

13      Q.  Did you intend for the supplement to be

14  similarly distributed?

15      A.  Yes.

16             MR. WANG:  Okay.  Mr. DeMoura, I'm

17  telling you I think this is a dangerous invocation

18  of privilege on your part.  I would really urge you

19  to reconsider it in light of the testimony.

20             Let's just take a couple-of-minutes

21  break.

22             (Recess taken)

23    BY MR. WANG:

24      Q.  Mr. Hoffman, have you ever appeared -- made

Rodney G. Hoffman                                    02/14/2005

72

1    any appearance before the board of directors at any

2    board of directors meeting for First Marblehead?

3         A.  Once.

4         Q.  And what was the general subject of your

5    appearance.

6         A.  I don't remember.

7         Q.  Did it have anything to do with stock

8    options?

9         A.  No.  It was shortly after Interlaken and Mr.

10   Berkley invested in the company.

11        Q.  Tell me everyone with whom you've discussed

12   stock options at First Marblehead.  That's a very

13   broad question, and it's meant to be broad.  I know

14   you've told me Mr. Meyers.

15        A.  Mr. Samra.

16        Q.  Mr. Samra.  Were you discussing Mr. Samra's

17   stock options, or just stock options in general?

18        A.  Stock options in general.

19        Q.  Okay.  Who else?

20        A.  Mr. James, Bruce Leffenfeld, Joann Burnham,

21   Steve Anbinder.  I think that's the First Marblehead

22   employees.

23        Q.  I'm going to now kind of carve out a little

24   bit and see what the universe of people are you've

Rodney G. Hoffman                                    02/14/2005

73

1    spoken to regarding the difference between statutory

2    and nonstatutory stock options.  Who have you spoken

3    to about that, if anyone?

4        A.  It would probably be Mr. Meyers, James,

5    Samra.

6        Q.  And you -- I'm sorry, were there others?

7        A.  I think that's it.

8        Q.  Okay.  And you testified earlier that you

9    designed the plan with the flexibility for the

10   company to grant either statutory or nonstatutory

11   options?

12       A.  Yes, I did.

13       Q.  Were you ever told that the company had

14   exercised that ability; that is, to do both?

15           MR. DeMOURA:  I instruct the witness not

16   to answer the question if he got the information

17   from the client for purposes of attorney-client

18   advice.

19           MR. WANG:  Well, whatever he got he got

20   from the client, so if you're instructing him not to

21   answer, you're instructing him not to answer.  I

22   don't agree with it, but...

23           Is that your instruction?

24           MR. DeMOURA:  Yes.

Rodney G. Hoffman                              02/14/2005

1    Q.  Were you involved at all with the actual

2    granting of stock options at all, the decision as to

3    who was to get how many options?

4    A.  No.

5    Q.  Other than the discussion about the full

6    vesting of Mr. House's options, did you have any

7    discussion with anybody about Gregory House?

8    A.  Yes.

9    Q.  Who?  With whom?

10   A.  Mr. Meyers.

11   Q.  And was that after Mr. House made his claim?

12   A.  No.

13   Q.  Before?

14   A.  Yes.

15   Q.  Okay.  Tell me what was the nature of the

16   communication by Mr. House, unless it was

17   something --

18           MR. DeMOURA:  Unless it was specifically

19   for getting legal advice.

20   A.  Mr. Meyers asked if I would represent Mr.

21   House in his house closing.

22   Q.  Other than that --

23           MR. DeMOURA:  That would be a joint

24   defense privilege.  We can't answer questions on

Rodney G. Hoffman                              02/14/2005

75

 1   that.

 2       Q.  Other than that communication about Mr.

 3   House, did you have any other communications

 4   regarding Mr. House up until the time that Mr. House

 5   asserted a claim in connection with his options?

 6       A.  I don't believe so.

 7       Q.  Did you review interrogatory responses

 8   prepared by the company at all?

 9       A.  No.

10       Q.  Do you recall that the stock option plan was

11   approved by the consent of stockholders?

12       A.  Yes.

13       Q.  There was no stockholder meeting, is that

14   correct, to approve the plan?

15       A.  I think that's right.

16       Q.  Did you make any presentation to

17   stockholders to explain to them how the plan was

18   going to work in connection with the gathering of

19   their signatures for their consent?

20       A.  I believe I drafted a memorandum to the

21   board which consisted of all the stockholders that

22   outlined the terms of the plan.

