# House Appendix
# Exhibit L

Not Reported in A.2d                                                                                      Page 1
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

⚑

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.
Richard R. COLLINS, Plaintiff,
v.
AMERICAN INTERNATIONAL GROUP, INC., a
Delaware corporation, Defendant.
**No. CIV.A. 14365.**

April 29, 1998.

Richard G. Elliott, Jr., Esquire, and Jeffrey L. Moyer,
Esquire, of Richards, Layton & Finger, Wilmington, for
Plaintiff.

Stephen E. Jenkins, Esquire, and Regina A. Iorii, Esquire, of
Ashby & Geddes, Wilmington, for Defendant.

MEMORANDUM OPINION
CHANDLER, Chancellor.

**\*1** This is the Court's decision after a three-day trial on the
merits and a final hearing at which both parties presented
closing arguments. At the heart of this case is a simple
question: whether plaintiff, Richard Collins ("Collins"), was
promised by an agent of his former employer, American
International Group, Inc. ("AIG"), that he could exercise his
AIG stock options as they matured in the normal course.
AIG has a policy that requires early retirees to exercise their
stock options within ninety days of their termination date. In
this case, Collins sought to exercise his stock options well
after the ninety-day window had closed, but was prevented
from doing so by AIG. Collins claims that AIG made an
oral promise that he could exercise his options as they
became due. AIG claims that none of its agents made such a
promise. As a result, I am forced to resolve, based on
credibility, a dispute between a senior international
insurance executive and his former employer, a worldwide
insurance company. I turn first to the background for this
dispute.

I. FACTUAL HISTORY
Collins was president of American Life Insurance Company
("ALICO"), which is a subsidiary of AIG. ALICO is an

international life insurance company, and part of the Life
Division of AIG. [FN1]

FN1. Collins' employer will be referred to as
"AIG" throughout this Opinion.

During his tenure at AIG, Collins received several stock
option plans as part of his compensation. Most of the option
plans operate for ten years, after which time the plans
expire. During each of the first four years of a plan, the plan
vests 25%. Accordingly, four years after the plan is issued,
the employee is vested 100% and may exercise his options
in full at anytime during his employment. If an employee
retires before age sixty-five, however, the employee has
ninety days following his termination date to exercise his
options under the plan. Once the ninety-day period has
passed, the retired employee's options are no longer valid.

Six option plans are at issue in this case. AIG issued these
plans to Collins on the following dates: November 16, 1983
for 600 shares; July 10, 1985 for 500 shares; December 1,
1987 for 500 shares; May 18, 1988 for 500 shares; January
18, 1990 for 500 shares; and October 11, 1990 for 500
shares. The price of the option shares is fixed. At trial,
Collins explained that he used AIG shares he already owned
to purchase option shares and, that because the price of AIG
shares continued to rise, he always waited until the last date
possible to exercise his options. The longer Collins waited,
the fewer AIG shares he was required to sell in order to
purchase the option shares. Accordingly, Collins testified he
always exercised his options as close as possible to the
expiration date of the option plan.

Kathleen Shannon ("Shannon"), vice president, secretary
and associate general counsel for AIG, heads the department
that administers the stock option and purchase plans, acts as
the liaison with AIG's stock transfer agent, and responds to
shareholder inquiries. At trial, Shannon testified about how
the Corporate Group administers the stock option plans with
respect to employees who retire early. She explained that a
computer program runs the stock option program. The
Corporate Group receives the retiring employee's date of
termination and enters that date into the computer.
Thereafter, the computer program allows the retired
employee to exercise his or her stock options for ninety days

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 2
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

following the date of termination. Once the ninety-day period passes, the computer program simply will not allow the retired employee to exercise the options. [FN2] Shannon testified that AIG could not waive this ninety-day limitation in order to allow employees to exercise their options after ninety days had passed. Shannon testified that to allow AIG to waive the three-month provision without first obtaining shareholder approval would imperil the tax and securities qualifications of the plan.

