UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────
                              )
FIRST MARBLEHEAD CORP.,       )
                              )
            Plaintiff,        )
                              )
        v.                    )      CIVIL ACTION NO. 04-11263-PBS
                              )
GREGORY J. HOUSE,             )
                              )
            Defendant.        )
─────────────────────────────)
```

**MEMORANDUM AND ORDER**

November 18, 2005

Saris, U.S.D.J.

## I. INTRODUCTION

This dispute arises out of defendant Gregory House's attempt to exercise stock options granted to him by his employer, plaintiff First Marblehead Corporation. First Marblehead asserts that House's options expired three months after he left First Marblehead, while House contends that the options have a ten-year duration. First Marblehead moves for summary judgment on all claims and counterclaims. After hearing and review of the briefs, the motion is **ALLOWED**.

## II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the non-moving party, see Barbour v. Dynamics Research Corp, 63 F.3d 32, 36 (1st Cir. 1995), the facts are as follows:

Prior to joining First Marblehead, House had worked in the area of stock options for over ten years. He was employed in the commodity options division of Prudential Bache's New York City

office for five years starting in 1982 and in the options trading
division of Societe Generale from 1990 to 1993.  While self-
employed, he wrote a fixed income stock options pricing model.
He has also purchased and sold stock options.

House began working at First Marblehead in April 1996 after
interviewing with First Marblehead's President, Stephen Anbinder,
and its Chief Executive Officer, Daniel Meyers.  As part of the
pre-employment discussions, Anbinder and Meyers told House that
First Marblehead would be issuing stock options and that House
would receive some of them if he came to work for First
Marblehead.

In October 1996, First Marblehead's Board of Directors
adopted a stock option plan (the "Plan"), which was approved by
the shareholders in March 1997.  House helped Meyers value the
options in the spring of 1997 at Meyer's request.  The Plan
provides for the grant of "incentive stock options ("Incentive
Stock Options"), as defined in section 422 of the [Internal
Revenue] Code."  (Pl.'s Summ. J. App. Tab D § 4.01.)  Section
7.02(d) of the Plan provides:

> Upon the termination of the grantee's employment for
> reasons other than [death of grantee, retirement or
> disability, or termination for cause], the Options will
> remain exercisable by the grantee for a period not
> extending beyond three months after the date of the
> termination of employment, but only to the extent of
> Options which are exercisable as of the date of such
> termination of employment.

(Id. § 7.02(d).)  The term "Options" refers to Incentive Stock
Options and Nonstatutory Stock Options.  (Id. § 1.)  Under the
Plan, a stock option committee (the "Committee") appointed by the
Board of Directors determines "the time or times within which

-2-

. . . all or portions of each Option may be exercised." (<u>Id.</u>
§ 2.01-02.)  First Marblehead granted options to House and other
employees in June 1997.

Also in June 1997, House received a "compensation review"
worksheet (the "Worksheet"), which showed his total employment
compensation consisting of his salary, benefits, and stock
options for 2500 shares of First Marblehead stock.  The Worksheet
stated:

    STOCK OPTIONS
    ISO Shares Granted:  2,500
    Value of ISO Shares (at $31.25 per share):  $78,125

(Pl.'s Summ. J. App. Tab H.)  House understood that the term ISO
meant incentive stock options.

House also received a two-page memorandum dated July 7, 1997
(the "July 7 Memorandum"), authored by First Marblehead's outside
general counsel, which set forth the "principal terms" of the
Plan.  The memorandum stated that the issued incentive stock
options "must be exercised within ten years of the date of grant"
and had a strike price of approximately $32 per share.  (Pl.'s
Summ. J. App. Tab J Part 2.)  It outlined a vesting schedule,
where 20% of the options would vest immediately and the remainder
would vest 20% each year for the following four years.  According
to the July 7 Memorandum, the vesting of some options could be
deferred if the employee's work was unsatisfactory, and all
unvested options would terminate in the event of resignation or
termination for "cause."  (<u>Id.</u>)

The vesting schedule outlined in the July 7 Memorandum
conflicted with what House had been told regarding stock options

-3-

when he interviewed with First Marblehead.  During the interview, House had been told that his options were to be fully vested at the time of the grant.  House contacted Meyers, who agreed that House's options were not subject to the vesting schedule in the July 7 Memorandum, but were fully vested options upon grant.  The parties do not dispute that House had fully vested options at the time his employment terminated.

