# United States Court of Appeals
## For the First Circuit

FILED
CLERKS OFFICE

2006 DEC 26  A  9: 29

U.S. DISTRICT COURT
DISTRICT OF MASS.

No. 06-1114

THE FIRST MARBLEHEAD CORP.,

Plaintiff, Appellee,

v.

GREGORY HOUSE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Siler,* Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Peter N. Wang, with whom Yonaton Aronoff and Foley & Lardner LLP were on brief, for appellant.
Kenneth J. DeMoura, with whom Michael D. Riseberg and Adler Pollock & Sheehan P.C. were on brief, for appellee.

---

December 22, 2006

---

* Of the Sixth Circuit, sitting by designation.

**LIPEZ, Circuit Judge.** This case concerns a claim made by Gregory House against his former employer, First Marblehead Corporation (the "Company"), relating to its refusal to honor his attempt to exercise certain incentive stock options ("ISOs") he received during his employment. According to the written, board-approved plan governing the ISOs' terms and conditions ("the Plan"), House's ISOs expired three months after his resignation from the Company. However, House alleges that he was repeatedly assured that his ISOs had a ten-year term of exercise and that he never received a copy of the Plan. He also alleges that the Company was advised by its outside general counsel that employees such as House were misinformed about the duration of their ISOs after termination of employment, but that the Company failed to inform him of this fact.

The district court granted summary judgment for First Marblehead on House's claims for breach of contract, promissory estoppel, and negligent misrepresentation. After careful review of the record, we affirm the grant of summary judgment on the breach of contract and promissory estoppel claims, but vacate the judgment on the negligent misrepresentation claim and remand for further proceedings.

## I.

The following facts are drawn from the pleadings and depositions and are largely undisputed. Where conflicts exist, we

view the record in the light most favorable to House, who is the nonmoving party. Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). House was recruited by Dan Meyers, his friend and First Marblehead's CEO, to work at First Marblehead in early 1996. Meyers promised House that he would receive valuable stock options to compensate him for the salary cut he would take by leaving his previous position.

Shortly after House began working at First Marblehead, the Company approved the 1996 First Marblehead Stock Option Plan. The Plan documents included a vesting schedule and specified the constraints on exercise when an employee resigned or was terminated. According to the Plan, a resigning employee's "[o]ptions will remain exercisable by the grantee for a period not extending beyond three months." House has testified and First Marblehead has conceded that House never received a copy of this Plan.

In the spring of 1997, Meyers asked House to value the incentive stock options the Company was preparing to issue. Management described the key features of these options to House - features that would play an important role in House's valuation - including that the options would have a $32 strike price,[1] a ten-year duration, and a certain rate of interest and volatility. This

---

[1] The strike price is the price at which the employee may purchase the corporate stock.

was the first time House learned that the ISOs would be exercisable
for ten years.

At his compensation review in June 1997, House received
a worksheet indicating that he had been granted 2,500 ISOs, valued
at $31.25 per share. This worksheet did not reference the Plan nor
did it disclose that the ISOs would expire within three months
should House resign from First Marblehead.

A few weeks later, on July 7, 1997, House received a memo
from First Marblehead's general counsel, Rodney Hoffman, spelling
out "the principal terms" of the ISOs.  This memo, and a
presentation by Hoffman, reiterated the strike price and the ten-
year duration House had ascertained during his role in pricing the
options.  The memo failed to address the three-month expiration
upon resignation. It did, however, introduce conditions relating
to the vesting schedule.  The vesting schedule caught House by
surprise – only 20% of his options would vest immediately and 20%
of the remainder would vest each year over a period of four years.
House objected to the vesting schedule and immediately negotiated
with Meyers to make his options exercisable at once.   Meyers
agreed.

Shortly after preparing the memo and presentation laying
out the vesting schedule, Hoffman realized that the three-month
expiration date on options for employees leaving First Marblehead
was another significant term and condition requiring disclosure.

