1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

FIRST MARBLEHEAD CORP.,

                                        Civil

                    Plaintiff,         Action

                                        No.

            -against-                  04-11263PBS

GREGORY HOUSE,

                    Defendant.

- - - - - - - - - - - - - - - - - x


                    April 20, 2005

                    12:57 p.m.




Deposition of STEPHEN E. ANBINDER, taken by

Defendant, pursuant to Notice, held at the offices

of Foley & Lardner LLP, 90 Park Avenue, New York,

New York, before Robert E. Levy, a Certified

Shorthand Reporter and Notary Public within and for

the State of New York.

2

A p p e a r a n c e s :

        ADLER POLLOCK & SHEEHAN P.C.

                Attorneys for Plaintiff

                175 Federal Street

                Boston, Massachusetts 02110


        By:    KENNETH J. DEMOURA, ESQ.,

                                        of Counsel



        FOLEY & LARDNER LLP

                Attorneys for Defendant

                90 Park Avenue

                New York, New York 10016-1314


        By:    YONATON ARONOFF, ESQ.,

                                        of Counsel


                        oOo

IT IS HEREBY STIPULATED AND
AGREED, by and between the attorneys
for the respective parties hereto, that
the sealing and filing of the within
deposition be, and the same hereby are,
waived; and that the transcript may be
signed before any Notary Public with the
same force and effect as if signed before
the Court.

IT IS FURTHER STIPULATED AND AGREED

that all objections, except as to the form

of the question, shall be reserved to the

time of trial.

oOo

6

1                        Anbinder

2           A.    No.

3           Q.    Did you review any documents?

4           A.    No.

5           Q.    All right.  What is your current

6    position with First Marblehead?

7           A.    Vice chairman.

8           Q.    How long have you been vice

9    chairman?

10          A.    Vice chairman since probably '98

11   or '99.  I don't remember the exact date.

12          Q.    Have you held any other positions

13   during that time since '98, '99 in addition to

14   being vice chairman?

15          A.    No.

16          Q.    Let's do this, let's start with

17   formation of First Marblehead which I

18   understand it is fair to say you were a part

19   of, correct?

20          A.    Yes.

21          Q.    Okay.  Who else was involved with

22   the formation of First Marblehead?

23          A.    Just Dan Meyers and myself.

24          Q.    When was First Marblehead formed?

25          A.    I think it goes back to '91.

1                     Anbinder

2           Q.    How do you know Mr. Meyers?

3           A.    We became acquainted when we both

4    worked on Wall Street.

5           Q.    When was that?

6           A.    That was in the three or four

7    years prior to '91.

8           Q.    Did you work at the same firm on

9    Wall Street?

10          A.    We did for a while, yes.

11          Q.    What firm was that?

12          A.    L.F. Rothschild.

13          Q.    When did you leave L.F.

14   Rothschild?

15          A.    1989 or thereabouts.

16          Q.    What did you do after that?

17          A.    I went to -- I went from

18   Rothschild to Oppenheimer.

19          Q.    When did you leave Oppenheimer?

20          A.    About a year later.

21          Q.    Then where did you go?

22          A.    I went to Merrill Lynch from

23   there.

24          Q.    How long were you at Merrill

25   Lynch?

8

Anbinder

1

2    A.    Approximately two years.

3    Q.    Then I assume that's when you

4  founded First Marblehead?

5    A.    Yes, uh-huh.

6    Q.    How did it come about that First

7  Marblehead was founded?

8    A.    Dan Meyers and I in prior

9  dealings with universities and university

10  finance discovered that one of the major

11  problems facing the universities was financial

12  aid and we both felt that a loan program

13  secured only by student loan receivables could

14  be financed in Wall Street in the asset-backed

15  market and we formed First Marblehead to do

16  just that.  It was formed as a limited

17  partnership to begin with.

18    Q.    And were you a limited partner?

19    A.    Yes.

20    Q.    Who were the other limited

21  partners?

