UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE FIRST MARBLEHEAD CORPORATION
    Plaintiff

v

GREGORY J. HOUSE
    Defendant

CIVIL ACTION NO. 04-11263PBS

## FIRST MARBLEHEAD'S EXPERT DISCLOSURE

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts, Plaintiff First Marblehead Corp. ("First Marblehead") hereby submits its expert disclosure.

1.    <u>Robert A. Sherwin</u>

Plaintiff First Marblehead expects to call Robert A. Sherwin as an expert witness at the trial of the above captioned action. Mr. Sherwin holds a J.D. from the University of Chicago, and an A.B. in economics and physics from Wabash College. He also is a Registered Certified Public Accountant and is Managing Principal and Vice President of Analysis Group, Inc., an economic, financial and strategy consulting firm. Mr. Sherwin's qualifications are set forth in greater detail in Appendix A to his report, attached hereto.

Mr. Sherwin is expected to testify in accordance with his report, attached hereto. The grounds for Mr. Sherwin's opinions include his education, background and experience, as well as his review of materials identified in Exhibit B to his report.

2.    First Marblehead reserves the right to supplement its disclosure upon receipt of outstanding discovery from Defendant Gregory House. First Marblehead further reserves the

right to supplement its expert disclosure and call further expert witnesses in rebuttal to any expert opinions offered by the Defendant.

Respectfully submitted,

THE FIRST MARBLEHEAD CORPORATION
By its attorneys

Kenneth J. Fishkin (BBO#548918)
Michael D. Blanchard (BBO# 567771)
Callan Nevin (BBO#665114)
ADLER POLLOCK & SHEEHAN, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 482-0600

Dated: March 1, 2007
40083_1

**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| The First Marblehead Corporation | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 04-11263PBS |
| | ) |
| Gregory House | ) |
| | ) |
| Defendant, | ) |

**EXPERT REPORT OF ROBERT A. SHERWIN**

# I.     INTRODUCTION

## A.     Qualifications

1.  My name is Robert A. Sherwin. I am an expert in the fields of economics and finance. I hold a J.D. from the University of Chicago and an A.B. in Economics and Physics from Wabash College. I am a Registered Certified Public Accountant (Illinois), and a member of the American Bar Association, the American Economic Association, and the Illinois Bar Association.

2.  I am currently employed as Managing Principal and Vice President of Analysis Group, Inc., an economic, financial, and strategy consulting firm. Analysis Group employs over three hundred consultants in the areas of economics, financial economics, asset valuation, and strategic advisory. My responsibilities include the supervision of experts and consultants in these fields with Ph.D., MBA, and Master's degrees. Analysis Group is compensated at the rate of $495 per hour for my time. Hourly rates for other staff working on this matter under my direction and guidance range from $195 to $490 per hour.

3.  I have frequently analyzed complex financial and economic issues relating to securities, antitrust, tax, regulatory, patent infringement, capital adequacy and commercial damages matters. My testimony has included numerous cases related to valuation of securities and derivatives instruments, including employee stock options; evaluation of risk-reward characteristics of investment portfolios; and estimation of damages in securities litigation.

4.  Prior to joining Analysis Group, Inc., I was Senior Economist and Vice President of Lexecon Inc., an economic consulting firm in Chicago. My curriculum vitae is attached to this report as Appendix A and includes a list of matters in which I have testified at deposition or trial in the past four years and a list of my publications for at least the past ten years.

1

## II.    BACKGROUND

5. The First Marblehead Corporation ("First Marblehead"), founded in 1991, provides loan services to the private education market from the initial phases of loan program design through application processing and support to the ultimate disposition of the loans through securitization.[1]

6. Defendant in this matter, Gregory J. House, was hired by First Marblehead in early 1996. Mr. House was granted employee stock options ("ESOs") in June 1997 under First Marblehead's 1996 Stock Option Plan (the "Plan"). These options provided Mr. House the right, but not the obligation, to purchase 2,500 shares of First Marblehead stock for $32.00 per share, which, under the terms of the Plan, was equal to or greater than the fair market price of a share of First Marblehead stock as determined by its Stock Option Committee at the time of grant.[2]

