UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------
FIRST MARBLEHEAD CORP.,              )
                                      )
      Plaintiff,                    )
                                      )
vs.                                   ) Civil Action No. 04-11263PBS
                                      )
GREGORY HOUSE,                        )
                                      )
      Defendant.                    )
---------------------------------------------------------

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF DANIEL M. MEYERS' RESIGNATION**

Defendant Gregory House ("House") submits this memorandum of law in opposition to plaintiff First Marblehead Corporation's ("First Marblehead" or the "Company") motion *in limine* to preclude evidence of Daniel M. Meyers' resignation (the "Motion"). First Marblehead's Motion should be denied, for the simple reason that evidence that speaks to the credibility and bias of one of its key witnesses unquestionably is relevant. Further, any concerns that First Marblehead may have with respect to prejudice can be addressed during trial. Thus, at most, First Marblehead's Motion is entirely premature.

**FACTS**

The following facts, among others, are not in dispute:[1] Dan Meyers was the Chairman of the Board of Directors and the CEO of First Marblehead during House's employ. He was House's friend, and recruited House to come work at First Marblehead. Meyers also participated

---

[1] For a more thorough recitation of the undisputed facts in this case, including those that pertain specifically to Meyers, the Court is directed to Section IV of the parties' Joint Pretrial Memorandum, entitled "The facts established by pleadings or by stipulations or admissions of counsel."

in the compensation review meeting in 1997 during which House was told he had been granted 2,500 stock options (the "Options"), and was approached by House in connection with House's objections to the vesting characteristics of his Options, which Meyers proceeded to have altered to House's satisfaction. Thus, there is little question that, by First Marblehead's own admissions, Meyers' testimony will touch upon many of the key events in this case.

Further, House alleges that Meyers was involved and/or implicated in numerous other highly relevant events and issues at the core of House's negligent misrepresentation claim including, <u>inter alia</u>:

- Meyers was Chairman of the Company's Board of Directors, which approved and implemented the 1996 First Marblehead Stock Option Plan (the "Plan"). Although the Plan required that First Marblehead distribute "a writing . . . specifying the terms and conditions" of employees' options thereunder, House <u>never</u> was furnished with a copy of the Plan during his tenure. Nor was House ever given a copy of his formal, written "grant" document (entitled "June 15, 1997 Grant of Incentive Stock Options"). These documents, and First Marblehead's failure to provide them to House, form part of the basis for House's negligent misrepresentation claim, because had he been given either of these documents House may have discovered the three-month exercise restriction. Thus, Meyers' knowledge of the Company's failure to distribute these materials to House clearly is relevant.

- At some point in the spring of 1997, Meyers asked House to help value the stock options that First Marblehead would soon be issuing. House agreed, and met with Meyers and Stephen Anbinder (House's supervisor) to price the options. Meyers informed House that the options First Marblehead would be granting (to House, among others) would be valued as having the following *and only the following* features: (i) a ten-year duration; (ii) a $32 "strike price"; (iii) a $32 "underlying price"; (iv) a volatility, which Meyers asked House to determine; and (v) an interest rate. Based upon these parameters, and again, without being provided with a copy of the Plan, House calculated a value for the options. House was <u>never</u> told by Meyers during this meeting (or at any other time) that the options had to be exercised within three months of an employee's departure from the Company – in fact, had House been informed of such a restriction, his calculations would have been substantially different.

- When House met with Meyers (and Ralph James, then First Marblehead's Executive Vice President) for his annual performance/compensation review, he was given a worksheet (the "Worksheet") indicating that he had been granted 2,500 Options. The Worksheet did *not* mention the three-month exercise restriction, nor did Meyers or James inform House of this provision at that time (or otherwise).

2

NYC_24139.1

- On July 7, 1997, employees of First Marblehead (including House) were given a memorandum (the "Memo") written by Rod Hoffman, outside counsel for First Marblehead, which, among other things, outlined the essential terms of the Plan. Pursuant to the Memo, the Options were exercisable within ten years of the date of their grant. Additionally, the Memo provided that in the event that a First Marblehead employee resigned or was terminated for "cause," any unvested options would terminate immediately – *the vested options, however, could be exercised at any time prior to the ten-year expiration date*. The Memo contained <u>no</u> provision or requirement with respect to a three-month time period for exercising options upon an employee's departure from First Marblehead. Similarly, in his presentation about the Options on July 7, 1997, Hoffman failed to mention any such requirement. Hoffman subsequently has conceded that this omission was a "mistake." Certainly, Meyers' knowledge of, and/or insight into, that admitted "mistake" by Hoffman is relevant to House's claim.

