## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------

|  |  |
|---|---|
| FIRST MARBLEHEAD CORP., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) Civil Action No. 04-11263PBS |
|  | ) |
| GREGORY HOUSE, | ) |
|  | ) |
| Defendant. | ) |

---------------------------------------------------------

## DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

Defendant Gregory House ("House") submits this Motion for a new trial pursuant to Fed. R. Civ. P. 59, and states as grounds the following:

### FACTS

On or about March 1, 2007, First Marblehead submitted its Expert Disclosure (attached hereto as Exhibit A), indicating that it expected to call Robert A. Sherwin ("Sherwin") as an expert witness at trial, annexing Sherwin's expert report thereto (the "Report," included in Exhibit A). In his Report, Sherwin purported to have reached two "findings": (i) "It is extremely unlikely that a reasonable investor in Mr. House's position would have exercised the First Marblehead incentive stock options at an exercise price of $32.00 per share between March and May of 1998"; and (ii) "Even if Mr. House had exercised his options between March and May of 1998, his damages would be zero." (Ex. A at Report, p. 3)

House objected to Sherwin's Report and the subjects of his anticipated testimony, and moved *in limine* to preclude Sherwin from testifying at trial (the "Motion," attached hereto as Exhibit B) on two primary grounds. First, Sherwin's two purported "findings" – (i) how a "reasonable investor" would have acted under the circumstances, and (ii) what the proper measure of damages ought to be – are legal and factual inferences which directly invade the

provinces of the judge and jury, and are thus inappropriate subjects of expert testimony. (Motion at 4-9)  Second, even assuming that testimony about how a so-called "reasonable investor" would have acted would be an appropriate subject for an expert opinion, Sherwin's background and expertise made it apparent that he was not qualified to opine on that subject. (Id. at 5 n.5) Sherwin's qualifications lie in the areas of valuation and damages (see Ex. A, Appendix to Report) – he is not a Certified Financial Planner,[1] nor is he any kind of "human behavior" expert qualified to opine on how a hypothetical "reasonable person" in House's shoes would have acted under the circumstances.

House's Motion was argued before the Court during the Final Pretrial Conference held on July 9, 2007.  Although the Court agreed with House that Sherwin should not be permitted to testify about what the proper measure of damages ought to be (see 7/9/07 Tr. at 20:15-17, 26:17-19), the Court expressly declined to rule on whether Sherwin could testify about what a reasonable investor in House's shoes would have done.  Reserving the decision for trial, the Court acknowledged that it had serious concerns about whether such testimony was appropriate, given that the proper standard was what *House* would have done (and not what a "reasonable investor" would have done), and that such testimony might confuse the jury:

> THE COURT: ...I haven't quite decided yet whether I'll allow them to use the reasonable investor standard because that might be confusing to a jury. But, certainly spelling out what a strike price is and going through financially what the status of it was. I'm going to let Sherwin do all that. Whether I let him use a reasonable man standard, which could be confusing to a jury, I don't know. We could talk about that. But, I think it's -- they don't have to take House's word for it. (7/9/07 Tr. at 21:9-17)

...

---

[1] This important gap in Sherwin's expertise was confirmed during cross-examination of Sherwin at trial. (See 7/20/07 Tr. at 75:8-10; relevant excerpts of hearing transcripts attached as Group Exhibit C)

2

THE COURT:  ...Now I am a little worried about using the reasonable man standard because that's a little confusing where the standard is -- it's a subjective one. (Id. at 23:4-7)

...

THE COURT:  ...But, on the reasonable man standard, I'm torn.  Because, I do think you have the right to put in what is the strike price, that it's basically the value of the stock at that minute, you know, and that kind of thing.  On the other hand, that's not the standard.

MR. RISEBERG:  And, we're not suggesting for a moment that it is the standard.

THE COURT:  So, there's got to be another way you can phrase this so that it's not -- it's not -- You know, they hear a hundred times "reasonable man standard," -- "reasonable investor standard" --

MR. RISEBERG:  Right.

THE COURT:  -- so we will be gender equal here.  But, whatever the standard is, you know, it starts getting embedded in their mind --

MR. RISEBERG:  Right.

THE COURT:  -- and I'm worried about that.  And, I think there was one case that suggested that I should be careful about that.

MR. RISEBERG:  Because, I think it would be cumulative --

THE COURT:  Right.

MR. RISEBERG:  -- in that particular case.  But, I think they still do.  I don't think it is that uncommon for experts to talk about what a reasonable person in some respects --

THE COURT:  Well, that's --

MR. RISEBERG:  It's evidence of what this person subjectively would or would not have done.

