EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE FIRST MARBLEHEAD CORPORATION
    Plaintiff

v

GREGORY J. HOUSE
    Defendant

CIVIL ACTION NO. 04-11263PBS

## FIRST MARBLEHEAD'S EXPERT DISCLOSURE

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts, Plaintiff First Marblehead Corp. ("First Marblehead") hereby submits its expert disclosure.

1.    Robert A. Sherwin

Plaintiff First Marblehead expects to call Robert A. Sherwin as an expert witness at the trial of the above captioned action. Mr. Sherwin holds a J.D. from the University of Chicago, and an A.B. in economics and physics from Wabash College. He also is a Registered Certified Public Accountant and is Managing Principal and Vice President of Analysis Group, Inc., an economic, financial and strategy consulting firm. Mr. Sherwin's qualifications are set forth in greater detail in Appendix A to his report, attached hereto.

Mr. Sherwin is expected to testify in accordance with his report, attached hereto. The grounds for Mr. Sherwin's opinions include his education, background and experience, as well as his review of materials identified in Exhibit B to his report.

2.    First Marblehead reserves the right to supplement its disclosure upon receipt of outstanding discovery from Defendant Gregory House. First Marblehead further reserves the

right to supplement its expert disclosure and call further expert witnesses in rebuttal to any

expert opinions offered by the Defendant.

Respectfully submitted,

THE FIRST MARBLEHEAD CORPORATION
By its attorneys

Kenneth J. DeMoura (BBO#548910)
Michael D. Blanchard (BBO# 567771)
Colleen Nevin (BBO#665114)
ADLER POLLOCK & SHEEHAN, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 482-0600

Dated: March 1, 2007
#####_1

**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| The First Marblehead Corporation | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 04-11263PBS |
| | ) |
| Gregory House | ) |
| | ) |
| Defendant, | ) |

**EXPERT REPORT OF ROBERT A. SHERWIN**

# I.    INTRODUCTION

## A.    Qualifications

1. My name is Robert A. Sherwin. I am an expert in the fields of economics and finance. I hold a J.D. from the University of Chicago and an A.B. in Economics and Physics from Wabash College. I am a Registered Certified Public Accountant (Illinois), and a member of the American Bar Association, the American Economic Association, and the Illinois Bar Association.

2. I am currently employed as Managing Principal and Vice President of Analysis Group, Inc., an economic, financial, and strategy consulting firm. Analysis Group employs over three hundred consultants in the areas of economics, financial economics, asset valuation, and strategic advisory. My responsibilities include the supervision of experts and consultants in these fields with Ph.D., MBA, and Master's degrees. Analysis Group is compensated at the rate of $495 per hour for my time. Hourly rates for other staff working on this matter under my direction and guidance range from $195 to $490 per hour.

3. I have frequently analyzed complex financial and economic issues relating to securities, antitrust, tax, regulatory, patent infringement, capital adequacy and commercial damages matters. My testimony has included numerous cases related to valuation of securities and derivatives instruments, including employee stock options; evaluation of risk-reward characteristics of investment portfolios; and estimation of damages in securities litigation.

4. Prior to joining Analysis Group, Inc., I was Senior Economist and Vice President of Lexecon Inc., an economic consulting firm in Chicago. My curriculum vitae is attached to this report as Appendix A and includes a list of matters in which I have testified at deposition or trial in the past four years and a list of my publications for at least the past ten years.

1

## II.    BACKGROUND

5.  The First Marblehead Corporation ("First Marblehead"), founded in 1991, provides loan services to the private education market from the initial phases of loan program design through application processing and support to the ultimate disposition of the loans through securitization.[1]

6.  Defendant in this matter, Gregory J. House, was hired by First Marblehead in early 1996. Mr. House was granted employee stock options ("ESOs") in June 1997 under First Marblehead's 1996 Stock Option Plan (the "Plan"). These options provided Mr. House the right, but not the obligation, to purchase 2,500 shares of First Marblehead stock for $32.00 per share, which, under the terms of the Plan, was equal to or greater than the fair market price of a share of First Marblehead stock as determined by its Stock Option Committee at the time of grant.[2]

7.  On February 28, 1998, Mr. House voluntarily resigned his employment at First Marblehead.[3] In March of 2004, Mr. House attempted to exercise his stock options.[4] First Marblehead rejected Mr. House's exercise attempt on the grounds that, under the terms of the Plan, his options expired three months after the date of his resignation. Mr. House alleges that he was not informed about the three-month expiration condition and, consequently, claims that he has been damaged.[5]

## III.    ASSIGNMENT

8.  I have been retained by Adler Pollock & Sheehan, P.C., counsel for First Marblehead, in the above captioned matter to evaluate (1) whether a reasonable investor in Mr. House's position would have exercised incentive stock options to

---

[1]    First Marblehead, Prospectus, at 1 (October 30, 2003).

[2]    First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1997).

[3]    First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004, para 6.

[4]    First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004, para 17.

[5]    First Marblehead Corp. v. House, 473 F.3d 1 (2006) at 6.

2

purchase the shares of First Marblehead at an exercise price of $32.00 per share between March and May of 1998 (i.e., the three-month period following his resignation); and, (2) whether Mr. House has been damaged by allegedly not being informed about the three-month expiration of his options. For purposes of my analysis, I have been instructed by counsel to assume that the three-month expiration condition was binding. In addition to the foregoing, I may also be asked by counsel to respond to any opinions offered by Mr. House's experts.

9.  In conducting my analyses I have reviewed various documents and materials provided to me in this case. Appendix B lists the documents and data sources that I and my staff reviewed in reaching my conclusions. My analysis and conclusions are based on the information available at the time of this report. If and when additional information and materials become available to me, I will update my analysis as may be appropriate.

## IV.    SUMMARY OF FINDINGS

10. I have reached the following conclusions:

- It is extremely unlikely that a reasonable investor in Mr. House's position would have exercised the First Marblehead incentive stock options at an exercise price of $32.00 per share between March and May of 1998.

- Even if Mr. House had exercised his options between March and May of 1998, his damages would be zero.

## V.    ANALYSIS OF INCENTIVE STOCK OPTIONS

### A.    Overview of Incentive Stock Options

11. Companies issue employee stock options on its stock to attract, motivate and retain employees. An option gives an employee the right, but not the obligation, to purchase shares of the issuing company's stock at a specified price (i.e., the exercise price) prior the option's expiration. The option has value, which allows a

3

firm to attract employees. The option becomes more valuable the higher the company's stock price, which motivates employees to work to increase a company's stock price above its exercise price. And valuable options that are unvested, i.e., not exercisable until after a specified period of time, serve to retain employees who do not want to forgo recognizing the value associated with exercising the options.

12. An incentive stock option (ISO) is a type of employee stock option with potential tax benefits for an employee. An employee does not have to pay income tax on an ISO when it is issued or when he exercises it. And, as long the employee holds the stock obtained through exercise for at least two years after it is issued and one year after it is exercised, any gain on the exercise (i.e., the amount by which the proceeds of the stock sale exceeds the cost of exercise) will be taxed at the more favorable capital gains tax rates.[6] ISOs may not be granted at a discount to the current stock price, and they are not transferable, except through a will.[7]

13. There are generally two components to an option's value: the "intrinsic value" and the "option value." The "intrinsic value" of an option is the amount by which the fair market value of the stock exceeds the exercise price. The "option value" is the value that comes from the fact that, if one waits, the intrinsic value will increase if the stock price goes up. This option value is greater with a longer time to option expiration and higher volatility of the underlying stock price.

14. Clearly, a reasonable investor would never exercise an option if the exercise price were higher than the value of an underlying share. However, an investor might choose to sell the option, if allowed, in order to realize its "option value." Alternatively, an investor could hold the option until a time nearer to expiration in the hopes of increases in the stock's value.

---

[6]    See "Taxes on Incentive Stock Options," updated January 9, 2007 available at http://www.smartmoney.com/tax/capital/index.cfm?story=options_iso (viewed February 28, 2007).

[7]    I.R.C. § 422 (b). available at http://www4.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00000422----000-.html (viewed March 1, 2007).

4

### B.    Mr. House's Option Grant

15. The options issued to Mr. House were nontransferable. Therefore, he could not
have sold his options during the three-month period following his departure from
First Marblehead. In retrospect, at most Mr. House could have exercised his
options and obtained 2,500 shares of stock in the then privately-held company.

16. In order to exercise his options, Mr. House would have had to pay $32.00 to
exercise each option, or $80,000 in total. In return he would have received stock in
First Marblehead that appears to have been valued by First Marblehead's Stock
Option Committee at $32.00 per share as of June 1998 based on the price at which
additional incentive stock options were granted to others in June 1998.[8]

17. Assuming that these shares could have been sold in the market for $32.00 a share
with no transaction costs, a reasonable investor would have been indifferent (i.e., in
the same economic position) to exercising the options. However, shares in First
Marblehead were not publicly traded and, consequently, would have been difficult
to sell. Thus, in exercising an option, an investor would be converting a relatively
liquid asset (i.e., cash) into a relatively illiquid asset that would take significant time
and effort to sell. This imposes an implicit illiquidity cost on the investor that must
be factored into his investment decision.

18. A reasonable investor would not invest a significant proportion of his assets in an
illiquid investment, such as First Marblehead's stock, as the implicit cost of
illiquidity would be prohibitively expensive. Rather, a reasonable investor would
maintain sufficient liquid assets to cover unforeseen expenses and fund his living
expenses.[9] Even assuming that a reasonable investor had sufficient liquid assets to

---

[8]    First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1998).

[9]    By extension, a reasonable investor would not borrow money to make an illiquid investment
unless he had other liquid assets that were sufficient to cover his operating expenses and financing
costs. In Mr. House's particular case, I understand from his deposition that the last day that he
lived with his wife, in a process that led to his divorce, was March 1, 1998, the day after he left
First Marblehead (House Dep. 176, March 2, 2005). Divorce proceedings typically require the
valuation and division of assets and, most likely, increased expenditures for living expenses. A
reasonable investor would be even less likely to make a risky and illiquid investment in First

5

minimize illiquidity costs, it is unlikely that he would have exercised the First Marblehead options at $32.00 a share using liquid assets to obtain illiquid shares in a company that was worth only $32.00 a share because the option's intrinsic value to an individual investor would be negative.

