# United States Court of Appeals
## For the First Circuit

---

No. 07-2789

FIRST MARBLEHEAD CORPORATION,

Plaintiff, Appellee,

v.

GREGORY J. HOUSE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Torruella, Lipez, and Howard,
Circuit Judges.

---

Peter N. Wang, with whom Yonaton Aronoff and Foley & Lardner LLP, was on brief for appellant.
Kenneth J. DeMoura, with whom Michael D. Riseberg, Colleen M. Nevin, and Adler Pollock & Sheehan P.C., was on brief for appellee.

---

September 8, 2008

---

TORRUELLA, Circuit Judge. Gregory J. House, a former employee of First Marblehead Corporation, was unable to exercise his incentive stock options because he failed to do so within three months of his resignation. In a set of claims removed to federal district court under diversity jurisdiction, House alleged, inter alia, that he had relied on First Marblehead's negligent misrepresentations that the options would be viable for ten years. A jury found that House had reasonably relied on those negligent representations. However, the jury concluded that House would not have exercised those options during the three months after his resignation and thus awarded no damages. House now appeals, challenging the admission of certain expert testimony and the district court's denial of his motion for a new trial. After careful review, we conclude there was no error and affirm the jury's verdict.

## I. Background

The background facts in this case are generally undisputed. In 1996, House was recruited by his friend and First Marblehead Chief Executive Officer ("CEO"), Daniel Meyers, to work at First Marblehead, a start-up student loan servicing company. House was offered a position as President of First Marblehead Data Services. House accepted the job and as part of his employment, he

was granted incentive stock options to purchase 2,500 shares at a strike price of $32 per share.[1]

First Marblehead's stock option plan ("the Plan") provided that the options would have a duration of ten years. Unbeknownst to House, the Plan also had a provision that in the event of an employee's departure from the company, the options would expire within three months of the date of resignation. House attested, and First Marblehead does not seriously challenge, that he did not receive a copy of either the Plan or the written document memorializing the grant of the options. Furthermore, communications between House and various First Marblehead executives -- CEO Myers, Executive Vice President Ralph James, and outside general counsel, Rod Hoffman -- reiterated that the options would be good for ten years and made no mention of the three-month expiration provision in the event of resignation.[2]

---

[1] Stock options give the holder the ability to purchase a company stock at a set price. It would have cost $80,000 to exercise all 2,500 options.

[2] Indeed, Hoffman testified that at some point, he realized that he had omitted the three-month expiration provision from the Plan. He authored a "Corrections and Amplifications" memo, which clearly stated that in the event of a resignation, the options must be exercised within three months:

> I found that I had misstated one of the terms of the option in the summary memo . . . . Mea culpa. A copy of that revised memo is attached . . . . You will note that the change is to Section II.4 which describes what happens to the options upon termination of employment.

Although Hoffman testified that he delivered this revised memo to

In February 1998, House resigned from First Marblehead; no one at the company mentioned the three-month period within which he would have to exercise his options. In 2001, First Marblehead acquired the assets of a nonprofit student loan company, TERI. The acquisition allowed First Marblehead to increase its loan volume significantly. Due in part to the success of the TERI acquisition, First Marblehead became a publicly traded company in 2003, which resulted in a dramatic increase in the value of the company's stock. Several months later, after hearing about the company's successful initial public offering, House contacted Meyers and inquired about exercising his options. House was then informed that the options had expired in May 1998, three months after his resignation.

House and First Marblehead initially attempted negotiation; First Marblehead averred that the options had expired and House asserted that his options were worth $7 million. At some point, First Marblehead sought a declaratory judgment in Massachusetts Superior Court that the options had expired three months after his resignation. On the basis of diversity jurisdiction, House removed the action to federal court and asserted two counterclaims: breach of contract and promissory estoppel. House then added a third claim for negligent

---

the company, the parties generally agree that House never received it.

misrepresentation. On First Marblehead's motion for summary judgment, the district court dismissed the case entirely. On appeal, we upheld summary judgment on the breach of contract and promissory estoppel claims, but vacated and remanded for further proceedings on the negligent misrepresentation claim. First Marblehead Corp. v. House, 473 F.3d 1 (1st Cir. 2006).

As the case proceeded to trial, First Marblehead made it known that it intended to call Robert Sherwin as an expert witness and submitted his expert report. House objected to Sherwin's report and anticipated testimony, arguing that it was irrelevant and that Sherwin was not a qualified expert. The district court declined to rule and reserved the issue for trial.