23       Q.  Was that memorandum, in form and substance,

24   like the memorandum that we've seen before, Exhibit

Rodney G. Hoffman                                    02/14/2005

76

1    3?

2        A.  It was much more detailed.

3        Q.  Much more detailed; is that right?

4        A.  Yes.

5            MR. WANG:  I assume that's going to be

6    on your privilege log, Mr. DeMoura.

7            MR. DeMOURA:  I need to prepare the

8    privilege log.

9            MR. WANG:  Well, let me request a copy

10   of the document, but I'm assuming from its

11   description that's something that, Mr. DeMoura, you

12   withheld?

13           MR. DeMOURA:  It is.

14       Q.  And who were you distributing it to, that

15   memorandum?

16       A.  Members of the board.

17       Q.  And the stockholders, or just members of the

18   board?

19       A.  I think just members of the board.

20       Q.  The board had to first approve -- the board

21   first approved the plan, correct?

22       A.  Yes.

23       Q.  And then there was a consent of

24   stockholders, correct?

Rodney G. Hoffman                                    02/14/2005

77

1      A.  Yes.

2      Q.  So the memorandum you believe was

3  prepared --

4      A.  I guess I'm not sure there was consent of

5  stockholders.  I'm conflating directors and

6  stockholders.

7          MR. WANG:  Let me show you what we'll

8  have marked as Hoffman Exhibit 1 for identification.

9          (Exhibit No. 1, Consent of Stockholders

10             in Lieu of a Meeting, marked for

11             identification)

12     Q.  I've showed you a document that's entitled

13  "Consent of Stockholders in Lieu of a Meeting."

14  Does that refresh your recollection?

15     A.  Yes, it does.

16     Q.  And there also was a board approval of the

17  plan, was there not?

18     A.  I believe so.

19          MR. DeMOURA:  Can I just take one

20  second?

21          MR. WANG:  Sure.

22          (Pause)

23          MR. WANG:  Mr. DeMoura, in the answers

24  to interrogatories there's a reference made to

Rodney G. Hoffman                                    02/14/2005

78

1    approval by the corporation's board of directors as

2    of October 15, 1996, but you didn't supply any board

3    minutes or --

4              MR. DeMOURA:  To the extent there are

5    any, I'll get them.

6              MR. WANG:  Okay.  That's what I'm asking

7    for.

8         Q.  In any event, sir, your recollection is that

9    this memorandum that you're talking about is

10   prepared in connection with getting board approval,

11   as opposed to the stockholders' consent?

12        A.  My recollection is that it was addressed to

13   the board, but I'll also note that the board members

14   were the vast majority of the shareholders.

15        Q.  And what was the purpose of the memorandum?

16        A.  To outline the terms.

17        Q.  For the purposes of soliciting their vote or

18   describing what they were going to be voting on?

19        A.  Describing what the plan was about.

20        Q.  I see.  Now, do you recall we had some

21   discussion earlier about Mr. House's vesting or

22   immediate vesting of the shares?

23        A.  Yes.

24        Q.  Do you recall that there came a time when

Rodney G. Hoffman                              02/14/2005

                                                        79

1    Mr. Meyers, in Mr. House's presence, called you and

2    directed you to have the options immediately vest?

3        A.  I don't remember.  It could have, but I

4    don't remember.

5        Q.  That doesn't ring a bell particularly with

6    you?

7        A.  No, not that I can give any kind of

8    assurance to.

9        Q.  Mr. House was in Mr. Meyers' office, and Mr.

10   Meyers picked up the phone, called you, and in

11   substance said he wanted you to arrange to have Mr.

12   House's options vest immediately?

13       A.  Somehow I got that information, but I don't

14   remember a particular phone call.

15       Q.  Do you keep -- you keep time records, I take

16   it.

17       A.  Yes.

18       Q.  How detailed are you when you keep your

19   diary, sir?  That is, do you just simply write down

20   "a telephone conference with client," or do you keep

21   a fairly detailed --

22       A.  I don't keep particularly detailed records.

23   It would be unlikely that a time record would say,

24   you know, "Telephone call from Mr. Meyers in Mr.

Rodney G. Hoffman                                02/14/2005

1    House's presence."

2        Q.  No, but would it say, for example,

3    "Telephone call from Mr. Meyers re: Mr. House's

4    stock options," as an example?

5        A.  I would doubt that.  I just don't keep it at

6    that level of detail.