> FN2. In Shannon's original answer to an interrogatory submitted by Collins, requesting the names of AIG employees who had retired early and who had been allowed to exercise their options more than 90 days after termination, Shannon answered, "[n]o AIG employee who retired before his or her normal retirement age has ever been permitted to exercise stock options more than 90 days after termination of employment." PX38 at 5. However, at trial Shannon testified that since answering the interrogatory she has learned, in connection with discovery in this lawsuit, that AIG had in fact allowed employees who retired early to exercise their options after the 90- day period had passed. During cross-examination, when asked if after learning that some AIG employees had been allowed to exercise their options more than 90 days after their termination she had investigated the circumstances surrounding their exercise, Shannon testified that she had not. Tr. Tran., Vol. III at 507, 591. Thus, it is clear to the Court that at the time AIG allegedly promised Collins that he could exercise his options as they became due, AIG had failed to ensure the integrity of the computer program that administers the stock option plans. It is also equally clear to the Court that after learning of the breach in the computer program that administers the stock option plans, AIG failed to take steps to discover how such a breach could have occurred.

**\*2** In July 1992, Ernest Stempel ("Stempel"), vice chairman of the Life Division and a director of ALICO, asked Collins to step down from his position as president of ALICO after

twenty-six years with AIG. They agreed Collins would retire at the end of 1992. The benefits package that AIG ultimately provided Collins in connection with his separation from ALICO came about through several meetings with Stempel, Axel Freudmann ("Freudmann"), the senior human resources executive of AIG, and other key AIG and ALICO executives over several months. This package included the following:

• a $2,000 per month pension supplement until Collins reached age 65. (This amount represents the reduction in pension Collins would receive because he was retiring at age 56 and not at 65.)
• a letter written on Collins' behalf that would enable Collins to receive his "SICO benefits," a major deferred compensation package he is entitled to receive, at age 65.
• an interest payment of approximately $2,700 per month from January 1 to August 1, 1993, in connection with C.V. Starr, another deferred compensation benefit for AIG executives.
• a severance payment of a lump sum amount, representing Collins' salary through February 26, 1993. [FN3]

> FN3. AIG has paid all of these benefits to Collins as promised.

Of all these benefits, only the terms of the severance payment, memorialized in the "Consulting Agreement," were reduced to writing. This reliance on informal, oral agreements is not unusual at AIG. From the testimony at trial, it appears that the "culture" at AIG is for senior executives to arrange the terms of their retirement via informal agreements, not reduced to writing. This circumstance lends weight to Collins' claim that an informal, unwritten promise was made to him regarding his right to exercise stock options.

At trial, Collins testified that in his meetings with Stempel and Freudmann, they briefly discussed his request that an extension for exercising the stock options become part of his retirement package. Collins further contends that in the early part of November 1992--before he left AIG's employ--Collins asked Thomas Hoffman ("Hoffman"), the senior human resources executive for the Life Division of AIG, [FN4] if he could exercise his stock options as they

Not Reported in A.2d                                                                                           Page 3
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

became due. Collins testified that he "specifically proposed to Hoffman to make sure that he cleared with his bosses that I could elect the options as they came due ...." [FN5] Collins explained that he made this request based, in part, on his understanding that AIG had allowed other AIG executives who retired early to exercise their options as they became due. Collins also testified that near the end of November or early in December 1992, Hoffman agreed to Collins' request. Hoffman, however, testified that he did not make any promises to Collins regarding the option plans. Further, Hoffman testified that he never discussed with Collins whether he could exercise his options as they became due. [FN6]

> FN4. Prior to Collins' retirement, Hoffman reported to Freudmann, Stempel, and Robinson Nottingham (chairman and chief executive officer of ALICO), as well as Collins.

> FN5. Tr. Tran., Vol. I at 58.

> FN6. At the time Collins retired in 1992, all but two of Collins' option plans were already vested 100%. The two partially-vested plans, issued in January 1990 and October 1990, respectively, had only vested 50% by the end of 1992.

Stempel testified that neither Collins, nor anyone else at AIG, had asked him whether Collins could exercise his options as they became due. Nonetheless, at trial, Stempel was unable to explain why in early 1993 he had requested (and had in his possession) a document outlining all of the stock option plans AIG had granted to Collins as of January 8, 1993. Importantly, this document *does not indicate a termination date* for Collins.

**\*3** In his closing argument, counsel for Collins argued that Stempel requested this document listing Collins' option plans in order to ensure that the deal Stempel approved--that Collins could exercise his options as they became due--was in place. According to this logic, the document showed Stempel whether Human Resources had sent to the Corporate Secretary's office by mistake a termination date to the Corporate Secretary's office that would block Collins' ability to exercise his options. Although Stempel denied

making any representation to Collins about his stock options, I think the most credible explanation is that Stempel requested the document outlining Collins' option plans because Stempel was involved with, or actually authorized, the decision to allow Collins to exercise his options as they became due.