At some point after the distribution of the July 7 Memorandum, First Marblehead prepared specific stock option grants to its employees.  House's grant was dated June 15, 1997, but was never signed by House or Meyers.  It stated: "The Option is intended by the parties to be, and shall be treated as, an incentive stock option as such term is defined under Section 422 of the Internal Revenue Code of 1986, as amended."  (Pl.'s Compl. Ex. B § 1.)  The grant specified that House's options were fully vested options and exercisable immediately.  (<u>Id.</u> § 2.01.) House's grant also stated that the options "shall terminate and become null and void after the expiration of ten (10) years from the Date of Grant."  (<u>Id.</u> § 3.01.)  In language identical to that of the Plan, House's grant also imposed a three-month time limit for exercising the options upon leaving the company.  (<u>Compare id.</u> § 3.02(d) <u>with</u> Pl.'s Summ. J. App. Tab D § 7.02(d).)

House quit in February 1998.  House saw neither the specific grant of incentive stock options, which was prepared for him, nor the complete Plan as adopted by First Marblehead's Board of Directors prior to his departure.  House was never told he had to exercise his incentive stock options within 3 months of

-4-

termination from his job.  House contends that he believed he
could exercise his stock options any time within the ten-year
period.  However, no one at First Marblehead ever told him
anything about the time limits for exercise upon the termination
of his employment -- nor did he inquire.

In February 2004, House contacted First Marblehead and
indicated that he wanted to exercise his incentive stock options.
On February 27, 2004, First Marblehead declined to honor House's
options on the grounds that House's options expired under the
Plan when he did not exercise them within three months after
leaving First Marblehead.

On May 19, 2004, First Marblehead filed this complaint
seeking a declaratory judgment that House's options expired and
are thus null and void.  House counterclaimed for breach of
contract and promissory estoppel.  Only July 1, 2005, First
Marblehead moved for summary judgment on all claims and
counterclaims.  After the parties submitted all summary judgment
briefs, House amended his answer to add a negligent
misrepresentation counterclaim.

### III. ANALYSIS

**A.  <u>Summary Judgment Standard</u>**

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  <u>Barbour</u>, 63 F.3d
at 36 (quoting Fed. R. Civ. P. 56(c)).  "To succeed [in a motion

-5-

for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50).  The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

**B.  Incentive Stock Options**

First Marblehead argues that under the Plan, defendant's options are Incentive Stock Options ("ISOs") governed by the Internal Revenue Code, 26 U.S.C. § 422.  Section 422(a) requires the holder of an ISO to exercise that option during the holder's employment or within three months of termination of that employment in order to take advantage of the special tax treatment conferred by 26 U.S.C. § 421(a).  The Plan stated that the options were ISOs within the meaning of the code, and the July 7 Memorandum informed House that the options he received

-6-

were ISOs.

The Plan's definition of the options as ISOs governed by the Internal Revenue Code, however, does not conclusively resolve this dispute.  The time requirement contained in § 422(a) is not a limit on the exercisability of an ISO but a limit on the availability of the special tax treatment in § 421(a).  First Marblehead's Plan recognized that its ISOs may, under certain circumstances, fail to qualify for special tax treatment: ". . . the tax treatment available pursuant to Section 422 of the Code upon the exercise of an Incentive Stock Option will not be available to a grantee who exercises any Incentive Stock Options more than . . . three months after the date of termination . . . ." (Pl.'s Summ. J. App. Tab D § 7.02(b).)  While the three-month limitation of § 422(a) is not dispositive because House is not claiming any special tax treatment, the definition of the option in the grant to House as an "ISO" is relevant in evaluating the merits of the state-law claims, as will be seen below.

C.  **Breach of Contract**

First Marblehead contends that the terms of the Plan, specifically its three-month limit for employees who have terminated their employment, govern the exercisability of House's ISOs.  From their briefs, both parties appear to agree that Delaware law applies.

Delaware law provides that the terms of the options, including the time for exercise, shall be determined by the board of directors subject to the provisions in the certificate of

incorporation.  In relevant part, § 157 of the Delaware Code
states:

> (a) Subject to any provisions in the certificate of
> incorporation, every corporation may create and issue,
> whether or not in connection with the issue and sale of
> any shares of stock or other securities of the
> corporation, rights or options entitling the holders
> thereof to acquire from the corporation any shares of
> its capital stock of any class or classes, such rights
> or options to be evidenced by or in such instrument or
> instruments as shall be approved by the board of
> directors.