-4-

According to Hoffman's testimony in a deposition, he prepared a supplemental memorandum on July 11, 1997, specifying that vested options would terminate if not exercised within three months of an employee's departure. The cover letter accompanying this memo and addressed to "Employees of First Marblehead" stated:

In preparing the final form of the ISO grant document, I found that I had misstated one of the terms of the option in the summary memo . . . . Mea culpa. A copy of that revised memo is attached . . . . You will note that the change is to Section II.4 which describes what happens to the options upon termination of employment.

Hoffman testified that he delivered this memo to the Company, but it is unclear whether the Company distributed it. House claims – and the Company concedes – that he never received this memo.

In early 1998, House resigned from First Marblehead. In February 2004 – after a public offering of First Marblehead's stock led to a dramatic increase in the stock's value – House attempted to exercise his options, but his efforts were rejected. House claims that his options are worth 7 million dollars; when issued, they had a grant price of $75,125.

During the ensuing negotiations between House and First Marblehead, the Company sought a declaratory judgment in the Massachusetts Superior Court that House's ISOs had expired three months after his resignation. Invoking diversity jurisdiction,[2]

---

[2] House is a New Jersey resident; First Marblehead is incorporated in Delaware and its principal place of business is Massachusetts.

House removed the action to federal court and asserted two counterclaims: breach of contract, based on First Marblehead's refusal to honor the terms of his options, and promissory estoppel, based on First Marblehead's failure to make good on its repeated promises to House that he had ten years in which to exercise his options.

House became aware of the "mea culpa" memo as a result of deposing Hoffman. Soon thereafter, House moved to compel the Company to produce this memo. First Marblehead filed a motion for summary judgment on House's counterclaims soon thereafter. During the pendency of that motion and after the parties had submitted briefs and argued before the district court, the district court compelled production of the memo. House promptly amended his complaint to add a negligent misrepresentation claim arising from First Marblehead's failure to inform House about the three-month expiration of his options upon his resignation even though Hoffman's memo had alerted the Company to the urgency of doing so.

The district court granted First Marblehead's motion for summary judgment on House's breach of contract and promissory estoppel counterclaims. In addition, the court granted summary judgment sua sponte on House's negligent misrepresentation counterclaim, even though First Marblehead had not moved for summary judgment on that claim and the parties had not briefed the issue.

-6-

The district court granted the Company's motion for summary judgment on House's breach of contract claim because it found that the worksheet from House's compensation review and the July 7 memo contained no affirmative representations that conflicted with the Plan and that, even if they did, Delaware law requires that a written, board-approved plan take precedence over all other representations regarding corporate stock. The district court also granted the Company's motion for summary judgment on House's promissory estoppel claim on several grounds: (1) Delaware law bars equitable claims based on representations contrary to written, board-approved language regarding stock options; (2) no affirmative representations were made to House about a ten-year period for exercising his options after terminating his employment; and (3) House could not have reasonably relied on any affirmative representations made in any event because he had expert knowledge of how options worked. Finding that House's negligent misrepresentation claim required two of the same elements as his rejected promissory estoppel claim – an affirmative misrepresentation and reasonable reliance – the district court granted summary judgment to First Marblehead on that claim as well.

On appeal, House argues that the district court erred by applying an overly broad construction of Delaware law to his contract and promissory estoppel claims, and that Delaware law does not foreclose either of these claims. He also argues that the

-7-

Company affirmatively misrepresented the terms of his options; that he reasonably relied on those assertions or, at the least, that the reasonableness of his reliance - an element of both the promissory estoppel and negligent misrepresentation claims - is a factual question that should have survived summary judgment; and that the Company's failure to disclose to him the "mea culpa" memo correcting the earlier, erroneous memo constituted negligent misrepresentation. As we shall explain, we agree in part with his contentions.

## II.

We review the grant of summary judgment de novo. McConkie v. Nichols, 446 F.3d 258, 260 (1st Cir. 2006). We are not "wed to the lower court's rationale but, rather, may affirm the entry of summary judgment on any ground made manifest by the record." Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005). Summary judgment is proper where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We apply Delaware law to the contract and promissory estoppel claims since both parties agree that it controls. Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003)(noting that, where the parties agree as to the substantive law controlling their diversity case, the court can and should accept that agreement). However, we apply Massachusetts law to the

negligent misrepresentation claim. See Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 13 (1st Cir. 2004) ("Sitting in diversity, we look to the substantive law of the forum state . . . to guide our analysis.") (citing Correia v. Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003)).