22    A.    Just Dan Meyers and myself.

23    Q.    Not Leslie Alexander?

24    A.    He came a year or so afterwards.

25    Q.    He became a limited partner then?

9

                           Anbinder

1

2          A.     No, we then formed a corporation.

3          Q.     That would have been in '92?

4          A.     '92 or thereabouts, yes.

5          Q.     Are you on the board of directors

6    of First Marblehead?

7          A.     Yes.

8          Q.     How long have you been on the

9    board of directors?

10         A.     Since the beginning.

11         Q.     Since --

12         A.     The beginning.

13         Q.     Since it was incorporated?

14         A.     Yes.

15         Q.     Your present office is in New

16   York City, is that right?

17         A.     Yes.

18         Q.     Has that always been the case?

19         A.     Yes.

20         Q.     Sorry, as long as you have been

21   at First Marblehead?

22         A.     Yes, uh-huh.

23         Q.     I would like to get a quick sense

24   of what you do, what your job description is in

25   your words as vice chairman, what is your

10

Anbinder

1    general duties?

2          A.     General duties, I'm in charge of

3    the capital markets function, which is the

4    raising of money to finance our loan pools.

5          Q.     Generally what does that consist

6    of on a day-to-day basis?

7          A.     It consists of talking to rating

8    agencies, bond insurers, potential suppliers of

9    financing, agreeing with the people in charge

10   of business development on product pricing.

11   That's about it.

12         Q.     How many other employees work

13   with you in the New York office?

14         A.     Three other employees.

15         Q.     Do you supervise any of them?

16         A.     Indirectly.

17         Q.     How do you mean indirectly?

18         A.     They are part of the First

19   Marblehead data services group which is

20   responsible for reporting, and they report to

21   somebody in Boston.

22         Q.     And as long as you have been with

23   First Marblehead, you have performed a similar

24   supervisory function?

15

1                         Anbinder

2          A.      No.

3          Q.      Did you -- were you involved in

4    the hiring of Greg House?

5          A.      Yes.

6          Q.      How were you involved in the

7    hiring of Greg House?

8          A.      I met with him and interviewed

9    him prior to his being hired.  Dan Meyers and I

10   talked about him and we both agreed that we

11   should hire him.

12         Q.      When was the first time you met

13   with Mr. House?

14         A.      My best recollection is it would

15   have been '95 or '6.

16         Q.      How did that meeting come about?

17         A.      I believe at Dan Meyers'

18   suggestion.

19         Q.      What was Mr. Meyers' suggestion,

20   as best as you can remember?

21         A.      Why don't we meet with him with

22   an eye towards hiring him.

23         Q.      This is a conversation that you

24   had with Mr. Meyers?

25         A.      Yes.

16

1                            Anbinder

2              Q.     And did he approach you?

3              A.     Yes.

4              Q.     What did he say as best as you

5     can remember?

6              A.     I think Greg House would be a

7     good addition to the capital markets department

8     at the firm.  I think we ought to talk to him.

9     Or words to that effect.

10             Q.     Do you remember approximately how

11    long before you met with him that conversation

12    took place?

13             A.     I don't.

14             Q.     And so subsequently, you met with

15    Mr. House?

16             A.     Yes.

17             Q.     And where was that meeting?

18             A.     I don't remember.

19             Q.     Was there anyone else there

20    besides you and Mr. House?

21             A.     At one point I met with Mr. House

22    alone.  At several other meetings Dan Meyers

23    would have been present.

24             Q.     Okay, let's start with the

25    meeting when you met with him alone.