7. On February 28, 1998, Mr. House voluntarily resigned his employment at First Marblehead.[3] In March of 2004, Mr. House attempted to exercise his stock options.[4] First Marblehead rejected Mr. House's exercise attempt on the grounds that, under the terms of the Plan, his options expired three months after the date of his resignation. Mr. House alleges that he was not informed about the three-month expiration condition and, consequently, claims that he has been damaged.[5]

## III.    ASSIGNMENT

8. I have been retained by Adler Pollock & Sheehan, P.C., counsel for First Marblehead, in the above captioned matter to evaluate (1) whether a reasonable investor in Mr. House's position would have exercised incentive stock options to

---

[1]    First Marblehead, Prospectus, at 1 (October 30, 2003).

[2]    First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1997).

[3]    First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004, para 6.

[4]    First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004, para 17.

[5]    First Marblehead Corp. v. House, 473 F.3d 1 (2006) at 6.

2

purchase the shares of First Marblehead at an exercise price of $32.00 per share between March and May of 1998 (i.e., the three-month period following his resignation); and, (2) whether Mr. House has been damaged by allegedly not being informed about the three-month expiration of his options. For purposes of my analysis, I have been instructed by counsel to assume that the three-month expiration condition was binding. In addition to the foregoing, I may also be asked by counsel to respond to any opinions offered by Mr. House's experts.

9. In conducting my analyses I have reviewed various documents and materials provided to me in this case. Appendix B lists the documents and data sources that I and my staff reviewed in reaching my conclusions. My analysis and conclusions are based on the information available at the time of this report. If and when additional information and materials become available to me, I will update my analysis as may be appropriate.

## IV.   SUMMARY OF FINDINGS

10. I have reached the following conclusions:

- It is extremely unlikely that a reasonable investor in Mr. House's position would have exercised the First Marblehead incentive stock options at an exercise price of $32.00 per share between March and May of 1998.

- Even if Mr. House had exercised his options between March and May of 1998, his damages would be zero.

## V.   ANALYSIS OF INCENTIVE STOCK OPTIONS

### A.   Overview of Incentive Stock Options

11. Companies issue employee stock options on its stock to attract, motivate and retain employees. An option gives an employee the right, but not the obligation, to purchase shares of the issuing company's stock at a specified price (i.e., the exercise price) prior the option's expiration. The option has value, which allows a

3

firm to attract employees. The option becomes more valuable the higher the company's stock price, which motivates employees to work to increase a company's stock price above its exercise price. And valuable options that are unvested, i.e., not exercisable until after a specified period of time, serve to retain employees who do not want to forgo recognizing the value associated with exercising the options.

12. An incentive stock option (ISO) is a type of employee stock option with potential tax benefits for an employee. An employee does not have to pay income tax on an ISO when it is issued or when he exercises it. And, as long the employee holds the stock obtained through exercise for at least two years after it is issued and one year after it is exercised, any gain on the exercise (i.e., the amount by which the proceeds of the stock sale exceeds the cost of exercise) will be taxed at the more favorable capital gains tax rates.[6] ISOs may not be granted at a discount to the current stock price, and they are not transferable, except through a will.[7]

13. There are generally two components to an option's value: the "intrinsic value" and the "option value." The "intrinsic value" of an option is the amount by which the fair market value of the stock exceeds the exercise price. The "option value" is the value that comes from the fact that, if one waits, the intrinsic value will increase if the stock price goes up. This option value is greater with a longer time to option expiration and higher volatility of the underlying stock price.

14. Clearly, a reasonable investor would never exercise an option if the exercise price were higher than the value of an underlying share. However, an investor might choose to sell the option, if allowed, in order to realize its "option value." Alternatively, an investor could hold the option until a time nearer to expiration in the hopes of increases in the stock's value.

---

[6]     See "Taxes on Incentive Stock Options," updated January 9, 2007 available at http://www.smartmoney.com/tax/capital/index.cfm?story=options_iso (viewed February 28, 2007).