- Sometime after the July 1997 meeting, Hoffman realized that he mistakenly had omitted mention of the three-month exercise restriction from his Memo and presentation. As a result, Hoffman authored a second, supplemental memorandum, entitled "Corrections and Amplifications," which stated in relevant part, "I found that I had misstated one of the terms of the option in the summary memo which I distributed on Monday. <u>Mea</u> <u>culpa</u>. A copy of that revised memo is attached and you should substitute it for the [Memo]." (emphasis in original) This second, supplemental memorandum added the additional requirement that the Options be exercised within three months of an employee's resignation. Hoffman gave this supplemental memorandum to the Company with the intent that it be distributed to the recipients of his earlier Memo. First Marblehead never distributed Hoffman's second memorandum to House, and now takes the position (in a related state court action the Company has instituted against Hoffman) that it never received Hoffman's supplemental memorandum. Again, as the Company's then-CEO, any knowledge by Meyers about the supplemental memorandum and the Company's receipt (or purported lack) thereof clearly is relevant.

- When House departed First Marblehead in or around February of 1998, he gave two weeks notice to Meyers (and James), among others. House informed Meyers that he planned to work for ABN-AMRO in Chicago. Despite knowing that House was departing the Company, at no time during his last two weeks at the Company, or within the three months following his departure, did Meyers, or anyone else at First Marblehead, inform House that his Options would expire if not exercised within that time period.

In sum, Meyers' testimony is highly relevant and material to House's negligent misrepresentation claim, in that Meyers was either directly or indirectly involved in many, if not all, of the misrepresentations and/or omissions alleged by House. Meyers is, by any standard, a key witness.

3

## ARGUMENT

I. **Evidence Pertaining To Meyers' Credibility And/Or Character For Truthfulness Unquestionably Is Relevant**

Evidence is deemed "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. However, that Rule must be read in tandem with Fed.R.Evid. 608(a), which provides expressly that evidence relating to a witness' character for truthfulness or untruthfulness may be introduced. Accordingly, it is well-settled that "[t]he relevancy of testimony which aids in the jury's determination of a party's credibility and veracity has been repeatedly affirmed." Lewis v. Baker, 526 F.2d 470, 475 (2d Cir. 1975). Likewise, evidence "of potential witness bias … bears directly on a witness's credibility and is a perfectly appropriate function of cross-examination." Tavares v. Michigan Fishing, Inc., 937 F. Supp. 84, 85-86 (D. Mass. 1996) (permitting inquiry into relationship between agent of defendant company and defendant company as relevant to bias and therefore credibility).[2]

This principle is especially important on cross-examination, where "the trial judge is accorded great discretion in his assessment of the matters which should properly be raised … as bearing on the credibility of a party or witness. Id. Courts of this District have concurred:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness'

---

[2] This is of particular relevance here, where First Marblehead's counsel has made it clear that, in his view, the central issue in this case is *House's* credibility. In its aggressive recent deposition of House, First Marblehead explicitly announced that it intends vigorously to attack House's credibility at trial – among other things, through detailed examination of House's domestic relations of his then-wife (who they have listed as a trial witness). Yet, remarkably, First Marblehead wants to limit or foreclose House's ability to conduct his own cross-examination of Meyers' credibility at trial.

> perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness…. A … particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "*always relevant as discrediting the witness and affecting the weight of his testimony*."

DiBenedetto v. Hall, 176 F. Supp. 2d 45, 55 (D. Mass. 2000) (quoting 3A J. Wigmore, Evidence, § 930, p. 775 (Chadbourne rev. 1970) and Greene v. McElroy, 380 U.S. 474, 496, 79 S. Ct. 1400 (1959)) (emphasis added).

Thus, the law is clear that evidence relating to a key witness' (such as Meyers) propensity for truth-telling is relevant. This is especially so in this case, where many of the misrepresentations at issue were alleged to have been spoken (or omitted) by Meyers himself. Clearly, the circumstances involved in Meyers' departure from the Company, which, by the Company's own admission (Motion, p. 1) involved allegations of improper use of corporate funds, should be allowed to come before the jury so that they may weigh Meyers' credibility, as it is well-settled that "[a]cts involving fraud or deceit clearly raise … doubt" concerning "a witness's reliability for telling the truth." Varhol v. Nat'l Railroad Passenger Corp., 909 F.2d 1557, 1567 (7th Cir. 1990). Moreover, the apparent arrangement by First Marblehead to excuse Meyers' misbehavior is clearly an event that suggests bias on his part, in the Company's favor.

At the very least, these issues ought to be addressed at trial, where their proper context, relevance, and prejudice can be better assessed. Similarly, the concerns First Marblehead purports to have about "undue" prejudice, etc., can be addressed, if necessary, through appropriate limiting instructions.

## CONCLUSION

For all of the foregoing reasons, First Marblehead's Motion should be denied.

NYC_24139.1

DATED: April 19, 2007

        Respectfully submitted,
        Gregory House,
        By his attorneys,

        /s/Peter N. Wang
        Peter N. Wang (admitted *Pro Hac Vice*)
        Yonaton Aronoff (admitted *Pro Hac Vice*)
        **Foley & Lardner LLP**
        90 Park Avenue
        New York, NY 10016

## CERTIFICATE OF SERVICE

I, Yonaton Aronoff, hereby certify that on this 19th day of April 2007, I served a copy of this document via the United States District Court electronic filing system to all counsel of record.

        //S//Yonaton Aronoff

        Yonaton Aronoff