THE COURT:  I wouldn't mind a few cases on that.[2]  (Id. at 27:4-28:10)

---

[2] The Court twice repeated its request for additional cases in support of First Marblehead's position that Sherwin could testify as to what a "reasonable investor" would have done (see 7/9/07 Tr. at 30:19-31:19, 35:21-36:3); however no such cases ever materialized.

3

...

MR. WANG:  ...What I'm concerned about is that under the guise of giving up -- my friends want to talk about what that reasonable person standard is.  And, that's really not right.  Because, among other things, Mr. Sherwin is not a behavior expert.  He's a financial expert.  And, he's going to be asked to testify about what Mr. House would have done in certain circumstances.  He doesn't have the training for that.

THE COURT:  Yes.  And, I don't so much disagree with that.  That's where I'm worried about --

MR. RISEBERG:  But, doesn't that go to the weight, really, not the admissibility.  I mean, aren't these fair points that they could bring out in cross-examining Mr. Sherwin?

THE COURT:  To some extent.  And, this is why I'm not going to micro manage it.  I need to think a little bit more deeply and I'll tell you, as I think about it, if you could find a few cases on point.  I think what the reasonable investor would do is relevant to what someone might suggest that they do.  On the other hand, I'm worried about so embedding the notion of the reasonable investor standard that, no matter what I tell the jury, that's the way they're going to be thinking.  So, I just, under 403, don't want it to be confusing.  (Id. at 30:19-31:19)

...

THE COURT:  ...I do get worried on the illiquidity thing, commenting that no reasonable divorced man -- and that's something a jury can do -- you know, given the amount of money he had, you could say:  What portion of this would it be?  Rather than saying no reasonable person in his situation would do it.  I don't think he has the expertise to do this.  (Id. at 32:4-10)

...

THE COURT:  ...I'm just not going to let them put in what a reasonable divorced man would do in the same or similar circumstances.  Now, on a reasonable investor, given the whole thing, I'm going to think about that and you need to give me cases that would be helpful, if you can, outside of the drug trafficking role, because we all agree what the reckless of standard is.  We all agree.  Right?  (Id. at 35:21-36:3)

Despite acknowledging the dangers of Sherwin's anticipated testimony, the Court ultimately allowed Sherwin to testify along the precise lines that House had objected to: how a "reasonable investor" in House's shoes would have acted.  Indeed, that was exactly how Sherwin

NYC_46337.1

defined the scope of his engagement, testifying that he had "been asked to determine whether it would make financial sense[3] for Mr. House to exercise his options in June of 1998."[4]  (7/20/07 Tr. at 58:25-59:2) That testimony was followed by the following exchange:

> Q.  And did you reach an opinion in this case to a reasonable degree of professional certainty regarding whether it would have made financial sense, in your view, for Mr. House to make this investment in First Marblehead in 1998?
>
> A.  Yes, I did.
>
> Q.  Okay. And what is that opinion?
>
> A.  That it would not have made financial sense for Mr. House to have exercised his options in the early part of 1998.
>
> Q.  Okay. And, very generally, what is the basis of that opinion?
>
> A.  The primary basis is that the stock would have been worth no more than the amount he would have had to have paid, potentially less than that. And then the secondary basis would be that the stock would not be particularly suitable for someone in Mr. House's position in terms of the risk and the liquidity and the diversification areas of financial performance. (Id. at 60:25-61:18)

Despite House's counsel's objections, Sherwin repeatedly was permitted to offer his opinion that a reasonable investor in House's circumstances would not have exercised the stock options at issue:

> Q.  Okay. Well, why wouldn't it make financial sense, in your opinion, for him to have made that exercise?
>
> A.  Well, I concluded it wouldn't make sense for him to exercise the option, and the primary reason is that he would be spending $80,000

---

[3] Sherwin used the phrase "financial sense" as an obvious proxy for what a "reasonable investor" would do, in a transparent effort to get around the Court's expressed concern about such testimony.

[4] House's counsel objected immediately at this point; the objection was overruled without any further discussion. (Id. at 59:3-9)

for stock that was not worth $80,000, or worth at best $80,000. (Id. at 68:13-18)

…

Q.  Well, even assuming he was spending $80,000 to get stock that was worth $80,000, do you think it would have made financial sense for him to do that?

A.  No.  There are other reasons other than -- it seems like it doesn't really matter, but there are other reasons why he would be in a position -- not in as good a position to own $80,000 worth of First Marblehead.

Q.  Okay, could you please explain those reasons to us.

A.  Yes.  Those reasons have to do with financial resources and the problem of private stock being illiquid and lack of diversification, and, finally, the riskiness of the particular stock.  (Id. at 69:11-22)

…

Q.  All right, why don't you talk to us just generally about the issue of diversification.

A.  I think diversification is the most important concept in investing, and that is that you don't put all your eggs in one basket.  If you're trying to invest, you want to put a little bit in one stock, a little bit in another --

MR. WANG:  Your Honor, I object.