19. In addition to the illiquidity consideration, a reasonable investor would consider the riskiness of the investment when deciding whether to invest. In 1998, First Marblehead was an unprofitable, seven-year old company with less than 30 employees.[10] Accordingly, a reasonable investor would consider First Marblehead stock to be a relatively risky investment, particularly when combined with its illiquidity. A reasonable investor would not invest a significant proportion of his wealth in an undiversified and risky asset, in the absence of special circumstances. As is the case with the illiquidity cost, the cost of an undiversified portfolio may make the intrinsic value of the First Marblehead options to an individual investor at $32.00 a share negative if the value of each share is $32.00.[11]

20. Given the risks and costs associated with owning a share of a privately-held, illiquid company such as First Marblehead, a reasonable investor would not have exercised an option whose exercise price was equal to its estimated fair market value because the intrinsic value of the option would be negative once the costs of illiquidity and undiversified risk were accounted for. Consistent with this, no incentive stock options were exercised between April 1, 1997 and June 30, 2002 according to First Marblehead's audited financial statements. In addition, at least one former employee who was admittedly aware of the three-month expiry on his incentive stock options following his resignation decided not to exercise his vested options. With the benefit of 20/20 hindsight, this employee apparently contacted First Marblehead after it went public to see whether the three-month expiry could be

---

Marblehead when faced with the uncertainty of the outcome, and the costs, of divorce proceedings.

[10]   First Marblehead, Prospectus, at p. 1 (October 30, 2003) and Meyers Dep. 57, February 15, 2005.

[11]   I understand that counsel has requested personal financial statements from Mr. House in order to assess his net worth at the time of his departure from First Marblehead.

6

waived and was informed that it could not.[12]

### C.    Inappropriate to use Hindsight in Decision

21. In hindsight, exercising the First Marblehead options in early 1998 would have ultimately been profitable given how well the company has performed to date. However, it is inappropriate to consider subsequent events and performance in evaluating a decision that would have been made in 1998.[13] Any investor could make money if he knew, with certainty, how a stock would perform subsequent to making an investment. It is analogous to betting on a horse race after the outcome is known.

22. At the time of an investment, no one can predict its ultimate return. But, a reasonable investor can and does ensure that the expected return to an investment is commensurate with the riskiness of the investment. For example, an investor in small cap stock requires a considerably higher expected return than an investor in US Treasury Notes. This higher rate of expected return is necessary because the risk of loss on an investment in a small cap stock due to, for example, negative news about the company or a downward trend in the market, is much greater than the risk of loss on an investment in US Treasury Notes due to, for example, the default of the US Government.

23. As of May 1998, no one could have predicted with certainty that First Marblehead's share price would increase from a split-adjusted $0.80 in early 1998 to approximately $30 in March 2004.[14] While this is a large price increase, there were a number of developments after May 1998 that favorably affected First Marblehead's stock price. These developments could not have been known in May 1998.

---

[12]    Meyers Dep., 122-126, February 15, 2005.

[13]    See, for example, Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

[14]    There was a ten for one split on August 25, 2003 and a four for one split on October 29, 2003, per First Marblehead's prospectus dated October 30, 2003. The unadjusted value of the stock in early

7

24. First Marblehead's performance benefited significantly from developments in educational financing. The amount of private borrowing for post-secondary education increased substantially during the period, from $2.0 billion in the 1997/1998 school year to $7.0 billion in the 2002/2003 school year.[15] Private loans increased by over $2 billion from the 2001/2002 to 2002/2003 school year alone. (See Exhibit 1.)  This trend increased the demand for the private educational funding facilitated by First Marblehead.

25. First Marblehead's performance benefited greatly from this growth in demand for private loans. For example, for the 15 months ended June 30, 1998, First Marblehead had revenues of $1.1 million and a pre-tax loss of $2.8 million. In fact, First Marblehead had had losses since at least 1995 according to its June 30, 1998 financial statements. From 1999 to 2003, total annual revenues increased from $2.3 million to $91.4 million. (See Exhibit 2.) In addition, First Marblehead reported increasing annual net income in each year from 1999 to 2003, moving from a loss of approximately $800,000 to a profit of over $31 million. (See Exhibit 3.) However, as stated in its June 30, 1998 financial statements, First Marblehead's performance was uncertain: "[a]lthough management believes that its loan marketing efforts will be successful and that the trusts loans securitization and sales will increase in volume such that the Company will generate sufficient revenue no assurance can be given that these events will occur."[16] In fact, in his deposition, Mr. House appears to recognize this uncertainty in describing his role at First Marblehead: "Tasks previously performed by Steve Anbinder and [sic] were fairly explicitly assigned to me and assigned to me in a way to have me make them more

---

1998 from the Stock Option Committee's estimate of fair market value of $32.00 per share is divided by 40 to account for the stock splits. These prices do not include the effect of the three for two split of December 5, 2006. (Source: Bloomberg.)

[15]   Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006), available at http://www.collegeboard.com/press/releases/150634.html. Student Aid Tables & Charts.xls (viewed February 26, 2007).

[16]   First Marblehead, 1998 Financial Statement, at 6.

8

robust and make them work if the firm God for bid [sic] ever succeeded."[17] In addition, in an email written by Mr. House dated February 7, 2005, he states: "seven years [after he left First Marblehead], in October 2003, the company lo and behold and to my great surprise went public."[18]

26. As a consequence of its strong performance, the company was able to gain access to the public equity markets through an initial public offering on October 30, 2003, which raised $115.1 million, after fees.[19] In addition, it increased the market for its shares and reduced any liquidity discount that a reasonable investor would have applied to a private company.

## VI.    DAMAGES

27. If Mr. House had exercised his at-the-money options in May 1998, he would have, at best, exchanged $80,000 of liquid assets (i.e., the cash necessary to pay for the exercise) for an illiquid asset that, based on contemporaneous option grants was worth at most $80,000. Thus, Mr. House's damages are zero.

28. It is important to note that Mr. House was *not* deprived of the right to invest in a similarly risky company or project, which had the potential to outperform First Marblehead. For example, the stock price of Chico's Fashion Inc., a publicly traded company, increased over 4,500 percent from March 1998 to March 2004. Mr. House could have invested in this company, for example, which had large increases, with less risk and no illiquidity costs, in lieu of investing in First Marblehead.

Signed: _Robert A. Sherwin_

       Robert A. Sherwin

Date: _March 1, 2007_

---

[17]   House Dep. 164, March 2, 2005.

[18]   Email from Gregory House (Feb. 7, 2005, 12:59:30), Bates # GH0542-45.

[19]   First Marblehead, Annual Report (Form 10-K) at 22, (September 15, 2004).

9







**APPENDIX A**
**ROBERT A. SHERWIN**
**Managing Principal**

601 South Figueroa Street
Suite 1300
Los Angeles, CA 90017
Phone: (213) 896 4500
Fax: (213) 623 4112

117 Lyndon Street
Hermosa Beach, CA 90254
Phone: (310) 753 6929

## EDUCATION

| | |
|---|---|
| 1985 | CPA, State of Illinois |
| 1978 | J.D., University of Chicago |
| 1975 | A.B. in Economics and Physics, Wabash College |

## PROFESSIONAL EMPLOYMENT

| | |
|---|---|
| Analysis Group, Inc.<br>Los Angeles, CA | Managing Principal and Vice President (2003 - present)<br>Principal and Vice President (1989 - 2003)<br>Member, Board of Directors (1995 - 1997) |
| Analysis Group/Economics<br>Los Angeles, CA | Principal (1995 - 2003) |
| Lexecon Inc.<br>Chicago, IL | Senior Economist, Vice President (1977 - 1989) |

## ACADEMIC HONORS AND FELLOWSHIPS

George Lewes Mackintosh Fellow

Summa Cum Laude

Phi Beta Kappa

Distinction in Senior Comprehensive Examinations in both fields

Wall Street Journal Award for outstanding business student

## PROFESSIONAL AFFILIATIONS

American Bar Association

American Economic Association

Illinois Bar Association

## PUBLICATIONS

"Economic Analysis of Intellectual Property Rights" (with Elizabeth Evans and Martha Samuelson), in *Litigation Services Handbook*, (Frank, Weil, and Wagner, editors 3rd ed. 2001)

"Damage Awards" (with John C. Jarosz) in *The IP Litigator* (Sept./Oct. 1996) p. 19

"Economic Analysis of Intellectual Property Rights" (with Elizabeth Evans and Martha Samuelson), in *Litigation Services Handbook*, (Frank, Weil, and Wagner, editors 2nd ed. 1995)

"Comments on Werden and Froeb -- Correlation, Causality, and all that Jazz," *8 Rev. of Industrial Org.* 355 (1993)

"Navigating the Changing Tides of Managed Care and Health Reform," (contributing author) (American Medical Association Monograph 1994)

"The Extent of the Market," (with George J. Stigler), *28 J. Law & Econ.* 555 (1985), republished in *Monopoly and Competition Policy*, Volume II (F.M. Scherer, ed. 1994)

## TESTIFYING EXPERIENCE

- **AIG Annuity Ins. Co. v. Sears, Roebuck and Co.**
  *192nd Judicial District, Dallas County, Texas*
  Trial and deposition testimony regarding damages suffered by bond holders from alleged premature redemption of bonds with above-market interest rates. (2006, 2007)

- **Layne v. Noritsu America Corp.**
  *Arbitration*
  Trial testimony regarding damages to a retail photo-developer resulting from alleged defects in a processing machine. (2007)

- **State of Ark. Teacher Ret. Sys. v. Merrill Lynch & Co., Inc.**
  *193rd Judicial District, Dallas County, Texas*
  Deposition testimony regarding material misstatements of financial results and defendant's knowledge regarding those misstatements. (2006)