At trial, House testified that had he known of the three-month expiration, he would have exercised his options during that period: "There's zero chance . . . in the God's green earth that I was going to let [the options] lapse into worthlessness. That would not have happened." He claimed, without equivocation, that he would have paid the $80,000 necessary at the time to exercise all 2,500 of his options. He maintained that the company's success was "nearly guaranteed." According to House's calculations, had he exercised his options within the three-month period, the 2,500 shares would have eventually amounted to 150,000 shares of common stock (as a result of subsequent stock splits) and, had he

-5-

continued to keep his shares through the company's public offering, the value of his stock would have been worth $8.4 million.

First Marblehead argued, contrary to House's testimony, that the company's success was not such a foregone conclusion. As of House's resignation in 1998, the company had lost money during each of the first seven years since its inception; the market value of the stock had dropped from $32 per share in 1997 to $20 per share in 1998. Meyers and James both testified that the company struggled to obtain necessary financing and it was in a precarious financial situation until the successful acquisition of TERI in 2001 and the company's initial public offering of stock. First Marblehead submitted a 2005 e-mail from House to his brother in which he wrote that in 1998, shortly before leaving the company, he had attempted to sell his options back to the company at a substantial discount; House stated that "the options were not worth a great deal." In the e-mail, House went on to say: "Seven years later, in October of 2003, the company, lo and behold and to my great surprise, went public."

At issue in this appeal is the testimony of First Marblehead's expert witness, Robert Sherwin, who testified over House's objection. Sherwin is a certified public accountant, with a bachelor's degree in economics and a law degree from the University of Chicago. At the time of trial, he was employed by Analysis Group, a consulting company that specializes in economics,

-6-

finance, and strategy consulting. He concentrates in two areas of economics: financial economics and industrial organization.

Sherwin testified that during the three-month period in which House would have had to exercise his stock options (had he known of their expiration), the "stock was not worth $80,000, or worth at best $80,000." He further testified that in his opinion, it would not have made financial sense for House to exercise the options at that time for several reasons. First, House would not have obtained an immediate financial gain because the stock was not worth more than the $80,000 House would have had to pay to obtain them. Second, First Marblehead was, at the time, a private company and it would have been more difficult to sell those private shares than shares in a publicly traded company. Third, such a significant investment in one stock would be risky and contrary to the principle of diversification. Fourth, Sherwin testified that House's own financial position at the time made such an investment even riskier: "House at the time was going through a divorce, had limited assets in the bank, he had no stock that he owned . . . [$80,000 worth of stock] would probably be more than a hundred percent of [his investable assets]."

On July 23, 2007, the jury returned a verdict in which it found that House had reasonably relied on the negligent misrepresentations of First Marblehead regarding the expiration of his incentive stock options. However, the jury concluded that even

-7-

if House had been aware of the three-month expiration period, he would not have exercised the options; the jury thus awarded House no damages. The district court denied House's motion for a new trial. House now appeals.

## II. Discussion

We review the district court's decision regarding the admissibility of expert testimony for abuse of discretion. See Wilder v. Eberhart, 977 F.2d 673, 676 (1st Cir. 1992) (citing Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, 851 F.2d 540, 544 (1st Cir. 1988)); see also Rodríguez v. Smithkline Beecham, 224 F.3d 1, 8 (1st Cir. 2000). Our deference to the district court's judgment is consistent with the discretion given to the district court by the Federal Rules of Evidence, which "afford district courts substantial latitude in the admission or exclusion of opinion evidence." Crowe v. Marchand, 506 F.3d 13, 16 (1st Cir. 2007); see also Espeaignnette v. Gene Tierney Co. Inc., 43 F.3d 1, 11 (1st Cir. 1994) ("A trial judge's rulings in this sphere should be upheld unless manifestly erroneous." (quoting United States v. Sepúlveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (internal quotation marks omitted))). Moreover, even if an evidentiary ruling is deemed erroneous, we will not disturb the jury's verdict if "it is highly probable that the error did not affect the outcome of the case." McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006).

Federal Rule of Evidence 702 requires that before giving testimony as an expert, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and provide such knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Furthermore, the expert's testimony must be "based upon sufficient facts or data" that result from the application of "reliable principles and methods." Fed. R. Evid. 702. The purpose of these requirements is to "ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." Crowe, 506 F.3d at 17 (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).

House challenges Sherwin's qualifications to testify as an expert and also argues that the substance of his testimony was improper. With respect to Sherwin's qualifications, House contends that Sherwin's experience is limited to industrial organization and securities pricing, and he therefore lacks the expertise to testify about how individuals choose investments and arrange portfolios. House argues that such testimony would have been appropriate from a certified financial planner, which Sherwin is not.