7        Q.  Okay.  When you submitted bills to the

8    company, did you do that on a monthly basis?

9        A.  Roughly.

10       Q.  Roughly.  And did it include a breakdown of

11   your time?

12       A.  Yes.

13       Q.  Okay.  So your bills would already be -- the

14   bills you submitted to First Marblehead would have a

15   compilation of all your time records?

16       A.  Yes.

17           MR. WANG:  All right.  I'll request that

18   Mr. Hoffman's bills be reviewed.  If there are any

19   references to any stock options or Mr. House on the

20   bills, that those be supplied to us, the

21   description, and leave out the amount of the charge.

22   I'm not interested in the amount of the charge, but

23   I do want to know the substance of what's in the

24   billings.

Rodney G. Hoffman                                    02/14/2005

81

1      Q.  I think I may have asked you this before,

2  and if I did, I apologize, sir.  How did you

3  learn -- tell me how you learned that Mr. House was

4  asserting a claim for stock options?

5      A.  I believe Peter Tarr called me.

6      Q.  Peter Tarr called you?

7      A.  Yes.  I think that's right.

8      Q.  And did you subsequently speak with anyone

9  from the company on that subject, or were all your

10  conversations with Mr. Tarr?

11      A.  I think only with Mr. Tarr.

12      Q.  And then at some subsequent point you spoke

13  to Mr. DeMoura, I take it.

14      A.  Yes.

15      Q.  Well, when was the first time that you spoke

16  to Mr. DeMoura?  The question was when, not about

17  what.

18      A.  Last summer sometime.

19      Q.  With whom have you spoken about Mr. House's

20  claim?  When I say "Mr. House's claim," whether it's

21  Mr. House's claim or First Marblehead's declaratory

22  judgment claim.  Mr. Tarr and Mr. DeMoura.  Who

23  else?

24      A.  Mr. Hillman, the attorney in my office.

Rodney G. Hoffman                                    02/14/2005

82

1    Q.   The one who is now deceased?

2    A.   No.

3    Q.   Oh, he's not.  Sorry.  Oh, the litigator?

4    A.   The litigator.  Just what-can-I-expect-in-

5    this-deposition kind of conversation.

6    Q.   I hope I haven't disappointed you.

7    A.   I'll be grading you.

8    Q.   Thank you.

9         Anyone else?

10   A.   No.

11        MR. WANG:  I believe we're done.  We

12   have a number of open subjects of Mr. Hoffman and a

13   number of open -- a number of directions not to

14   answer to which we've taken exception, so

15   unfortunately we might have to resume this

16   deposition at some point, but I can assure you it

17   will be at a time of your convenience.

18        THE WITNESS:  Thank you.

19        MR. DeMOURA:  Thanks.

20        (Whereupon the deposition was suspended

21        at 3:00 p.m.)

22

23

24

Rodney G. Hoffman                                    02/14/2005

83

1                        C E R T I F I C A T E

2   I, RODNEY G. HOFFMAN, do hereby certify that I have

3   read the foregoing transcript of my testimony, and

4   further certify that said transcript is a true and

5   accurate record of said testimony (with the

6   exception of the following corrections listed

7   below):

8   Page      Line                    Correction

9   _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16

17                        _____

18                        RODNEY G. HOFFMAN

19     Sworn and subscribed to before me this _____

20  day of _____, 2005.

21

22                        _____

23                        NOTARY PUBLIC

24  My commission expires:

Rodney G. Hoffman                                              02/14/2005

84

1    Commonwealth of Massachusetts

2    Suffolk, ss.                        CERTIFIED ORIGINAL
                                         LEGALINK BOSTON
3

4    I, Lisa A. Moreira, Registered Merit Reporter,

5    Certified Real-Time Reporter and Notary Public in

6    and for the Commonwealth of Massachusetts, do hereby

7    certify that RODNEY G. HOFFMAN, the witness whose

8    deposition is hereinbefore set forth, was duly sworn

9    by me and that such deposition is a true record of

10   the testimony given by the witness.

11   I further certify that I am neither related to or

12   employed by any of the parties in or counsel to this

13   action, nor am I financially interested in the

14   outcome of this action.

15   In witness whereof, I have hereunto set my hand

16   and seal this 22nd day of February, 2005.

17

18

19

20        Lisa A. Moreira, RMR, CRR

21        Notary Public

22        CSR No. 146299

23        My commission expires

24        December 25, 2009