Robinson Nottingham ("Nottingham"), chairman and chief executive officer of ALICO, also testified at trial. [FN7] He stated emphatically that only AIG executives determine the retiring employee's date of termination, and that it is these executives who decide whether a retiring employee's date of termination will be extended. [FN8] Nottingham further testified that the Corporate Secretary--*i.e.,* Shannon--has no responsibility for determining a retiring employee's exact date of termination. According to Nottingham, the Corporate Secretary simply receives the termination date information in order to implement the stock option policy regarding early retirement. Finally, Nottingham testified that "human resources at AIG is a very semi-clerical, relatively low level function, and certainly in my 29 years' experience I have never seen anyone in that department making decisions about people's retirement dates." [FN9] Specifically, Nottingham stated that Hoffman merely implements Nottingham's decisions.

> FN7. Nottingham had supervisory authority over Collins.

> FN8. Tr. Tran., Vol. II at 377.

> FN9. Tr. Tran., Vol. II at 375.

In October 1993, Collins sought to exercise his options under the stock option plan issued November 16, 1983. Initially, nothing unusual occurred. The Corporate Group's computer program generated the appropriate documents to initiate the exercise process. Shannon approved the documents. The options were sent to the Bank of New York. Stock was reissued in Collins' and his wife's names, as well as in the name of a designated charity. Then, Shannon reversed the process and refused to allow Collins to exercise his options.

Shannon testified that the reason for the reversal was that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 4
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

she knew Collins had terminated his employment with AIG more than three months prior to exercising his options. Shannon explained that she had personal knowledge of Collins' termination more than three months prior to his exercising the options, because she had supervised the drafting of the Consulting Agreement that governed Collins' severance payment. [FN10]

> FN10. Shannon testified she was not aware whether anyone at AIG had ever told Collins what his termination date was for the purpose of calculating when his options would expire. Shannon also testified that the Corporate Group had not notified Collins that his options were about to expire, nor was it the policy of AIG to give such notification to former AIG employees who had taken early retirement. Shannon did testify, however, that it was AIG's practice as a courtesy to give "current employees notification of expiring options." Tr. Tran., Vol. III at 510. In response to Collins' counsel's inquiry that "once [an employee has] left AIG, you are not concerned anymore about the employee or former employee, is that correct?" Shannon simply replied "Yes." *Id.* at 512.

### II. ANALYSIS

The first issue I must address is whether AIG, through one or more of its representatives, promised Collins he could exercise his stock options as they became due. If I find such a promise was made, then I must decide whether that promise was supported by consideration, such that the promise is enforceable. If I find that the promise was supported by consideration, then I also must decide whether that promise necessarily implied that Collins' option plans that were not fully vested in 1992 should be allowed to vest 100%. If I find, however, that AIG made a promise to Collins, but that the promise was not supported by consideration, then I must determine whether another basis exists to enforce the promise, *e.g.,* promissory estoppel. If I find that no promise was made at all, the inquiry ends, and AIG prevails in this dispute.

**\*4** AIG's counsel argues that the easiest interpretation of these events is that Collins simply "forgot" to exercise his options within the ninety-day window and then "created"

the story about the promise to remedy his own costly oversight. To this end, AIG presented at trial a variety of circumstances that AIG insists undermine Collins' credibility. AIG thus invites me to make one credibility determination (adverse to Collins) and thereby avoid making several involving all of the witnesses for AIG, including Stempel, Hoffman, Shannon and Nottingham. This argument has a logical appeal, but I do not think that one harmonious story can be made of the conflicting testimony, even if I accept the testimony of all of AIG's witnesses and reject Collins' version of these events.

Based on my assessment of the testimony and my review of the exhibits, I am satisfied that the purported AIG rule--that an employee who takes early retirement *must* exercise his or her options within ninety days of his or her termination date--has not been strictly enforced in the past. I also am satisfied that *certain AIG employees who have retired early have been allowed to exercise stock options more than ninety days after their date of termination.* [FN11] I formed these conclusions after carefully reviewing the admitted evidence, and after assessing the demeanor of the witnesses and their motives for testifying in the manner that they did.