> (b) The terms upon which, including the time or times
> which may be limited or unlimited in duration, at or
> within which, and the consideration (including a
> formula by which such consideration may be determined)
> for which any such shares may be acquired from the
> corporation upon the exercise of any such right or
> option, shall be such as shall be stated in the
> certificate of incorporation, or in a resolution
> adopted by the board of directors providing for the
> creation and issue of such rights or options, and, in
> every case, shall be set forth or incorporated by
> reference in the instrument or instruments evidencing
> such rights or options.  In the absence of actual fraud
> in the transaction, the judgment of the directors as to
> the consideration for the issuance of such rights or
> options and the sufficiency thereof shall be conslusive
> [sic].

Del. Code tit. 8, § 157.  "Section 157, relating to rights and
options respecting stock, requires board approval and a written
instrument to create such rights or options."  Grimes v. Alteon,
Inc., 804 A.2d 256, 260 (Del. 2002).  The Board of Directors has
the "exclusive authority to issue stock and regulate a
corporation's capital structure."  Id. at 261.  Delaware law
mandates "strict conformity with the statutory requirements for
the issuance and sale of stock" even in situations which "might
generate an inequitable result."  Liebermann v. Frangiosa, 844
A.2d 992, 1004 (Del. Ch. 2002).

House argues that the written terms of the grant of the

-8-

stock option do not govern because the July 7 Memorandum he received states that the options have a ten-year duration.  This argument fails for two reasons.  First, even if the July 7 Memorandum had provided a ten-year period to exercise an option, under Delaware law, the terms of the instrument approved by First Marblehead's Board of Directors, not the terms of a memorandum and worksheet with arguably conflicting terms, govern the exercisability of options.  Second, the July 7 Memorandum merely stated that the options had a ten-year duration.  The July 7 Memorandum contained no provisions governing the exercisability of options in the event of termination.  Accordingly, this Court allows First Marblehead's motion for summary judgment on the breach of contract counterclaim.

**D.   Promissory Estoppel**

Alternatively, House argues that he was entitled to exercise his stock options at prices in 2004 after the company went public under a theory of promissory estoppel.  While there is no dispute that House was granted 2500 fully vested options, as promised, House claims he relied on the language in the Worksheet and the July 7 Memorandum, and its omission to state a time deadline for exercise after termination.

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires."  Restatement (Second) of Contracts § 90(1) (1981).

-9-

Under the doctrine of estoppel, minor extensions of an option exercise deadline by management may be permitted to deal with last minute emergencies. Ostler v. Codman Research Group, Inc., 241 F.3d 91, 98 (1st Cir. 2001) (holding that estoppel doctrine protects those who rely on corporation officers later found to lack actual authority). Based on Ostler and an unpublished Delaware case, one district court used estoppel principles to hold that an affirmative waiver of a 90-day requirement of exercisability of stock options not made by the board of directors was not *ultra vires* under Del. Code tit. 8, § 157. Wert v. Clear Channel Commc'ns, Inc., 345 F. Supp. 2d 909, 911-12 (N.D. Ill. 2004). However, "corporate law remains fairly fussy about the actual authority of officers when their actions affect stock options." Ostler, 241 F.3d at 94; Wert, 345 F. Supp. 2d at 911 (quoting Ostler, 241 F.3d at 94).

This promissory estoppel argument lacks merit. First, no corporate officers made affirmative misrepresentations with respect to the exercisability of time requirements. Second, House was no babe-in-the-option woods; he knew that a written grant was necessary, yet he never asked for the written grant or inquired about the terms of the ISO upon leaving. Any reliance on an omission to discuss a post-termination time limit for exercising the stock options in the July 7 Memorandum was unreasonable, particularly in light of the designation of the option as an "ISO," which should have raised a red flag to exercise due diligence and to investigate its terms. Therefore, this Court also allows First Marblehead's motion for summary

-10-

judgment on the promissory estoppel counterclaim.

**E.  Negligent Misrepresentation**

House's negligent misrepresentation claim expires for the same reasons.[1]  Under either Delaware or Massachusetts law, a negligent misrepresentation claim requires, inter alia, plaintiff to prove that defendant supplied false information and justifiable reliance by plaintiff on the false information.  H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 147 n.44 (Del. Ch. 2003); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 60 n.25, 809 N.E.2d 1017, 1031 n.25 (2004).  As discussed, House has produced no evidence to show justifiable reliance on the omission of the July 7 Memorandum and the Worksheet.  Accordingly, this Court allows First Marblehead's motion for summary judgment on the negligent misrepresentation claim.

---

[1] Neither party has briefed this claim.

-11-

## ORDER

First Marblehead's motion for summary judgment on all claims and counterclaims is **ALLOWED**.  (Docket No. 23.)


**S/PATTI B. SARIS**
United States District Judge