**A.      Breach of Contract and Promissory Estoppel**

**1.      Affirmative Misrepresentation**

At the heart of both House's breach of contract and promissory estoppel claims is the proposition that the Company represented to him that he would have ten years to exercise his ISOs.[3] Even if the Company had affirmatively represented to House that he had ten years in which to exercise his ISOs even after terminating his employment, any such representations would have been contrary to the Plan approved by the Company's board of directors, which only permitted a three-month period for the exercise of House's ISOs after departure. As we describe below, Delaware law requires that the terms and conditions of stock options be governed by a written, board-approved Plan.

_____

[3] House also argues that the court should not have granted the motion for summary judgment on the breach of contract claim because First Marblehead's failure to disclose the terms and conditions of the ISOs breached Section 5 of the Plan, which required First Marblehead to deliver "a writing" to House "specifying the terms and conditions" of his options. However, this appears to be a novel claim not raised before the district court and we will not entertain it here. Domegan v. Fair, 859 F.2d 1059, 1065 (1st Cir. 1988).

-9-

## 2.    Delaware Corporate Law

Pursuant to Delaware Law," every corporation may create and issue . . . rights or options . . . <u>such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors</u>." Del. Code Ann. tit. 8, § 157(a)(emphasis added). Delaware courts have observed that this rule was designed to serve the important policy goal of "preserv[ing] the board's broad authority over the corporation and . . . protect[ing] the certainty of investors' expectations regarding stock." <u>Grimes</u> v. <u>Alteon, Inc.</u>, 804 A.2d 256, 258 (Del. 2002); <u>see also</u> <u>STAAR Surgical Co.</u> v. <u>Waggoner</u>, 588 A.2d 1130, 1136 (Del. 1991) ("The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters."). Here the Plan's explicit three-month time limit for the exercise of ISOs held by employees who resign would thus supersede any other non-board-approved communications about the expiration of the ISOs.

We note that Delaware courts have adhered to statutory requirements respecting stocks when denying claims for equitable relief – "even in situations when that might generate an inequitable result." <u>Liebermann</u> v. <u>Frangiosa</u>, 844 A.2d 992, 1004 (Del. Ch. 2002); <u>see also</u> <u>STAAR Surgical Co.</u>, 588 A.2d at 1137

(directing that "neither logic nor equity compel the validation of a legally void [because in contravention of Section 157] act"); Superwire.com, Inc. v. Hampton, 805 A.2d 904, 909 n.17 (Del. Ch. 2002) (averring that the court "cannot give any effect to void shares even in the context of an equitable defense" (emphasis in original)) (citing STAAR Surgical Co., 588 A.2d at 1137).

House urges us to read these cases narrowly, as standing only for the proposition that the initial issuance of stock need be controlled by a writing, duly approved by a corporation's board of directors. Since the case at hand concerns the right to exercise options to purchase validly issued stock, House argues that this Delaware jurisprudence does not apply. We find this argument unpersuasive. The policy concern motivating Section 157 – that a "corporation know precisely what its capital stock is and what the potential calls on that capital will be," Grimes, 804 A.2d at 259 (quoting Grimes v. Alteon, No. 18442-NC, at 60 (Del. Ch. Apr. 11, 2001) (bench ruling)) – is compromised if validly issued stock options are exercised in a way that conflicts with the Plan's terms.[4] It seems incontestable that resurrecting House's right to

_____

[4] House advances an alternative argument that depends upon the distinction between "statutory" and "nonstatutory" options. Statutory ISOs that meet six criteria enumerated in Section 422(b)of the Internal Revenue Code, 26 U.S.C. § 422(b) (including expiration within three months of employment termination) qualify for special tax benefits. House contends that the Plan required only that statutory options be exercised within three months of resignation and that his ISOs should be treated as nonstatutory, thereby exposing him to tax liability but shielding him from the

redeem 100,000[5] shares of Company stock would substantially affect the corporation's control of its capital stock.