17

```
1                    Anbinder
2    Presumably this was before he was hired?
3         A.    Yes.
4         Q.    Okay.  Can you tell me about what
5    you talked about?
6         A.    In general terms we talked about
7    the needs of the capital markets department and
8    how he might be able to fill those needs.
9         Q.    What were those needs that he was
10   being asked to fill if you remember?
11        A.    Specifically we talked about our
12   need for a more comprehensive cash flow model,
13   one that was based on loan-by-loan performance
14   rather than summary performance of the pool.
15        Q.    And was there a job title
16   discussed that he would be filling?
17        A.    Not that I recall.
18        Q.    Was his compensation discussed?
19        A.    I don't recall discussing
20   compensation at that meeting.
21        Q.    But it may have been?
22        A.    It's possible.
23        Q.    Was the stock option program
24   discussed at that meeting?
25        A.    As I say, I don't recall
```

18

Anbinder

1

2  discussing compensation.

3        Q.    Do you remember how long that

4  meeting lasted?

5        A.    Not exactly, but I would say

6  probably about an hour.

7        Q.    Subsequent to meeting with Mr.

8  House, did you then make a recommendation to

9  Mr. Meyers with respect to whether he should be

10 hired?

11       A.    Yes.  Although I don't know if

12 you could term it a recommendation other than

13 that we decided to, together, to hire him, to

14 offer him a job.

15       Q.    That was before you met with him

16 additional times with Mr. Meyers or after?

17       A.    No, after.

18       Q.    Do you remember the specifics of

19 any of those meetings you had with him and Mr.

20 Meyers, Mr. House and Mr. Meyers?

21       A.    I remember one meeting well

22 before this when we just had a general

23 discussion and weren't talking about a job

24 offer at all.

25       Q.    When you say "we" --

19

Anbinder

1

2      A.    Dan and I met with Greg House.

3      Q.    When you say before --

4      A.    It was my introduction to him.

5      Q.    Approximately how many times did

6  you meet with Greg House before he was hired,

7  do you remember?

8      A.    I don't remember exactly but my

9  best recollection is perhaps two or three

10 times.

11     Q.    Do you remember if the topic of

12 compensation came up at any of those meetings?

13     A.    No, it certainly did not come up

14 at the first meeting.  As I say, I don't recall

15 it coming up at the meeting that I had with

16 him, alone, after that.

17     Q.    So as far as you can remember, it

18 didn't come up, you don't remember it coming up

19 at any of the times that you met with him,

20 prior to Mr. House joining First Marblehead?

21     A.    That's correct.

22     Q.    When Greg House was hired, did

23 you conduct any entrance interviews or anything

24 like that with him?

25     A.    No, nothing formal like that.

20

1                         Anbinder

2              Q.     What about informally, did you

3    meet with him after he was hired?

4              A.     Sure.

5              Q.     What was the purpose of that

6    meeting or those meetings?

7              A.     To assign him responsibilities

8    and projects to work on.

9              Q.     Was he one of the individuals,

10   was Greg House one of the individuals you were

11   charged with supervising?

12             A.     Yes.

13             Q.     When you supervised Mr. House,

14   what did that entail, did you meet with him on

15   a daily basis?

16             A.     No.   It entailed talking on the

17   telephone and occasional personal meetings.

18             Q.     You would have spoken to him on

19   the telephone because you were in New York and

20   he was in Massachusetts?

21             A.     Right.

22             Q.     Approximately how often were you

23   in contact with Mr. House?

24             A.     I don't recall exactly but

25   probably in the neighborhood of once a week to

34

Anbinder

1   involved in setting that amount.  I'm not sure

2

3   of that.

4        Q.    But that event was separate from

5   the board's resolution to adopt the 1996 plan?

6        A.    Yes.

7        Q.    Did you participate in the

8   setting of the total amount of options that

9   were to be granted at that time?

10        A.    Yes.

11        Q.    What was your participation?

12        A.    Dan Meyers and I, and I forget if

13   there was anybody else, I don't remember if

14   Ralph was involved in the setting of the first

15   option total or not, but at least Dan Meyers

16   and I discussed the total amount of options.

17        Q.    What factored into that decision?

18        A.    Performance of the employees over

19   the past year or more than one year, if they

20   had been around longer.  Essentially that was

21   it.