[7]     I.R.C. § 422 (b). available at http://www4.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00000422----000-.html (viewed March 1, 2007).

4

B.    **Mr. House's Option Grant**

15. The options issued to Mr. House were nontransferable. Therefore, he could not have sold his options during the three-month period following his departure from First Marblehead. In retrospect, at most Mr. House could have exercised his options and obtained 2,500 shares of stock in the then privately-held company.

16. In order to exercise his options, Mr. House would have had to pay $32.00 to exercise each option, or $80,000 in total. In return he would have received stock in First Marblehead that appears to have been valued by First Marblehead's Stock Option Committee at $32.00 per share as of June 1998 based on the price at which additional incentive stock options were granted to others in June 1998.[8]

17. Assuming that these shares could have been sold in the market for $32.00 a share with no transaction costs, a reasonable investor would have been indifferent (i.e., in the same economic position) to exercising the options. However, shares in First Marblehead were not publicly traded and, consequently, would have been difficult to sell. Thus, in exercising an option, an investor would be converting a relatively liquid asset (i.e., cash) into a relatively illiquid asset that would take significant time and effort to sell. This imposes an implicit illiquidity cost on the investor that must be factored into his investment decision.

18. A reasonable investor would not invest a significant proportion of his assets in an illiquid investment, such as First Marblehead's stock, as the implicit cost of illiquidity would be prohibitively expensive. Rather, a reasonable investor would maintain sufficient liquid assets to cover unforeseen expenses and fund his living expenses.[9] Even assuming that a reasonable investor had sufficient liquid assets to

---

[8]    First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1998).

[9]    By extension, a reasonable investor would not borrow money to make an illiquid investment unless he had other liquid assets that were sufficient to cover his operating expenses and financing costs. In Mr. House's particular case, I understand from his deposition that the last day that he lived with his wife, in a process that led to his divorce, was March 1, 1998, the day after he left First Marblehead (House Dep. 176, March 2, 2005). Divorce proceedings typically require the valuation and division of assets and, most likely, increased expenditures for living expenses. A reasonable investor would be even less likely to make a risky and illiquid investment in First

5

minimize illiquidity costs, it is unlikely that he would have exercised the First Marblehead options at $32.00 a share using liquid assets to obtain illiquid shares in a company that was worth only $32.00 a share because the option's intrinsic value to an individual investor would be negative.

19. In addition to the illiquidity consideration, a reasonable investor would consider the riskiness of the investment when deciding whether to invest. In 1998, First Marblehead was an unprofitable, seven-year old company with less than 30 employees.[10] Accordingly, a reasonable investor would consider First Marblehead stock to be a relatively risky investment, particularly when combined with its illiquidity. A reasonable investor would not invest a significant proportion of his wealth in an undiversified and risky asset, in the absence of special circumstances. As is the case with the illiquidity cost, the cost of an undiversified portfolio may make the intrinsic value of the First Marblehead options to an individual investor at $32.00 a share negative if the value of each share is $32.00.[11]

20. Given the risks and costs associated with owning a share of a privately-held, illiquid company such as First Marblehead, a reasonable investor would not have exercised an option whose exercise price was equal to its estimated fair market value because the intrinsic value of the option would be negative once the costs of illiquidity and undiversified risk were accounted for. Consistent with this, no incentive stock options were exercised between April 1, 1997 and June 30, 2002 according to First Marblehead's audited financial statements. In addition, at least one former employee who was admittedly aware of the three-month expiry on his incentive stock options following his resignation decided not to exercise his vested options. With the benefit of 20/20 hindsight, this employee apparently contacted First Marblehead after it went public to see whether the three-month expiry could be

---

Marblehead when faced with the uncertainty of the outcome, and the costs, of divorce proceedings.

[10]   First Marblehead, Prospectus, at p. 1 (October 30, 2003) and Meyers Dep. 57, February 15, 2005.

[11]   I understand that counsel has requested personal financial statements from Mr. House in order to assess his net worth at the time of his departure from First Marblehead.