THE COURT:  Overruled.

MR. WANG:  He's not a financial planner, Judge.

THE COURT:  Overruled, overruled.

A.  Diversification means, because stocks are risky, if you're going to own stocks, it's best to own quite a few stocks.  What you can do if you don't have enough money to buy quite a few stocks is instead buy mutual funds.  Mutual funds are very popular because they take a lot of people's money and then turn around and invest into a number of different stocks, achieving the diversification for the investors and reducing the risk of owning just a handful of stocks.

Q.  So that in Mr. House's case, making an $80,000 investment in this one security would have been somewhat contrary to the notion of diversification?

A. It would be very contrary for Mr. House to put all his eggs in one stock, let alone one stock that was a private company and was particularly risky. (Id. at 72:10-73:9)

Sherwin's testimony thus spoke directly to the specific issue that House had objected to. *Notably, Sherwin was the only witness from whom First Marblehead elicited testimony on this issue, and it offered no other evidence to rebut House's unequivocal testimony that he would have exercised his stock options.* To make matters worse, House's counsel was not even allowed to conduct a *voir dire* examination of Sherwin at the outset of his testimony, to determine whether Sherwin was even *qualified* to opine about what would have made "financial sense" for House. (See id. at 58:17-59:9) In fact, on cross examination, Sherwin revealed that he lacked such expertise (id. at 75:8-10), although by that time the testimony had been given and the damage done.

On July 23, 2007, the jury returned a verdict. The special verdict form (attached hereto as Exhibit D) indicated that although the jury had found that there had been a negligent misrepresentation by First Marblehead upon which House reasonably relied, it further found that House would not have exercised his stock options even had he known that they were going to expire within three months. Because Sherwin's testimony was the only evidence contradicting House (who testified that he would have exercised his stock options), it is clear that the jury accepted Sherwin's opinion that a reasonable investor in House's shoes would not have exercised his stock options. Such testimony – for which Sherwin had no expertise to give in any event – was improper, confusing, and *highly* prejudicial to House.

7

**ARGUMENT**

**I.    The Admission Of Defendant's Expert's Testimony Was Improper, Confusing, And Prejudicial, Warranting A New Trial**

Under Rule 59 of the Federal Rules of Civil Procedure, following a jury trial any party may move for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). The rule is broadly stated to include, among general grounds for obtaining a new trial, "...that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions." 11 Wright & Miller, Federal Practice and Procedure: Civil § 2805, p. 54 (1995); see also McKeown v. Woods Hole, 9 F. Supp. 2d 32, 38 (D. Mass. 1998) ("evidentiary rulings in the admission or exclusion of evidence provide a basis for a new trial").

Specifically, the improper admission of expert evidence and testimony has been held to warrant a new trial where such evidence inflicts unfair surprise or other prejudice upon another party. See, e.g., Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 283-84, 286-88 (1st Cir. 1993) (improper admission of previously-undisclosed expert's testimony was abuse of discretion warranting new trial); Nimely v. City of New York, 414 F.3d 381, 393-400 (2d Cir. 2005) (prejudice caused by improper admission of expert testimony regarding witnesses' credibility warranted new trial); Logan v. Dayton Hudson Corp., 865 F.2d 789, 790-91 (6th Cir. 1989) (District Court did not abuse discretion by granting new trial upon determining that it improperly had permitted expert to testify outside of his scope of expertise).

In his Motion, House outlined the dangers associated with allowing Sherwin to testify about what a "reasonable investor" would have done. As explained in the Motion, Fed. R. Evid. 702 precludes the introduction of evidence that does not "assist the trier of fact," such as expert

8

testimony that instructs the jury about what conclusion to reach on an ultimate issue in the case.
(See Exhibit B at 4-6) Because the determination of whether House would have exercised his
stock options was a question of fact expressly reserved for the jury, Sherwin's testimony on that
subject – in addition to being speculative and unsupported by any actual evidence – was
improper and should not have been admitted.    See e.g., Davis v. Protection One Alarm
Monitoring, Inc., 456 F. Supp. 2d 243, 249 (D. Mass. 2006) (recognizing that the "application of
the reasonable person standard is uniquely within the competence of the jury"); U.S. v.
Buchanan, 964 F. Supp. 533, 537-538 (D. Mass. 1997) (excluding expert testimony which
concluded that defendant's conduct was not consistent with generally accepted standards of
conduct in industry, in part, because such testimony improperly usurped the jury's fact finding
authority).