- **Frontier Infiniti v. Nissan North America, Inc.**
  *California New Motor Vehicle Board*
  Hearing and deposition testimony regarding likely financial effects on existing new car dealership resulting from a proposed proximate competing dealership. (2006)

- **Ciena Corp. v. Nortel Networks Inc.**
  *United States District Court, Eastern District of Texas*
  Deposition testimony regarding lost profits and reasonable royalty damages in a patent infringement case involving fiber optics equipment. (2006)

- **Chevron Texaco Credit Union v. The Members Group**
  *Arbitration*
  Deposition testimony regarding damages to a federal credit union from alleged professional malpractice. (2006)

- **In re: Nanovation Technologies, Inc.**
  *United States Bankruptcy Court, Northern District of Illinois*
  Trial and deposition testimony regarding the value of a development stage company in the photonics industry. (2006)

- **Robins v. Roland**
  *California Superior Court, Los Angeles.*
  Trial and deposition testimony regarding the valuation of a land development company and the net payments owed to departing owners. (2006)

- **Dvorchak v. eMachines, Inc.**
  *California Superior Court, Orange County*
  Deposition testimony regarding whether the market for eMachines was efficient, the response of the market to items of information, and eMachine's fair market value at the time of a tender offer. (2006)

- **Fisher Tool Co., Inc. v. Gillet Outillage**
  *United States District Court, Central District of California*
  Deposition testimony regarding market definition, market power, and prospects for using patent litigation to monopolize sales of a particular automotive hand tool. (2005)

- **Yurick v. McKesson HBOC, Inc.**
  *California Superior Court, San Francisco*
  Deposition testimony regarding losses suffered by individual investors as the result of a merger involving the company in which they were invested. (2005)

- **SourceTrack, LLC v. Ariba, Inc.**
  *Florida Circuit Court, Hillsborough County*
  Trial and deposition testimony regarding the valuation of a software firm providing business-to-business electronic purchasing capabilities. (2005)

- **Regents of the University of California v. ESPN, Inc.**
  *United States District Court, Central District of California*
  Deposition testimony regarding copyright damages resulting from the use of Hearst "Metrotone" Newsreel footage of various sports figures. (2005)

- **Fran Am Partnership, LLC v. Sports Car Club of America, Inc.**
  *United States District Court, District of Colorado*
  Deposition testimony regarding market definition, market power, and damages in an antitrust case involving standards setting in amateur race cars. (2004, 2005)

- **Crown Poly, Inc. v. Unistar Plastics, LLC**
  *United States District Court, Central District of California*
  Deposition testimony regarding lost profits and reasonable royalties in a patent infringement dispute involving plastic bags and their dispensers used for produce in grocery stores. (2005)

- **In re Clarent Corp. Securities Litigation**
  *United States District Court, Northern District of California*
  Trial and deposition testimony regarding class-wide securities damages from an alleged violation of Rule 10b-5. (2005)

- **Adams v. Home Depot USA, Inc.**
  *California Superior Court, Riverside*
  Deposition testimony regarding statistical analysis of the degree to which management responsibilities varied among members of a putative class in a wage-and-hour dispute. (2004)

- **Plantronics, Inc. v. Levin Consulting**
  *Arbitration*
  Trial and deposition testimony regarding damages suffered by headset manufacturer from alleged breach of contract and disclosure of trade secrets. (2004)

- **Liberty Communications, Inc. v. MCI Worldcom Communications, Inc.**
  *Arbitration*
  Trial and Deposition testimony regarding damages suffered by an independent sales agent for long distance services allegedly arising from misrepresentation of the account management system. (2002, 2004)

- **Jneid v. Novell, Inc.**
  *California Superior Court, Orange County*
  Trial and deposition testimony regarding revenue measurement for purposes of an earn-out provision. (2004, 2006)

- **FOH Holdings, Inc. v. Andersen, LLP**
  *California Superior Court, Los Angeles*
  Trial and deposition testimony regarding lost business value resulting from alleged accounting malpractice. (2004)

- **VSI Holdings, Inc. v. SPX Corporation**
  *United States District Court, Eastern District of Michigan*
  Deposition testimony regarding damages to a company resulting from an alleged breach of a contract to purchase that company. (2004)

- **Frontier Oil Corporation v. Holly Corporation**
  *Delaware Chancery Court, New Castle County*
  Trial and deposition testimony and trial regarding damages allegedly sustained by an acquirer when the target corporation refused to go through with the acquisition. (2003, 2004)

- **Modi Enterprises v. ESPN, Inc.**
  *New York Supreme Court, New York County*
  Trial and deposition testimony regarding damages suffered by the distributor of ESPN cable broadcasts in India from a variety of alleged breaches of contract. (2003, 2004)

- **Flash Technology Corporation v. PCS Resources, Inc.**
  *Tennessee Chancery Court, 20th Judicial District*
  Deposition testimony regarding damages suffered by tower lighting firm from alleged breaches of fiduciary duty and non-competition agreements. (2003)

- **Technology For Communications International v. Tower Interests, Inc.**
  *Arbitration*
  Trial testimony regarding alleged damages suffered by licensee of a broadcast tower from the failure to install master television and F.M. radio antennas. (2003)

- **LSQ II, LLC v. Bearing Point, Inc.**
  *United States District Court, Middle District of Florida*
  Deposition testimony regarding damages to allegedly sustained by a factoring company from the failure to build a computer system to specifications. (2003)

- **SMS Eumuco GmbH v. Korte**
  *California Superior Court, Los Angeles*
  Deposition testimony regarding damages to manufacturer of industrial machines from trade secret theft and unfair competition. (2003)

- **Grant Products International v. American Products Company, Inc.**
  *United States District Court, Central District of California*
  Deposition testimony regarding damages to manufacturer of replacement steering wheels from copyright and trademark violations. (2003)

- **Helio Medical Supplies, Inc. v. UPC Medical Supplies, Inc.**
  *Unites States District Court, Northern District of California*
  Deposition testimony regarding damages to supplier of medical supplies from unfair competition. (2003)

- **Sunrise International Leasing Corp. v. Sun Microsystems, Inc.**
  *United States District Court, District of Minnesota*
  Deposition testimony regarding damages to equipment lessor from breach of contract by manufacturer. (2003)

- **Marvel Characters, Inc. v. Universal Studios, Inc.**
  *Arbitration*
  Trial testimony regarding damages suffered by Marvel because of Universal's alleged breach of contract and failure to provide required advertising expenditures. (2003)

- **NPI Medical Group, Inc. v. State Compensation Ins. Fund**
  *California Superior Court, Los Angeles*
  Deposition testimony regarding market definition, market power, alleged exclusionary conduct, damages, and valuation in the context of medical providers specializing in pain relief under the California workers compensation system. (2003, 2002)

- **Wong v. Catholic Healthcare West**
  *Arbitration*
  Trial testimony regarding the aging on accounts receivables and methods for making reasonable estimates of the future costs associated with the collection of those accounts. (2003)

- **National Instruments Corporation v. The Mathworks Inc.**
  *United States District Court, Eastern District of Texas*
  Trial and deposition testimony regarding reasonable royalties in a patent infringement case involving graphical programming software. (2002, 2003)

**Appendix B**
**Documents and Materials Reviewed**

Deposition Transcripts
Ralph M. James, February 14, 2005

Daniel M. Meyers, February 15, 2005

William R. Berkley, April 28, 2005

Gregory House, March 2, 2005


Documents
First Marblehead Audited Financials, 1996, 1997, 1998, 1999, 2001, 2002

First Marblehead Prospectus dated October 30, 2003

Grant of Incentive Stock Options dated June 15, 1997

Memo from Rodney G. Hoffman to Employees of First Marblehead, July 7, 1997

1996 Stock Option Plan

Growth in First Marblehead's Facilitated Loan Volume, 1993 to 2004

Memo from Gregory House to Sales Staff Re: A summarization of "Asset-Backed Securities Face New Scrutiny", an article in the Wall Street Journal of Tuesday, February 18 1997.

Memo Re: The Strategic Research Institute 1997 Asset Securitization Symposium in Scottsdale, Arizona dated February 14, 1997

Draft Working Agenda for June 18 COFHE Meeting in Dedham dated June 11, 1997

Case written by Jeffrey L. Cruikshank

Fax from Rod Hoffman to Dan Meyers, November 8, 1995

First Marblehead's Assignment of Partnership Interest dated December 1, 1994

First Marblehead's Shareholder Agreement as of December 21, 1995

Correspondence from Rodney Hoffman to Daniel Meyers dated October 19, 2000

First Marblehead's Comprehensive Description and Business Plan dated July 14, 1995

First Marblehead's Comprehensive Description and Business Plan dated January 9, 1995

Valuation Analysis by Atlantic Management of First Marblehead stock options

Email from Gregory House to housel@hotmail.com dated February 7, 2005 (GH0542 to GH0545)

Email from Gregory House to NELSONC910@aol.com dated March 29, 2004 (GH0546)

Email from Gregory House to NELSONC910@aol.com dated February 25, 2005 (GH0547)

Information on stock option grants from First Marblehead prospectus for 6,440,271 shares

First Marblehead Corporation Grant of Incentive Stock Option (June 15, 1998)

Court Filings
First Marblehead Corp. v. House, 473 F.3d 1 (2006).

First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004.