First Marblehead rejects House's myopic view of Sherwin's credentials. Sherwin has nearly two decades of experience as a consultant in economics, finance, and strategy consulting. With respect to his testimony regarding investment diversification,

-9-

Sherwin works on the 401(k) committee at his consulting firm and advises employees in their various investments. Additionally, he testified that his experience includes providing investment advice to accredited investors. While a certified financial planner who focuses entirely on individual investment decisionmaking would also have been qualified to provide this testimony, we are unconvinced that Sherwin's own credentials are such that he is unqualified to testify as an expert in this case.[3] See United States v. Vargas, 471 F.3d 255, 262 (1st Cir. 2006) ("It is not required that experts be 'blue-ribbon practitioners' with optimal qualifications" (citing United States v. Mahone, 453 F.3d 68, 71 (1st Cir. 2006))). We thus conclude that the district court's decision to find Sherwin qualified to testify as an expert falls well within the district court's "broad discretionary powers in determining the qualification . . . of expert witnesses." Diefenbach v. Sheridan Transp., 229 F.3d 27, 30 (1st Cir. 2000) (quoting Richmond Steel Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 20 (1st Cir. 1992)).

---

[3] House also argues that the district court should have provided him with the opportunity to conduct a voir dire of Sherwin outside the hearing of the jury. We are unmoved by this argument; our Rule 702 inquiry does not demand that the district court follow any particular procedure. See United States v. Díaz, 300 F.3d 66, 73-74 (1st Cir. 2002) (citing Daubert, 509 U.S. at 594; Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)). Moreover, in this case, despite ample opportunity to do so, House made no request for a voir dire until Sherwin began his testimony.

Second, with respect to whether the testimony was helpful to the jury, House makes two somewhat inconsistent arguments for why the district court erred: (1) Sherwin's testimony was irrelevant because the jury is tasked with determining what House -- and not a reasonable investor -- would have done with the options had he known about the three-month expiration period; and (2) by testifying as to what a reasonable investor would have done, Sherwin's testimony improperly invaded the province of the jury.

With respect to the issue of relevance, "expert testimony must be relevant . . . in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (citing Daubert, 509 U.S. at 591-92).  In this case, Sherwin's testimony was proffered by First Marblehead to explain to the jury how stock options function and how an investor would think about exercising those options.  Those are not topics ordinarily within the knowledge of the jury and thus are appropriate for expert testimony.  See United States v. Shay, 57 F.3d 126, 132-33 (1st Cir. 1995) ("The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is 'whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized

-11-

understanding of the subject matter involved.'" (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994)).

Sherwin testified that based on House's financial circumstances in early 1998 and the uncertainty surrounding First Marblehead's financial future, it would not have made financial sense for someone in House's position to exercise the options. Sherwin testified that:

> the stock would have been worth no more than the amount [House] would have had to have paid, potentially less than that . . . . [and] the stock would not be particularly suitable for someone in Mr. House's position in terms of the risk and the liquidity and the diversification areas of financial performance.

Sherwin explained that an incentive stock option plan provides an employee with the opportunity to purchase stock at a set strike price and, potentially, realize an immediate financial gain if the value of the stock is higher than the purchase price. In 1998 when House would have had to decide whether or not to exercise the options, he would have had to pay $80,000 for stock that was worth -- at most, $80,000; House would not have enjoyed any immediate financial gains. Sherwin further explained that based on House's financial position -- House's salary at the time was $70,000, he had only $50,000 in personal assets, and he would have had to borrow around $30,000 in order to purchase the options -- such a large investment in one privately held company was risky. The district court's conclusion that Sherwin's testimony was relevant

-12-

and provided helpful context for the jury was well within the court's broad discretion.

Testimony that provides a necessary context and framework, especially in cases involving complex or unfamiliar concepts, can be appropriate for expert testimony without improperly interfering with the jury's assessment of credibility. Cf. United States v. Brien, 59 F.3d 274, 276-77 (1st Cir. 1995) (observing that in the context of identification, expert testimony could "give the jury background information about the mechanism of memory, types of errors, error rates, and other information not commonly possessed by the jury"). Our review of the record makes clear that Sherwin's testimony was careful to provide the jury with the information to evaluate House's assertions as to what he would have done in 1998, and stopped short of giving Sherwin's own opinion as to what he believed House would have done. At no point did Sherwin opine on the credibility of House's testimony; his comments were limited to expressing an opinion on the financial risk involved in the decision. The determination of whether House was credible or not was appropriately left to the jury.

We therefore conclude that the district court's decision to admit Sherwin's expert testimony was not an abuse of discretion. House also appeals the denial of his Rule 59 motion on the sole basis that the admission of Sherwin's testimony was substantial error and highly prejudicial. Given our determination that the

-13-

district court did not err in deeming Sherwin qualified and his testimony relevant, the district court did not abuse its discretion in denying House's motion for a new trial. See Crowe, 506 F.3d at 19.

### III. Conclusion

For the foregoing reasons, we affirm the district court's decision to allow the expert testimony and affirm the district court's denial of the motion for a new trial.

**Affirmed.**