> FN11. The evidence offered at trial unquestionably supports my finding that AIG did not strictly adhere to its 90-day rule. I refer to PX42, PX58, PX60 and PX69. Each of these exhibits includes a matrix (prepared by AIG in response to Collins' discovery requests) containing information about former AIG employees who retired early and were permitted to exercise their options more than three months after termination. I am troubled that these matrices do not accurately reflect the termination date of two former AIG employees. In these two instances, the employee's actual date of termination was replaced in the matrix by a date later in time. If the actual date of termination had been used in the matrix, the matrix would have indicated that the employee exercised his options more than ninety days after the date of termination. Because a date later in time was used in the matrix, however, the matrix suggests that the two employees exercised their options *before* their dates of termination.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

These are but two examples of the inconsistencies in the evidence regarding AIG's administration of its employee stock option plan.

Specifically, PX42 indicates a termination date for Derek Oatway of July 1, 1995, when other credible evidence introduced at trial strongly suggests that the actual date of Oatway's termination was August 26, 1992. For example, PX47, a letter from AIG to Derek Oatway, indicates that Oatway's termination date for the purpose of exercising his options was August 26, 1992. Additionally, the matrix at PX60 indicates a termination date for Ray Williams of September 13, 1991. PX64, however, which is an AIG computer-generated Stock Option Personnel Summary for Mr. Williams, indicates that his date of termination was actually February 15, 1991.

I was particularly influenced by the testimony of Shannon, whose department administers AIG's option program, and by Stempel's testimony--especially Stempel's recollection of his approval of the Joe Allen memo. The Joe Allen memo is an internal AIG document addressing whether AIG had a practice of allowing employees who retire early to exercise their options *more than ninety days after their termination date.* The memo concluded that:

2. *In certain circumstances AIG Human Resources will extend in their records a person's retirement date for additional time to allow more portions of the stock options to vest.*

3. For employees with as many years of service as Mario, *it is normal practice* to extend the retirement date for several months for AIG Human Resources' records. [FN12]

FN12. PX55 (emphasis added).

Based on this document, as well as others in the record, I am convinced that at the end of 1992, Hoffman told Collins that he could exercise his stock options as they became due and that, at the very least, Stempel provided the authority for this promise. I also believe that this was not the first time that Stempel, Hoffman or others within AIG made such a promise to an employee taking early retirement.

Hoffman carried out AIG's promise to Collins by not providing the Corporate Group with the date of Collins' termination. Because no termination date was provided to them, the Corporate Group never entered Collin's termination date into the computer program that administers the stock option plan. Thus, when Collins attempted to exercise his options, under the option plan issued November 16, 1983, the computer program initially did not prevent him from exercising his options, but instead generated the appropriate documents.

**\*5** Although I am satisfied of the existence of a promise, I cannot find that AIG's promise to Collins was supported by consideration. I simply do not believe that Collins made a promise or surrendered anything of value in return for Hoffman's promise. In fact, by the time Hoffman promised Collins that he could exercise his options as they became due, Collins had already "decided" to take early retirement from AIG. Thus, because Hoffman's promise was unsupported by any consideration, it is unenforceable under traditional principles of contract law. I turn, therefore, to the equitable doctrine of promissory estoppel.

This Court has previously outlined four elements that a plaintiff must prove by clear and convincing evidence in order to demonstrate promissory estoppel. [FN13] Collins has satisfied each of these elements, through clear and convincing testimony and evidence presented at trial. Specifically, I am satisfied that:

FN13. *Brandner v. Delaware State Housing Authority,* Del. Ch., C.A. No. 1132-K, Chandler, V.C. (Dec. 9, 1993), slip op. at 7-8. *See Metropolitan Convoy Corp. v. Chrysler Corp.,* Del.Supr., 208 A.2d 519 (1965).

1) a promise was made. The evidence persuades me that toward the end of November (or early December) 1992--through Hoffman and approved by Stempel--AIG promised Collins he could exercise his stock options as they became due. AIG's promise necessarily implied three things: first, that Collins' option plans would not expire ninety days after his date of termination; second, that Collins could exercise his options until the plans expired; and third, that the two option plans that were vested 50% (at the time of the promise) would be permitted to vest

Not Reported in A.2d                                                                Page 6
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

100%.

2) the promisor reasonably expected to induce action or forbearance on the promisee's part. Hoffman (and Stempel) reasonably expected that, as a result of AIG's promise, Collins would not exercise his options within ninety days of his termination, but rather would exercise his options as they became due.