Appellant also offers several cases suggesting that Section 157 may not completely bar his promissory estoppel claim. See, e.g., Ostler v. Codman Research Group, Inc., 241 F.3d 91 (1st Cir. 2001); Wert v. Clear Channel Commc'ns, Inc., 345 F.Supp.2d 909 (N.D. Ill. 2004). In Ostler, a case we decided, the plaintiff (Ostler) held stock options that were soon to expire. To exercise them, Ostler was required by a board-approved writing to certify that he had fully investigated the company's current financial condition. Ostler requested relevant information from the company,

---

three-month expiration. House's argument fails for two reasons. First, it depends upon a misreading of the Plan. The Plan does not limit the three-month expiration to statutory options. Section 7.02(d), entitled: "The Effect of Termination of Employment," states: "[u]pon the termination of grantee's employment . . . the Options will remain exercisable by the grantee for a period not extending beyond three months . . . ." "Options" is a defined term in the Plan, signifying "Incentive Stock Options and Nonstatutory Stock Options (collectively, as defined below, 'Options')." House relies upon the testimony of the Plan's drafter indicating that nonstatutory options were never intended to be covered by this provision; however, the Plan language is clear and it is well established that extrinsic evidence may not be used to interpret an otherwise clear and unambiguous contract. Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997). Second, there is no basis on which to classify House's options as nonstatutory: they were clearly labeled ISOs in the worksheet and the July 7 memo and the discussion of "types of options" in Section 4.01 of the Plan allows for only ISOs "as defined in Section 422 of the Code" and nonstatutory options. There is no room for a nonstatutory ISO.

[5] Although House was initially granted 2,500 ISOs, he argues that a series of stock splits has increased that number to 100,000.

but received only a draft financial report just days before the options were to expire. Because it was likely that the final report would differ significantly from the draft, company management extended the option exercise deadline to 48 hours after a final report was issued. In a subsequent breach of contract case, Ostler argued that the deadline extension was not valid because it was not written and approved by the board. We ultimately validated the extension and denied relief to Ostler,[6] noting that at least one Delaware court - albeit in an unpublished decision - had recognized an exception to the requirement that board approval be obtained for all actions related to options. See Collins v. Am. Int'l Group, No. 14365, 1998 Del. Ch. LEXIS 67 (Del. Ch. Apr. 28, 1998).

We observed that the ruling in Collins "may suggest that a minor extension of an option exercise deadline by management is permitted under Delaware law, but it is hardly conclusive."[7]

---

[6] Ostler's claim in the case depended on a finding that the company had not fulfilled its disclosure requirements because it delivered its financial report after the original option deadline. He therefore sought to demonstrate that extension of the option deadline was invalid.

[7] In Collins, an employee brought a claim to enforce the Company's oral promise that it would waive the expiration date for the exercise of his stock options upon his retirement, allowing him ten years in which to exercise his options. The Delaware Chancery Court determined that Collins met his burden of proving the elements of promissory estoppel and enforced the employer's promise, allowing the employee to exercise his options "but only to the extent that he could have exercised them before the expiration of the ninety-day grace period following his early retirement."

Ostler, 241 F.3d at 94. We further noted that "[i]t is not clear in Collins whether the [contested option] deadline was part of the option plan or who had authority to alter the deadline; nor did the court expressly discuss section 157." Id. at 94 n.2. In underscoring our narrow interpretation of Collins, we cautioned that "corporate law remains fairly fussy about the actual authority of officers when their actions affect stock options." Id. at 94. Thus we emphasized in Ostler the limited nature of the exception we were reluctantly endorsing, allowing - in the district court's words - only "minor extensions of an option exercise deadline . . . to deal with last minute emergencies."

Appellant asks us to expand this narrow holding to accommodate the far different circumstances here. Rather than a 48-hour extension, appellant seeks to extend his options years beyond the expiration period set by the board. While a two-day extension arguably would not frustrate management's ability to make capital decisions with certainty, a delay of years could have a significant impact. We agree with the district court that Delaware law does not allow the relief House seeks under these circumstances.

---

No. 14365, 1998 Del. Ch. LEXIS 67, at *18. We note that Delaware permits the citation of unpublished decisions as precedent. See New Castle County v. Goodman, 461 A.2d 1012, 1013 (Del. 1983) ("[L]itigants before this Court may cite Orders as precedent.")