22        Q.    We are talking again about the

23   setting of the total amount of options to be

24   granted?

25        A.    Right.

35

Anbinder

1    Q.    So when you say the performance

2    of the employees, you mean the employees

3    generally as a group?

4    A.    Employees were -- the initial

5    conversation was each specific employee was to

6    be assigned this amount of options, the amount

7    was totaled up and the total amount was

8    determined that way.

9    Q.    I see.  And presumably you were

10   charged with setting the amount of options to

11   be granted to the employees under your

12   supervision, is that correct?

13   A.    I wouldn't say setting the amount

14   but I had primary responsibility for

15   determining what those amounts should be.

16   Q.    You said that that amount was set

17   based on that employee's performance?

18   A.    Primarily on the employee's

19   performance.  In some cases it might have been

20   based on agreements that had been reached at

21   their hiring.

22   Q.    When you say agreements that had

23   been reached at their hiring, what do you mean

24   by that?

                        Anbinder

1

2         A.    Well, in some cases employment

3  offers might have involved in addition to cash

4  compensation, the promise of options being

5  awarded.

6         Q.    Would those agreements be with

7  respect to the amount of options?

8         A.    They might have been.

9         Q.    Might they have been with respect

10 to the terms of those options?

11        A.    Well, as far as I remember, the

12 options were defined in the option plan and

13 there was no -- I mean there was no room to

14 change the terms of the option plan in the --

15 the terms defined in the option plan.

16             MR. DEMOURA:  Can we take a

17        break?

18             (Recess taken)

19 BY MR. ARONOFF:

20        Q.    All right, sir, I would like to

21 skip back to what we were just discussing.

22 It's you're understanding that upon an

23 employee's hiring at First Marblehead, they may

24 or may not have certain agreements with respect

25 to their options?

37

Anbinder

1

2     A.     Yes.

3     Q.     What I'm trying to get at is what

4     those agreements may or may not have consisted

5     of.   What could they have consisted of.

6     MR. DEMOURA:   Objection.

7     A.     They might have consisted of a

8     number of shares promised to an employee upon

9     his hiring.

10    Q.     Is that the only thing that might

11    have varied among employees?

12    A.     Yes.

13    Q.     So it's your understanding, sir,

14    that under the 1996 plan, the only thing that

15    could have varied among an individual

16    employee's grant is the amount of shares that

17    that employee would be given?

18    MR. DEMOURA:   Objection.

19    A.     Yes.

20    MR. ARONOFF:   I would like to

21           have this marked.

22           (Whereupon, First Marblehead

23           Corporation 1996 stock option plan

24           marked Anbinder Exhibit 1 for

25           identification, as of this date.)

50

1                        Anbinder

2    discuss how many options he would be getting?

3              A.    I don't recall if we met to

4    discuss that.

5              Q.    What do you recall about the

6    granting of options to Mr. House?

7              A.    Just that it was part of the

8    normal year-end award.  I don't remember

9    anything specific.

10             Q.    When you say it was part of a

11   year-end award, how did this work?  Was

12   there -- did you meet first with other

13   supervisors to discuss each employee and then

14   meet with the employees?

15             A.    Back in those early days, it was

16   pretty much Dan and myself and then Ralph James

17   at some point.  I don't remember at what year

18   Ralph became involved in these discussions.

19             Q.    So you and Dan would discuss how

20   many --

21             A.    Right.

22             Q.    -- options --

23             A.    How well the employee had done.

24             MR. DEMOURA:  Let him finish the

25             question.

52

Anbinder

1

2      Q.    After you had had these

3  discussions, you and Dan, who would be charged

4  with meeting with the employee to tell them the

5  results of that meeting or meetings?

6      A.    Dan liked to sit in on all those

7  meetings in the early days.  I generally sat in

8  on the ones that involved capital markets

9  people but not always.  And sometimes we did it

10  by telephone.

11      Q.    What generally were the form of

12  those meetings, did you have -- was there a

13  writing prepared in advance?