6

waived and was informed that it could not.[12]

## C.    Inappropriate to use Hindsight in Decision

21. In hindsight, exercising the First Marblehead options in early 1998 would have ultimately been profitable given how well the company has performed to date. However, it is inappropriate to consider subsequent events and performance in evaluating a decision that would have been made in 1998.[13] Any investor could make money if he knew, with certainty, how a stock would perform subsequent to making an investment. It is analogous to betting on a horse race after the outcome is known.

22. At the time of an investment, no one can predict its ultimate return. But, a reasonable investor can and does ensure that the expected return to an investment is commensurate with the riskiness of the investment. For example, an investor in small cap stock requires a considerably higher expected return than an investor in US Treasury Notes. This higher rate of expected return is necessary because the risk of loss on an investment in a small cap stock due to, for example, negative news about the company or a downward trend in the market, is much greater than the risk of loss on an investment in US Treasury Notes due to, for example, the default of the US Government.

23. As of May 1998, no one could have predicted with certainty that First Marblehead's share price would increase from a split-adjusted $0.80 in early 1998 to approximately $30 in March 2004.[14] While this is a large price increase, there were a number of developments after May 1998 that favorably affected First Marblehead's stock price. These developments could not have been known in May 1998.

---

[12]    Meyers Dep., 122-126, February 15, 2005.

[13]    See, for example, Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

[14]    There was a ten for one split on August 25, 2003 and a four for one split on October 29, 2003, per First Marblehead's prospectus dated October 30, 2003. The unadjusted value of the stock in early

24. First Marblehead's performance benefited significantly from developments in educational financing. The amount of private borrowing for post-secondary education increased substantially during the period, from $2.0 billion in the 1997/1998 school year to $7.0 billion in the 2002/2003 school year.[15] Private loans increased by over $2 billion from the 2001/2002 to 2002/2003 school year alone. (See Exhibit 1.)   This trend increased the demand for the private educational funding facilitated by First Marblehead.

25. First Marblehead's performance benefited greatly from this growth in demand for private loans. For example, for the 15 months ended June 30, 1998, First Marblehead had revenues of $1.1 million and a pre-tax loss of $2.8 million. In fact, First Marblehead had had losses since at least 1995 according to its June 30, 1998 financial statements. From 1999 to 2003, total annual revenues increased from $2.3 million to $91.4 million. (See Exhibit 2.) In addition, First Marblehead reported increasing annual net income in each year from 1999 to 2003, moving from a loss of approximately $800,000 to a profit of over $31 million. (See Exhibit 3.) However, as stated in its June 30, 1998 financial statements, First Marblehead's performance was uncertain: "[a]lthough management believes that its loan marketing efforts will be successful and that the trusts loans securitization and sales will increase in volume such that the Company will generate sufficient revenue no assurance can be given that these events will occur."[16] In fact, in his deposition, Mr. House appears to recognize this uncertainty in describing his role at First Marblehead: "Tasks previously performed by Steve Anbinder and [sic] were fairly explicitly assigned to me and assigned to me in a way to have me make them more

---

1998 from the Stock Option Committee's estimate of fair market value of $32.00 per share is divided by 40 to account for the stock splits. These prices do not include the effect of the three for two split of December 5, 2006. (Source: Bloomberg.)

15    Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006), available at http://www.collegeboard.com/press/releases/150634.html. Student Aid Tables & Charts.xls (viewed February 26, 2007).

16    First Marblehead, 1998 Financial Statement, at 6.

robust and make them work if the firm God for bid [sic] ever succeeded."[17]  In addition, in an email written by Mr. House dated February 7, 2005, he states: "seven years [after he left First Marblehead], in October 2003, the company lo and behold and to my great surprise went public."[18]

26. As a consequence of its strong performance, the company was able to gain access to the public equity markets through an initial public offering on October 30, 2003, which raised $115.1 million, after fees.[19]  In addition, it increased the market for its shares and reduced any liquidity discount that a reasonable investor would have applied to a private company.

## VI.    DAMAGES

27. If Mr. House had exercised his at-the-money options in May 1998, he would have, at best, exchanged $80,000 of liquid assets (i.e., the cash necessary to pay for the exercise) for an illiquid asset that, based on contemporaneous option grants was worth at most $80,000.  Thus, Mr. House's damages are zero.