In Nimely, under similar circumstances, the Second Circuit held that a new trial was
warranted. In that case, the District Court had allowed defendants' expert to testify about the
defendant police officers' credibility, despite plaintiff's objections.[5]    The Second Circuit
determined that defendants' expert's testimony was improper, because it "essentially instructed
the jury as to an ultimate determination that was exclusively within its province, namely, the
credibility of [the defendant police officers]." Nimely, 414 F.3d at 398. The Court explained its
rationale for ordering a new trial as follows:

> The prejudice that flowed to Nimely from the erroneous admission of this
> testimony was magnified when [defendants' expert] was permitted to offer
> 'expert' conclusions regarding the tendency of police officers in general, and [the
> defendant police officers] in particular, not to lie in excessive force investigations.
> Because there is a distinct possibility that, absent the errors – perhaps
> individually, and certainly cumulatively – the jury would not have reached the

---

[5] As was the case here, the plaintiff in Nimely had moved in limine to preclude the
defendants' expert from testifying at trial, but the motion was denied. Nimely, 414 F.3d at 393.

NYC_46337.1

verdict that it did, the prejudice cause by them rendered the verdict a 'miscarriage of justice.' … Therefore, a new trial must be ordered.

Id. at 400 (citations omitted).

For the same reasons, a new trial is warranted in this case. Sherwin's testimony about whether it would have made "financial sense" for someone in House's situation to exercise stock options spoke to an issue that was exclusively within the province of the jury. At the very least, such testimony very likely caused juror confusion as to the proper legal standard to apply. Sherwin's testimony was especially improper and confusing because whether or not it would have made "financial sense" to a hypothetical person in House's shoes is completely irrelevant to this case – the issue is what *House* would have done. ***There is no "reasonableness" standard with respect to the causation element of House's negligent misrepresentation claim.***[6]

Sherwin's testimony was also improper in that he lacked the expertise necessary to opine on how investors do or should behave. As discussed *supra*, Sherwin is not a Certified Financial Planner, nor does he even purport to have any expertise in the area of "human behavior" (to the extent such a field of "expertise" even exists). At the very least, House's counsel should have been afforded the opportunity to conduct a *voir dire* examination about Sherwin's qualifications on these subjects, before he was permitted to testify and opine about them. See, e.g., Nimely, 414 F.3d at 399 n.13 ("In the first place, there is no indication whatever that [defendants' expert] qualified as an expert on human perception or cognitive function – the subject areas implicated by his [opinion]").

---

[6] Indeed, in allowing Sherwin to testify about what would have constituted "reasonable" investment decisions, it is possible the Court conflated the reasonable reliance element of House's claim with the causation element – the former deals with whether House was justified in relying on First Marblehead's representations to him about his stock options; the latter simply requires a factual determination as to whether House would have exercised his stock options. House's testimony on that point was *unrebutted*, aside from Sherwin.

NYC_46337.1

In addition to being improper, Sherwin's testimony was highly prejudicial to House. As discussed *supra*, Sherwin's testimony was the *only* evidence of any significance introduced by First Marblehead to rebut House's testimony that he would have exercised his stock options. Because the jury found for First Marblehead on that very issue, it is clear that Sherwin's testimony tipped the scales in First Marblehead's favor.[7] It would be difficult to imagine a more acute example of prejudice to a party. A new trial is the only possible remedy for the harm done to House.

## CONCLUSION

For all of the foregoing reasons, House respectfully requests a new trial.

DATED:  August 6, 2007

> Respectfully submitted,
> Gregory House,
> By his attorneys,
>
>
>     //S// Peter N. Wang
> Peter N. Wang (admitted *Pro Hac Vice*)
> Yonaton Aronoff (admitted *Pro Hac Vice*)
> **Foley & Lardner LLP**
> 90 Park Avenue
> New York, NY 10016

## LOCAL RULE 37.1 CERTIFICATE

I, Yonaton Aronoff, Esq., do hereby certify that I have conferred with counsel for Plaintiff, First Marblehead Corp., in advance of filing this Motion, and that Plaintiff does *not* assent to the Motion.

>     //S//Yonaton Aronoff
> Yonaton Aronoff

---

[7] Thus, House also moves hereunder to reverse the jury's verdict on the grounds that it was against the clear weight of the evidence, since Sherwin's testimony – the only piece of evidence arguably in support of the jury's verdict – should not have been admitted for the reasons discussed herein.

11

<u>CERTIFICATE OF SERVICE</u>

I, Yonaton Aronoff, hereby certify that on this 6th day of August 2007, I served a copy of this document via the United States District Court electronic filing system to all counsel of record.

　　　　　　　　　　　　　　　　　　　<u>　//S//Yonaton Aronoff　　　　</u>
　　　　　　　　　　　　　　　　　　　Yonaton Aronoff

NYC_46337.1