Data
Stock price and split information for First Marblehead from Bloomberg

Stock price of various companies from Compustat

Other Materials
Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006)

Internal Revenue Code § 422

"Taxes on Incentive Stock Options," updated January 9, 2007 available at http://www.smartmoney.com/tax/capital/index.cfm?story=options_iso (viewed February 28, 2007)

First Marblehead, Annual Report (Form 10-K) at 22, (September 15, 2004)

**Appendix B**
**Documents and Materials Reviewed**

Deposition Transcripts
Ralph M. James, February 14, 2005

Daniel M. Meyers, February 15, 2005

William R. Berkley, April 28, 2005

Gregory House, March 2, 2005


Documents
First Marblehead Audited Financials, 1996, 1997, 1998, 1999, 2001, 2002

First Marblehead Prospectus dated October 30, 2003

Grant of Incentive Stock Options dated June 15, 1997

Memo from Rodney G. Hoffman to Employees of First Marblehead, July 7, 1997

1996 Stock Option Plan

Growth in First Marblehead's Facilitated Loan Volume, 1993 to 2004

Memo from Gregory House to Sales Staff Re: A summarization of "Asset-Backed Securities Face New Scrutiny", an article in the Wall Street Journal of Tuesday, February 18 1997.

Memo Re: The Strategic Research Institute 1997 Asset Securitization Symposium in Scottsdale, Arizona dated February 14, 1997

Draft Working Agenda for June 18 COFHE Meeting in Dedham dated June 11, 1997

Case written by Jeffrey L. Cruikshank

Fax from Rod Hoffman to Dan Meyers, November 8, 1995

First Marblehead's Assignment of Partnership Interest dated December 1, 1994

First Marblehead's Shareholder Agreement as of December 21, 1995

Correspondence from Rodney Hoffman to Daniel Meyers dated October 19, 2000

First Marblehead's Comprehensive Description and Business Plan dated July 14, 1995

First Marblehead's Comprehensive Description and Business Plan dated January 9, 1995

Valuation Analysis by Atlantic Management of First Marblehead stock options

Email from Gregory House to housel@hotmail.com dated February 7, 2005 (GH0542 to GH0545)

Email from Gregory House to NELSONC910@aol.com dated March 29, 2004 (GH0546)

Email from Gregory House to NELSONC910@aol.com dated February 25, 2005 (GH0547)

Information on stock option grants from First Marblehead prospectus for 6,440,271 shares.


Court Filings
First Marblehead Corp. v. House, 473 F.3d 1 (2006).

First Marblehead Corp. v. House, CA 04-2174, Commonwealth of Mass., Complaint filed May 19, 2004.


Data
Stock price and split information for First Marblehead from Bloomberg

Stock price of various companies from Compustat


Other Materials
Franklin M. Fisher and R Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 (1) Journal of Accounting, Auditing, and Finance, 145 (1990).

Press Release, College Board, Tuition Increases Continue to Slow at Public Colleges According to the College Board's 2006 Reports on College Pricing and Financial Aid (October 24, 2006)

Internal Revenue Code § 422

EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------

FIRST MARBLEHEAD CORP.,        )
                                     )
        Plaintiff,            )
                                     )
vs.                                 )    Civil Action No. 04-11263PBS
                                   )
GREGORY HOUSE,              )
                                   )
        Defendant.        )

-------------------------------------------------------

## DEFENDANT'S MOTION IN LIMINE TO EXCLUDE FROM TRIAL THE ANTICIPATED TESTIMONY OF ROBERT A. SHERWIN

Defendant Gregory House ("House"), by and through counsel, respectfully states as follows in support of his motion *in limine* for an order to exclude Plaintiff First Marblehead Corp.'s ("First Marblehead") proposed expert, Robert A. Sherwin, from testifying during the trial in this matter.[1]

## PRELIMINARY STATEMENT

First Marblehead's attempt to introduce Mr. Sherwin's expert testimony is nothing more than a thinly-veiled (and improper) effort to instruct the judge and jury as to what law to apply in this case, and inappropriately to direct the jury what conclusions to reach. Indeed, a review of Mr. Sherwin's report reveals that his "expert conclusions" do no more than summarize (1) his view of how a reasonable investor would hypothetically have acted with respect to the options at issue (for which the witness has no "expertise," in any event); and (2) his interpretation of the proper method for measuring damages in this case (which is based entirely on an improper standard of law). Mr. Sherwin's so-called expert conclusions thus impermissibly consists of legal and factual inferences which directly invade the provinces of the judge and jury. The

---

[1] Mr. Sherwin's expert report is attached hereto as Exhibit A.

Federal Rules of Evidence and the law of this Circuit make clear that this type of purported expert testimony is not considered helpful to the trier of fact and thus should be precluded as a matter of law.

## FACTUAL BACKGROUND

The background facts of this litigation are set forth in detail in House's Opposition to First Marblehead's Motion for Summary Judgment, and the parties' Joint Pretrial Statement (filed herewith).  The facts pertinent to this motion are essentially not disputed and may be stated in brief.

This action stems from House's attempt to exercise the employee stock options (the "Options")[2] First Marblehead granted House during his employment.  House was granted his Options in or around the spring of 1997 and all of his Options were fully vested upon his voluntary departure from First Marblehead in February 1998.  As now admitted by First Marblehead, House was never provided with a copy of the stock option agreement governing his Options, or any other communication that would have revealed to him that his Options would expire three months after the end of his employment.[3]  First Marblehead's counsel, Rodney Hoffman, has conceded that that was a "mistake."  House thus alleges that First Marblehead's

---

[2] House's Options contained a $32 per share "strike price," and were subject to the condition that they be exercised within ten years.

[3] Neither of the two documents First Marblehead actually gave to House relating to his Options mention the purported 90-day exercise requirement.  In fact, the Court of Appeals for the First Circuit, in its Order vacating the grant of summary judgment on House's negligent misrepresentation claim, acknowledged that it is "undisputed" that First Marblehead failed to provide House with a revised memo to remedy the "misleading nature" of the Option memo which was given to House.  See The First Marblehead Corp. v. Gregory House, No. 06-1114, filed December 26, 2006 (attached hereto as Exhibit B).

failure to inform him that his Options expired three months after the end of his employment constitutes negligent misrepresentation and caused him to suffer significant financial damages. [4]

In an effort to refute House's negligent misrepresentation claim, First Marblehead seeks to introduce the testimony of an "expert," Robert A. Sherwin of Analysis Group, Inc. (an economic, financial and strategy consulting firm). In his expert report, Mr. Sherwin states that he was asked to address two specific questions:

> (1) "whether a reasonable investor in Mr. House's position would have exercised [the Options] to purchase the shares of First Marblehead at an exercise price of $32.00 per share between March and May of 1998 (i.e., the three-month period following his resignation);" and

> (2) "whether Mr. House has been damaged by allegedly not being informed about the three-month expiration of his [O]ptions."

Exhibit A, p. 3. In his report, Mr. Sherwin reached the following two conclusions:

> (1) "[i]t is extremely unlikely that a reasonable investor in Mr. House's position   would have exercised [the Options] at  an exercise price of $32.00 per share between March and May of 1998;" and

> (2) "[e]ven if Mr. House had exercised his [O]ptions between March and May of 1998, his damages would be zero."

Id. As explained more fully below, Mr. Sherwin's anticipated testimony should be excluded at trial because such testimony is directly prohibited by the Federal Rules of Evidence and the law of this Circuit.

## ARGUMENT

### I.    Mr. Sherwin's Anticipated Testimony Should Be Excluded At Trial

It is black letter law that a trial court must act as a "gatekeeper" to ensure that evidence presented by expert witnesses is not only relevant, but also reliable and helpful to the jury's

---

[4] First Marblehead went public in October 2003, as a result of which House's Options became worth more than $8 million.

evaluation of such evidence. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993) ("<u>Daubert</u>"); <u>Kumhoe Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 147 (1998) (extending "gatekeeper" obligation beyond "scientific" testimony to all expert testimony).

As the Supreme Court noted in <u>Daubert</u>, the "primary locus" of this obligation is Federal Rule of Evidence 702. That Rule provides in pertinent part:

> If scientific, technical, or other specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...

Fed. R. Evid. 702 (emphasis added). Yet the expert report and anticipated testimony of Mr. Sherwin will *not* assist the Court in determining evidence or facts material to this case. Instead, Mr. Sherwin's expert report and testimony infringes upon the judge's role as the arbiter of the law and the jury's role as fact-finder; the report and testimony thus should be excluded as a matter of law.

**A.    Mr. Sherwin's Proposed Expert Report and Testimony Regarding The Conduct of a "Reasonable Investor" Improperly Invades the Province Of the Jury And Is Irrelevant**

The Federal Rules of Evidence and the law in this Circuit are clear that an expert cannot merely tell the jury what result to reach. <u>See, e.g.</u>, Fed. R. Evid. 704, Advisory Committee Notes; <u>Dinco v. Dylex Limited</u>, 111 F.3d 964, 973 (1st Cir. 1997) (notwithstanding Federal Rule of Evidence 704's abolition of the bar against ultimate issue opinions, "that is not a carte blanche for experts to substitute their views for matters well within the ken of the jury") (internal citation omitted). Yet, Mr. Sherwin's expert report, in large measure, does precisely this by concluding that "it is extremely unlikely that a reasonable investor in Mr. House's position would have exercised [the Options] . . . between March and May of 1998." Exhibit A, p. 3. In other words,

4

First Marblehead is seeking to introduce Mr. Sherwin's so-called expert opinion for purposes of demonstrating to the jury that it would not have mattered whether First Marblehead had informed House of the true expiration period of his Options because – according to Mr. Sherwin – a reasonable investor would have allowed the Options to expire had he known the correct information.

The question of how a reasonable investor (and House) would have acted if he had been presented with all of the information regarding the Options, however, is a question of fact expressly reserved for the jury.[5]  See e.g., Davis v. Protection One Alarm Monitoring, Inc., 456 F. Supp. 2d 243, 249 (D. Mass. 2006) (recognizing that the "application of the reasonable person standard is uniquely within the competence of the jury"); U.S. v. Buchanan, 964 F. Supp. 533, 537-538 (D. Mass. 1997) (excluding expert testimony which concluded that defendant's conduct was not consistent with generally accepted standards of conduct in industry, in part, because such testimony improperly usurped the jury's fact finding authority).