3) the promisee reasonably or justifiably relied on the promise and took action to his detriment in reliance thereon. I base the reliance determination on several factors. First, and perhaps the single most important factor is that, at the time Hoffman made his promise to Collins, Hoffman was the senior human resources executive for the Life Division of AIG. Thus, Collins had no reason to question what Hoffman told him. To the contrary, Collins was entitled to trust Hoffman and justifiably relied on Hoffman's word. Second, Collins was aware of other AIG employees who had retired early and had been allowed to exercise their stock options as they became due. In my opinion, Collins knew, for example, that Derek Oatway had been allowed to exercise his options as they became due--well past the ninety-day period following his retirement from AIG. I base my conclusion on Collins' testimony that he and Oatway were friends, that Oatway had worked for Collins, and that Collins knew that Hoffman was involved in arranging Oatway's retirement package. When Collins ultimately failed to exercise his stock options within ninety days after his termination date, he lost the opportunity to exercise those options. This reliance on Hoffman's promise was clearly detrimental to Collins' interests.

**\*6** 4) the promise is binding because injustice can be avoided only by its enforcement. If I refused to recognize or enforce AIG's promise on the ground that it lacked consideration, Collins would be forever precluded from exercising valuable stock options. Such a result would be neither fair nor reasonable, given Collins' reasonable reliance on AIG's promise.

Therefore, based on the clear and convincing evidence presented at trial, I conclude that AIG's promise is binding and enforceable by virtue of promissory estoppel. I will only enforce AIG's promise, however, to the extent necessary to avoid injustice. Therefore, Collins may exercise his stock options, but only to the extent that he could have exercised them before expiration of the ninety-day grace period following his early retirement. That is, I conclude that Collins may exercise *fully* the four option plans that had completely vested as of the date Collins took early retirement. Collins may exercise the two option plans issued on October 11 and January 18, 1990, to the extent he could have exercised them ninety days after his date of termination, that is 50%.

III. CONCLUSION

I have elected to grant Collins the equitable relief he has requested, as opposed to damages. Generally, specific performance of a contract for the sale of corporate stock will not be granted if similar shares are available in the open market. [FN14] In such circumstances, money damages are deemed adequate relief. The remedy of specific performance, however, "is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice." [FN15]

> FN14. *U.S. Dimension Products, Inc. v. Tassette, Inc.,* Del. Supr ., 290 A.2d 634, 635 (1972).

> FN15. *Equitable Trust Co. v. Gallagher,* Del.Supr., 102 A.2d 538, 546 (1954).

I understand that the stock that is the subject of the option plans readily is available on the open market. I also understand that it is possible to calculate the value of stock options given the unique circumstances of this case. [FN16] This case, however, is unusual. Collins worked at AIG for twenty-six years. During many of those years, he was away from home the majority of the time. During the trial, Collins testified that he was stationed in Iran during the fall of the Shah. The option plans at issue in this lawsuit were granted to Collins as compensation for his work and years of service to AIG. Having considered all of the circumstances and having assessed the witnesses' testimony at trial, I am satisfied that but for AIG's promise, Collins would have exercised his options within the ninety-day grace period following his retirement.

> FN16. *See* Fisher Black & Myron Scholes, *The Pricing of Options and Corporate Liabilities,* 81 J.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 7
1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E
**(Cite as: 1998 WL 227889 (Del.Ch.))**

Pol. Econ. 637 (1973).

In the exercise of my discretion to fashion appropriate relief, therefore, I find that justice will be served best if Collins is allowed to exercise his options to the extent I have described above . [FN17]

> FN17. In light of this conclusion (based on promissory estoppel), I need not reach Collins' claim that AIG violated the implied covenant of good faith and fair dealing by the manner in which AIG administered the option plans.

An Order has been entered in accordance with this decision.

ORDER
For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED (A) that final judgment is entered against defendant American International Group, Inc., and in favor of plaintiff Richard Collins on plaintiff's complaint seeking specific performance of certain stock options and plaintiff is entitled to exercise the following options:
**\*7** 1). November 16, 1983 for 600 shares;
2). July 10, 1985 for 500 shares;
3). December 1, 1987 for 500 shares;
4). May 18, 1988 for 500 shares;
5). January 18, 1990 for 250 shares (50% vested);
6). October 11, 1990 for 250 shares (50% vested).

(B) that the parties shall bear their own court costs and attorneys fees in connection with this litigation.

1998 WL 227889 (Del.Ch.), Pens. Plan Guide (CCH) P 23948E

END OF DOCUMENT