### 3. Reasonable Reliance

In granting summary judgment to First Marblehead as to House's promissory estoppel claim, the district court also found that, even if the Company had affirmatively misrepresented the terms of his options, House could not have reasonably relied on any such misrepresentation because House was no "babe-in-the-option woods." Because we agree with the district court that Delaware law bars House's recovery on his breach of contract and promissory estoppel claims, we do not analyze House's reliance here. Instead, we will address the reliance issue in analyzing his negligent misrepresentation claim.

## B. Negligent Misrepresentation

Although the district court noted that "neither party has briefed this claim," it granted First Marblehead summary judgment on House's negligent misrepresentation claim, concluding that the claim failed for the same reasons as his promissory estoppel claim. We disagree with that conclusion.

### 1. Governing Law

Where the parties "have reached a plausible agreement about what law governs, a federal court sitting in diversity jurisdiction is free to forgo independent inquiry and accept that agreement." Cochran, 328 F.3d at 6. Pursuant to a clause in First Marblehead's Plan, its provisions "shall be governed by and interpreted in accordance with" Delaware law. Provisions of the

-15-

Plan were, in fact, central to the contract and promissory estoppel claims. Hence the parties plausibly agreed that Delaware law applied to the contract and promissory estoppel claims. Since no similar agreement governs the negligent misrepresentation claim, we consult Massachusetts choice of law principles to determine whether Massachusetts or Delaware law applies.[6]

Massachusetts's approach to choice of law is "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." Levin v. Dalva Bros., Inc., 459 F.3d 68, 74 (1st Cir. 2006) (quoting Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass. App. Ct. 492 (Mass. App. Ct. 2004)). Section 148 of the Restatement spells out the choice of law analysis for misrepresentation claims, indicating that the law of the state where the representations were made, received, and relied upon should govern unless another state has a closer connection to the parties or the occurrence. See Restatement (Second) of Conflict of Laws § 148(1) (1971). First Marblehead's principal place of business is Boston, Massachusetts. The misrepresentations were made, received, and relied upon in Massachusetts and House is a Massachusetts resident. These factors

---

[6] The district court assessed the negligent misrepresentation claim under both Delaware and Massachusetts law, concluding that House's claim was foreclosed by the law of both jurisdictions. In briefing this issue on appeal, the parties follow the district court's lead, citing the negligent misrepresentation law of both Delaware and Massachusetts. Although the law of both jurisdictions may well be the same, we see no reason to avoid the choice of law issue.

-16-

all point to the application of Massachusetts law to the negligent misrepresentation claim.    Further, no one has argued that the requirements of the cause of action in Delaware are different than in Massachusetts, and there is no obvious conflict with the Delaware statute.   Cf. Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004).

## 2.    The Massachusetts Law of Negligent Misrepresentation

To prevail on his negligent misrepresentation claim under Massachusetts law, House must show that the Company "(1) in the course of [its] business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information," Nota Constr. Corp. v. Keyes Assocs., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998) (citation omitted).   We discuss the key issues of misrepresentation and justifiable reliance.

### a.    Misrepresentation

The   district   court   did   not   squarely   address   the misrepresentation at issue on this claim.    Instead, it seemed to rely on its earlier conclusion that the Company made no affirmative misrepresentation to House regarding the expiration of his ISOs upon departure from the Company.    However, Massachusetts law allows negligent misrepresentation claims to be predicated upon a failure

-17-

to disclose. Thus, even if First Marblehead made no affirmative misrepresentations to House, this fact poses no bar to House's recovery. See Fox v. F&J Gattozzi Corp., 672 N.E.2d 547, 550-51 (Mass. App. Ct. 1996) (finding a grant of summary judgment to employer improper where employee advanced a negligent misrepresentation claim based on employer's withholding of critical information relating to employees' retirement benefits); see also Swinton v. Whitinsville Sav. Bank, 42 N.E.2d 808 (Mass. 1942) (establishing that the correct statement of liability for nondisclosure is contained in the Restatement of Torts § 551); Restatement (Second) of Torts § 551(1) (1977) ("One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.").