14      A.    In those days there was not.

15      Q.    Is it fair to say it was

16  informal?

17      A.    It was very informal.

18      Q.    In the meeting that you had with

19  Mr. House in 1997 did Dan attend?

20      A.    I don't remember.

21          MR. DEMOURA:  Objection.

22          MR. ARONOFF:  Can I have this

23      marked as Anbinder 2.

24          (Whereupon, document reflecting

25      grant of incentive stock option dated

54

Anbinder

1    that you don't recall the specifics of the

2    meeting that you had with Mr. Meyers to

3    determine Mr. House's compensation for 1997, is

4    that correct?

5          A.    That's correct.

6          Q.    And I think you also said you

7    don't remember meeting with Mr. House

8    subsequent to that?

9          A.    I don't remember that meeting.

10         Q.    Do you remember when that meeting

11   would have taken place?

12         A.    Usually the review meetings took

13   place in the summertime, whether it was early

14   or late summer, I don't know.  This date

15   doesn't help me pin it down.

16              MR. ARONOFF:  Can we have this

17              marked as Anbinder 3, please.

18              (Whereupon, compensation review

19              of Gregory House for June 1997 marked

20              Anbinder Exhibit 3 for identification,

21              as of this date.)

22         Q.    Take a moment to review this.

23              Okay, I've shown you what's been

24   marked as Anbinder Exhibit 3, a compensation

55

1                     Anbinder
2    review, June 1997, name, Gregory House.  Do you
3    see where it says that?
4          A.    Yes.
5          Q.    Is that your handwriting, sir?
6          A.    No.
7          Q.    Do you know whose handwriting
8    that is?
9          A.    I don't.
10         Q.    Would this have been -- did you
11   give this to Greg House in the compensation
12   review meeting that you had with him in 1997?
13              MR. DEMOURA:  Objection.
14         A.    I don't remember.
15         Q.    Does this look like what you
16   normally gave out at compensation review
17   meetings?
18         A.    Yes.
19         Q.    Do you see where it says "Stock
20   options"?
21         A.    Yes.
22         Q.    It says, "ISO shares granted,
23   2500, value of ISO shares at 31.25 per share,
24   78,125."  Do you see that?
25         A.    Yes, I do.

60

Anbinder

1    Q.    Have you seen this before?

2    A.    No.

3

4    Q.    If you would, would you look at,

5    I'm sorry, the pages are not numbered, look at

6    number 6 -- not page 6.  Number 6.

7    Interrogatory number 6.

8             (Pause)

9    Q.    If you follow along on the next

10   page, for first Marblehead's response is, do

11   you see where it says, "Employees who were

12   granted options pursuant to the 1996 stock

13   option plan were advised of the grants

14   individually"?

15   A.    Uh-huh.  Yes.

16   Q.    Is this an accurate statement as

17   far as you know?

18   A.    Yes.

19   Q.    How were employees advised of

20   their grants individually?

21   A.    During their annual review.

22   Q.    So the review would have been the

23   time that they were advised?

24   A.    Yes.

25   Q.    That is the only time they would

61

Anbinder

1    have been individually apprised of their

2    grants?

3

4            A.    I believe so.

5            Q.    Sir, turning to number 11, and

6    following on the next page, objection to

7    response number 11, "It is presently unknown

8    whether House knew or was advised orally or in

9    writing that he was required to exercise his

10   stock options within 90 days of his termination

11   of his employment with First Marblehead."

12           A.    I'm sorry, where are you reading?

13               MR. DEMOURA:    Look at the top of

14           that response.    Objection and response

15           to number 11.

16               (Pause)

17           A.    Yes.

18           Q.    Did anyone ask you whether you

19   had told Mr. House that he had 90 days

20   following his termination to exercise his stock

21   options?

22           A.    No.

23           Q.    You would have been the one

24   charged with advising Mr. House of his grants,

25   isn't that correct?