28. It is important to note that Mr. House was *not* deprived of the right to invest in a similarly risky company or project, which had the potential to outperform First Marblehead.  For example, the stock price of Chico's Fashion Inc., a publicly traded company, increased over 4,500 percent from March 1998 to March 2004.  Mr. House could have invested in this company, for example, which had large increases, with less risk and no illiquidity costs, in lieu of investing in First Marblehead.

Signed:  _Robert A. Sherwin_

Robert A. Sherwin

Date:  _March 1, 2007_

---

[17]    House Dep. 164, March 2, 2005.

[18]    Email from Gregory House (Feb. 7, 2005, 12:59:30), Bates # GH0542-45.

[19]    First Marblehead, Annual Report (Form 10-K) at 22, (September 15, 2004).

9



Exhibit 1
Dollar Amount in Rhode Island Student Loans Used to
Finance Post-Secondary Education Expense





APPENDIX A
## ROBERT A. SHERWIN
**Managing Principal**

601 South Figueroa Street
Suite 1300
Los Angeles, CA 90017
Phone: (213) 896 4500
Fax: (213) 623 4112

117 Lyndon Street
Hermosa Beach, CA 90254
Phone: (310) 753 6929

## EDUCATION

| | |
|---|---|
| 1985 | CPA, State of Illinois |
| 1978 | J.D., University of Chicago |
| 1975 | A.B. in Economics and Physics, Wabash College |

## PROFESSIONAL EMPLOYMENT

| | |
|---|---|
| Analysis Group, Inc.<br>Los Angeles, CA | Managing Principal and Vice President (2003 - present)<br>Principal and Vice President (1989 - 2003)<br>Member, Board of Directors (1995 - 1997) |
| Analysis Group/Economics<br>Los Angeles, CA | Principal (1995 - 2003) |
| Lexecon Inc.<br>Chicago, IL | Senior Economist, Vice President (1977 - 1989) |

## ACADEMIC HONORS AND FELLOWSHIPS

George Lewes Mackintosh Fellow

Summa Cum Laude

Phi Beta Kappa

Distinction in Senior Comprehensive Examinations in both fields

Wall Street Journal Award for outstanding business student

## PROFESSIONAL AFFILIATIONS

American Bar Association

American Economic Association

Illinois Bar Association

## PUBLICATIONS

"Economic Analysis of Intellectual Property Rights" (with Elizabeth Evans and Martha Samuelson), in *Litigation Services Handbook*, (Frank, Weil, and Wagner, editors 3rd ed. 2001)

"Damage Awards" (with John C. Jarosz) in *The IP Litigator* (Sept./Oct. 1996) p. 19

"Economic Analysis of Intellectual Property Rights" (with Elizabeth Evans and Martha Samuelson), in *Litigation Services Handbook*, (Frank, Weil, and Wagner, editors 2nd ed. 1995)

"Comments on Werden and Froeb -- Correlation, Causality, and all that Jazz," *8 Rev. of Industrial Org.* 355 (1993)

"Navigating the Changing Tides of Managed Care and Health Reform," (contributing author) (American Medical Association Monograph 1994)

"The Extent of the Market," (with George J. Stigler), *28 J. Law & Econ.* 555 (1985), republished in *Monopoly and Competition Policy*, Volume II (F.M. Scherer, ed. 1994)

## TESTIFYING EXPERIENCE

- **AIG Annuity Ins. Co. v. Sears, Roebuck and Co.**
  *192nd Judicial District, Dallas County, Texas*
  Trial and deposition testimony regarding damages suffered by bond holders from alleged premature redemption of bonds with above-market interest rates. (2006, 2007)

- **Layne v. Noritsu America Corp.**
  *Arbitration*
  Trial testimony regarding damages to a retail photo-developer resulting from alleged defects in a processing machine. (2007)

- **State of Ark. Teacher Ret. Sys. v. Merrill Lynch & Co., Inc.**
  *193rd Judicial District, Dallas County, Texas*
  Deposition testimony regarding material misstatements of financial results and defendant's knowledge regarding those misstatements. (2006)