Moreover, as Daubert makes plain, expert testimony must be "sufficiently tied to the facts" to help the jury resolve the factual dispute. Daubert, supra, 509 U.S. at 591. Expert testimony which relies on assumptions that are not relevant cannot "assist the trier of fact" as Rule 702 requires. Here, Mr. Sherwin's subjective testimony as to what a reasonable investor would or would not have done regarding the Options is entirely irrelevant. The only pertinent

---

[5]  Moreover, the notion that Mr. Sherwin somehow is qualified to proffer an opinion on the issue of how a "reasonable investor" would have acted is ludicrous. Mr. Sherwin's background and expertise admittedly is in valuations and damages (see Exhibit A); he is not some kind of "human behavior" expert and thus is not qualified to provide such testimony as a matter of law. See, e.g., Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006) (recognizing that a proposed expert witness is an expert in one area does not ipso facto qualify him to testify as an expert in other areas; affirming the exclusion of expert testimony on matters outside the scope of expert's expertise).

question presented by this litigation is what *House* would have done had he been informed of the expiration period. The question of whether House would have exercised his Options during March and May of 1998 *can only be answered and addressed by House himself* (and certainly not by a so-called "expert"). Mr. Sherwin's conclusion and opinion regarding the "reasonable investor" thus is besides the point and should not be admitted into evidence.[6] See e.g., Hochen v. Bobst Group, Inc., 290 F.3d 446, 452-453 (1st Cir. 2002) (finding district court did not abuse its discretion by excluding expert testimony which proffered a perspective irrelevant to the issue in question).

**B.**     **Mr. Sherwin's Proposed Expert Report And Anticipated Testimony Regarding The Calculation Of Damages Offers Nothing More Than An Improper Legal Conclusion**

This Circuit (as well as numerous other Circuit Courts) long has held that "[i]t is not for the witnesses to instruct the jury as to applicable principles of law, but for the judge." Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997). Indeed, in our legal system, "legal questions and instructions to the jury . . . [are] exclusively the domain of the judge." Id. The rationale for this rule is simple: "The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge – [] an impermissible inference . . ." Id.

Despite this well-established rule of law, Mr. Sherwin seeks to instruct the judge and jury on the proper legal standard for calculating damages. Specifically, Mr. Sherwin opines that if House had exercised his Options between March and May of 1998, he would have suffered no damages at all. See Exhibit A, pp. 3, 9. Mr. Sherwin appears to be assuming that the damages in

---

[6] Even assuming *arguendo* that Mr. Sherwin's proposed expert report and testimony is relevant (which it is not), such testimony should be excluded under Rule 403, because Mr. Sherwin's opinions regarding a reasonable investor will serve only to confuse the issues, and mislead the jury.

this case must be limited solely to House's out of pocket expenses. This conclusion, however, constitutes nothing more than an improper legal conclusion as to the appropriate standard for measuring damages in negligent misrepresentation cases – albeit, an incorrect legal standard (see infra at 7-8) – and thus should not be permitted into evidence. See, e.g., Chapman v. Bernard's Inc., 167 F. Supp. 2d 406, 421 (D. Mass. 2001) (striking legal conclusions from expert report because such conclusions cannot "properly assist the trier of fact as required by Rule 702"); U.S. v. Buchanan, 964 F. Supp. 533, 537-538 (D. Mass. 1997) (excluding expert testimony which concluded that defendant's conduct was not consistent with generally accepted standards of conduct in industry, in part because such testimony improperly usurped the jury's fact finding authority and tread on the judge's function to instruct the jury on the law); Pond v. Poirier, 1987 WL 17867, *5-6 (D. Mass. 1987) (striking expert affidavit which concluded that defendant failed to meet professional standards and demonstrated "gross negligence" because the Federal Rules of Evidence "do[] not permit the expert to testify as to the legal standard to be applied").

The case of Trytko v. Hubbell, 28 F.3d 715 (7th Cir. 1994)[7] -- a case almost factually identical to the one at bar[8] -- is directly on point, and provides the correct damage model to be applied. In that case, the Court correctly recognized that it is solely within the province of the judge to determine and instruct the jury as to the proper legal theory of the measure of damages. There, the Court reviewed, among other things, the trial court's instruction to the jury regarding

---

[7] The Trytko opinion is attached hereto as Exhibit C.

[8] In the Trytko case, John Trytko, a retired employee of Hubbell, Inc. brought an action against his former employer for, among other things, negligent misrepresentation. Trytko alleged, as House does here, that he failed to exercise certain stock options granted to him by his former employer before the options expired because he relied on the negligent misrepresentations and omissions made to him by his former employer. These misrepresentations, Trytko claimed, led him to believe that the period in which he could exercise his options was longer than it actually was.

the applicable theory of damages, and ultimately affirmed its correctness (without reference to any expert testimony). Indeed, the Court noted that the instruction was the product of the parties' and the trial court's efforts to cull the appropriate law from various sources -- none of which included expert testimony. Id. at 726; see also State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1576-77 (Fed. Cir. 1989) ("the methodology of assessing and computing damages is committed to the sound discretion of the [d]istrict [c]ourt").

In any event – and notwithstanding the legal impropriety of Mr. Sherwin's damage calculation – Mr. Sherwin's testimony regarding the method for calculating damages also should be excluded because *the standard he seeks to employ is simply wrong as a matter of law.* Indeed, the Trytko Court made clear that the proper method for calculating damages in a case involving an employer's negligent misrepresentations concerning the expiration period of an employee's stock options is as follows:

> The damages for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to that plaintiff of which the misrepresentation is a legal cause including the difference between the value of what the plaintiff has received in the transaction and its purchase price or other value given for it and the pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

Id. at 725, fn. 8. In other words, the proper measure of damages for negligent misrepresentation is what is referred to as "reliance damages," or the value of the right foregone as a result of the misrepresentation. Id. at 723. The Court in Trytko held that had the jury correctly applied the legal theory of damages provided to it by the judge, it would have found Trytko was damaged in the amount equal to the value his stock shares would have been worth as of the date of trial if he had exercised his options within the allotted period of time, minus the sum he would have had to pay to exercise those options. Id. at 724. By comparison, Mr. Sherwin's calculation of damages wrongly fails to consider the right that House forewent as a result of his reliance on the

8

misrepresentations -- namely the right to exercise his Options and then retain the stock purchased until it rose in value. Mr. Sherwin's purported expert calculation of damages thus not only constitutes an improper intrusion into the duties of the Court, but also is based on a legal standard that simply is incorrect. At base, Mr. Sherwin's so-called expert opinion regarding the calculation of damages is "not helpful" under Rule 702 and must be excluded.

## CONCLUSION

House's motion *in limine* to exclude Mr. Sherwin's expert report and anticipated testimony should be granted in its entirety.

DATED: April 12, 2007

Respectfully submitted,
Gregory House,
By his attorneys,


/s/Peter N. Wang
Peter N. Wang (admitted *Pro Hac Vice*)
Yonaton Aronoff (admitted *Pro Hac Vice*)
**Foley & Lardner LLP**
90 Park Avenue
New York, NY 10016

9

## CERTIFICATE OF RULE 7.1 CONFERENCE AND OF SERVICE

I, Yonaton Aronoff, hereby certify that, prior to filing the above motion, counsel conferred concerning this motion. I further certify that on this 12th day of April 2007, I served a copy of the above motion via the United States District Court electronic filing system to the undersigned counsel of record.

//S//Yonaton Aronoff

Yonaton Aronoff

Kenneth J. DeMoura, Esq.
**Adler Pollock & Sheehan PC**
175 Federal Street, 10th Floor
Boston, MA  02110
(617) 482-0600

10

EXHIBIT C

07-09-2007 Pretrial Conf.txt

1

```
 1                UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3  ---------------------------------
    FIRST MARBLEHEAD CORP.      :     Civil Action
 4                   Plaintiff  :     No. 04-11263-PBS
                                :
 5        v.                    :     Courtroom No. 13
                                :     1 Courthouse Way
 6                              :     Boston, MA 02210
    GREGORY J. HOUSE,           :     3:00 p.m., Monday
 7                   Defendant  :     July 9, 2007
    ---------------------------------
 8
                    Final Pretrial Conference
 9

10

11  Before:        THE HONORABLE PATTI B. SARIS,
                   UNITED STATES DISTRICT JUDGE
12

13  ZZ

14

15  APPEARANCES:

16  Adler, Pollock & Sheehan, PC,
       (by Kenneth J. DeMoura, Esq. and Michael D.
17     Riseberg, Esq.), 175 Federal Street, Boston, MA 02110,
       on behalf of First Marblehead Corporation.
18
    Foley & Lardner LLP,
19     (by Peter N. Wang, Esq. and Yonaton Aronoff, Esq.),
       90 Park Avenue - 37th Floor, York, NY 10016,
20     on behalf of Gregory J. House.

21

22
                    Marie L. Cloonan
23                  Federal Court Reporter
               1 Courthouse Way - Room 7200
24            Boston, MA  02210- 617-439-7086
          Mechanical Steno - Transcript by Computer
25
```

2

```
 1              THE CLERK:  The case of First Marblehead

 2   Corp. v. Gregory House, Civil Action No. 04-11263, will

 3   now be heard before this Court.  Counsel please identify

 4              themselves for the record.
                MR. WANG:  Your Honor, sitting at plaintiff's
                          Page 1
```

07-09-2007 Pretrial Conf.txt

1          I think it's a very good argument for them.
2    They can use it.  But, I was not going to exclude it.  I
3    mean, I wasn't going to use the document for judicial
4    estoppel.
5          Now, on the Sherwin issue, maybe we can vet
6    that a little bit.  So, motion in limine.  Do you want
7    to argue?
8          MR. WANG:  That's our motion, Judge.
9          THE COURT:  Right.
10          MR. WANG:  Mr. Sherwin has two things he's
11    going to testify about.  The first thing he's going to
12    talk about, presumably, at least according to his
13    report, is what the measure of damages is supposed to
14    be.  That's actually --
15          THE COURT:  Well, that's the second thing and
16    that was much easier.  Because, the way he worded it,
17    I'd never let him say it.  The way he worded it.
18          MR. WANG:  Okay.
19          THE COURT:  It sort of struck me that the
20    attorneys were recasting it a little bit when they
21    briefed it.
22          So, if he -- let's talk about the first part,
23    which is -- we all agree that the standard is what
24    Mr. House would or wouldn't have done subjectively, he,
25    himself.