House's negligent misrepresentation claim features the allegation that the Company failed to inform him of the three-month expiration upon termination of employment while supplying him with incomplete materials suggesting that his options would be exercisable for ten years. Indeed, when First Marblehead's outside general counsel and the drafter of the Plan noticed that the July 7 memo (which House received) specified a ten-year term without

-18-

addressing the three-month expiration that applied to employees upon leaving the Company, he realized he had made a "mistake." Hoffman drafted a revised memo so that employees like House could be advised of the misleading nature of his July 7 memo. In the cover letter he attached, Hoffman took responsibility for his mistake and stressed the importance of distributing the revised information to employees like House who had received the earlier memo. Though Company management claims it never received the memo, Hoffman testified that he gave it to them and a jury could reasonably believe Hoffman's account of events.

That House did not receive the revised memo is undisputed. In fact, First Marblehead attempts to make a virtue of its failure to provide this memo to House, arguing that because he never received the revised memo, he could not have relied upon it. This is a foolish argument. The Company's failure to provide this revised memo to House is at the heart of House's negligent misrepresentation claim. Given Hoffman's testimony, a reasonable jury could find that the Company "failed to exercise reasonable care" when it failed to distribute the revised memo to House. Hoffman's testimony that the Company had notice regarding its failure to disclose an important term of the options and the Company's acknowledged failure to disclose that information to House are more than sufficient to raise a genuine issue of material fact regarding negligent misrepresentation through failure to disclose.

-19-

### b.   Reasonable Reliance

The district court determined that House could not have reasonably relied upon any misrepresentations by First Marblehead regarding the terms and conditions of his ISOs because of his expertise in the options field. In our view, the summary judgment record does not permit this definitive conclusion.

It is indisputable that House had more than a passing familiarity with stock options. House priced the ISOs issued by First Marblehead; he testified during his deposition that prior to joining the Company, he worked for a bank that "traded options . . . I priced them – managed – risk managed them, did a variety of things in that regard"; and he admitted having read "uncountable" books on the subject.

The record, however, casts doubt on the breadth of House's knowledge regarding ISOs' legal attributes and suggests that his familiarity with options extended only to their technical, financial characteristics. House testified that he had never received ISOs nor had he attempted to price or redeem them before joining the Company.[9] In describing a three-year period in which he was self-employed, House explained that he "wrote a fixed income options pricing model . . . [which] required [the] skill of writing in the C [computer programming] language." In addition, in his subsequent

---

[9] While House had priced options before, he had never before priced incentive stock options, which often involve the kind of abbreviated redemption period we see in this case.

employment with ABN Amro, he was employed by the "software development group . . . provid[ing] the financial information that would be used by the programmers to develop . . . software." According to Meyers, House was hired by First Marblehead to work with the Company's president "[o]n financial modeling and technical issues."

Responding to the question "Do you know what incentive stock options are?", House responded: "Yes, I have a vague idea. I mean that to me is a legal term, and that is not my area of expertise in what I do . . . [o]ptions to me are – have mathematical characteristics that can be mathematically modeled."   House testified regarding the precise factors relevant to pricing options:

as far as I was concerned, these options were that – options that from a mathematical standpoint could have been on the Chicago board of trade, and we priced them that way, and there was a standard variety mathematical model for doing that. Embedded in that model though is a set of assumptions . . . [s]ome are known, like 32 dollar strike price and ten-year term, and some are assumed. One main one was assumed. . . . volatility.

Massachusetts courts have expressed a strong preference that reliance, in the context of negligent misrepresentation claims, be determined by a jury, and not on summary judgment, "unless the undisputed facts are so clear as to permit only one conclusion." Nota, 694 N.E.2d at 20 (citing Fox, 672 N.E.2d at 551).   Whether House reasonably relied upon the representations of the Company is at least a question of fact that should have survived the motion for summary judgment.

-21-

## III.

For the reasons stated above, we affirm the district court's grant of summary judgment on House's breach of contract and promissory estoppel claims; however, we vacate and remand for further proceedings on House's negligent misrepresentation claim. Costs are awarded to appellant.

So ordered.