62

1                      Anbinder

2          **A.     Of the number of options granted.**

3              MR. ARONOFF:  I would like to

4          have this marked as Exhibit 5, please.

5              (Whereupon, complaint marked

6          Anbinder Exhibit 5 for identification,

7          as of this date.)

8          **Q.    Showing you what's been marked as**

9   **Exhibit 5, Anbinder Exhibit 5, it is the**

10  **complaint filed by First Marblehead in this**

11  **case?**

12         **A.    Uh-huh.**

13         **Q.    If you would like to take a**

14  **moment to review it, you are welcome to.**

15              **Have you seen it before?**

16         **A.    No.**

17         **Q.    If you would, could you turn to**

18  **paragraph 10, it is numbered 10.**

19         **A.    Yes.**

20         **Q.    Reading along, it says, "Upon**

21  **information and belief, sometime after the**

22  **option grant was made to House, First**

23  **Marblehead provided House with a copy of the**

24  **plan."  Do you see that, sir?**

25         **A.    I do.**

63

Anbinder

1

2          Q.    Is that an accurate statement as

3    far as you know?

4          A.    What does the phrase "upon

5    information and belief" mean?

6          Q.    That's a good question.  As you

7    would define it.  These are factual allegations

8    that First Marblehead is making so I'm just

9    asking you, sir, what is the basis for the

10   allegation that First Marblehead has

11   information and believes that after the option

12   grant was made to House, it provided House a

13   copy of the plan.

14              MR. DEMOURA:  That is the

15         question you want him to answer, what

16         is the basis for the information?

17              MR. ARONOFF:  Sure.

18         A.    I don't know.

19         Q.    Is it an accurate allegation?

20         A.    I don't know.

21         Q.    Okay.  Did you provide House with

22   a copy of the 1996 stock option plan?

23         A.    Not that I remember.

24         Q.    Would you have provided it to him

25   in his compensation review in 1997?

64

Anbinder

1

2     A.    No.

3     Q.    Do you see paragraph 11 where it

4 says, "Upon information and belief, sometime

5 after the option grant was made to House, First

6 Marblehead provided House with the stock option

7 agreement which further set forth the terms of

8 the grant"?

9     A.    I see that.

10    Q.    Is that an accurate statement?

11    A.    I don't know.

12    Q.    Did you provide Mr. House with

13 the stock option agreement?

14    A.    I did not.

15    Q.    You don't know if anyone did?

16    A.    I don't know.

17    Q.    Were you ever asked to distribute

18 copies of either -- start with the plan.  Were

19 you ever asked to distribute copies of the plan

20 to the employees you supervised?

21    A.    No.

22    Q.    Were you ever asked to distribute

23 copies of the respective agreements to the

24 employees who were to be receiving grants under

25 your supervision?

65

Anbinder

1

2      A.      No.

3      Q.      Do you know whether anyone was

4   ever -- do you know whether anyone was ever

5   asked to distribute copies of the plan or the

6   agreement to any First Marblehead employees?

7      A.      I do not know that personally.

8      Q.      But you never heard anyone being

9   charged with that task in your presence?

10     A.      No, I did not.

11     Q.      Did you ever direct anyone to do

12  that?

13     A.      No.

14     Q.      Turning back to the responses,

15  which was Exhibit 4, once again, paragraph 8,

16  the response to it on the next page, do you see

17  where it says, sir, at the top of the page,

18  third line, "A copy of the grant is part of

19  his," meaning House's, "personnel file"?

20     A.      Yes.

21     Q.      I believe you testified that you

22  didn't maintain House's personnel file, isn't

23  that correct?

24     A.      That's correct.

25     Q.      Did you put a copy of the stock

69

Anbinder

1

2      A.    Yes.

3      Q.    As specifically as possible,

4   please, if you could, I would like to know what

5   was said by Mr. Hoffman at this meeting.

6      A.    The only thing I can recall was

7   there was a discussion as to how these options

8   should be valued, and obviously the management

9   of the company thought they were worth a lot

10  and it was difficult to impress that upon the

11  people that were receiving the options.