- **Frontier Infiniti v. Nissan North America, Inc.**
  *California New Motor Vehicle Board*
  Hearing and deposition testimony regarding likely financial effects on existing new car dealership resulting from a proposed proximate competing dealership. (2006)

- **Ciena Corp. v. Nortel Networks Inc.**
  *United States District Court, Eastern District of Texas*
  Deposition testimony regarding lost profits and reasonable royalty damages in a patent infringement case involving fiber optics equipment. (2006)

- **Chevron Texaco Credit Union v. The Members Group**
  *Arbitration*
  Deposition testimony regarding damages to a federal credit union from alleged professional malpractice. (2006)

- **In re: Nanovation Technologies, Inc.**
  *United States Bankruptcy Court, Northern District of Illinois*
  Trial and deposition testimony regarding the value of a development stage company in the photonics industry. (2006)

- **Robins v. Roland**
  *California Superior Court, Los Angeles.*
  Trial and deposition testimony regarding the valuation of a land development company and the net payments owed to departing owners. (2006)

- **Dvorchak v. eMachines, Inc.**
  *California Superior Court, Orange County*
  Deposition testimony regarding whether the market for eMachines was efficient, the response of the market to items of information, and eMachine's fair market value at the time of a tender offer. (2006)

- **Fisher Tool Co., Inc. v. Gillet Outillage**
  *United States District Court, Central District of California*
  Deposition testimony regarding market definition, market power, and prospects for using patent litigation to monopolize sales of a particular automotive hand tool. (2005)

- **Yurick v. McKesson HBOC, Inc.**
  *California Superior Court, San Francisco*
  Deposition testimony regarding losses suffered by individual investors as the result of a merger involving the company in which they were invested. (2005)

- **SourceTrack, LLC v. Ariba, Inc.**
  *Florida Circuit Court, Hillsborough County*
  Trial and deposition testimony regarding the valuation of a software firm providing business-to-business electronic purchasing capabilities. (2005)

- **Regents of the University of California v. ESPN, Inc.**
  *United States District Court, Central District of California*
  Deposition testimony regarding copyright damages resulting from the use of Hearst "Metrotone" Newsreel footage of various sports figures. (2005)

- **Fran Am Partnership, LLC v. Sports Car Club of America, Inc.**
  *United States District Court, District of Colorado*
  Deposition testimony regarding market definition, market power, and damages in an antitrust case involving standards setting in amateur race cars. (2004, 2005)

- **Crown Poly, Inc. v. Unistar Plastics, LLC**
  *United States District Court, Central District of California*
  Deposition testimony regarding lost profits and reasonable royalties in a patent infringement dispute involving plastic bags and their dispensers used for produce in grocery stores. (2005)

- **In re Clarent Corp. Securities Litigation**
  *United States District Court, Northern District of California*
  Trial and deposition testimony regarding class-wide securities damages from an alleged violation of Rule 10b-5. (2005)

- **Adams v. Home Depot USA, Inc.**
  *California Superior Court, Riverside*
  Deposition testimony regarding statistical analysis of the degree to which management responsibilities varied among members of a putative class in a wage-and-hour dispute. (2004)

- **Plantronics, Inc. v. Levin Consulting**
  *Arbitration*
  Trial and deposition testimony regarding damages suffered by headset manufacturer from alleged breach of contract and disclosure of trade secrets. (2004)

- **Liberty Communications, Inc. v. MCI Worldcom Communications, Inc.**
  *Arbitration*
  Trial and Deposition testimony regarding damages suffered by an independent sales agent for long distance services allegedly arising from misrepresentation of the account management system. (2002, 2004)

- **Jneid v. Novell, Inc.**
  *California Superior Court, Orange County*
  Trial and deposition testimony regarding revenue measurement for purposes of an earn-out provision.
  (2004, 2006)

- **FOH Holdings, Inc. v. Andersen, LLP**
  *California Superior Court, Los Angeles*
  Trial and deposition testimony regarding lost business value resulting from alleged accounting
  malpractice. (2004)