21

1          Well, why isn't it relevant what a reasonable
2    -- since he's such a sophisticated guy -- I mean, I keep
3    coming back to that.
4          MR. WANG:  Sure.

Page 17

07-09-2007 Pretrial Conf.txt

5          THE COURT:  But, he's so -- he's such a

6    sophisticated investor, it's relevant as to -- you know,

7    what is an option, what is a strike price?  What would

8    someone do at that given point in time?

9          I haven't quite decided yet whether I'll allow

10   them to use the reasonable investor standard because

11   that might be confusing to a jury.  But, certainly

12   spelling out what a strike price is and going through

13   financially what the status of it was.  I'm going to let

14   Sherwin do all that.  Whether I let him use a reasonable

15   man standard, which could be confusing to a jury, I

16   don't know.  We could talk about that.  But, I think

17   it's -- they don't have to take House's word for it.

18          MR. WANG:  Judge, let me take that in pieces

19   if I may.

20          THE COURT:  Yes.

21          MR. WANG:  First of all, I guess I was

22   unsuccessful the last time you and I were together about

23   the ideal and how sophisticated an investor Mr. House

24   was.

25          THE COURT:  I thought he wrote the book on --

                                                        22

1          MR. WANG:  No, Judge.

2          THE COURT:  A chapter of a book?  Something

3    like that.  Right?

4          MR. WANG:  No, he did research -- Judge, he

5    did research with respect to pricing options and trying

6    to create a model for pricing options that has nothing

7    whatsoever to do with --

8          THE COURT:  Put that aside.  In any event,

9    he's not a little old lady from Des Moines.

                          Page 18

07-09-2007 Pretrial Conf.txt

10          And so, the issue is he's -- didn't he -- I

11   can't remember.  I haven't looked at it in years.

12          MR. WANG:  He's not an investor, Judge.  In

13   fact, I --

14          THE COURT:  Isn't he an economist or something

15   like that?

16          MR. WANG:  No.  No, Judge.  He's none of those

17   things.  He's worked in that field and he certainly is

18   familiar with pricing options.  Pricing options.  But,

19   stock options, which is a completely different kind of

20   thing than what we're dealing with here, which is --

21          THE COURT:  All right.

22          MR. WANG:  -- is employee options.

23          THE COURT:  Sorry I even mentioned -- the

24   point is, they have the right to put in how this works

25   and how someone --

23

1          MR. WANG:  I agree.

2          THE COURT:  -- an investor would think about

3   this stuff and their expert can talk about this.

4          Now I am a little worried about using the

5   reasonable man standard because that's a little

6   confusing where the standard is -- it's a subjective

7   one.

8          MR. WANG:  And, that's exactly the problem

9   here, Judge.

10          THE COURT:  But, I'm not going to exclude his

11   whole testimony.

12          MR. WANG:  Well, no.  But, Judge --

13          THE COURT:  Yes.

14          MR. WANG:  -- let me take a swing at it and

Page 19

07-09-2007 Pretrial Conf.txt
25          THE COURT:  I just wanted to know what were

                                                                26

1    the reasons.
2           MR. WANG:  He hadn't even thought about it.
3           So, you have a situation here where this is
4    something very personal with Mr. House, whether -- and,
5    they agreed.  This is about whether Mr. House would have
6    exercised it.
7           So, if that's the standard --
8           THE COURT:  That actually leaves you
9    unrebutted.  I mean, there's --
10          MR. WANG:  No, Judge.
11          THE COURT:  -- no way he can do it.
12          MR. WANG:  No.  They can cross-examine him,
13   what was it..
14          THE COURT:  Anyway I'm going to let Sherwin
15   testify.
16          But, let me turn to you.
17          I did get concerned about -- first of all, the
18   way he worded the damage model cannot go.  He can't --
19   you can't say:  Therefore, the damages is zero.
20          The only answer can be if he had exercised at,
21   you know --
22          MR. RISEBERG:  Correct.  And, I understand --
23          THE COURT:  -- and he was told right away,
24   that's the best he can do on that.
25          MR. RISEBERG:  And, that's really all that we

                                                                27

1    want, your Honor.  They don't have to hear a legal
2    conclusion from him about what the damages were.
3           THE COURT:  They're not going to do it.
                          Page 22

07-09-2007 Pretrial Conf.txt

4           But, on the reasonable man standard, I'm

5    torn.  Because, I do think you have the right to put in

6    what is the strike price, that it's basically the value

7    of the stock at that minute, you know, and that kind of

8    thing.

9           On the other hand, that's not the standard.

10          MR. RISEBERG:  And, we're not suggesting for a

11   moment that it is the standard.

12          THE COURT:  So, there's got to be another way

13   you can phrase this so that it's not -- it's not -- You

14   know, they hear a hundred times "reasonable man

15   standard," -- "reasonable investor standard" --

16          MR. RISEBERG:  Right.

17          THE COURT:  -- so we will be gender equal

18   here.  But, whatever the standard is, you know, it

19   starts getting embedded in their mind --

20          MR. RISEBERG:  Right.

21          THE COURT:  -- and I'm worried about that.

22          And, I think there was one case that suggested

23   that I should be careful about that.

24          MR. RISEBERG:  Because, I think it would be

25   cumulative --

                                                        28

1           THE COURT:  Right.

2           MR. RISEBERG:  -- in that particular case.

3    But, I think they still do.  I don't think it is that

4    uncommon for experts to talk about what a reasonable

5    person in some respects --

6           THE COURT:  Well, that's --

7           MR. RISEBERG:  It's evidence of what this

8    person subjectively would or would not have done.

                            Page 23

07-09-2007 Pretrial Conf.txt

9          THE COURT:  I wouldn't mind a few cases on

10    that.

11          MR. RISEBERG:  Okay.

12          We did attach some.  Some criminal cases are

13    cited in our brief about --

14          THE COURT:  Drug traffickers?

15          MR. RISEBERG:  Yeah, drug traffickers and, you

16    know, if you see people with this amount of cocaine and

17    they've got the beeper, generally, those are indicia

18    that they are distributing.

19          THE COURT:  You know what?  I get that

20    testimony every day of the week.  So, I could

21    practically be an expert on the stand.

22          MR. RISEBERG:  I'm sure you could be.

23          THE COURT:  But, that's a different issue.

24    Okay?  I do see that kind of testimony:  What is the

25    fiduciary, what is the reasonable investor standard,

29

1    what would the reasonable investor do?  But, I'm a

2    little worried about the cumulative impact.

3          I'm not saying it's not relevant.  I'm going

4    to let you put in a lot of it.  The cumulative impact of

5    always saying:  What would a reasonable investor do?

6    Because, that's not what the standard is here.

7          MR. RISEBERG:  I understand that.  We do not

8    want to confuse jurors about that or suggest that is --

9    that is the standard.

10          It's really a semantics problem, because we

11    can't have Mr. -- our expert say what Mr. House would or

12    would not have done.  He says it.  And, we need to find

13    a way to refute it.

Page 24

07-09-2007 Pretrial Conf.txt

14          THE COURT:  Well, think about that, give me
15    some cases on it, on how ... I assumed, because you only
16    gave me drug trafficking cases, that you didn't find any
17    directly on point.
18          It is relevant as to what the value was and
19    what the strike price means, and what does it mean --
20    based on the company as it existed, you know, the fact
21    that nobody actually did exercise their stock options
22    and that sort of thing.
23          And, maybe there would be one question on --
24          MR. RISEBERG:  The illiquidity was a big one.
25          THE COURT:  The illiquidity issue.

30

1          MR. RISEBERG:  Right.
2          THE COURT:  But, that's -- I have to think it
3    through and I'm not sure exactly how I will do it as to
4    how you would caste -- formulate that, that opinion.
5    And, if you have some cases on it, it would be useful.
6    The drug trafficking is different.
7          MR. RISEBERG:  Right.
8          THE COURT:  That's not what the reasonable
9    drug trafficker would do.  It's more along the lines of
10    these kinds of things that you typically see used by
11    drug traffickers and, you know, what does an "eight
12    ball" mean in the trade.  That's different.
13          MR. WANG:  Your Honor, part of what bothers
14    me, though, about this is that -- what your Honor is
15    saying that you should be allowed to do in terms of --
16    or give his own glossary of terms and liquidity and
17    things like that.  That, I guess is okay.  I don't know
18    that we actually need an expert for that.
                        Page 25

07-09-2007 Pretrial Conf.txt

19      What I'm concerned about is that under the
20  guise of giving up -- my friends want to talk about what
21  that reasonable person standard is.  And, that's really
22  not right.  Because, among other things, Mr. Sherwin is
23  not a behavior expert.  He's a financial expert.  And,
24  he's going to be asked to testify about what Mr. House
25  would have done in certain circumstances.  He doesn't

31

1   have the training for that.
2       THE COURT:  Yes.  And, I don't so much
3   disagree with that.  That's where I'm worried about --
4       MR. RISEBERG:  But, doesn't that go to the
5   weight, really, not the admissibility.  I mean, aren't
6   these fair points that they could bring out in cross-
7   examining Mr. Sherwin?
8       THE COURT:  To some extent.  And, this is why
9   I'm not going to micro manage it.  I need to think a
10  little bit more deeply and I'll tell you, as I think
11  about it, if you could find a few cases on point.
12      I think what the reasonable investor would do
13  is relevant to what someone might suggest that they do.
14      On the other hand, I'm worried about so
15  embedding the notion of the reasonable investor standard
16  that, no matter what I tell the jury, that's the way
17  they're going to be thinking.
18      So, I just, under 403, don't want it to be
19  confusing.
20      MR. RISEBERG:  Okay.
21      THE COURT:  Similarly, while I think it is
22  relevant to talk in terms of what a strike price is and
23  how is it valued and to point out the fact that that's
                        Page 26

07-09-2007 Pretrial Conf.txt

24    no one bought during that period, that's basically your
25    side of the story.