12     Q.    The employees?

13     A.    The employees.

14     Q.    So you remember there were

15  concerns aired at this particular meeting?

16     A.    They were not concerns, they were

17  just, you know, what are they worth, that kind

18  of thing, because I don't think people put

19  stock in the number that was attached to the

20  compensation package as to the value of the

21  options.

22     Q.    How did Mr. Hoffman, to your

23  recollection, respond to those --

24     A.    I don't remember.  I don't

25  remember.

74

Anbinder

2     A.    I don't see that here.

3          MR. DEMOURA:    Stipulate that it

4     doesn't say that.

5     Q.    Did it ever come to your

6  attention that that was a mistake?

7     A.    No.

8     Q.    Do you remember any discussions

9  following the meeting that we are talking about

10  that there was a term or two that should have

11  been included in this memo that wasn't?

12     A.    No.

13     Q.    Did it ever come to your

14  attention that another memo had been issued

15  that was purported to correct such a mistake?

16     A.    No.

17     Q.    Did you continue to be Mr.

18  House's supervisor up and through the time that

19  he departed First Marblehead?

20     A.    Technically I was, yes.

21     Q.    When you say technically, does

22  that mean that you became less directly his

23  supervisor?

24     A.    We had less and less contact as

25  time went on.

75

1                      Anbinder

2          Q.    Do you remember his departure?

3          A.    I was informed of his departure

4    after the fact.

5          Q.    So you didn't conduct any kind of

6    exit interview or anything like that?

7          A.    No, I did not.

8          Q.    To your knowledge, sir, had any

9    other employees other than Mr. House contacted

10   First Marblehead with respect to options that

11   they claim they are entitled to exercise that

12   First Marblehead claims they aren't?

13         A.    No.

14         Q.    To your knowledge, sir, have any

15   other -- have any employees of First Marblehead

16   exercised options after 90 days following their

17   departure from First Marblehead?

18         A.    I'm not aware of any such.

19         Q.    Are you aware of any other

20   employees that have been given options with the

21   condition that they can exercise them more than

22   90 days following their departure from First

23   Marblehead?

24         A.    No.

25         Q.    Are you aware, sir, that Mr.

79

Anbinder

1

2    Q.    I just want to make sure I have

3    this nailed down.  You said that, you testified

4    that the compensation review meetings you would

5    have with the employees that you supervised,

6    you would tell them the number of their

7    options.  As far as you are aware, that is the

8    only time that those -- that employees were

9    apprised, individually, with respect to the

10   grants of their options, is that your

11   testimony?

12        A.    I believe that's right.

13        Q.    How is it your understanding that

14   employees would come to know the terms of their

15   options?

16        A.    From reading their option plan, I

17   would surmise.

18        Q.    But you also testified, sir, that

19   as far as you know, you didn't hand out that

20   plan?

21        A.    I did not.

22        Q.    You don't know whether anyone

23   ever did?

24        A.    I don't, to my knowledge, know

25   whether anybody did.

1                          Anbinder

2           Q.    And you never directed anyone to?

3           A.    I never did.

4           Q.    And you don't know that the board

5     ever directed anyone to?

6           A.    I don't know that.

7           Q.    You were a member of the board

8     and did you have -- did you -- strike that.

9     Did the board design a mechanism for informing

10    employees as to the terms of their options?

11          A.    Not that I can remember.

12          Q.    Do you remember discussing the

13    specific terms of options with employees other

14    than Mr. House?

15                MR. DEMOURA:   Objection.

16          A.    No, I don't.

17          Q.    Was there any other manner other

18    than reading the plan that you understood would

19    be the way in which an employee would

20    understand the terms of his options?

21                MR. DEMOURA:   Objection.

22          A.    No.

23          Q.    Did you participate in the

24    amending of the plan in 2003, was it amended in

25    2003, the plan, sir, or was it superseded?