- **VSI Holdings, Inc. v. SPX Corporation**
  *United States District Court, Eastern District of Michigan*
  Deposition testimony regarding damages to a company resulting from an alleged breach of a contract to
  purchase that company. (2004)

- **Frontier Oil Corporation v. Holly Corporation**
  *Delaware Chancery Court, New Castle County*
  Trial and deposition testimony and trial regarding damages allegedly sustained by an acquirer when the
  target corporation refused to go through with the acquisition. (2003, 2004)

- **Modi Enterprises v. ESPN, Inc.**
  *New York Supreme Court, New York County*
  Trial and deposition testimony regarding damages suffered by the distributor of ESPN cable broadcasts in
  India from a variety of alleged breaches of contract. (2003, 2004)

- **Flash Technology Corporation v. PCS Resources, Inc.**
  *Tennessee Chancery Court, 20th Judicial District*
  Deposition testimony regarding damages suffered by tower lighting firm from alleged breaches of
  fiduciary duty and non-competition agreements. (2003)

- **Technology For Communications International v. Tower Interests, Inc.**
  *Arbitration*
  Trial testimony regarding alleged damages suffered by licensee of a broadcast tower from the failure to
  install master television and F.M. radio antennas. (2003)

- **LSQ II, LLC v. Bearing Point, Inc.**
  *United States District Court, Middle District of Florida*
  Deposition testimony regarding damages to allegedly sustained by a factoring company from the failure
  to build a computer system to specifications. (2003)

- **SMS Eumuco GmbH v. Korte**
  *California Superior Court, Los Angeles*
  Deposition testimony regarding damages to manufacturer of industrial machines from trade secret theft
  and unfair competition. (2003)

- **Grant Products International v. American Products Company, Inc.**
  *United States District Court, Central District of California*
  Deposition testimony regarding damages to manufacturer of replacement steering wheels from copyright
  and trademark violations. (2003)

- **Helio Medical Supplies, Inc. v. UPC Medical Supplies, Inc.**
  *Unites States District Court, Northern District of California*
  Deposition testimony regarding damages to supplier of medical supplies from unfair competition. (2003)

- **Sunrise International Leasing Corp. v. Sun Microsystems, Inc.**
  *United States District Court, District of Minnesota*
  Deposition testimony regarding damages to equipment lessor from breach of contract by manufacturer. (2003)

- **Marvel Characters, Inc. v. Universal Studios, Inc.**
  *Arbitration*
  Trial testimony regarding damages suffered by Marvel because of Universal's alleged breach of contract and failure to provide required advertising expenditures. (2003)

- **NPI Medical Group, Inc. v. State Compensation Ins. Fund**
  *California Superior Court, Los Angeles*
  Deposition testimony regarding market definition, market power, alleged exclusionary conduct, damages, and valuation in the context of medical providers specializing in pain relief under the California workers compensation system. (2003, 2002)

- **Wong v. Catholic Healthcare West**
  *Arbitration*
  Trial testimony regarding the aging on accounts receivables and methods for making reasonable estimates of the future costs associated with the collection of those accounts. (2003)

- **National Instruments Corporation v. The Mathworks Inc.**
  *United States District Court, Eastern District of Texas*
  Trial and deposition testimony regarding reasonable royalties in a patent infringement case involving graphical programming software. (2002, 2003)

**Appendix B**
**Documents and Materials Reviewed**

Deposition Transcripts

Ralph M. James, February 14, 2005

Daniel M. Meyers, February 15, 2005

William R. Berkley, April 28, 2005

Gregory House, March 2, 2005


Documents

First Marblehead Audited Financials, 1996, 1997, 1998, 1999, 2001, 2002

First Marblehead Prospectus dated October 30, 2003

Grant of Incentive Stock Options dated June 15, 1997

Memo from Rodney G. Hoffman to Employees of First Marblehead, July 7, 1997

1996 Stock Option Plan

Growth in First Marblehead's Facilitated Loan Volume, 1993 to 2004

Memo from Gregory House to Sales Staff Re: A summarization of "Asset-Backed Securities Face New Scrutiny", an article in the Wall Street Journal of Tuesday, February 18 1997.