32

1                MR. RISEBERG:  Right.
2                THE COURT:  Why would anyone do it?  I imagine
3    your people will put in the fact that it isn't so rosey.
4                I do get worried on the illiquidity thing,
5    commenting that no reasonable divorced man -- and that's
6    something a jury can do -- you know, given the amount of
7    money he had, you could say:  what portion of this would
8    it be?  Rather than saying no reasonable person in his
9    situation would do it.  I don't think he has the
10   expertise to do this.
11               MR. WANG:  Judge --
12               THE COURT:  Yes?
13               MR. WANG.  But, your Honor just mentioned
14   something actually that brings up a complete separate
15   point.
16               Your Honor says one of the points of their
17   case is that:  Well, no one else exercised ... I want to
18   tell your Honor that was all news to us.  Because,
19   during the discovery phase of this case we asked for
20   other option grants and when they were signed and what
21   happened with them.  Stonewalled.  We got none of that.
22   We got none of that.
23               And, then, your Honor's ruling came.  And,
24   then, we had the First Circuit --
25               THE COURT:  Did anyone ask the question:  Did

33

1    anyone else exercise?
                          Page 27

07-09-2007 Pretrial Conf.txt

2          MR. WANG:  Judge, we asked both of those

3    things.  We asked -- we want to know how many options

4    various people had.  I mean, some of this stuff is

5    publicly reported.  But, we want to know the timing of

6    when people --

7          THE COURT:  I'm not going to prevent them from

8    saying that no one exercised during the three months,

9    unless you show me that you asked that precise question

10   and they denied it and they give you --

11         MR. WANG:  During that three months?

12         THE COURT:  Yeah, during that three months.

13         MR. WANG:  Well, I don't believe we asked that

14   specific question.

15         But, Judge, if some -- if other people opt, if

16   other people exercised before it went public, for

17   example, that would be totally relevant.

18         And, they do make a point that says no one

19   exercised until -- and they pick a time that was still

20   before it went public.

21         And, we don't have --

22         THE COURT:  I have nothing in front of me now.

23   They made that good point in their --

24         MR. WANG:  Exactly.  And, it was the first

25   time we saw it.

                                                          34

1          THE COURT:  It seems like a good point for

2    them.

3          I mean, you have a good point and your guys --

4    I mean, I wouldn't run away from this sophistication.

5    My guy's more sophisticated.  He saw the Berkleys of the

6    world were jumping into it and he saw a good investment

Page 28

07-09-2007 Pretrial Conf.txt
7    opportunity because this is what he does.  I mean, I
8    don't know why you're running away from it.
9              But, in any event -- in any event -- I mean,
10   isn't that his basic argument?  I saw this company.  I
11   know this company.  I know this field.
12              MR. WANG:  That's correct.
13              THE COURT:  This placing is moving up.
14              MR. WANG:  That's correct.
15              THE COURT:  I mean, that seems like a -- I
16   mean, that's what --
17              MR. WANG:  That's exactly the point.
18              THE COURT:  When we're focusing on the three
19   months, it's a pretty very, very narrow window.  So --
20              MR. WANG:  Well, it's only a narrow window --
21   it's only a narrow window because what he would have
22   been faced with is forfeitting it entirely.
23              THE COURT:  That's right, that's where we are.
24   So, that's the three months.  It's quite relevant what
25   was going on then.

35

1              But, for example, I wouldn't want this expert
2    to say the reasonable divorcee standard.  You know, no
3    reasonable divorced man in this situaiton would risk his
4    liquidity by doing this.  What you could say is here's
5    what his assets were, and here's how much the cost would
6    be to him.  And that's reasonable information for the
7    jury to understand. But would someone who only had
8    200,000 in the bank, going through a divorce, make that
9    argument with an $82,000 --
10             MR. WANG:  But, you're going to need an expert
11   for that.
                          Page 29

07-09-2007 Pretrial Conf.txt
12          THE COURT: No, they can argue it.

13          I'm just saying --

14          MR. WANG: Yes, and that they're going to.

15    They did that with Mr. House's cross. I'm sure they're

16    going to do that to a fare-thee-well. But, it doesn't

17    -- you don't need an expert to --

18          THE COURT: It's just like you want to be in

19    counter. They want to be in counter. Because, it's how

20    they raised the issue. And, I'm going to let them do

21    it. I'm just not going to let them put in what a

22    reasonable divorced man would do in the same or similar

23    circumstances.

24          Now, on a reasonable investor, given the whole

25    thing, I'm going to think about that and you need to

36

1     give me cases that would be helpful, if you can, outside

2     of the drug trafficking role, because we all agree what

3     the reckless of standard is. We all agree. Right?

4          MR. WANG: Right.

5          MR. RISEBERG: Well, the justifiable alliance

6     is also an element that imposes on a certain objective

7     standard on the plaintiff's burden on liability. He has

8     to prove that his reliance was --

9          THE COURT: But, this is an odd case because

10    it's more of a reliance on an omission.

11          MR. RISEBERG: Well, that's part of our

12    defense, is that his reliance was not -- was not

13    reasonable where he didn't even ask for a copy of his

14    option grant. He didn't ask for a copy of the plan.

15          THE COURT: Yeah. But, you'll have time for

16    that.

Page 30

07-09-2007 Pretrial Conf.txt
17          So, is that it?
18          MR. WANG:  The only other point I want to make
19  --
20          THE COURT:  Plaintiff versus defendant.
21          MR. RISEBERG:  Yes.
22          THE COURT:  It does make sense that Mr. House
23  be treated as the plaintiff here, I think.
24          MR. RISEBERG:  We have no objection, your
25  Honor.

                                                        37

1           THE COURT:  On the key issue of this lawsuit
2   up to date, which was the promissory estoppel slash
3   contract issue, it makes sense for First Marblehead to
4   be the plaintiff.
5           But, I think it makes sense for you to be the
6   plaintiff.  I agree with that, so, you get to sit at
7   plaintiff's table.
8           Do you all have a lot of documents?
9           MR. RISEBERG:  Lots of documents?  I don't
10  think so.
11          MR. WANG:  There are some.  It's not ...
12          THE COURT:  Well --
13          MR. WANG:  We have them on a laptop.
14          THE COURT:  Okay.
15          So, you all are going to use the document
16  equipment?
17          MR. WANG:  I believe we're going to try it.
18          THE COURT:  Good.
19          Point 2 would be if you want, on the key
20  documents, I find that, despite all the fancy-schmancy
21  high tech stuff, jurors still like to mark up the key
                        Page 31

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


FIRST MARBLEHEAD CORPORATION,)
                             )
              Plaintiff      )
                             )
         -VS-                ) CA No. 04-11263-PBS
                             ) Pages 5-1 - 5-102
GREGORY J. HOUSE,            )
                             )
              Defendant      )


JURY TRIAL - DAY FIVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

     KENNETH J. DeMOURA, ESQ., MICHAEL D. RISEBERG, ESQ., and
COLLEEN NEVIN, ESQ., Adler, Pollock & Sheehan, P.C.,
175 Federal Street, Boston, Massachusetts, 02110, for First
Marblehead Corporation.

     PETER N. WANG, ESQ. and YONATON ARONOFF, ESQ.,
Foley & Lardner, LLP, 90 Park Avenue, New York, New York,
10016, for Gregory J. House.


                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    July 20, 2007, 9:05 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 2

1                          I N D E X

2  WITNESS                    DIRECT    CROSS    REDIRECT    RECROSS

3  Ralph James                5-7      5-40      5-54
   Robert A. Sherwin          5-57     5-74      5-92
4
   EXHIBITS              RECEIVED IN EVIDENCE
5
   Defendant
6
   113                        5-96
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    even before I got out of law school.  I've never practiced

2    law on a full-time basis.

3    Q.   And you have your CPA?

4    A.   That's correct.

5    Q.   And how long have you been with Analysis Group?

6    A.   Eighteen years next month.

7    Q.   And what is your area of concentration professionally?

8    A.   I concentrate in two areas of economics:  financial

9    economics and in industrial organization.

10   Q.   Could you elaborate on that just a little bit.

11   A.   Well, industrial organization is about how companies are

12   organized, how they produce their products, and in particular

13   how they compete in the marketplace with other companies.

14   Financial economics is about how claims on assets, business

15   assets, in more common terms how stocks and how bonds are

16   priced in the marketplace and the importance of those.

17             MR. RISEBERG:  Your Honor, I'd like to offer

18   Mr. Sherwin as an expert in financial economics to testify.

19             MR. WANG:  Your Honor please, I don't know what the

20   issue --

21             THE COURT:  He can offer an opinion, and I'll deal

22   with it opinion by opinion.

23   Q.   What have you been asked to do in this case,

24   Mr. Sherwin?

25   A.   I've been asked to determine whether it would make

1   financial sense for Mr. House to exercise his options in June

2   of 1998.

3            MR. WANG:  Then I object.

4            THE COURT:  Overruled.

5            MR. WANG:  Your Honor --

6            THE COURT:  Overruled.

7            MR. WANG:  May I ask voir dire about his expertise

8   to give that opinion?

9            THE COURT:  Overruled, overruled.

10  Q.   And what did you do to formulate your opinions?

11  A.   I read the pleadings in the case, the complaint.  I

12  looked at a number of financial documents, the grant of the

13  options to Mr. House, the stock option plan.  I looked at the

14  financial performance of First Marblehead, its financial

15  statements; and I looked at a number of depositions,

16  including two volumes of depositions of Mr. House.

17  Q.   Is that stack of documents on our table next to our --

18  on the defense table, does that look familiar to you?

19  A.   That looks about the size of the documents that I

20  reviewed in this case, or the people working with me

21  reviewed.

22  Q.   Yes, could you please explain to us how your colleagues

23  at Analysis Group assisted you in the work you did in this

24  case.