Memo Re: The Strategic Research Institute 1997 Asset Securitization Symposium in Scottsdale, Arizona dated February 14, 1997

Draft Working Agenda for June 18 COFHE Meeting in Dedham dated June 11, 1997

Case written by Jeffrey L. Cruikshank

Fax from Rod Hoffman to Dan Meyers, November 8, 1995

First Marblehead's Assignment of Partnership Interest dated December 1, 1994

First Marblehead's Shareholder Agreement as of December 21, 1995

Correspondence from Rodney Hoffman to Daniel Meyers dated October 19, 2000

First Marblehead's Comprehensive Description and Business Plan dated July 14, 1995

First Marblehead's Comprehensive Description and Business Plan dated January 9, 1995

Valuation Analysis by Atlantic Management of First Marblehead stock options

Email from Gregory House to housel@hotmail.com dated February 7, 2005 (GH0542 to GH0545)

Email from Gregory House to NELSONC910@aol.com dated March 29, 2004 (GH0546)

Email from Gregory House to NELSONC910@aol.com dated February 25, 2005 (GH0547)

Information on stock option grants from First Marblehead prospectus for 6,440,271 shares

First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1998)


Court Filings

First Marblehead Corp. v. House, 473 F.3d 1 (2006).

First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004.


Data

Stock price and split information for First Marblehead from Bloomberg

Stock price of various companies from Compustat


Other Materials

Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006)

Internal Revenue Code § 422

"Taxes on Incentive Stock Options," updated January 9, 2007 available at http://www.smartmoney.com/tax/capital/index.cfm?story=options_iso (viewed February 28, 2007)

First Marblehead, Annual Report (Form 10-K) at 22, (September 15, 2004)

**Appendix B**
**Documents and Materials Reviewed**

<u>Deposition Transcripts</u>
Ralph M. James, February 14, 2005

Daniel M. Meyers, February 15, 2005

William R. Berkley, April 28, 2005

Gregory House, March 2, 2005


<u>Documents</u>
First Marblehead Audited Financials, 1996, 1997, 1998, 1999, 2001, 2002

First Marblehead Prospectus dated October 30, 2003

Grant of Incentive Stock Options dated June 15, 1997

Memo from Rodney G. Hoffman to Employees of First Marblehead, July 7, 1997

1996 Stock Option Plan

Growth in First Marblehead's Facilitated Loan Volume, 1993 to 2004

Memo from Gregory House to Sales Staff Re: A summarization of "Asset-Backed Securities Face New Scrutiny", an article in the Wall Street Journal of Tuesday, February 18 1997.

Memo Re: The Strategic Research Institute 1997 Asset Securitization Symposium in Scottsdale, Arizona dated February 14, 1997

Draft Working Agenda for June 18 COFHE Meeting in Dedham dated June 11, 1997

Case written by Jeffrey L. Cruikshank

Fax from Rod Hoffman to Dan Meyers, November 8, 1995

First Marblehead's Assignment of Partnership Interest dated December 1, 1994

First Marblehead's Shareholder Agreement as of December 21, 1995

Correspondence from Rodney Hoffman to Daniel Meyers dated October 19, 2000

First Marblehead's Comprehensive Description and Business Plan dated July 14, 1995

First Marblehead's Comprehensive Description and Business Plan dated January 9, 1995

Valuation Analysis by Atlantic Management of First Marblehead stock options

Email from Gregory House to housel@hotmail.com dated February 7, 2005 (GH0542 to GH0545)

Email from Gregory House to NELSONC910@aol.com dated March 29, 2004 (GH0546)

Email from Gregory House to NELSONC910@aol.com dated February 25, 2005 (GH0547)

Information on stock option grants from First Marblehead prospectus for 6,440,271 shares.


Court Filings
First Marblehead Corp. v. House, 473 F.3d 1 (2006).

First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004.


Data
Stock price and split information for First Marblehead from Bloomberg

Stock price of various companies from Compustat


Other Materials
Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006)

Internal Revenue Code § 422