25  A.   Well, in some cases, they would get the documents first,

1    and they'd look through it to find out whether there was

2    anything that was important for my task in those documents.

3    And then, as they found things, they would pass that along to

4    me.

5    Q.   And is Ted Laguerre sitting over here one of the

6    colleagues at Analysis Group that assisted you in reviewing

7    this material?

8    A.   Yes.   Ted is a vice president of Analysis Group, and he

9    helped me on this case.

10   Q.   And how is Analysis Group being compensated for your

11   work in this case?

12   A.   Analysis Group charges for my time and the time of my

13   colleagues on an hourly rate, and that's how we get

14   compensated.

15   Q.   And what is your hourly rate?

16   A.   $495 per hour.

17   Q.   And the rate for your colleagues?

18   A.   It ranges from about $170 per hour up to, I think on

19   this case there was someone very close to my rate at $490 per

20   hour.

21   Q.   Okay.   And you and I have met before today, correct?

22   A.   Yes, we have.

23   Q.   Okay.   And we met again yesterday?

24   A.   Yes.

25   Q.   And did you reach an opinion in this case to a

1    reasonable degree of professional certainty regarding whether

2    it would have made financial sense, in your view, for

3    Mr. House to make this investment in First Marblehead in

4    1998?

5    A.    Yes, I did.

6    Q.    Okay.  And what is that opinion?

7    A.    That it would not have made financial sense for

8    Mr. House to have exercised his options in the early part of

9    1998.

10   Q.    Okay.  And, very generally, what is the basis of that

11   opinion?

12   A.    The primary basis is that the stock would have been

13   worth no more than the amount he would have had to have paid,

14   potentially less than that.  And then the secondary basis

15   would be that the stock would not be particularly suitable

16   for someone in Mr. House's position in terms of the risk and

17   the liquidity and the diversification areas of financial

18   performance.

19   Q.    Well, I'd like to go through that opinion with you and

20   the basis for it.  Can we start by discussing very generally

21   what Mr. House had, what exactly this stock option grant

22   was.  And the ladies and gentlemen of the jury have heard

23   something about this before, so we'll try to move through it

24   as quickly as we can.

25   A.    Well, a stock option is just the right to buy stock for

Page 68

1    exercise his options, in the spring of 1998, correct?

2    A.    It's a few days later, so it brackets the time.    He

3    would have had to decide a little bit before that, is my

4    understanding.

5    Q.    Okay.  Well, wouldn't that have left Mr. House then with

6    the option to spend $80,000 to get stock that was worth

7    $80,000?

8                   MR. WANG:   Objection.

9                   THE COURT:  Overruled.

10   A.    Yes, at best $80,000.  As I said, the most the value

11   could be is the amount of the exercise price.  It can be

12   less.

13   Q.    Okay.  Well, why wouldn't it make financial sense, in

14   your opinion, for him to have made that exercise?

15   A.    Well, I concluded it wouldn't make sense for him to

16   exercise the option, and the primary reason is that he would

17   be spending $80,000 for stock that was not worth $80,000, or

18   worth at best $80,000.

19   Q.    Well, why was it perhaps not worth $80,000 if the strike

20   price was $32 a share?

21   A.    Because the rules only require, the tax rules only

22   require that the strike price be equal to or greater than the

23   fair market value.  Therefore, the fair market value could be

24   less than.  That can happen.

25   Q.    Okay, but Mr. House's plan said that the strike price

1    would equal the fair market value in this case, okay?  So

2    will you make that assumption for me?

3    A.    Yes.

4    Q.    Okay, so if we assume then that the strike price equals

5    the fair market value of the company's stock, then the stock

6    arguably would have a value of about $80,000, correct?

7    A.    Assuming actually in 1998 that option, not Mr. House's

8    but that option, said it was also fair market value -- and I

9    think it did, by the way -- then $80,000 would be the fair

10   market value.

11   Q.    Well, even assuming he was spending $80,000 to get stock

12   that was worth $80,000, do you think it would have made

13   financial sense for him to do that?

14   A.    No.  There are other reasons other than -- it seems like

15   it doesn't really matter, but there are other reasons why he

16   would be in a position -- not in as good a position to own

17   $80,000 worth of First Marblehead.

18   Q.    Okay, could you please explain those reasons to us.

19   A.    Yes.  Those reasons have to do with financial resources

20   and the problem of private stock being illiquid and lack of

21   diversification, and, finally, the riskiness of the

22   particular stock.

23   Q.    Thank you.  What do you mean by the stock being

24   illiquid?

25   A.    It's difficult to sell.  He's allowed to sell it, but

1  the risk because of the delay.  In a public market, you know

2  what your stock is worth every day.  In a private situation,

3  the fluctuations in the price aren't obvious; and until you

4  make the sale, the owner of the stock may not know how much

5  it's really worth.  So that increases the risk as well as

6  putting in the delay in getting cash when needed.

7  Q.   I think you also mentioned the issue of diversification,

8  correct?

9  A.   Yes.

10  Q.   All right, why don't you talk to us just generally about

11  the issue of diversification.

12  A.   I think diversification is the most important concept in

13  investing, and that is that you don't put all your eggs in

14  one basket.  If you're trying to invest, you want to put a

15  little bit in one stock, a little bit in another --

16            MR. WANG:  Your Honor, I object.

17            THE COURT:  Overruled.

18            MR. WANG:  He's not a financial planner, Judge.

19            THE COURT:  Overruled, overruled.

20  A.   Diversification means, because stocks are risky, if

21  you're going to own stocks, it's best to own quite a few

22  stocks.  What you can do if you don't have enough money to

23  buy quite a few stocks is instead buy mutual funds.  Mutual

24  funds are very popular because they take a lot of people's

25  money and then turn around and invest into a number of

1   different stocks, achieving the diversification for the

2   investors and reducing the risk of owning just a handful of

3   stocks.

4   Q.   So that in Mr. House's case, making an $80,000

5   investment in this one security would have been somewhat

6   contrary to the notion of diversification?

7   A.   It would be very contrary for Mr. House to put all his

8   eggs in one stock, let alone one stock that was a private

9   company and was particularly risky.

10  Q.   Well, given the ultimate success of First Marblehead,

11  Mr. Sherwin, how can you say that investing in the company

12  would not have made financial sense for Mr. House in 1998?

13  It certainly would have worked out quite well, right?

14  A.   It would have worked quite well by the time the company

15  had gone public or thereafter, but that is over five years

16  later.

17  Q.   And it's not appropriate to consider hindsight, how the

18  stock ultimately went on to perform, to evaluate whether it

19  would have made sense for him to invest five years earlier?

20  Fair enough?

21  A.   That's right.  What I was asked to do is to answer the

22  question, did it make financial sense at the time?  And you

23  can't know about the future.  You can't know about, for

24  instance, the TERI acquisition in 2001.  You couldn't know

25  about that in 1998 in deciding whether to exercise the

1   you're a CPA?

2   A.    I am.

3   Q.    You're a lawyer, but you never practiced as a lawyer?

4   A.    No, I have actually done a little bit of practicing as a

5   lawyer, but I've never been full time.  For a number of

6   years, I was special counsel to a Chicago law firm in their

7   health care practice area.

8   Q.    But the one thing you're not, you're not a certified

9   financial planner, are you, sir?

10  A.    I am not.

11  Q.    You don't give investment advice to people other than

12  maybe yourself?

13  A.    No, I do give investment advice to accredited investors

14  from time to time, and they pay me for that.

15  Q.    They pay you for that?

16  A.    Yes.

17  Q.    Is that part of your work for Analysis Group?

18  A.    And the private company I worked for, yes.

19  Q.    So are you expanding your expertise to be able to give

20  investment advice to people, sir?  Is that a part of your

21  expertise to give investment advice?

22  A.    Yes.  One of the things that I do as a financial

23  economist is do valuations, and so people will ask me what a

24  certain project is worth, what the value of it is, what the

25  profits will be, and they then make the investment decisions

EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIRST MARBLEHEAD CORP., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 04-11263-PBS |
| GREGORY HOUSE, | ) |
| Defendant. | ) |

*Received*
*4:50 am*
*7/23/07*

## SPECIAL VERDICT FORM

1.    Did Gregory House know, or should he have reasonably known, prior to May 19, 2001, that he had been harmed by First Marblehead's conduct?

_____ Yes          ✓ No

**[Proceed to Q.2.]**

2.  Has Gregory House proven by a preponderance of the evidence that First Marblehead Corporation made a negligent misrepresentation upon which he reasonably relied?

✓ Yes          _____ No

**[If you answered YES to Q.2, go to Q.3.  If you answered NO, please skip to the end and sign the verdict form.]**

3.    Did Gregory House prove that, if he had known about the three-month expiration period, he would have exercised his options within three months of his resignation?

_____ Yes          ✓ No

**[If you answered YES to Q.3, go to Q.4.  If you answered NO, please skip to the end and sign the verdict form.]**

4.  Did First Marblehead prove that Gregory House was negligent?

_____ Yes          _____ No

**[If you answered YES to Q.4, go to Q.5.  If you answered NO, please skip to Q.6.]**

5.  What percentage of negligence is attributed to defendant First Marblehead and what percentage of negligence is attributed to plaintiff Gregory House?

Defendant First Marblehead:    _____ %

Plaintiff Gregory House:    _____ %

**Total:    100 %**

NOTE:  The combined negligence of both parties must total 100%.

**[Proceed to Q.6.]**

6.  Please state, in words and numbers, the amount of money that House proved would fairly and adequately compensate him for the damages proximately caused by his reliance on First Marblehead's misrepresentation(s).  This is the total amount of damages, without subtracting for any percentage of House's negligence, if any.  The Court will calculate any reduction.

**[Do not complete this section if Mr. House's negligence is more than 50%]**

\$ _____

(Numbers)

_____

(Words)

I certify that each of the questions answered above was answered unanimously.

_____
JURY FOREPERSON

\_\_\_July 23, 2007\_\_\_\_
Date